1  Ira Spiro, State Bar No. 67641
    ira@spiromoore.com
2  H. Scott Leviant, State Bar No. 200834
    scott@spiromoore.com
3  **SPIRO MOORE LLP**
    11377 W. Olympic Blvd., 5th Floor
4  Los Angeles, California 90064-1683
    Telephone: (310) 235-2468
5  Facsimile: (310) 235-2456

6  Attorneys for Plaintiffs

*FILED*
*CLERK, U.S. DISTRICT COURT*

*DEC - 7 2012*

*CENTRAL DISTRICT OF CALIFORNIA*
*BY                    DEPUTY*

9  UNITED STATES DISTRICT COURT

10  CENTRAL DISTRICT OF CALIFORNIA

12  MARIO SALAS, individually, and on
    behalf of all others similarly situated;
13  MELVIN CHAMBERLAIN,
    individually, and on behalf of all
14  others similarly situated;
    ALBIN WATSON, individually, and
15  on behalf of all others similarly
    situated;
16  JOHN PAXIN, individually, and on
    behalf of all others similarly situated;

17          Plaintiffs,

18      vs.

19  INTERNATIONAL UNION OF
20  OPERATING ENGINEERS, a trade
    union;
21  WILLIAM C. WAGGONER, an
    individual;
22  VINCE GIBLIN, an individual;
    JAMES T. CALLAHAN, an
23  individual;
    BRIAN E. HICKEY, an individual;
24  PATRICK L. SINK, an individual;
    JERRY KALMAR, an individual;
25  RUSSELL E. BURNS, an individual;
    RODGER KAMINSKA, an individual;
26  JAMES M. SWEENEY, an individual;

27

28

Case No.:
CV12 10506 ABC (PJWx)

CLASS ACTION

**CLASS ACTION COMPLAINT FOR:**

1. Violations Of Racketeer Influenced And Corrupt Organizations Act [18 U.S.C. § 1962(c)]
2. Violations Of Racketeer Influenced And Corrupt Organizations Act [18 U.S.C. § 1962(d)]
3. Violations Of Racketeer Influenced And Corrupt Organizations Act [18 U.S.C. § 1962(b)]
4. Violations Of Racketeer Influenced And Corrupt Organizations Act [18 U.S.C. § 1962(d)]
5. Violations of Labor Management Disclosure Act [29 U.S.C. § 501]
6. Breaches of Fiduciary Duties [ERISA]
7. Aiding and Abetting

**DEMAND FOR JURY TRIAL**

SPIRO MOORE LLP

ROBERT T. HEENAN, an individual;
DANIEL J. MCGRAW, an individual;
DAREN KONOPASKI, an individual;
MICHAEL GALLAGHER, an
individual;
GREG LALEVEE, an individual;
TERRANCE E. MCGOWAN, an
individual;
LOUIS G. RASETTA, an individual;
JAMES VAN DYKE, an individual;
PATRICIA M. WAGGONER, an
individual;
BERT TOLBERT, an individual;
MICKEY J. ADAMS, an individual;
KURT GLASS, an individual;
RON SIKORSKI, an individual;
DAN BILLY, an individual;
DAN HAWN, an individual;
LARRY DAVIDSON, an individual;
STEVE BILLY, an individual;
FRED YOUNG, an individual;
C. W. POSS, an individual;
JOHN NELSON, an individual;
WALT ELLIOT, an individual;
MITCH WHITE, an individual;
MIKE RODDY, an individual;
MICHAEL CRAWFORD, an
individual;
BRUCE COOKSEY, an individual;
MIKE PRLICH, an individual;
DON BOURGUIGNON, an
individual;
JOHN SAWYER, an individual;
PAUL VON BERG, an individual;
JIM HULSE, an individual;
MIKE GOMEZ, an individual;
OPERATING ENGINEERS FUNDS
INC. a non-profit corporation; and
DOES 1 through 10, inclusive,

Defendants.

SPIRO MOORE LLP

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................... i

I.   INTRODUCTION ...........................................................1

II.  JURISDICTION AND VENUE...............................................1

III. THE PARTIES TO EACH CAUSE OF ACTION.........................2

   A.  Plaintiffs .............................................................. 2

   B.  Defendants............................................................3

IV.  DEFENDANTS' MISCONDUCT ......................................8

   A.  About the IUOE....................................................8

   B.  IUOE Forced Plaintiffs Serving As Officers of Local 12 to Contribute to the President's Club, a Political Action Fund.......................9

   C.  Waggoner Forced Employees of Local 12 to Contribute to His Re-election Fund ...........................................................9

   D.  Assets Were Diverted or Embezzled from Local 12 and IUOE Accounts or Trust Accounts Created for the Benefit of Union Members 11

      1.  Defendants Used Aircraft Purchased by Local 12 for Personal Use, Embezzled Revenues Generated by Those Aircraft, and Falsified Many Years of LM-2 Filings to Conceal Activities and True Costs and Asset Values to Local 12 ........................................ 11

      2.  Defendants Embezzled Revenue from Local 12's Printing Press, Failing to Report That Income on Any IRS Form 990 or LM-2 Forms, and Diverting Resources From Agency Fee Members Without Consent ........................................................ 16

      3.  Defendants Embezzled Other Property Purchased By Local 12 or Its Many Associated Trusts ............................................. 17

**CLASS ACTION COMPLAINT**

4.   Waggoner Engaged in Self-Dealing by Causing Local 12 to Hire Patty Waggoner's Company, Spacemaker Tenant Improvements, to Work on the Local 12's Headquarters and Other Property .............. 19

5.   Waggoner Diverted Valuable Assets in the Form of Room Space in the Washington Court Hotel ............................................. 22

E.   IUOE's and Local 12's Leadership Used Threats of Physical and Economic Violence, and Suborned Perjury, to Suppress Investigations and Usurp Control Over Local 12 ............................................. 22

1.   David Casey Was Beaten at the Direction of Waggoner for Running Against Waggoner for Business Manager ........................ 22

2.   Waggoner Prevents Opposition Voices From Speaking at Any Meetings ........................................................................... 23

3.   Local 12 Uses Its Job Referral Service to Suppress Opposition ...... 23

4.   Business Agents for Local 12 Carry Guns That Have Had Serial Numbers Removed ............................................................ 24

F.   Defendants Diverted Caremark Reimbursements From Local 12's Health & Welfare Fund to IUOE and Purchased PBM Services That Were Well Above Competitive Rates From Other Vendors ................... 24

G.   Local 12 Allows Employers Contracted With Local 12 to Operate Double-Breasted, Thereby Depriving Members of Protections and Benefits Available Under Union Agreements ......................................... 26

H.   Steve Montrie, Convicted of Mere Vehicular Manslaughter, Remains a Business Agent Despite Killing an Individual While Driving a Union Vehicle Under the Influence of Alcohol ................................................. 27

I.   Miscellaneous Breaches of Fiduciary Duties ........................................... 27

V.   CLASS ACTION ALLEGATIONS ............................................................... 28

VI.   CLAIMS FOR RELIEF ................................................................................. 32

FIRST CLAIM FOR RELIEF ................................................................................. 32

**CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

(Violation of 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt
    Organizations Act [18 U.S.C. §§ 1961-68]) ................................................32

By Plaintiffs against All Defendants ................................................32

SECOND CLAIM FOR RELIEF ................................................38

(Violation of 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt
    Organizations Act [18 U.S.C. §§ 1961-68]) ................................................38

By Plaintiffs against All Defendants ................................................38

THIRD CLAIM FOR RELIEF ................................................41

(Violations of 18 U.S.C. § 1962(b) of the Racketeer Influenced and Corrupt
    Organizations Act [18 U.S.C. §§ 1961-68]) ................................................41

By Plaintiffs against All Defendants ................................................41

FOURTH CLAIM FOR RELIEF ................................................46

(Violations of 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt
    Organizations Act [18 U.S.C. §§ 1961-68]) ................................................46

By Plaintiffs against All Defendants ................................................46

FIFTH CLAIM FOR RELIEF ................................................48

(Violation of Bill of Rights Secured by Labor Management Disclosure Act, 29
    U.S.C. § 501) ................................................48

By Plaintiffs against All Defendants ................................................48

SIXTH CLAIM FOR RELIEF ................................................50

BREACHES OF FIDUCIARY DUTIES ARISING UNDER ERISA OR
    COMMON LAW ................................................50

By Plaintiffs Against Specific Defendants ................................................50

SEVENTH CLAIM FOR RELIEF ................................................52

AIDING AND ABETTING ................................................52

By Plaintiffs Against All Defendants ................................................52

PRAYER FOR RELIEF ................................................53

SPIRO MOORE LLP

# I. **INTRODUCTION**

1.     This action arises from years of illegal activity by the International Union of Operating Engineers and its controlling officers and co-conspirators. Local 12, a local trade union, and its members, were victimized by those many years of illegal activity.  The unlawful abuses suffered by Local 12 and its members takes two predominant forms.  First, millions upon millions of dollars were withheld and/or embezzled from Local 12 and its membership, much of which was used by Defendant WILLIAM C. WAGGONER and his circle of co-conspirators for personal benefit.  Second, the membership of Local 12 was denied the right to freely select its own officers, through fair and honest elections, again, as a result of machinations by Defendant WILLIAM C. WAGGONER, with the knowledge and assistance of INTERNATIONAL UNION OF OPERATING ENGINEERS and its leadership, of which Defendant WILLIAM C. WAGGONER was a highly placed member.

2.     The conduct of Defendants harkens back to the days of unrepentant racketeering by organized crime, which makes some sense here.  The International Union of Operating Engineers and Local 12's leadership conduct their affairs with the same disregard for others' rights as the mob.  Not surprisingly, the International Union of Operating Engineers has a long history of ties to organized crime families in New York and New Jersey, and they have apparently learned their techniques from the very best of those crime syndicates.

# II.     **JURISDICTION AND VENUE**

3.     The action is brought, among other bases, under the Interstate Commerce Clause of the United States Constitution, and the Racketeering, Mail Fraud, Wire Fraud and Money Laundering laws of the United States.  In addition, this action is brought pursuant to Article 1, Section 1 of the Constitution of the State of California and other statutes and laws of the State of California.

**CLASS ACTION COMPLAINT**

4. Jurisdiction is specifically conferred on this Court by various federal statutes including, but not limited to, the following: Section 1964 of the Racketeer Influenced and Corrupt Organizations Act of the Organized Crime Control Act of 1970 as amended, 18 U.S.C. § 1964, based upon a pattern of racketeering activity in which Defendants have been engaged in connection with their operation of the International Union of Operating Engineers, consisting of violations of, among others, (a) 18 U.S.C. § 1341, relating to mail fraud, (b) 18 U.S.C. § 1343, relating to wire fraud, (c) 18 U.S.C. § 1957, relating to monetary transactions of unlawfully obtained proceeds from specified crimes, including mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, (d) 18 U.S.C. § 1951, relating to travel and use of interstate commerce in furtherance of certain unlawful activities, including unlawful monetary transactions, 18 U.S.C. § 1957.

5. Original jurisdiction lies with this Court as to the Federal questions raised herein, pursuant to 28 U.S.C. § 1331.

6. Jurisdiction over any California State causes of action contained in this Complaint arises under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367(a).

7. Venue as to each Defendant is proper in this District pursuant to 18 U.S.C. § 1965, because each of the Defendants resides, is found, has an agent, controls and/or transacts or transacted affairs in this District. In addition, the Defendants are engaged in interstate and foreign commerce, and a substantial part of the events giving rise to the claims for violations of Federal law occurred in this District, all in the course of interstate and foreign commerce.

## III. THE PARTIES TO EACH CAUSE OF ACTION

### A. Plaintiffs

8. Plaintiff Mario Salas is, and at all relevant time was, a member of Local 12. Plaintiff Salas is a former Business Agent for Local 12.

CLASS ACTION COMPLAINT

9.     Plaintiff Melvin Chamberlain is, and at all relevant time was, a member of Local 12.  Plaintiff Chamberlain is a former Instructor at the OETT Training center.  He is now retired.

10.    Plaintiff Albin Watson is, and at all relevant time was, a member of Local 12.  Plaintiff Watson is a former Coordinator at the OETT Training center.  He is now retired.

11.    Plaintiff John Paxin is, and at all relevant time was, a member of Local 12.  Plaintiff Paxin is a former Executive Board member and Instructor at the OETT Training Center.

12.    Plaintiffs reserve the right to seek leave to amend this complaint to add new plaintiffs, if necessary, in order to establish suitable representative(s) of the Class proposed herein and/or any necessary sub-Class.

**B.     Defendants**

13.    Defendant International Union of Operating Engineers is a trade union that primarily represents operating engineers, who work as heavy equipment operators, mechanics, and surveyors in the construction industry, and stationary engineers, who work in operations and maintenance in building and industrial complexes, and in the service industries. IUOE also represents nurses and other health industry workers, a significant number of public employees engaged in a wide variety of occupations, as well as a number of job classifications in the petrochemical industry.

14.    Defendant James T. Callahan is the General President of IUOE, allegedly elected in November 2011.  Prior to his election by the general executive board (little more than an appointment by outgoing General President ("GP") Giblin as all officers of the General Executive Board swear allegiance to the GP and to his named successor.  There has never been a contested "election" in the history of the IUOE for the position of General President. Defendant Callahan

**CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

served as the IUOE General Secretary-Treasurer and was elected as IUOE Vice President in 2008.  Defendant Callahan is also a Trustee of the IUOE General Pension Fund.

15.     Defendant Brian E. Hickey is General Secretary-Treasurer of IUOE, elected in November 2011.  Mr. Hickey has served as an IUOE Vice President since 2001.  Defendant Hickey is also a Trustee of the IUOE Central Pension Fund and also Business Manager of Local 399, located in Chicago, Illinois.  Local 399 is also a stationary local.

16.     Defendant William C. Waggoner is the First Vice President of IUOE.  Mr. Waggoner was first elected as an IUOE Vice President in 1980.  Mr. Waggoner is also the Western States Director and Business Manager of Local 12 headquartered in Pasadena, California.  Local 12 is a hoisting and portables local which principally engages in the construction industry.

17.     Defendant Patrick L. Sink is the Third Vice President of IUOE.  Mr. Sink was first elected as an IUOE Vice President in 2004.  Mr. Sink is Business Manager of IUOE Local 18 headquartered in Cleveland, Ohio.  Local 18 is a mixed local in that it has both a hoisting and portables division and a stationary division (18s).

18.     Defendant Jerry Kalmar is the Fourth Vice President of IUOE.  Mr. Kalmar was first elected as an IUOE Vice President in 2005.  Mr. Kalmar is the Business Manager of IUOE Local 39.  Local 39 is a stationary local headquartered in San Francisco, California.

19.     Defendant Russell E. Burns is the Fifth Vice President of IUOE.  Mr. Burns was first elected as an IUOE Vice President in October 2006.  Mr. Burns is the Business Manager for IUOE Local 3 headquartered in Alameda, California.

20.     Defendant Rodger Kaminska is the Sixth Vice President of IUOE.  Mr. Kaminska was first elected as an IUOE Vice President in 2008.  Mr. Kaminska is the Business Manager for IUOE local 101 headquartered in Kansas City, Missouri.

CLASS ACTION COMPLAINT

21.     Defendant James M. Sweeney is the Seventh Vice President of IUOE. Mr. Sweeney was first elected as an IUOE Vice President in 2009. Mr. Sweeney is Business Manager for IUOE Local 150 headquartered in Countryside, Illinois.

22.     Defendant Robert T. Heenan is the Eighth Vice President of IUOE. Mr. Heenan was first elected as an IUOE Vice President in 2009. Mr. Heenan is the Business Manager of IUOE Local 542 headquartered in Fort Washington, Pennsylvania.

23.     Defendant Daniel J. McGraw is the Ninth Vice President of IUOE. Mr. McGraw was first elected as an IUOE Vice President in 2011.  Mr. McGraw also serves as the Northeast Regional Director for the IUOE and is headquartered in Albany, New York.  He is also the Business Manager for IUOE Local 17 headquartered in Lakeview, New York.

24.     Defendant Daren Konopaski is the Tenth Vice President of IUOE.  Mr. Konopaski was first elected as an IUOE Vice President in 2011. Mr. Konopaski is the Business Manager of IUOE Local 302 headquartered in Bothell, Washington.

25.     Defendant Michael Gallagher is the Eleventh Vice President of IUOE. Mr. Gallagher was first elected as an IUOE Vice President in 2011. Mr. Gallagher is the Business Manager of IUOE Local 793 headquartered in Oakville, Ontario, Canada.

26.     Defendant Greg Lalevee is the Twelfth Vice President of IUOE.  Mr. Lalevee was first elected as an IUOE Vice President in 2011.  Mr. Lalevee is the Business Manager for IUOE Local 825 headquartered in Springfield, New Jersey.

27.     Defendant Terrance E. McGowan is the Thirteenth Vice President of IUOE.  Mr. McGowan was first elected as an IUOE Vice President in 2011.  Mr. McGowan is also a Trustee of the IUOE General Pension Fund. He is the Business Manager of IUOE Local 139 headquartered in Pewaukee, Wisconsin.

28.     Defendant Louis G. Rasetta is the Fourteenth Vice President of IUOE. Mr. Rasetta was first elected as an IUOE Vice President in 2012. Mr. Rasetta also

serves as the Chairman of the Board of the IUOE General Pension Fund. He is Business Manager of IUOE Local 4 which is headquartered in Medway, Massachusetts.

29.   Defendant Vincent (Vince) Giblin was General President of IUOE from about 2005 until his retirement in November 2011.

30.   Defendant James Van Dyke was the Chief of Staff for IUOE, but he is now retired.

31.   Defendant Patricia M. Waggoner is the wife of Defendant William Waggoner and a Senior Vice President of Amalgamated Bank.

32.   Defendant Bert Tolbert is the Administrator of the Southern California Training Trust and the Southern Nevada Training Trust.

33.   Defendant Mickey J. Adams is and/or was a Trustee of the Local 12 Health & Welfare Trust, the General Pension Fund, and the Local 12 Operating Engineers Training Trust.  Defendant Adams is the President.

34.   Defendant Kurt Glass is and/or was a Trustee of the Local 12 Health & Welfare Trust, the General Pension Fund, and the Local 12 Operating Engineers Training Trust.  Defendant Glass is the Recording Secretary for Local 12.

35.   Defendant Ron Sikorski is and/or was a Trustee of the Local 12 Health & Welfare Trust, the General Pension Fund, and the Local 12 Operating Engineers Training Trust.  Defendant Sikorski is the Vice-President of Local 12.

36.   Defendant Dan Billy is and/or was a Trustee of the Local 12 Health & Welfare Trust and the General Pension Fund.

37.   Defendant Dan Hawn is and/or was a Trustee of the Local 12 Health & Welfare Trust, the General Pension Fund, and the Local 12 Operating Engineers Training Trust.  Defendant Hawn is the Financial Secretary of Local 12.

38.   Defendant Larry Davidson is and/or was a Trustee of the Local 12 Health & Welfare Trust, the General Pension Fund, and the Local 12 Operating Engineers Training Trust.  Defendant Davidson is the Treasurer of Local 12.

39.     Defendant Steve Billy was a Trustee of the Local 12 Operating Engineers Training Trust.

40.     Defendant Fred Young was a Trustee of the Local 12 Operating Engineers Training Trust.

41.     Defendant C. W. Poss is and/or was a Trustee of the Local 12 Health & Welfare Trust, the General Pension Fund, and the Local 12 Operating Engineers Training Trust.

42.     Defendant John Nelson is and/or was a Trustee of the Local 12 Health & Welfare Trust, the General Pension Fund, and the Local 12 Operating Engineers Training Trust.

43.     Defendant Walt Elliot is and/or was a Trustee of the Local 12 Health & Welfare Trust and the General Pension Fund.

44.     Defendant Mitch White is and/or was a Trustee of the Local 12 Health & Welfare Trust and the General Pension Fund.

45.     Defendant Mike Roddy is and/or was a Trustee of the Local 12 Health & Welfare Trust and the General Pension Fund.

46.     Defendant Michael Crawford is and/or was a Trustee of the Local 12 Health & Welfare Trust and the General Pension Fund.

47.     Defendant Bruce Cooksey is and/or was a Trustee of the Local 12 Health & Welfare Trust.

48.     Defendant Mike Prlich is and/or was a Trustee of the Local 12 General Pension Fund.

49.     Defendant Don Bourguignon is and/or was a Trustee of the Local 12 Operating Engineers Training Trust.

50.     Defendant John Sawyer is and/or was a Trustee of the Local 12 Operating Engineers Training Trust.

51.     Defendant Paul Von Berg is and/or was a Trustee of the Local 12 Operating Engineers Training Trust.

CLASS ACTION COMPLAINT

SPIRO MOORE LLP

52.     Defendant Jim Hulse is and/or was a Trustee of the Local 12 Operating Engineers Training Trust.

53.     Defendant Mike Gomez is and/or was a Trustee of the Local 12 Operating Engineers Training Trust.

54.     Defendant Operating Engineers Funds Inc. is a non-profit corporation that administers the employee benefit programs for over 35,000 participants of Local 12.

55.     Plaintiffs do not know the true names or capacities of the persons or entities sued herein as DOES 1-10, inclusive, and therefore sue said Defendants by such fictitious names.  Each of the DOE Defendants was in some manner legally responsible for the violations alleged herein.  Plaintiffs will amend this complaint to set forth the true names and capacities of these Defendants when they have been ascertained, together with appropriate charging allegations, as may be necessary.

56.     At all times mentioned herein, the Defendants named as DOES 1-10, inclusive, and each of them, were residents of, doing business in, availed themselves of the jurisdiction of, and/or injured Plaintiffs and aggrieved employees in the State of California, among other locations.

57.     At all times mentioned herein, each Defendant was the agent, servant, or employee of the other Defendants and in acting and omitting to act as alleged herein did so within the course and scope of that agency or employment.

58.     The term "Defendants" as used herein includes DOES 1-10.

### IV.     DEFENDANTS' MISCONDUCT

#### A.     About the IUOE

59.     The International Union of Operating Engineers (IUOE) is a trade union that primarily represents operating engineers, who work as heavy equipment operators, mechanics, and surveyors in the construction industry, and stationary engineers, who work in operations and maintenance in building and industrial

complexes, and in the service industries. IUOE also represents nurses and other health industry workers, a significant number of public employees engaged in a wide variety of occupations, as well as a number of job classifications in the petrochemical industry.

60.     Founded in 1896, IUOE today has approximately 400,000 members in 123 local unions throughout the United States and Canada. IUOE is the 10th largest union in the AFL-CIO.

### B.     IUOE Forced Plaintiffs Serving As Officers of Local 12 to Contribute to the President's Club, a Political Action Fund

61.     Vince Giblin, as General President of IUOE, dramatically increased contributions to IUOE's Political Action Fund, the President's Club, previously known as EPEC.  However, he did so by engaging in illegal conduct.  Giblin required any officer of a local union to contribute to the President's Club.  Officers were told that if they wanted to serve as an officer, they had no choice but to contribute to the President's Club, in amounts ranging from about $800 to about $1,000 per year.  The contributions were accomplished through compulsory payroll deductions.  Waggoner sent out a memo to staff members (excluding clerical employees) informing them that they had to sign an authorization for payroll deductions for the mandatory President's Club contributions.

### C.     Waggoner Forced Employees of Local 12 to Contribute to His Re-election Fund

62.     The OETT is managed by a group of six purportedly independent Trustees; however, the independence is a sham.  Three Trustees work for Waggoner as union representatives on the Board.  Three other Trustees represent contractors on the labor management side.  Waggoner ensures that one management-side Trustee will always vote in the manner that Waggoner directs.  In

1   addition to the three union-side Trustees that do Waggoner's bidding, Waggoner

2   controls four of the six votes at all times.

3        63.    Albin "Skip" Watson became the Curriculum Cootdinator of the

4   Operating Engineers Training Trust (OETT) in and around November 1997.  When

5   Watson became the Curriculum Coordinator, he was given a monthly expense

6   check, in the amount of $550 per month.  After Mr. Watson had been in that

7   position for about two years, the Administrator called him into his office and

8   reprimanded Watson for failing to contribute to the "BA's Fund."  Watson had no

9   idea what the Administrator was talking about.  The Administrator explained that

10  anyone who received a monthly expense check was expected to contribute $50 a

11  month to the "BA's Fund."  The Administrator made it clear to Watson that the

12  contribution was not viewed as voluntary.  While the Administrator excused

13  Watson for his lack of contributions in the past, Watson was told to begin

14  contributions immediately.  When Watson later asked what the money was for, a

15  business agent explained to him that it was for the Bill Waggoner Re-Election

16  Fund. That business agent told Watson that the money went to Pasadena and was

17  given to Waggoner's secretary.

18       64.    When employees asked if they could pay their mandatory BA's Fund

19  contribution by check, they were told, "No. This fund does not exist. Cash only."

20

21

22

23

24

25

26

27

28

**CLASS ACTION COMPLAINT**

D.   **Assets Were Diverted or Embezzled from Local 12 and IUOE Accounts or Trust Accounts Created for the Benefit of Union Members**

1.   **Defendants Used Aircraft Purchased by Local 12 for Personal Use, Embezzled Revenues Generated by Those Aircraft, and Falsified Many Years of LM-2 Filings to Conceal Activities and True Costs and Asset Values to Local 12**

65.   At least as early as 2000, Local 12 owned a Beechcraft Sky King Twin Turbo Prop airplane.  Local 12 did not report the value of the aircraft on Line 7 of Schedule 5 attached to Local 12's Form LM-2 Labor Organization Annual Report ("LM-2").  However, in the same LM-2 filing, Nickolas Bruce Timpe is listed in Schedule 10 ("Disbursements to Employees") as a "pilot" employed by Local 12 in 2000.  William Waggoner is listed as the addressee for any mailings associated with the LM-2.

66.   The FAA listed Aircraft N44KA as a model number B200 turbo prop, SN BB-1711, manufactured by Raytheon Aircraft Co.   Raytheon model B200 is commonly referred to as a Beechcraft Super King Air.

67.   Waggoner and Local 12 failed to report the aircraft on the 2001 LM-2. But, as before, Nickolas Bruce Timpe is listed in Schedule 10 ("Disbursements to Employees") as a "pilot" employed by Local 12.  The 2001 LM-2 also appears to omit the aircraft's costs and expenses, other than the pilot salary, though, based on a 2004 filing by Local 12, it is clear that Local 12 claimed to have a Beechcraft Super King Air aircraft registered with the FAA as N44KA.

68.   In 2002, Local 12 borrowed $4,000,000 from the Work Preservation Fund, on a note allegedly issued on June 1, 2002, to mature on June 1, 2015, with stated payments of $25,000 per month.  The claimed purposed of the loan was to serve as the down payment on a "new aircraft."  In addition to that loan, the 2002

**CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

LM-2 also lists a loan from Amalgamated Bank of New York, in the original amount of $3,352,125.00, at an interest rate of 4.25%. The loan's note date is June 30, 2002, with a maturity date of July 1, 2003, but no payments were reported on the LM-2 filing for 2002. In 2002, Nickolas Bruce Timpe is listed in Schedule 10 ("Disbursements to Employees") as a "pilot" employed by Local 12. Allen Wayne Morisset is listed on that same Schedule as a "Business Agent" in 2002, but he is later listed as a pilot in 2003.

In 2002, Local 12 apparently purchased a 2001 Cessna Citation XL, with registration number N705SG. The reported value of the Cessna in 2002 was $8,644,396.00. The nine-passenger cabin was appointed with, among other things, leather seats, a couch, a lavatory, walnut trim, 110-volt electrical outlets, 4 writing tables, and a wine caddy. The plane is pictured below:



Waggoner convinced the Executive Board to approve the purchase as an investment because, as promised by Waggoner, the Cesna jet would be leased, generating

SPIRO MOORE LLP

income, at least 51% of the time.

69.     In 2003, Waggoner and Local 12 failed to report either aircraft on the 2003 LM-2.  But aircraft sales tax was reported for the purchase of the newer aircraft, in the amount of $705,375.  The loan from Work Preservation Fund was listed as receiving timely payments.  However, no payments were made on Amalgamated loan for the reporting period of 2003.  Despite no reported payments on the Amalgamated loan,   Amalgamated Bank of NY loaned an additional $1,000,000.00 to Local 12.  In 2003, Nickolas Bruce Timpe and Allen Wayne Morisset are listed in Schedule 10 ("Disbursements to Employees") as a "pilots" employed by Local 12.  Christopher Gables is reported on staff as "clerical" in 2003, but he later is listed as a "pilot" in 2004.

70.     In the 2004 LM-2 filing, an aircraft with tail number N44KA, the Beechcraft Super King Air twin turbo prop, was reported as sold for $1,705,000.00.  The 2004 LM-2 reported an initial cost $6,422,438.00; however, the IRS 990 filing for the same year reports the initial cost as $3,122,437.50 excluding a newly purchased engine.  Local 12 also reported purchasing an engine for the turbo prop aircraft for $ 300,000.00 during the 2004 reporting period.  The loan from Work Preservation Fund was listed as receiving timely payments.  However, no payments were made on Amalgamated loan for the reporting period of 2004.  In 2004, Nickolas Bruce Timpe and Christopher Gables are listed in Schedule 10 ("Disbursements to Employees") as a "pilots" employed by Local 12.  The 2004 LM-2 does not appear to reflect either aircraft's operating costs and expenses, other than the pilot salaries.

71.     In the 2005 LM-2 report, more information was suddenly reported about the aircraft.  Pilot salaries of $140,024.00, and total disbursements to pilots of $176,666.00 were reported.  Transactions involving aircraft were reported in General Overhead, in amounts of $92,721, $35,550, $93,633, totalling

CLASS ACTION COMPLAINT

1   $221,904.00.  The Amalgamated Bank loan was repaid in full, without any

2   apparent interest.

3         72.    In the 2006 LM-2 report, even more information was suddenly

4   reported about the one remaining aircraft, the Cessna.  Pilot salaries of

5   $123,376.00, and total disbursements to pilots of $161,337.00 were reported.

6   Transactions involving aircraft were reported in General Overhead, in amounts of

7   $63,373, $31,550, $551,964, $138,615, $65,232, $ 37,084, totalling $887,818.00.

8   The total transactions for *one* aircraft exceeded $1 million.  Prior to 2005, there

9   were two aircraft maintained at some point; i.e. a Beechcraft Super Sky King and

10  the Cessna.  Earlier LM-2 reporting does not seem to reflect one or both aircraft's

11  operating cost and or expenses other than the pilot salary expense.

12        73.    In 2006, the reported value of the aircraft was identified as diminishing

13  by half, with an original value of $8,644,396.00 and a 2006 value of about

14  $4,203,468.

15        74.    In the 2007 LM-2 report, Pilot salaries of $156,370.00, and total

16  disbursements to pilots of $186,811.00 were reported.  Transactions involving

17  aircraft were reported in General Overhead, in amounts of $40,835, $136,464,

18  $59,829, $36,138, $149,331, $ 5337, $49,119, $18,700, $204,034, totalling

19  $699,787.00.

20        75.    In 2009, the Cesna, with registration number N705SG, was advertised

21  for lease, at $3,325.00 per hour.  No lease proceeds are reported in any LM-2 filing

22  by Local 12.  The agent handling lease arrangements was Guardian Air, owned by

23  James Previti.

24        76.    In the 2010 LM-2 filing, the value of the Cesna is not reported or not

25  accurately reported.  The total value of reported "other fixed assets" is $11,342.00,

26  far below the value of the Cesna.

27        77.    In 2010, the Cesna, with registration number N705SG, was advertised

28  for lease.  No lease proceeds are reported in any LM-2 filing by Local 12.

CLASS ACTION COMPLAINT

78.     In the 2011 LM-2 filing, the value of the Cesna is not reported or not accurately reported.  The total value of reported "other fixed assets" is $22,560.00, far below the value of the Cesna.

79.     Union officers, who frequently travelled in the Local 12 aircraft, would sometimes take commercial flights "just to make it look good".   The locations where this aircraft flew and does fly are adequately serviced by most commercial carriers.

80.     Vince Giblin utilized the Cesna on multiple occasions without compensating Local 12 for the rental time and expense of operating the plane.

81.     Approximately one-third of Local 12's members are "agency fee" members, who include all public employees that are members of Local 12.  Agency fee members must be given the choice to decline political contributions.  Waggoner, without consent or approval of the membership, gave use of Local 12's Cesna Jet to Local 12's Political Action Fund.  The Political Action Fund, in turn, made in-kind contributions of Jet flight time to individuals running for elected office or to politicians promoting matters of interest to Local 12.  Because the Political Action Fund failed to compensate Local 12 for use of Local 12's Cesna Jet, the in-kind contributions amounted to forced political contributions, and agency fee members were precluded from opting out of partisan union political spending or other activity.

82.     On March 3, 2012, LeAnn Goff married Kenneth D. Waggoner.  Goff is the daughter of Vice-President Carl Goff of Local 3.  Waggoner attended that wedding in Sacramento, using Local 12's Cesna to attend the wedding.  The plane stayed in Sacramento for an entire week, with a pilot and co-pilot, at Local 12's expense, for the wedding travel.

83.     Patricia Waggoner, wife of William Waggoner, used Local 12's Beechcraft and Cesna jet for her own personal travel.  William Waggoner frequently used Local 12's Beechcraft to visit his brother in Branson, Missouri.

SPIRO MOORE LLP

2.      **Defendants Embezzled Revenue from Local 12's Printing Press, Failing to Report That Income on Any IRS Form 990 or LM-2 Forms, and Diverting Resources From Agency Fee Members Without Consent**

84.     Local 12 owns a large printing press.  Allied Printing Trades Council assigns numbers to printers to identify the source of any printing;  Local 12's number from Allied Printing Trades Council is 212.

85.     Local 501 ordered 10,000 calendars annually from Waggoner and Local 12.  Local 501 paid either $1.25 or $1.50 for each calendar, resulting in orders of at least $12,500k in printing annually for Local 501. The income to Local 12 appears nowhere on either the Local 12 IRS 990s or the LM-2s for Local 12.

86.     An identical press operated by Local 3 reports income to Local 3 in excess of $250,000 per year.  With the same press and similar supporting staff, it is likely that Local 12 is receiving more than $250,000 in revenue per year for printing, but those revenues are not reported by Local 12, indicating that the funds are likely diverted by Waggoner and his team.

87.     As alleged above, approximately one-third of Local 12's members are agency fee members, who include all public employees that are members of Local 12.  Agency fee members must be given the choice to decline political contributions.  Waggoner, without consent or approval of the membership, authorized the purchase of printing press consumables from General Fund assets. The printing performed for candidates was routed through the Political Action Fund, without compensation from the Political Action Fund.  The Political Action Fund, in turn, made in-kind contributions of printed materials to individuals running for elected office or campaigning on matters of interest to Local 12. Because the Political Action Fund failed to compensate Local 12 for use of Local 12's printing press resources and materials, the in-kind contributions amounted to

forced political contributions, and agency fee members were precluded from opting out of partisan union political spending or other activity.

### 3.   Defendants Embezzled Other Property Purchased By Local 12 or Its Many Associated Trusts

88.    On Training Trust training site purchased a semi trailer.  The semi trailer was gutted and apprenticeship staff turned it into a mobile barbeque facility. It is capable of producing enough food to feed tens of thousands of individuals. Defendant Waggoner took the converted semi trailer and parked it in his own back yard.  Waggoner leases the trailer back to Local 12, retaining the revenue for himself, when Local 12 wants to use it for a Local 12 barbeque or other Local 12 sponsored event.

89.    OETT Whittier purchases equipment initially identified as purchased for the Southern California Training Trust.  The equipment is deleted from the Southern California Training Trust inventory.  It is transferred to the Southern Nevada Training Trust, without compensation from Southern Nevada Training Trust to Southern California Training Trust.

90.    Southern California Training Trust training personnel and equipment were used to transfer equipment from Southern California Training Trust to Southern Nevada Training Trust.  Southern California Training Trust personnel, including Peter Majich, an employee of Southern California Training Trust, applied for and received DOT permits to transfer "wide load" equipment.  Peter Majich operated the lead vehicle during the transport of large construction equipment to Southern Nevada Training Trust.  When equipment is deleted from the Southern California Training Trust inventory, it is not returned to Southern California Training Trust.  However, some equipment is also "loaned" from Southern California Training Trust to Southern Nevada Training Trust for periods of time

including one month to many years.  In these cases, fair market rental value is not paid by Southern Nevada Training Trust to Southern California Training Trust.

91.     Employees of Southern California Training Trust create the curriculum, testing, interview applicants and actually instruct and/or teach apprentices in Southern Nevada.  However, Southern Nevada Training Trust does not repay Southern California Training Trust for the use of its employees that remain at all times on the Southern California Training Trust payroll.  Southern Nevada Training Trust also fails to share in the cost of benefits provided to instructors on the payroll of Southern California Training Trust.

92.     Burt Tolbert is the Administrator for both the Southern California Training Trust and the Southern Nevada Training Trust.  But Tolbert remains at all time exclusively on Southern California Training Trust payroll.  No compensation for Tolbert is listed on Southern Nevada Training Trust's DOL 5500 filings or IRS form 990.  The total value of Tolbert's compensation package is approximately $200,000 per year, including salary and benefits.

93.     Bills for Southern Nevada Training Trust are received by Southern California Training Trust.  Tolbert reviews those bills.  Tolbert then approves those bills for payment and sends them to office staff to process and pay.  There is no system in place between the training centers in California and Nevada to bill Southern Nevada Training Trust for services provided by Southern California Training Trust.  In substance, two separate Trusts are operated out of a single office, without fair allocation of the expenses and overhead between the Trusts.

94.     Vehicles owned by Local 12 or the Southern California Training Trust training center that were scheduled to be sold at auction are often pulled from sale and purchased at a sub-market rate price from the auction house.  The vehicles are then restored by staff members at the Southern California Training Trust Whittier training center.  All replaced parts are charged to other equipment numbers.  The time required for staff members to restore the vehicles is not paid to the Southern

California Training Trust.  The vehicle ownership is then transferred to the union staff member that purchased the vehicle at the sub-market rate.  Administrators, Board Members, and upper management of Local 12, including line officers, have taken advantage of this arrangement, thereby embezzling funds from Southern California Training Trust.  Many of those same individuals receive free service on their personal vehicles at the Southern California Training Trust Whittier training center.

95.    Union leadership, including Waggoner, store personal vehicles at the Southern California Training Trust Whittier training center without paying fair rental compensation for use of the space, thus providing value to union officers that they are not entitled to receive.  For example, Waggoner stores a vintage Cadillac at the Southern California Training Trust Whittier training center.  Special devices were constructed to allow staff to move Waggoner's vehicle when they require access to bay space it occupies.

96.    As of about November 2012 or December 2012, records are being destroyed at Southern California Training Trust's Whittier training center by staff. The records being destroyed are more recent records, rather than the very old files that date back to the 1970's.

### 4.    Waggoner Engaged in Self-Dealing by Causing Local 12 to Hire Patty Waggoner's Company, Spacemaker Tenant Improvements, to Work on the Local 12's Headquarters and Other Property

97.    Patricia Morrison Waggoner, the wife of William Waggoner, is a Senior Vice-President, marketing Taft-Hartley investments at Amalgamated Bank of Pasadena, a division of Amalgamated Bank of New York.  Patricia Morrison Waggoner was an officer of the contracting company, Spacemaker Tenant Improvements.  Spacemaker Tenant Improvements is a California licensed

SPIRO MOORE LLP

contractor.  According to the California State Contractor license Board, the holder of the license was Stanley W. Smith, and Patty Waggoner was the President.  Later, records show that Richard A. Marker, currently a lawyer at the Green & Marker law firm, was also an officer and may be the sole remaining officer.

98.    At least as far back as 1980, Patricia Morrison Waggoner, the wife of William Waggoner, through her contracting company Spacemaker Tenant Improvements, performed work on Local 12 facilities and facilities owned by Local 12's General Pension Fund.  Patricia Waggoner is a member of Local 12.

99.    At all times relevant, Spacemaker Tenant Improvements had offices in buildings owned by Local 12's General Pension Fund, including 301 N. Lake Avenue, Pasadena, California 91101 and 3699 Wilshire Blvd., Los Angeles, California 90010.

100.    The contracting services provided by Spacemaker Tenant Improvements to Local 12 facilities and facilities owned by Local 12's General Pension Fund were not provided on the basis of arms-length bidding processes.  Rather, Spacemaker Tenant Improvements received those construction jobs simply by virtue of Patricia Waggoner's marriage to William Waggoner.  Moreover, even had they used a bidding process, Spacemaker Tenant Improvements, by virtue of the relationship between the Waggoners, could not have performed that work.

101.    Patricia Waggoner has also used her position as the wife of William Waggoner to market and obtain business for Amalgamated Bank.

102.    Waggoner's LM-30 filing identifies Patricia Waggoner as the "First Vice-President" of Amalgamated Bank (in fact, she is a Senior Vice-President of Marketing & Sales, Western Region).  Her annual salary is listed as $141,057, but Waggoner states that there are no conflicts of interest.  Waggoner claims in the filing that the value of services provided to Local 12 or associated funds is "not readily available."

CLASS ACTION COMPLAINT

103.    On March 8, 2011, William Waggoner caused the borrowing of $50,000,000 from Massachusetts Mutual Life Insurance Company, secured by an asset owned by Local 12's Pension Fund.  One such asset is Vintage Park East, LLC.  Vintage Park East, LLC purported to encumber a number of real properties held by Vintage Park East, LLC.  However, one of the properties, a parcel designated as APN 0238-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 is listed in the San Bernardino County Clerk's records as owned by the San Bernardino County Flood Control District.

104.    The loan funds were then deposited in Amalgamated Bank for the purpose of preventing the collapse of Amalgamated Bank.  Waggoner and property manager Wilbur L. Ross, principal of Invesco, and Ron Bukle, each deposited funds in Amalgamated Bank for the sole purpose of artificially providing adequate liquidity to Amalgamated Bank.

105.    On August 31, 2011, a Consent Decree was issued by the Federal Deposit Insurance Corporation.  Without the assets deposited by Waggoner, Ross and Burkle in March 2011, Amalgamated would not have survived the FDIC's audit and review as an autonomous entity.

106.    Local 12's Pension Fund is currently obligated as a result of the loan to prop up Amalgamated Bank.  In the 2011 LM-2 filing by Local 12's Pension Fund, the Fund listed an obligation of $50,000,000, at 4.46% per annum, and an interest expense of $706,167 for less than a full year of interest.  $185,833 per month is the interest expense.  April 1, 2018 is the maturity date, at which time the full amount of principal is due.  Due to Amalgamated's weak financial condition, it is unlikely that the $50,000,000 will be available for withdrawal from Amalgamated. Members of Local 12 are paying $2,229,996 per year out of their General Pension Fund for the sole purpose of propping up the bank at which William Waggoner's wife, Patty Waggoner, works as First Vice President.  Page 102 of the 2011 Form 5500 filed with the DOL by the Local 12 Pension Fund provides information about the terms of the Note, identified as Note 10.

CLASS ACTION COMPLAINT

1

2         **5.**      **Waggoner Diverted Valuable Assets in the Form of Room**

3                        **Space in the Washington Court Hotel**

4     107.    Local 12 Pension Fund (OEFI) owns several buildings, including the

5 Washington Court Hotel in Washington, D.C. The Harbaugh company, owned by

6 George Harbaugh, manages day-to-day operations. The hotel converted two rooms

7 into an apartment. The apartment is occupied by Joel Harbaugh, the son of George

8 Harbaugh. The cost of converting the rooms was charged to OEFI. The conversion

9 was never voted on by the trustees of the Pension Fund. The Pension Fund lost

10 revenue in the form of (1) conversion costs, and (2) lost room rental revenue,

11 which, in the Washington, D.C. location, can exceed many hundreds of dollars a

12 night. Joel Harbaugh even received hotel meals in his room.

13

14    **E.**     **<u>IUOE's and Local 12's Leadership Used Threats of Physical and</u>**

15           **<u>Economic Violence, and Suborned Perjury, to Suppress</u>**

16           **<u>Investigations and Usurp Control Over Local 12</u>**

17        **1.**     **David Casey Was Beaten at the Direction of Waggoner for**

18                  **Running Against Waggoner for Business Manager**

19     108.    David Casey, a member, attended Local 12 meetings. At Local 12

20 meetings, members are supposedly given the right to make statements or ask

21 questions at an open microphone. In an around 2005, Mr. Casey attempted to

22 speak up at a meeting. Two individuals assaulted Mr. Casey immediately after the

23 meeting, beating him violently. The assailants were the nephew and the son of the

24 District 7 Representative. David Casey filed a complaint with the Federal Bureau

25 of Investigation about the assault.

26

27

28

**CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

### 2. Waggoner Prevents Opposition Voices From Speaking at Any Meetings

109.   In and around about 2007, Waggoner directed Chris Norton, one of his enforcers, to "cover the microphone" and keep anyone who opposed Waggoner from speaking at any general membership meetings.  At one meeting, Chris Norton was involved in a physical altercation with David Casey to prevent Casey from speaking at the meeting, particularly about misuse of membership assets related to the purchase of the Cesna jet.

110.   On September 18, 2012, Mr. Waggoner and the entire leadership team attended a District 5 meeting.  At that meeting, Mr. Waggoner told Rodney Karr, who had sent Waggoner a letter raising issues, that "if you don't stop this shit, you're going to get hurt."  Generally, Waggoner and/or his co-conspirators at general membership and District meetings assign large individuals to take up positions near microphones to intimidate any individual that might attempt to speak up in opposition.

### 3. Local 12 Uses Its Job Referral Service to Suppress Opposition

111.   Local 12 operates an exclusive hiring hall.  All jobs for Local 12 members are dispatched through the centralized hiring hall.  Waggoner and Local 12's leadership use this arrangement to intimidate members that might express opposition to the activities of Local 12's leadership.  The fear of economic retaliation is extremely high.  Some members have children that are also members of Local 12 and will not speak out due to fear of physical and economic harm directed at their children.

SPIRO MOORE LLP

**4.      Business Agents for Local 12 Carry Guns That Have Had Serial Numbers Removed**

112.     Waggoner requires Business Agents to carry firearms.  The weapons provided to Business Agents have had their serial numbers removed in some cases. Waggoner negotiated a deal with Dwight Helmick, the former California Highway Patrol Commissioner, under which Local 12 would pay $25,000 to the surviving spouse or family members of any California Highway Patrol officer seriously injured or killed in the line of duty.  In exchange, Waggoner received a letter from Dwight Helmick, authorizing Business Agents to stop at the side of road where, if questioned, they could produce the letter that instructed the investigating Highway Patrol Officers to take no action.

**F.      <u>Defendants Diverted Caremark Reimbursements From Local 12's Health & Welfare Fund to IUOE and Purchased PBM Services That Were Well Above Competitive Rates From Other Vendors</u>**

113.     Vince Giblin was Chairman of the Board for Horizon Blue Cross, a paid position with a salary in excess of $200,000, at the time he became General President of the IUOE.  Because of his dual roles, Giblin was able to require use of Blue Cross as the healthcare benefits provider to local unions, including Local 12. Blue Cross utilizes Caremark as its Prescription Benefits Manager ("PBM"). Because of the number of members utilizing the Blue Cross/Caremark benefit, members are entitled to receive a rebate from Caremark, reflecting the members' substantial buying power.  The Caremark rebates should have been paid out to each local union.  Instead, they were paid, in part, to IUOE.  IUOE, in turn, failed to account to Local 12 and other local unions for the rebates they should have received.

114.     The contract with Caremark is held by IUOE, not Local 12.  Terms are negotiated by Trivantage, an entity retained by IUOE, not the Health & Welfare

SPIRO MOORE LLP

Fund at Local 12.  Fees are charged to Local 12's Health & Welfare fund to pay Trivantage, even though Trivantage is not under contract with Local 12.

115.   In 2009, Caremark reached a settlement in *New England Carpenters* as a result of allegations of overcharging third party payors, such as Local 12's Health & Welfare Fund.  In response to being forced by this settlement to reimburse third party payors for overcharges, Caremark asserted a right to unilaterally increase rates charged to Local 12's Health & Welfare Fund for PBM services.  Caremark contended that any challenge to their rate increase constituted a failure to negotiate "in good faith."  Local 12, which was not a party to the contract with Caremark, was left in a position adverse to both IUOE and Caremark.  The Trustees of Local 12's Health & Welfare Fund acquiesced, in violation of their fiduciary duties to members, to this extortionate pricing by Caremark, the PBM imposed on them by Giblin and IUOE.  IUOE First Vice President Waggoner cooperated with Giblin's transaction that amounted to a breach of Giblin's fiduciary duties, rather than risk losing his access to the power and resources available to the Western States Director of IUOE.

116.   Caremark's rates for PBM services are significantly higher than the rates charged by comparable competitors.  For example, Local 3, another IUOE Local in California, put out the PBM package for competitive bid.  Caremark's bid was fourth by price.  Caremark's bid was roughly $4 million higher than the winner of the bidding process.  Giblin was told that Medco had won the bid process, so Giblin was aware that Caremark's rates were significantly higher than other options, and continued insistence on the use of Caremark was detrimental to members and contrary to fiduciary obligations of Fund trustees and Union leadership to their members.  Local 3 and Local 12 are of similar size, thus the bid experience by Local 3 is similar to what Local 12 could have obtained if it had not acquiesced to Giblin.

**CLASS ACTION COMPLAINT**

117.   In the case of Local 3, Giblin forced Local 3 to put the PBM service out for rebid after Giblin received copies of the bids.  With inside information provided by Giblin, Caremark was able to underbid Medco by nearly $2 million, and Local 3 was forced to award the contract to Caremark.  Once Caremark had the contract, it raised its rates back to the level comparable with its initial bid.  Local 3 is now paying PBM rates that are roughly 17% higher than they would have been if IUOE had not interfered in a competitive bidding process.

G.   **Local 12 Allows Employers Contracted With Local 12 to Operate Double-Breasted, Thereby Depriving Members of Protections and Benefits Available Under Union Agreements**

118.   Union contracts with employers hiring Local 12 members require, at minimum, that employers unionized through Local 12 must remain unionized in subsequent labor contracts with Local 12.  The Business Manager, Waggoner, was responsible for supervising all business representatives and ensuring that all collective bargaining agreements for Local 12 were negotiated, fully executed, and that all terms under the collective bargaining agreements were enforced.

119.   Instead, employers subject to collective bargaining agreements operate "double breasted."  In labor parlance, "double breasted" refers to the side-by-side operation of unionized and non-unionized workforces.  For example, Morley Builders is signatory to a Local 12 collective bargaining agreement, but its alter ego, Benchmark Construction, is operated as though it is a non-unionized entity.  Benchmark Construction uses heavy equipment operators.  LKR Group is signatory to a Local 12 collective bargaining agreement, but its alter ego, Group Delta Consultants, Inc. , is operated as though it is a non-unionized entity.  Group Delta Consultants, Inc. uses heavy equipment operators.  Twining Laboratories is signatory to a Local 12 collective bargaining agreement, but its alter ego, Quality Assurance International, is operated as though it is a non-unionized entity.  The

operators of Twining Laboratories and Quality Assurance International are husband and wife, with the husband owning the former and the wife owning the later to conceal double-breasted activity. Quality Assurance International uses heavy equipment operators.  Smith-Emery also operates double-breasted.  The unionized portion of Smith-Emery's operations, on information and belief, is limited to about 30% of Smith-Emery's total operations.

**H.    Steve Montrie, Convicted of Mere Vehicular Manslaughter, Remains a Business Agent Despite Killing an Individual While Driving a Union Vehicle Under the Influence of Alcohol**

120.    In December 2008, Steve Montrie killed an individual while driving a union vehicle under the influence of alcohol.  Ron Sikorski, the President of the Union, was also present.  Using its influence with local officials, Local 12 secured a sentence of vehicular manslaughter, rather than gross vehicular manslaughter, for Montrie.  He was sentenced to three years and served about 18 months.  Previously-ordered restitution to the family of victim, in the amount of about $24,881.99 to one family member and $32,829.05 to another, was rescinded.

121.    Immediately after his release, Mr. Montrie was employed as a business representative by Local 12, in violation of Section 504 of the LMRDA.  Waggoner was aware of the prohibition on hiring individuals convicted of crimes inflicting great bodily injury or death, but nevertheless hired him.  Waggoner recently campaigned for the expungement of Montrie's conviction so that Montrie could serve as an officer, confirming Waggoner's awareness of the restrictions imposed by Section 504.

**I.    Miscellaneous Breaches of Fiduciary Duties**

122.    Employees of various Funds associated with Local 12 were instructed to fabricate receipts for goods and services not received when they traveled for

business purposes but did not exhaust the expense monies provided in advance of their travels.  The purpose of this instruction was two-fold.  First, the administration of the funds was so deficient that the procedures were not in place to receive back unused funds.  The instruction eliminated the need to correct those deficiencies.  Second, when Fund employees complied with this instruction, it was believed by Defendants that engaging in this improper activity, though at the direction of superiors, would prevent employees from discussing the many improprieties they observed.  In other words, Defendants viewed these excess funds as "hush" monies to buy the silence of potential whistle-blowers.

123.    Defendants also utilized the Training Trusts to defraud the State of California out of education funds.  Apprentice members were sometimes instructed to repeat classes multiple times for the purpose of allowing Defendants to defraud California out of monies distributed through the Community College system.

## V.    CLASS ACTION ALLEGATIONS

124.    Plaintiffs bring this action individually, as well as on behalf of each and all other persons similarly situated in a concerted effort to improve wages and working conditions for other, similarly situated employees, and thus, seek class certification under Fed. R. Civ. Proc. 23.

125.    The proposed Class consists of and is defined as:

All individuals that are or have been members of the International Union of Operating Engineers Local 12 at any time within the four years prior to the filing of this action.  Excluded from the Class are all Defendants in this action, and all of their current and former officers, directors, management employees, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees and members; all persons within the third degree of relationship to any of the excluded individuals and any judge who hears or decides any matter in this litigation.

126.    The "agency fee" sub-class is defined as follows:

All member of the Class that are "agency fee" members of Local 12, including all public entity employees who are members of Local 12 for purposes of collective bargaining representation.

SPIRO MOORE LLP

1    127.   Plaintiffs reserve the right to establish sub-classes, or modify any Class

2    or sub-Class definition, as appropriate.

3        128.   At all material times, Plaintiffs were or are members of the Class.

4        129.   There is a well-defined community of interest in the litigation and the

5    class is readily ascertainable:

6        (a)    Numerosity:  The members of the class (and each subclass, if

7               any) are so numerous that joinder of all members would be

8               unfeasible and impractical.  The membership of the entire class

9               is unknown to Plaintiffs at this time, however, the class is

10              estimated to be greater than 10,000 individuals and the identity

11              of such membership is readily ascertainable by inspection of

12              Defendants' records.

13       (b)    Typicality:  Plaintiffs are qualified to, and will, fairly and

14              adequately protect the interests of each class member with

15              whom there is a shared, well-defined community of interest.

16              Plaintiffs' claims are typical of all class members' claims.  For

17              example, Plaintiffs were members of Local 12 within the class

18              period, like all other Class members, and Plaintiffs were injured

19              by manipulation of Local 12 through racketeering activity as all

20              other Class members were.

21       (c)    Adequacy:  Plaintiffs are qualified to, and will, fairly and

22              adequately protect the interests of each class member with

23              whom there is a shared, well-defined community of interest and

24              typicality of claims, as demonstrated herein.  Plaintiffs

25              acknowledge that Plaintiffs have an obligation to make known to

26              the Court any relationship, conflicts or differences with any

27              class member.  Plaintiffs' attorneys, the proposed class counsel,

28              are versed in the rules governing class action discovery,

**CLASS ACTION COMPLAINT**

1    certification, and settlement.

2    (d)    Superiority:  A Class Action is superior to other available

3    methods for the fair and efficient adjudication of the

4    controversy, including consideration of:

5        1)    The interests of the members of the class in individually

6            controlling the prosecution or defense of separate actions;

7        2)    The extent and nature of any litigation concerning the

8            controversy already commenced by or against members of

9            the class;

10       3)    The desirability or undesirability of concentrating the

11           litigation of the claims in the particular forum; and

12       4)    The difficulties likely to be encountered in the

13           management of a class action.

14   (e)    Public Policy Considerations:  Labor organizations are intended

15   to protect employees from the potential for employer abuse of

16   power, but when the parent union conspires with employers, a

17   local union is powerless to protect itself from abuses origination

18   from multiple directions.  Current union members are often

19   afraid to assert their rights out of fear of direct or indirect

20   retaliation.  Former union members know the reputation of large

21   labor organizations as violent and dangerous when challenged.

22   Class actions provide the class members who are not named in

23   the complaint with a type of anonymity that allows for the

24   vindication of their rights at the same time as their privacy and

25   safety is protected.

26   130.    There are common questions of law and fact as to the class (and each

27   subclass, if any) that predominate over questions affecting only individual

28   members, including but not limited to:

SPIRO MOORE LLP

SPIRO MOORE LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(a)    Whether Defendants engaged in racketeering;

(b)    Whether Defendants violated the LMRDA;

(c)    Whether Defendants unlawfully conspired to engage in racketeering;

(d)    Whether Defendants breached fiduciary obligations to the Class; and,

(e)    The appropriate amount of damages, restitution, or monetary penalties resulting from Defendants' violations of law.

131.    This Court should permit this action to be maintained as a class action pursuant to Fed. R. Civ. P. 23 because:

(a)    The questions of law and fact common to the class predominate over any question affecting only individual members;

(b)    A class action is superior to any other available method for the fair and efficient adjudication of the claims of the members of the class;

(c)    The members of the class are so numerous that it is impractical to bring all members of the class before the Court;

(d)    Plaintiff, and the other members of the class, will not be able to obtain effective and economic legal redress unless the action is maintained as a class action;

(e)    There is a community of interest in obtaining appropriate legal and equitable relief for the statutory violations, and in obtaining adequate compensation for the damages and injuries for which Defendants are responsible in an amount sufficient to adequately compensate the members of the class for the injuries sustained;

(f)    Without class certification, the prosecution of separate actions by individual members of the class would create a risk of:

1)    Inconsistent or varying adjudications with respect to

individual members of the class which would establish
incompatible standards of conduct for Defendants; and/or

2)  Adjudications with respect to the individual members
which would, as a practical matter, be dispositive of the
interests of other members not parties to the adjudications,
or would substantially impair or impede their ability to
protect their interests, including but not limited to the
potential for exhausting the funds available from those
parties who are, or may be, responsible Defendants; and,

(g)  Defendants have acted or refused to act on grounds generally
applicable to the class, thereby making final injunctive relief
appropriate with respect to the class as a whole.

132.   Plaintiffs contemplate the eventual issuance of notice to the proposed members of the class that would set forth the subject and nature of the instant action.  The Defendants' own business records may be utilized for assistance in the preparation and issuance of the contemplated notices.  To the extent that any further notices may be required, Plaintiff would contemplate the use of additional mailings.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. §§ 1961-68])
### By Plaintiffs against All Defendants

133.   Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

SPIRO MOORE LLP

134.   Defendants are each a "person" as that term is defined by 18 U.S.C. section 1961(3).

135.   Local 12 constitutes an enterprise as that term is defined by 18 U.S.C. § 1961(4) (hereinafter known as the "Local 12 ENTERPRISE").

136.   The LOCAL 12 ENTERPRISE is engaged in, and its activities affect, interstate and foreign commerce.

137.   The DEFENDANTS are, and at all relevant times were, associated with the LOCAL 12 ENTERPRISE.

138.   As described herein, the DEFENDANTS, beginning at least as early as 2000, and continuing to the present, knowingly and willfully set into motion an over-arching scheme to defraud the LOCAL 12 ENTERPRISE out of revenues, cost savings, and membership.  The primary goal in all instances was the unlawful enrichment of the DEFENDANTS through activities of the LOCAL 12 ENTERPRISE.  Numerous kickback schemes enabled employers to avoid contractual obligations while providing bribes to Defendants.  Assets in trust funds were co-mingled and diverted to personal uses.  To accomplish the over-arching goal of fraudulent and unlawful enrichment, the DEFENDANTS engaged in and/or authorized a variety of unlawful activities, including the use of threats of economic harm and violence to seize control of Local 12 and prevent discovery of the many asset diversion and kickback schemes enriching the leadership of the IUOE.

139.   Rights guaranteed under the LMRDA are protectable property interests held by Plaintiffs and other Class members.  Plaintiffs' and Class members' rights under the LMRDA are extortable in violation of the Hobbs Act.

140.   Assets intended to benefit Plaintiffs and Class members when deposited into trust account, including the Health & Welfare Fund and others, represent tangible assets subject to conversion in violation of the Hobbs Act.

141.   Plaintiff and Class members were and are aware of ties between the leadership of IUOE and organized crime syndicates in New York and New Jersey.

As a result of that awareness, threats of economic and physical harm directed at the Plaintiffs and other Class members were viewed as highly credible and elicited substantial fear and concern amongst Plaintiffs and other Class members.  In fact, members of Local 12 were physically beaten for speaking up against leadership of Local 12.

142.    Beginning at least as early as 2000 and continuing to the present, the DEFENDANTS, in furtherance of and for the purpose of executing the schemes and artifices to defraud and divert Local 12 resources described herein, on numerous occasions engaged in the extortion of rights guaranteed to Plaintiffs and other Class members under the LMRDA and other laws.  Each such extortionate activity in connection with the described schemes and artifices to defraud and divert Local 12 resources constitutes a distinct violation of the Hobbs Act, 18 U.S.C. § 1951, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  The unlawful extortion of property and rights secured under the LMRDA and other laws include, but is not limited to, the following acts whereby the DEFENDANTS:

(a)    Obtained the voting rights of Plaintiffs and other Class members by utilizing threats of economic and physical harm to control the winners of elections at Local 12;

(b)    Actively prevented members from speaking out at meetings against leadership;

(c)    Obtained assets belonging rightfully to Plaintiffs and other Class members by utilizing threats of economic and physical harm to control Local 12's ability to investigate asset diversions.

143.    Beginning at least as early as 2000 and continuing to the present, the DEFENDANTS, in furtherance of and for the purpose of executing the schemes and artifices to defraud described herein, on numerous occasions used and caused to be used the United States Mails and other commercial interstate carriers by both

placing and causing to be placed letters and other mailable matter in the authorized depositories of such carriers and receiving and causing to be received letters and other matter from such carriers.  Each such use of the United States mails and other carriers in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. § 1341, relating to mail fraud, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  The unlawful use of the mails includes, but is not limited to, the following:

    (a)    Fraudulent mailing from Local 12's leadership indicating that Local 12's funds were in sound financial condition.

    (b)    Fraudulent mailings concerning illegal transfers of assets between funds, including transfers of heavy equipment deleted from fund inventories.

    (c)    Fraudulent mailings concerning the source of "in-kind" political contributions.

144.    By issuing threats of physical assault, as described above, Defendants engaged in racketeering activity as defined by 18 U.S.C. § 1961(1)(A).

145.    Beginning at least as early as 2000 and continuing to the present, the DEFENDANTS, in furtherance of and for the purpose of executing the schemes and artifices to defraud described herein, on numerous occasions used and caused to be used wire communications in interstate and foreign commerce by both making and causing to be made wire communications.  Each such use of a wire communication in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. § 1343, relating to wire fraud, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).  The unlawful use of wire communications includes, but is not limited to, the following:

CLASS ACTION COMPLAINT

(a)     False online information regarding the integrity of funds associated with Local 12;

(b)     Acceptance via wire, on occasions too numerous to identify herein, and at times known exclusively by Defendants, of fraudulently obtained kickback payments from employers.

146.     Beginning at least as early as 2000 and continuing to the present, the DEFENDANTS, in furtherance of and for the purpose of executing the schemes and artifices to defraud described herein, on numerous occasions knowingly engaged in and caused to occur monetary transactions in criminally derived property with value in excess of $10,000. The transactions were accomplished by depositing, withdrawing or transferring funds by, through, or to a financial institution, as such an institution is defined by 18 U.S.C. § 1956. Funds used in such transactions were derived from offenses listed in 18 U.S.C. § 1961(1), including, but not limited to, funds derived from mail fraud, in violation 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343. Each such monetary transaction in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. § 1957, relating to unlawful monetary transactions and money laundering, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b). The unlawful monetary transactions include, but are not limited to, the following:

(a)     Acceptance of payments by Waggoner and his co-conspirators from employers, at times known exclusively to Defendants;

(b)     Acceptance of payments by Waggoner for the sale of real estate belonging to Local, at times known exclusively to Defendants;

(c)     Deposits by Waggoner at Amalgamated Bank that were diverted from Local 12 fund assets and used to prop up Amalgamated Bank while under investigation by the FDIC.

CLASS ACTION COMPLAINT

147.   Beginning as least as early as 2000, and continuing to the present, the DEFENDANTS, in furtherance of and for the purpose of executing the schemes and artifices to defraud described herein, on numerous occasions knowingly traveled in interstate commerce and used facilities of interstate commerce (including, but not limited to, the mails) with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of unlawful activities (including violations of 18 U.S.C. § 1957), and thereafter performed or attempted to perform such violations.  Each such interaction with facilities of interstate commerce in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. section 1952 (the "Travel Act"), relating to travel in interstate commerce with intent to facilitate certain unlawful activities, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).  These violations included habitual interstate travel by the DEFENDANTS to and from Local 12 for the purpose of delivering threats to ensure that schemes for fraudulent profiteering could continue unabated.

148.   The DEFENDANTS' repeated violations of 18 U.S.C. §§ 1341, 1343, 1951, 1952 and 1957 extended over a period of years and involved distinct and independent criminal acts.  Those criminal acts were neither isolated or sporadic events, but involved the regular and repeated violation as a way of doing business and to accomplish the DEFENDANTS' desired ends in the course of the continuing business of the LOCAL 12 ENTERPRISE.  These predicate acts were related to each other by virtue of (a) common participants, (b) similarly situated victims, (c) common methods of commission through the habitual dissemination of fraudulent and misleading information, and (d) the common purpose and common result defrauding and looting the LOCAL 12 ENTERPRISE, all while enriching the DEFENDANTS.  As such, this conduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

SPIRO MOORE LLP

149.   The fraudulent, unlawful and improper activities of the DEFENDANTS threatens to continue.  Based upon the past pattern of activity, other Local Unions either have or will likely be defrauded by the DEFENDANTS.  Based upon the past pattern of activity, the DEFENDANTS will likely continue to defraud Local Unions like Local 12.  Furthermore, the DEFENDANTS are able, based upon their managerial and controlling positions, to replace management in Local Unions, which could thereafter be defrauded and looted without consequence in a manner similar to the schemes and artifices outlined herein.

150.   The DEFENDANTS all violated or aided violation of 18 U.S.C. § 1962(c) by directly or indirectly conducting or participating in the conduct of the affairs of the LOCAL 12 ENTERPRISE through a pattern of racketeering activity.

151.   The DEFENDANTS' violation of 18 U.S.C. § 1962(c) caused the Plaintiffs and the Class to suffer direct injury in amounts as may be shown according to proof at time of trial.

## SECOND CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. §§ 1961-68])
### By Plaintiffs against All Defendants

152.   Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

153.   Defendants are each a "person" as that term is defined by 18 U.S.C. section 1961(3).

154.   Local 12 constitutes an enterprise as that term is defined by 18 U.S.C. § 1961(4) (hereinafter known as the "Local 12 ENTERPRISE").

155.   The LOCAL 12 ENTERPRISE is engaged in, and its activities affect, interstate and foreign commerce.

156.    From at least 1994 and continuing through to the present, Defendants, being persons employed by or associated with the LOCAL 12 ENTERPRISE at all relevant times herein, unlawfully and willfully combined, conspired, confederated and agreed each with the other to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the LOCAL 12 ENTERPRISE through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1962(d).  The times and locations and forms of such agreements constitute information uniquely within the control of the DEFENDANTS.

157.    As part of this conspiracy, the DEFENDANTS each personally plotted, conspired and agreed to commit two or more fraudulent and illegal racketeering acts and thereby conducted and agreed to conduct the affairs of the LOCAL 12 ENTERPRISE through the pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) described generally herein and specifically in the First Claim for Relief.

158.    In furtherance of the conspiracy and to effect the objects thereof, the DEFENDANTS committed and caused to be committed a series of overt acts, including, but not limited to, the following:

(a)    Habitual interstate travels by the Defendants to and from Local 12, for the purpose of delivering threats to Plaintiffs and ensuring that Defendants asset diversion and kickback schemes continued unabated and unchallenged;

(b)    Obtained the voting rights of Plaintiffs and other Class members by utilizing threats of economic and physical harm to control the winners of elections at Local 12;

(c)    Obtained assets belonging rightfully to Plaintiffs and other Class members by utilizing threats of economic and physical harm to control Local 12's ability to investigate asset diversions;

(d)    Actively prevented members from speaking out at meetings against leadership;

CLASS ACTION COMPLAINT

(e)    Fraudulent mailing from Local 12's leadership indicating that Local 12's funds were in sound financial condition.

(f)    Fraudulent mailings concerning illegal transfers of assets between funds, including transfers of heavy equipment deleted from fund inventories.

(g)    Fraudulent mailings concerning the source of "in-kind" political contributions.

(h)    False online information regarding the integrity of funds associated with Local 12;

(i)    Acceptance via wire, on occasions too numerous to identify herein, and at times known exclusively by Defendants, of fraudulently obtained kickback payments from employers.

(j)    Acceptance of payments by Waggoner and his co-conspirators from employers, at times known exclusively to Defendants;

(k)    Acceptance of payments by Waggoner for the sale of real estate belonging to Local, at times known exclusively to Defendants;

(l)    Deposits by Waggoner at Amalgamated Bank that were diverted from Local 12 fund assets and used to prop up Amalgamated Bank while under investigation by the FDIC.

(m)    Upon information and belief, similar violations constituting predicate acts were perpetrated upon other local union chapters around the country.

159.    The Defendants' violation of 18 U.S.C. § 1962(d) caused the Plaintiffs and the Class to suffer direct injury in amounts as may be shown according to proof at time of trial.

### THIRD CLAIM FOR RELIEF

### (Violations of 18 U.S.C. § 1962(b) of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. §§ 1961-68])

### By Plaintiffs against All Defendants

160.   Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

161.   Each and every Defendant named herein is a "person" as that term is defined by 18 U.S.C. section 1961(3).

162.   Local 12 constitutes an enterprise as that term is defined by 18 U.S.C. § 1961(4) (hereinafter known as the "Local 12 ENTERPRISE").

163.   The Local 12 ENTERPRISE is engaged in, and its activities affect, interstate and foreign commerce.

164.   Rights guaranteed under the LMRDA are protectable property interests held by Plaintiffs and other Class members.  Plaintiffs' and Class members' rights under the LMRDA are extortable in violation of the Hobbs Act.

165.   Assets intended to benefit Plaintiffs and Class members when deposited into trust account, including the Health & Welfare Fund and others, represent tangible assets subject to conversion in violation of the Hobbs Act.

166.   Plaintiff and Class members were and are aware of ties between leadership of IUOE and organized crime syndicates in New York and New Jersey. As a result of that awareness, threats of economic and physical harm directed at Plaintiffs and other Class members were viewed as highly credible and elicited substantial fear and concern amongst Plaintiffs and other Class members.

167.   Beginning at least as early as 2005 and continuing to the present, the DEFENDANTS, in furtherance of and for the purpose of executing the schemes and artifices to defraud and divert Local 12 resources described herein, on numerous occasions engaged in the extortion of rights guaranteed to Plaintiffs and other Class members under the LMRDA and other laws.  Each such extortionate

activity in connection with the described schemes and artifices to defraud and divert Local 12 resources constitutes a distinct violation of the Hobbs Act, 18 U.S.C. § 1951, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  The unlawful extortion of property and rights secured under the LMRDA and other laws include, but is not limited to, the following acts by the DEFENDANTS:

> (a)     Obtained the voting rights of Plaintiffs and other Class members by utilizing threats of economic and physical harm to control the winners of elections at Local 12;

> (b)     Actively prevented members from speaking out at meetings against leadership;

> (c)     Obtained assets belonging rightfully to Plaintiffs and other Class members by utilizing threats of economic and physical harm to control Local 12's ability to investigate asset diversions.

168.     Beginning at least as early as 2007, and continuing to the present, the Defendants, in furtherance of and for the purpose of executing the schemes and artifices to defraud and seize control of Local Unions, including the Local 12 ENTERPRISE, on numerous occasions used and caused to be used mail depositories of the United States Mails and other commercial interstate carriers by both placing and causing to be placed letters and other mailable matter in the authorized depositories of such carriers and receiving and causing to be received letters and other matter from such carriers.  Each such use of the United States Mails and other carriers in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. § 1341, relating to mail fraud, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  The unlawful use of the mails includes, but is not limited to, the following:

(a)    Fraudulent mailing from Local 12's leadership indicating that Local 12's funds were in sound financial condition.

(b)    Fraudulent mailings concerning illegal transfers of assets between funds, including transfers of heavy equipment deleted from fund inventories.

(c)    Fraudulent mailings concerning the source of "in-kind" political contributions.

169.    Beginning at least as early as 2007, and continuing to the present, the Defendants, in furtherance of and for the purpose of executing the schemes and artifices to defraud and seize control of Local Unions, including the Local 12 ENTERPRISE, on numerous occasions used and caused to be used wire communications in interstate and foreign commerce by both making and causing to be made wire communications.  Each such use of a wire communication in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. § 1343, relating to wire fraud, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  The unlawful use of wire communications includes, but is not limited to, the following:

(a)    False online information regarding the integrity of funds associated with Local 12;

(b)    Acceptance via wire, on occasions too numerous to identify herein, and at times known exclusively by Defendants, of fraudulently obtained kickback payments from employers.

170.    Beginning at least as early as 2007 and continuing to the present, the Defendants, in furtherance of and for the purpose of executing the schemes and artifices to defraud and seize control of Local Unions, including the Local 12 ENTERPRISE, on numerous occasions knowingly engaged in and caused to occur monetary transactions in criminally derived property with value in excess of

SPIRO MOORE LLP

$10,000. The transactions were accomplished by depositing, withdrawing or transferring funds by, through, or to a financial institution, as such an institution is defined by 18 U.S.C. § 1956. Funds used in such transactions were derived from offenses listed in 18 U.S.C. § 1961(1), including, but not limited to, funds derived from mail fraud, in violation 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343. Each such monetary transaction in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. § 1957, relating to unlawful monetary transactions and money laundering, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b). The unlawful monetary transactions include, but are not limited to, the following:

> (a) Acceptance of payments by Waggoner and his co-conspirators from employers, at times known exclusively to Defendants;
>
> (b) Acceptance of payments by Waggoner for the sale of real estate belonging to Local, at times known exclusively to Defendants;
>
> (c) Deposits by Waggoner at Amalgamated Bank that were diverted from Local 12 fund assets and used to prop up Amalgamated Bank while under investigation by the FDIC.

171. Beginning as least as early as 1997, and continuing to the present, the Defendants, in furtherance of and for the purpose of executing the schemes and artifices to defraud and seize control of Local Unions, including the Local 12 ENTERPRISE, on numerous occasions knowingly traveled in interstate commerce and used facilities of interstate commerce (including, but not limited to, the mails) with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of unlawful activities (including violations of 18 U.S.C. § 1957), and thereafter performed or attempted to perform such violations. Each such interaction with facilities of interstate commerce in connection with the described schemes and artifices to defraud constitutes a

separate and distinct violation of 18 U.S.C. § 1952 (the "Travel Act"), relating to travel in interstate commerce with intent to facilitate certain unlawful activities, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  These violations included habitual interstate travels by the Defendants to and from Local 12, for the purpose of delivering threats to Plaintiffs and ensuring that Defendants asset diversion and kickback schemes continued unabated and unchallenged.

172.    The DEFENDANTS' repeated violations of 18 U.S.C. §§ 1341, 1343, 1951, 1952 and 1957 extended over a period of at least one year and involved distinct and independent criminal acts.  Those criminal acts were neither isolated or sporadic events, but involved the regular and repeated violation as a way of doing business and to accomplish the Defendants' desired ends in the course of pursuing their unlawful scheme to seize control of Local Unions, including the Local 12 ENTERPRISE.  These predicate acts were related to each other by virtue of (a) common participants, (b) similarly situated victims, (c) common methods of commission through the habitual dissemination of fraudulent and misleading information and the dissemination of threats of physical and economic harm to Plaintiffs and other Class members, and (d) the common purpose and common result of unlawfully maintaining control over Local 12, all while enriching the Defendants at the expense of Local 12 members.  As such, this conduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

173.    The fraudulent, unlawful and improper activities of the Defendants threaten to continue.  Based upon the past pattern of activity, other existing Local Unions either have or will likely be seized on false pretexts by the Defendants. Based upon the past pattern of activity, the Defendants will likely continue to defraud and deprive members of their membership rights and assets.  Furthermore, the Defendants are able to implement the same unlawful schemes in other local unions if not stopped here and now.

174.    The Defendants all violated or aided in violation of 18 U.S.C. §
1962(b) by acquiring, directly or indirectly, control of the Local 12 ENTERPRISE
through a pattern of racketeering activity.

175.    The Defendants' violation of 18 U.S.C. § 1962(b) caused the Plaintiffs
and the Class to suffer direct injury in amounts as may be shown according to proof
at time of trial.

## FOURTH CLAIM FOR RELIEF

## (Violations of 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. §§ 1961-68])

## By Plaintiffs against All Defendants

176.    Plaintiffs re-allege, and incorporate by reference, each and every
paragraph herein.

177.    Each and every Defendant named herein is a "person" as that term is
defined by 18 U.S.C. § 1961(3).

178.    Local 12 constitutes an enterprise as that term is defined by 18 U.S.C.
§ 1961(4) (hereinafter known as the "Local 12 ENTERPRISE").

179.    The Local 12 ENTERPRISE is engaged in, and its activities affect,
interstate and foreign commerce.

180.    From at least 2000 and continuing through to the present, Defendants
unlawfully and willfully combined, conspired, confederated and agreed each with
the other to violate 18 U.S.C. § 1962(b), that is, to acquire, directly or indirectly,
control of the Local 12 ENTERPRISE through a pattern of racketeering activity, all
in violation of 18 U.S.C. § 1962(d).  The times and locations and forms of such
agreements constitute information uniquely within the control of the Defendants.

181.    As part of this conspiracy, the Defendants each personally plotted,
conspired and agreed to commit two or more fraudulent and illegal racketeering
acts and thereby acquired and agreed to acquire, directly or indirectly, control of

the Local 12 ENTERPRISE through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b) described generally herein and specifically in the Third Claim for Relief.

182.   In furtherance of the conspiracy and to effect the objects thereof, the Defendants committed and caused to be committed a series of overt acts, including, but not limited to, the following:

(a)   Habitual interstate travels by the Defendants to and from Local 12, for the purpose of delivering threats to Plaintiffs and ensuring that Defendants asset diversion and kickback schemes continued unabated and unchallenged;

(b)   Obtained the voting rights of Plaintiffs and other Class members by utilizing threats of economic and physical harm to control the winners of elections at Local 12;

(c)   Obtained assets belonging rightfully to Plaintiffs and other Class members by utilizing threats of economic and physical harm to control Local 12's ability to investigate asset diversions;

(d)   Actively prevented members from speaking out at meetings against leadership;

(e)   Fraudulent mailing from Local 12's leadership indicating that Local 12's funds were in sound financial condition.

(f)   Fraudulent mailings concerning illegal transfers of assets between funds, including transfers of heavy equipment deleted from fund inventories.

(g)   Fraudulent mailings concerning the source of "in-kind" political contributions.

(h)   False online information regarding the integrity of funds associated with Local 12;

SPIRO MOORE LLP

(i) Acceptance via wire, on occasions too numerous to identify herein, and at times known exclusively by Defendants, of fraudulently obtained kickback payments from employers.

(j) Acceptance of payments by Waggoner and his co-conspirators from employers, at times known exclusively to Defendants;

(k) Acceptance of payments by Waggoner for the sale of real estate belonging to Local, at times known exclusively to Defendants;

(l) Deposits by Waggoner at Amalgamated Bank that were diverted from Local 12 fund assets and used to prop up Amalgamated Bank while under investigation by the FDIC.

(m) Upon information and belief, similar violations constituting predicate acts were perpetrated upon other local union chapters around the country.

183. The Defendants' violation of 18 U.S.C. § 1962(d) caused the Plaintiffs and the Class to suffer direct injury in amounts as may be shown according to proof at time of trial.

## FIFTH CLAIM FOR RELIEF

### (Violation of Bill of Rights Secured by Labor Management Disclosure Act, 29 U.S.C. § 501)

### By Plaintiffs against All Defendants

184. Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

185. Jurisdiction is conferred on this Court pursuant to 29 U.S.C. § 412.

186. Violations of the Labor Management Disclosure Act, Title I (Bill of Rights), occurred within the Central District of California where Local 12 is headquartered.  As such, venue is proper in this District pursuant to 29 U.S.C. § 412.

187.    Violations of the Labor Management Disclosure Act, Title IV (Elections), occurred within the Central District of California where Local 12 is headquartered.  As such, venue is proper in this District pursuant to 29 U.S.C. § 412.

188.    Plaintiffs are members of the International Union of Operating Engineers, in the Local 12 Chapter of that labor union.

189.    Defendant IUOE is a labor organization as defined in 29 U.S.C. § 402(i).

190.    Defendants, described above, are officials of IUOE or Local 12 or agents of IUOE or Local 12 or both.

191.    Section 411 of the LMRDA, 29 U.S.C. § 411, provides in part:

(a)(1) Equal rights

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of speech and assembly

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(1) and (2).  Defendants, through their schemes to usurp control of Local 12 described above, deprived Plaintiffs of their right to honest, open, fair and free elections to determine the leadership of Local 12.

192.   Defendants denied union members in good standing, including Plaintiffs and the Class, the right to be candidates for and to hold union office, by imposing unreasonable meeting attendance qualifications, in violation of section 401(e) of the Act, 29 U.S.C.A. § 481(e).

193.   Defendants denied union members in good standing, including Plaintiffs and the Class, a reasonable opportunity to nominate candidates by imposing unreasonable qualifications on candidacy, in violation of section 401(e) of the Act, 29 U.S.C.A. § 481(e).

194.   As a result of threats of physical and economic violence, demonstrated as credible through beatings and assault of Local 12 members, Plaintiffs reasonably concluded that internal procedures were futile and that IUOE, Local 12 and their joint leadership would not permit a democratic process to proceed.

195.   The violations of the LMRDA by the identified Defendants is current and ongoing in nature.

196.   Plaintiffs seek equitable orders restraining: (1) IUOE and its leadership and the current leadership of Local 12 from interfering in the democratic operation of Local 12; and, (2) requiring the immediate institution of a valid leadership election.  Plaintiffs also seek a judgment directing the conduct of a new election under the supervision of the Secretary of Labor.  Plaintiffs also request punitive damages for Defendants' malicious violations of their LMRDA rights.

## SIXTH CLAIM FOR RELIEF
## BREACHES OF FIDUCIARY DUTIES ARISING UNDER ERISA OR COMMON LAW
### By Plaintiffs Against Specific Defendants

197.   Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

198.    ERISA § 502(a)(2), 29 U.S.C.A. § 1132(a)(2), authorizes a plan participant or beneficiary to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C.A. § 1109. Section 409 requires "any person who is a fiduciary … who breaches any of the … duties imposed upon fiduciaries … to make good to such plan any losses to the plan …" Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate …"

199.    Plaintiffs and Class Members are or were at relevant times participants and/or beneficiaries in the ERISA-governed plans alleged herein and associated with Local 12, including, but not limited to, the General Pension Fund, the Health & Welfare Fund, and the Operating Engineers Training Trusts, among others.

200.    Defendants identified herein as Administrators and/or Trustees and/or IUOE Executives and/or Local Executives have assumed fiduciary obligations to Plaintiffs and Class Members.

201.    According to the terms of the plans identified, participants such as the Plaintiffs have a right to periodically direct the plans, by and through the plans' delegated administrators and trustees, as to how the participants want his or her monies directed.

202.    Plaintiffs are not requires to exhaust administrative remedies pertaining to breaches of fiduciary duty claims arising under ERISA.

203.    As a direct result of the activities alleged herein, the plans have lost monies, or engaged in activities that a prudent investor would not engage in and suffered losses as a result, in amounts not presently known with precision but exceeding $25 million.

204.    Plaintiffs request equitable and declaratory relief, including order requiring Defendants or their bonding agents or insurers to "make whole" the ERISA-governed plans misused by Defendants.

**CLASS ACTION COMPLAINT**

# SEVENTH CLAIM FOR RELIEF

## AIDING AND ABETTING

### By Plaintiffs Against All Defendants

205.    Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

206.    As described above, Defendants engaged in a pattern of oppression intended to restrict Local 12's ability to discover or contest numerous asset diversion schemes put in place by Defendants to enrich themselves at the expense of Local 12 and its members, including Plaintiffs.

207.    As described above, Defendants knew that other Defendants were engaged in unlawful conduct intended to restrict Local 12's ability to discover or contest numerous asset diversion schemes put in place by various Defendants for self-enrichment at the expense of Local 12 and its members, including Plaintiffs.

208.    As described above, Defendants knew that threats of violence were issued against Plaintiffs and others.

209.    As described above, Defendants knew that assets were diverted from or denied to Local 12.

214.    As described above, Defendants knew that threats of physical and economic harm directed at Plaintiffs and others were likely to deprive Local 12 of democratically elected leadership.  Despite this knowledge, Defendants persisted in their conduct, resulting in the removal of democratically elected officers of Local 12 and the imposition of officers completely controlled by IUOE.

215.    As described above, all Defendants cooperated with the unlawful activities described herein or failed to warn appropriate persons and governmental officials of the unlawful conduct used to divert assets and obtain total control of Local 12.

217.    As a direct and proximate result of Defendants' aiding and abetting one another, the Plaintiffs and the Class members have been damaged in an amount

CLASS ACTION COMPLAINT

to be proven at trial.  Plaintiffs and the Class Members are also entitled to recover punitive damages in an amount sufficient to punish Defendants and to deter future conduct of this type.

**<u>PRAYER FOR RELIEF</u>**

Plaintiffs, individually, and on behalf of all others similarly situated, pray for relief and judgment against Defendants, jointly and severally, as follows:

<u>Class Certification</u>

1.    That this action be certified as a class action;

2.    That Plaintiffs be appointed as the representative of the Class; and

3.    That counsel for Plaintiffs be appointed as Class Counsel.

<u>As to the First Claim for Relief</u>

4.    For compensatory and general damages, as shown according to proof;

5.    For treble damages;

6.    For the appointment of a Receiver to operate Defendant IUOE in a lawful manner, to assure the cessation of its illegal acts and to assure the proper handling of income and payments;

7.    For an accounting;

8.    For temporary and permanent injunctive relief;

9.    For disgorgement of monies improperly obtained;

10.    For prejudgment interest according to law;

11.    For attorney's fees;

12.    For costs of suit; and,

13.    For such other and further relief as this Court may deem proper.

**CLASS ACTION COMPLAINT**

<div style="text-align:center; writing-mode: vertical-rl;">SPIRO MOORE LLP</div>

<div align="center">As to the Second Claim for Relief</div>

14.   For compensatory and general damages, as shown according to proof;

15.   For treble damages;

16.   For the appointment of a Receiver to operate Defendant IUOE in a lawful manner, to assure the cessation of its illegal acts and to assure the proper handling of income and payments;

17.   For an accounting;

18.   For temporary and permanent injunctive relief;

19.   For disgorgement of monies improperly obtained;

20.   For prejudgment interest according to law;

21.   For attorney's fees;

22.   For costs of suit; and,

23.   For such other and further relief as this Court may deem proper.

<div align="center">As to the Third Claim for Relief</div>

24.   For compensatory and general damages, as shown according to proof;

25.   For treble damages;

26.   For the appointment of a Receiver to operate Defendant IUOE in a lawful manner, to assure the cessation of its illegal acts and to assure the proper handling of income and payments;

27.   For an accounting;

28.   For temporary and permanent injunctive relief;

29.   For disgorgement of monies improperly obtained;

30.   For prejudgment interest according to law;

31.   For attorney's fees;

32.   For costs of suit; and,

33.   For such other and further relief as this Court may deem proper.

<div align="center">CLASS ACTION COMPLAINT</div>

As to the Fourth Claim for Relief

34. For compensatory and general damages, as shown according to proof;

35. For treble damages;

36. For the appointment of a Receiver to operate Defendant IUOE in a lawful manner, to assure the cessation of its illegal acts and to assure the proper handling of income and payments;

37. For an accounting;

38. For temporary and permanent injunctive relief;

39. For disgorgement of monies improperly obtained;

40. For prejudgment interest according to law;

41. For attorney's fees;

42. For costs of suit; and,

43. For such other and further relief as this Court may deem proper.

As to the Fifth Claim for Relief

44. For compensatory and general damages, as shown according to proof;

45. For the appointment of a Receiver to operate Defendant IUOE in a lawful manner, to assure the cessation of its illegal acts and to assure the proper handling of income and payments;

46. For temporary and permanent injunctive relief;

47. For such other and further relief as this Court may deem proper.

As to the Sixth Claim for Relief

48. For temporary and permanent injunctive relief;

49. For declaratory relief;

50. For appropriate "make whole" equitable relief authorized pursuant to ERISA;

51. For attorney's fees and costs pursuant to ERISA;

1    52.    For such other and further relief as this Court may deem proper.

2

3

4              As to the Seventh Claim for Relief

5    53.    For compensatory and general damages, as shown according to proof;

6    54.    For exemplary damages;

7    55.    For the appointment of a Receiver to operate Defendant IUOE in a

8    lawful manner, to assure the cessation of its illegal acts and to assure the proper

9    handling of income and payments;

10   56.    For an accounting;

11   57.    For temporary and permanent injunctive relief;

12   58.    For disgorgement of monies improperly obtained;

13   59.    For prejudgment interest according to law;

14   60.    For attorney's fees;

15   61.    For costs of suit; and,

16   62.    For such other and further relief as this Court may deem proper.

17   Dated: December 7, 2012              Respectfully submitted,

18                                        SPIRO MOORE LLP

19

20                                        By: _____

21                                        H. Scott Leviant

22                                        Attorneys for Plaintiffs

23

24

25

26

27

28

SPIRO MOORE LLP

# DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Dated: December 7, 2012

Respectfully submitted,

SPIRO MOORE LLP

By:_____

H. Scott Leviant

Attorneys for Plaintiffs

**CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Audrey B. Collins and the assigned discovery Magistrate Judge is Patrick J. Walsh.

The case number on all documents filed with the Court should read as follows:

## CV12- 10506 ABC (PJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)      NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| MARIO SALAS, individually, and on behalf of all others similarly situated; [see Attachment A (Complaint caption pages) for full list of Plaintiffs] | ) ) ) ) |
| _Plaintiff(s)_ | ) |
| v. | ) |
| INTERNATIONAL UNION OF OPERATING ENGINEERS, a trade union; [see Attachment A (Complaint caption pages) for full list of Defendants] | ) ) ) ) |
| _Defendant(s)_ | ) |

Civil Action No.

## CV1 2-10506 ʌʙ⸀ (Pᴊwₗ)

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Ira Spiro
H. Scott Leviant
SPIRO MOORE LLP
11377 W. Olympic Blvd., 5th Floor
Los Angeles, CA 90064

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: DEC - 7 2012

SHEA BOURGEOIS

_Signature of Clerk or Deputy Clerk_

1184

# ATTACHMENT A TO SUMMONS

Ira Spiro, State Bar No. 67641
    ira@spiromoore.com
H. Scott Leviant, State Bar No. 200834
    scott@spiromoore.com
**SPIRO MOORE LLP**
11377 W. Olympic Blvd., 5th Floor
Los Angeles, California 90064-1683
Telephone:  (310) 235-2468
Facsimile:   (310) 235-2456

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIO SALAS, individually, and on behalf of all others similarly situated; MELVIN CHAMBERLAIN, individually, and on behalf of all others similarly situated; ALBIN WATSON, individually, and on behalf of all others similarly situated; JOHN PAXIN, individually, and on behalf of all others similarly situated; <br><br> Plaintiffs, <br><br> vs. <br><br> INTERNATIONAL UNION OF OPERATING ENGINEERS, a trade union; WILLIAM C. WAGGONER, an individual; VINCE GIBLIN, an individual; JAMES T. CALLAHAN, an individual; BRIAN E. HICKEY, an individual; PATRICK L. SINK, an individual; JERRY KALMAR, an individual; RUSSELL E. BURNS, an individual; RODGER KAMINSKA, an individual; JAMES M. SWEENEY, an individual; | Case No.: <br><br> CLASS ACTION <br><br> **CLASS ACTION COMPLAINT FOR:** <br><br> 1. Violations Of Racketeer Influenced And Corrupt Organizations Act [18 U.S.C. § 1962(c)] <br> 2. Violations Of Racketeer Influenced And Corrupt Organizations Act [18 U.S.C. § 1962(d)] <br> 3. Violations Of Racketeer Influenced And Corrupt Organizations Act [18 U.S.C. § 1962(b)] <br> 4. Violations Of Racketeer Influenced And Corrupt Organizations Act [18 U.S.C. § 1962(d)] <br> 5. Violations of Labor Management Disclosure Act [29 U.S.C. § 501] <br> 6. Breaches of Fiduciary Duties [ERISA] <br> 7. Aiding and Abetting <br><br> **DEMAND FOR JURY TRIAL** |

SPIRO MOORE LLP

**CLASS ACTION COMPLAINT**

ROBERT T. HEENAN, an individual;
DANIEL J. MCGRAW, an individual;
DAREN KONOPASKI, an individual;
MICHAEL GALLAGHER, an individual;
GREG LALEVEE, an individual;
TERRANCE E. MCGOWAN, an individual;
LOUIS G. RASETTA, an individual;
JAMES VAN DYKE, an individual;
PATRICIA M. WAGGONER, an individual;
BERT TOLBERT, an individual;
MICKEY J. ADAMS, an individual;
KURT GLASS, an individual;
RON SIKORSKI, an individual;
DAN BILLY, an individual;
DAN HAWN, an individual;
LARRY DAVIDSON, an individual;
STEVE BILLY, an individual;
FRED YOUNG, an individual;
C. W. POSS, an individual;
JOHN NELSON, an individual;
WALT ELLIOT, an individual;
MITCH WHITE, an individual;
MIKE RODDY, an individual;
MICHAEL CRAWFORD, an individual;
BRUCE COOKSEY, an individual;
MIKE PRLICH, an individual;
DON BOURGUIGNON, an individual;
JOHN SAWYER, an individual;
PAUL VON BERG, an individual;
JIM HULSE, an individual;
MIKE GOMEZ, an individual;
OPERATING ENGINEERS FUNDS
INC. a non-profit corporation; and
DOES 1 through 10, inclusive,

Defendants.

CLASS ACTION COMPLAINT

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) <br> Mario Salas, Melvin Chamberlain, Albin Watson and John Paxin | DEFENDANTS <br> International Union of Operating Engineers, William C. Waggoner, Vince Giblin, James T. Callahan, Brian E. Hickey, Patrick L. Sink, Jerry Kalmar, Russell E. Burns, Rodger Kaminska, James M. Sweeney, Robert T. Heenan, et al. |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) <br> Ira Spiro, H. Scott Leviant; SPIRO MOORE LLP <br> 11377 W. Olympic Blvd., 5th Floor, Los Angeles, CA 90064 <br> Tel.: (310) 235-2468 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No  ☑ **MONEY DEMANDED IN COMPLAINT: $** Exceeding 7.5 million

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

18 USC section 1962 (RICO) raises federal questions.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☑ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | **IMMIGRATION** | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | ☐ 462 Naturalization Application | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: _____   **CV12105 06**

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No   ☑ Yes
If yes, list case number(s): CASE NO. 2:12-CV-09324-CAS-PJW

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☑ A. Arise from the same or closely related transactions, happenings, or events; or
☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☑ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles; Orange; San Bernardino | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles; Orange; Riverside; San Bernardino | See Attachment A; Defendants are dispersed through California, Nevada, and other states |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | Washington, D.C.; Clark County, Nevada |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
**Note**: In land condemnation cases, use the location of the tract of land involved                                                   .

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   **Date** December 7, 2012

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# <u>ATTACHMENT A</u>
to Civil Cover Sheet

## <u>IX. VENUE – part b</u>

<u>California Counties outside of this District</u>          <u>States, if other than California</u>

Placer                                                                Florida
Napa                                                                 Illinois
Kern                                                                 Massachusetts
San Francisco                                                        Missouri
                                                                     New Jersey
                                                                     New York
<u>Foreign Country</u>                                                   Ohio
                                                                     Pennsylvania
Canada                                                               Virginia
                                                                     Washington
                                                                     Washington, D.C.
                                                                     Wisconsin