FILED
CLERK, U.S. DISTRICT COURT

APR 1 9 2013

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1   Ira Spiro, State Bar No. 67641
    ira@spiromoore.com
2   H. Scott Leviant, State Bar No. 200834
    scott@spiromoore.com
3   **SPIRO MOORE LLP**
    11377 W. Olympic Blvd., 5th Floor
4   Los Angeles, California 90064-1683
    Telephone: (310) 235-2468
5   Facsimile: (310) 235-2456

6   Attorneys for Plaintiffs

7

8

9               UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11

12   MARIO SALAS, individually, and on       Case No.:   12-cv-10506 DDP (xVBK)
     behalf of all others similarly situated;
13   MELVIN CHAMBERLAIN,                      CLASS ACTION
     individually, and on behalf of all
14   others similarly situated;              **FIRST AMENDED CLASS
     ALBIN WATSON, individually, and         ACTION COMPLAINT FOR:**
15   on behalf of all others similarly
     situated;                               1. Violations Of Racketeer Influenced
16   JOHN PAXIN, individually, and on           And Corrupt Organizations Act
     behalf of all others similarly situated;    [18 U.S.C. § 1962(c)]
17                                           2. Violations Of Racketeer Influenced
                 Plaintiffs,                    And Corrupt Organizations Act
18                                              [18 U.S.C. § 1962(d)]
          vs.                                3. Violations Of Racketeer Influenced
19                                              And Corrupt Organizations Act
     INTERNATIONAL UNION OF                     [18 U.S.C. § 1962(b)]
20   OPERATING ENGINEERS, a trade          4. Violations Of Racketeer Influenced
     union;                                    And Corrupt Organizations Act
21   WILLIAM C. WAGGONER, an                   [18 U.S.C. § 1962(d)]
     individual;                            5. Violations of Labor Management
22   VINCE GIBLIN, an individual;              Disclosure Act
     JAMES T. CALLAHAN, an                     [29 U.S.C. § 501]
23   individual;                            6. Breaches of Fiduciary Duties
     BRIAN E. HICKEY, an individual;           [ERISA]
24   PATRICK L. SINK, an individual;       7. Aiding and Abetting
     JERRY KALMAR, an individual;          8. Violation of Cal. Business &
25   RUSSELL E. BURNS, an individual;         Professions Code § 17200, et seq.
     RODGER KAMINSKA, an individual;
26   JAMES M. SWEENEY, an individual;      **DEMAND FOR JURY TRIAL**

27

28

SPIRO MOORE LLP

SPIRO MOORE LLP

1   ROBERT T. HEENAN, an individual;
    DANIEL J. MCGRAW, an individual;
2   DAREN KONOPASKI, an individual;
    MICHAEL GALLAGHER, an
3   individual;
    GREG LALEVEE, an individual;
4   TERRANCE E. MCGOWAN, an
    individual;
5   LOUIS G. RASETTA, an individual;
    JAMES VAN DYKE, an individual;
6   PATRICIA M. WAGGONER, an
    individual;
7   BERT TOLBERT, an individual;
    MICKEY J. ADAMS, an individual;
8   RON SIKORSKI, an individual;
    DAN BILLY, an individual;
9   DAN HAWN, an individual;
    LARRY DAVIDSON, an individual;
10  STEVE BILLY, an individual;
    FRED YOUNG, an individual;
11  C. W. POSS, an individual;
    JOHN NELSON, an individual;
12  WALT ELLIOT, an individual;
    MIKE RODDY, an individual;
13  MICHAEL CRAWFORD, an
    individual;
14  BRUCE COOKSEY, an individual;
    MIKE PRLICH, an individual;
15  DON BOURGUIGNON, an
    individual;
16  JOHN SAWYER, an individual;
    PAUL VON BERG, an individual;
17  JIM HULSE, an individual;
    MIKE GOMEZ, an individual;
18  OPERATING ENGINEERS FUNDS
    INC. a non-profit corporation;
19  KENNETH D. WAGGONER, an
    individual;
20  INVESCO ADVISERS, INC., a
    corporation; and
21  DOES 1 through 10, inclusive,

22                  Defendants.

23

24

25

26

27

28

**FIRST AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

I.   INTRODUCTION ...........................................................................1

II.  JURISDICTION AND VENUE.........................................................1

III. THE PARTIES TO EACH CAUSE OF ACTION.........................................2

    A.  Plaintiffs ...............................................................................2

    B.  Defendants.............................................................................3

IV.  DEFENDANTS' MISCONDUCT .......................................................8

    A.  About the IUOE......................................................................8

    B.  IUOE Forced Plaintiffs Serving As Officers or Employees of Local 12
        to Contribute to the President's Club/EPEC, a Political Action Fund,
        and a Second EPEC Fund Affecting a Substantial Number of the
        Members of Local 12 .................................................................9

    C.  Waggoner Forced Employees of Local 12 to Contribute to His Re-
        election Fund..........................................................................13

    D.  Assets Were Diverted or Embezzled from Local 12 and IUOE
        Accounts or Trust Accounts Created for the Benefit of Union Members15

        1.  Defendants Used Aircraft Purchased by Local 12 for Personal Use,
            Embezzled Revenues Generated by Those Aircraft, and Falsified
            Many Years of LM-2 Filings to Conceal Activities and Costs and
            Asset Values ..................................................................15

        2.  Politicians Received, but Frequently Did Not Report or Pay for, the
            In-Kind Contribution of Jet Time from Local 12............................20

        3.  Defendants Embezzled Revenue from Local 12's Printing Press,
            Failing to Report That Income on Any IRS Form 990 or LM-2
            Forms, and Diverting Resources From Agency Fee Members
            Without Consent..............................................................23

**FIRST AMENDED CLASS ACTION COMPLAINT**

4. Defendants Embezzled Other Property Purchased By Local 12 or Its Many Associated Trusts ............................................................... 25

5. Waggoner Engaged in Self-Dealing by Causing Local 12 to Hire Patty Waggoner's Company, Spacemaker Tenant Improvements, to Work on the Local 12's Headquarters and Other Property ............. 28

6. William Waggoner Diverted Assets From the Pension Fund to Prop Up Amalgamated Bank, Which Was the Investment Custodian of Other Funds Placed in Risky Investments ................. 30

7. Waggoner Diverted Valuable Assets in the Form of Room Space in the Washington Court Hotel and Authorized Sub-Market Leases of Revenue-Generating Properties ....................................................... 35

8. In Violation of the IUOE Constitution, Waggoner Steered Health & Welfare Fund Investments to His Son's Employer Without Disclosing the Prohibited Conflict of Interest in LM-2 Filings ....... 36

9. Patty Waggoner Diverted Local 12's Insurance Purchases to Her Friend, AJ Longo ............................................................................. 37

10. William Waggoner Demanded the Diversion of Real Estate Account Funds to Pay for Roughly $90,000 in Rose Bowl Tickets Every Year ...................................................................................... 38

11. Leo Majich's Daughter, Theresa Goodell, Used an OEFI Credit Card to Travel to Jamaica to Visit Her Boyfriend and Defrauded OEFI Out of Other Monies ............................................................. 38

12. Bernard Kotkin & Co., LLP, a Certified Public Accounting Firm, Was Hired by OEFI to Conduct a Substantial Internal Audit, Uncovering Massive Financial Misconduct, Including Embezzlement, Fraud and the Misuse of Hundreds of Credit Cards 39

13. William Waggoner Awarded a No-Bid Security Services Contract to His Friend's Firm, Worldwide Security, at Roughly Three Times the Competitive Market Rate ..........................................................40

14. OEFI, Local 12's Fund Administration Arm, is Declaring Losses Related to the Dos Vientos Property Development, but no Asset is Disclosed on OEFI's 5500 Filings ...................................................40

15. $10 Million from Local 12's General Fund Was Used to Shore Up Professional Business Bank (Pro Biz), and Local 12 Received a $10 Million Line of Credit in Return but Could Not Draw Funds on that Line of Credit ......................................................................41

16. While Waggoner and His Family and Cronies Were Enjoying Personal-Use Jet Flights and Failing to Reimburse the General Fund for Printing and Jet Time Contributed to Politicians, the General Fund Was Hemorrhaging Money ......................................42

17. Local 12 Paid Employees' Payroll Taxes Out of the General Fund 43

18. Bert Tolbert, With the Knowledge of Waggoner, Sold Metal Belonging to the Southern California Training Trust at SA Recycling and Other Recyclers for Cash and Did Not Deliver That Cash to the Trust.................................................................................43

19. Waggoner Wrote Off Debts Without Approval of a Majority of the Trustees When the Debts Were Owed by an Employer Trustee's Company or the Relatives of Waggoner's Buddies .........................44

20. Patty Waggoner Used a Local 12 Ford Flex Without Justification, Thereby Embezzling Local 12 Assets .............................................45

21. Defendants Used Southern California Training Trust Facilities, Assets, and Personnel to Service and Refurbish Their Personal Vehicles and Work on Their Homes ...............................................45

**FIRST AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

E.  IUOE's and Local 12's Leadership Used Threats of Physical and
    Economic Violence, and Suborned Perjury, to Suppress Investigations
    and Usurp Control Over Local 12............................................................46

    1.  David Casey Was Beaten at the Direction of Waggoner for
        Running Against Waggoner for Business Manager.........................46

    2.  Waggoner Prevents Opposition Voices From Speaking at Any
        Meetings ........................................................................................46

    3.  Local 12 Uses Its Job Referral Service to Suppress Opposition......47

    4.  Business Agents for Local 12 Carry Guns That Have Had Serial
        Numbers Removed ..........................................................................47

F.  Defendants Diverted Caremark Reimbursements From Local 12's
    Health & Welfare Fund to IUOE and Purchased PBM Services That
    Were Well Above Competitive Rates From Other Vendors ..................48

G.  Local 12 Allows Employers Contracted With Local 12 to Operate
    Double-Breasted, Thereby Depriving Members of Protections and
    Benefits Available Under Union Agreements .........................................52

H.  Steve Montrie, Convicted of Mere Vehicular Manslaughter, Remains a
    Business Agent Despite Killing an Individual While Driving a Union
    Vehicle Under the Influence of Alcohol ..................................................53

I.  Miscellaneous Breaches of Fiduciary Duties ..........................................54

J.  Massive Fraud Involving State and Federal Education Funds................55

K.  Waggoner Used Pension Benefits That Should Have Been Universally
    Available to All Employees of Local 12 or Its Related Trusts as a
    Selective Reward Tool .............................................................................58

L.  All Employees of Local 12, Other Than Some Clerical Workers, Must
    Pay Union Dues Despite no Coverage Under Any Collective
    Bargaining Agreement .............................................................................59

FIRST AMENDED CLASS ACTION COMPLAINT

SPIRO MOORE LLP

M.   Waggoner and His Team Issued Instructions to Shred or Hide Documents That Could Be Used to Corroborate Allegations in This Lawsuit .................................................................................. 60

N.   After Destroying or Hiding Documents, Defendants Are Now Moving Equipment Back to the Southern California Training Sites, Including Devore, Whittier, and San Diego, to Hide Unlawful Asset Transfers from the Southern California Training Trust to the Southern Nevada Training Trust .......................................................................... 60

O.   Employees at Local 12 Were Forced to Participate in Precinct Walks, Under Threat of Retaliation or Termination, in Violation of the Federal Election Campaign Act .......................................................... 61

P.   Waggoner Defrauded Pension Funds to Secure the Loyalty and Votes of Retirees, Allowing Them to Work Hours in Excess of Limits Imposed by the Pension Fund .................................................. 62

Q.   Severe Fiduciary Breaches Have Harmed Health & Welfare Fund Beneficiaries, Whose Claims Have Not Been Paid for Years ................. 63

R.   Local 12 Habitually Purchases Its Vehicle Fleet From Ford and Services Its Own Vehicles, but Its LM-2 Filings Since at Least 2006 Show Inexplicably Variable Expendidures Classified As "Auto Leasing and Maintenance." ...................................................... 64

S.   When Witnesses Agreed to Come Forward and "Blow the Whistle" on Wrongdoing in Local 12, the DOL Investigative Agents Looking Into Local 12 Threatened the Witnesses for Their Failure to Stop Misconduct at Local 12 and Refused to Examine Evidence Voluntarily Produced for the DOL Agents ............................................... 64

T.   Additional False Represenatations in Mandatory Union Reports ............ 65

V.   CLASS ACTION ALLEGATIONS ................................................ 65

Spiro Moore LLP

First Amended Class Action Complaint

SPIRO MOORE LLP

VI.  CLAIMS FOR RELIEF ............................................................70

FIRST CLAIM FOR RELIEF .......................................................70

(Violation of 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt

  Organizations Act [18 U.S.C. §§ 1961-68]) ...............................70

By Plaintiffs against All Defendants ...............................................70

SECOND CLAIM FOR RELIEF ...................................................76

(Violation of 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt

  Organizations Act [18 U.S.C. §§ 1961-68]) ...............................76

By Plaintiffs against All Defendants ...............................................76

THIRD CLAIM FOR RELIEF ......................................................79

(Violations of 18 U.S.C. § 1962(b) of the Racketeer Influenced and Corrupt

  Organizations Act [18 U.S.C. §§ 1961-68]) ...............................79

By Plaintiffs against All Defendants ...............................................79

FOURTH CLAIM FOR RELIEF ...................................................84

(Violations of 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt

  Organizations Act [18 U.S.C. §§ 1961-68]) ...............................84

By Plaintiffs against All Defendants ...............................................84

FIFTH CLAIM FOR RELIEF .......................................................86

(Violation of Bill of Rights Secured by Labor Management Disclosure Act, 29

  U.S.C. § 501) ..................................................................86

By Plaintiffs against Specific Defendants .........................................86

SIXTH CLAIM FOR RELIEF .......................................................89

BREACHES OF FIDUCIARY DUTIES ARISING UNDER ERISA OR

  COMMON LAW ..............................................................89

By Plaintiffs Against Specific Defendants ........................................89

SEVENTH CLAIM FOR RELIEF .................................................90

AIDING AND ABETTING .........................................................90

By Plaintiffs Against All Defendants .............................................90

EIGHTH CLAIM FOR RELIEF ............................................................................91

PRAYER FOR RELIEF .......................................................................................93

SPIRO MOORE LLP

**FIRST AMENDED CLASS ACTION COMPLAINT**

# I.   **INTRODUCTION**

1.     This action arises from years of illegal activity by the International Union of Operating Engineers and its controlling officers and co-conspirators. Local 12, a local trade union, and its members, were victimized by those many years of illegal activity.  The unlawful abuses suffered by Local 12 and its members takes two predominant forms.  First, millions upon millions of dollars were withheld and/or embezzled from Local 12 and its membership, much of which was used by Defendant WILLIAM C. WAGGONER and his circle of co-conspirators for personal benefit.  Second, the membership of Local 12 was denied the right to freely select its own officers, through fair and honest elections, again, as a result of machinations by Defendant WILLIAM C. WAGGONER, with the knowledge and assistance of INTERNATIONAL UNION OF OPERATING ENGINEERS and its leadership, of which Defendant WILLIAM C. WAGGONER was a highly placed member.

2.     The conduct of Defendants harkens back to the days of unrepentant racketeering by organized crime, which makes some sense here.  The International Union of Operating Engineers and Local 12's leadership conduct their affairs with the same disregard for others' rights as the mob.  Not surprisingly, the International Union of Operating Engineers has a long history of ties to organized crime families in New York and New Jersey, and they have apparently learned their techniques from the very best of those crime syndicates.

# II.   **JURISDICTION AND VENUE**

3.     The action is brought, among other bases, under the Interstate Commerce Clause of the United States Constitution, and the Racketeering, Mail Fraud, Wire Fraud and Money Laundering laws of the United States.  In addition, this action is brought pursuant to Article 1, Section 1 of the Constitution of the State of California and other statutes and laws of the State of California.

SPIRO MOORE LLP

4.     Jurisdiction is specifically conferred on this Court by various federal statutes including, but not limited to, the following: Section 1964 of the Racketeer Influenced and Corrupt Organizations Act of the Organized Crime Control Act of 1970 as amended, 18 U.S.C. § 1964, based upon a pattern of racketeering activity in which Defendants have been engaged in connection with their operation of the International Union of Operating Engineers, consisting of violations of, among others, (a) 18 U.S.C. § 1341, relating to mail fraud, (b) 18 U.S.C. § 1343, relating to wire fraud, (c) 18 U.S.C. § 1957, relating to monetary transactions of unlawfully obtained proceeds from specified crimes, including mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, (d) 18 U.S.C. § 1951, relating to travel and use of interstate commerce in furtherance of certain unlawful activities, including unlawful monetary transactions, 18 U.S.C. § 1957.

5.     Original jurisdiction lies with this Court as to the Federal questions raised herein, pursuant to 28 U.S.C. § 1331.

6.     Jurisdiction over any California State causes of action contained in this Complaint arises under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367(a).

7.     Venue as to each Defendant is proper in this District pursuant to 18 U.S.C. § 1965, because each of the Defendants resides, is found, has an agent, controls and/or transacts or transacted affairs in this District.  In addition, the Defendants are engaged in interstate and foreign commerce, and a substantial part of the events giving rise to the claims for violations of Federal law occurred in this District, all in the course of interstate and foreign commerce.

## III.   THE PARTIES TO EACH CAUSE OF ACTION

### A.   Plaintiffs

8.     Plaintiff Mario Salas is, and at all relevant time was, a member of Local 12.  Plaintiff Salas is a former Business Agent for Local 12.

9.      Plaintiff Melvin Chamberlain is, and at all relevant time was, a member of Local 12.  Plaintiff Chamberlain is a former Instructor at the OETT Training center.  He is now retired.

10.     Plaintiff Albin Watson is, and at all relevant time was, a member of Local 12.  Plaintiff Watson is a former Coordinator at the OETT Training center. He is now retired.

11.     Plaintiff John Paxin is, and at all relevant time was, a member of Local 12.  Plaintiff Paxin is a former Executive Board member and Instructor at the OETT Training Center.

12.     Plaintiffs reserve the right to seek leave to amend this complaint to add new plaintiffs, if necessary, in order to establish suitable representative(s) of the Class proposed herein and/or any necessary sub-Class.

**B.      Defendants**

13.     Defendant International Union of Operating Engineers is a trade union that primarily represents operating engineers, who work as heavy equipment operators, mechanics, and surveyors in the construction industry, and stationary engineers, who work in operations and maintenance in building and industrial complexes, and in the service industries. IUOE also represents nurses and other health industry workers, a significant number of public employees engaged in a wide variety of occupations, as well as a number of job classifications in the petrochemical industry.

14.     Defendant James T. Callahan is the General President of IUOE, allegedly elected in November 2011.  Prior to his election by the general executive board (little more than an appointment by outgoing General President ("GP") Giblin as all officers of the General Executive Board swear allegiance to the GP and to his named successor.  There has never been a contested "election" in the history of the IUOE for the position of General President. Defendant Callahan

SPIRO MOORE LLP

served as the IUOE General Secretary-Treasurer and was elected as IUOE Vice President in 2008.  Defendant Callahan is also a Trustee of the IUOE General Pension Fund.

15.     Defendant Brian E. Hickey is General Secretary-Treasurer of IUOE, elected in November 2011.  Mr. Hickey has served as an IUOE Vice President since 2001.  Defendant Hickey is also a Trustee of the IUOE Central Pension Fund and also Business Manager of Local 399, located in Chicago, Illinois.  Local 399 is also a stationary local.

16.     Defendant William C. Waggoner is the First Vice President of IUOE.  Mr. Waggoner was first elected as an IUOE Vice President in 1980.  Mr. Waggoner is also the Western States Director and Business Manager of Local 12 headquartered in Pasadena, California.  Local 12 is a hoisting and portables local which principally engages in the construction industry.

17.     Defendant Patrick L. Sink is the Third Vice President of IUOE.  Mr. Sink was first elected as an IUOE Vice President in 2004.  Mr. Sink is Business Manager of IUOE Local 18 headquartered in Cleveland, Ohio.  Local 18 is a mixed local in that it has both a hoisting and portables division and a stationary division (18s).

18.     Defendant Jerry Kalmar is the Fourth Vice President of IUOE.  Mr. Kalmar was first elected as an IUOE Vice President in 2005.  Mr. Kalmar is the Business Manager of IUOE Local 39.  Local 39 is a stationary local headquartered in San Francisco, California.

19.     Defendant Russell E. Burns is the Fifth Vice President of IUOE.  Mr. Burns was first elected as an IUOE Vice President in October 2006.  Mr. Burns is the Business Manager for IUOE Local 3 headquartered in Alameda, California.

20.     Defendant Rodger Kaminska is the Sixth Vice President of IUOE.  Mr. Kaminska was first elected as an IUOE Vice President in 2008.  Mr. Kaminska is the Business Manager for IUOE local 101 headquartered in Kansas City, Missouri.

FIRST AMENDED CLASS ACTION COMPLAINT

21.     Defendant James M. Sweeney is the Seventh Vice President of IUOE. Mr. Sweeney was first elected as an IUOE Vice President in 2009. Mr. Sweeney is Business Manager for IUOE Local 150 headquartered in Countryside, Illinois.

22.     Defendant Robert T. Heenan is the Eighth Vice President of IUOE. Mr. Heenan was first elected as an IUOE Vice President in 2009. Mr. Heenan is the Business Manager of IUOE Local 542 headquartered in Fort Washington, Pennsylvania.

23.     Defendant Daniel J. McGraw is the Ninth Vice President of IUOE. Mr. McGraw was first elected as an IUOE Vice President in 2011.  Mr. McGraw also serves as the Northeast Regional Director for the IUOE and is headquartered in Albany, New York.  He is also the Business Manager for IUOE Local 17 headquartered in Lakeview, New York.

24.     Defendant Daren Konopaski is the Tenth Vice President of IUOE.  Mr. Konopaski was first elected as an IUOE Vice President in 2011. Mr. Konopaski is the Business Manager of IUOE Local 302 headquartered in Bothell, Washington.

25.     Defendant Michael Gallagher is the Eleventh Vice President of IUOE. Mr. Gallagher was first elected as an IUOE Vice President in 2011. Mr. Gallagher is the Business Manager of IUOE Local 793 headquartered in Oakville, Ontario, Canada.

26.     Defendant Greg Lalevee is the Twelfth Vice President of IUOE.  Mr. Lalevee was first elected as an IUOE Vice President in 2011.  Mr. Lalevee is the Business Manager for IUOE Local 825 headquartered in Springfield, New Jersey.

27.     Defendant Terrance E. McGowan is the Thirteenth Vice President of IUOE.  Mr. McGowan was first elected as an IUOE Vice President in 2011.  Mr. McGowan is also a Trustee of the IUOE General Pension Fund. He is the Business Manager of IUOE Local 139 headquartered in Pewaukee, Wisconsin.

28.     Defendant Louis G. Rasetta is the Fourteenth Vice President of IUOE. Mr. Rasetta was first elected as an IUOE Vice President in 2012. Mr. Rasetta also

serves as the Chairman of the Board of the IUOE General Pension Fund. He is Business Manager of IUOE Local 4 which is headquartered in Medway, Massachusetts.

29.    Defendant Vincent (Vince) Giblin was General President of IUOE from about 2005 until his retirement in November 2011.

30.    Defendant James Van Dyke was the Chief of Staff for IUOE, but he is now retired.

31.    Defendant Patricia M. Waggoner is the wife of Defendant William Waggoner and a Senior Vice President of Amalgamated Bank.

32.    Defendant Bert Tolbert is the Administrator of the Southern California Training Trust and the Southern Nevada Training Trust.

33.    Defendant Mickey J. Adams is and/or was a Trustee of the Local 12 Health & Welfare Trust, the General Pension Fund, and the Local 12 Operating Engineers Training Trust.  Defendant Adams is the President.

34.    Defendant Ron Sikorski is and/or was a Trustee of the Local 12 Health & Welfare Trust, the General Pension Fund, and the Local 12 Operating Engineers Training Trust.  Defendant Sikorski is the Vice-President of Local 12.

35.    Defendant Dan Billy is and/or was a Trustee of the Local 12 Health & Welfare Trust and the General Pension Fund.

36.    Defendant Dan Hawn is and/or was a Trustee of the Local 12 Health & Welfare Trust, the General Pension Fund, and the Local 12 Operating Engineers Training Trust.  Defendant Hawn is the Financial Secretary of Local 12.

37.    Defendant Larry Davidson is and/or was a Trustee of the Local 12 Health & Welfare Trust, the General Pension Fund, and the Local 12 Operating Engineers Training Trust.  Defendant Davidson is the Treasurer of Local 12.

38.    Defendant Steve Billy was a Trustee of the Local 12 Operating Engineers Training Trust.

**FIRST AMENDED CLASS ACTION COMPLAINT**

39.     Defendant Fred Young was a Trustee of the Local 12 Operating Engineers Training Trust.

40.     Defendant C. W. Poss is and/or was a Trustee of the Local 12 Health & Welfare Trust, the General Pension Fund, and the Local 12 Operating Engineers Training Trust.

41.     Defendant John Nelson is and/or was a Trustee of the Local 12 Health & Welfare Trust, the General Pension Fund, and the Local 12 Operating Engineers Training Trust.

42.     Defendant Walt Elliot is and/or was a Trustee of the Local 12 Health & Welfare Trust and the General Pension Fund.

43.     Defendant Mike Roddy is and/or was a Trustee of the Local 12 Health & Welfare Trust and the General Pension Fund.

44.     Defendant Michael Crawford is and/or was a Trustee of the Local 12 Health & Welfare Trust and the General Pension Fund.

45.     Defendant Bruce Cooksey is and/or was a Trustee of the Local 12 Health & Welfare Trust.

46.     Defendant Mike Prlich is and/or was a Trustee of the Local 12 General Pension Fund.

47.     Defendant Don Bourguignon is and/or was a Trustee of the Local 12 Operating Engineers Training Trust.

48.     Defendant John Sawyer is and/or was a Trustee of the Local 12 Operating Engineers Training Trust.

49.     Defendant Paul Von Berg is and/or was a Trustee of the Local 12 Operating Engineers Training Trust.

50.     Defendant Jim Hulse is and/or was a Trustee of the Local 12 Operating Engineers Training Trust.

51.     Defendant Mike Gomez is and/or was a Trustee of the Local 12 Operating Engineers Training Trust.

SPIRO MOORE LLP

FIRST AMENDED CLASS ACTION COMPLAINT

52.     Defendant Operating Engineers Funds Inc. ("OEFI") is a non-profit corporation that administers the employee benefit programs for over 35,000 participants of Local 12.

53.     Defendant Kenneth D. Waggoner is and individual residing in Los Angeles County, California.  Kenneth D. Waggoner is the son of Patricia and William Waggoner.  Kenneth D. Waggoner is the Vice President, Client Services, in the Taft-Hartley Group of McMorgan & Company LLC.

54.     Defendant Invesco Advisers, Inc. manages assets held in various funds by OEFI.

55.     Plaintiffs do not know the true names or capacities of the persons or entities sued herein as DOES 1-10, inclusive, and therefore sue said Defendants by such fictitious names.  Each of the DOE Defendants was in some manner legally responsible for the violations alleged herein.  Plaintiffs will amend this complaint to set forth the true names and capacities of these Defendants when they have been ascertained, together with appropriate charging allegations, as may be necessary.

56.     At all times mentioned herein, the Defendants named as DOES 1-10, inclusive, and each of them, were residents of, doing business in, availed themselves of the jurisdiction of, and/or injured Plaintiffs and aggrieved employees in the State of California, among other locations.

57.     At all times mentioned herein, each Defendant was the agent, servant, or employee of the other Defendants and in acting and omitting to act as alleged herein did so within the course and scope of that agency or employment.

58.     The term "Defendants" as used herein includes DOES 1-10.

## IV.     DEFENDANTS' MISCONDUCT

### A.     About the IUOE

59.     The International Union of Operating Engineers (IUOE) is a trade union that primarily represents operating engineers, who work as heavy equipment

SPIRO MOORE LLP

1   operators, mechanics, and surveyors in the construction industry, and stationary

2   engineers, who work in operations and maintenance in building and industrial

3   complexes, and in the service industries. IUOE also represents nurses and other

4   health industry workers, a significant number of public employees engaged in a

5   wide variety of occupations, as well as a number of job classifications in the

6   petrochemical industry.

7       60.    Founded in 1896, IUOE today has approximately 400,000 members in

8   123 local unions throughout the United States and Canada. IUOE is the 10th largest

9   union in the AFL-CIO.

10

11   **B.**    **IUOE Forced Plaintiffs Serving As Officers or Employees of Local**

12         **12 to Contribute to the President's Club/EPEC, a Political Action**

13         **Fund, and a Second EPEC Fund Affecting a Substantial Number**

14         **of the Members of Local 12**

15       61.    Vince Giblin, as General President of IUOE, dramatically increased

16   contributions to IUOE's Political Action Fund, the President's Club, previously

17   known as EPEC.  However, he did so by engaging in illegal conduct.  Giblin

18   required any officer of a local union to contribute to the President's Club.  Officers,

19   Directors, Coordinators, District Representatives, Business Agents and Organizers

20   were all told that if they wanted to serve in their positions, they had no choice but

21   to contribute to the President's Club, in amounts up to $800 per year, calculated as

22   one percent of $80,000, the salary cap for this contribution.  The contributions were

23   accomplished through compulsory payroll deductions.  William Waggoner, the

24   First Vice-President of IUOE, assisted Giblin's forced-donation campaign by

25   extorting his own Local's employees.  Waggoner sent out a memo to staff members

26   (excluding clerical employees) informing them that they had to sign an

27   authorization for payroll deductions for the mandatory President's Club

28   contributions.

**FIRST AMENDED CLASS ACTION COMPLAINT**

62.     All other Local unions were similarly required to contribute, on a mandatory basis, to the President's Club Political Action Fund.  The annual contribution to the President's Club Fund from the employees and officers of all Local unions is estimated to exceed $2.5 million per year and is in the range of $2 million to $3 million per year.  In 2012, the total contributions to the fund were $3,023,901.12.  A small portion of those contributions were additional contributions from other members, but the vast portion consists of mandatory contributions from officers and employees of Locals around the country.  The FEC Committee ID for the Fund is C00029504.

63.     The mandatory nature of the contributions was part of IUOE's and Giblin's desire to elevate the stature of IUOE as a political force through aggressive donations to political candidates.  These contributions are used, in part, to shield IUOE from the full intensity of regulatory scrutiny.  IUOE's average expenditures doubled in 2006 and reached an unprecedented level in 2012:



**FIRST AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

64. These contributions were not distributed evenly across the political spectrum. Rather, the recipients of this massively elevated largesse were more frequently Democrats, though contributions to Republicans increased from near zero levels in the 1990's to noticeable levels in the 2000's:



Given these contribution levels, it is, unfortunately, unsurprising that elected officials and administrative agencies have been slow to respond to widespread reports of criminal activity throughout IUOE.

65. Rather than "soliciting" contributions from members, IUOE, in violation of the Federal Election Campaign Act and Federal Election Commission rules, mandated that officers and employees contribute to the President's Club/EPEC, in the amount of 1% of compensation, up to 1% of $80,000. Contribution forms are included as part of the new-hire paperwork. Individuals are first encouraged to complete the authorization paperwork. When mere encouragement fails, hardball tactics are applied, and the resisting individual is told that they must contribute if they want to keep their job.

66. In 2008, after already pressing for increased contributions from officers and employees, Giblin and International implemented a plan to circumvent union member consent and collect a five-cent per hour political contribution

SPIRO MOORE LLP

directly from employers, through collective bargaining agreements.  The local unions were directed to negotiate this provision and then supply employers with check-off lists of union members from whom the contributions would be automatically deducted from their paychecks, even though the union members were often unaware that this was occurring and had not consented to it.  At the 2008 IOUE General Convention, IUOE resolved, in Resolution 12, that:

> NOW THEREFORE. BE IT RESOLVED that each IUOE local union make it a top priority to negotiate at least a five-cents per hour check-off in all collective bargaining agreements for the purpose or raising volun1ary political contributions;

> BE IT FURTHER RESOLVED that it is mandatory that the International negotiate at least a five-cents per hour check-off in all national collective bargaining agreements for the purpose or raising voluntary political contributions;

However, this practice was already underway in IUOE, and the IUOE Board merely ratified this illegal practice that Giblin had already instituted after assuming the General Presidency in and around 2005, between the conventions that occur once every five years.  The end result was that members around the country were forced into political contribution schemes without voluntarily consenting to participation.  The results of this illegal behavior speak for themselves, as IUOE's political collections and expenditures skyrocketed under Giblin's control.  In the 37th Convention Program, Giblin boasted about the results of his unlawful political contribution collection schemes when he wrote:

> Also, the IUOE today ranks near the top of national lists as one of the most active union political players in terms of influence and voluntary contributions.  Considering that three years ago we couldn't be found on anyone's political list, this is a very noteworthy accomplishment – and one we have every intention of continuing to improve on as we move forward.

What is implausible about this claim is the characterization of contributions as "voluntary."  At that same convention, contributions from members were mandated

SPIRO MOORE LLP

1    to be included in collective bargaining agreements, and officers and employees of

2    locals around the country experienced extortive pressure to contribute upon threat

3    of job loss, eliminating any pretense of choice. Financial threats of economic harm

4    and retaliation, in violation of the Hobbs Act, among other laws, were used, at the

5    direction of IUOE and Giblin, to obtain the dramatically increased contribution

6    levels about which Giblin boasted.

7          67.     Waggoner, fully in agreement with Giblin's "mandatory" "voluntary"

8    donation extortion scheme, required that all collective bargaining agreements

9    negotiated by Local 12 should include a similar five cent per hour contribution to

10   the EPEC fund.

11

12        **C.**     **Waggoner Forced Employees of Local 12 to Contribute to His Re-**

13              **election Fund**

14         68.     The OETT is managed by a group of six purportedly independent

15   Trustees; however, the independence is a sham. Three Trustees work for

16   Waggoner as union representatives on the Board. Three other Trustees represent

17   contractors on the labor management side. Waggoner ensures that one

18   management-side Trustee will always vote in the manner that Waggoner directs. In

19   addition to the three union-side Trustees that do Waggoner's bidding, Waggoner

20   controls four of the six votes at all times.

21         69.     Albin "Skip" Watson became the Curriculum Coordinator of the

22   Operating Engineers Training Trust (OETT) in and around November 1997. When

23   Watson became the Curriculum Coordinator, he was given a monthly expense

24   check, in the amount of $550 per month. After Mr. Watson had been in that

25   position for about two years, the Administrator called him into his office and

26   reprimanded Watson for failing to contribute to the "BA's Fund." Watson had no

27   idea what the Administrator was talking about. The Administrator explained that

28   anyone who received a monthly expense check was expected to contribute $50 a

SPIRO MOORE LLP

month to the "BA's Fund."  The Administrator made it clear to Watson that the contribution was not viewed as voluntary.  While the Administrator excused Watson for his lack of contributions in the past, Watson was told to begin contributions immediately.  When Watson later asked what the money was for, a business agent explained to him that it was for the Bill Waggoner Re-Election Fund. That business agent told Watson that the money went to Pasadena and was given to Waggoner's secretary.

70.     When employees asked if they could pay their mandatory BA's Fund contribution by check, they were told, "No. This fund does not exist. Cash only."

71.     Cash payments from Local 12 employees were eventually delivered, either directly or through District Representatives, to Patricia Harvey, Waggoner's secretary.  Patricia Harvey issued receipts to District Representatives or Coordinators for the cash payments they delivered to her.  So long as Local 12 has not already shredded this document as they have done with others since the filing of this lawsuit, those receipts will further confirm the existence of this additional, mandatory contribution scheme.

72.     Payments collected by Patricia Harvey were turned over to Karen Ragin-Best for deposit.  Two-thirds of the $50 payments went towards the Bill Waggoner Re-Election Fund, and one-third remained in the BA's Fund.  Karen Ragin-Best and Mickey Adams were both signatories to the Bill Waggoner Re-Election Fund.  When any banking transactions occurred, both Karen Ragin-Best and Mickey Adams were required to be present.  Ron Sikorski was an alternate signatory if one of the other two were not available.

73.     Susan Holmes, Karen Ragin-Best and Patricia Harvey were rewarded with a $400 per month car allowance, despite the fact that they never drove their personal vehicles on union business.  Instead, the car allowance was a reward for loyalty to Waggoner, including loyalty in administration of the illegal Bill

Waggoner Re-Election Fund and the BA's Fund, which were funded with extorted monies, a *quid pro quo* as it were.

**D.**   **Assets Were Diverted or Embezzled from Local 12 and IUOE Accounts or Trust Accounts Created for the Benefit of Union Members**

**1.**   **Defendants Used Aircraft Purchased by Local 12 for Personal Use, Embezzled Revenues Generated by Those Aircraft, and Falsified Many Years of LM-2 Filings to Conceal Activities and Costs and Asset Values**

74.    At least as early as 2000, Local 12 owned a Beechcraft Sky King Twin Turbo Prop airplane.  Local 12 did not report the value of the aircraft on Line 7 of Schedule 5 attached to Local 12's Form LM-2 Labor Organization Annual Report ("LM-2").  However, in the same LM-2 filing, Nickolas Bruce Timpe is listed in Schedule 10 ("Disbursements to Employees") as a "pilot" employed by Local 12 in 2000.  William Waggoner is listed as the addressee for any mailings associated with the LM-2.

75.    The FAA listed Aircraft N44KA as a model number B200 turbo prop, SN BB-1711, manufactured by Raytheon Aircraft Co.   Raytheon model B200 is commonly referred to as a Beechcraft Super King Air.

76.    Waggoner and Local 12 failed to report the aircraft on the 2001 LM-2. But, as before, Nickolas Bruce Timpe is listed in Schedule 10 ("Disbursements to Employees") as a "pilot" employed by Local 12.  The 2001 LM-2 also appears to omit the aircraft's costs and expenses, other than the pilot salary, though, based on a 2004 filing by Local 12, it is clear that Local 12 claimed to have a Beechcraft Super King Air aircraft registered with the FAA as N44KA.

77.    In 2002, Local 12 borrowed $4,000,000 from the Work Preservation Fund, on a note allegedly issued on June 1, 2002, to mature on June 1, 2015, with

SPIRO MOORE LLP

stated payments of $25,000 per month.  The claimed purposed of the loan was to serve as the down payment on a "new aircraft."  In addition to that loan, the 2002 LM-2 also lists a loan from Amalgamated Bank of New York, in the original amount of $3,352,125.00, at an interest rate of 4.25%.  The loan's note date is June 30, 2002, with a maturity date of July 1, 2003, but no payments were reported on the LM-2 filing for 2002.  In 2002, Nickolas Bruce Timpe is listed in Schedule 10 ("Disbursements to Employees") as a "pilot" employed by Local 12.  Allen Wayne Morisset is listed on that same Schedule as a "Business Agent" in 2002, but he is later listed as a pilot in 2003.

78.     In 2002, Local 12 apparently purchased a 2001 Cessna Citation XL, with registration number N705SG.  The reported value of the Cessna in 2002 was $8,644,396.00.  The nine-passenger cabin was appointed with, among other things, leather seats, a couch, a lavatory, walnut trim, 110-volt electrical outlets, 4 writing tables, and a wine caddy.  The plane is pictured below:



**FIRST AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

Waggoner convinced the Executive Board to approve the purchase as an investment because, as promised by Waggoner, the Cessna jet would be leased, generating income, at least 51% of the time.

79.    In 2003, Waggoner and Local 12 failed to report either aircraft on the 2003 LM-2.  But aircraft sales tax was reported for the purchase of the newer aircraft, in the amount of $705,375.  The loan from Work Preservation Fund was listed as receiving timely payments.  However, no payments were made on Amalgamated loan for the reporting period of 2003.  Despite no reported payments on the Amalgamated loan,   Amalgamated Bank of NY loaned an additional $1,000,000.00 to Local 12.  In 2003, Nickolas Bruce Timpe and Allen Wayne Morisset are listed in Schedule 10 ("Disbursements to Employees") as a "pilots" employed by Local 12.  Christopher Gables is reported on staff as "clerical" in 2003, but he later is listed as a "pilot" in 2004.

80.    In the 2004 LM-2 filing, an aircraft with tail number N44KA, the Beechcraft Super King Air twin turbo prop, was reported as sold for $1,705,000.00.  The 2004 LM-2 reported an initial cost $6,422,438.00; however, the IRS 990 filing for the same year reports the initial cost as $3,122,437.50 excluding a newly purchased engine.  Local 12 also reported purchasing an engine for the turbo prop aircraft for $300,000.00 during the 2004 reporting period.  The loan from Work Preservation Fund was listed as receiving timely payments.  However, no payments were made on Amalgamated loan for the reporting period of 2004.  In 2004, Nickolas Bruce Timpe and Christopher Gables are listed in Schedule 10 ("Disbursements to Employees") as a "pilots" employed by Local 12.  The 2004 LM-2 does not appear to reflect either aircraft's operating costs and expenses, other than the pilot salaries.

81.    In the 2005 LM-2 report, more information was suddenly reported about the aircraft.  Pilot salaries of $140,024.00, and total disbursements to pilots of $176,666.00 were reported.  Transactions involving aircraft were reported in

**FIRST AMENDED CLASS ACTION COMPLAINT**

General Overhead, in amounts of $92,721, $35,550, $93,633, totalling $221,904.00.  The Amalgamated Bank loan was repaid in full, without any apparent interest.

82.     In the 2006 LM-2 report, even more information was suddenly reported about the one remaining aircraft, the Cessna.  Pilot salaries of $123,376.00, and total disbursements to pilots of $161,337.00 were reported.  Transactions involving aircraft were reported in General Overhead, in amounts of $63,373, $31,550, $551,964, $138,615, $65,232, $ 37,084, totalling $887,818.00.  The total transactions for *one* aircraft exceeded $1 million.  Prior to 2005, there were two aircraft maintained at some point; i.e. a Beechcraft Super Sky King and the Cessna.  Earlier LM-2 reporting does not seem to reflect one or both aircraft's operating cost and or expenses other than the pilot salary expense.

83.     In 2006, the reported value of the aircraft was identified as diminishing by half, with an original value of $8,644,396.00 and a 2006 value of about $4,203,468.

84.     In the 2007 LM-2 report, Pilot salaries of $156,370.00, and total disbursements to pilots of $186,811.00 were reported.  Transactions involving aircraft were reported in General Overhead, in amounts of $40,835, $136,464, $59,829, $36,138, $149,331, $ 5337, $49,119, $18,700, $204,034, totalling $699,787.00.

85.     In 2009, the Cessna, with registration number N705SG, was advertised for lease, at $3,325.00 per hour.  No lease proceeds are reported in any LM-2 filing by Local 12.  The agent handling lease arrangements was Guardian Air, owned by James Previti.

86.     In the 2010 LM-2 filing, the value of the Cessna is not reported or not accurately reported.  The total value of reported "other fixed assets" is $11,342.00, far below the value of the Cessna.

87.     In 2010, the Cessna, with registration number N705SG, was advertised for lease.  No lease proceeds are reported in any LM-2 filing by Local 12.

88.     In the 2011 LM-2 filing, the value of the Cessna is not reported or not accurately reported.  The total value of reported "other fixed assets" is $22,560.00, far below the value of the Cessna.

89.     In 2012, the Cessna, with registration number N705SG, was advertised for lease at a rate of $3,325 per hour, through the Guardian Jet Center.  However, since the filing of this action, the listing on Guardian's website has vanished.

90.     Union officers, who frequently travelled in the Local 12 aircraft, would sometimes take commercial flights "just to make it look good".   The locations where this aircraft flew and does fly are adequately serviced by most commercial carriers.

91.     Vince Giblin utilized the Cessna on multiple occasions without compensating Local 12 for the rental time and expense of operating the plane.

92.     On March 3, 2012, LeAnn Goff married Kenneth D. Waggoner.  Goff is the daughter of Vice-President Carl Goff of Local 3.  While it was originally believed, based on the circumstances of the timing, that Waggoner attended that wedding in Sacramento using Local 12's Cessna, the Cessna, on that one occasion, was actually being serviced by Cessna.  However, there are numerous other instances where William Waggoner and/or Patricia Waggoner used the Cessna for person travel.  For example, William Waggoner flew to Bakersfield to attend a Ray Price concert.  Local 12 paid for that excursion.  William Waggoner also used the Local 12 Cessna to attend rodeo and Nascar events in Las Vegas.  The rodeo events were annual trips for Waggoner.  And the entire Waggoner family flew to Las Vegas to attend the wedding of Margaret Hammond.  These trips were not reimbursed to Local 12, which had to pay the costs associated with the use of the Cessna.  Waggoner also used the Local 12 Cessna jet to fly to Bakersfield to attend the funeral of a member of Mickey Adam's family.

SPIRO MOORE LLP

93.     Patricia Waggoner, wife of William Waggoner, used Local 12's Beechcraft and Cessna jet for her own personal travel.  For example, Patricia Waggoner would use the Local 12 Cessna to fly to Las Vegas for shopping trips. She sometimes travelled with a representative of ProBiz Bank, Valerie Prince, who brokered the $10 million loan to Local 12's Health & Welfare Fund, and/or Dr. John Giddings.  Dr. Giddings' medical license was revoked after he failed to report his arrests for driving under the influence to his Medical Board probation monitor, made false statements in an application for reappointment as a qualified medical examiner, and violated the terms and conditions of his Medical Board-ordered probation.  Patricia Waggoner also used Local 12's Cessna Jet to go on shopping trips with Maritza Adams, Mickey Adam's wife, until the Adams got their dog. The Adams were able to get a guide dog certification for their dog, allowing it to fly unrestrained in the cabin, but neither Mariza nor Mickey are blind.

94.     William Waggoner frequently used Local 12's Beechcraft to visit his brother, Gino, in Lawrence, Kansas (not Branson, Missouri, as previously alleged). On flights to the East Coast or Mid-West, Waggoner would stop over in Lawrence, Kansas to visit his brother and refuel the Cessna jet, despite higher fuel costs for refuelling there.

95.     Maritza Adams was frequently a guest on the Local 12 jet for the purpose of visiting her mother in Henderson, Nevada.

96.     Kenneth D. Waggoner was shuttled back and forth to college in Santa Clara on the Local 12 Cessna jet.  Local 12 was not reimbursed for this personal use of Local 12's property.

### 2.     Politicians Received, but Frequently Did Not Report or Pay for, the In-Kind Contribution of Jet Time from Local 12

97.     Approximately one-third of Local 12's members are "agency fee" members, who include all public employees that are members of Local 12.  Agency

SPIRO MOORE LLP

fee members must be given the choice to decline political contributions. Waggoner, without consent or approval of the membership, gave use of Local 12's Cessna Jet to Local 12's Political Action Fund.  The Political Action Fund, in turn, made in-kind contributions of Jet flight time to individuals running for elected office or to politicians promoting matters of interest to Local 12.  Because the Political Action Fund failed to compensate Local 12 for use of Local 12's Cessna Jet, the in-kind contributions amounted to forced political contributions, and agency fee members were precluded from opting out of partisan union political spending or other activity.

98.     It is well known within the Operating Engineers that Hilda Solis' election campaign was heavily funded by the Operating Engineers and other unions.  In fact, during her time in Congress (2001-09), she received more than $900,000 in contributions from unions (not including the in-kind contributions discussed below).  She was flown to Washington D.C. for her swearing in on Local 12's Private Jet.  William Waggoner bragged openly that he was flying Hilda Solis back to DC to be sworn in.  Vince Giblin responded to this boasting by declaring, "We finally have a friend in the Department of Labor."  Vince Giblin then chastised other Business Managers for failing to make similar investments in political candidates.  Giblin singled out Waggoner, the First Vice-President of IUOE and James Sweeny, the Seventh Vice-President and Business Manager of Local 150, for their heavy investments into political campaigns on both the state and national level.  Hilda Solis also flew on Local 12's Cessna jet while serving in Congress, though it appears that she failed to report the in-kind contributions from Local 12.  In late 2012, Waggoner flew Larry Hopkins and Ron Havlick to Washington D.C. to meet with Hilda Solis over a Local 12 problem involving the Department of Labor (DOL) when Waggoner and his cronies believed that some legal action was imminent.  An article discussing Hilda Solis' policy of protecting

unions is attached as Exhibit "5", and there is little doubt about her close ties to Local 12, Waggoner, and IUOE as pictured below:



99.     And a comprehensive review of the 2008 election cycle data maintained by the Federal Election Commission, current through March 2013, shows no in-kind contributions from Local 12, whether in the form of Cessna jet time, or literature printing and postage provided by the Local 12 printing press operations for that election cycle.

100.    On information and belief, Linda and Loretta Sanchez were also recipients of in-kind contributions that their FEC reports do not disclose.

101.    On many occasions, the Local 12 Cessna jet, in route for some other purpose, would be diverted to pick up a politician, who would then ride with the Local 12 official(s) to the destination.  These detour trips were customarily not reported by either the passenger politician or Local 12 or the Local 12 Political Action Fun.

**3.**     **Defendants Embezzled Revenue from Local 12's Printing Press, Failing to Report That Income on Any IRS Form 990 or LM-2 Forms, and Diverting Resources From Agency Fee Members Without Consent**

102.    Local 12 owns a large printing press.  Allied Printing Trades Council assigns numbers to printers to identify the source of any printing; Local 12's number from Allied Printing Trades Council is 212.

103.    Local 501 ordered 10,000 calendars annually from Waggoner and Local 12.  Local 501 paid either $1.25 or $1.50 for each calendar, resulting in orders of at least $12,500k in printing annually for Local 501. The income to Local 12 appears nowhere on either the Local 12 IRS 990s or the LM-2s for Local 12.

104.    An identical press operated by Local 3 reports income to Local 3 in excess of $250,000 per year.  With the same press and similar supporting staff, it is likely that Local 12 is receiving more than $250,000 in revenue per year for printing, but those revenues are not reported by Local 12, indicating that the funds are likely diverted by Waggoner and his team.

105.    As alleged above, approximately one-third of Local 12's members are agency fee members, who include all public employees that are members of Local 12.  Agency fee members must be given the choice to decline political contributions.  Waggoner, without consent or approval of the membership, authorized the purchase of printing press consumables from General Fund assets.  The printing performed for candidates was routed through the Political Action Fund, without compensation from the Political Action Fund.  The Political Action Fund, in turn, made in-kind contributions of printed materials to individuals running for elected office or campaigning on matters of interest to Local 12.  Because the Political Action Fund failed to compensate Local 12 for use of Local 12's printing press resources and materials, the in-kind contributions amounted to

**FIRST AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

1    forced political contributions, and agency fee members were precluded from opting

2    out of partisan union political spending or other activity.

3         106.    Hilda Solis received in-kind campaign contributions in the form of

4    printing services and mailings while serving in Congress, though it appears that she

5    failed to report the in-kind contributions from Local 12.

6         107.    In 2010, Local 12 provided campaign support to Senator Harry Reid's

7    campaign in the form of ten full-time employees of Local 12 (business agents and

8    organizers), rotated into Las Vegas on a weekly basis for roughly six weeks.  This

9    effort was part of an IUOE program, manned by Jeff Fiedler (Director of Special

10   Operations for IUOE), lobbyist Tim Cremins (Director of Education and Research

11   for the IUOE California-Nevada Conference of Operating Engineers), Richard

12   Pound, Richard Spencer, and Dennis Lundy (Western Regional Director for IUOE),

13   to support Harry Reid.  In addition to providing manpower, Local 12 supplied

14   printed campaign materials for Harry Reid's campaign.  The materials were printed

15   on the Local 12 printing press, the material costs for the printing were paid by

16   Local 12 (not the Political Action Fund), and then the materials were flown to Las

17   Vegas on Local 12's Cessna jet.  The ten-member Local 12 team, all paid out of the

18   Local 12's payroll account, then distributed these printed materials for Harry

19   Reid's campaign effort.  Harry Reid appears to have neglected to declare these in-

20   kind contributions on his FEC filings.

21        108.    Since the initial filing of this lawsuit, Local 12 has attempted to hide

22   the widespread non-reporting by filing its own amended contribution reports.  The

23   problem with this concealment tactic is that there is no coordination with those

24   candidates that reported some contributions from a different contributing entity,

25   namely, the Political Action Fund.  Now Local 12 is the position of having just

26   claimed that it donated in-kind contributions, when, years ago, the candidate

27   reported a contribution from the Political Action Fund.  As to those politicians that

28   never reported an in-kind contribution, at least Local 12's suspiciously late

SPIRO MOORE LLP

amended reporting does not have to be reconciled with an inconsistent filing by a politician.  Notably, Local 12 failed to amend reporting for the in-kind contribution to Hilda Solis and Harry Reid.

### 4.     Defendants Embezzled Other Property Purchased By Local 12 or Its Many Associated Trusts

109.    One Training Trust training site purchased a semi trailer.  The semi trailer was gutted and apprenticeship staff turned it into a mobile barbeque facility.  It is capable of producing enough food to feed tens of thousands of individuals.  Defendant Waggoner took the converted semi trailer and parked it in his own back yard.  Waggoner leases the trailer back to Local 12, retaining the revenue for himself, when Local 12 wants to use it for a Local 12 barbeque or other Local 12 sponsored event.

110.    OETT Whittier purchases equipment initially identified as purchased for the Southern California Training Trust.  The equipment is deleted from the Southern California Training Trust inventory.  It is transferred to the Southern Nevada Training Trust, without compensation from Southern Nevada Training Trust to Southern California Training Trust.

111.    Southern California Training Trust training personnel and equipment were used to transfer equipment from Southern California Training Trust to Southern Nevada Training Trust.  Southern California Training Trust personnel, including Peter Majich, an employee of Southern California Training Trust, applied for and received DOT permits to transfer "wide load" equipment.  Peter Majich operated the lead vehicle during the transport of large construction equipment to Southern Nevada Training Trust.  When equipment is deleted from the Southern California Training Trust inventory, it is not returned to Southern California Training Trust.  However, some equipment is also "loaned" from Southern California Training Trust to Southern Nevada Training Trust for periods of time

SPIRO MOORE LLP

including one month to many years.  In these cases, fair market rental value is not paid by Southern Nevada Training Trust to Southern California Training Trust.

112.    Employees of Southern California Training Trust create the curriculum, testing, interview applicants and actually instruct and/or teach apprentices in Southern Nevada.  However, Southern Nevada Training Trust does not repay Southern California Training Trust for the use of its employees that remain at all times on the Southern California Training Trust payroll.  Southern Nevada Training Trust also fails to share in the cost of benefits provided to instructors on the payroll of Southern California Training Trust.  Jim Leslie, Skip Watson, and Dave Barton were sent to Southern Nevada to provide trainings at that Trust, but the Southern Nevada Trust did not pay for their time or training materials.  During testing, proctors would be sent from Southern California to Southern Nevada, but, again, Southern Nevada's Trust did not pay for the Southern California Training Trust staff time.  Lee Lander and Ron Havlick were also sent to provide services to the Southern Nevada Training Trust.  Handbooks were printed and shipped to the Southern Nevada Training Trust from Southern California, at Southern California's expense.

113.    Burt Tolbert is the Administrator for both the Southern California Training Trust and the Southern Nevada Training Trust.  But Tolbert remained at all times exclusively on Southern California Training Trust payroll.  No compensation for Tolbert is listed on Southern Nevada Training Trust's DOL 5500 filings or IRS form 990.  The total value of Tolbert's compensation package is approximately $200,000 per year, including salary and benefits.  However, it is not clear how Tolbert is able to participate in the General Pension Plan because his participation in that Plan would occur exclusively through the Southern Nevada Training Trust.  The calculation of the General Pension Plan benefit contribution would be based on the first three percent of the first $80,000 of income earned from the Southern Nevada Training Trust, for the first 20 years (thereafter it drops to two

**FIRST AMENDED CLASS ACTION COMPLAINT**

percent of the first $80,000; prior to 2005, the contribution was calculated up to $60,000).  Since the reported income out of that Trust is $0, his contribution should be $0 and he should not be a General Pension Plan participant at all.  Instead, Tolbert and Waggoner conspired to falsely include Tolbert in the General Pension Plan.

114.    Burt Tolbert placed a granddaughter on the Southern California Training Trust payroll in order to provide her with health care through the Health & Welfare Fund.  Jodi McMullen, about 25 years old at the time, had been addicted to prescription drugs and alcohol which destroyed her liver.  She was on the liver donor list and received a liver at the expense of the Trust.  Ms. McMullen did almost no work while she was on the payroll. She would spend a lot of her time printing out pictures of animals or drawing with crayons.  She would go through several color printer cartridges in a week.

115.    Bills for Southern Nevada Training Trust are received by Southern California Training Trust.  Tolbert reviews those bills.  Tolbert then approves those bills for payment and sends them to office staff to process and pay.  There is no system in place between the training centers in California and Nevada to bill Southern Nevada Training Trust for services provided by Southern California Training Trust.  In substance, two separate Trusts are operated out of a single office, without fair allocation of the expenses and overhead between the Trusts.  Bills were sent from Southern Nevada to Southern California on an almost weekly basis.

116.    Vehicles owned by Local 12 or the Southern California Training Trust training center that were scheduled to be sold at auction are often pulled from sale and purchased at a sub-market rate price from the auction house.  The vehicles are then restored by staff members at the Southern California Training Trust Whittier training center.  All replaced parts are charged to other equipment numbers.  The time required for staff members to restore the vehicles is not paid to the Southern

SPIRO MOORE LLP

California Training Trust.  The vehicle ownership is then transferred to the union staff member that purchased the vehicle at the sub-market rate.  Administrators, Board Members, and upper management of Local 12, including line officers, have taken advantage of this arrangement, thereby embezzling funds from Southern California Training Trust.  Many of those same individuals receive free service on their personal vehicles at the Southern California Training Trust Whittier training center.

117.    Union leadership, including Waggoner, store personal vehicles at the Southern California Training Trust Whittier training center without paying fair rental compensation for use of the space, thus providing value to union officers that they are not entitled to receive.  For example, Waggoner stores a vintage Cadillac at the Southern California Training Trust Whittier training center.  Special devices were constructed to allow staff to move Waggoner's vehicle when they require access to bay space it occupies.

118.    As of about November 2012 or December 2012, records are being destroyed at Southern California Training Trust's Whittier training center by staff.  The records being destroyed are more recent records, rather than the very old files that date back to the 1970's.

**5.    Waggoner Engaged in Self-Dealing by Causing Local 12 to Hire Patty Waggoner's Company, Spacemaker Tenant Improvements, to Work on the Local 12's Headquarters and Other Property**

119.    Patricia Morrison Waggoner, the wife of William Waggoner, is a Senior Vice-President, marketing Taft-Hartley investments at Amalgamated Bank of Pasadena, a division of Amalgamated Bank of New York.  Patricia Morrison Waggoner was also an officer of the contracting company, Spacemaker Tenant Improvements.  Spacemaker Tenant Improvements is a California licensed

contractor.  According to the California State Contractor license Board, the holder of the license was Stanley W. Smith, and Patty Waggoner was the President.  Later, records show that Richard A. Marker, currently a lawyer at the Green & Marker law firm, was also an officer and may be the sole remaining officer.

120.   At least as far back as 1980, Patricia Morrison Waggoner, the wife of William Waggoner, through her contracting company Spacemaker Tenant Improvements, performed work on Local 12 facilities and facilities owned by Local 12's General Pension Fund.  Patricia Waggoner is a member of Local 12.

121.   At all times relevant, Spacemaker Tenant Improvements had offices in buildings owned by Local 12's General Pension Fund, including 301 N. Lake Avenue, Pasadena, California 91101 and 3699 Wilshire Blvd., Los Angeles, California 90010.

122.   The contracting services provided by Spacemaker Tenant Improvements to Local 12 facilities and facilities owned by Local 12's General Pension Fund were not provided on the basis of arms-length bidding processes. Rather, Spacemaker Tenant Improvements received those construction jobs simply by virtue of Patricia Waggoner's marriage to William Waggoner.  Moreover, even had they used a bidding process, Spacemaker Tenant Improvements, by virtue of the relationship between the Waggoners, could not have performed that work.

123.   Patricia Waggoner has also used her position as the wife of William Waggoner to market and obtain business for Amalgamated Bank.

124.   Waggoner's LM-30 filing identifies Patricia Waggoner as the "First Vice-President" of Amalgamated Bank (in fact, she is a Senior Vice-President of Marketing & Sales, Western Region).  Her annual salary is listed as $141,057, but Waggoner states that there are no conflicts of interest.  Waggoner claims in the filing that the value of services provided to Local 12 or associated funds is "not readily available."

**FIRST AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

**6.      William Waggoner Diverted Assets From the Pension Fund to Prop Up Amalgamated Bank, Which Was the Investment Custodian of Other Funds Placed in Risky Investments**

125.   The Operating Engineers Pension Trust ("The Plan" or "The Local 12 Pension Fund") is a pension benefit plan established by I.U.O.E., Local #12 and participating employers through collective bargaining. It is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).  OEFI manages the Local 12 Pension Fund (though Invesco Advisers also appears to have management power over some Local 12 Pension Fund assets by virtue of its designation as the managing member of LLC's that serve effectively as holding companies for various Local 12 Pension Fund real estate assets).

126.   The Local 12 Pension Fund is not capable of supporting the massive graft and misuse of assets perpetrated by Waggoner and other Defendants.  In Local 12's own words, the funding status is "critical":

> The Plan's actuary has determined that the Plan is considered to be in critical status. The Plan is required to adopt a rehabilitation plan aimed at restoring the financial health of the plan. Based on reasonable assumptions, the Plan is expected to emerge from critical status by the plan year beginning July 1, 2023. The Trustees recognize the possibility that actual experience could be less favorable than the reasonable assumptions. Therefore, the Trustees are establishing annual standards to reflect possible actuarial losses and still keep the Plan on target to emerge from critical status by the end of the rehabilitation period.

*See*, Form 5500 filed with the DOL (year ending 2011), attached as Exhibit "8".

127.   On March 8, 2011, William Waggoner caused the borrowing of $50,000,000 from Massachusetts Mutual Life Insurance Company, secured by assets owned by Local 12's Pension Fund.  One such asset is held by Vintage Park

East, LLC.  Vintage Park East, LLC purported to encumber a number of real properties held by Vintage Park East, LLC.  Attached hereto as Exhibit "7" is a true and correct copy of that Deed of Trust.  However, one of the properties, a parcel designated as APN 0238-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 is listed in the San Bernardino County Clerk's records as owned by the San Bernardino County Flood Control District.

128.   Prior to encumbering Local 12 Pension Fund assets, a representative of Invesco Advisers met with the Local 12 Pension Fund Board to discuss the transaction.  At that meeting and after, the Invesco Advisers representative failed to disclose that (1) one of its subsidiaries, WL Ross & Co. LLC, was in any way considering an equity investment in Amalgamated Bank, (2) borrowing against real estate to put money into bank deposits or securities was not prudent investing, given the borrowing costs, (3) Invesco Advisers should have no part in the decision given the potential conflict created by its subsidiary's bank investing activities, and (4) Invesco Advisers, which managed investments for other unions invested in Amalgamated Bank, failed to disclose the conflict created by its incentive to protect Amalgamated Bank.  Invesco Advisers concealed material information that it had a duty to disclose.  Invesco Advisers was in a fiduciary relationship, as a manager of Local 12 Pension Fund assets, with the beneficiaries of the Local 12 Pension Fund, including Plaintiffs.  Invesco Advisers had exclusive knowledge of material facts not known to the beneficiaries, including information about the activities of its subsidiary, WL Ross & Co. LLC.  An article describing the modus operandi of WL Ross & Co. LLC is attached hereto as Exhibit "6."  Invesco Advisers actively concealed material facts from beneficiaries of the Local 12 Pension Fund, or, at minimum, Invesco Advisers made partial representations but also suppressed some material facts, including information about activities of WL Ross & Co. LLC.  Moreover, Invesco Advisers never came forward and disclosed the activities of WL Ross & Co. LLC or offered to recuse itself from further involvement in Local 12's Pension Fund at any later time.  Notably, Invesco Advisers were willing to see their

SPIRO MOORE LLP

client's money placed at risk in Amalgamated Bank before the FDIC allowed Amalgamated Bank to continue operations, but Invesco's subsidiary, WL Ross & Co. LLC was unwilling to risk assets in Amalgamated until deposits from Local 12 shored up Amalgamated's balance sheet enough to escape further FDIC control.

129.    The loan funds were then deposited in Amalgamated Bank for the purpose of preventing the collapse of Amalgamated Bank.  Waggoner and property manager Wilbur L. Ross, principal of Invesco, and Ron Burkle, each deposited funds in Amalgamated Bank for the purposes of artificially providing adequate liquidity to Amalgamated Bank and/or securing equity positions in Amalgamated Bank.

130.    On August 31, 2011, a Consent Decree was issued by the Federal Deposit Insurance Corporation.  Without the assets deposited by Waggoner in March 2011, Amalgamated would not likely have survived the FDIC's audit and review as an autonomous entity.  Instead, Amalgamated remained barely viable, thanks in part to the infusion of assets from Local 12, that Ross and Burkle were each able to snap up 20% of Amalgamated's common stock.

131.    Local 12's Pension Fund is currently obligated as a result of the loan to prop up Amalgamated Bank.  In the 2011 LM-2 filing by Local 12's Pension Fund, the Fund listed an obligation of $50,000,000, at 4.46% per annum, and an interest expense of $706,167 for less than a full year of interest.  $185,833 per month is the interest expense.  April 1, 2018 is the maturity date, at which time the full amount of principal is due.  Due to Amalgamated's weak financial condition, it is unclear whether the $50,000,000 will be available for withdrawal from Amalgamated upon demand.  Members of Local 12 are paying $2,229,996 per year out of their General Pension Fund for the sole purpose of propping up the bank at which William Waggoner's wife, Patty Waggoner, works as First Vice President, the *quid pro quo* as it were.  Page 102 of the 2011 Form 5500 filed with the DOL by the Local 12

Pension Fund provides information about the terms of the Note, identified as Note 10, which says:

> In March, 2011, the Fund obtained a loan, secured by Vintage Park
> East property located in Fontana, California. The terms of the note are
> as follows:
>
> > A note payable of $50,000,000, with an interest rate of 4.46%
> > per annum. Interest only payments of $185,833 per month until
> > the maturity date of April 1, 2018. On the maturity date any
> > outstanding principal will be due.

*See*, 2011 Form 5500, Note 10.

132.   Local 12 also participates in a securities lending program with assets placed on deposit with Amalgamated Bank.  According to Local 12, in its 2011 Form 5500, the securities lending program operated with JP Morgan Chase through Amalgamated Bank is not identifies as carrying any elevated investment risk:

> The Plan participates in securities lending program with JP Morgan
> Chase, through Amalgamated Bank as investment custodian. Under
> this program, certain investment securities of the Plan are loaned to
> investment brokers for a fee. Securities so loaned are fully
> collateralized by cash and other investments. At June 30, 2011 and
> 2010, $9,115,893 and $38,437,344 respectively, of the Trust's
> securities were on loan under the JP Morgan securities lending
> program. Collateral provided by brokers is maintained at levels of at
> least 100% of the fair value of the securities on loan and is adjusted for
> market fluctuations. The Plan maintains effective control of the loaned
> securities with JP Morgan Chase through Amalgamated Bank as
> investment custodian during the term of the arrangement in that they
> may be recalled by the Plan at any time. Under the terms of the
> agreement, the borrower must return the same, or substantially the

FIRST AMENDED CLASS ACTION COMPLAINT

SPIRO MOORE LLP

1    same, investments that were borrowed. The market value of collateral

2    held for loaned securities is reported as collateral received under the

3    securities lending program, and a corresponding obligation is reported

4    for repayment of such collateral upon settlement of the lending

5    transaction. Income from the securities lending program was $90,860

6    and $77,755 for the years ended June 30, 2011 and 2010, respectively,

7    and is included in interest income in the statement of changes in net

8    assets available for benefits.

9    But JP Morgan tells a different story:

10       Securities Lending Risk - The Fund or the vehicles in which it

11   invests may participate in securities lending programs. The lending

12   fund bears the risk of investment loss associated with any reinvestment

13   of securities lending collateral held by the lending fund.

14       Risks Associated with Investing in an Investment Vehicle - The

15   Fund may itself invest in an investment vehicle, such as a private

16   investment or commingled fund. When it does so, the investing fund is

17   subject to the underlying risk of that investment vehicle's portfolio

18   securities.

19       Increase in Expenses Risk - The actual cost of investing may be

20   higher than the expenses listed in the expense table for a variety of

21   reasons, including termination of a voluntary fee waiver or losing

22   portfolio fee breakpoints if average net assets decrease. The risk of

23   expenses increasing because of a decrease in average net assets is

24   heightened when markets are volatile.

25       Not FDIC Insured Risk - The investment is not a deposit or

26   obligation of, or guaranteed or endorsed by, any bank and is not

27   insured by the Federal Deposit Insurance Corporation, the Federal

28   Reserve Board, or any other U.S. governmental agency.

Accounts of Affiliates of the Investment Manager - Affiliated

managers may trade in securities at the same time as the Fund and,

therefore, may potentially affect prices or available opportunities.

No Securities Registration - The Fund is exempt from

registration with the SEC. Units of the Fund are exempt from

registration with the SEC. Neither is registered with any state

securities regulator.

No CFTC Registration - The Fund is not registered as a commodity

pool with the CFTC because the Trustee is exempt from having to

register as a commodity pool operator under CFTC Rule 4.5.

The Local 12 Pension Fund, in critical condition, should not be invested in such a

reckless manner.

**7.     Waggoner Diverted Valuable Assets in the Form of Room**
**Space in the Washington Court Hotel and Authorized Sub-**
**Market Leases of Revenue-Generating Properties**

133.   Local 12 Pension Fund (OEFI) owns several buildings, including the

Washington Court Hotel in Washington, D.C. The Harbaugh Hotel Management

Company, owned by George Harbaugh, manages day-to-day operations under a

lease agreement.  The hotel converted two rooms into an apartment. The apartment

is occupied by Joel Manion, the General Manager of the hotel and the son of Jim

Manion, the Chief Operating Officer at Harbaugh (in the original Complaint, Joel

Manion was inadvertently identified as the son of George Harbaugh). The cost of

converting the rooms was charged to OEFI.  The conversion was never voted on by

the trustees of the Pension Fund.  The Pension Fund lost revenue in the form of (1)

conversion costs, and (2) lost room rental revenue, which, in the Washington, D.C.

location, can exceed many hundreds of dollars a night.  Joel Manion even received

hotel meals in his room.  Coincidentally, the lease payment received by the Local

SPIRO MOORE LLP

12 Pension Fund, roughly $3 million, is substantially below the market value of a lease of the Washington Court Hotel property.  Thus, it is likely that Joel Manion's improper living arrangement is some sort of "quid pro quo" for under-the-table payments flowing back as a result of the sub-market lease rate.

134.    As with the Washington Court Hotel, the Local 12 Pension Fund owned parking facilities near the Dallas-Ft. Worth Airport in Texas.  Rather than collect the substantial revenue generated by the parking facilities and simply pay a local parking management company to service them, Local 12 leased the garages out at a fixed rate that was well below the revenue that could have been collected.

135.    The Sheraton Grand Dallas Ft. Worth is another valuable property that was leased to the Harbaugh Hotel Management Company.  The Sheraton is reported to cause a loss for Local 12, since Local 12 has agreed to unusually low lease fees and assumed various costs of operation of the property.

136.    When Trustees attempted to convince Waggoner to sell the Sheraton due to the loss, Waggoner refused to consider the idea.  The Sheraton is still held today.

### 8.    In Violation of the IUOE Constitution, Waggoner Steered Health & Welfare Fund Investments to His Son's Employer Without Disclosing the Prohibited Conflict of Interest in LM-2 Filings

137.    When Kenneth Waggoner went to work at Chelsea Management, Chelsea Management was awarded the business of investing Local 12's Health & Welfare fund assets.  William Waggoner did not disclose the prohibited conflict of interest in Local 12's LM-2 filings, despite the fact that Kenneth Waggoner lived in William Waggoner's home at the time.

138.    When Kenneth Waggoner left Chelsea, Chelsea lost the Local 12 Health & Welfare Account.  Kenneth Waggoner went to McMorgan, which is now

handling pension fund investments for Local 12 and IUOE Local 3.  John Elliot, of New England Pension Advisers, arranged for the bidding process out of which McMorgan emerged as the winning bidder.  Kenneth Waggoner is the Vice-President of marketing for McMorgan.  Shortly thereafter, in December 2011, Patty Waggoner sent an e-mail to John Elliot, asking him to direct clients to Kenneth Waggoner at McMorgan because Kenneth Waggoner was not successfully attracting enough business to McMorgan.  Patty Waggoner stated in her email that she had cleared her request with her husband, William Waggoner, and he approved of the request.

139.    Kenneth Waggoner was aware, based upon his work with Taft Hartley fund management and his living arrangements in his parents' home, that the Local 12 property and OEFI property provided to him was improperly provided.  For example, when Kenneth Waggoner charged expenses at the Washington Court Hotel to the Presidential Suite he shared with his mother and father, for later payment by Local 12, he was stealing from Local 12.  And, when Kenneth Waggoner had Local 12 employees Max Gomez and Christopher Totten, who were on the clock at Local 12, working on construction projects at the home he co-owned with William and Patty Waggoner, he knew that he was stealing from Local 12.  Thus, Kenneth Waggoner was a willing accomplice and co-conspirator in William and Patty Waggoner's racketeering activities.  Kenneth Waggoner unjustly enriched himself at the expense of Local 12's members.

### 9.    Patty Waggoner Diverted Local 12's Insurance Purchases to Her Friend, AJ Longo

140.    For many decades, Local 12 obtained insurance through New West, an insurance broker.  Patty Waggoner wanted to replace New West with AJ Longo, a broker with whom Patty was friends.  A bidding process was initiated.  Bids were due for morning delivery.  Normally, at Local 12, bids are opened and read without

secrecy, and the winner is immediately announced.  In the case of this bidding process, the bids were not revealed and the winner was not announced until that afternoon.  Naturally, Patty's fried, AJ Longo, won that bidding process.

### 10. William Waggoner Demanded the Diversion of Real Estate Account Funds to Pay for Roughly $90,000 in Rose Bowl Tickets Every Year

141.    Prior to his death in 2011, Leo Majich, OEFI administrator, would provide tickets to attend the Rose Bowl to all employees of the Trusts and Local 12.  Majich was diverting funds from real estate accounts to pay for the tickets.  Michael Graydon then assumed the position of administrator after Majich's death.  Graydon refused to continue the illegal asset diversion, despite William Waggoner's demands that he do so.  The tickets cost roughly $90,000 per year.

### 11. Leo Majich's Daughter, Theresa Goodell, Used an OEFI Credit Card to Travel to Jamaica to Visit Her Boyfriend and Defrauded OEFI Out of Other Monies

142.    Theresa Goodell, the daughter of Leo Majich, was employed at OEFI under the father, Leo Majich.  On multiple occasions, Ms. Goodell used a credit card belonging to OEFI to pay for her personal trips to Jamaica to visit her boyfriend.

143.    On weekends, Theresa Goodell would remotely log onto the OEFI computer network, do no work, but turn in overtime hours to fraudulently increase her pay.  She frequently claimed eight hours of overtime per weekend.

144.    Theresa Goodell also periodically required the issuance of an additional payroll check, equal to a week of pay, for herself and her father, Leo Majich.  These improper distributions, occurring roughly five times a year, amounted to the embezzlement of tens of thousands of dollars from OEFI.

145.    According to a high ranking OEFI official, when Michael Graydon discovered the embezzlements by Theresa Goodell, he fired her.  William Waggoner then fired Michael Graydon for terminating Theresa Goodell and other employees involved in the embezzlement schemes and for refusing to follow past practices of diverting assets to pay for such indulgences as Rose Bowl tickets. Waggoner likely protected Theresa Goodell, in part, because he is her "secret" business partner in her artisanal soap company and because Waggoner is always loyal to those who assist him with his many illegal schemes.

**12.      Bernard Kotkin & Co., LLP, a Certified Public Accounting Firm, Was Hired by OEFI to Conduct a Substantial Internal Audit, Uncovering Massive Financial Misconduct, Including Embezzlement, Fraud and the Misuse of Hundreds of Credit Cards**

146.    Bernard Kotkin & Co., LLP, a Certified Public Accounting firm, was hired by OEFI to conduct a substantial internal audit.  During the course of that audit, Auditor Angelo Nicodemo, CPA, determined that hundreds of credit cards had likely been misused by employees and other embezzlements and fraud had occurred.  A report was prepared and provided to Leo Majich.

147.    Each year, the report of asset misuse from Bernard Kotkin & Co., LLP grew in size.  Eventually, when issues identified by Auditor Angelo Nicodemo, CPA, were not addressed under Leo Majich's tenure, he sent the Bernard Kotkin findings to Michael Graydon.  Michael Graydon set out to first verify and later remedy the misconduct uncovered by Bernard Kotkin.

148.    Margaret Bowen, who worked under Michael Graydon, worked with Mr. Graydon to try and clean out the fraud and corruption that permeated OEFI. However, in the end, after Mr. Graydon terminated Theresa Goodell for obtaining

**FIRST AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

1  overtime wages under false pretenses, Mr. Graydon and Ms. Bowen were both fired
2  by William Waggoner.

3

4    **13.    William Waggoner Awarded a No-Bid Security Services**
5         **Contract to His Friend's Firm, Worldwide Security, at**
6         **Roughly Three Times the Competitive Market Rate**

7    149.   Worldwide Security provides security at Local 12 facilities.  The
8  security firm was previously owned by Mike Marker, now deceased.  Worldwide
9  Security is located at 10302 Glasgow, Los Angeles, California.

10    150.   Mike Marker and William Waggoner were close friends.  The contract
11  between Local 12 and Worldwide Security cost roughly three times the competitive
12  market rate for the same security services.  The issue of price was often discussed
13  by the Local 12 board.  Mickey Adams challenged the awarding of the contract to
14  Worldwide Security and was told by William Waggoner to drop it.

15    151.   Worldwide Security has held the contract for security services at Local
16  12 for about ten or more years.

17

18    **14.    OEFI, Local 12's Fund Administration Arm, is Declaring**
19         **Losses Related to the Dos Vientos Property Development,**
20         **but no Asset is Disclosed on OEFI's 5500 Filings**

21    152.   For the year ending June 30, 2011, the Operating Engineers Pension
22  Trust declared net losses of $2,756,215 on their DOL Form 5500 filing related to
23  the Dos Vientos Ranch property, described as the source of losses on "other
24  properties."  And for the partial year of 2011, the Operating Engineers Pension
25  Trust declared net losses of $992,607 on their DOL Form 5500 filing for the Dos
26  Vientos Ranch property.  However, the Dos Vientos Ranch property, described as
27  the source of losses on "other properties," is not listed as a property asset anywhere

28

SPIRO MOORE LLP

else in the Form 5500 filing.  Thus, at minimum, OEFI is incurring losses for a property held by some other entity or fund.

**15.    $10 Million from Local 12's General Fund Was Used to Shore Up Professional Business Bank (Pro Biz), and Local 12 Received a $10 Million Line of Credit in Return but Could Not Draw Funds on that Line of Credit**

153.    Much like the asset movement to shore up Amalgamated Bank, Local 12 stepped in to save Professional Business Bank in and around 2011 when it was under review by the FDIC.  The Order to Cease and Desist resulting from the FDIC's review is attached hereto as Exhibit "1."  $10 Million was taken from Local 12's general account and placed on deposit at Professional Business Bank.

154.    The Health & Welfare Trust Fund was unable to find any lender willing to provide it with a line of credit, since the Health & Welfare Trust Fund had no assets to pledge as security.  But, Professional Business Bank, in exchange for the deposit and the personal relationship with Patty Waggoner, provided the Health & Welfare Trust Fund with a "line of credit."  This supposed line of credit was not certain to be available in full at the time it was given, since Professional Business Bank did not have assets to allow the Health & Welfare Trust Fund to actually draw on its full line of credit without difficulty.  The "line of credit" was used to create the false appearance that it had access to additional liquidity, when, in truth, Professional Business Bank needed as much of the funds on deposit as possible to preserve its asset balance, keep its doors open and comply with the FDIC's Cease and Desist Order.

155.    Prior to engaging in this questionable borrowing for the Health & Welfare Trust Fund, Waggoner decided that he wanted assurances from his friends at the Department of Labor that DOL would not be concerned about borrowing by a Trust Fund that holds not securable assets.  An individual described as an

SPIRO MOORE LLP

"undersecretary" advised Waggoner by email that, although it was not an official imprimatur of the DOL, Waggoner could rest assured that the transaction would not be scrutinized by DOL.  Once again, Waggoner's patronage paid dividends.

156.   Despite the fact that the Professional Business Bank line of credit was shaky at best, William Waggoner touted it as provided much-needed support for the Health & Welfare Fund:

> The Health and Welfare Trust Fund was the hardest hit, and the one that needed the most attention. We had almost daily meetings with trustees and auditors in the summer and fall of 2011 to try to address the critical losses we were experiencing, despite record cutbacks in spending.
>
> Then things finally started looking up. The $10 million loan by Local 12 to rescue the Health and Welfare Fund *and the subsequent $10 million line of credit* has finally stopped the bleeding.

An Excerpt from William Waggoner's "State of the Union" Column is attached as Exhibit "2."

157.   Professional Business Bank was later purchased by Bank of Manhattan.

**16.    While Waggoner and His Family and Cronies Were Enjoying Personal-Use Jet Flights and Failing to Reimburse the General Fund for Printing and Jet Time Contributed to Politicians, the General Fund Was Hemorrhaging Money**

158.   One of the more tragic aspects of Defendants' rampant misuse of Local 12 assets was the dire financial impact on Local 12's General Fund.  In 2010, the General Fund lost $5,727,742, according to William Waggoner.  The 2011 loss was estimated to be $4 million during the latter half of 2011.  To address this deficit, Waggoner and the Executive Board recommended asking employees to take

two days off without pay.  A true and correct copy of William Waggoner's letter is attached hereto as Exhibit "3."  While employees were being asked to give up their wages, Waggoner, his family, and his poker cabal, were still flying around the country in Local 12's jet without reimbursing Local 12 for the jet time.  Local 12 was also giving jet time to politicians, but the Political Action Fund was not reimbursing Local 12's General Fund.  And Local 12 continued to print campaign materials for politicians, but, again, the Political Action Fund did not reimburse Local 12's General Fund for the massive amount of printing supplies that Local 12 purchased.

## 17.  Local 12 Paid Employees' Payroll Taxes Out of the General Fund

159.  Employees are normally obligated to pay their share of FICA out of their gross wages.  Inexplicably, Defendant Waggoner conceived of a plan to pay the employee share of taxes out of the General Fund at Local 12.

## 18.  Bert Tolbert, With the Knowledge of Waggoner, Sold Metal Belonging to the Southern California Training Trust at SA Recycling and Other Recyclers for Cash and Did Not Deliver That Cash to the Trust

160.  For many years, scrap metal was taken from the Southern California Training Trust and recycled, often at SA Recycling, located at 12301 E. Valley Blvd., El Monte, CA 91732.  Teamster's Union drivers or Pete Majich took that metal to the recycling yards.  While "scrap metal" suggests a nominal amount of waste metal, the "scrap metal" sold included dismembered heavy construction equipment no longer in use, constituting tens or even hundreds of thousands of pounds of metal annually.  For example, a 977 front end loader weighs approximately 47,641, and at least one was cut apart and sold as scrap.  Cranes can

SPIRO MOORE LLP

be heavier.  The embezzled sale proceeds frequently exceeded $100,000 per year, but that money was not delivered to the Southern California Training Trust's operating account.

161.    Unfortunately, the DOL expressed a lack of interest in investigating or stopping the embezzlement of hundreds of thousands of dollars of assets from the Trust fund.  The agents expressed a lack of interest in scrap metal sales that they classified as possibly less than their arbitrary threshold of $50,000 for a single transaction.  This arbitrary and capricious threshold is inconsistent with many examples where employee clerks or secretaries were prosecuted for embezzlements of far less.  Evidently, the DOL's arbitrary investigative minimum threshold rises proportionately with the level of seniority of the embezzler.

**19.    Waggoner Wrote Off Debts Without Approval of a Majority of the Trustees When the Debts Were Owed by an Employer Trustee's Company or the Relatives of Waggoner's Buddies**

162.    Waggoner would write off debts owed to Trusts by fiat, without full Trustee votes, when it suited him and certain other Trustees.  For example, Waggoner excused roughly $500,000 in contributions owed to a Trust by Majich Bros. at the same time that Leo Majich was the Administrator for Local 12's Trusts.  In another case, over $300,000 in contribution debt owed by Employer-Trustee C.W. Poss's company, CW Poss, Inc., was excused by Waggoner while Poss was sitting as a Trustee.   Notably, the other Trustees, who were circumvented by Waggoner, did not resign or act in any way after-the-fact to correct Waggoner's misconduct.

SPIRO MOORE LLP

**20.   Patty Waggoner Used a Local 12 Ford Flex Without Justification, Thereby Embezzling Local 12 Assets**

163.   For at least half a year, Patty Waggoner was provided access to a Ford Flex, owned by Local 12.  Patty Waggoner frequently drove the vehicle to her house.  Patty Waggoner also used the vehicle while conducting business as the Vice-President of Amalgamated Bank and as a board member of the Pasadena Chamber of Commerce.  Patty Waggoner could not be properly authorized to utilize that vehicle because she was not an employee of Local 12 or any related entity or Fund.  Her use of Local 12 property, valued in excess of $25,000, constitutes the embezzlement of union assets.  Her husband, William Waggoner, is complicit in that embezzlement.

**21.   Defendants Used Southern California Training Trust Facilities, Assets, and Personnel to Service and Refurbish Their Personal Vehicles and Work on Their Homes**

164.   Over the years, Waggoner, Tolbert and others have restored personal vehicles, including collectible antique cars and boats repaired and restored using Southern California Training Trust funds and staff.  Fred Young and Ray Horn's relative, Jeff Fellows, also had boats rebuilt at the training facility.  Jeff Fellows is employed by Local 12 as an Inspector Business Agent.

165.   A 1951 Chevrolet Bowtie owned by Bert Tolbert was also rebuilt using Trust assets and staff.

166.   Waggoner's Model A Ford was rebuilt using Trust assets and staff.

167.   Bert Tolbert purchased a truck that was fully rebuilt using Trust assets and staff.

168.   Bert Tolbert purchased another truck previously owned by Local 12, had it fully reconditioned using Trust assets and staff, and gave it to his

granddaughter to drive.  The vehicle's value was substantially increased by the full restoration.

169.   These fraudulent vehicle restorations were concealed through the use of dummy VIN numbers.  When Defendants embezzled these assets, they would direct office staff to record repairs under different VIN numbers.

170.   Burt Tolbert, Mickey Adams, and William Waggoner had annual landscaping projects performed on their homes by Trust staff, using Trust tools and assets.  In addition, welder Miley Salazar was sent to officers' homes to do ornamental welding.

E.   **IUOE's and Local 12's Leadership Used Threats of Physical and Economic Violence, and Suborned Perjury, to Suppress Investigations and Usurp Control Over Local 12**

1.   **David Casey Was Beaten at the Direction of Waggoner for Running Against Waggoner for Business Manager**

171.   David Casey, a member, attended Local 12 meetings.  At Local 12 meetings, members are supposedly given the right to make statements or ask questions at an open microphone.  In an around 2005, Mr. Casey attempted to speak up at a meeting.  Two individuals assaulted Mr. Casey immediately after the meeting, beating him violently.  The assailants were the nephew and the son of the District 7 Representative.  David Casey filed a complaint with the Federal Bureau of Investigation about the assault.

2.   **Waggoner Prevents Opposition Voices From Speaking at Any Meetings**

172.   In and around about 2007, Waggoner directed Chris Norton, one of his enforcers, to "cover the microphone" and keep anyone who opposed Waggoner from speaking at any general membership meetings.  At one meeting, Chris Norton

was involved in a physical altercation with David Casey to prevent Casey from speaking at the meeting, particularly about misuse of membership assets related to the purchase of the Cessna jet.

173.    On September 18, 2012, Mr. Waggoner and the entire leadership team attended a District 5 meeting.  At that meeting, Mr. Waggoner told Rodney Karr, who had sent Waggoner a letter raising issues, that "if you don't stop this shit, you're going to get hurt."  Generally, Waggoner and/or his co-conspirators at general membership and District meetings assign large individuals to take up positions near microphones to intimidate any individual that might attempt to speak up in opposition.

### 3.    Local 12 Uses Its Job Referral Service to Suppress Opposition

174.    Local 12 operates an exclusive hiring hall.  All jobs for Local 12 members are dispatched through the centralized hiring hall.  Waggoner and Local 12's leadership use this arrangement to intimidate members that might express opposition to the activities of Local 12's leadership.  The fear of economic retaliation is extremely high.  Some members have children that are also members of Local 12 and will not speak out due to fear of physical and economic harm directed at their children.

### 4.    Business Agents for Local 12 Carry Guns That Have Had Serial Numbers Removed

175.    Waggoner requires Business Agents to carry firearms.  The weapons provided to Business Agents have had their serial numbers removed in some cases.  Waggoner negotiated a deal with Dwight Helmick, the former California Highway Patrol Commissioner, under which Local 12 would pay $25,000 to the surviving spouse or family members of any California Highway Patrol officer seriously

injured or killed in the line of duty.  In exchange, Waggoner received a letter from Dwight Helmick authorizing Business Agents to stop at the side of road where, if questioned, they could produce the letter that instructed the investigating Highway Patrol Officers to take no action.

F.    **Defendants Diverted Caremark Reimbursements From Local 12's Health & Welfare Fund to IUOE and Purchased PBM Services That Were Well Above Competitive Rates From Other Vendors**

176.    In 2006, International Union of Operating Engineers ("IUOE") reported that it had engaged Trivantage Solutions to solicit bids for PBM services for all of IUOE.  PBM refers alternatively to "prescription benefits manager" or "pharmacy benefits manager," both describing the same benefit.

177.    Vince Giblin was Chairman of the Board for Horizon Blue Cross, a paid position with a salary in excess of $200,000, at the time he became General President of the IUOE.  Because of his dual roles, Giblin was able to require use of Blue Cross as the healthcare benefits provider to local unions, including Local 12. Blue Cross utilizes Caremark as its Prescription Benefits Manager ("PBM"). Because of the number of members utilizing the Blue Cross/Caremark benefit, members are entitled to receive a rebate from Caremark, reflecting the members' substantial buying power.  The Caremark rebates should have been paid out to each local union.  Instead, they were paid, in part, to IUOE.  IUOE, in turn, failed to account to Local 12 and other local unions for the rebates they should have received.

178.    In April of 2008, the 37th International General Convention for IUOE was held in Las Vegas.  During the course of this Convention, General President Vincent Giblin met with the General Executive Board (GEB) and key business managers for the larger IUOE Locals to gain support for the new PBM, Caremark.

SPIRO MOORE LLP

179.   The inclusion of the Locals that had the largest membership numbers was critical to the General President's plans with Caremark.  These included, at a minimum, locals 3, 12, 18, 68, 94,150, and local 501.  The total membership in the IUOE is roughly 400,000, according to IUOE's own website.  Local 3 claims to have 42,000 members.  Local 12 had roughly 21,000 members. Local 18 claims to have 15,000 members. Local 68 claims to have 5,863 (all stationary) members.  Local 94 claims to have 5,835 members (all stationary). Local 150 claims to have 22,425 members.  Local 501 has roughly 10,000 members.  Although some other locals had larger memberships than 94 and 68, both of these locals are all stationary engineers. Local 399 with its 9,227 members, local 324 with its 15,530 members and Local 39 with its 16,762 members (all with loyal GEB members at the helm, were equally important to the Caremark contracts).  Totaling the membership from the IUOE locals that Giblin knew he could count on to support his Caremark deal, he had at least a total of 62,354 members (Locals 18, 39, 68, 94, 399) providing support for his Caremark plan.  However, this was less than 20% of the total IUOE membership.  In order for Giblin's plan to succeed, he needed locals 3, 12, 150 and 501 to sign on as well to his plan.  In total, these locals held just shy of 100,000 members.

180.   The contract with Caremark is held by IUOE, not Local 12.  For most Locals, the terms are negotiated by Trivantage, an entity retained by IUOE, not the Health & Welfare Fund at any particular Local.  Fees are charged to Local 12's Health & Welfare fund to pay Trivantage, even though Trivantage is not under contract with Local 12.  In the case of Local 12, however, Local 12 was secretly given permission by Giblin to negotiate its own deal with Caremark.

181.   Trivantage received five cents from every prescription filled under the Caremark agreement.  Truven Health Analytics, Inc. acquired Trivantage as part of the acquisition of the healthcare consulting business sold by Thomson Reuters.  On information and belief, Truven is responsible for the obligations of Trivantage.

1   Local 12 circumvented Trivantage in order to avoid this five cent per prescription

2   payment.

3        182.    In 2009, Caremark reached a settlement in *New England Carpenters* as

4   a result of allegations of overcharging third party payors, such as Local 12's Health

5   & Welfare Fund.  In response to being forced by this settlement to reimburse third

6   party payors for overcharges, Caremark asserted a right to unilaterally increase

7   rates charged to Local 12's Health & Welfare Fund for PBM services.  Caremark

8   contended that any challenge to their rate increase constituted a failure to negotiate

9   "in good faith."  Local 12, which was not a party to the contract with Caremark,

10  was left in a position adverse to both IUOE and Caremark.  The Trustees of Local

11  12's Health & Welfare Fund acquiesced, in violation of their fiduciary duties to

12  members, to this extortionate pricing by Caremark, the PBM imposed on them by

13  Giblin and IUOE.  IUOE First Vice President Waggoner cooperated with Giblin's

14  transaction that amounted to a breach of Giblin's fiduciary duties, rather than risk

15  losing his access to the power and resources available to the Western States

16  Director of IUOE.

17       183.    Caremark's rates for PBM services are significantly higher than the

18  rates charged by comparable competitors.  For example, Local 3, another IUOE

19  Local in California, put out the PBM package for competitive bid.  Caremark's bid

20  was fourth by price.  Caremark's bid was roughly $4 million higher than the winner

21  of the bidding process.  Giblin was told that Medco had won the bid process, so

22  Giblin was aware that Caremark's rates were significantly higher than other

23  options, and continued insistence on the use of Caremark was detrimental to

24  members and contrary to fiduciary obligations of Fund trustees and Union

25  leadership to their members.  Local 3 and Local 12 are of similar size, thus the bid

26  experience by Local 3 is similar to what Local 12 could have obtained if it had not

27  acquiesced to Giblin.

28

FIRST AMENDED CLASS ACTION COMPLAINT

SPIRO MOORE LLP

184.    Several of the larger locals investigated other PBM Servicers prior to agreeing under duress to accept Caremark as its PBM service provider.

185.    At Local 3, a meeting was held to discuss Caremark.  Representatives from the Local, from Trivantage, and IUOE were all present.  The IUOE representative demanded access to bids for PBM services obtained by the Local. Giblin forced Local 3 to put the PBM service out for rebid after Giblin received copies of the bids.  The Local acquiesced to the demand, and, not surprisingly, with inside information provided by Giblin, Caremark was able to underbid Medco by nearly $2 million, and Local 3 was forced to award the contract to Caremark.  This illegal bid rigging allowed Giblin to secure the critical mass of acceptance of Caremark that he needed to force Caremark on all of IUOE.  Once Caremark had the contract, it raised its rates back to the level comparable with its initial bid. Local 3 is now paying PBM rates that are roughly 17% higher than they would have been if IUOE had not interfered in a competitive bidding process.

186.    While Local 3 was being extorted and threatened, Local 12, helmed by the loyal GEB Vice-President William Waggoner, was given permission to negotiate its own deal with Caremark.  The only demand placed on Waggoner was that he keep it a secret that the deal his Local negotiated was somewhat better than the deal obtained by IUOE for every other Local in IUOE.  This deal was finalized without the assistance of Trivantage, after Local 12 kicked Trivantage out of the mix.

187.    In mid-2012, auditors at one Local completed a review of Caremark's PBM services.  They discovered that, in one aspect of the service only, Caremark had illegally overcharged the Local's health & welfare fund in excess of $6.5 million for the relatively short period covered by the audit review.  This same illegal practice was in place throughout the nation, and Caremark is under investigation by states around the Country for this fraudulent practice.  The affected beneficiaries around the country may have been harmed in excess of $200 million

2cv-10506-DDP-VBK   Document 58   Filed 04/19/13   Page 61 of 151   Page ID #:323

1  by this one illegal scheme operated by Caremark.  Caremark has received a demand

2  from the Local to refund these overcharges.  Caremark refused, but did not deny

3  that the illegal practice occurred.  Caremark only challenged the amount of the

4  alleged damage.

5  188.    Representatives of IUOE and Trivantage conspired within the state of

6  California to engage in unlawful conduct designed to ensure that Caremark was

7  selected as the PBM for all Locals in IUOE.  This conspiracy included fraud

8  directed at Locals and their members, bid-rigging, extortion, and other anti-

9  competitive conduct that actually injured beneficiaries throughout the State of

10  California and the United States.  After conspiring to take certain actions in

11  furtherance of that goal, the plan was implemented and Caremark did, in fact,

12  secure business from the vast majority of Locals in IUOE nationwide.

13  189.    Because Caremark was aware that its contract was with IUOE, and

14  IUOE was forcing Locals to accept the Caremark arrangement, Caremark had no

15  incentive to deal honestly and fairly with Locals seeking to negotiate terms that

16  were in their best interest.  Lacking a direct, arms-length relationship with Locals,

17  Caremark took maximum advantage of the captured Locals that were forced to deal

18  with it.  In addition, given that Local 12, with fewer members than IUOE as a

19  whole, was able to negotiate better terms than IUOE obtained, IUOE clearly failed

20  to obtain the most favorable terms for IUOE members.

21

22  **G.    Local 12 Allows Employers Contracted With Local 12 to Operate**

23  **Double-Breasted, Thereby Depriving Members of Protections and**

24  **Benefits Available Under Union Agreements**

25  190.    Union contracts with employers hiring Local 12 members require, at

26  minimum, that employers unionized through Local 12 must remain unionized in

27  subsequent labor contracts with Local 12.  The Business Manager, Waggoner, was

28  responsible for supervising all business representatives and ensuring that all

**FIRST AMENDED CLASS ACTION COMPLAINT**

collective bargaining agreements for Local 12 were negotiated, fully executed, and that all terms under the collective bargaining agreements were enforced.

191.   Instead, employers subject to collective bargaining agreements operate "double breasted."  In labor parlance, "double breasted" refers to the side-by-side operation of unionized and non-unionized workforces.  For example, Morley Builders is signatory to a Local 12 collective bargaining agreement, but its alter ego, Benchmark Construction, is operated as though it is a non-unionized entity. Benchmark Construction uses heavy equipment operators.  LKR Group is signatory to a Local 12 collective bargaining agreement, but its alter ego, Group Delta Consultants, Inc., is operated as though it is a non-unionized entity.  Group Delta Consultants, Inc. uses construction inspectors.  Twining Laboratories is signatory to a Local 12 collective bargaining agreement, but its alter ego, Quality Assurance International, is operated as though it is a non-unionized entity.  The operators of Twining Laboratories and Quality Assurance International are husband and wife, with the husband owning the former and the wife owning the latter to conceal double-breasted activity. Quality Assurance International uses heavy equipment operators.  Smith-Emery also operates double-breasted.  The unionized portion of Smith-Emery's operations, on information and belief, is limited to about 30% of Smith-Emery's total operations.

## H.   **Steve Montrie, Convicted of Mere Vehicular Manslaughter, Remains a Business Agent Despite Killing an Individual While Driving a Union Vehicle Under the Influence of Alcohol**

192.   In December 2008, Steve Montrie admitted to killing an individual while driving a union vehicle under the influence of alcohol.  Ron Sikorski, the President of the Union, was also present.  Using its influence with local officials, Local 12 secured a sentence of vehicular manslaughter, rather than gross vehicular manslaughter, for Montrie.  He was sentenced to three years and served about 18

months.  Previously-ordered restitution to the family of victim, in the amount of about $24,881.99 to one family member and $32,829.05 to another, was rescinded.

193.    Immediately after his release, Mr. Montrie was employed as a business representative by Local 12, in violation of Section 504 of the LMRDA.  Waggoner was aware of the prohibition on hiring individuals convicted of crimes inflicting great bodily injury or death, but nevertheless hired him.  Waggoner recently campaigned for the expungement of Montrie's conviction so that Montrie could serve as an officer, confirming Waggoner's awareness of the restrictions imposed by Section 504.

194.    Waggoner's protection of Montrie is inconsistent with Waggoner's 2004 Driver Safety Policy, which acknowledged that safe-driving agents should not be punished or burdened by the reckless or careless drivers causing problems at Local 12.  Waggoner's Policy and Memorandum is attached as Exhibit "4."

195.    Montrie's conduct was such that he could not be insured under the standard liability insurance purchased by Local 12 for all of its employees.  Instead, Montrie was separately insured through a high-risk individual policy.  This policy was extraordinarily expensive.  Patty Waggoner's friend AJ Longo provided that policy.  This policy was initially purchased before Montrie was sentenced.  After his release from prison, when Montrie was re-employed by Local 12, a similar policy was purchased for him.

## I.    <u>Miscellaneous Breaches of Fiduciary Duties</u>

196.    Employees of various Funds associated with Local 12 were instructed to fabricate receipts for goods and services not received when they traveled for business purposes but did not exhaust the expense monies provided in advance of their travels.  The purpose of this instruction was two-fold.  First, the administration of the funds was so deficient that the procedures were not in place to receive back unused funds.  The instruction eliminated the need to correct those

deficiencies.  Second, when Fund employees complied with this instruction, it was believed by Defendants that engaging in this improper activity, though at the direction of superiors, would prevent employees from discussing the many improprieties they observed.  In other words, Defendants viewed these excess funds as "hush" monies to buy the silence of potential whistle-blowers.

197.   At all times alleged herein, the Trustees and Officers named as Defendants, where not actively participating in the fraudulent schemes and embezzlements, acquiesced to all of the misconduct related to their positions, were aware of it, and did nothing to stop it.

**J.** **Massive Fraud Involving State and Federal Education Funds**

198.   Defendants also utilized the Training Trusts to defraud the State of California out of education funds.  Apprentice members were sometimes instructed to repeat classes multiple times for the purpose of allowing Defendants to defraud California out of monies distributed through the Community College system.

199.   Here is how the Apprenticeship program is supposed to work.  Every two years the program opens up to take in new apprentices. Interested persons take a written test and must score at least 70%. The higher the score, the higher the applicant is placed on the accepted applicant list. Once an applicant passes the entrance exam, their name is placed on the accepted applicant list. Apprentice applicants names are supposed to be pulled from the top of the list down. If an applicant scored 75% on the exam, for example, it would very unlikely that the name would be selected.  The program would test roughly 4,000 people when this program's applicant window opened. The program's duration is three years. Veterans are given an additional ten points which is added to their score.

200.   In truth, the program works differently.  If Bert Tolbert or William Waggoner, or some other officer, were asked to allow someone into the program, if they liked the person, they would confer "VIP" status on the applicant. A time

would be scheduled for the "VIP" applicant to take the test.  Valerie Ascencio would be made aware of the so-called "VIP's" from Bert Tolbert or the Field Coordinators. Valerie would remind the Field Coordinators not to forget to get her the list of "VIP" names so she could make sure that their scores would be high enough to land on the top end of the accepted applicant list.

201.    Scores for VIP applicants were often altered on their scantron test sheets to ensure that a sufficient number of correct answers resulted in a high test score.  This had the additional effect of excluding applicants who did not have VIP status.

202.    The Southern California Training Trust was accredited through Rio Hondo Community College to offer vocational training classes in the Apprenticeship Training Program.  The Southern California Training Trust received compensation for each student enrolled in a class, for the first enrollment in the class.  These funds are known as Montoya funds, administered through the California Department of Education ("CDE"), and may also include a federal subsidy or subsidies related to Department of Labor training grants. Apprenticeship RSI funding is provided to the CDE through California's annual budget act. Funds are appropriated to local education agencies through the principal apportionment system based on the actual number of hours in RSI coursework. Each local education agency is capped on the number of hours of instruction it can claim for reimbursement.  Apprenticeship programs in California are developed and conducted by program sponsors including individual employers, employer associations, or a jointly sponsored labor/management association. Local education agencies (community colleges, for example) individually contract with program sponsors (like the Trust) providing educational leadership in the provision of RSI.

203.    If a student failed a class due, for example, to their use in political campaign activities, the Southern California Training Trust could not receive compensation if the student was re-enrolled in the same class a second time. To

**FIRST AMENDED CLASS ACTION COMPLAINT**

circumvent this, the Southern California Training Trust reported the student as having enrolled in a different, new training class, but the student re-took the original class, and the Southern California Training Trust was reimbursed for the falsely reported class that the student was not attending.  This fraud has occurred for at least a decade, if not longer.  The fraud scheme is draining capped funds from the Community College that could be put to educational use elsewhere.

204.   Waggoner's close ally, Hilda Solis, is closely tied to the use of community colleges for trade program training courses.  On September 19, 2012, Hilda Solis said, at a grant announcement:

> I know there's so much talent in the community college system. The first elected office I ever held was on the Board of Trustees of Rio Hondo Community College back in California. For millions of Americans, community colleges offer quality education that's financially within their reach. That's especially important during our recovery.

Secretary of Labor Hilda L. Solis announced $500 million in grants to community colleges and universities around the country for the development and expansion of innovative training programs:



The grants are part of the Trade Adjustment Assistance Community College and

SPIRO MOORE LLP

1  Career Training initiative, which promotes skills development and employment
2  opportunities in fields such as advanced manufacturing, transportation and health
3  care, as well as science, technology, engineering and math careers through
4  partnerships between training providers and local employers. The U.S. Department
5  of Labor is implementing and administering the program in coordination with the
6  U.S. Department of Education.

7      205.    During various election seasons, apprentices were removed from
8  classes and forced to walk precincts or engage in other campaign activity.  As a
9  result of missing classes, many apprentices failed their testing, which necessitated
10  repeating classes.  Thus Local 12 essentially defrauded California out of education
11  funds to subsidize political campaigns by Local 12.  This mandatory campaign
12  activity imposed on apprentices is also a violation of the Federal Election
13  Campaign Act that prohibits mandatory participation in political activities.
14  Defendants also falsified attendance records submitted to the State when
15  apprentices that were forced to campaign were marked as present in class.

16

17      **K.     Waggoner Used Pension Benefits That Should Have Been**
18      **Universally Available to All Employees of Local 12 or Its Related**
19      **Trusts as a Selective Reward Tool**

20      206.    A participant in the General Pension Plan is any full-time employee of
21  an IUOE Local or of a Related Organization that is a Participating Employer in the
22  Plan.

23      207.    Local 12 is an IUOE Local.  Contract Compliance is a Related
24  Organization.  OEFI, which manages all of Local 12's funds, is a Related
25  Organization.  This action does not include the Southern California Training Trust
26  with respect to allegations of violations of the Pension Plan's all-or-none rule.

27

28

SPIRO MOORE LLP

208.   Pursuant to the General Pension Plan's all-or-none rule, all employees of Local 12 or its Related Organizations must be participants in the General Pension Plan or none may participate.

209.   Waggoner repeatedly violated this rule by selectively authorizing participation in the General Pension Plan.  For example, Waggoner initially offered participation in the General Pension Plan to pilot Bruce Timpe, but not Robert Squillace, another pilot.  After the filing of this action, Robert Squillace was included in the General Pension Plan.  And co-pilots were never offered the opportunity to participate in the General Pension Plan.

210.   David Lanham, in Contract Compliance, is included in the General Pension Plan, while other employees in Contract Compliance are excluded.

**L.      All Employees of Local 12, Other Than Some Clerical Workers, Must Pay Union Dues Despite no Coverage Under Any Collective Bargaining Agreement**

211.   Roughly 200 employees at Local 12 are not covered by any collective bargaining agreement.  Nevertheless, they are required to pay $320 per year in dues to Local 12, and $48 per week in supplemental dues (which is $2,496 annually).  These employees have never been covered by a collective bargaining agreement.  As alleged above, these employees are subject to the whims of Local 12 management when, for example, only some are provided the opportunity to participate in the General Pension Plan.  For their $2,816 per year, these employees have no guarantee that they will receive the sorts of benefits that Local 12's regular members receive under their collective bargaining agreements.  Since they were not covered, their dues should be reimbursed as unlawfully converted under false pretenses.

**FIRST AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

**M.** **Waggoner and His Team Issued Instructions to Shred or Hide Documents That Could Be Used to Corroborate Allegations in This Lawsuit**

212.   Since the filing of this lawsuit, Waggoner and his leadership team have directed the destruction of evidence in the form of records that would tend to prove the allegations of this action.  For example, records that would show asset embezzlements and transfers between the Southern California Training Trust and the Southern Nevada Training Trust were collected for shredding.  Once Defendants were warned that their spoliation of evidence plans were know, they changed tactics, instead collecting and hiding documents outside of their ordinary places of filing.

**N.** **After Destroying or Hiding Documents, Defendants Are Now Moving Equipment Back to the Southern California Training Sites, Including Devore, Whittier, and San Diego, to Hide Unlawful Asset Transfers from the Southern California Training Trust to the Southern Nevada Training Trust**

213.   After this lawsuit was filed, and as described above, a comprehensive effort was undertaken to eliminate (or, as was frequently said at the Southern California Training Trust, "unmarry") the connections between the Southern California Training Trust and the Southern Nevada Training Trust.  This plan included an initial document shredding campaign.  When Plaintiffs' counsel warned certain Defendants through counsel of the consequences of evidence spoliation, the shredding campaign morphed into a plan of document concealment wherein documents were collected, boxed and secreted from the training site offices.  Then, some of the equipment wrongfully transferred to Nevada was brought back to California, at great expense.

SPIRO MOORE LLP

214.    Two Teamster drivers, James Capen and John Bader, are completing the transfers from the State of Nevada to the Southern California training sites. Many of these pieces of equipment exceed 8 feet in width and qualify as wide or oversize loads, requiring the use of a pilot car and permits from the Nevada Department of Transportation to complete.  Pursuant to DOT regulations, the drivers must stay overnight to comply with hours of service regulations.  These transfers, intended solely to conceal asset misuse and fraud between Trusts, are expensive.  The costs of these expensive transfers are falling upon the Southern California Training Trust, from which the equipment was originally pirated and deleted from its inventory.

O.    **Employees at Local 12 Were Forced to Participate in Precinct Walks, Under Threat of Retaliation or Termination, in Violation of the Federal Election Campaign Act**

215.    Along with mandatory political fund contributions, mandatory phone banking and precinct walks, under threat of termination, were a part of life at Local 12.  For example:

(a)    Employees were required to participate in mandatory phone banking on February 22, 2000 and October 3, 2000.

(b)    Employees were required to participate in a mandatory precinct walk for Hilda Solis on February 26, 2000, February 27, 2000, March 4, 2000, and March 5, 2000.

(c)    Employees were required to participate in a mandatory precinct walk for Adam Shiff on October 8, 2000, October 15, 2000, and October 22, 2000.

(d)    Employees were required to participate in mandatory phone banking on February 19, 2002, without compensation.

SPIRO MOORE LLP

**FIRST AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

(e)     Employees were required to participate in a mandatory precinct walk for Linda Sanchez on October 5, 2002.

(f)     Employees were required to participate in a mandatory precinct walk for Linda Sanchez on October 26, 2002, at the direction of John Spaulding, among others.

(g)     In May 2003, employees were required to participate in precinct walks, at the direction of John Spaulding, among others.

(h)     Employees were required to volunteer for the Nate Holden campaign on February 20, 2004, at the direction of John Spaulding, among others.

(i)     In and around April 28, 2005, employees were required to participate in precinct walks.

(j)     Employees were required to participate in a mandatory precinct walks on June 5, 2006 and June 6, 2006.

(k)     Employees were required to participate in a mandatory phone banking on October 21, 2008, October 22, 2008, and October 29, 2008.

(l)     Employees were required to participate in a mandatory precinct walks on October, 2008 and October 11, 2008.

Mandatory precinct walks remained in effect through 2012.

**P.     <u>Waggoner Defrauded Pension Funds to Secure the Loyalty and Votes of Retirees, Allowing Them to Work Hours in Excess of Limits Imposed by the Pension Fund</u>**

216.     Waggoner allowed loyal retirees to return to work and actually work in excess of the monthly hours of service limits imposed by the Pension Fund.  The employers, including, in some cases, Local 12 itself, are not required under this selective arrangement to contribute to Pension or benefit plans, including Health &

1  Welfare.  This arrangement persisted despite the critical status of the Health &

2  Welfare and Pension Funds.  This selective use of Pension Fund rules has helped

3  Waggoner secure and maintain power for decades.  The strong vote of retirees in

4  favor of Waggoner at each election has been purchased by Waggoner with Local 12

5  Pension Fund assets.

6

7  **Q.**    **Severe Fiduciary Breaches Have Harmed Health & Welfare Fund**

8        **Beneficiaries, Whose Claims Have Not Been Paid for Years**

9       217.   For many years, Local 12 processed Health & Welfare benefits claims

10  processing through OEFI.  Due to the use of a decades-old computer system and

11  because of the severe underfunding of the Health & Welfare Fund, the claims

12  submitted by health care providers, for treatments delivered to covered

13  beneficiaries, have sat in piles, in baskets, in boxes, all throughout OEFI's offices,

14  unprocessed for many years.  As a result, many beneficiaries have medical bills that

15  remain unpaid for many years, despite multiple invoices submitted by providers for

16  payment.

17       218.   In 2011, Anthem Blue Cross told the Board of Trustees, including

18  Wagoner, to get their "house in order."  Anthem Blue Cross declared its intent to

19  terminate the contract with the Health & Welfare Trust Fund on July 31, 2011.

20  Anthem Blue Cross did, in fact, terminate that contract.

21       219.   Eventually, Local 12 outsourced claim payment processing.  This has

22  improved the speed of payment for current claims, but the massive backlog of

23  neglected claims has not been cleared.

24

25

26

27

28

**FIRST AMENDED CLASS ACTION COMPLAINT**

**R.** **Local 12 Habitually Purchases Its Vehicle Fleet From Ford and Services Its Own Vehicles, but Its LM-2 Filings Since at Least 2006 Show Inexplicably Variable Expendidures Classified As "Auto Leasing and Maintenance."**

220.    On past LM-2 filings, Waggoner reported payments to Wright Express Fleet Services, Inc. and Fleet Services, Inc.  In 2011, these expenditures totaled $281,153.00.  However, the monthly payments vary as much as fifty percent ($13,708 as a low and $20,514 as a high).  If these charges were lease payments, they would be stable.  If they are automobile fuel charges, they are unusually erratic.  On the most recent LM-2, Waggoner finally reported the true nature of the expenses, fuel, that were previously camouflaged as vehicle lease expenses.  In the 2012 LM-2, payments to Wright Express *Financial* Services, Inc. are classified as "Transportation Equipment Fuel."  The company is classified as a "Gas and Oil Company."

**S.** **When Witnesses Agreed to Come Forward and "Blow the Whistle" on Wrongdoing in Local 12, the DOL Investigative Agents Looking Into Local 12 Threatened the Witnesses for Their Failure to Stop Misconduct at Local 12 and Refused to Examine Evidence Voluntarily Produced for the DOL Agents**

221.    Recently, witnesses that agreed, at the request of local DOL agents, to come forward and share their insights into misconduct at Local 12 received an unusually frosty welcome for witnesses voluntarily cooperating with federal investigators.  One witness was grilled, not on his deep and expansive knowledge of illegal conduct at Local 12 and its affiliated Trusts, but on his failure to fix it all when he was employed there.

222.    Other witnesses, who came forward with collected documents and information, were told that the DOL was not interested in embezzlements that did

SPIRO MOORE LLP

not exceed an arbitrary threshold of $50,000 for a single transaction.  This is odd, given that the congress has declared money laundering in amounts exceeding $10,000 to be a special form of crime, and many union-affiliated individuals have been prosecuted and convicted by the United States Attorneys in other jurisdictions for embezzlements of far less.  Further, many of the documented illegal transactions by Waggoner and his cronies are far in excess of the arbitrary $50,000 threshold, though any sign of serious consequences remains to be seen.  It would seem to date that Waggoner's campaign of influence peddling through Hilda Solis and others continues to pay dividends in the form of criminal immunity for him, his family, and his inner cabal.

### T.    **Additional False Represenatations in Mandatory Union Reports**

223.    In the most recent LM-2 Filing by Local 12, William Waggoner falsely claims that Local 12 was named as a defendant in this lawsuit.

## V.    **CLASS ACTION ALLEGATIONS**

224.    Plaintiffs bring this action individually, as well as on behalf of each and all other persons similarly situated in a concerted effort to improve wages and working conditions for other, similarly situated employees, and thus, seek class certification under Fed. R. Civ. Proc. 23.

225.    The proposed Class consists of and is defined as:

All individuals that are or have been members of the International Union of Operating Engineers Local 12 at any time within the five years prior to the filing of this action.  Excluded from the Class are all Defendants in this action, and all of their current and former officers, directors, management employees, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees and members; all persons within the third degree of relationship to any of the excluded individuals and any judge who hears or decides any matter in this litigation.

226.    The "agency fee" sub-class is defined as follows:

SPIRO MOORE LLP

All member of the Class that are "agency fee" members of Local 12, including all public entity employees who are members of Local 12 for purposes of collective bargaining representation.

227. The proposed Local 12 Fund Beneficiary Class consists of and is defined as:

All individuals that are or have been beneficiaries of any of the Trust Funds associated with International Union of Operating Engineers Local 12 at any time within the five years prior to the filing of this action. Excluded from the Class are all Defendants in this action, all of the Defendants' family members, and all of their current and former officers, directors, management employees, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees and members; all persons within the third degree of relationship to any of the excluded individuals and any judge who hears or decides any matter in this litigation.

228. The proposed Local 12 Employee sub-class consists of and is defined as:

All individuals that are or have been employees of the International Union of Operating Engineers Local 12 or its affiliated entities, including Trusts, at any time within the five years prior to the filing of this action. Excluded from the Class are all Defendants in this action, and all of their current and former officers, directors, management employees, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees and members; all persons within the third degree of relationship to any of the excluded individuals and any judge who hears or decides any matter in this litigation.

229. Plaintiffs reserve the right to establish sub-classes, or modify any Class or sub-Class definition, as appropriate.

230. At all material times, Plaintiffs were or are members of the Class.

231. There is a well-defined community of interest in the litigation and the class is readily ascertainable:

(a)   Numerosity:  The members of the class (and each subclass, if any) are so numerous that joinder of all members would be unfeasible and impractical.  The membership of the entire class is unknown to Plaintiffs at this time, however, the class is estimated to be greater than 10,000 individuals and the identity

SPIRO MOORE LLP

1    of such membership is readily ascertainable by inspection of

2    Defendants' records.

3    (b)   Typicality:  Plaintiffs are qualified to, and will, fairly and

4          adequately protect the interests of each class member with

5          whom there is a shared, well-defined community of interest.

6          Plaintiffs' claims are typical of all class members' claims.  For

7          example, Plaintiffs were members of Local 12 within the class

8          period, like all other Class members, and Plaintiffs were injured

9          by manipulation of Local 12 through racketeering activity as all

10         other Class members were.

11   (c)   Adequacy:  Plaintiffs are qualified to, and will, fairly and

12         adequately protect the interests of each class member with

13         whom there is a shared, well-defined community of interest and

14         typicality of claims, as demonstrated herein.  Plaintiffs

15         acknowledge that Plaintiffs have an obligation to make known to

16         the Court any relationship, conflicts or differences with any

17         class member.  Plaintiffs' attorneys, the proposed class counsel,

18         are versed in the rules governing class action discovery,

19         certification, and settlement.

20   (d)   Superiority:  A Class Action is superior to other available

21         methods for the fair and efficient adjudication of the

22         controversy, including consideration of:

23         1)    The interests of the members of the class in individually

24               controlling the prosecution or defense of separate actions;

25         2)    The extent and nature of any litigation concerning the

26               controversy already commenced by or against members of

27               the class;

28         3)    The desirability or undesirability of concentrating the

litigation of the claims in the particular forum; and

4)     The difficulties likely to be encountered in the management of a class action.

(e)     <u>Public Policy Considerations</u>:  Labor organizations are intended to protect employees from the potential for employer abuse of power, but when the parent union conspires with employers, a local union is powerless to protect itself from abuses origination from multiple directions.  Current union members are often afraid to assert their rights out of fear of direct or indirect retaliation.  Former union members know the reputation of large labor organizations as violent and dangerous when challenged.  Class actions provide the class members who are not named in the complaint with a type of anonymity that allows for the vindication of their rights at the same time as their privacy and safety is protected.

232.     There are common questions of law and fact as to the class (and each subclass, if any) that predominate over questions affecting only individual members, including but not limited to:

(a)     Whether Defendants engaged in racketeering;

(b)     Whether Defendants violated the LMRDA;

(c)     Whether Defendants unlawfully conspired to engage in racketeering;

(d)     Whether Defendants breached fiduciary obligations to the Class; and,

(e)     The appropriate amount of damages, restitution, or monetary penalties resulting from Defendants' violations of law.

233.     This Court should permit this action to be maintained as a class action pursuant to Fed. R. Civ. P. 23 because:

**FIRST AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

SPIRO MOORE LLP

(a)   The questions of law and fact common to the class predominate over any question affecting only individual members;

(b)   A class action is superior to any other available method for the fair and efficient adjudication of the claims of the members of the class;

(c)   The members of the class are so numerous that it is impractical to bring all members of the class before the Court;

(d)   Plaintiff, and the other members of the class, will not be able to obtain effective and economic legal redress unless the action is maintained as a class action;

(e)   There is a community of interest in obtaining appropriate legal and equitable relief for the statutory violations, and in obtaining adequate compensation for the damages and injuries for which Defendants are responsible in an amount sufficient to adequately compensate the members of the class for the injuries sustained;

(f)   Without class certification, the prosecution of separate actions by individual members of the class would create a risk of:

    1)   Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants; and/or

    2)   Adjudications with respect to the individual members which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests, including but not limited to the potential for exhausting the funds available from those parties who are, or may be, responsible Defendants; and,

(g)   Defendants have acted or refused to act on grounds generally

1 |     applicable to the class, thereby making final injunctive relief

2 |     appropriate with respect to the class as a whole.

3 |     234.   Plaintiffs contemplate the eventual issuance of notice to the proposed

4 | members of the class that would set forth the subject and nature of the instant

5 | action.  The Defendants' own business records may be utilized for assistance in the

6 | preparation and issuance of the contemplated notices.  To the extent that any

7 | further notices may be required, Plaintiff would contemplate the use of additional

8 | mailings.

9 |

## VI.    CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## (Violation of 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. §§ 1961-68])

## By Plaintiffs against All Defendants

235.   Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

236.   Defendants are each a "person" as that term is defined by 18 U.S.C. section 1961(3).

237.   Local 12 constitutes an enterprise as that term is defined by 18 U.S.C. § 1961(4) (hereinafter known as the "Local 12 ENTERPRISE").

238.   The LOCAL 12 ENTERPRISE is engaged in, and its activities affect, interstate and foreign commerce.

239.   The DEFENDANTS are, and at all relevant times were, associated with the LOCAL 12 ENTERPRISE.

240.   As described herein, the DEFENDANTS, beginning at least as early as 2000, and continuing to the present, knowingly and willfully set into motion an over-arching scheme to defraud the LOCAL 12 ENTERPRISE out of revenues, cost savings, and membership.  The primary goal in all instances was the unlawful

SPIRO MOORE LLP

1   enrichment of the DEFENDANTS through activities of the LOCAL 12

2   ENTERPRISE.  Numerous kickback schemes enabled employers to avoid

3   contractual obligations while providing bribes to Defendants.  Assets in trust funds

4   were co-mingled and diverted to personal uses.  To accomplish the over-arching

5   goal of fraudulent and unlawful enrichment, the DEFENDANTS engaged in and/or

6   authorized a variety of unlawful activities, including the use of threats of economic

7   harm and violence to seize control of Local 12 and prevent discovery of the many

8   asset diversion and kickback schemes enriching the leadership of the IUOE.

9        241.   Rights guaranteed under the LMRDA are protectable property interests

10  held by Plaintiffs and other Class members.  Plaintiffs' and Class members' rights

11  under the LMRDA are extortable in violation of the Hobbs Act.

12       242.   Assets intended to benefit Plaintiffs and Class members when

13  deposited into trust account, including the Health & Welfare Fund and others,

14  represent tangible assets subject to conversion in violation of the Hobbs Act.

15       243.   Plaintiff and Class members were and are aware of ties between the

16  leadership of IUOE and organized crime syndicates in New York and New Jersey.

17  As a result of that awareness, threats of economic and physical harm directed at the

18  Plaintiffs and other Class members were viewed as highly credible and elicited

19  substantial fear and concern amongst Plaintiffs and other Class members.  In fact,

20  members of Local 12 were physically beaten for speaking up against leadership of

21  Local 12.

22       244.   Beginning at least as early as 2000 and continuing to the present, the

23  DEFENDANTS, in furtherance of and for the purpose of executing the schemes

24  and artifices to defraud and divert Local 12 resources described herein, on

25  numerous occasions engaged in the extortion of rights guaranteed to Plaintiffs and

26  other Class members under the LMRDA and other laws.  Each such extortionate

27  activity in connection with the described schemes and artifices to defraud and

28  divert Local 12 resources constitutes a distinct violation of the Hobbs Act, 18

U.S.C. § 1951, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  The unlawful extortion of property and rights secured under the LMRDA and other laws include, but is not limited to, the following acts whereby the DEFENDANTS:

      (a)   Obtained the voting rights of Plaintiffs and other Class members by utilizing threats of economic and physical harm to control the winners of elections at Local 12;

      (b)   Actively prevented members from speaking out at meetings against leadership;

      (c)   Obtained assets belonging rightfully to Plaintiffs and other Class members by utilizing threats of economic and physical harm to control Local 12's ability to investigate asset diversions.

245.   Beginning at least as early as 2000 and continuing to the present, the DEFENDANTS, in furtherance of and for the purpose of executing the schemes and artifices to defraud described herein, on numerous occasions used and caused to be used the United States Mails and other commercial interstate carriers by both placing and causing to be placed letters and other mailable matter in the authorized depositories of such carriers and receiving and causing to be received letters and other matter from such carriers.  Each such use of the United States mails and other carriers in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. § 1341, relating to mail fraud, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  The unlawful use of the mails includes, but is not limited to, the following:

      (a)   Fraudulent mailing from Local 12's leadership indicating that Local 12's funds were in sound financial condition.

FIRST AMENDED CLASS ACTION COMPLAINT

    (b)    Fraudulent mailings concerning illegal transfers of assets between funds, including transfers of heavy equipment deleted from fund inventories.

    (c)    Fraudulent mailings concerning the source of "in-kind" political contributions.

246.    By issuing threats of physical assault, as described above, Defendants engaged in racketeering activity as defined by 18 U.S.C. § 1961(1)(A).

247.    Beginning at least as early as 2000 and continuing to the present, the DEFENDANTS, in furtherance of and for the purpose of executing the schemes and artifices to defraud described herein, on numerous occasions used and caused to be used wire communications in interstate and foreign commerce by both making and causing to be made wire communications.  Each such use of a wire communication in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. § 1343, relating to wire fraud, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).  The unlawful use of wire communications includes, but is not limited to, the following:

    (a)    False online information regarding the integrity of funds associated with Local 12;

    (b)    Acceptance via wire, on occasions too numerous to identify herein, and at times known exclusively by Defendants, of fraudulently obtained kickback payments from employers.

248.    Beginning at least as early as 2000 and continuing to the present, the DEFENDANTS, in furtherance of and for the purpose of executing the schemes and artifices to defraud described herein, on numerous occasions knowingly engaged in and caused to occur monetary transactions in criminally derived property with value in excess of $10,000.  The transactions were accomplished by depositing, withdrawing or transferring funds by, through, or to a financial

institution, as such an institution is defined by 18 U.S.C. § 1956.  Funds used in

such transactions were derived from offenses listed in 18 U.S.C. § 1961(1),

including, but not limited to, funds derived from mail fraud, in violation 18 U.S.C.

§ 1341, and wire fraud, in violation of 18 U.S.C. § 1343.  Each such monetary

transaction in connection with the described schemes and artifices to defraud

constitutes a separate and distinct violation of 18 U.S.C. § 1957, relating to

unlawful monetary transactions and money laundering, and further constitutes

racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  The

unlawful monetary transactions include, but are not limited to, the following:

> (a)   Acceptance of payments by Waggoner and his co-conspirators from employers, at times known exclusively to Defendants;

> (b)   Acceptance of payments by Waggoner for the sale of real estate belonging to Local, at times known exclusively to Defendants;

> (c)   Deposits by Waggoner at Amalgamated Bank that were diverted from Local 12 fund assets and used to prop up Amalgamated Bank while under investigation by the FDIC.

249.   Beginning as least as early as 2000, and continuing to the present, the DEFENDANTS, in furtherance of and for the purpose of executing the schemes and artifices to defraud described herein, on numerous occasions knowingly traveled in interstate commerce and used facilities of interstate commerce (including, but not limited to, the mails) with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of unlawful activities (including violations of 18 U.S.C. § 1957), and thereafter performed or attempted to perform such violations.  Each such interaction with facilities of interstate commerce in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. section 1952 (the "Travel Act"), relating to travel in interstate commerce with intent to facilitate certain unlawful activities, and further constitutes

**FIRST AMENDED CLASS ACTION COMPLAINT**

racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).  These violations included habitual interstate travel by the DEFENDANTS to and from Local 12 for the purpose of delivering threats to ensure that schemes for fraudulent profiteering could continue unabated.

250.   Beginning at least as early as 2000 and continuing to the present, the DEFENDANTS, in furtherance of and for the purpose of executing the schemes and artifices to defraud described herein, on numerous occasions knowingly engaged in and caused to occur the embezzlement of assets from union welfare and benefit funds, in repeated violation of 18 U.S.C. § 664.

251.   The DEFENDANTS' repeated violations of 18 U.S.C. §§ 664, 1341, 1343, 1951, 1952 and 1957 extended over a period of years and involved distinct and independent criminal acts.  Those criminal acts were neither isolated or sporadic events, but involved the regular and repeated violation as a way of doing business and to accomplish the DEFENDANTS' desired ends in the course of the continuing business of the LOCAL 12 ENTERPRISE.  These predicate acts were related to each other by virtue of (a) common participants, (b) similarly situated victims, (c) common methods of commission through the habitual dissemination of fraudulent and misleading information, and (d) the common purpose and common result defrauding and looting the LOCAL 12 ENTERPRISE, all while enriching the DEFENDANTS.  As such, this conduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

252.   The fraudulent, unlawful and improper activities of the DEFENDANTS threatens to continue.  Based upon the past pattern of activity, other Local Unions either have or will likely be defrauded by the DEFENDANTS. Based upon the past pattern of activity, the DEFENDANTS will likely continue to defraud Local Unions like Local 12.  Furthermore, the DEFENDANTS are able, based upon their managerial and controlling positions, to replace management in

**FIRST AMENDED CLASS ACTION COMPLAINT**

Local Unions, which could thereafter be defrauded and looted without consequence in a manner similar to the schemes and artifices outlined herein.

253.    The DEFENDANTS all violated or aided violation of 18 U.S.C. § 1962(c) by directly or indirectly conducting or participating in the conduct of the affairs of the LOCAL 12 ENTERPRISE through a pattern of racketeering activity.

254.    The DEFENDANTS' violation of 18 U.S.C. § 1962(c) caused the Plaintiffs and the Class to suffer direct injury in amounts as may be shown according to proof at time of trial.

## SECOND CLAIM FOR RELIEF
## (Violation of 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. §§ 1961-68])
## By Plaintiffs against All Defendants

255.    Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

256.    Defendants are each a "person" as that term is defined by 18 U.S.C. section 1961(3).

257.    Local 12 constitutes an enterprise as that term is defined by 18 U.S.C. § 1961(4) (hereinafter known as the "Local 12 ENTERPRISE").

258.    The LOCAL 12 ENTERPRISE is engaged in, and its activities affect, interstate and foreign commerce.

259.    From at least 1994 and continuing through to the present, Defendants, being persons employed by or associated with the LOCAL 12 ENTERPRISE at all relevant times herein, unlawfully and willfully combined, conspired, confederated and agreed each with the other to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the LOCAL 12 ENTERPRISE through a pattern of racketeering activity, all in violation of 18

SPIRO MOORE LLP

U.S.C. § 1962(d).  The times and locations and forms of such agreements constitute information uniquely within the control of the DEFENDANTS.

260.    As part of this conspiracy, the DEFENDANTS each personally plotted, conspired and agreed to commit two or more fraudulent and illegal racketeering acts and thereby conducted and agreed to conduct the affairs of the LOCAL 12 ENTERPRISE through the pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) described generally herein and specifically in the First Claim for Relief.

261.    In furtherance of the conspiracy and to effect the objects thereof, the DEFENDANTS committed and caused to be committed a series of overt acts, including, but not limited to, the following:

> (a)    Habitual interstate travels by the Defendants to and from Local 12, for the purpose of delivering threats to Plaintiffs and ensuring that Defendants asset diversion and kickback schemes continued unabated and unchallenged;

> (b)    Obtained the voting rights of Plaintiffs and other Class members by utilizing threats of economic and physical harm to control the winners of elections at Local 12;

> (c)    Obtained assets belonging rightfully to Plaintiffs and other Class members by utilizing threats of economic and physical harm to control Local 12's ability to investigate asset diversions;

> (d)    Actively prevented members from speaking out at meetings against leadership;

> (e)    Fraudulent mailing from Local 12's leadership indicating that Local 12's funds were in sound financial condition.

> (f)    Fraudulent mailings concerning illegal transfers of assets between funds, including transfers of heavy equipment deleted from fund inventories.

SPIRO MOORE LLP

**FIRST AMENDED CLASS ACTION COMPLAINT**

(g) Fraudulent mailings concerning the source of "in-kind" political contributions.

(h) False online information regarding the integrity of funds associated with Local 12;

(i) Acceptance via wire, on occasions too numerous to identify herein, and at times known exclusively by Defendants, of fraudulently obtained kickback payments from employers.

(j) Acceptance of payments by Waggoner and his co-conspirators from employers, at times known exclusively to Defendants;

(k) Acceptance of payments by Waggoner for the sale of real estate belonging to Local, at times known exclusively to Defendants;

(l) Deposits by Waggoner at Amalgamated Bank that were diverted from Local 12 fund assets and used to prop up Amalgamated Bank while under investigation by the FDIC.

(m) Upon information and belief, similar violations constituting predicate acts were perpetrated upon other local union chapters around the country.

(n) Embezzlement of assets from union welfare and benefit trust funds.

262. The Defendants' violation of 18 U.S.C. § 1962(d) caused the Plaintiffs and the Class to suffer direct injury in amounts as may be shown according to proof at time of trial.

SPIRO MOORE LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### THIRD CLAIM FOR RELIEF

### (Violations of 18 U.S.C. § 1962(b) of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. §§ 1961-68])

### By Plaintiffs against All Defendants

263.   Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

264.   Each and every Defendant named herein is a "person" as that term is defined by 18 U.S.C. section 1961(3).

265.   Local 12 constitutes an enterprise as that term is defined by 18 U.S.C. § 1961(4) (hereinafter known as the "Local 12 ENTERPRISE").

266.   The Local 12 ENTERPRISE is engaged in, and its activities affect, interstate and foreign commerce.

267.   Rights guaranteed under the LMRDA are protectable property interests held by Plaintiffs and other Class members.  Plaintiffs' and Class members' rights under the LMRDA are extortable in violation of the Hobbs Act.

268.   Assets intended to benefit Plaintiffs and Class members when deposited into trust account, including the Health & Welfare Fund and others, represent tangible assets subject to conversion in violation of the Hobbs Act.

269.   Plaintiff and Class members were and are aware of ties between leadership of IUOE and organized crime syndicates in New York and New Jersey. As a result of that awareness, threats of economic and physical harm directed at Plaintiffs and other Class members were viewed as highly credible and elicited substantial fear and concern amongst Plaintiffs and other Class members.

270.   Beginning at least as early as 2005 and continuing to the present, the DEFENDANTS, in furtherance of and for the purpose of executing the schemes and artifices to defraud and divert Local 12 resources described herein, on numerous occasions engaged in the extortion of rights guaranteed to Plaintiffs and other Class members under the LMRDA and other laws.  Each such extortionate

**FIRST AMENDED CLASS ACTION COMPLAINT**

activity in connection with the described schemes and artifices to defraud and divert Local 12 resources constitutes a distinct violation of the Hobbs Act, 18 U.S.C. § 1951, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  The unlawful extortion of property and rights secured under the LMRDA and other laws include, but is not limited to, the following acts by the DEFENDANTS:

> (a)   Obtained the voting rights of Plaintiffs and other Class members by utilizing threats of economic and physical harm to control the winners of elections at Local 12;

> (b)   Actively prevented members from speaking out at meetings against leadership;

> (c)   Obtained assets belonging rightfully to Plaintiffs and other Class members by utilizing threats of economic and physical harm to control Local 12's ability to investigate asset diversions.

271.   Beginning at least as early as 2007, and continuing to the present, the Defendants, in furtherance of and for the purpose of executing the schemes and artifices to defraud and seize control of Local Unions, including the Local 12 ENTERPRISE, on numerous occasions used and caused to be used mail depositories of the United States Mails and other commercial interstate carriers by both placing and causing to be placed letters and other mailable matter in the authorized depositories of such carriers and receiving and causing to be received letters and other matter from such carriers.  Each such use of the United States Mails and other carriers in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. § 1341, relating to mail fraud, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  The unlawful use of the mails includes, but is not limited to, the following:

**FIRST AMENDED CLASS ACTION COMPLAINT**

(a)    Fraudulent mailing from Local 12's leadership indicating that Local 12's funds were in sound financial condition.

(b)    Fraudulent mailings concerning illegal transfers of assets between funds, including transfers of heavy equipment deleted from fund inventories.

(c)    Fraudulent mailings concerning the source of "in-kind" political contributions.

272.    Beginning at least as early as 2007, and continuing to the present, the Defendants, in furtherance of and for the purpose of executing the schemes and artifices to defraud and seize control of Local Unions, including the Local 12 ENTERPRISE, on numerous occasions used and caused to be used wire communications in interstate and foreign commerce by both making and causing to be made wire communications.  Each such use of a wire communication in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. § 1343, relating to wire fraud, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  The unlawful use of wire communications includes, but is not limited to, the following:

(a)    False online information regarding the integrity of funds associated with Local 12;

(b)    Acceptance via wire, on occasions too numerous to identify herein, and at times known exclusively by Defendants, of fraudulently obtained kickback payments from employers.

273.    Beginning at least as early as 2007 and continuing to the present, the Defendants, in furtherance of and for the purpose of executing the schemes and artifices to defraud and seize control of Local Unions, including the Local 12 ENTERPRISE, on numerous occasions knowingly engaged in and caused to occur monetary transactions in criminally derived property with value in excess of

$10,000.  The transactions were accomplished by depositing, withdrawing or transferring funds by, through, or to a financial institution, as such an institution is defined by 18 U.S.C. § 1956.  Funds used in such transactions were derived from offenses listed in 18 U.S.C. § 1961(1), including, but not limited to, funds derived from mail fraud, in violation 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.  Each such monetary transaction in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. § 1957, relating to unlawful monetary transactions and money laundering, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  The unlawful monetary transactions include, but are not limited to, the following:

    (a)    Acceptance of payments by Waggoner and his co-conspirators from employers, at times known exclusively to Defendants;

    (b)    Acceptance of payments by Waggoner for the sale of real estate belonging to Local, at times known exclusively to Defendants;

    (c)    Deposits by Waggoner at Amalgamated Bank that were diverted from Local 12 fund assets and used to prop up Amalgamated Bank while under investigation by the FDIC.

274.  Beginning as least as early as 1997, and continuing to the present, the Defendants, in furtherance of and for the purpose of executing the schemes and artifices to defraud and seize control of Local Unions, including the Local 12 ENTERPRISE, on numerous occasions knowingly traveled in interstate commerce and used facilities of interstate commerce (including, but not limited to, the mails) with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of unlawful activities (including violations of 18 U.S.C. § 1957), and thereafter performed or attempted to perform such violations.  Each such interaction with facilities of interstate commerce in connection with the described schemes and artifices to defraud constitutes a

SPIRO MOORE LLP

separate and distinct violation of 18 U.S.C. § 1952 (the "Travel Act"), relating to travel in interstate commerce with intent to facilitate certain unlawful activities, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  These violations included habitual interstate travels by the Defendants to and from Local 12, for the purpose of delivering threats to Plaintiffs and ensuring that Defendants asset diversion and kickback schemes continued unabated and unchallenged.

275.   Beginning at least as early as 2000 and continuing to the present, the DEFENDANTS, in furtherance of and for the purpose of executing the schemes and artifices to defraud described herein, on numerous occasions knowingly engaged in and caused to occur the embezzlement of assets from union welfare and benefit funds, in repeated violation of 18 U.S.C. § 664.

276.   The DEFENDANTS' repeated violations of 18 U.S.C. §§ 664, 1341, 1343, 1951, 1952 and 1957 extended over a period of at least one year and involved distinct and independent criminal acts.  Those criminal acts were neither isolated or sporadic events, but involved the regular and repeated violation as a way of doing business and to accomplish the Defendants' desired ends in the course of pursuing their unlawful scheme to seize control of Local Unions, including the Local 12 ENTERPRISE.  These predicate acts were related to each other by virtue of (a) common participants, (b) similarly situated victims, (c) common methods of commission through the habitual dissemination of fraudulent and misleading information and the dissemination of threats of physical and economic harm to Plaintiffs and other Class members, and (d) the common purpose and common result of unlawfully maintaining control over Local 12, all while enriching the Defendants at the expense of Local 12 members.  As such, this conduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

277.   The fraudulent, unlawful and improper activities of the Defendants threaten to continue.  Based upon the past pattern of activity, other existing Local

SPIRO MOORE LLP

1    Unions either have or will likely be seized on false pretexts by the Defendants.

2    Based upon the past pattern of activity, the Defendants will likely continue to

3    defraud and deprive members of their membership rights and assets.  Furthermore,

4    the Defendants are able to implement the same unlawful schemes in other local

5    unions if not stopped here and now.

6        278.    The Defendants all violated or aided in violation of 18 U.S.C. §

7    1962(b) by acquiring, directly or indirectly, control of the Local 12 ENTERPRISE

8    through a pattern of racketeering activity.

9        279.    The Defendants' violation of 18 U.S.C. § 1962(b) caused the Plaintiffs

10   and the Class to suffer direct injury in amounts as may be shown according to proof

11   at time of trial.

12

13                    **FOURTH CLAIM FOR RELIEF**

14   **(Violations of 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt**

15                **Organizations Act [18 U.S.C. §§ 1961-68])**

16                    **By Plaintiffs against All Defendants**

17       280.    Plaintiffs re-allege, and incorporate by reference, each and every

18   paragraph herein.

19       281.    Each and every Defendant named herein is a "person" as that term is

20   defined by 18 U.S.C. § 1961(3).

21       282.    Local 12 constitutes an enterprise as that term is defined by 18 U.S.C.

22   § 1961(4) (hereinafter known as the "Local 12 ENTERPRISE").

23       283.    The Local 12 ENTERPRISE is engaged in, and its activities affect,

24   interstate and foreign commerce.

25       284.    From at least 2000 and continuing through to the present, Defendants

26   unlawfully and willfully combined, conspired, confederated and agreed each with

27   the other to violate 18 U.S.C. § 1962(b), that is, to acquire, directly or indirectly,

28   control of the Local 12 ENTERPRISE through a pattern of racketeering activity, all

SPIRO MOORE LLP

in violation of 18 U.S.C. § 1962(d).  The times and locations and forms of such agreements constitute information uniquely within the control of the Defendants.

285.   As part of this conspiracy, the Defendants each personally plotted, conspired and agreed to commit two or more fraudulent and illegal racketeering acts and thereby acquired and agreed to acquire, directly or indirectly, control of the Local 12 ENTERPRISE through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b) described generally herein and specifically in the Third Claim for Relief.

286.   In furtherance of the conspiracy and to effect the objects thereof, the Defendants committed and caused to be committed a series of overt acts, including, but not limited to, the following:

(a)   Habitual interstate travels by the Defendants to and from Local 12, for the purpose of delivering threats to Plaintiffs and ensuring that Defendants asset diversion and kickback schemes continued unabated and unchallenged;

(b)   Obtained the voting rights of Plaintiffs and other Class members by utilizing threats of economic and physical harm to control the winners of elections at Local 12;

(c)   Obtained assets belonging rightfully to Plaintiffs and other Class members by utilizing threats of economic and physical harm to control Local 12's ability to investigate asset diversions;

(d)   Actively prevented members from speaking out at meetings against leadership;

(e)   Fraudulent mailing from Local 12's leadership indicating that Local 12's funds were in sound financial condition.

(f)   Fraudulent mailings concerning illegal transfers of assets between funds, including transfers of heavy equipment deleted from fund inventories.

SPIRO MOORE LLP

1  (g)    Fraudulent mailings concerning the source of "in-kind" political
2          contributions.

3  (h)    False online information regarding the integrity of funds
4          associated with Local 12;

5  (i)    Acceptance via wire, on occasions too numerous to identify
6          herein, and at times known exclusively by Defendants, of
7          fraudulently obtained kickback payments from employers.

8  (j)    Acceptance of payments by Waggoner and his co-conspirators
9          from employers, at times known exclusively to Defendants;

10 (k)    Acceptance of payments by Waggoner for the sale of real estate
11         belonging to Local, at times known exclusively to Defendants;

12 (l)    Deposits by Waggoner at Amalgamated Bank that were diverted
13         from Local 12 fund assets and used to prop up Amalgamated
14         Bank while under investigation by the FDIC.

15 (m)    Embezzlement of assets from union welfare and benefit funds.

16 (n)    Upon information and belief, similar violations constituting
17         predicate acts were perpetrated upon other local union chapters
18         around the country.

19    287.    The Defendants' violation of 18 U.S.C. § 1962(d) caused the Plaintiffs
20 and the Class to suffer direct injury in amounts as may be shown according to proof
21 at time of trial.

22

23                        **FIFTH CLAIM FOR RELIEF**

24 **(Violation of Bill of Rights Secured by Labor Management Disclosure Act, 29**

25                              **U.S.C. § 501)**

26                **By Plaintiffs against Specific Defendants**

27    288.    Plaintiffs re-allege, and incorporate by reference, each and every
28 paragraph herein.

289. Jurisdiction is conferred on this Court pursuant to 29 U.S.C. § 412.

290. This Claim for Relief is asserted against all Defendants holding any position as a Board Member of IUOE, a Trustee of IOUE, or any other union official, including any officers and other officials of Local 12, named herein as a Defendant.

291. Violations of the Labor Management Disclosure Act, Title I (Bill of Rights), occurred within the Central District of California where Local 12 is headquartered. As such, venue is proper in this District pursuant to 29 U.S.C. § 412.

292. Violations of the Labor Management Disclosure Act, Title IV (Elections), occurred within the Central District of California where Local 12 is headquartered. As such, venue is proper in this District pursuant to 29 U.S.C. § 412.

293. Plaintiffs are members of the International Union of Operating Engineers, in the Local 12 Chapter of that labor union.

294. Defendant IUOE is a labor organization as defined in 29 U.S.C. § 402(i).

295. Defendants, described above, are officials of IUOE or Local 12 or agents of IUOE or Local 12 or both.

296. Section 411 of the LMRDA, 29 U.S.C. § 411, provides in part:

(a)(1) Equal rights

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of speech and assembly

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor

SPIRO MOORE LLP

SPIRO MOORE LLP

organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(1) and (2). Defendants, through their schemes to usurp control of Local 12 described above, deprived Plaintiffs of their right to honest, open, fair and free elections to determine the leadership of Local 12.

297. Defendants denied union members in good standing, including Plaintiffs and the Class, the right to be candidates for and to hold union office, by imposing unreasonable meeting attendance qualifications, in violation of section 401(e) of the Act, 29 U.S.C.A. § 481(e).

298. Defendants denied union members in good standing, including Plaintiffs and the Class, a reasonable opportunity to nominate candidates by imposing unreasonable qualifications on candidacy, in violation of section 401(e) of the Act, 29 U.S.C.A. § 481(e).

299. As a result of threats of physical and economic violence, demonstrated as credible through beatings and assault of Local 12 members, Plaintiffs reasonably concluded that internal procedures were futile and that IUOE, Local 12 and their joint leadership would not permit a democratic process to proceed.

300. The violations of the LMRDA by the identified Defendants is current and ongoing in nature.

301. Plaintiffs are suing exclusively under Title 1 of the LMRDA, which provides for a private right of action.

302. Plaintiffs seek equitable orders restraining: (1) IUOE and its leadership and the current leadership of Local 12 from interfering in the democratic operation of Local 12; and, (2) requiring the immediate institution of a valid leadership election. Plaintiffs also seek a judgment directing the conduct of a new election

1   under the supervision of the Secretary of Labor.  Plaintiffs also request punitive

2   damages for Defendants' malicious violations of their LMRDA rights.

3

4   ### SIXTH CLAIM FOR RELIEF

5   ### BREACHES OF FIDUCIARY DUTIES ARISING UNDER ERISA OR

6   ### COMMON LAW

7   #### By Plaintiffs Against Specific Defendants

8   303.   Plaintiffs re-allege, and incorporate by reference, each and every

9   paragraph herein.

10   304.   ERISA § 502(a)(2), 29 U.S.C.A. § 1132(a)(2), authorizes a plan

11   participant or beneficiary to bring a civil action for appropriate relief under ERISA

12   § 409, 29 U.S.C.A. § 1109. Section 409 requires "any person who is a fiduciary …

13   who breaches any of the … duties imposed upon fiduciaries … to make good to

14   such plan any losses to the plan …" Section 409 also authorizes "such other

15   equitable or remedial relief as the court may deem appropriate …"

16   305.   Plaintiffs and Class Members are or were at relevant times participants

17   and/or beneficiaries in the ERISA-governed plans alleged herein and associated

18   with Local 12, including, but not limited to, the General Pension Fund, the Health

19   & Welfare Fund, and the Operating Engineers Training Trusts, among others.

20   306.   Defendants identified herein as Administrators and/or Trustees and/or

21   IUOE Executives and/or Local Executives have assumed fiduciary obligations to

22   Plaintiffs and Class Members.

23   307.   According to the terms of the plans identified, participants such as the

24   Plaintiffs have a right to periodically direct the plans, by and through the plans'

25   delegated administrators and trustees, as to how the participants want his or her

26   monies directed.

27   308.   Plaintiffs are not requires to exhaust administrative remedies

28   pertaining to breaches of fiduciary duty claims arising under ERISA.

309.   As a direct result of the activities alleged herein, the plans have lost monies, or engaged in activities that a prudent investor would not engage in and suffered losses as a result, in amounts not presently known with precision but exceeding $25 million.

310.   Plaintiffs request equitable and declaratory relief, including order requiring Defendants or their bonding agents or insurers to "make whole" the ERISA-governed plans misused by Defendants.

## SEVENTH CLAIM FOR RELIEF
## AIDING AND ABETTING
### By Plaintiffs Against All Defendants

311.   Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

312.   As described above, Defendants engaged in a pattern of oppression intended to restrict Local 12's ability to discover or contest numerous asset diversion schemes put in place by Defendants to enrich themselves at the expense of Local 12 and its members, including Plaintiffs.

313.   As described above, Defendants knew that other Defendants were engaged in unlawful conduct intended to restrict Local 12's ability to discover or contest numerous asset diversion schemes put in place by various Defendants for self-enrichment at the expense of Local 12 and its members, including Plaintiffs.

314.   As described above, Defendants knew that threats of violence were issued against Plaintiffs and others.

315.   As described above, Defendants knew that assets were diverted from or denied to Local 12.

316.   As described above, Defendants knew that threats of physical and economic harm directed at Plaintiffs and others were likely to deprive Local 12 of democratically elected leadership.  Despite this knowledge, Defendants persisted in

SPIRO MOORE LLP

their conduct, resulting in the removal of democratically elected officers of Local 12 and the imposition of officers completely controlled by IUOE.

317.     As described above, all Defendants cooperated with the unlawful activities described herein or failed to warn appropriate persons and governmental officials of the unlawful conduct used to divert assets and obtain total control of Local 12.

318.     As a direct and proximate result of Defendants' aiding and abetting one another, the Plaintiffs and the Class members have been damaged in an amount to be proven at trial.  Plaintiffs and the Class Members are also entitled to recover punitive damages in an amount sufficient to punish Defendants and to deter future conduct of this type.

## EIGHTH CLAIM FOR RELIEF

## VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, ET SEA.

### By Plaintiffs Against Defendants

319.     Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

320.     Defendants, and each of them, are "persons" as defined under Business & Professions Code § 17201.

321.      Defendants' conduct, as alleged herein, has been, and continues to be, unfair, unlawful, and harmful to Plaintiffs, other Class members, and to the general public.  Plaintiffs seeks to enforce important rights affecting the public interest within the meaning of Code of Civil Procedure § 1021.5.

322.     Defendants' activities, as alleged herein, are violations of California law, and constitute unlawful business acts and practices in violation of California Business & Professions Code § 17200, et seq.

323.     A violation of California Business & Professions Code § 17200, et seq.

SPIRO MOORE LLP

SPIRO MOORE LLP

1    may be predicated on the violation of any state or federal law.  All of the acts

2    described herein as violations of, among other things, the California Labor Code,

3    are unlawful and in violation of public policy; and in addition are immoral,

4    unethical, oppressive, fraudulent and unscrupulous, and thereby constitute unfair,

5    unlawful and/or fraudulent business practices in violation of California Business

6    and Professions Code § 17200, et seq.

7        324.   Defendants engaged in false, unfair, and misleading business practices,

8    or received ill-gotten gains therefrom, as a result of acts and omissions described

9    herein.

10       325.   By and through their unfair, unlawful and/or fraudulent business

11   practices described herein, the Defendants, have obtained valuable property, money

12   and services from Plaintiffs, and all persons similarly situated, and have deprived

13   Plaintiffs, and all persons similarly situated, of valuable rights and benefits

14   guaranteed by law, all to their detriment.

15       326.   Plaintiffs and the other Class members suffered monetary injury as a

16   direct result of Defendants' wrongful conduct.

17       327.   The Plaintiffs, individually, and on behalf of members of the putative

18   Classes, are entitled to, and do, seek such relief as may be necessary to disgorge

19   money and/or property which the Defendants have wrongfully acquired, or of

20   which Plaintiffs have been deprived, by means of the above-described unfair,

21   unlawful and/or fraudulent business practices.  Plaintiffs, and the members of the

22   putative Class, are not obligated to establish individual knowledge of the wrongful

23   practices of Defendants in order to recover restitution.

24       328.   The Plaintiffs, individually, and on behalf of members of the putative

25   class, are further entitled to and do seek a declaration that the above described

26   business practices are unfair, unlawful and/or fraudulent, and injunctive relief

27   restraining the Defendants, and each of them, from engaging in any of the above-

28   described unfair, unlawful and/or fraudulent business practices in the future.

**FIRST AMENDED CLASS ACTION COMPLAINT**

329.    The Plaintiffs, individually, and on behalf of members of the putative class, have no plain, speedy, and/or adequate remedy at law to redress the injuries which they have suffered as a consequence of the Defendants' unfair, unlawful and/or fraudulent business practices.  As a result of the unfair, unlawful and/or fraudulent business practices described above, the Plaintiffs, individually, and on behalf of members of the putative Class, have suffered and will continue to suffer irreparable harm unless the Defendants, and each of them, are restrained from continuing to engage in said unfair, unlawful and/or fraudulent business practices.

330.    The Plaintiffs also allege that if Defendants are not enjoined from the conduct set forth herein above, they will continue to avoid paying the appropriate taxes, insurance and other withholdings.

331.    Pursuant to California Business & Professions Code § 17200, et seq., Plaintiffs and putative Class members are entitled to restitution of the wages withheld and retained by Defendants during a period that commences four years prior to the filing of this complaint; a permanent injunction requiring Defendants to pay all outstanding wages due to Plaintiffs and Class members; an award of attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 and other applicable laws; and an award of costs.

## **PRAYER FOR RELIEF**

Plaintiffs, individually, and on behalf of all others similarly situated, pray for relief and judgment against Defendants, jointly and severally, as follows:

### Class Certification

1.    That this action be certified as a class action;

2.    That Plaintiffs be appointed as the representative of the Class; and

3.    That counsel for Plaintiffs be appointed as Class Counsel.

SPIRO MOORE LLP

### As to the First Claim for Relief

4.   For compensatory and general damages, as shown according to proof;

5.   For treble damages;

6.   For the appointment of a Receiver to operate Defendant IUOE in a lawful manner, to assure the cessation of its illegal acts and to assure the proper handling of income and payments;

7.   For an accounting;

8.   For temporary and permanent injunctive relief;

9.   For disgorgement of monies improperly obtained;

10.   For prejudgment interest according to law;

11.   For attorney's fees;

12.   For costs of suit; and,

13.   For such other and further relief as this Court may deem proper.

### As to the Second Claim for Relief

14.   For compensatory and general damages, as shown according to proof;

15.   For treble damages;

16.   For the appointment of a Receiver to operate Defendant IUOE in a lawful manner, to assure the cessation of its illegal acts and to assure the proper handling of income and payments;

17.   For an accounting;

18.   For temporary and permanent injunctive relief;

19.   For disgorgement of monies improperly obtained;

20.   For prejudgment interest according to law;

21.   For attorney's fees;

22.   For costs of suit; and,

23.   For such other and further relief as this Court may deem proper.

**FIRST AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

### As to the Third Claim for Relief

24.     For compensatory and general damages, as shown according to proof;

25.     For treble damages;

26.     For the appointment of a Receiver to operate Defendant IUOE in a lawful manner, to assure the cessation of its illegal acts and to assure the proper handling of income and payments;

27.     For an accounting;

28.     For temporary and permanent injunctive relief;

29.     For disgorgement of monies improperly obtained;

30.     For prejudgment interest according to law;

31.     For attorney's fees;

32.     For costs of suit; and,

33.     For such other and further relief as this Court may deem proper.


### As to the Fourth Claim for Relief

34.     For compensatory and general damages, as shown according to proof;

35.     For treble damages;

36.     For the appointment of a Receiver to operate Defendant IUOE in a lawful manner, to assure the cessation of its illegal acts and to assure the proper handling of income and payments;

37.     For an accounting;

38.     For temporary and permanent injunctive relief;

39.     For disgorgement of monies improperly obtained;

40.     For prejudgment interest according to law;

41.     For attorney's fees;

42.     For costs of suit; and,

43.     For such other and further relief as this Court may deem proper.

**FIRST AMENDED CLASS ACTION COMPLAINT**

As to the Fifth Claim for Relief

44.    For compensatory and general damages, as shown according to proof;

45.    For the appointment of a Receiver to operate Defendant IUOE in a lawful manner, to assure the cessation of its illegal acts and to assure the proper handling of income and payments;

46.    For temporary and permanent injunctive relief;

47.    For such other and further relief as this Court may deem proper.

As to the Sixth Claim for Relief

48.    For temporary and permanent injunctive relief;

49.    For declaratory relief;

50.    For appropriate "make whole" equitable relief authorized pursuant to ERISA;

51.    For attorney's fees and costs pursuant to ERISA;

52.    For such other and further relief as this Court may deem proper.

As to the Seventh Claim for Relief

53.    For compensatory and general damages, as shown according to proof;

54.    For exemplary damages;

55.    For the appointment of a Receiver to operate Defendant IUOE in a lawful manner, to assure the cessation of its illegal acts and to assure the proper handling of income and payments;

56.    For an accounting;

57.    For temporary and permanent injunctive relief;

58.    For disgorgement of monies improperly obtained;

59.    For prejudgment interest according to law;

60.    For attorney's fees;

61.    For costs of suit; and,

**FIRST AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

62.    For such other and further relief as this Court may deem proper.

### As to the Eighth Claim for Relief

63.    That the Court declare, adjudge and decree that Defendants violated California Business and Professions Code §§ 17200, et seq. by failing to disclose fraud and deceit, by falsely asserting unilateral contractual rights, by receiving commissions derived from unlawful transactions, and by failing to reimburse Class Members;

64.    For restitution to Plaintiffs and all class members and prejudgment interest from the day such amounts were due and payable;

65.    For the appointment of a receiver to receive, manage and distribute any and all funds disgorged from Defendants and determined to have been wrongfully acquired by Defendants as a result of violations of California Business & Professions Code §§ 17200 et seq.;

66.    For reasonable attorneys' fees and costs of suit incurred herein pursuant to California Code of Civil Procedure § 1021.5;

67.    For injunctive relief to ensure compliance with this section, pursuant to California Business & Professions Code § 17200, et seq.; and,

68.    For such other and further relief as the Court may deem equitable and appropriate.

Dated: April 19, 2013                         Respectfully submitted,

                                              SPIRO MOORE LLP


                                              By: _____
                                              H. Scott Leviant
                                              Attorneys for Plaintiffs

**FIRST AMENDED CLASS ACTION COMPLAINT**

# DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Dated: April 19, 2013

Respectfully submitted,

SPIRO MOORE LLP

By: _____

H. Scott Leviant

Attorneys for Plaintiffs

# EXHIBIT "1"

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

CALIFORNIA DEPARTMENT OF FINANCIAL INSTITUTIONS

SAN FRANCISCO, CALIFORNIA

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| | )   ORDER TO CEASE AND DESIST |
| PROFESSIONAL BUSINESS BANK | ) |
| PASADENA, CALIFORNIA | )   FDIC-09-371b |
| | ) |
| (INSURED STATE NONMEMBER BANK) | ) |
| | ) |

Professional Business Bank, Pasadena, California ("Bank"), having been advised of its right to a NOTICE OF CHARGES AND OF HEARING detailing the unsafe or unsound banking practices alleged to have been committed by the Bank and of its right to a hearing on the alleged charges under section 8(b)(1) of the Federal Deposit Insurance Act ("Act"), 12 U.S.C. § 1818(b)(1), and California Financial Code Section 1912, and having waived those rights, entered into a STIPULATION AND CONSENT TO THE ISSUANCE OF AN ORDER TO CEASE AND DESIST ("CONSENT AGREEMENT") with counsel for the Federal Deposit Insurance Corporation ("FDIC"), and with counsel for the California Department of Financial Institutions ("CDFI"), dated August 19, 2009, whereby solely for the purpose of this proceeding and without admitting or denying the alleged charges of unsafe or unsound banking practices and violations of law and/or regulations, the Bank consented to the issuance of an ORDER TO CEASE AND DESIST ("ORDER") by the FDIC and the CDFI.

The FDIC and the CDFI considered the matter and determined that they had reason to believe that the Bank had engaged in unsafe or unsound banking practices. The FDIC and the CDFI, therefore, accepted the CONSENT AGREEMENT and issued the following:

- 2 -

<u>ORDER TO CEASE AND DESIST</u>

IT IS HEREBY ORDERED, that the Bank, its institution-affiliated parties, as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and its successors and assigns, cease and desist from the following unsafe and unsound banking practices:

      (a)     operating with management whose policies and practices are detrimental to the Bank and jeopardize the safety of its deposits;

      (b)     operating with a board of directors which has failed to provide adequate supervision over and direction to the active management of the Bank;

      (c)     operating with inadequate capital in relation to the kind and quality of assets held by the Bank;

      (d)     operating with an unsatisfactory loan valuation reserve policy;

      (e)     operating with a large volume of poor quality loans;

      (f)     engaging in unsatisfactory lending and collection practices;

      (g)     operating in such a manner as to produce operating losses; and

      (h)     operating with inadequate provisions for liquidity.

IT IS FURTHER ORDERED, that the Bank, its institution-affiliated parties, and its successors and assigns, take affirmative action as follows:

1.     The Bank shall have and retain qualified management.

      (a)     Each member of management shall have qualifications and experience commensurate with his or her duties and responsibilities at the Bank.  Management shall include the following:  (i) a chief executive officer with proven ability in managing a bank of comparable size and risk profile; (ii) a chief financial officer with proven ability in all aspects of financial management; and (iii) a senior lending officer with significant appropriate lending, collection, and loan supervision experience and experience in upgrading a low quality loan portfolio.  Each

member of management shall be provided appropriate written authority from the Bank's Board of Directors ("Board") to implement the provisions of this ORDER.

     (b)    The qualifications of management shall be assessed on its ability to:

        (i)    comply with the requirements of this ORDER;

        (ii)    operate the Bank in a safe and sound manner;

        (iii)    comply with applicable laws and regulations; and

        (iv)    restore all aspects of the Bank to a safe and sound condition,

including asset quality, capital adequacy, earnings, management effectiveness, liquidity, and sensitivity to market risk.

The Commissioner of the CDFI ("Commissioner") and the Regional Director of the FDIC's San Francisco Regional Office ("Regional Director") acknowledge that certain members of senior management and the Board have changed since the Report of Examination dated as of December 8, 2008.  Notwithstanding the foregoing, the Commissioner and the Regional Director reserve the right to determine whether the current senior officers and directors of the Bank will be considered to be qualified for purposes of compliance with this ORDER.

     (c)    During the life of this ORDER, the Bank shall notify the Regional Director and the Commissioner in writing when it proposes to add any individual to the Bank's Board or employ any individual as a senior executive officer.  The term "senior executive officer" shall have the same meaning ascribed to it in Part 303 of the FDIC's Rules and Regulations, 12 C.F.R. § 303.102.  The notification must be received at least 30 days before such addition or employment is intended to become effective and should include a description of the background and experience of the individual or individuals to be added or employed, and a completed Interagency Biographical and Financial Report and Interagency Change in Director or Senior Executive Officer.  The Bank shall not add, elect or appoint any individual to the Bank's

- 4 -

Board or employ any individual as a senior executive if the Commissioner or the Regional Director, in response to the Bank's notification as required in this paragraph, notifies the Bank of his or her disapproval.

(d)     The requirement to submit information and the prior disapproval provisions of this paragraph are based upon the authority of 12 U.S.C. § 1818(b) and California Financial Code Section 1912, and do not require the Regional Director or the Commissioner to complete their reviews and act on any such information or any such authority within 30 days, or any other timeframe.  The Bank shall not add, employ or change the responsibilities of any proposed director or senior executive officer until such time as the Regional Director and the Commissioner have completed their reviews.

2.     As of the effective date of this ORDER, the Board shall assume full responsibility for the approval of sound policies and objectives and for the supervision of all of the Bank's activities, consistent with the role and expertise commonly expected for directors of banks of comparable size.  Board oversight shall continue to include meetings of the Board to be held no less frequently than monthly at which, at a minimum, the following areas shall be reviewed and approved: reports of income and expenses; new, overdue, renewal, insider, charged-off, and recovered loans; investment activity; liquidity and funds managements activities; operating policies; and individual committee actions.  The minutes of each meeting of the Board shall document these reviews and approvals, including the names of any dissenting directors.

3.     (a)     The Bank shall increase and maintain its Tier 1 capital in such an amount to ensure that the Bank's leverage ratio equals or exceeds 9 percent by no later than December 31, 2009.

(b)     The Bank shall increase and thereafter maintain its total risk-based capital ratio in such an amount as to equal or exceed 12 percent by no later than December 31, 2009.

- 5 -

(c)     Within 60 days from the effective date of this ORDER, the Bank shall develop and adopt a capital plan consistent with the Bank being controlled by a holding company to meet and thereafter maintain minimum Tier 1 and Risk-based capital levels to comply with the capital levels required in subparagraphs 3 (a) and 3 (b) above.  The capital plan shall be in a form and manner acceptable to the Regional Director and the Commissioner as determined at subsequent examinations.

(d)     The level of Tier 1 capital to be maintained by the Bank during the life of this ORDER shall be in addition to a fully funded allowance for loan and lease losses, the adequacy of which shall be satisfactory to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.  Any increase in Tier 1 capital necessary to meet the requirements of this paragraph may not be accomplished through a deduction from the Bank's allowance for loan and lease losses.

(e)     If all or part of the increase in Tier 1 capital required by this ORDER is accomplished by the sale of new securities, the Bank's Board shall adopt and implement a plan for the sale of such additional securities, including the voting of any shares owned or proxies held or controlled by them in favor of the plan.  Should the implementation of the plan involve a public distribution of the Bank's securities (including a distribution limited only to the Bank's existing shareholders), the Bank shall prepare offering materials fully describing the securities being offered, including an accurate description of the financial condition of the Bank and the circumstances giving rise to the offering, and any other material disclosures necessary to comply with all applicable State and Federal securities laws.  Prior to the implementation of the plan and, in any event, not less than 20 days prior to the dissemination of such materials, the plan and any materials used in the sale of the securities shall be submitted to the FDIC, Registration, Disclosure and Securities Unit, 550 17th St. N.W., Washington, D.C. 20429, for review, and to

- 6 -

the Commissioner to obtain any and all necessary securities permits or other approvals.  Any

changes requested by the FDIC or the Commissioner shall be made prior to dissemination.  If the

increase in Tier 1 capital is provided by the sale of noncumulative perpetual preferred stock, then

all terms and conditions of the issue, including but not limited to those terms and conditions

relative to interest rate and convertibility factor, shall be presented to the Regional Director and

the Commissioner for prior approval.

(f)        In complying with the provisions of this paragraph, the Bank shall provide

to any subscriber and/or purchaser of the Bank's securities, a written notice of any planned or

existing development or other changes which are materially different from the information

reflected in any offering materials used in connection with the sale of Bank securities.  The

written notice required by this paragraph shall be furnished within 10 days from the date such

material development or change was planned or occurred, whichever is earlier, and shall be

furnished to every subscriber and/or purchaser of the Bank's securities who received or was

tendered the information contained in the Bank's original offering materials.  In addition, the

Bank shall obtain all required prior authorizations, permits or other approvals from the

Commissioner.

(g)        For the purposes of this ORDER, the terms "leverage ratio", "Tier 1

capital" and "total risk-based capital ratio" shall have the meanings ascribed to them in Part 325

of the FDIC's Rules and Regulations, 12 C.F.R. §§ 325.2(m), 325.2(v), and 325.2(y).

4.        (a)        The Bank shall maintain an allowance for loan and lease losses ("ALLL")

at a level that is appropriate in relation to the overall risk in the Bank's loan portfolio,

satisfactory to the Regional Director and the Commissioner, as determined at subsequent

examinations and/or visitations.

- 7 -

     (b)      Additionally, within 90 days from the effective date of this ORDER, the Bank's Board shall develop or revise, adopt and implement a comprehensive policy for determining the adequacy of the ALLL.  For the purpose of this determination, the adequacy of the reserve shall be determined after the charge-off of all loans or other items classified "Loss." The policy shall provide for a review of the allowance at least once each calendar quarter. Said review shall be completed in order that the findings of the Board with respect to the ALLL are properly reported in the quarterly Reports of Condition and Income.  The review should focus on the results of the Bank's internal loan review, external loan review, the findings of regulatory reports, loan loss experience, trends of delinquent and non-accrual loans, an estimate of potential loss exposure of significant credits, concentrations of credit, and present and prospective economic conditions.  A deficiency in the allowance shall be remedied in the calendar quarter it is discovered, prior to submitting the Report of Condition, by a charge to current operating earnings.  The minutes of the meetings of the Board at which such review is undertaken shall indicate the results of the review.  Upon completion of the review, the Bank shall increase and maintain its ALLL consistent with the ALLL policy established.  Such policy and its implementation shall be satisfactory to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

     5.      (a)      Within 60 days from the effective date of this ORDER, the Bank shall formulate and adopt an action plan to reduce (to "reduce" means to collect, to charge off or to place in such a condition as to not be listed for Special Mention, or subject to classification as Loss, Doubtful, or Substandard, as determined by the Commissioner or the Regional Director) the volume of adversely classified assets listed in the Bank's internal reports, "Classified/Extended Credits Conventional 4/30/09" and "Classified/Extended Credits SBA 4/30/09", with internal risk ratings of 8 (Substandard) and 9 (Doubtful).  The action plan shall

- 8 -

include Other Real Estate Owned as of April 30, 2009.  The action plan shall contain specific target levels and timetables for reduction, and shall detail specific plans for each adversely classified asset.  Management shall submit to the Board a monthly progress report on all adversely classified assets, and the Board's review of this report shall be recorded in the meetings of the Board at which such review is undertaken.

6.    Within 60 days from the effective date of this ORDER, the Bank shall revise, adopt, and implement written lending and collection policies to provide effective guidance and control over the Bank's lending function, which policies shall include specific guidelines for placing loans on a non-accrual basis.  In addition, the Bank shall obtain adequate and current documentation for all loans in the Bank's loan portfolio.  Such policies and their implementation shall be in a form and manner acceptable to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

7.    Within 60 days from the effective date of this ORDER, the Bank shall develop or revise, adopt, and implement a written three-year strategic plan.  The plan shall be submitted to the Regional Director and the Commissioner and shall include specific goals for the dollar volume of total loans, total investment securities, and total deposits as of year-end 2009, 2010, and 2011.  For each time frame, the plan will also specify:

(a)    the anticipated average maturity and average yield on loans and securities;

(b)    the average maturity and average cost of deposits;

(c)    the level of earning assets as a percentage of total assets; and

(d)    the ratio of net interest income to average earning assets.

The plan and its implementation shall be satisfactory to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

- 9 -

8.   (a)   Within 60 days from the effective date of this ORDER, the Bank shall develop or revise, adopt, and implement a written plan addressing retention of profits, reducing overhead expenses, and setting forth a comprehensive budget covering the period October 1, 2009 to December 31, 2010.  The plan required by this paragraph shall contain formal goals, strategies and benchmarks which are consistent with sound banking practices to improve the Bank's net interest margin, increase interest income, reduce discretionary expenses, and improve and sustain earnings of the Bank.  It shall also contain a thorough description of the operating assumptions that form the basis for, and adequately support, each major component of the plan. The plan policy and its implementation shall be satisfactory to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

(b)   Promptly following the end of each calendar quarter that ends after the effective date of this ORDER, the Bank's Board shall evaluate the Bank's actual performance in relation to the plan and shall record the results of the evaluation, and any actions taken by the Bank, in the minutes of the Bank's Board meeting at which such evaluation is undertaken.

9.   Within 60 days from the effective date of this ORDER, the Bank shall develop or revise, adopt, and implement a written liquidity and funds management policy that adequately addresses liquidity needs and appropriately reduces the reliance on non-core funding sources. The policy and its implementation shall be satisfactory to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

10.   The Bank shall not pay cash dividends without the prior written consent of the Regional Director and the Commissioner.

11.   The Bank shall not open, relocate or discontinue any branch office or place of business/loan production office without the prior written consent of the Regional Director and the Commissioner.

- 10 -

12.    Within 30 days of the end of the first quarter, following the effective date of this ORDER, and within 30 days of the end of each quarter thereafter, the Bank shall furnish written progress reports to the Regional Director and the Commissioner detailing the form and manner of any actions taken to secure compliance with this ORDER and the results thereof.  The reports shall include a copy of the Bank's Report of Condition and the Bank's Report of Income.  The reports may be discontinued when the corrections required by this ORDER have been accomplished and the Regional Director and the Commissioner have released the Bank in writing from furnishing further reports.

13.    Following the effective date of this ORDER, the Bank shall provide a copy of the ORDER or otherwise furnish a description of the ORDER to its shareholder(s) in conjunction with:

    (a)    the Bank's next shareholder communication; and

    (b)    the notice or proxy statement preceding the Bank's next shareholder meeting.

    The description shall fully describe the ORDER in all material respects.  The description and any accompanying communication, statement, or notice shall be sent to the FDIC, Division of Supervision and Consumer Protection, Accounting and Securities Disclosure Section, 550 17th Street, N.W., Washington, D.C. 20429 and the Commissioner, at least 20 days prior to dissemination to shareholders.  Any changes requested to be made by the FDIC or CDFI shall be made prior to dissemination of the description, communication, notice, or statement.

    This ORDER will become effective upon its issuance by the FDIC and the CDFI. Violation of any provision of this ORDER will be deemed to be conducting business in an unsafe and unsound manner, and will subject the Bank to further regulatory enforcement action.  The provisions of this ORDER shall remain effective and enforceable except to the extent that, and

- 11 -

until such time as, any provisions of this ORDER shall have been modified, terminated,

suspended, or set aside by the FDIC and the CDFI.

Pursuant to delegated authority.

Dated at San Francisco, California, this 24th day of August, 2009.


/s/ _____          /s/ _____
J. George Doerr                              William S. Haraf
Deputy Regional Director                     Commissioner
Risk Management                              California Department of Financial
Division of Supervision and Consumer Protection   Institutions
San Francisco Region
Federal Deposit Insurance Corporation

# EXHIBIT "2"

# BILL WAGGONER
## BUSINESS MANAGER

# State of the Union

At the start of 2011, it seemed as if the struggling economy and the high unemployment numbers were going to take forever to improve. The recession isn't over yet, and not everybody's back to work, but it's looking a whole lot better than it was this time last year.

Our stated goal at the beginning 2011 was to get the economy moving again. That would make the out-of-work list shorter.

The loss of reported hours hit every union organization even harder in early 2011, and we were no exception. The Officers and I had to learn how to become familiar with the ins and outs of the Pension Rehabilitation Agreement and compliance with federal regulations.

If you will recall, I reported at the General Membership Meeting in December 2010 that our Health and Welfare Fund was in serious financial condition. Estimates were that we had to come up with an increase amounting to $4.60 per hour, which included $1.00 an hour in the hourly wage rate, a $1.90 reduction in benefits and a $1.50 per hour increase from the employer.

Also in the early part of 2011, you read in the News-Record how the Pension Fund fell below acceptable levels. The Southern California Operating Engineers Training Trust, and to a lesser degree the Las Vegas Training Trust, were running at a loss every month, and were scrambling to reduce their expenditures. The Survey Training Trust was also experiencing financial problems.

Even though many unions were in worse shape than we were, this was a very difficult time for all of us.

You, the membership, are the reason why things started to turn around mid-2011. Your vote to allocate the negotiated increase at the June Semi-Annual Membership Meeting created an infusion of funds into the Health and Welfare Fund, Pension Fund, Joint Apprentice Training/Journeyman Retraining Fund and The Engineers Contract Compliance Committee Fund.

Without your support, without that membership vote, there is no way we Officers could accomplish what we needed to do.

The Health and Welfare Trust Fund was the hardest hit, and the one that needed the most attention. We had almost daily meetings with trustees and auditors in the summer and fall of 2011 to try to address the critical losses we were experiencing, despite record cutbacks in spending.

Then things finally started looking up. The $10 million loan by Local 12 to rescue the Health and Welfare Fund and the subsequent $10 million line of credit has finally stopped the bleeding.

At the latest Trust Fund Meeting, a report revealed

a number of positive trends. The hours reported were improving, the backlog of claims was shrinking, they are in the process of catching up and the newer claims were also being processed.

And I received a report recently from the International which stated that there are almost 17,000 more Operating Engineers working now than there were three months ago. Overall employment percent fell from 15.8 to 9.8. It may not be that low here in California and Nevada, but judging from the out-of-work list, it is definitely lower.

Another item in the good news department - our new Dispatch Hall in San Diego is open for business.

### Labor-Friendly Politicians

There were a few other things that were going our way in 2011. With Jerry Brown in Sacramento, we had the ear of the Governor's office, including his Labor-friendly departmental appointments. These departments, such as the Employment Development Department, which handles unemployment insurance issues dealing with wage and hour situations, are important when we encounter a major problem with respect to the membership of Local 12.

One of Brown's key choices was Christine Baker, now head of the Department of Industrial Relations (DIR). She's agreed to merge the formerly independent divisions of the DIR, so it is going to be easier to get help with our problems regarding the enforcement of



*Business Manager William C. Waggoner addresses the January meeting in District 4.*

the State Prevailing Laws and the registration of our Prevailing Rates.

Another good choice was Labor Commissioner Julie Su, who has a record of prosecuting employers who take advantage of workers.

Jerry Brown is a classic example of why we need to elect Labor-friendly people in government. The major priority in the presidential election this year must be to keep Barack Obama and Labor Secretary Hilda Solis in office. The working men and women of our country must protect their rights to earn a decent wage and work in safe conditions, and they can do that by choosing candidates who value those rights.

### Labor-UNfriendly politicians

Some of the Labor-UNfriendly politicians, especially in Nevada, worked hard last year, as they always do, to try to undo legislation that we have fought hard to get enacted to benefit the working men and women of our country.

Somebody in Nevada came up with Bill 312, which would delete the overtime provision in our negotiated contracts. Prevailing rates would be the prevailing rates

*Continued on page 10*

### ABOUT THE COVER

*For more information on the Porter Ranch Project turn to our centerspread.*

*Cover photo courtesy of Business Representative Ed Guthrie.*

# EXHIBIT "3"




AFL-CIO

Southern California & Southern Nevada

**WM. C. WAGGONER**
*Business Manager*
*and*
*General Vice-President*

August 19, 2011

TO:    All Officers and Local 12 Employees

FROM:  Wm. C. Waggoner, Business Manager
       I.U.O.E., Local Union No. 12

======================================================================

At the Executive Board Meeting held on August 6, 2011, the Executive Board took certain actions that will affect practically all of the employees of Local 12.

First, a motion was passed unanimously that Executive Board Meetings will be held every other month instead of the usual schedule of meetings every month.  Therefore, there will not be a Board Meeting in September.

Secondly, I recommended that we ask the employees to take two days off per month without pay.  We will work out a schedule to determine which day of the week each employee will be off work.

This will allow us to reduce the number of employees in each department by 50 percent for those days off.

In other words, half of the staff will be working five days per week and the other half will receive pay for four days.

Between December 31, 2009 and December 31, 2010, the General Fund's loss was $5,727,742.  According to the number generated in the first six months of this year, we estimate that we will lose approximately $4 million this year.

As we all know, you cannot continue to operate creating a deficit in the amounts reflected in the above paragraph.

In the event the economy improves, the membership goes back to work and we stop the bleeding, we will discontinue this program and return to a five day week operation.

Thank you for your assistance and cooperation in adopting this program until we see better days ahead.

# EXHIBIT "4"



**International Union of Operating Engineers** AFL-CIO

Southern California & Southern Nevada

**WM. C. WAGGONER**
*Business Manager*
*and*
*General Vice-President*

## MEMORANDUM

TO:      ALL LOCAL 12 OFFICERS, DISTRICT REPRESENTATIVES, BUSINESS AGENTS AND OTHER DRIVERS

FROM:   WILLIAM C. WAGGONER, BUSINESS MANAGER

DATE:   9/13/04

Please be advised, I am sending this memo that is of utmost importance. This is not just a memo from the main office and like similar memos you toss in a file. Local 12 is having a serious problem of obtaining automobile insurance coverage at a reasonable rate. In fact, Hartford Insurance our present carrier was the only insurance company that would agree to underwrite our auto insurance coverage.

The reason is very simple. Some of the agents driving records are horrible. It is not fair that the agents who drive very carefully and sensibly are "burdened" by those who take to many risks in their driving habits. Like everything else we have to mix their good driving records with those who think they are "Jeff Gordon". In other words, clean up your act, because we don't intend to buy "tanks" for you to perform your every day activities.

Please review the attached Driver Safety Policy and acknowledge by signing the white copy and sending it to me no later than September 30, 2004.

WCW:sdh

# DRIVER SAFETY POLICY

Local 12 considers the prevention of vehicle accidents essential to the well being of our employees, union equipment and the general public.  All drivers are expected to practice defensive driving by following traffic regulations and our established procedures.

## *DEFINITION OF DEFENSIVE DRIVER*

> "Defensive Drivers are persons who commit no driving errors themselves and make allowances for the lack of skill or improper driving practice of the other driver.  Defensive Drivers adjust their own driving to compensate for unusual weather, road and traffic conditions and are not tricked into an accident by the unsafe actions of pedestrians and other drivers.  Being alert to accident producing situations, they recognize the need for preventive action in advance and take the necessary precaution to prevent the accident.  As Defensive Drivers, they know when it is necessary to slow down, stop or yield the right-of-way to avoid involvement."

- A Department of Motor Vehicle report will be run routinely on all of our drivers each year to insure safety and compliance to this policy.

## *PREDOMINATE VEHICLE ACCIDENT CAUSES:*

Disregard For Signs & Lights                    Following to Close
Not Driving Defensively                          Inattention/Poor Judgment
Speeding/Attitude                                Unsafe Backing
Unsafe Stopping or Parking                       Too Fast For Conditions
Alcohol, Drugs, Tired                            Momentarily Distracted
Unsafe Entry Onto Highway                        Failure to Stop or Signal

## *PROCEDURES WHEN ACCIDENT OCCURS*

1. Report an accident promptly to the executive offices.
2. Give a detailed report of how the accident occurred with a diagram.
3. Get information from the other driver such as:
   a. Name
   b. Address

Page 2

    c.  Name of Insurance Company
          i.  Policy number
        ii.  Agent
      iii.  Phone number

(A copy of an Accident Report Brochure, which has been given to you recently is attached for your reference)

By: _____        Date: _9 - 10 - 04_____
   William C. Waggoner
   Business Manager


Acknowledged and Understood:


_____        Date:_____

# EXHIBIT "5"

## SCANLON: Hilda Solis' legacy of pandering

*She enabled union corruption*

COMMENTS (4)    SIZE: + / -    PRINT

---

By Terrence Scanlon                                                    Thursday, January 17, 2013

Hilda Solis is leaving her position as secretary of labor ⬛(#) -- or, as she saw the job, secretary for the Support of Unions.

The official mission of he Labor Department is "To foster, promote, and develop he welfare of the wage earners, job seekers, and retirees of the United States; improve working conditions; advance opportunities for profitable employment; and assure work-related benefits and rights." There's nothing in that description about unions, which today represent fewer than 1 in 16 workers in he private sector. From her first day in office to the last, however, Ms. Solis was the unions' faithful servant.

Ms. Solis was born into the labor union movement. Her father was a Teamster and her mother a member of what is now the United Steelworkers. During her time in Congress (2001-09), she received more than $900,000 in contributions from unions, and she was a member of the so-called Progressive Caucus, the far left among members of Congress.

When President Obama picked her as his labor secretary, John Sweeney, then the president of the AFL-CIO, said he was "thrilled." At a United Food and Commercial Workers Union convention, she told conventioneers, "President Obama has your back, and so do I."

At a conven ion of the plumbers and pipe fitters union, she called her audience "brothers and sisters" and called he labor union movement "our movement."

In the Bush administration, the Labor Department had conducted a program of "compliance assistance," a good-cop approach that sought to avoid crippling fines for businesses ⬛(#) even as it resulted in record-low workplace death and injury rates and record-high back pay collected for workers. When she became labor secretary, Ms. Solis abandoned that approach and hired hundreds of investigators (710 of them by early 2010) to go after businesses that, she said, were shortchanging workers, denying them rightful benefits and endangering their safety. She would be, in her words, a "new sheriff in town."

She sought scores of new rules and regulations on business ⬛(#) , 90 in 2010 alone, but she got rid of rules that unions didn't like.

One of her biggest changes in direction was her reversal of Bush administration efforts to fight union corruption. Ms. Solis' predecessor, Elaine Chao, had issued several rule changes to make it easier for union members and watchdogs to detect wrongdoing, especially conflicts of interest among union officials and the people with whom they do business.

Regarding a conflict-of-interest form that union officials file, the Bush administration offered amnesty to first-time filers in 2005, and the number of filers went from 96 to 13,326. The form, which had not been updated for 40 years, was made more detailed, and coverage was extended to include more officials such as, in some cases, shop stewards.

The new disclosure rules helped union members by exposing corruption. For example, they forced Tyrone Freeman, head of California's largest union local, out of office after the revelation of the union's contract with his wife's video production firm and of he expenditure of nearly $10,000 of union money at a cigar bar.

Case 2:12-cv-10506-DDP-VBK   Document 58   Filed 04/19/13   Page 130 of 151   Page ID #:392

In Denver, a local president of the United Food and Commercial Workers was voted out of office and replaced with a Safeway bakery clerk after disclosures that he president spent union money on alcohol and Broncos tickets and that, while making $162,000 a year, he put his wife and son on the payroll for a combined $268,000.

The Chao rules helped the Labor Department's Office of Labor-Management Standards obtain 929 convictions, mostly for embezzlement, and recover some $93 million. Other rules would have made it easier to track the operation of union trusts such as those set up for health benefits, pensions ⧉(#) , training programs and strike funds.

Ms. Solis rolled back the Chao reforms.

Her excuse? The changes "had a detrimental impact on workers" and "made the union financial ⧉(#) reporting requirements not only overly burdensome but ineffective." In response, Ms. Chao accused the Obama administration of "not enforcing laws on union transparency and democracy" and "telling unions that they don't have to comply."

Today, private-sector unions are failing enterprises. They seem unable to adapt to a changing environment -- to global trade, to the advance of information technology ⧉(#) and robotics, and to the rise, in states like Indiana and Michigan, of poli ical leaders who do not fear them. In the private sector, 38 percent of workers belonged to unions 60 years ago; today the figure is 6 2 percent.

Ironically, given unions' critical role in electing and re-elec ing Mr. Obama, the jobs-destroying taxes and hyper-regulation of the Obama era may make it even worse for unions. Unionized businesses, lacking the flexibility of non-union businesses, will be less likely to grow and more likely to fail, which will further diminish the influence and membership of unions.

Hilda Solis ran the Labor Department as an extension of the union movement, but her heavy-handed approach -- seeing business as an enemy rather than as a partner in creating jobs -- may have simply been another nail in the movement's coffin.

*Terrence Scanlon is president of the Capital Research Center.*

EXHIBIT "6"

Bloomberg.com | Business Exchange

**Bloomberg Businessweek**

# Wilbur Ross, the Bank Eater

Troubled financial institution lying on the side of the road? Ross will have a bite—and might even ask for seconds

By Devin Leonard



Ross describes himself as "a guy who likes to run into burning buildings"
Bruce Gilden

Early one October morning, Wilbur Ross sits before a dozen or so colleagues at the head of a long table in his Manhattan office, considering in his quiet way the purchase of a business worth more than a billion dollars. Ross, 74, is the chairman of WL Ross & Co., among the largest and most active firms specializing in the purchase of distressed companies; in other words, he is a vulture, albeit a well-dressed one, favoring crisp pinstripe suits and freshly shined shoes.

His investment committee is presenting the final details of the firm's $1.2 billion bid for Northern Rock, the English bank seized by the British government in 2008 after panicked depositors withdrew their funds. WL Ross is partnering with Richard Branson's Virgin Money. "Who is our competition?" asks Pamela Wilson, a WL Ross managing director.

"J.C. Flowers is always our competition on everything," says Stephen Johnson, one of the firm's vice-presidents, referring to J. Christopher Flowers, another private equity investor. Johnson adds, "The word at the moment is that he won't be able to bid on this." That leaves the field open for Ross, who describes himself as "a guy who likes to run into burning buildings" and who has been running into a lot of them lately. The committee spends much of its time talking about the need to structure the bid so it won't embarrass the British government, which has spent an estimated $2.2 billion on the Northern Rock bailout. The firm plans to offer the Cameron administration a slice of the proceeds if it takes the bank public.

Ross himself says little, and when he does, he does so in his characteristic near- whisper. It would not be overstating it to say Ross coos. He scrutinizes a pile of documents before him. From time to time he asks a question. He wants to make sure there will be no last-minute regulatory issues. Finally, he says, "I think we are ready to vote on this."

On Oct. 25, Virgin and WL Ross make their offer. Three weeks later, the British government accepts it and controversy soon follows. Ed Balls, the Labour Party's shadow chancellor, assails England's Conservative Party leaders for taking a loss on the bank. Ross arguably makes matters worse by telling British reporters that he hopes to make a substantial profit—unless, of course, Northern Rock is swamped by the European financial crisis that enabled him to buy it so cheaply in the first place. This is a familiar scenario these days. Ross stands to make a lot, if he doesn't lose even more.

**Since 2008, Ross has invested $1.8 billion** in faltering banks, a major play by a high-profile player. Ross is an investor's investor; he's not a household name like Warren Buffett or a constant presence on the cable channels like Pimco's Bill Gross, but he's revered and followed in his field. "He's charming, and he's smart," says Steven Kaplan, a professor of finance at the University of Chicago Booth School of Business. "And he has been brilliant and contrarian in discerning opportunities." He is also worth an estimated $2.1 billion, according to *Forbes*.

His firm was one of four private equity groups that paid $900 million for the failed BankUnited, a large Florida thrift, purchasing it from the Federal Deposit Insurance Corp. in May 2009. He has taken stakes in ailing institutions such as Oregon's Cascade Bancorp, New Jersey's Sun Bancorp, and the union-owned Amalgamated Bank in New York, all of which required his financial aid after writing down bad real estate loans. Ross has also looked abroad for bargains—and not just in England. In July he and four other investors spent $1.6 billion to buy 35 percent of the Bank of Ireland.

**Ross assiduously promotes his successes** and had little trouble raising $4 billion in 2008 to invest in banks on the heels of the financial crisis. In May 2009, WL Ross, Blackstone Group, Carlyle Group, and Centerbridge Partners bought BankUnited from the FDIC. It was predicted at the time that BankUnited's failure would cost the agency $4.9 billion. As part of the deal, the FDIC assumed up to 80 percent of BankUnited's copious losses.

The U.S. was still mired in a recession. The country had spent billions of dollars bailing out the banking system and now private equity speculators such as Ross were scooping up banks, apparently taking advantage of the FDIC's safeguards. On Oct. 22, Democratic Senator Jack Reed of Rhode Island wrote to Treasury Secretary Timothy Geithner and former FDIC Chairman Sheila Bair, urging them to put curbs on such acquisitions. The FDIC issued rules requiring buyout firms investing in banks to hold them for three years and maintain profit-crimping amounts of capital.

So Ross changed his strategy. He funneled money into troubled banks that needed cash but hadn't yet fallen into the FDIC's hands, such as Oregon's Cascade and New Jersey's Sun Bancorp. "Their stocks were trading at very, very big discounts from book value," Ross says. "We felt that provided enough cover we'd be O.K. if they had more losses."

He also began to indirectly invest in banks that had been seized by the FDIC. In April 2010, WL Ross became the largest investor in First Michigan Bank in Troy. It was a tiny institution with only 30 employees. But First Michigan CEO David Provost had grand ambitions. Banks were failing left and right in Michigan. He wanted to buy them from the FDIC. Provost says Ross understood his strategy immediately and invested $100 million of his firm's money in First Michigan.

On the day First Michigan announced Ross's cash infusion, it bought CF Bancorp, a bank in Port Huron, Mich., with 368 employees and $1.3 billion in assets. Its collapse had been the largest in the state. First Michigan, now known as Talmer Bank and Trust, has since bought three more failed banks. Provost aims to create a network of community banks that profit from problems in their larger rivals. It seems to be working. Talmer earned more than $40 million last year. "The Bank of Americas get picketed," Provost says. "The customers close out their accounts. Then they come over and see us."

In November, Ross crossed the Atlantic to check on his new investment in the Bank of Ireland. When it was time to leave, CEO Boucher offered Ross a ride to the airport. On the way, they made an unannounced visit to a Bank of Ireland branch in a Dublin suburb. Ross spent nearly an hour at the bank, wandering around and asking questions. "It went down extremely well," says Boucher. "There was a lot of positive buzz among the employees afterwards."

For his part, Ross can't understand why anybody at the Bank of Ireland would be surprised by his interest. "We just put a big chunk of money into it," he says. "It was kind of under the control of the government. I guess the employees weren't used to the Prime Minister dropping by."

There is one banking investment of which Ross is particularly proud. In September his firm pledged $50 million to Amalgamated Bank, which is controlled by unions representing hotel and garment industry workers and has become known as the financial institution guarding the deposits of Occupy Wall Street. On Dec. 8, Ross visits the bank's art deco headquarters in New York to meet with Edward Grebow, its president. Sitting around a coffee table, the two explain how Ross, a loyal member of the 1 percent, came to be interested in the self-styled bank of the other 99 percent. "Well, the bank, like lots of others, made some bad real estate loans," Grebow says. "That left us of short of capital."

He knew there were private equity investors interested in banks. There weren't many, though, who would put their cash into a bank that is not only union-owned but also has a unionized staff. He could think of only two. One was obvious: Ron Burkle, managing partner of Yucaipa and a major Democratic Party contributor. The other was Ross. Grebow knew Ross had good relationships with labor leaders representing steel and textile workers. "We never had a strike at any of our facilities," says Ross. "For us, there is nothing strange about having breakfast with a labor leader. We do it all the time." Together, they agreed to put $100 million in the bank. The deal is awaiting regulatory approval, but Grebow is already talking about using the new funds to create progressive products, such as prepaid credit cards for customers with "uncertain" immigration status and mortgages for city sanitation workers.

Then there are the benefits of being associated with the Occupy Wall Street protests that began in September. Grebow produces a chart showing that 131 new depositors signed up online in October, up from 13 the previous month. The influx of new customers was roughly the same in November. "That's with no marketing," he says. Ross listens, quiet as ever. He says he has no problem with Amalgamated Bank's connection to Occupy Wall Street. It's clearly good for the bank's bottom line and therefore his investment. "The bank by its nature is a so-called progressive, liberal bank," Ross says. "Ed Grebow even marched in one of its demonstrations."

You won't see the 74-year-old billionaire accompanying him anytime soon, however. Says Ross, "I myself wouldn't have anything to do with Occupy Wall Street." Nevertheless, he's thinking about putting more money into Amalgamated Bank. Ross may not cotton to protesters who want to share his wealth, but his investments are strictly nonpartisan.

*Leonard is a reporter for Bloomberg Businessweek in New York.*

http://www.businessweek.com/magazine/wilbur-ross-the-bank-eater-01052012.html

# EXHIBIT "7"

## LAWYERS TITLE COMPANY

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO:

Cox, Castle & Nicholson LLP
2049 Century Park East, 28th Floor
Los Angeles, California 90067
Attention: Adam B. Weissburg, Esq.
Mortgage Loan No.: 10713
*124/57/4 -27.*

(Space above line for Recorder's use only)



Recorded In Official Records, County of San Bernardino     3/10/2011
8:00 AM
EM

**DENNIS DRAEGER**
ASSESSOR – RECORDER – CLERK

803  LandAmerica Commonwealth

Doc#:  **2011 – 0097549**

| Titles: | 5 | Pages: | 45 |
|---|---|---|---|
| Fees | | | 210.00 |
| Taxes | | | 0.00 |
| Other | | | 0.00 |
| PAID | | | $210.00 |

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

Cover Sheet

| | |
|---|---|
| Date: | As of March 8, 2011 |
| Borrower: | **VINTAGE PARK EAST, LLC** |
| Borrower's State of Organization: | California |
| Borrower's Organizational ID Number: | 200825310276 |
| Trustee: | **COMMONWEALTH LAND TITLE INSURANCE COMPANY**, a Nebraska corporation |
| Lender: | **MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**, a Massachusetts corporation |
| Note Amount: | $50,000,000.00 |
| Maturity Date: | April 1, 2018 |
| State: | California |
| Record Owner of the Land: (as defined herein) | **VINTAGE PARK EAST, LLC**, a California limited liability company |

THIS DOCUMENT IS ALSO A FIXTURE FILING IN ACCORDANCE WITH SECTION 9402(b) OF THE CALIFORNIA COMMERCIAL CODE

DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING

THIS DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "**Deed of Trust**") is made as of March 8, 2011, by and between **VINTAGE PARK EAST, LLC**, a California limited liability company, with an address in care of Invesco Advisers, Inc., 13155 Noel Road Suite 500, Dallas TX 75240 ("**Borrower**"), to **COMMONWEALTH LAND TITLE INSURANCE COMPANY**, a Nebraska corporation, having an address at 801 S. Figueroa Street, Suite 870, Los Angeles, CA 90017 ("**Trustee**"), for the use and benefit of **MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**, a Massachusetts corporation having an address in care of Cornerstone Real Estate Advisers LLC, One Financial Plaza, Hartford, Connecticut 06103, Attention: Paralegal, Finance Group ("**Lender**" and, to the extent applicable under Article 13 of the Loan Agreement, "**Administrative Agent**").

GRANTING CLAUSES

For good and valuable consideration and to secure the payment of an indebtedness in the principal sum of **FIFTY MILLION AND 00/100 DOLLARS ($50,000,000.00)** in lawful money of the United States, to be paid according to (i) that certain Loan Agreement of even date herewith between Borrower and Lender (as the same may hereafter be amended or modified, the "**Loan Agreement**"), and (ii) that certain Promissory Note of even date herewith from Borrower to Lender in said principal sum with a maturity date of April 1, 2018 (the "**Maturity Date**"), and any replacement(s) or substitution(s) of said Promissory Note held by Lender or by any successor or assignee of Lender (as the same may hereafter be amended, modified, split, consolidated or extended, the "**Note**"), which Loan Agreement and Note are hereby incorporated herein by this reference and made a part hereof, together with all other obligations and liabilities due or to become due to Lender, all amounts, sums and expenses paid hereunder by or payable to Lender according to the terms hereof (including, without limitation, all Advances (as hereinafter defined) and interest thereon as provided herein and in the Loan Agreement), and all other covenants, obligations and liabilities of Borrower under the Note, the Loan Agreement, this Deed of Trust, the Assignment (as hereinafter defined) and any other instrument executed by Borrower evidencing, securing or delivered in connection with the loan evidenced by the Note (all of the foregoing instruments, as the same may be amended or modified from time to time, collectively, the "**Loan Documents**"), and together with all interest on said indebtedness, obligations, liabilities, amounts, sums, Advances and expenses (all of the foregoing, collectively, the "**Indebtedness**"), Borrower has created in favor of Lender a security interest in and mortgaged, warranted, granted, bargained, sold, conveyed, assigned, pledged, transferred and set over, and does by these presents create a security interest in and WARRANT, GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER AND SET OVER unto Trustee, as trustee for the benefit of Lender, to its successors in the trust created by this Deed of Trust, and to its and their respective assigns forever, in trust, with all POWERS OF SALE and RIGHTS OF ENTRY AND POSSESSION and all STATUTORY RIGHTS AND COVENANTS in the State (as hereinafter defined), together with all interest and estate which Borrower may hereafter acquire in the following property:

The parcel or parcels of land described in <u>Exhibit A</u> attached hereto and by this reference made a part hereof (the "**Land**");

TOGETHER with the buildings, foundations, structures and improvements (including fixtures) now or hereafter located on or in the Land (collectively, the "**Improvements**");

TOGETHER with all right, power, privilege, option, title and interest, if any, of Borrower in and to the streets and roads, opened or proposed, abutting the Land, all strips and gores within or adjoining the Land, the air space and right to use the air space above the Land, all rights of ingress and egress to and from the Land, all easements, rights of way, reversions, remainders, estates, rights, titles, interests, privileges, servitudes, tenements, hereditaments, and appurtenances now or hereafter affecting the Land or the Improvements, all royalties and rights and privileges appertaining to the use and enjoyment of the Land or the Improvements, including all air, lateral support, streets, alleys, passages, vaults, drainage, water, oil, gas and mineral rights, development rights, all leases and licenses and options to purchase or lease, and all other interests, estates or claims, in law or in equity, which Borrower now has or hereafter may acquire in or with respect to the Land or the Improvements (collectively, the "**Appurtenances**");

The Land, the Improvements and the Appurtenances are hereinafter collectively referred to as the "**Premises**";

TOGETHER with all equipment, fittings, furniture, furnishings, appliances, apparatus, and machinery in which Borrower now or hereafter has a possessory or title interest and now or hereafter installed in or located upon the Premises and all building materials, supplies and equipment now or hereafter delivered to the Premises and intended to be installed therein or located thereon; all fixtures, inventory, other goods and personal property of whatever kind and nature now contained on or in or hereafter placed on or in the Premises and used or to be used in connection with the letting or operation thereof, in which Borrower now has or hereafter may acquire a possessory or title interest and all renewals or replacements of any of the foregoing property or articles in substitution thereof, including chairs, desks, lamps, mirrors, bookcases, tables, rugs, carpeting, drapes, draperies, curtains, shades, venetian blinds, screens, paintings, hangings, pictures, keys or other entry systems, intercom and paging equipment, electric and electronic equipment, dictating equipment, private telephone systems, medical equipment, potted plants, heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, ash and fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washers and dryers, and other equipment used in the operation of the Premises (collectively, the "**Equipment**");

TOGETHER with all right, power, privilege, option, title and interest of Borrower in and under all present or future accounts, deposit accounts, documents, instruments, chattel paper, and general intangibles (including "payment intangibles"), as the foregoing terms are defined in the Code (as hereinafter defined), all deposits, monies or escrows held by Lender or Lender's agent or any accounts established pursuant hereto or pursuant to any other Loan Documents, and all

contract rights, equipment leases, operating leases and licenses, Operating Agreements (as hereinafter defined), derivative investments, letters of credit, and rate cap agreements, including casualty insurance policies and liability insurance policies (irrespective of whether such policies are required to be obtained or maintained in force pursuant to this Deed of Trust or other Loan Documents), trade names, trademarks, servicemarks, logos, copyrights, goodwill, franchises, books, records, plans, specifications, permits, licenses, approvals, actions, claims under the Federal Bankruptcy Code (as hereinafter defined)  and causes of action which now or hereafter relate to, are derived from or are used in connection with the Premises or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon (collectively, the "**Intangibles**");

TOGETHER with all right, power, privilege, option, title and interest of Borrower in and under all existing and future leases, lettings, tenancies, occupancy agreements, licenses to occupy and other similar arrangements affecting the Premises or any part thereof now or hereafter entered into and all amendments, extensions, renewals and guaranties thereof, all security therefore, including letter of credit rights, guaranties and other supporting obligations, and all moneys payable thereunder, whether entered into before or after the filing by or against Borrower of any petition for relief under the Federal Bankruptcy Code (collectively, the "**Leases**");

TOGETHER with all rents, income, accounts, receivables, issues, profits, security deposits, including the proceeds from letters of credit, guarantees and other supporting obligations, all other payments and profits from the Leases and the use and occupation of the Premises, including fixed and additional rents, cancellation payments, option payments, all revenues and credit card receipts collected from restaurants, bars, and recreational facilities and otherwise, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of sale, lease, sublease, license, concession or other grant of the right of the possession, use or occupancy of all or any portion of the Premises, or personally located thereon, or rendering of services by Borrower or any operator or manager of any commercial space located in the Premises or acquired from others including from the rental of any office space, retail space, commercial space, or other space, halls, stores or offices, including any deposits securing reservations of such space, exhibit or sales space of every kind, license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, telephone and television systems, the provision or sale of other goods and services, service charges, vending machine sales, and any other payments and benefits to which Borrower may now or hereafter be entitled from the Premises, the Equipment or the Intangibles or under or in connection with the Leases (collectively, the "**Property Income**"), including the immediate and continuing right to make claim for, receive, collect and receipt for Property Income, including the right to make claim in a proceeding under the Federal Bankruptcy Code and to apply the same to the payment of the Indebtedness, all whether before or after the filing by or against Borrower of any petition for relief under the Federal Bankruptcy Code; and

TOGETHER with all proceeds, judgments, claims, compensation, awards of damages and settlements pertaining to or resulting from or in lieu of any condemnation or taking of the Premises by eminent domain or any casualty loss or damage to any of the Premises, the Equipment, the Intangibles, the Leases or the Property Income, and including also, the right to

assert, prosecute and settle claims arising out of or pertaining to such condemnation or taking or such casualty loss under insurance policies constituting an Intangible and to apply for and receive payments of proceeds under such insurance policies and in any condemnation or taking, the right to apply for and receive all refunds with respect to the payment of property taxes and assessments and all other proceeds from the conversion, voluntary or involuntary, of the Premises, the Equipment, the Intangibles, the Leases or the Property Income, or any part thereof, into cash or liquidated claims.  Collectively, all of the foregoing, are herein referred to as the "**Proceeds**".

The Equipment, the Intangibles, the Leases, the Property Income and the Proceeds are hereinafter collectively referred to as the "**Collateral**".  The Premises and the Collateral are hereinafter collectively referred to as the "**Mortgaged Property**".

TO HAVE AND TO HOLD the Mortgaged Property, with all the privileges and appurtenances to the same belonging, and with the possession and right of possession thereof, unto Trustee, as trustee for the benefit of Lender as beneficiary, to its successors in the trust created by this Deed of Trust, and to its and their successors and assigns forever, in trust, upon the terms and conditions set forth herein.

All initially capitalized terms not defined in this Deed of Trust shall have the respective meanings ascribed to such terms in the Loan Agreement.

## ARTICLE I

### Definition of Terms

As used in this Deed of Trust, the terms set forth below shall have the following meanings:

"Advances" means all sums, amounts or expenses advanced or paid and all costs incurred by Lender, as provided in this Deed of Trust or in any other Loan Document, upon failure of Borrower to pay or perform any obligation or covenant contained herein or in such other Loan Document.

"Appurtenances" has the meaning assigned in the Granting Clauses.

"Assignment" means the Assignment of Leases and Rents from Borrower to Lender of even date herewith.

"Borrower" means the party or parties identified and defined as Borrower on the Cover Sheet and in the preamble of this Deed of Trust, any subsequent owner of the Mortgaged Property, and its or their respective heirs, executors, legal representatives, successors and assigns.

"Code" means the Uniform Commercial Code of the State, as the same may be amended from time to time or any successor statute thereto.

"Collateral" has the meaning assigned in the Granting Clauses.

"Default Rate" has the meaning assigned in the Loan Agreement.

"Equipment" has the meaning assigned in the Granting Clauses.

"Event of Default" means any one or more of the events described in Section 9.1 of the Loan Agreement.

"Federal Bankruptcy Code" means Title 11 of the United States Code, as the same may be amended from time to time or any successor statute thereto.

"Impositions" has the meaning assigned in the Loan Agreement.

"Indebtedness" has the meaning assigned in the Granting Clauses.

"Intangibles" has the meaning assigned in the Granting Clauses.

"Land" has the meaning assigned in the Granting Clauses.

"Leases" has the meaning assigned in the Granting Clauses.

"Lender" means Massachusetts Mutual Life Insurance Company, the lender identified as such on the Cover Sheet and in the preamble of this Deed of Trust, and its successors and assigns (including any other holders from time to time of the Note).

"Loan" means the loan made by Lender to Borrower evidenced by the Note and governed by the Loan Agreement.

"Loan Agreement" has the meaning assigned in the Granting Clauses.

"Loan Documents" has the meaning assigned in the Granting Clauses.

"Maturity Date" has the meaning assigned in the Granting Clauses.

"Mortgaged Property" has the meaning assigned in the Granting Clauses.

"Note" has the meaning assigned in the Granting Clauses.

"Permitted Encumbrances" means the liens and security interests created by this Deed of Trust and the other Loan Documents and those exceptions to title set forth in Exhibit B.

"Person" means and includes any individual, corporation, partnership, joint venture, limited liability company, association, bank, joint-stock company, trust, unincorporated organization or government, or an agency or political subdivision thereof.

"Premises" has the meaning assigned in the Granting Clauses.

"Proceeds" has the meaning assigned in the Granting Clauses.

"Property Income" has the meaning assigned in the Granting Clauses.

"State" means the State or Commonwealth in which the Land is situated.

"Trustee" means the party or parties identified and defined as Trustee on the Cover Sheet and in the preamble of this Deed of Trust, and its or their respective successors in trust created by this Deed of Trust, and its or their respective successors and assigns.

"Upstream Owner" has the meaning assigned in the Loan Agreement.

## ARTICLE II

### Covenants, Warranties and Representations of Borrower

Borrower covenants, warrants, represents and agrees as follows:

Section 2.01   Interest on Advances and Expenses.   All Advances made and any reasonable expenses incurred at any time by Lender or Trustee pursuant to the provisions of this Deed of Trust or the other Loan Documents or under applicable law shall be secured by this Deed of Trust as part of the Indebtedness, with equal rank and priority. All such Advances and expenses shall bear interest at the Default Rate from the date that each such Advance or expenses is made or incurred to the date of repayment and all such Advances and expenses with interest thereon shall be paid to Lender by Borrower upon demand therefor.

Section 2.02   Prohibition Against Conveyances, Encumbrances and Borrowing.  Except as expressly permitted under Article 8 of the Loan Agreement, neither Borrower nor any Person shall convey, assign, sell, mortgage, encumber, pledge, hypothecate, grant a security interest in, grant options with respect to, or otherwise dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) all or any portion of any legal or beneficial interest in: (a) all or any portion of the Mortgaged Property including the Leases; or (b) all or any ownership interest in Borrower or in any Upstream Owner.

Section 2.03   Assignment of Leases and Property Income.

(a)      Borrower hereby absolutely, presently, unconditionally and irrevocably assigns, transfers and sets over to Lender all of the right, title and interest of Borrower in and to the Leases and the Property Income. Borrower shall not otherwise assign, transfer or encumber in any manner the Leases or the Property Income or any portion thereof, except as expressly permitted for in the Loan Agreement. Borrower shall have a license, revocable by Lender, to collect and use the Property Income as the same becomes due and payable so long as no Event of Default has occurred, but may not collect any Property Income more than thirty (30) days in advance of the date the same becomes due. The assignment in this Section 2.03 shall constitute an absolute, irrevocable and present assignment of the Leases and the Property Income, and not an additional assignment for security, and the existence or exercise of Borrower's revocable license to collect Property Income shall not operate to subordinate this assignment to any subsequent assignment. The exercise by Lender of any of its rights or remedies under this Section 2.03 shall not be deemed or construed to make Lender: (i) a mortgagee-in-possession; (ii) responsible for the payment of any taxes or assessments with respect to the Premises, (iii) liable to perform any obligation of the lessor under any Lease(s) or under applicable law, (iv)

liable to any person for any dangerous or defective condition in the Premises or for any negligence in the management, upkeep, repair, or control of the Premises resulting in loss or injury or death to any Person, or (v) be liable in any manner for the remediation of any environmental impairment.

(b)     Borrower shall comply with the terms and conditions of Section 5.1 of the Loan Agreement with respect to Leases of all or any portion of the Mortgaged Property.

Section 2.04   Environmental Matters.   Borrower shall comply with the terms and conditions of Article 4 of the Loan Agreement, expressly including the indemnification provisions contained therein.

Section 2.05   Condemnation Awards.   Borrower hereby unconditionally assigns all awards and compensation for any condemnation or other taking of the Mortgaged Property or any portion thereof, or any purchase in lieu thereof, to Lender and authorizes Lender to collect and receive such awards and compensation and to give proper receipts and acquittances therefor, subject to the terms of the Loan Agreement.

Section 2.06   Insurance Proceeds.   Borrower hereby (a) unconditionally assigns to Lender all Proceeds of any insurance policies insuring against loss or damage to the Mortgaged Property, and (b) authorizes Lender to collect and receive such Proceeds and authorizes and directs the issuer of each of such insurance policies to make payment for all such losses directly to Lender, instead of to Borrower and Lender jointly, all subject to the terms of the Loan Agreement.

Section 2.07   No Discrimination.   Borrower hereby covenants and agrees that there shall be no discrimination against or segregation of, any person or group of persons on account of race, color, creed, religion, sex, marital status, national origin, or ancestry in the sublease or enjoyment of the land, nor shall the Borrower himself or any person claiming under or through Borrower establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use, or occupancy of sublessees or vendees of the land.

## ARTICLE III

### Security Agreement

Section 3.01   Warranties, Representations and Covenants of Borrower.   Borrower covenants, warrants, represents and agrees with and to Lender as follows:

(a)     This Deed of Trust constitutes a security agreement under the Code and serves as a fixture filing in accordance with the Code. This Deed of Trust creates, and Borrower hereby grants to Lender, a security interest in favor of Lender as secured party under the Code with respect to all of the Mortgaged Property which is covered by the Code. The mention of any portion of the Mortgaged Property in a financing statement filed in the records normally pertaining to personal property shall not derogate from or impair in any manner the intention of Borrower and Lender hereby declared that all items of the Collateral are part of the real property encumbered hereby to the fullest extent permitted by law, regardless of whether any such item is

physically attached to the Improvements or whether serial numbers are used for the better identification of certain items. Specifically, the mention in any such financing statement of: (i) the rights in or to the Proceeds of any policy of insurance; (ii) any condemnation Proceeds; (iii) Borrower's interest in any Leases or Property Income; or (iv) any other item included in the Mortgaged Property, shall not be construed to alter, impair or impugn any rights of Lender as determined by this Deed of Trust or the priority of Lender's lien upon and security interest in the Mortgaged Property. Any such mention shall be for the protection of Lender in the event that notice of Lender's priority of interest as to any portion of the Mortgaged Property is required to be filed in accordance with the Code to be effective against or take priority over the interest of any particular class of Persons, including the federal government or any subdivision or instrumentality thereof.

(b)     Except for the Permitted Encumbrances and the security interest granted by this Deed of Trust, Borrower is and, as to portions of the Mortgaged Property to be acquired after the date hereof, will be the sole owner of the Mortgaged Property, free from any lien, security interest, encumbrance or adverse claim thereon of any kind whatsoever. Borrower shall notify Lender of, and shall defend the Mortgaged Property against, all claims and demands of all Persons at any time claiming the same or any interest therein.

(c)     Except as expressly provided in the Loan Agreement and this Deed of Trust, Borrower shall not lease, sell, convey or in any manner transfer the Mortgaged Property without the prior consent of Lender.

(d)     The Mortgaged Property is not and will not be used or bought for personal, family or household purposes.

(e)     The Collateral shall be kept on the Land or in the Improvements, and Borrower shall not remove the Collateral from the Land or the Improvements without the prior consent of Lender, which consent shall not be unreasonably withheld or delayed, except such portions or items of the Collateral as are consumed or worn out in ordinary usage, all of which shall be promptly replaced by Borrower with items of equal utility and similar or greater value.

(f)     Borrower shall provide Lender upon Lender's request from time to time with an inventory of the Collateral by serial number and account number, as appropriate.

(g)     Borrower shall not change its place of formation or its entity name without providing Lender with at least sixty (60) days' prior written notice. In the event of any change in name, identity or structure of Borrower, Borrower shall notify Lender thereof and promptly after request shall execute, file and record such Code forms as are necessary to maintain the priority of Lender's lien upon and security interest in the Mortgaged Property, and shall pay all expenses and fees in connection with the filing and recording thereof. If Lender shall require the filing or recording of additional Code forms or continuation statements, Borrower shall, promptly after request, execute, file and record such Code forms or continuation statements as Lender shall deem necessary (subject to Lender's right to sign such statements on behalf of Borrower as provided in Section 3.01(h)), and shall pay all expenses and fees in connection with the filing and recording thereof. If Lender shall initially pay such expenses, Borrower shall promptly reimburse Lender for the expenses.

(h)     Borrower hereby authorizes Lender to file with the appropriate public office, at Borrower's expense any financing statements, amendments or continuations thereof, identifying Borrower as debtor and Lender as secured party in connection with the Mortgaged Property.

(i)     Borrower represents that its exact legal name is as set forth on the Cover Sheet of this Deed of Trust.

(j)     Borrower's Federal Tax Identification Number is 71-0935159 and Borrower's Organizational Number is 200825310276.

(k)     Borrower shall not file any termination statements concerning the Mortgaged Property without Lender's prior consent unless the Indebtedness has been repaid and this Deed of Trust has been released.

(l)     Where Collateral is in possession of a third party, Borrower will join with Lender in notifying the third party of Lender's interest and obtaining an acknowledgment from the third party that it is holding the Collateral for the benefit of Lender.

(m)     Borrower will cooperate with Lender in obtaining control with respect to Collateral consisting of deposit accounts, investment property, letter of credit rights and electronic chattel paper.

Section 3.02   Financing Statements.   A CARBON, PHOTOGRAPHIC OR OTHER REPRODUCTION OF THIS DEED OF TRUST OR ANY FINANCING STATEMENT RELATING TO THIS DEED OF TRUST SHALL BE SUFFICIENT AS A FINANCING STATEMENT.

Section 3.03   Addresses.   The state of organization, organizational ID number and mailing address of Borrower and the address of Lender from which information concerning the security interest granted hereby may be obtained are set forth on the Cover Sheet and in the preamble of this Deed of Trust.   Borrower maintains its sole place of business or its chief executive office at the address shown in said preamble, and Borrower shall immediately notify Lender in writing of any change in said place of business or chief executive office.

Section 3.04   Fixture Filing.   This Deed of Trust shall constitute a fixture filing under the Code as to any goods and other personal property included in the Mortgaged Property in which Borrower has granted to Lender a security interest as provided in this Article III which are or may become fixtures under applicable law.   Borrower is the "debtor" and Lender is the "secured party" as such terms are defined in the Code.   This fixture filing is to be recorded in the Official Records of San Bernardino County, California.

### ARTICLE IV

Default and Remedies

Section 4.01   Remedies.   Upon the occurrence of any Event of Default, Lender may take such actions against Borrower and/or the Mortgaged Property or any portion thereof as it deems

advisable to protect and enforce its rights against Borrower and in and to the Mortgaged Property, without notice or demand except as set forth herein.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.  Such actions may include the following:

(a)    Lender may declare the entire principal balance under the Note then unpaid, together with all accrued and unpaid interest thereon, prepayment fees thereunder, and all other unpaid Indebtedness, to be immediately due and payable.

(b)    Lender may enter into or upon the Mortgaged Property, personally or by its agents, nominees or attorneys, and may dispossess Borrower and its agents and servants therefrom, and thereupon Lender at its sole discretion may:  (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every portion of the Mortgaged Property and conduct business thereon, in any case either in the name of Lender or in such other name as Lender shall deem best; (ii) complete any construction on the Mortgaged Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Mortgaged Property; (iv) exercise all rights and powers of Borrower with respect to the Mortgaged Property, whether in the name of Borrower or otherwise, including the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Property Income; and (v) apply the receipts of Property Income to the payment of the Indebtedness (including any prepayment fee payable under the Loan Agreement) in such order as Lender shall determine in its sole discretion, after deducting therefrom all expenses (including reasonable attorneys' fees, costs and expenses) incurred in connection with the aforesaid operations and all amounts necessary to pay the Impositions, insurance and other charges in connection with the Mortgaged Property, as well as just and reasonable compensation for the services of Lender, its agents, nominees and attorneys.

(c)    With or without entry, personally or by its agents, nominees or attorneys, Lender may require Trustee to sell all or any portion of the Mortgaged Property and all or any portion of Borrower's estate, right, title, interest, claim and demand therein and right of redemption thereof at one or more private or public sales in the manner and to the extent permitted by law, as an entirety or in parcels or portions, and Trustee shall have any statutory power of sale as may be provided by law in the State.

(d)    Lender may institute proceedings for the complete foreclosure of this Deed of Trust, in which case the Mortgaged Property may be sold for cash or upon credit, as an entirety or in parcels or portions.

(e)    Lender may institute, or require Trustee to institute, proceedings for the partial foreclosure of this Deed of Trust for the portion of the Indebtedness then due and payable, subject to the continuing lien of this Deed of Trust for the balance of the Indebtedness not then due.

(f)    Lender may institute, or require Trustee to institute, an action, suit or proceeding at law or in equity for the specific performance of any covenant, condition or agreement contained in the Note, this Deed of Trust or any other Loan Document, or in aid of the execution of any power granted hereunder or for the enforcement of any other appropriate legal or equitable remedy.

(g)    Lender and Trustee shall have the rights and may take such actions as are set forth, described or referred to in <u>Article VII</u> of this Deed of Trust entitled "State Law Provisions" or as are permitted by the laws of the State.

(h)    Lender may recover judgment on the Loan Agreement and the Note, either before, during or after any proceedings for the foreclosure or enforcement of this Deed of Trust.

(i)    Lender may secure the appointment of a receiver, trustee, liquidator or similar official of the Mortgaged Property or any portion thereof, and Borrower hereby consents and agrees to such appointment, without notice to Borrower and without regard to the adequacy of the security for the Indebtedness and without regard to the solvency of Borrower or any other Person liable for the payment of the Indebtedness, and such receiver or other official shall have all rights and powers permitted by applicable law and such other rights and powers as the court making such appointment may confer, but the appointment of such receiver or other official shall not impair or in any manner prejudice the rights of Lender to receive the Property Income pursuant to this Deed of Trust or the Assignment.

(j)    Lender may exercise any or all of the remedies available to a secured party under the Code.

(k)    Lender may pursue, or require Trustee to institute, any other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.

(l)    Lender may, in its sole discretion, apply any funds then on deposit with Lender, including but not limited to such funds on deposit for the payment of Impositions, ground rent or insurance premiums, to the payment of such items or to the repayment of the Indebtedness.

(m)    Lender in its sole discretion may surrender any insurance policies and collect the unearned premiums and apply such sums against the Indebtedness.

(n)    To the extent permitted by law, exercise any power of sale.

Section 4.02    <u>General Provisions Regarding Remedies</u>.

(a)    <u>Proceeds of Sale</u>.  The proceeds of any sale of the Mortgaged Property or any part thereof received by Lender shall be distributed and applied to the amounts set forth in <u>Section 2.7</u> of the Loan Agreement in such order and priority as Lender deems appropriate in its sole discretion.

(b)     Effect of Judgment.  No recovery of any judgment by Lender or Trustee and no levy of an execution under any judgment upon the Mortgaged Property or upon any other property of Borrower shall affect in any manner or to any extent the lien of this Deed of Trust upon the Mortgaged Property or any portion thereof, or any rights, powers or remedies of Lender hereunder.  Such lien, rights, powers and remedies of Lender and Trustee shall continue unimpaired as before.

(c)     Continuing Power of Sale.  The power of sale conferred upon Lender in this Deed of Trust shall not be exhausted by any one or more sales as to any portion of the Mortgaged Property remaining unsold, but shall continue unimpaired until all of the Mortgaged Property is sold or all of the Indebtedness is paid.

(d)     Right to Purchase.  At any sale of the Mortgaged Property or any portion thereof pursuant to the provisions of this Deed of Trust, Lender or Trustee shall have the right to purchase the Mortgaged Property being sold, and in such case shall have the right to credit against the amount of the bid made therefor (to the extent necessary) all or any portion of the Indebtedness then due.

(e)     Right to Terminate Proceedings.  Lender or Trustee may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided in Section 4.01 at any time before the conclusion thereof, as determined in Lender's sole discretion and without prejudice to Lender.

(f)     No Waiver or Release.  Lender may resort to, or require Trustee to resort to, any remedies and the security given by the Loan Documents, in whole or in part, and in such portions and in such order as determined in Lender's sole discretion.  No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by the Loan Documents.  The failure of Lender or Trustee to exercise any right, remedy or option provided in the Loan Documents shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by the Loan Documents.  No acceptance by Lender or Trustee of any payment after the occurrence of an Event of Default and no payment by Lender or Trustee of any Advance or obligation for which Borrower is liable hereunder shall be deemed to waive or cure such Event of Default or Borrower's liability to pay such obligation.  No sale of all or any portion of the Mortgaged Property, no forbearance on the part of Lender or Trustee, and no extension of time for the payment of the whole or any portion of the Indebtedness or any other indulgence given by Lender or Trustee to Borrower or any other Person, shall operate to release or in any manner affect Lender's or Trustee's interest in the Mortgaged Property or the liability of Borrower to pay the Indebtedness, except to the extent that such liability shall be reduced by proceeds of the sale of all or any portion of the Mortgaged Property received by Lender.  No waiver by Lender or Trustee shall be effective unless it is in a writing executed by Lender and then only to the extent specifically stated therein.

(g)     No Impairment; No Release.  The interests and rights of Lender or Trustee under the Loan Documents shall not be impaired by any indulgence, including: (i) any renewal, extension or modification which Lender may grant with respect to any of the Indebtedness; (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender or Trustee may grant with respect to the Mortgaged Property or any portion thereof; or (iii) any

release or indulgence granted to any maker, endorser, guarantor or surety of any of the Indebtedness. If the Mortgaged Property is sold and Lender enters into any agreement with the then owner of the Mortgaged Property extending the time of payment of the Indebtedness, or otherwise modifying the terms hereof or of any other Loan Document, Borrower shall continue to be liable to pay the Indebtedness according to the tenor of any such agreement unless expressly released and discharged in writing by Lender.

(h)     Waivers and Agreements Regarding Remedies.  To the fullest extent that Borrower may legally do so, Borrower:

(i)     agrees that Borrower will not at any time insist upon, plead, claim or take the benefit or advantage of any laws now or hereafter in force providing for any appraisal or appraisement, valuation, stay, extension or redemption, and waives and releases all rights of redemption, valuation, appraisal or appraisement, stay of execution, extension and notice of election to accelerate or declare due the whole of the Indebtedness;

(ii)     waives all rights to a marshalling of the assets of Borrower, Borrower's partners, if any, and others with interests in Borrower, including the Mortgaged Property, or to a sale in inverse order of alienation in the event of foreclosure of the interests hereby created, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Mortgaged Property for the collection of the Indebtedness without any prior or different resort for collection, or the right of Lender or Trustee to the payment of the Indebtedness out of the proceeds of sale of the Mortgaged Property in preference to every other claimant whatsoever;

(iii)     waives any right to bring or utilize any defense, counterclaim or setoff, other than one in good faith, which denies the existence or sufficiency of the facts upon which the foreclosure action is grounded or which is based on Lender's or Trustee's wrongful actions.  If any defense, counterclaim or setoff (other than one permitted by the preceding sentence) is raised by Borrower in such foreclosure action, such defense, counterclaim or setoff shall be dismissed.  If such defense, counterclaim or setoff is based on a claim which could be tried in an action for money damages, the foregoing waiver shall not bar a separate action for such damage (unless such claim is required by law or applicable rules of procedure to be pleaded in or consolidated with the action initiated by Lender or Trustee), but such separate action shall not thereafter be consolidated with Lender's or Trustee's foreclosure action.  The bringing of such separate action for money damages shall not be deemed to afford any grounds for staying any such foreclosure action;

(iv)     waives and relinquishes any and all rights and remedies which Borrower may have or be able to assert by reason of the provisions of any laws pertaining to the rights and remedies of sureties;

(v)     waives the defense of laches and any applicable statutes of limitation; and

(vi)  waives any right to have any trial, action or proceeding tried by a jury.

(i)  Lender's Discretion.  Except as expressly set forth herein or in any other Loan Document to the contrary, Lender may exercise its rights, options and remedies and may make all decisions, judgments and determinations under this Deed of Trust and the other Loan Documents in its sole and absolute discretion.

(j)  Recitals of Facts.  In the event of a sale or other disposition of the Mortgaged Property pursuant to Section 4.01 and the execution of a deed or other conveyance pursuant thereto, the recitals therein of facts (such as default, the giving of notice of default and notice of sale, demand that such sale should be made, postponement of sale, terms of sale, purchase, payment of purchase money and other facts affecting the regularity or validity of such sale or disposition) shall be conclusive proof of the truth of such facts.  Any such deed or conveyance shall be conclusive against all Persons as to such facts recited therein.

(k)  Lender's Right to Waive, Consent or Release.  Lender may at any time, in writing: (i) waive compliance by Borrower with any covenant herein made by Borrower to the extent and in the manner specified in such writing; (ii) consent to Borrower's doing any act which Borrower is prohibited hereunder from doing, or consent to Borrower's failing to do any act which Borrower is required hereunder to do, to the extent and in the manner specified in such writing; or (iii) release, or require Trustee to release, any portion of the Mortgaged Property, or any interest therein, from this Deed of Trust and the lien of the other Loan Documents.  No such act shall in any way impair the rights of Lender or Trustee hereunder except to the extent specified by Lender in such writing.

(l)  Possession of the Mortgaged Property.  Upon the occurrence of any Event of Default hereunder and demand by Lender at its option, Borrower shall immediately surrender or cause the surrender of possession of the Premises to Lender.   If Borrower or any other occupant is permitted to remain in possession, such possession shall be as tenant of Lender and such occupant: (i) shall on demand pay to Lender monthly, in advance, reasonable use and occupancy charges for the space so occupied; and (ii) in default thereof, may be dispossessed by the usual summary proceedings.  Upon the occurrence of any Event of Default and demand by Lender, Borrower shall assemble the Collateral and make it available at any place Lender may designate to allow Lender to take possession and/or dispose of the Collateral.  The covenants herein contained may be enforced by a receiver of the Mortgaged Property or any portion thereof.  Nothing in this Section 4.02(l) shall be deemed a waiver of the provisions of this Deed of Trust prohibiting the sale or other disposition of the Mortgaged Property without the prior consent of Lender.

(m)  Limitations on Liability.  Notwithstanding anything contained herein to the contrary, Borrower's liability hereunder is subject to the limitation on liability provisions of Article 11 of the Loan Agreement, which Article 11 is incorporated herein by reference, mutatis mutandis, as if such Article 11 was set forth in full herein.

(n)  Subrogation.  If all or any portion of the proceeds of the Note or any Advance shall be used directly or indirectly to pay off, discharge or satisfy, in whole or in part,

any prior lien or encumbrance upon the Mortgaged Property or any portion thereof, then Lender and Trustee shall be subrogated to, and shall have the benefit of the priority of, such other lien or encumbrance and any additional security held by the holder thereof.

## ARTICLE V

### Miscellaneous

Section 5.01   Notices.   All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if delivered to the Persons and locations and in the manner set forth in Section 12.1 of the Loan Agreement.

Section 5.02   Binding Obligations; Joint and Several.   The provisions and covenants of this Deed of Trust shall run with the land, shall be binding upon Borrower, its successors and assigns, and shall inure to the benefit of Lender and Trustee and their respective successors and assigns. If there is more than one Borrower, all their obligations and undertakings hereunder are and shall be joint and several.

Section 5.03   Captions.   The captions of the sections and subsections of this Deed of Trust are for convenience only and are not intended to be a part of this Deed of Trust and shall not be deemed to modify, explain, enlarge or restrict any of the provisions hereof.

Section 5.04   Severability.   If any one or more of the provisions contained in this Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Deed of Trust, but this Deed of Trust shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

Section 5.05   Amendments; Consents.   This Deed of Trust cannot be altered, amended, modified or discharged orally and no executory agreement shall be effective to modify or discharge it in whole or in part, unless in writing and signed by the party against which enforcement is sought. No consent or approval required hereunder or under any other Loan Document shall be binding unless in writing and signed by the party sought to be bound.

Section 5.06   Other Loan Documents and Exhibits.   All of the agreements, conditions, covenants, provisions and stipulations contained in the Loan Agreement, the Note and the other Loan Documents, and each of them, which are to be kept and performed by Borrower are hereby made a part of this Deed of Trust to the same extent and with the same force and effect as if they were fully set forth in this Deed of Trust, and Borrower shall keep and perform the same, or cause them to be kept and performed, strictly in accordance with their respective terms. The Cover Sheet and each exhibit, schedule and rider attached to this Deed of Trust are integral parts of this Deed of Trust and are incorporated herein by this reference. In the event of any conflict between the provisions of any such exhibit, schedule or rider and the remainder of this Deed of Trust, the provisions of such exhibit, schedule or rider shall prevail.

Section 5.07   Legal Construction.