1  H. Scott Leviant, State Bar No. 200834
       scott@spiromoore.com
2  J. Mark Moore, State Bar No. 180473
       mark@spiromoore.com
3  **SPIRO MOORE LLP**
   11377 W. Olympic Blvd., 5th Floor
4  Los Angeles, California 90064-1683
   Telephone:  (310) 235-2468
5  Facsimile:   (310) 235-2456

6  Attorneys for Plaintiffs

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  MARIO SALAS, individually, and on       Case No.: 12-cv-10506 DDP (VBKx)
    behalf of all others similarly situated;
12  MELVIN CHAMBERLAIN,
    individually, and on behalf of all       CLASS ACTION
13  others similarly situated;
    ALBIN WATSON, individually, and          **SECOND AMENDED CLASS**
14  on behalf of all others similarly        **ACTION COMPLAINT FOR:**
    situated;
15  JOHN PAXIN, individually, and on         [Filed by leave of court granted June
    behalf of all others similarly situated; 24, 2013 – Docket No. 69]
16
                   Plaintiffs,              1.  Violations Of Racketeer Influenced
17                                              And Corrupt Organizations Act
            vs.                                 [18 U.S.C. § 1962(c)]
18                                          2.  Violations Of Racketeer Influenced
    INTERNATIONAL UNION OF                      And Corrupt Organizations Act
19  OPERATING ENGINEERS, a trade               [18 U.S.C. § 1962(d)]
    union;                                  3.  Violations of Labor Management
20  WILLIAM C. WAGGONER, an                     Disclosure Act
    individual;                                 [29 U.S.C. § 501]
21  VINCE GIBLIN, an individual;           4.  Breaches of Fiduciary Duties
    JAMES T. CALLAHAN, an                      [ERISA]
22  individual;                            5.  Breach of Fiduciary Duty [Common
    BRIAN E. HICKEY, an individual;            Law]
23  PATRICK L. SINK, an individual;        6.  Violation of the California Labor
    JERRY KALMAR, an individual;              Code §§ 221 and 2802
24  RUSSELL E. BURNS, an individual;       7.  Negligence and Negligent
    RODGER KAMINSKA, an individual;           Supervision
25  JAMES M. SWEENEY, an individual;       8.  Violation of Cal. Business &
                                              Professions Code § 17200, et seq.
26                                          9.  Aiding and Abetting

27                                          **DEMAND FOR JURY TRIAL**

28

**SECOND AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

1   ROBERT T. HEENAN, an individual;
    DANIEL J. MCGRAW, an individual;
2   DAREN KONOPASKI, an individual;
    MICHAEL GALLAGHER, an
3   individual;
    GREG LALEVEE, an individual;
4   TERRANCE E. MCGOWAN, an
    individual;
5   LOUIS G. RASETTA, an individual;
    JAMES VAN DYKE, an individual;
6   PATRICIA M. WAGGONER, an
    individual;
7   BERT TOLBERT, an individual;
    MICKEY J. ADAMS, an individual;
8   RON SIKORSKI, an individual;
    DAN BILLY, an individual;
9   DAN HAWN, an individual;
    LARRY DAVIDSON, an individual;
10  STEVE BILLY, an individual;
    FRED YOUNG, an individual;
11  C. W. POSS, an individual;
    JOHN NELSON, an individual;
12  WALT ELLIOT, an individual;
    MIKE RODDY, an individual;
13  MICHAEL CRAWFORD, an
    individual;
14  BRUCE COOKSEY, an individual;
    MIKE PRLICH, an individual;
15  DON BOURGUIGNON, an
    individual;
16  KENNETH BOURGUIGNON, an
    individual;
17  JOHN SAWYER, an individual;
    PAUL VON BERG, an individual;
18  JIM HULSE, an individual;
    MIKE GOMEZ, an individual;
19  OPERATING ENGINEERS FUNDS
    INC. a non-profit corporation;
20  KENNETH D. WAGGONER, an
    individual;
21  INVESCO ADVISERS, INC., a
    corporation; and
22  DOES 1 through 10, inclusive,

23           Defendants.

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT

SPIRO MOORE LLP

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................... i

I.   INTRODUCTION ....................................................1

II.  JURISDICTION AND VENUE...........................................1

III. THE PARTIES TO EACH CAUSE OF ACTION........................2

    A.  Plaintiffs ..................................................2

    B.  Defendants.................................................3

IV.  FACTS COMMON TO ALL COUNTS .........................9

    A.  About the IUOE...........................................9

    B.  About IUOE Local 12 Employee Benefit Trusts ....................12

    C.  IUOE Forced Plaintiffs and Class members Serving As Officers or Employees of Local 12 to Contribute to the President's Club/EPEC, a Political Action Fund, and a Second EPEC Fund Affecting a Substantial Number of the Members of Local 12 ....................12

    D.  Waggoner Forced Watson, Salas and Other Employees of Local 12 and Its Related Entities, including OEFI, to Contribute to His Re-election Fund.......................................................16

    E.  Assets Were Diverted or Embezzled from Local 12 and IUOE Accounts or Trust Accounts Created for the Benefit of Union Members19

        1.  Some Defendants Embezzled Physical Property Purchased By Local 12 or Its Many Associated Trusts...........................19

        2.  Defendants William Waggoner, Patty Waggoner, Kenneth Waggoner, Mickey Adams, Ron Sikorski, Larry Davidson, Dan Hawn, and Others Used Local 12's Aircraft for Their Personal Use, Embezzled Revenues Generated by Those Aircraft, and Falsified Many Years of LM-2 Filings to Conceal Activities, Costs, and Asset Values ...........................................25

3.   William Waggoner Provided Politicians With Transportation on the Local 12 Jet, But that In-Kind Contribution Was Frequently Not Paid for or Reported ...................................................................31

4.   Defendants Waggoner, Sikorski, Adams, Davidson and Hawn Embezzled Revenue from Local 12's Printing Press Operations, Failing to Report Income on Any IRS Form 990 or LM-2 Forms, and Diverting Resources From Agency Fee Members Without Consent ...........................................................................................34

5.   William Waggoner Engaged in Self-Dealing by Causing Local 12 to Hire Patty Waggoner's Company, Spacemaker Tenant Improvements, to Work on Local 12's Headquarters, OEFI-Owned Properties, and Other Property ...........................................................37

6.   William Waggoner Diverted Assets From the Pension Fund to Prop Up Amalgamated Bank, Which Was the Investment Custodian of Other Funds Placed in Risky Investments .................38

7.   William Waggoner Diverted Valuable Assets in the Form of Room Space in the Washington Court Hotel and Authorized Sub-Market Leases of Revenue-Generating Properties ......................................44

8.   In Violation of the IUOE Constitution, William Waggoner Steered Health & Welfare Fund Investments to His Son's Employer While Kenneth Waggoner Was Employed at Chelsea Management Without Disclosing the Prohibited Conflict of Interest in LM-30 Filings ...........................................................................................46

9.   William Waggoner, For Many Years, Demanded and Obtained From Leo Majich, the Diversion of Real Estate Account Funds from the Local 12 Pension Fund to Pay for Roughly $90,000 in Rose Bowl Tickets Every Year .......................................................47

SECOND AMENDED CLASS ACTION COMPLAINT

SPIRO MOORE LLP

10. Leo Majich's Daughter, Theresa Goodell, Used an OEFI Credit Card to Travel to Jamaica to Visit Her Boyfriend and Defrauded OEFI Out of Other Monies ................................................................. 48

11. Bernard Kotkin & Co., LLP, a Certified Public Accounting Firm, Was Hired by OEFI to Conduct Annual Audits, Uncovering Massive Financial Misconduct, Including Embezzlement, Fraud and the Misuse of Hundreds of Credit Cards ................................... 50

12. William Waggoner Awarded a No-Bid Security Services Contract to His Friend's Firm, Worldwide Security, at Multiple Times the Competitive Market Rate ............................................................. 51

13. While Waggoner and His Family and Others Were Enjoying Personal-Use Jet Flights and Failing to Reimburse the General Fund for Printing and Jet Time Contributed to Politicians, the General Fund Was Hemorrhaging Money ....................................... 51

14. OEFI Paid Employees' Payroll Taxes Out of the General Fund ...... 52

15. Bert Tolbert, With the Knowledge of Waggoner, Directed or Caused the Sale of Metal Belonging to OETT (Southern California) at SA Recycling and Other Recyclers for Cash and Did Not Deliver That Cash to the Trust ................................................. 53

16. William Waggoner Wrote Off Debts Without Approval of a Majority of the Trustees When the Debts Were Owed by an Employer Trustee's Company or the Relatives of Waggoner's Close Friends ....................................................................... 54

17. Patty Waggoner Used a Local 12 Ford Flex Without Justification, Thereby Embezzling Local 12 Assets ............................................. 55

18. Various Defendants Used Southern California Training Trust Facilities, Assets, and Personnel to Service and Refurbish Their Personal Vehicles and Work on Their Homes ................................. 56

SPIRO MOORE LLP

SECOND AMENDED CLASS ACTION COMPLAINT

19. William Waggoner Maintained Incompetent Employer Trustees on the Local 12 Associated Trusts to Guarantee That He Controlled All Local 12 Associated Trusts .......................................................57

F. IUOE's and Local 12's Leadership Used Threats of Physical and Economic Violence, and Suborned Perjury, to Suppress Investigations and Maintain Control Over Local 12 ....................................................58

1. David Casey Was Beaten at the Direction of William Waggoner for Running Against Waggoner for Business Manager ...................58

2. William Waggoner Prevents Opposition Voices From Speaking at Any Meetings ...................................................................59

3. Local 12 Uses Its Job Referral Service to Suppress Opposition ......59

4. Business Agents for Local 12 Carry Guns That Have Had Serial Numbers Removed ...........................................................60

G. William Waggoner, Mickey Adams, Ron Sikorski, Larry Davidson and Dan Hawn Allow Employers Contracted With Local 12 to Operate Double-Breasted, Thereby Depriving Members of Protections and Benefits Available Under Union Agreements .........................................60

H. Steve Montrie, Convicted of Vehicular Manslaughter, Remains a Business Agent Despite Killing an Individual While Driving a Union Vehicle Under the Influence of Alcohol .................................................61

I. Miscellaneous Breaches of Fiduciary Duties ...........................................63

J. Waggoner Used Pension Benefits That Should Have Been Universally Available to All Employees of Local 12 or Its Related Trusts as a Selective Reward Tool ...........................................................................64

K. All Employees of Local 12, Other Than Some Clerical Workers, Must Pay Union Dues Despite no Coverage Under Any Collective Bargaining Agreement ...........................................................................65

SPIRO MOORE LLP

SPIRO MOORE LLP

L.   Waggoner and His Team Issued Instructions to Shred or Hide Documents That Could Be Used to Corroborate Allegations in This Lawsuit ..................................................................................66

M.   After Destroying or Hiding Documents, Defendants Are Now Moving Equipment Back to the Southern California Training Sites, Including Devore, Whittier, and San Diego, to Hide Unlawful Asset Transfers from the Southern California Training Trust to the Southern Nevada Training Trust..........................................................................66

N.   Local 12 Habitually Purchases Its Vehicle Fleet From Ford and Services Its Own Vehicles, but Its LM-2 Filings Since at Least 2006 Show Inexplicably Variable Expenditures Classified As "Auto Leasing and Maintenance."............................................................67

O.   Additional False Representations in Mandatory Union Reports ............68

V.   CLASS ACTION ALLEGATIONS................................................................68

VI.  CLAIMS FOR RELIEF ..................................................................................73

FIRST CLAIM FOR RELIEF ....................................................................................73

(Violation of 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. §§ 1961-68]) ................................................73

By Plaintiffs against All Defendants William Waggoner, Patty Waggoner, Ron Sikorski, Mickey Adams, Dan Hawn, Larry Davidson and Bert Tolbert......73

SECOND CLAIM FOR RELIEF ...............................................................................79

(Violation of 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. §§ 1961-68]) ................................................79

By Plaintiffs against All Defendants William Waggoner, Patty Waggoner, Ron Sikorski, Mickey Adams, Dan Hawn, Larry Davidson and Bert Tolbert......79

THIRD CLAIM FOR RELIEF ...................................................................................81

(Violations of Labor Management Reporting and Disclosure Act, 29 U.S.C. §§ 411, 431 and 501) ......................................................................................81

SPIRO MOORE LLP

By Plaintiffs against Specific Defendants ...........................................81

FOURTH CLAIM FOR RELIEF ....................................................................85

BREACHES OF FIDUCIARY DUTIES ARISING UNDER ERISA By Plaintiffs
       Against Specific Defendants..........................................................85

FIFTH CLAIM FOR RELIEF ..........................................................................86

COMMON LAW BREACH OF FIDUCIARY DUTY ....................................86

By Plaintiffs Against Specific Defendants .........................................................86

SIXTH CLAIM FOR RELIEF .........................................................................88

VIOLATION OF CALIFORNIA LABOR CODE § 221 and 2802.....................88

By Plaintiffs Against Defendants William Waggoner, Ron Sikorski, Mickey
       Adams, Dan Hawn, Larry Davidson and OEFI ...........................88

SEVENTH CLAIM FOR RELIEF ...................................................................89

NEGLIGENCE AND NEGLIGENT SUPERVISION ......................................89

By Plaintiffs Against Certain Defendants and Does 1-10 ..................................89

EIGHTH CLAIM FOR RELIEF .......................................................................91

NINTH CLAIM FOR RELIEF..........................................................................97

AIDING AND ABETTING OF CONDUCT ALLEGED IN PRIOR CLAIMS...97

By Plaintiffs Against All Defendants .................................................................97

PRAYER FOR RELIEF .................................................................................100

**SECOND AMENDED CLASS ACTION COMPLAINT**

# I.   **INTRODUCTION**

1.   This action arises from years of illegal activity by the International Union of Operating Engineers ("IUOE") and its controlling officers and co-conspirators. Local 12, a local trade union, and its members, were victimized by those many years of illegal activity.  The unlawful abuses suffered by Local 12 and its members take two predominant forms.  First, millions upon millions of dollars were withheld and/or embezzled from Local 12 and its membership, much of which was used by Defendant William C. Waggoner and his circle of co-conspirators for personal benefit.  Second, the membership of Local 12 was denied the right to freely select its own officers, through fair and honest elections, again, as a result of machinations by Defendant William C. Waggoner (sometimes, "Waggoner"), with the knowledge and assistance of the IUOE and its leadership, of which Defendant William C. Waggoner was a highly placed member.

2.   The conduct of Defendants harkens back to the days of unrepentant racketeering by organized crime, which makes some sense here.  Local 12's leadership conduct its affairs with the same disregard for others' rights as the mob.

# II.   **JURISDICTION AND VENUE**

3.   The action is brought, among other bases, under the Interstate Commerce Clause of the United States Constitution, and the Racketeering, Mail Fraud, Wire Fraud and Money Laundering laws of the United States.  In addition, this action is brought pursuant to Article 1, Section 1 of the Constitution of the State of California and other statutes and laws of the State of California.

4.   Jurisdiction is specifically conferred on this Court by various federal statutes including, but not limited to, the following: Section 1964 of the Racketeer Influenced and Corrupt Organizations Act of the Organized Crime Control Act of 1970 as amended, 18 U.S.C. § 1964, based upon a pattern of racketeering activity in which Defendants have been engaged in connection with their operation of the

**SECOND AMENDED CLASS ACTION COMPLAINT**

IUOE, consisting of violations of, among others, (a) 18 U.S.C. § 1341, relating to mail fraud, (b) 18 U.S.C. § 1343, relating to wire fraud, (c) 18 U.S.C. § 1957, relating to monetary transactions of unlawfully obtained proceeds from specified crimes, including mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, (d) 18 U.S.C. § 1951, relating to travel and use of interstate commerce in furtherance of certain unlawful activities, including unlawful monetary transactions, 18 U.S.C. § 1957.

5.   Original jurisdiction lies with this Court as to the Federal questions raised herein, pursuant to 28 U.S.C. § 1331.

6.   Jurisdiction over any California State causes of action contained in this Complaint arises under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367(a).

7.   Venue as to each Defendant is proper in this District pursuant to 18 U.S.C. § 1965, because each of the Defendants resides, is found, has an agent, controls and/or transacts or transacted affairs in this District.  In addition, the Defendants are engaged in interstate and foreign commerce, and a substantial part of the events giving rise to the claims for violations of Federal law occurred in this District, all in the course of interstate and foreign commerce.

### III.   THE PARTIES TO EACH CAUSE OF ACTION

#### A.   Plaintiffs

8.   Plaintiff Mario Salas is, and at all relevant time was, a member of Local 12.  Plaintiff Salas is a former Business Agent for (and employee of) Local 12. Plaintiff Salas is a member of the Local 12 Employee Class.

9.   Plaintiff Melvin Chamberlain is, and at all relevant time was, a member of Local 12.  Plaintiff Chamberlain is a former Instructor for the Operating Engineers' Training Trust ("OETT"), at the San Diego training center (and, as such, a former employee of OETT).  He is now retired.

10. Plaintiff Albin Watson is, and at all relevant time was, a member of Local 12.  Plaintiff Watson is a former Coordinator for the OETT, at the Whittier training center (and, as such, a former employee of OETT).  He is now retired.

11. Plaintiff John Paxin is, and at all relevant time was, a member of Local 12.  Plaintiff Paxin is a former Local 12 Executive Board member (and thus a former employee of Local 12) and Instructor for the OETT, at the Whittier and Devore training centers (and thus an employee of OETT).

12. Plaintiffs reserve the right to seek leave to amend this complaint to add new plaintiffs, if necessary, in order to establish suitable representative(s) of the Class proposed herein and/or any necessary sub-Class.

### B.  **Defendants**

13. Defendant IUOE is a trade union that primarily represents operating engineers, who work as heavy equipment operators, mechanics, and surveyors in the construction industry, and stationary engineers, who work in operations and maintenance in building and industrial complexes, and in the service industries. IUOE also represents nurses and other health industry workers, a significant number of public employees engaged in a wide variety of occupations, as well as a number of job classifications in the petrochemical industry.

14. Defendant James T. Callahan is the General President of IUOE, purportedly "elected" to that position in November 2011.   (In fact, his election by the General Executive Board was little more than an appointment by outgoing General President ("GP") Giblin, as all officers of the General Executive Board swear allegiance to the GP and to his named successor.  There has never been a contested "election" in the history of the IUOE for the position of General President.)  Prior to becoming General President, Defendant Callahan served as the IUOE General Secretary-Treasurer and was elected as an IUOE Vice President in 2008.  Defendant Callahan is also a Trustee of the IUOE General Pension Fund.

**SECOND AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

SPIRO MOORE LLP

15. Defendant Brian E. Hickey is General Secretary-Treasurer of IUOE, elected in November 2011.  Mr. Hickey has served as an IUOE Vice President since 2001.  Defendant Hickey is also a Trustee of the IUOE Central Pension Fund and is also Business Manager of Local 399, located in Chicago, Illinois.

16. Defendant William C. Waggoner is the First Vice President of IUOE.  Mr. Waggoner was first elected as an IUOE Vice President in 1980.  Mr. Waggoner is also the Western States Director and the Business Manager (the top elected official) of Local 12 headquartered in Pasadena, California.  Mr. Waggoner is the Secretary-Treasurer of the Southern California Labor Management Operating Engineers Contract Compliance Trust Fund.  Local 12 is a hoisting and portables local which principally engages in the construction industry.

17. Defendant Patrick L. Sink is the Second Vice President of IUOE.  Mr. Sink was first elected as an IUOE Vice President in 2004.  Mr. Sink is Business Manager of IUOE Local 18 headquartered in Cleveland, Ohio.

18. Defendant Jerry Kalmar is the Third Vice President of IUOE.  Mr. Kalmar was first elected as an IUOE Vice President in 2005.  Mr. Kalmar is the Business Manager of IUOE Local 39.  Local 39 is headquartered in San Francisco, California.

19. Defendant Russell E. Burns is the Fourth Vice President of IUOE.  Mr. Burns was first elected as an IUOE Vice President in October 2006.  Mr. Burns is the Business Manager for IUOE Local 3 headquartered in Alameda, California.

20. Defendant Rodger Kaminska is the Fifth Vice President of IUOE.  Mr. Kaminska was first elected as an IUOE Vice President in 2008.  Mr. Kaminska is the Business Manager for IUOE local 101 headquartered in Kansas City, Missouri.

21. Defendant James M. Sweeney is the Sixth Vice President of IUOE.  Mr. Sweeney was first elected as an IUOE Vice President in 2009. Mr. Sweeney is the Business Manager for IUOE Local 150 headquartered in Countryside, Illinois.

**SECOND AMENDED CLASS ACTION COMPLAINT**

22. Defendant Robert T. Heenan is the Seventh Vice President of IUOE.  Mr. Heenan was first elected as an IUOE Vice President in 2009. Mr. Heenan is the Business Manager of IUOE Local 542 headquartered in Fort Washington, Pennsylvania.

23. Defendant Daniel J. McGraw is the Eighth Vice President of IUOE.  Mr. McGraw was first elected as an IUOE Vice President in 2011.  Mr. McGraw also serves as the Northeast Regional Director for the IUOE and is headquartered in Albany, New York.  He is also the Business Manager for IUOE Local 17 headquartered in Lakeview, New York.

24. Defendant Daren Konopaski is the Ninth Vice President of IUOE.  Mr. Konopaski was first elected as an IUOE Vice President in 2011. Mr. Konopaski is the Business Manager of IUOE Local 302 headquartered in Bothell, Washington.

25. Defendant Michael Gallagher is the Tenth Vice President of IUOE.  Mr. Gallagher was first elected as an IUOE Vice President in 2011. Mr. Gallagher is the Business Manager of IUOE Local 793 headquartered in Oakville, Ontario, Canada.

26. Defendant Greg Lalevee is the Eleventh Vice President of IUOE.  Mr. Lalevee was first elected as an IUOE Vice President in 2011.  Mr. Lalevee is the Business Manager for IUOE Local 825 headquartered in Springfield, New Jersey.

27. Defendant Terrance E. McGowan is the Twelfth Vice President of IUOE. Mr. McGowan was first elected as an IUOE Vice President in 2011.  Mr. McGowan is also a Trustee of the IUOE General Pension Fund. He is the Business Manager of IUOE Local 139 headquartered in Pewaukee, Wisconsin.

28. Defendant Louis G. Rasetta is the Thirteenth Vice President of IUOE. Mr. Rasetta was first elected as an IUOE Vice President in 2012. Mr. Rasetta also serves as the Chairman of the Board of the IUOE General Pension Fund. He is the Business Manager of IUOE Local 4 which is headquartered in Medway, Massachusetts.

**SECOND AMENDED CLASS ACTION COMPLAINT**

29. Defendant Vincent (Vince) Giblin was General President of IUOE from about 2005 until his retirement in November 2011.

30. Other than Defendant William Waggoner, Defendant IUOE, the GPs of IUOE and the Vice-Presidents of IUOE are named exclusively for any breaches of their fiduciary duties to union members, their ongoing role in the unlawful mandatory contributions to the political fund known as EPEC or President's Club, for Negligent Supervision of agents acting on their behalf, including William Waggoner, and for aiding and abetting the misconduct of other Defendants, including William Waggoner. The General Executive Board, and through them, IUOE, has been aware of Defendant Vincent Giblin's decision to force contributions upon union members and has continued to ratify that conduct since that unlawful plan was first approved by the GEB.

31. Defendant Patricia M. ("Patty") Waggoner is the wife of Defendant William Waggoner and a Senior Vice President of Amalgamated Bank.

32. Defendant Bert Tolbert is the Administrator of the Southern California Training Trust and the Southern Nevada Training Trust.

33. Defendant Mickey J. Adams is and/or was a Trustee of the Local 12 Health & Welfare Trust, the Local 12 Pension Fund, and the Local 12 Operating Engineers Training Trust. Defendant Adams is the President of Local 12.

34. Defendant Ron Sikorski is and/or was a Trustee of the Local 12 Health & Welfare Trust, the Local 12 Pension Fund, and the Local 12 Operating Engineers Training Trust. Defendant Sikorski is the Vice President of Local 12.

35. Defendant Dan Billy is and/or was a Trustee of the Local 12 Health & Welfare Trust and the Local 12 Pension Fund.

36. Defendant Dan Hawn is and/or was a Trustee of the Local 12 Health & Welfare Trust, the Local 12 Pension Fund, and the Local 12 Operating Engineers Training Trust. Defendant Hawn is the Financial Secretary of Local 12.

**SECOND AMENDED CLASS ACTION COMPLAINT**

37. Defendant Larry Davidson is and/or was a Trustee of the Local 12 Health & Welfare Trust, the Local 12 Pension Fund, and the Local 12 Operating Engineers Training Trust.  Defendant Davidson is the Treasurer of Local 12.

38. Defendant C. W. Poss is and/or was a Trustee of the Local 12 Health & Welfare Trust, the Local 12 Pension Fund, and the Local 12 Operating Engineers Training Trust.   Mr. Poss, on information and belief, is now mentally incompetent; however, notwithstanding ERISA rules and in violation of his fiduciary duties, he remains a Trustee of certain Trusts and regularly "votes" to support the positions of William Waggoner, in exchange for which he and his family receive expensive paid vacations, funded by Local 12 trust(s), each year.

39. Defendant Walt Elliot is and/or was a Trustee of the Local 12 Health & Welfare Trust and the Local 12 Pension Fund.

40. Defendant Michael Crawford is and/or was a Trustee of the Local 12 Health & Welfare Trust and the Local 12 Pension Fund.

41. Defendant Bruce Cooksey is and/or was a Trustee of the Local 12 Health & Welfare Trust.

42. Defendant Mike Prlich is and/or was a Trustee of the Local 12 Pension Fund.

43. Defendant Don Bourguignon is and/or was a Trustee of the Local 12 Operating Engineers Training Trust (sometimes referred to as "OETT").

44. Defendant Kenneth Bourguignon is a Trustee of the Local 12 OETT the CEO of OEFI/Southern California Labor Management Operating Engineers Contract Compliance Trust Fund and the Secretary-Treasurer of the Local 12 Pension Fund.

45. Defendant John Sawyer is and/or was a Trustee of the Local 12 Operating Engineers Training Trust.

SPIRO MOORE LLP

**SECOND AMENDED CLASS ACTION COMPLAINT**

46. Defendant Paul Von Berg is and/or was a Trustee of the Local 12 Operating Engineers Training Trust.

47. Defendant Jim Hulse is and/or was a Trustee of the Local 12 Operating Engineers Training Trust.

48. Defendant Mike Gomez is and/or was a Trustee of the Local 12 Operating Engineers Training Trust.

49. Defendant Operating Engineers Funds Inc. ("OEFI") is a non-profit corporation that administers the employee benefit programs for over 35,000 participants in Local 12's various benefit funds.

50. Defendant Kenneth D. Waggoner is and individual residing in Los Angeles County, California.  Kenneth D. Waggoner is the son of Patricia and William Waggoner.  Kenneth D. Waggoner is the Vice President, Client Services, in the Taft-Hartley Group of McMorgan & Company LLC ("McMorgan").

51. Defendant Invesco Advisers, Inc. manages assets held in various funds by OEFI.

52. Plaintiffs do not know the true names or capacities of the persons or entities sued herein as DOES 1-10, inclusive, and therefore sue said Defendants by such fictitious names.  Each of the DOE Defendants was in some manner legally responsible for the violations alleged herein.  Plaintiffs will amend this complaint to set forth the true names and capacities of these Defendants when they have been ascertained, together with appropriate charging allegations, as may be necessary.

53. At all times mentioned herein, the Defendants named as DOES 1-10, inclusive, and each of them, were residents of, doing business in, availed themselves of the jurisdiction of, and/or injured Plaintiffs and aggrieved employees in the State of California, among other locations.

54. At all times mentioned herein, each Defendant was the agent, servant, or employee of the other Defendants and in acting and omitting to act as alleged herein did so within the course and scope of that agency or employment.

SECOND AMENDED CLASS ACTION COMPLAINT

Defendants acted in concert or participation with each other, and/or aided and abetted one another, and/or were joint participants and collaborators in the acts complained of, and /or were the agents or employees of one another in doing the acts complained of herein, each and all of them acting or omitting to act within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together. Each Defendant was the co-conspirator, aider and abettor, agent, servant, employee, assignee and/or joint venturer of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the permission and consent of each of the other Defendants.

55. The term "Defendants" as used herein includes DOES 1-10.

## IV.   FACTS COMMON TO ALL COUNTS

### A.   About the IUOE

56. The IUOE is a trade union that primarily represents operating engineers, who work as heavy equipment operators, mechanics, and surveyors in the construction industry, and stationary engineers, who work in operations and maintenance in building and industrial complexes, and in the service industries. IUOE also represents nurses and other health industry workers, a significant number of public employees engaged in a wide variety of occupations, as well as a number of job classifications in the petrochemical industry.

57. Founded in 1896, IUOE today has approximately 400,000 members in 123 local unions throughout the United States and Canada. IUOE is the 10th largest union in the AFL-CIO.  Through much of its history, IUOE has been closely associated with criminal enterprises engaged in racketeering and related activities. In recent years, individuals in senior positions at various IOUE locals have been charged in criminal cases, including, for example:

SPIRO MOORE LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(a)   John L. Dorrier, former business agent of Operating Engineers Local 66, who was sentenced to 12 months imprisonment in 2003 after pleading guilty to charges of embezzlement, forgery, and interfering with the administration of Internal Revenue Laws.

(b)   James Roemer, former treasurer of the Operating Engineers Local 14, who was sentenced to 41 months imprisonment in 2003 and ordered to pay nearly $3 million in restitution and tax penalties after pleading guilty to several charges, including fraud, making and receiving unlawful union payments, tax evasion, and obstruction of justice.

(c)   Morris Diminno, former union representative of the Operating Engineers Local 14 who was sentenced to 70 months imprisonment in 2004 after pleading guilty to charges of fraud, unlawful labor payment, unlawful monetary transaction, and obstruction of justice.

(d)   Louis Moscatiello, organized crime associate who was sentenced to more than six years imprisonment in 2005 after pleading guilty to charges of racketeering, extortion, and conspiracy to commit union embezzlement.  Moscatiello admitted to using his influence over Operating Engineers Locals 14 and 15 to obtain preferential and no-show jobs for other organized crime associates.

(e)   Kenneth Campbell, former business manager of Operating Engineers Local 825 who was sentenced to 46 months imprisonment in 2009 after pleading guilty to embezzlement and taking bribes from contractors.

(f)     Andrew Merola, organized crime associated individual who was sentenced to 11 years in prison for numerous charges, including a charge of wire fraud involving a noshow job he had as a member of the Operating Engineers Local 825.

(g)     Leaders and members of the Operating Engineers Local 17 - 10 individuals in all - currently indicted on counts of racketeering and extortion involving vandalism and damage to machinery at non-union work sites.

58. The members of the GEB, at all times during their term of service, have both the constitutional authority and the fiduciary obligation to protect the members of IUOE.  At no time has any member of the GEB acted to curtail the illegal conduct of Waggoner and the other Local 12 officers and employees named as Defendants in this action.

59. The members of the GEB, at all times during their term of service, have, without exception, ratified the ongoing imposition of illegally-imposed political campaign contributions that were extracted from members.

60. The members of the GEB, at all times during their term of service, have, without exception, ratified the ongoing imposition of illegally-imposed political campaign contributions that were extracted from union employees and paid to the EPEC fund or President's Fund.

61. The members of the GEB, including the current members named herein, ratify acts of the GP on a regular basis.  When in session, the GEB acts for IUOE, so IUOE is liable for their acts.  When the GEB is not in session, the GP acts for the GEB, and, as a result, IUOE is liable for the acts of the GP by virtue of that agency and under the doctrine of respondeat superior.  When the GEB later ratifies the acts of the GP, the GEB members also assume responsibility for the acts of the GP.

62.

SECOND AMENDED CLASS ACTION COMPLAINT

SPIRO MOORE LLP

**B.**     <u>About IUOE Local 12 Employee Benefit Trusts</u>

63.     Local 12 established and maintains certain employee benefit plans for its members, including the Local 12 Health & Welfare Trust, the Local 12 Pension Fund, and the Local 12 Operating Engineers Training Trust ("OETT").

64.     Each of these trusts is an employee benefit plan under the Employee Retirement Income Security Act.

65.     Each trust is governed by a board of trustees. Half the trustees are representatives of employers who have signed collective bargaining agreements with Local 12. The remaining trustees are union officers appointed, in fact, by William Waggoner, who dominates and control the Trusts associated with Local 12.

66.     Each Board of Trustees is chaired by a selected member of the Board. The chairman position is often rotated amongst the Trustees.

67.     OEFI is a non-profit corporation that administers the employee benefit programs for the Local 12 trusts. Each of the trusts is supposed to pay only its pro rata share of the expenses incurred by OEFI.

68.     In addition, the OETT employs Local 12 members directly for the purpose of administration and training. Salaries, expenses, equipment, training, and other activities are paid directly from OETT assets.

**C.**     <u>IUOE Forced Plaintiffs and Class members Serving As Officers or Employees of Local 12 to Contribute to the President's Club/EPEC, a Political Action Fund, and a Second EPEC Fund Affecting a Substantial Number of the Members of Local 12</u>

69. Vince Giblin, as General President of IUOE, dramatically increased contributions to IUOE's Political Action Fund, the President's Club, previously known as EPEC. However, he did so by engaging in illegal conduct. Giblin required any officer of a local union to contribute to the President's Club. Officers, Directors, Coordinators, District Representatives, Business Agents and Organizers

were all told that if they wanted to serve in their positions, they had no choice but to contribute to the President's Club, in amounts up to $800 per year, calculated as one percent of $80,000, the salary cap for this contribution.  The contributions were accomplished through compulsory payroll deductions.  William Waggoner, the First Vice President of IUOE, assisted Giblin's forced-donation campaign by demanding contributions from his own Local's employees.  Waggoner sent out a memo to staff members (excluding clerical employees) informing them that they had to sign an authorization for payroll deductions for the mandatory President's Club contributions.  Plaintiffs Salas, Watson and Paxin, among other employees of Local 12 and its affiliated entities, were required to pay and did in fact pay mandatory contributions to the President's Club.  Forcing a contribution in connection with an implied threat to ongoing employment is a Hobbs Act violation.  Each employee that was compelled to contribute suffered an independent Hobbs Act violation.

70. All other IUOE Local unions were similarly required to contribute, on a mandatory basis, to the President's Club Political Action Fund.  The annual contribution to the President's Club Fund from the employees and officers of all Local unions is estimated to exceed $2.5 million per year.  In 2012, the total contributions to the fund were $3,023,901.12.  A small portion of those contributions were additional contributions from other members, but the vast portion consists of mandatory contributions from officers and employees of Locals around the country.  The FEC Committee ID for the Fund is C00029504.

71. The mandatory nature of the contributions was part of IUOE's and Giblin's desire to elevate the stature of IUOE as a political force through aggressive donations to political candidates.  These contributions are used, in part, to shield IUOE from the full intensity of regulatory scrutiny.  IUOE's average expenditures doubled in 2006 and reached an unprecedented level in 2012:

SPIRO MOORE LLP

1

2

3

4

5

6

7

8

9

10

11

12

13



SPIRO MOORE LLP

14    72. Rather than "soliciting" contributions from members, IUOE, in violation

15  of the Federal Election Campaign Act and Federal Election Commission rules,

16  mandated that officers and employees contribute to the President's Club/EPEC, in

17  the amount of 1% of compensation, up to 1% of $80,000.  As noted above,

18  Plaintiffs Salas, Watson and Paxin, among other Local 12 employees, were forced

19  to contribute to this fund under threat of loss of their jobs.  Contribution forms are

20  included as part of the new-hire paperwork.  Individuals are first encouraged to

21  complete the authorization paperwork.  When mere encouragement fails, hardball

22  tactics are applied, and the resisting individual is told that they must contribute if

23  they want to keep their job.  Threats to employment to obtain contributions

24  constitute a type of embezzlement that also amounts to a violation of the Hobbs Act

25  each time it occurs.

26    73. In 2008, after already pressing for increased contributions from officers

27  and employees, Giblin and International implemented a plan to circumvent union

28  member consent and collect a five-cent per hour political contribution directly from

SECOND AMENDED CLASS ACTION COMPLAINT

employers, through collective bargaining agreements. The local unions were directed to negotiate this provision and then supply employers with check-off lists of union members from whom the contributions would be automatically deducted from their paychecks, even though the union members were often unaware that this was occurring and had not consented to it. At the 2008 IOUE General Convention, IUOE resolved, in Resolution 12, that:

> NOW THEREFORE. BE IT RESOLVED that each IUOE local union make it a top priority to negotiate at least a five-cents per hour check-off in all collective bargaining agreements for the purpose or raising voluntary political contributions;
>
> BE IT FURTHER RESOLVED that it is mandatory that the International negotiate at least a five-cents per hour check-off in all national collective bargaining agreements for the purpose or raising voluntary political contributions;

However, this practice was already underway in IUOE, and the IUOE Board merely ratified this illegal practice that Giblin had already instituted after assuming the General Presidency in and around 2005, between the conventions that occur once every five years. The end result was that members around the country were forced into political contribution schemes without voluntarily consenting to participation. The results of this illegal behavior speak for themselves, as IUOE's political collections and expenditures skyrocketed under Giblin's control. In the 37th Convention Program, Giblin boasted about the results of his unlawful political contribution collection schemes when he wrote:

> Also, the IUOE today ranks near the top of national lists as one of the most active union political players in terms of influence and voluntary contributions. Considering that three years ago we couldn't be found on anyone's political list, this is a very noteworthy accomplishment – and one we have every intention of continuing to improve on as we move forward.

What is implausible about this claim is the characterization of contributions as "voluntary." At that same convention, contributions from members were mandated

to be included in collective bargaining agreements, and officers and employees of locals around the country experienced coercive pressure, rising to the level of extortion, to contribute upon threat of job loss, eliminating any pretense of choice. Financial threats of economic harm and retaliation, in violation of the Hobbs Act, among other laws, were used, at the direction of IUOE and Giblin, to obtain the dramatically increased contribution levels about which Giblin boasted.  On information and belief, the practice of collecting mandatory contributions continues under the present IUOE administration that includes IUOE itself, GP Callahan and the current GEB.

74. Waggoner, fully in agreement with Giblin's "mandatory" "voluntary" donation extortion scheme, required that all collective bargaining agreements negotiated by Local 12 should include a similar five cent per hour contribution to the EPEC fund.

## D. **Waggoner Forced Watson, Salas and Other Employees of Local 12 and Its Related Entities, including OEFI, to Contribute to His Re-election Fund**

75. The OETT is managed by a group of six purportedly independent Trustees; however, the independence is a sham.  Three Trustees work for Waggoner as union representatives on the Board.  Three other Trustees represent contractors from the management side.  Waggoner ensures that at least one management-side Trustee will always vote in the manner that Waggoner directs. Thus, since Waggoner always has the three union-side Trustees who do his bidding, Waggoner controls a majority of the six OETT trustee votes at all times.  One way that Waggoner accomplishes this control is through the inclusion of Trustees that are no longer capable of understanding the materials presented to Trustees as a result of physical infirmity.  Another way that Waggoner accomplishes this control is by providing gifts from the Trusts to management-side Trustees, such as

SPIRO MOORE LLP

1  expensive vacation travel, where luxury resorts and airfare are covered by the Trust

2  and concealed as travel for "educational".

3     76. Albin "Skip" Watson became the Curriculum Coordinator of the OETT in

4  and around November 1997.  When Watson became the Curriculum Coordinator,

5  he was given a monthly expense check, in the amount of $550 per month.  The

6  monthly expense payment was made to all OETT instructors. The money came

7  from OETT assets. Mr. Watson asked if he was required to submit receipts or

8  document the expenses incurred. He was told no. Neither the OETT Board nor the

9  OETT Administrator made any attempt to verify that expenditures from the $550 a

10  month expense checks were for the benefit of the OETT.

11     77. After Mr. Watson had been in that position for about two years, the

12  Administrator called him into his office and reprimanded Watson for failing to

13  contribute to the "BA's Fund" (i.e., the Business Agents' Fund, formerly referred

14  to internally as the "slush fund").  Watson had no idea what the Administrator was

15  talking about.  The Administrator explained that anyone who received a monthly

16  expense check was expected to contribute $50 a month to the "BA's Fund."  The

17  "BA's Fund," as discussed below, was directly for the benefit of Waggoner.

18     78.  The Administrator made it clear to Watson that the contribution was not

19  viewed as voluntary.  While the Administrator excused Watson for his lack of

20  contributions in the past, Watson was told to begin contributions immediately.

21  When Watson later asked what the money was for, a business agent explained to

22  him that it was for the "Bill Waggoner Re-Election Fund."  That business agent

23  told Watson that the money went to Pasadena and was given to Waggoner's

24  secretary, which confirmed that Waggoner intended all along to embezzle from the

25  OETT fund, using employees controlled by threat of termination to siphon those

26  funds.  The form 5500 filing for OETT was falsified by Waggoner and the other

27  Trustees, who falsely certified that the entire $550 was an expense reimbursement

28  to employees of OETT, when $50 was, in truth, added at Waggoner's direction to

SPIRO MOORE LLP

permit his election fund embezzlement scheme.  Thus, $600 was received from each employee per year as an untaxed transfer of assets ($50 per month, equal to $600 per year).

79. When employees asked if they could pay their mandatory BA's Fund contribution by check, they were told, "No. This fund does not exist. Cash only." Both Plaintiffs Watson and Salas were forced to contribute to the BA's Fund.  The insistence upon cash payments further confirms that Waggoner and OETT Administrator Tolbert were aware of the unlawful nature of this contribution demand.

80. Cash payments from Local 12 employees were eventually delivered, either directly or through District Representatives, to Patricia Harvey, Waggoner's secretary.  Patricia Harvey issued receipts to District Representatives or Coordinators for the cash payments they delivered to her.  So long as Local 12 has not already shredded those receipts as it has done with other documents since the filing of this lawsuit, those receipts will further confirm the existence of this additional, mandatory contribution scheme.  California Penal Code section 135 states:  Every person who, knowing that any book, paper, record, instrument in writing, or other matter or thing, is about to be produced in evidence upon any trial, inquiry, or investigation whatever, authorized by law, willfully destroys or conceals the same, with intent thereby to prevent it from being produced, is guilty of a misdemeanor."  The destruction of documents at Local 12 constitutes criminal conduct.

81. Payments collected by Patricia Harvey were turned over to Karen Ragin-Best for deposit.  Two-thirds of the $50 payments went towards the Bill Waggoner Re-Election Fund, and one-third remained in the BA's Fund.  Karen Ragin-Best and Mickey Adams were both signatories to the Bill Waggoner Re-Election Fund. When any banking transactions occurred, both Karen Ragin-Best and Mickey

Adams were required to be present, though Ron Sikorski was an alternate signatory if one of the other two was not available.

82. Local 12 office employees Susan Holmes, Karen Ragin-Best and Patricia Harvey were rewarded with a $400 per month car allowance, despite the fact that they never drove their personal vehicles on union business.  Instead, the car allowance was a reward for loyalty to Waggoner, including loyalty in administration of the illegal Bill Waggoner Re-Election Fund and the BA's Fund, which were funded with extorted monies.

83. In addition, Defendant IUOE, through its General President and GEB, required all union employees, including Plaintiffs, to contribute to its political action fund, the President's Club, aka EPEC.  Employees were required to contribute money as a condition of their employment, in violation of the law.   This constituted extortion.  Defendant Waggoner enforced the requirement in Local 12.

84. All Plaintiffs, other than Melvin Chamberlain, were compelled to contribute to the BA's Fund, discussed herein, at the risk of losing their jobs.   All Plaintiffs were compelled to the IUOE President's Club, aka EPEC, which, in June 2013, gave $900,000 to members of Congress.

**E.** **Assets Were Diverted or Embezzled from Local 12 and IUOE Accounts or Trust Accounts Created for the Benefit of Union Members**

**1.** **Some Defendants Embezzled Physical Property Purchased By Local 12 or Its Many Associated Trusts**

85. One OETT site purchased a semi trailer.  The semi trailer was gutted and apprenticeship staff turned it into a mobile barbeque facility.  It is capable of producing enough food to feed tens of thousands of individuals.  Defendant William Waggoner took the converted semi trailer and parked it in his own

backyard.  Waggoner leases the trailer back to Local 12, retaining the revenue for himself and his wife, when Local 12 wants to use it for a Local 12 barbeque or other Local 12 sponsored event.

86. During the last several years, the Southern California Training Trust("OETT"), a Taft-Hartley fund established to provide member training services to the Local 12 members in California, has purchased equipment initially identified as purchased for OETT.[1]  However, the equipment would then be deleted from the Southern California Training Trust inventory, and transferred to the Southern Nevada Training Trust, without compensation from the Southern Nevada Training Trust to the Southern California Training Trust.

87. Southern California Training Trust training personnel and equipment were used to transfer equipment from the Southern California Training Trust to the Southern Nevada Training Trust.  Southern California Training Trust personnel, including Peter Majich, an employee of the Southern California Training Trust, applied for and received DOT permits to transfer "wide load" equipment.  Peter Majich operated the lead vehicle during the transport of large construction equipment to the Southern Nevada Training Trust.  When equipment is deleted from the Southern California Training Trust inventory, it is not returned to the Southern California Training Trust.  However, some equipment also has been "loaned" from the Southern California Training Trust to the Southern Nevada Training Trust for periods of time including one month to many years.  In these cases, fair market rental value has not been paid by the Southern Nevada Training Trust to the Southern California Training Trust.  Plaintiffs, who paid contributions

---

[1] Local 12 creates some confusion with nomenclature in that it refers to both the Southern California Training Trust and the Southern Nevada Training Trust as "OETT."  The main location in Southern California is often called OETT Whittier.  However, these two Taft-Hartley trust funds are distinct legal entities, though the management employees co-mingled assets of the two trusts and treated them, at times, as though they were a single entity.  This reckless disregard for fund separateness places the status of both funds at risk under IRS regulations.

SPIRO MOORE LLP

SPIRO MOORE LLP

1   into the Trust, were injured when assets were embezzled from those Trust funds

2   and when fair rental rates were not paid for the extended use of those equipment

3   pieces.

4      88. Employees of the Southern California Training Trust create the

5   curriculum, testing, interview applicants and actually instruct and/or teach

6   apprentices in Southern Nevada.  However, the Southern Nevada Training Trust

7   does not repay the Southern California Training Trust for the use of its employees

8   that remain at all times on the Southern California Training Trust payroll.  The

9   Southern Nevada Training Trust also fails to share in the cost of benefits provided

10   to instructors on the payroll of the Southern California Training Trust.  Jim Leslie,

11   Skip Watson, and Dave Barton were sent to Southern Nevada to provide trainings

12   at that Trust, but the Southern Nevada Training Trust did not pay for their time or

13   training materials.  During testing, proctors would be sent from Southern California

14   to Southern Nevada, but, again, the Southern Nevada Training Trust did not pay for

15   the Southern California Training Trust staff time.  Lee Landers and Ron Havlick of

16   the Southern California Training Trust also were sent to provide services to the

17   Southern Nevada Training Trust, but the value of their services was not reimbursed.

18   Handbooks were printed and shipped to the Southern Nevada Training Trust from

19   Southern California, at Southern California's expense.

20      89. Defendant Bert Tolbert is the Administrator for both the Southern

21   California Training Trust and the Southern Nevada Training Trust.  But Tolbert

22   remained at all times exclusively on the Southern California Training Trust payroll.

23   No compensation for Tolbert is listed on the Southern Nevada Training Trust's

24   DOL 5500 filings or IRS form 990.  The total value of Tolbert's compensation

25   package is approximately $200,000 per year, including salary and benefits.  Tolbert

26   also is allowed to participate in the General Pension Plan, but he should not be

27   permitted to do so, since his participation in that Plan would occur exclusively by

28   means of employment by the Southern Nevada Training Trust, which, based on the

relevant records, does not appear to employ him.  Instead, Tolbert and Waggoner conspired to improperly include Tolbert in the General Pension Plan, injuring Plaintiffs Watson, Paxin and Chamberlain by discriminatory non-inclusion. Tolbert's pension benefit has been embezzled from the Southern California's OETT.  Tolbert's participation violated the "all or none" provision imposed by IRS regulations and the General Pension Plan rules.  Tolbert was included illegally, so now every other employee of Southern California's OETT must be included or the plan is at risk of revocation under IRS regulations.  Plaintiffs Watson, Paxin and Chamberlain, and the other class member employees of Southern California's OETT were and are injured by non-inclusion in the General Pension Plan.

90. Defendant Bert Tolbert also placed his granddaughter Jodi McMullen on the Southern California Training Trust payroll in order to provide her with health care through the Health & Welfare Fund.  Ms. McMullen, about 25 years old at the time, had been addicted to prescription drugs and alcohol which destroyed her liver.  She was on the liver donor list and received a liver at the expense of the Trust.  Ms. McMullen did almost no work while she was on the payroll. She would spend a lot of her time printing out pictures of animals, going through several color printer cartridges in a week, or drawing with crayons.   Tolbert violated his fiduciary duties as a Taft-Hartley fund administrator by hiring a relative who did little if no work in order to allow her to obtain an expensive medical procedure at the expense of the Trust.

91. Bills for the Southern Nevada Training Trust are received by the Southern California Training Trust.  Defendant Tolbert reviews those bills.  Tolbert then approves those bills for payment and sends them to office staff to process and pay. There is no system in place between the training centers in California and Nevada to bill the Southern Nevada Training Trust for services provided by the Southern California Training Trust.  In substance, two separate Trusts are operated out of a single office, without fair allocation of the expenses and overhead between the

SPIRO MOORE LLP

Trusts.  Bills were sent from Southern Nevada to Southern California on an almost weekly basis, and paid by Southern California, to the financial detriment of the Southern California Training Trust and its beneficiaries, whose trust funds are wrongly diminished in this fashion.

92. Vehicles owned by Local 12 or the Southern California Training Trust training center that were scheduled to be sold at auction after their useful life were often pulled from sale and purchased by Administrators, Board Members, Officers and upper management of Local 12, including line officers, at a sub-market rate price from the auction house.  The vehicles were then restored by staff members at the Southern California Training Trust Whittier training center (aka "OETT Whittier").  All replaced parts for such vehicles were charged to other equipment numbers.  The time required for OETT Whittier staff members to restore the vehicles was not paid to the Southern California Training Trust.  The restored vehicle's ownership would then be transferred to the union staff member who purchased the vehicle at the sub-market rate.  Administrators, Board Members, Officers and upper management of Local 12, including line officers, have taken advantage of this scheme, thereby embezzling funds from the Southern California Training Trust.  Many of those same individuals receive free service on their personal vehicles at OETT Whittier, constituting further embezzlement of union resources.  For example, Bert Tolbert's brother-in-law received a full restoration on a Dodge Stakebed pick up.  Bert Tolbert also had personal riding lawnmowers repaired by staff at OETT Whittier.  Bert Tolbert would also dispatch OETT Whitter vehicles to pick up and then repair equipment or vehicles owned by Administrators, Officers, Board Members, or upper management employees.

93. Union leaders, including Waggoner, also store personal vehicles at the OETT Whittier training center without paying fair rental compensation for use of the space, thus providing value to such union officers that they are not entitled to receive.  For example, Waggoner stores a vintage Cadillac at the OETT Whittier

1   training center.  Special devices were constructed – without cost to Waggoner, but
2   rather at the expense of the OETT – to allow OETT Whittier staff to move
3   Waggoner's vehicle when they require access to the bay space it occupies.

4   94. Employees of OETT were dispatched to repair or service Mickey Adams'
5   boat, which was docked at a river.  Mickey Adams embezzled the staff time, OETT
6   vehicle usage, fuel costs, and parts for the repair of his boat.  In at least one
7   instance, Pete Majich was dispatched to provide repair services for Mickey Adams'
8   boat.  The parts were purchased by OETT and reported as operating costs on the
9   5500 forms filed for OETT.  5500 forms are transmitted by wire to the DOL.  The
10  false filings in this instance and in all instances alleged herein, constitute wire
11  fraud, since the false filings were in furtherance of and to conceal asset
12  embezzlement schemes.

13  95. In short, those individuals receiving these embezzled benefits, including
14  individuals who were Defendants Officers of Local 12, senior management
15  Defendants for Local 12 and affiliated OEFI, and the OETT Trustees, as "parties in
16  interest" to the Trust, received fund assets that were neither reasonable nor
17  necessary to OETT operation and administration.

18  96. Trustees of OETT (Southern California) and OETT (Southern Nevada), as
19  well as Bert Tolbert and the officers of Local 12, actively concealed the misuse of
20  OETT assets from the members, who were not reasonably able to discovery the
21  embezzlement and related criminal activity until 2012.

22  97. As of about November or December 2012, during the pendency of this
23  litigation, records were being destroyed at the OETT Whittier training center by
24  staff.  The records being destroyed are more recent records, rather than the very old
25  files that date back to the 1970's.

26
27
28

SPIRO MOORE LLP

**2.** **Defendants William Waggoner, Patty Waggoner, Kenneth Waggoner, Mickey Adams, Ron Sikorski, Larry Davidson, Dan Hawn, and Others Used Local 12's Aircraft for Their Personal Use, Embezzled Revenues Generated by Those Aircraft, and Falsified Many Years of LM-2 Filings to Conceal Activities, Costs, and Asset Values**

98. At least as early as 2000, Local 12 owned a Beechcraft Super King Twin Turbo Prop airplane, FAA Aircraft N44KA.  Local 12 did not report the value of this aircraft on Line 7 of Schedule 5 attached to Local 12's 2000 Form LM-2 Labor Organization Annual Report ("LM-2").  However, in the same LM-2 filing, Nickolas Bruce Timpe is listed in Schedule 10 ("Disbursements to Employees") as a "pilot" employed by Local 12 in 2000.  William Waggoner is listed as the addressee for any mailings associated with the LM-2.

99. The FAA listed Aircraft N44KA as a model number B200 turbo prop, SN BB-1711, manufactured by Raytheon Aircraft Co.   Raytheon model B200 is commonly referred to as a Beechcraft Super King Air.

100.   Waggoner and Local 12 also failed to report this aircraft on the 2001 LM-2.  But, as before, Nickolas Bruce Timpe is listed in Schedule 10 ("Disbursements to Employees") as a "pilot" employed by Local 12.  The 2001 LM-2 also appears to omit the aircraft's costs and expenses, other than the pilot salary, though, based on a 2004 filing by Local 12, it is clear that Local 12 claimed to have a Beechcraft Super King Air aircraft registered with the FAA as N44KA.

101.   In 2002, Local 12 borrowed $4,000,000 from the Work Preservation Fund (but did not report the loan on the Fund's 5500 filing), on a note allegedly issued on June 1, 2002, to mature on June 1, 2015, with stated payments of $25,000 per month.  The claimed purposed of the loan was to serve as the down payment on a "new aircraft."  In addition to that loan, the 2002 LM-2 also lists a loan from Amalgamated Bank of New York, in the original amount of $3,352,125.00, at an

interest rate of 4.25%.  The loan's note date is June 30, 2002, with a maturity date of July 1, 2003, but no payments were reported on the LM-2 filing for 2002.  In 2002, Nickolas Bruce Timpe is listed in Schedule 10 ("Disbursements to Employees") as a "pilot" employed by Local 12.  Allen Wayne Morisset is listed on that same Schedule as a "Business Agent" in 2002, but he is later listed as a pilot in 2003.  The purpose of this misclassification of employees was to conceal the true cost of operating the Local 12 aircraft from members any anyone examining the LM-2 filing by Local 12.

102.    In 2002, Local 12 purchased a 2001 Cessna Citation XL, with registration number N705SG.  The reported value of the Cessna in 2002 was $8,644,396.00.  The value reported is false, because the Cessna, though claimed by Waggoner to be new, was actually previously owned, which diminished its actual value.  The nine-passenger cabin was appointed with, among other things, leather seats, a couch, a lavatory, walnut trim, 110-volt electrical outlets, 4 writing tables, and a wine caddy.  The plane is pictured below:



**SECOND AMENDED CLASS ACTION COMPLAINT**

1

2    Waggoner convinced the Executive Board to approve the purchase as an investment

3    because, as promised by Waggoner, the "new" Cessna jet would be leased,

4    generating income, at least 51% of the time, when, in fact, Local 12 never reported

5    lease income.

6    103.    In 2003, Waggoner and Local 12 failed to report either the Beechcraft

7    or the Cessna aircraft on the 2003 LM-2.  But aircraft sales tax was reported for the

8    purchase of the newer aircraft, in the amount of $705,375.  The loan from the Work

9    Preservation Fund was listed as receiving timely payments.  However, no payments

10   were made on the Amalgamated loan for the reporting period of 2003.  Despite no

11   reported payments on the Amalgamated loan, Amalgamated Bank of NY loaned an

12   additional $1,000,000.00 to Local 12.  In 2003, Nickolas Bruce Timpe and Allen

13   Wayne Morisset were listed in Schedule 10 ("Disbursements to Employees") as a

14   "pilots" employed by Local 12.  Christopher Gables is reported on staff as

15   "clerical" in 2003, but he later is listed as a "pilot" in 2004.

16   104.    In the 2004 LM-2 filing, an aircraft with tail number N44KA, the

17   Beechcraft Super King Air twin turbo prop, was reported as sold for $1,705,000.00.

18   The 2004 LM-2 reported an initial cost $6,422,438.00; however, the IRS 990 filing

19   for the same year reports the initial cost as $3,122,437.50 excluding a newly

20   purchased engine.  Local 12 also reported purchasing an engine for the turbo prop

21   aircraft for $300,000.00 during the 2004 reporting period.  The loan from the Work

22   Preservation Fund was listed as receiving timely payments.  However, no payments

23   were made on the Amalgamated loan for the reporting period of 2004.  In 2004,

24   Nickolas Bruce Timpe and Christopher Gables are listed in Schedule 10

25   ("Disbursements to Employees") as a "pilots" employed by Local 12.  The 2004

26   LM-2 does not appear to reflect either aircraft's operating costs and expenses, other

27   than the pilot salaries.

28

**SECOND AMENDED CLASS ACTION COMPLAINT**

105.    In the 2005 LM-2 report, more information was suddenly reported about the aircraft.  Pilot salaries of $140,024.00, and total disbursements to pilots of $176,666.00 were reported.  Transactions involving aircraft were reported in General Overhead, in amounts of $92,721, $35,550, $93,633, totalling $221,904.00.  The Amalgamated Bank loan was repaid in full, without any apparent interest.  The Amalgamated Bank loan was, in truth, a reverse kickback designed to obligate Local 12 to continue doing business with Amalgamated Bank despite the latter's deteriorating financial condition.

106.    In the 2006 LM-2 report, even more information was suddenly reported about the remaining aircraft, the Cessna jet.  Pilot salaries of $123,376.00, and total disbursements to pilots of $161,337.00 were reported.  Transactions involving aircraft were reported in General Overhead, in amounts of $63,373, $31,550, $551,964, $138,615, $65,232, $ 37,084, totalling $887,818.00.  The total transactions for *one* aircraft exceeded $1 million.  Prior to 2005, there were two aircraft maintained at some point; i.e. a Beechcraft Super Sky King and the Cessna.  Earlier LM-2 reporting does not seem to reflect one or both aircraft's operating cost and/or expenses other than the pilot salary expense.

107.    In the 2007 LM-2 report, pilot salaries of $156,370.00 and total disbursements to pilots of $186,811.00 were reported.  Transactions involving aircraft were reported in General Overhead, in amounts of $40,835, $136,464, $59,829, $36,138, $149,331, $ 5337, $49,119, $18,700, $204,034, totalling $699,787.00.

108.    In 2009, the Cessna, with registration number N705SG, was advertised for lease, at $3,325.00 per hour.  No lease proceeds are reported in any LM-2 filing by Local 12.  The agent handling lease arrangements was Guardian Air, owned by James Previti.

SECOND AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

S PIRO M OORE LLP

109.   In the 2010 LM-2 filing, the value of the Cessna is not reported or not accurately reported.  The total value of reported "other fixed assets" is $11,342.00, far below the value of the Cessna.

110.   In 2010, the Cessna, with registration number N705SG, was advertised for lease.  To Plaintiffs' knowledge, however, no lease proceeds are reported in any LM-2 filing by Local 12.

111.   In the 2011 LM-2 filing, the value of the Cessna is not reported or not accurately reported.  The total value of reported "other fixed assets" is $22,560.00, far below the value of the Cessna.

112.   In 2012, the Cessna, with registration number N705SG, was advertised for lease at a rate of $3,325 per hour, through the Guardian Jet Center.  However, since the filing of this action, the listing on Guardian's website has vanished.

113.   Union officers, who frequently travelled in the Local 12 aircraft, would sometimes take commercial flights "just to make it look good".   The locations where this aircraft flew and does fly are adequately serviced by most commercial carriers.

114.   Vince Giblin utilized the Cessna on multiple occasions without compensating Local 12 for the rental time and expense of operating the plane.

115.   On March 3, 2012, LeAnn Goff married Kenneth D. Waggoner.  Goff is the daughter of Vice President Carl Goff of Local 3.  While it was originally believed, based on the circumstances of the timing, that Waggoner attended that wedding in Sacramento using Local 12's Cessna, the Cessna, on that one occasion, was actually being serviced by Cessna.  However, there are numerous other instances where William Waggoner and/or Patricia Waggoner used the Cessna for personal travel.  For example, William Waggoner flew to Bakersfield to attend a Ray Price concert.  Local 12 paid for that excursion.  William Waggoner also used the Local 12 Cessna to attend rodeo and NASCAR events in Las Vegas.  The rodeo events were annual trips for Waggoner.  And the entire Waggoner family flew to

Las Vegas to attend the wedding of Margaret Hammond.  These trips were not reimbursed to Local 12, which had to pay the costs associated with the use of the Cessna.  Waggoner also used the Local 12 Cessna jet to fly to Bakersfield to attend the funeral of a member of Mickey Adams' family.

116.   Patricia Waggoner, wife of William Waggoner, used Local 12's Beechcraft and Cessna jet for her own personal travel.  For example, Patricia Waggoner would use the Local 12 Cessna to fly to Las Vegas for shopping trips.  She sometimes travelled with a representative of ProBiz Bank, Valerie Prince, who brokered a $10 million loan to Local 12's Health & Welfare Fund, and/or Dr. John Giddings.  Patricia Waggoner also used Local 12's Cessna Jet to go on shopping trips with Maritza Adams, Mickey Adams' wife.

117.   William Waggoner frequently used Local 12's Beechcraft to visit his brother, Geno in Lawrence, Kansas (not Branson, Missouri, as previously alleged).  On flights to the east coast or the midwest, Waggoner would stop over in Lawrence, Kansas to visit his brother and refuel the Cessna jet, despite higher fuel costs for refuelling there.

118.   Maritza Adams, defendant Mickey Adams' wife was frequently a guest on the Local 12 jet for the personal purpose of visiting her mother in Henderson, Nevada.

119.   Kenneth D. Waggoner, William Waggoner's son, was shuttled back and forth to college in Santa Clara on the Local 12 Cessna jet.  Local 12 was not reimbursed for this personal use of Local 12's property.

120.   In virtually every instance where William Waggoner used Local 12's Cessna, he would require the pilots to fly the Cessna jet from Ontario, California, where it was stored, to Van Nuys, California, because it was slightly closer to his home than the Ontario airport and the traffic was better.  Each of these short hops, requiring an extra landing and takeoff, cost Local 12 roughly $2,000 in additional

SPIRO MOORE LLP

charges.  These additional charges are an abuse by fiduciaries to the union and amount to embezzlement of union funds for personal benefit.

121.    In sum, Defendants William Waggoner, Patty Waggoner, Kenneth Waggoner, Mickey Adams, Ron Sikorski, Larry Davidson, Dan Hawn, and others used Local 12's aircraft purchased by Local 12 for their personal use, embezzled revenues generated by those aircraft, and falsified many years of LM-2 filings to conceal activities, and costs, and asset values from discovery by members.

### 3.  William Waggoner Provided Politicians With Transportation on the Local 12 Jet, But that In-Kind Contribution Was Frequently Not Paid for or Reported

122.    Approximately one-third of Local 12's members are "agency fee" members, who include all public employees who are members of Local 12. Agency fee members must be given the choice to decline political contributions. Waggoner, without consent or approval of the membership, gave use of Local 12's Cessna Jet to Local 12's Political Action Fund.  The Political Action Fund, in turn, made in-kind contributions of Jet flight time to individuals running for elected office or to politicians promoting matters of interest to Local 12.  Because the Political Action Fund failed to compensate Local 12 for use of Local 12's Cessna Jet, the in-kind contributions amounted to forced political contributions, and agency fee members were precluded from opting out of partisan union political spending or other activity.

123.    It is well known within the IUOE that Hilda Solis' congressional election campaign was heavily funded by the Operating Engineers and other unions.  In fact, during her time in Congress (2001-09), she received more than $900,000 in contributions from unions (not including the in-kind contributions discussed below).  She was flown to Washington D.C. for her swearing in on Local 12's Private Jet.  William Waggoner bragged openly that he was flying Hilda Solis

SPIRO MOORE LLP

back to Washington D.C. to be sworn in.  Vince Giblin responded to this boasting by declaring, "We finally have a friend in the Department of Labor."  Vince Giblin then chastised other Business Managers for failing to make similar investments in political candidates.  Giblin commended Waggoner, the First Vice President of IUOE, and James Sweeney, the Seventh Vice President and Business Manager of Local 150, for their heavy investments into political campaigns on both the state and national level.  Hilda Solis also flew on Local 12's Cessna jet while serving in Congress, though it appears that she failed to report the in-kind contributions from Local 12.  In late 2012, Waggoner flew Larry Hopkins and Ron Havlick to Washington D.C. to meet with Hilda Solis over a Local 12 problem involving the Department of Labor ("DOL") when Waggoner believed that some legal action was imminent.  An article discussing Hilda Solis' policy of protecting unions is attached as Exhibit "5", and there is little doubt about her close ties to Local 12, Waggoner, and IUOE as pictured below:

SECOND AMENDED CLASS ACTION COMPLAINT



Local 12 has backed Hilda Solis throughout her distinguished career, as she served in both the California State Assembly and Senate, and the US House of Representatives.

124.    And a comprehensive review of the 2008 election cycle data maintained by the Federal Election Commission, current through March 2013, shows no in-kind contributions from Local 12, whether in the form of Cessna jet time, or literature printing and postage provided by the Local 12 printing press operations for that election cycle.

125.    On information and belief, other politicians, including certain members of Congress, were also recipients of in-kind contributions consisting of uncompensated, undisclosed transportation on the Local 12 Cessna jet, sometimes as part of a detour trip when the Local 12 Cessna jet was in route for some other purpose.   Waggoner (who had the exclusive authority to direct the destinations of the Local 12 Cessna jet), though this deceit, embezzled from Local 12 for the benefit of Local 12's PAC, which was not paying for the Cessna jet time and expense associated with these in-kind contributions.

126.    In sum, William Waggoner provided politicians with embezzled transportation on the Local 12 jet, but that in-kind contribution was frequently not paid for or reported.  Officers of Local 12, including Mickey Adams, Ron Sikorski, Larry Davidson and Dan Hawn were aware of Waggoner's misuse of Local 12 assets, but did nothing to stop it and helped to conceal it from the members of Local 12.

> **4.      Defendants Waggoner, Sikorski, Adams, Davidson and Hawn Embezzled Revenue from Local 12's Printing Press Operations, Failing to Report Income on Any IRS Form 990 or LM-2 Forms, and Diverting Resources From Agency Fee Members Without Consent**

127.    Local 12 owns a large printing press.  Allied Printing Trades Council assigns numbers to printers to identify the source of any printing; Local 12's number from Allied Printing Trades Council is 212.

128.    Local 501 ordered 10,000 calendars annually from Waggoner and Local 12.  Local 501 paid either $1.25 or $1.50 for each calendar, resulting in orders of at least $12,500 in printing annually for Local 501. The income to Local 12 appears nowhere on either the Local 12 IRS 990s or the LM-2s for Local 12.

129.    An identical press operated by Local 3 reports income to Local 3 in excess of $250,000 per year.  With the same press and similar supporting staff, it is likely that Local 12 is receiving more than $250,000 in revenue per year for printing, but those revenues are not reported by Local 12, indicating that the funds are not accounted for in any filing by Local 12.  This is significant because Local 12 bears the cost of the press operation and its consumables.  Waggoner, by failing to report revenues and expenditures as required by law, embezzled from Local 12 for, among other things, the benefit of Local 12's PAC, which was not paying for the printing expenses.

SPIRO MOORE LLP

130.   As alleged above, approximately one-third of Local 12's members are agency fee members, who include all public employees who are members of Local 12.  Agency fee members must be given the choice to decline political contributions.  Waggoner, without consent or approval of the membership, authorized the purchase of printing press consumables from General Fund assets.  The printing performed for candidates was routed through the Political Action Fund, without compensation from the Political Action Fund.  The Political Action Fund, in turn, made in-kind contributions of printed materials to individuals running for elected office or campaigning on matters of interest to Local 12.  Because the Political Action Fund failed to compensate Local 12 for use of Local 12's printing press resources and materials, the in-kind contributions amounted to forced political contributions, and agency fee members were precluded from opting out of partisan union political spending or other activity.

131.   When politicians who received in-kind contributions failed to disclose them, and Local 12, at Waggoner's direction, failed to properly report them in all cases, members were precluded from detecting the misuse of union assets by Waggoner, which interfered with the members' exercise of Title II and Title V rights arising under the LMRDA (accurate reporting and fiduciary care by officers).

132.   In 2010, Local 12 provided campaign support to Senator Harry Reid's campaign in the form of ten full-time employees of Local 12 (business agents and organizers), rotated into Las Vegas on a weekly basis for roughly six weeks.  This effort was part of an IUOE program, manned by Jeff Fiedler (Director of Special Operations for IUOE), lobbyist Tim Cremins (Director of Education and Research for the IUOE California-Nevada Conference of Operating Engineers), Richard Pound, Richard Spencer, and Dennis Lundy (Western Regional Director for IUOE), to support Harry Reid.  In addition to providing manpower, Local 12 supplied printed campaign materials for Harry Reid's campaign.  The materials were printed on the Local 12 printing press, the material costs for the printing were paid by

SPIRO MOORE LLP

1    Local 12 (not the Political Action Fund), and then the materials were flown to Las

2    Vegas on Local 12's Cessna jet.  The ten-member Local 12 team, all paid out of

3    Local 12's payroll account, then distributed these printed materials for Harry

4    Reid's campaign effort.   Under Title V of the LMRDA, members were injured as

5    a result of embezzlement from Local 12, to the benefit of others, including the

6    Local 12 PAC.

7        133.   Defendants Sikorski, Adams, Hawn and Davidson were aware of the

8    embezzlement from Local 12, to the benefit of others, including the Local 12 PAC,

9    but they did nothing to stop it and helped to conceal the embezzlement from

10   members of Local 12.

11       134.   Since the initial filing of this lawsuit, Local 12 has attempted to hide

12   the widespread non-reporting by filing its own amended contribution reports.  The

13   problem with this concealment tactic is that there is no coordination with those

14   candidates who reported some contributions from a different contributing entity,

15   namely, the Political Action Fund.  Now Local 12 is in the position of having

16   recently amended its reports to claim that *it* donated in-kind contributions, when,

17   years ago, the candidate reported a contribution from the Political Action Fund.  As

18   to those politicians who never reported an in-kind contribution, at least Local 12's

19   suspiciously late amended reporting does not have to be reconciled with an

20   inconsistent filing by a politician.  Notably, Local 12 failed to amend reporting for

21   the in-kind contributions to Hilda Solis and Harry Reid.  These falsified filings

22   tolled members' obligation to bring suit under Titles II and V of the LMRDA.

23

24

25

26

27

28

**SECOND AMENDED CLASS ACTION COMPLAINT**

**5.     William Waggoner Engaged in Self-Dealing by Causing Local 12 to Hire Patty Waggoner's Company, Spacemaker Tenant Improvements, to Work on Local 12's Headquarters, OEFI-Owned Properties, and Other Property**

135.    Defendant Patricia Morrison ("Patty") Waggoner, the wife of William Waggoner, markets Taft-Hartley investments as a Senior Vice President at Amalgamated Bank of Pasadena, a division of Amalgamated Bank of New York. Patty Waggoner was also an officer of the contracting company, Spacemaker Tenant Improvements ("Spacemaker").  Spacemaker is a California licensed contractor.  According to the California State Contractor license Board, the holder of the Spacemaker contractor's license was Stanley W. Smith, and Patty Waggoner was Spacemaker's President.  Later, records show that Richard A. Marker, currently a lawyer at the Green & Marker law firm, was also an officer and may be the sole remaining officer.

136.    At least as far back as 1980, Patty Waggoner, through her contracting company Spacemaker, performed work on Local 12 facilities and facilities owned by Local 12's General Pension Fund.  Patty Waggoner is a member of Local 12.

137.    At all times relevant, Spacemaker had offices in buildings owned by Local 12's General Pension Fund, including 301 N. Lake Avenue, Pasadena, California 91101 and 3699 Wilshire Blvd., Los Angeles, California 90010.

138.    The contracting services provided by Spacemaker to Local 12 facilities and facilities owned by Local 12's General Pension Fund were not provided on the basis of arms-length bidding processes.  Rather, Spacemaker received those construction jobs simply by virtue of Patty Waggoner's marriage to William Waggoner.  Moreover, even had they used a bidding process, Spacemaker, due to the spousal relationship between the Waggoners, could not appropriately have performed that work.

**SECOND AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

139.   Plaintiffs and other members of Local 12 were harmed as a result of this self-dealing because William Waggoner prevented Local 12 and/or OEFI from demanding corrective action for the substandard work provided by Spacemaker. Instead, additional costs were incurred by Local 12 and its affiliated organizations to correct and repair the defective work done by Patty Waggoner's company.

140.   Patty Waggoner has also used her position as the wife of William Waggoner to market and obtain business for Amalgamated Bank.

141.   William Waggoner's LM-30 filing identifies Patricia Waggoner as the "First Vice President" of Amalgamated Bank (in fact, she is a Senior Vice President of Marketing & Sales, Western Region).  Her annual salary is listed as $141,057, but Waggoner states that there are no conflicts of interest.  Waggoner claims in the filing that the value of services provided to Local 12 or associated funds is "not readily available."  However, filings by Local 12 and William Waggoner never disclosed the conflicted relationship between William Waggoner and Patty Waggoner's company, Spacemaker.  Members, including Plaintiffs, were prevented from immediately discovering this improper arrangement due to the false and misleading filings by Waggoner or at Waggoner's behest.  These false filings violated the LMRDA and the resulting harm constitutes violations of ERISA's provisions barring self-dealing.

**6.   William Waggoner Diverted Assets From the Pension Fund to Prop Up Amalgamated Bank, Which Was the Investment Custodian of Other Funds Placed in Risky Investments**

142.   The Operating Engineers Pension Trust ("The Plan" or "The Local 12 Pension Fund") is a pension benefit plan established by the IUOE, Local 12 and participating employers through collective bargaining. It is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).  OEFI manages the Local 12 Pension Fund (though Invesco Advisers also appears to have

1    management power over some Local 12 Pension Fund assets by virtue of its

2    designation as the managing member of LLC's that serve effectively as holding

3    companies for various Local 12 Pension Fund real estate assets).

4         143.   The Local 12 Pension Fund is not capable of supporting the massive

5    graft and misuse of assets perpetrated by Waggoner and other Defendants.  In Local

6    12's own words, the funding status is "critical":

7         The Plan's actuary has determined that the Plan is considered to be in

8         critical status. The Plan is required to adopt a rehabilitation plan aimed

9         at restoring the financial health of the plan. Based on reasonable

10        assumptions, the Plan is expected to emerge from critical status by the

11        plan year beginning July 1, 2023. The Trustees recognize the

12        possibility that actual experience could be less favorable than the

13        reasonable assumptions. Therefore, the Trustees are establishing

14        annual standards to reflect possible actuarial losses and still keep the

15        Plan on target to emerge from critical status by the end of the

16        rehabilitation period.

17   *See*, Form 5500 filed with the DOL (year ending 2011), attached as Exhibit "8".

18        144.   On March 8, 2011, William Waggoner caused the borrowing of

19   $50,000,000 by Local 12 from Massachusetts Mutual Life Insurance Company,

20   secured by assets owned by Local 12's Pension Fund.  One such asset is held by

21   Vintage Park East, LLC.  Vintage Park East, LLC encumbered a number of real

22   properties held by Vintage Park East, LLC.  Attached hereto as Exhibit "7" is a true

23   and correct copy of that Deed of Trust.  However, one of the properties, a parcel

24   designated as APN 0238-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 is listed in the San Bernardino County

25   Clerk's records as owned by the San Bernardino County Flood Control District.

26   Page 102 of the 2011 Form 5500 filed with the DOL by the Local 12 Pension Fund

27   provides information about the terms of the Note, identified as Note 10, which

28   says:

SECOND AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SPIRO MOORE LLP

In March, 2011, the Fund obtained a loan, secured by Vintage Park East property located in Fontana, California. The terms of the note are as follows:

A note payable of $50,000,000, with an interest rate of 4.46% per annum. Interest only payments of $185,833 per month until the maturity date of April 1, 2018. On the maturity date any outstanding principal will be due.

*See*, 2011 Form 5500, Note 10.

145.   The $50,000,000 was subsequently deposited in Amalgamated Bank, which employs Patty Waggoner.  At the time, Amalgamated Bank was under heavy scrutiny by FDIC regulators because of its troubled financial condition.

146.   Prior to encumbering Local 12 Pension Fund assets, a representative of Invesco Advisers met with the Local 12 Pension Fund Board to discuss investing more heavily in securities and less heavily in real estate.  At that meeting and after, the Invesco Advisers representative failed to disclose to the members of the Board – the representatives of the interests of Plaintiffs and other pension fund beneficiaries -- that (1) one of Invesco Advisers' subsidiaries, WL Ross & Co. LLC, was considering an equity investment in Amalgamated Bank, (2) borrowing against real estate to put money into bank deposits or securities was not prudent investing, given the borrowing costs, (3) Invesco Advisers should have no part in the decision given the potential conflict created by its subsidiary's bank investing activities, and (4) Invesco Advisers, which managed investments for other unions invested in Amalgamated Bank, failed to disclose the conflict created by its incentive to protect Amalgamated Bank.  Invesco Advisers concealed material information that it had a duty to disclose.  Invesco Advisers was in a fiduciary relationship, as a manager of Local 12 Pension Fund assets, with the beneficiaries of the Local 12 Pension Fund, including Plaintiffs.  Invesco Advisers had exclusive knowledge of material facts not known to the beneficiaries, including information

about the activities of its subsidiary, WL Ross & Co. LLC.  An article describing the *modus operandi* of WL Ross & Co. LLC is attached hereto as Exhibit "6." Invesco Advisers actively concealed material facts from beneficiaries of the Local 12 Pension Fund, or, at minimum, Invesco Advisers made partial representations but also suppressed some material facts, including information about activities of WL Ross & Co. LLC.  Moreover, Invesco Advisers never came forward and disclosed the activities of WL Ross & Co. LLC or offered to recuse itself from further involvement in Local 12's Pension Fund at any later time.  Notably, Invesco Advisers was willing to see its client's money placed at risk in Amalgamated Bank before the FDIC allowed Amalgamated Bank to continue operations, but Invesco's subsidiary, WL Ross & Co. LLC, was unwilling to risk its own assets in Amalgamated until deposits from Local 12 shored up Amalgamated's balance sheet enough to escape further FDIC control.

147.    The fifty million dollars in loan funds were then deposited in Amalgamated Bank for the purpose of preventing the collapse of Amalgamated Bank.  Waggoner and property manager Wilbur L. Ross, principal of Invesco, and Ron Burkle, each deposited funds in Amalgamated Bank for the purposes of artificially providing adequate liquidity to Amalgamated Bank and/or securing their own equity positions in Amalgamated Bank.

148.    On August 31, 2011, a Consent Decree was issued by the FDIC.  The assets deposited by Waggoner in March 2011 helped Amalgamated survive the FDIC's audit and review as an autonomous entity.  Amalgamated remained barely viable, thanks in part to the infusion of assets from Local 12, and Ross was able to snap up 20% of Amalgamated's common stock.

149.    Local 12's Pension Fund is currently obligated as a result of the loan against real estate previously owned outright by the Fund to pay interest through to 2018.  In the 2011 LM-2 filing by Local 12's Pension Fund, the Fund listed an obligation of $50,000,000, at 4.46% per annum, and an interest expense of

$706,167 for less than a full year of interest.  $185,833 per month is the interest expense.  April 1, 2018 is the maturity date, at which time the full amount of principal is due. Members of Local 12 are paying $2,229,996 per year out of their General Pension Fund for the sole purpose of propping up the bank at which Patty Waggoner is a senior officer.   And, due to Amalgamated's weak financial condition, it is unclear whether the $50,000,000 will be available for withdrawal from Amalgamated upon demand.

150.   Local 12 also participates in a securities lending program with assets placed on deposit with Amalgamated Bank.  According to Local 12, in its 2011 Form 5500, the securities lending program operated with JP Morgan Chase through Amalgamated Bank does not carry any elevated investment risk:

The Plan participates in securities lending program with JP Morgan Chase, through Amalgamated Bank as investment custodian. Under this program, certain investment securities of the Plan are loaned to investment brokers for a fee. Securities so loaned are fully collateralized by cash and other investments. At June 30, 2011 and 2010, $9,115,893 and $38,437,344 respectively, of the Trust's securities were on loan under the JP Morgan securities lending program. Collateral provided by brokers is maintained at levels of at least 100% of the fair value of the securities on loan and is adjusted for market fluctuations. The Plan maintains effective control of the loaned securities with JP Morgan Chase through Amalgamated Bank as investment custodian during the term of the arrangement in that they may be recalled by the Plan at any time. Under the terms of the agreement, the borrower must return the same, or substantially the same, investments that were borrowed. The market value of collateral held for loaned securities is reported as collateral received under the securities lending program, and a corresponding obligation is reported

SPIRO MOORE LLP

1  for repayment of such collateral upon settlement of the lending

2  transaction. Income from the securities lending program was $90,860

3  and $77,755 for the years ended June 30, 2011 and 2010, respectively,

4  and is included in interest income in the statement of changes in net

5  assets available for benefits.

6  But JP Morgan itself has a different position regarding the risk in the program:

7  Securities Lending Risk - The Fund or the vehicles in which it

8  invests may participate in securities lending programs. The lending

9  fund bears the risk of investment loss associated with any reinvestment

10  of securities lending collateral held by the lending fund.

11  Risks Associated with Investing in an Investment Vehicle - The

12  Fund may itself invest in an investment vehicle, such as a private

13  investment or commingled fund. When it does so, the investing fund is

14  subject to the underlying risk of that investment vehicle's portfolio

15  securities.

16  Increase in Expenses Risk - The actual cost of investing may be

17  higher than the expenses listed in the expense table for a variety of

18  reasons, including termination of a voluntary fee waiver or losing

19  portfolio fee breakpoints if average net assets decrease. The risk of

20  expenses increasing because of a decrease in average net assets is

21  heightened when markets are volatile.

22  Not FDIC Insured Risk - The investment is not a deposit or

23  obligation of, or guaranteed or endorsed by, any bank and is not

24  insured by the Federal Deposit Insurance Corporation, the Federal

25  Reserve Board, or any other U.S. governmental agency.

26  Accounts of Affiliates of the Investment Manager - Affiliated

27  managers may trade in securities at the same time as the Fund and,

28  therefore, may potentially affect prices or available opportunities.

1   No Securities Registration - The Fund is exempt from

2   registration with the SEC. Units of the Fund are exempt from

3   registration with the SEC. Neither is registered with any state

4   securities regulator.

5   No CFTC Registration - The Fund is not registered as a

6   commodity pool with the CFTC because the Trustee is exempt from

7   having to register as a commodity pool operator under CFTC Rule 4.5.

8   The Local 12 Pension Fund, in critical condition, should not be invested in such a

9   reckless manner.  The Trustees of the Local 12 Pension Fund have breached their

10  fiduciary duties by investing fund assets in this risky investment program operated

11  through the bank in which Defendant Patty Wagoner is a senior officer.

12

13      **7.      William Waggoner Diverted Valuable Assets in the Form of**

14          **Room Space in the Washington Court Hotel and Authorized**

15          **Sub-Market Leases of Revenue-Generating Properties**

16      151.   The Local 12 Pension Fund owns several buildings, including the

17  Washington Court Hotel in Washington, D.C. The Harbaugh Hotel Management

18  Company, owned by George Harbaugh, manages day-to-day operations under a

19  lease agreement.  The hotel converted two rooms into an apartment.  The funds for

20  that conversion were misappropriated from the Furniture, Fixtures & Equipment

21  account ("FF&E"), which is comprised primarily of Local 12 Pension Fund monies

22  designated for maintenance and improvement of the property to correct wear and

23  maintain value. The apartment is occupied by Joel Manion, the General Manager of

24  the hotel and the son of Jim Manion, the Chief Operating Officer at Harbaugh (in

25  the original Complaint, Joel Manion was inadvertently identified as the son of

26  George Harbaugh). The cost of converting the rooms was charged to the FF&E

27  account and used funds that had been set aside for a restaurant in the Washington

28  Court Hotel.  The conversion was never voted on by the trustees of the Pension

SPIRO MOORE LLP

**SECOND AMENDED CLASS ACTION COMPLAINT**

Fund.  The Pension Fund lost revenue, due to the room conversion, in the form of (1) conversion costs, and (2) lost room rental revenue, which, in the Washington, D.C. location, can exceed many hundreds of dollars a night.  In addition to receiving free apartment rent in a city with a high cost of living, Joel Manion even received hotel meals in his room.  In addition, the prior lease payment received by the Local 12 Pension Fund, roughly $3 million, is substantially below the market value of a lease of the Washington Court Hotel property.  Joel Manion's improper living arrangement is the result of asset embezzlement from the Local 12 Pension Fund FF&E account.  This embezzlement was authorized by William Waggoner as part of the unlawful conspiracy between William Waggoner and George Harbaugh to use the lease arrangement on the Washington Court as a means of embezzling assets away from the Local 12 Pension Fund.

152.    In January 2013, a new lease agreement for the Washington Court hotel was entered into with the Harbaugh Hotel Management Company.  The new lease terms were even worse for the Local 12 Pension Fund than the terms were under the last lease in that the amount of money received by the Local 12 Pension Fund was substantially lower.  The lease arrangements prevent Local 12 members, including Plaintiffs, from detecting the embezzlements or having any means of evaluating the transactions.

153.    As with the Washington Court Hotel, the Local 12 Pension Fund owned parking facilities near the Dallas-Ft. Worth Airport in Texas.  Rather than collect the substantial revenue generated by the parking facilities and simply pay a local parking management company to service them, Local 12 leased the garages out at a fixed rate that was well below the revenue that could have been collected if the Local 12 Pension Fund has simply hired management to operate the facilities.

154.    The Sheraton Grand Dallas Ft. Worth is another valuable hotel property owned by the Local 12 Pension Fund that was leased to the Harbaugh Hotel Management Company.  The Sheraton is reported to cause a loss for Local

1   12, since Local 12 has agreed to unusually low lease fees without good justification

2   and assumed various costs of operation of the property.

3       155.   When Trustees attempted to convince Waggoner to sell the Sheraton

4   due to the loss, Waggoner, breaching his duties as a Trustee and Officer of Local

5   12, refused to consider the idea.  The Sheraton is still held today.

6

7       **8.    In Violation of the IUOE Constitution, William Waggoner**

8       **Steered Health & Welfare Fund Investments to His Son's**

9       **Employer While Kenneth Waggoner Was Employed at**

10      **Chelsea Management Without Disclosing the Prohibited**

11      **Conflict of Interest in LM-30 Filings**

12      156.   When Kenneth Waggoner went to work at Chelsea Management

13  ("Chelsea"), Chelsea was awarded the business of investing Local 12's Health &

14  Welfare fund assets.  William Waggoner did not disclose the prohibited conflict of

15  interest in William Waggoner's LM-30 filings, despite the fact that Kenneth

16  Waggoner lived in William Waggoner's home at the time.  This failure was a

17  violation of Title V of the LMRDA.

18      157.   Shortly after Kenneth Waggoner left Chelsea, Chelsea lost the Local

19  12 Health & Welfare investment account.  Kenneth Waggoner went to work at

20  McMorgan.  Shortly after Kenneth Waggoner joined McMorgan, Patty Waggoner,

21  in December 2011, sent an e-mail to John Elliot of New England Pension Advisers,

22  asking him to direct clients to Kenneth Waggoner at McMorgan because Kenneth

23  Waggoner was not successfully attracting enough business to McMorgan.  Patty

24  Waggoner stated in her email that she had cleared her request with her husband,

25  William Waggoner, and he approved the request.  John Elliot was advising the

26  trustees of the Local 12 Pension Fund on selecting investment managers at this

27  time. In 2011 (or 2012), McMorgan was selected to manage substantial assets for

28  the Local 12 Pension Fund.

SPIRO MOORE LLP

158.   Kenneth Waggoner was aware, based upon his work with Taft-Hartley fund management and his living arrangements in his parents' home, that he was improperly receiving property, services and other things of value from Local 12 or affiliated Funds.    For example, when Kenneth Waggoner charged his expenses at the Washington Court Hotel to the Presidential Suite he shared with his mother and father, which were later paid by Local 12, he was, in effect, stealing from Local 12. And, when Kenneth Waggoner had Local 12 employees Max Gomez and Christopher Totten, who were on the clock at Local 12, working on construction projects at the home he co-owned with William and Patty Waggoner, he knew that he was stealing from Local 12.  Thus, Kenneth Waggoner was a willing accomplice and co-conspirator in William and Patty Waggoner's racketeering activities. Kenneth Waggoner unjustly enriched himself at the expense of Local 12's members.

159.   William Waggoner, Mickey Adams, Ron Sikorski, Larry Davidson and Dan Hawn all breached their fiduciary duties to Local 12 and its members when Kenneth Waggoner's expenses were charged by William Waggoner to Local 12. Plaintiffs and the members of Local 12 were harmed by these breaches.

### 9.   William Waggoner, For Many Years, Demanded and Obtained From Leo Majich, the Diversion of Real Estate Account Funds from the Local 12 Pension Fund to Pay for Roughly $90,000 in Rose Bowl Tickets Every Year

160.   Prior to his death in 2008, Leo Majich, OEFI administrator, would, at William Waggoner's demand, provide tickets to attend the Rose Bowl to all employees of the Local 12 Trusts and Local 12.  Majich was diverting funds from real estate accounts for the Local 12 Pension Fund to pay for the tickets.  Michael Graydon then assumed the position of administrator for the Trusts after Majich's

death.  Graydon refused to continue the illegal asset diversion, despite William Waggoner's demands that he do so.  The tickets cost roughly $90,000 per year.

### 10.    Leo Majich's Daughter, Theresa Goodell, Used an OEFI Credit Card to Travel to Jamaica to Visit Her Boyfriend and Defrauded OEFI Out of Other Monies

161.    Theresa Goodell, the daughter of Leo Majich, was employed at OEFI under the father, Leo Majich.  On multiple occasions, Ms. Goodell used a credit card belonging to OEFI to pay for her personal trips to Jamaica to visit her boyfriend.  OEFI expenses are paid entirely by the Local 12 employee benefit trusts.

162.    OEFI served (and serves) as a fiduciary for the Local 12 employee benefit trusts in that it "administers the employee benefit programs" of Local 12.[2] Among other things, it determines how much in expenses to charge each of Local 12's employee benefit trust on a pro rata basis, depending on the relevant amount of work performed and expenses incurred in connection with administering each trust. Accordingly, it has a fiduciary duty to ensure that all expenses, including salary, and employee reimbursements, or necessary, appropriate, and for the benefit of one of the trusts.

163.    Because OEFI has no independent source of revenue and engages in no business other than administration of the Local 12-associated funds, every misappropriation by Ms. Goodell was an conversion of trust fund assets from the fund to which such expenses were billed.

164.    On weekends, Theresa Goodell often logged onto the OEFI computer network from home, did o no work, but turned in overtime hours to fraudulently increase her pay.  She frequently claimed eight hours of overtime per weekend.  For

---

[2] http://www.oefunds.org/ (last viewed July 22, 2013).

example, in fiscal year 2008, Theresa Goodell approved *for herself* the payment of overtime wages in the amount of $77,948, despite the fact that Ms. Goodell was an exempt managerial employee not entitled to overtime pay.  Her embezzled overtime wages ultimately were diverted from the Local 12 Funds administered by OEFI.  Unfortunately, this and other embezzlements were hidden from Local 12 members (who are also fund beneficiaries) by William Waggoner and the complicit officers of Local 12, the Trustees of the Local 12-associated Funds, and loyal upper management of Local 12 and OEFI.  Audit findings were not provided to any Local 12 member, and no collection actions were instituted to recover the funds identified as embezzled by the auditing accountant firm.

165.   Theresa Goodell also periodically required the issuance of an additional payroll check, equal to a week of pay, for herself and her father, Leo Majich.  These improper distributions, occurring roughly five times a year, amounted to the embezzlement of tens of thousands of dollars from OEFI-administered funds.

166.   When Michael Graydon discovered the embezzlements by Theresa Goodell, he fired her.  William Waggoner then fired Michael Graydon for terminating Theresa Goodell and other employees involved in the embezzlement schemes and for refusing to follow past practices of diverting assets to pay for such indulgences as Rose Bowl tickets.  Waggoner protected Theresa Goodell, in part, because he is her "secret" business partner in her artisanal soap company.

167.   Trustees of the Trust Funds impacted by Ms. Goodell's embezzlement were negligent in their oversight and breached their fiduciary duties to the respective Funds on which they sit and/or sat as Trustees.  Officers of Local 12 breached their fiduciary duties to the membership of Local 12 by failing to stop this embezzlement of associated fund assets, despite having an awareness that it was occurring with William Waggoner's encouragement and permission.

**11.** **Bernard Kotkin & Co., LLP, a Certified Public Accounting Firm, Was Hired by OEFI to Conduct Annual Audits, Uncovering Massive Financial Misconduct, Including Embezzlement, Fraud and the Misuse of Hundreds of Credit Cards**

168.    Bernard Kotkin & Co., LLP, a Certified Public Accounting firm, was hired by OEFI to conduct annual audits.  During the course of those audits, auditor Angelo Nicodemo, CPA, determined that hundreds of credit cards had been misused by employees and other embezzlements and fraud had occurred.  A report was prepared after each audit and provided to Leo Majich.  As noted elsewhere herein, OEFI bills all of its expenses to Local 12 trusts.  Every misappropriation by an OEFI employee was an embezzlement from every fund administered by OEFI, which allocates its administrative expenses across the funds proportionately.  Deficits in a Fund are corrected by an increase in contribution levels from Plaintiffs and the Local 12 members.  Plaintiffs, who are beneficiaries of the Funds impacted by OEFI employee embezzlements, suffered injuries as a result of the harm to their Funds.

169.    Each year, the report of asset misuse from Bernard Kotkin & Co., LLP grew in size.  Eventually, after issues identified by auditor Angelo Nicodemo, CPA, were not addressed under Leo Majich's tenure, Nicodemo sent the Bernard Kotkin findings to Michael Graydon.  Michael Graydon set out to first verify and later remedy the misconduct uncovered by Bernard Kotkin.  Mr. Graydon was able to obtain some reimbursements for embezzlements from OEFI.  This, in turn, benefited the Funds managed by OEFI, because those costs had been passed, in full, to the Funds.

170.    Margaret Bowen, who worked under Michael Graydon, worked with Mr. Graydon to try to clean out the fraud and corruption that permeated OEFI.  However, in the end, after Mr. Graydon terminated Theresa Goodell for obtaining

**SECOND AMENDED CLASS ACTION COMPLAINT**

1   overtime wages under false pretenses, Mr. Graydon and Ms. Bowen were both fired

2   by William Waggoner.

3

4   **12.   William Waggoner Awarded a No-Bid Security Services**

5   **Contract to His Friend's Firm, Worldwide Security, at**

6   **Multiple Times the Competitive Market Rate**

7   171.   Worldwide Security provides security at Local 12 facilities.  The

8   security firm was previously owned by Mike Marker, now deceased.  Mike

9   Marker's widow now operates Worldwide Secuirty.  Worldwide Security is located

10   at 10302 Glasgow, Los Angeles, California.

11   172.   Mike Marker and William Waggoner were close friends.  The contract

12   between Local 12 and Worldwide Security cost at least three times the competitive

13   market rate for the same security services.  The issue of price was often discussed

14   by the Local 12 executive board.  Mickey Adams challenged the awarding of the

15   contract to Worldwide Security and was told by William Waggoner to drop the

16   issue of sending the contract out for a competitive bid.  When William Waggoner

17   contracted with Worldwide Security at rates far above competitive levels, he

18   breached his fiduciary duty as an officer of Local 12, harming the members of

19   Local 12 by virtue of that breach.

20   173.   Worldwide Security has held the contract for security services at Local

21   12 for about ten or more years.

22

23   **13.   While Waggoner and His Family and Others Were Enjoying**

24   **Personal-Use Jet Flights and Failing to Reimburse the**

25   **General Fund for Printing and Jet Time Contributed to**

26   **Politicians, the General Fund Was Hemorrhaging Money**

27   174.   One of the more tragic aspects of the Local 12 officers' rampant

28   misuse of Local 12 assets was the dire financial impact on Local 12's General

Fund.  In 2010, the General Fund lost $5,727,742, according to William Waggoner. In 2011, the losses continued at a similar pace..  To address this deficit, Waggoner and the Executive Board recommended asking employees to take two days off without pay.  A true and correct copy of William Waggoner's letter is attached hereto as Exhibit "3."  Employees were ultimately required to give up days of work to address the General Fund deficit, including Plaintiff Salas.  While employees were giving up their wages, Waggoner, his family, and his poker cabal (consisting, at various times, of the other Defendant officers of Local 12 and anyone else that Waggoner directed to accompany him on the Cessna jet), were still flying around the country in Local 12's jet without reimbursing Local 12 for the jet time.  Local 12 was also giving jet time to politicians, but the Political Action Fund was not reimbursing Local 12's General Fund for the rental cost of the jet time or the employee costs associated with the pilots.  And Local 12 continued to print campaign materials for politicians, but, again, the Political Action Fund did not reimburse Local 12's General Fund for the massive amount of printing supplies that Local 12 purchased and the labor costs that Local 12 incurred.  This ongoing and pervasive breach of fiduciary duties by officers of Local 12 harmed Plaintiffs and the members and is actionable as violations of Title II of the LMRDA.

### 14.    OEFI Paid Employees' Payroll Taxes Out of the General Fund

175.    Employees are normally obligated to pay their share of FICA out of their gross wages.  Inexplicably, Defendant Waggoner conceived of a plan to pay the employee share of taxes out of the OEFI.   This, in fact, occurred, and the additional costs to OEFI were then passed on to the Funds administered by OEFI.

176.    As noted elsewhere herein, OEFI is funded entirely from the Trust Funds at Local 12.  OEFI has a fiduciary duty to avoid excessive or improper expenditures that are coming from Taft-Hartley Trust Fund contributions that it

SPIRO MOORE LLP

1    administers.  Because OEFI has no independent source of revenue and engages in

2    no business other than administration of the Local 12-associated funds, every

3    misappropriation by an OEFI employee was an embezzlement from every fund

4    administered by OEFI, which allocates its administrative expenses across the funds

5    proportionately.  Deficits in a Fund are corrected by an increase in contribution

6    levels from Plaintiffs and the Local 12 members.  Plaintiffs, who are beneficiaries

7    of the Funds impacted by OEFI employee embezzlements, suffered injuries as a

8    result of the harm to their Funds.

9        177.   Trustees of the Trust Funds impacted by this payroll tax embezzlement

10   were negligent in their oversight and breached their fiduciary duties to the

11   respective Funds on which they sit and/or sat as Trustees.  Officers of Local 12

12   breached their fiduciary duties to the membership of Local 12 by failing to stop this

13   embezzlement of associated fund assets, despite having an awareness that it was

14   occurring with William Waggoner's encouragement and permission.

15

16       **15.    Bert Tolbert, With the Knowledge of Waggoner, Directed or**

17               **Caused the Sale of Metal Belonging to OETT (Southern**

18               **California) at SA Recycling and Other Recyclers for Cash**

19               **and Did Not Deliver That Cash to the Trust**

20       178.   For many years, scrap metal was taken from the Southern California

21   Training Trust and recycled in exchange for money, often at SA Recycling, which

22   is located at 12301 E. Valley Blvd., El Monte, CA 91732.  Teamsters Union drivers

23   or Pete Majich, Leo Majich's son, took that metal to the recycling yards.  While

24   "scrap metal" suggests a nominal amount of waste metal, the "scrap metal" sold in

25   this case included dismembered heavy construction equipment no longer in use,

26   constituting tens or even hundreds of thousands of pounds of metal annually.  For

27   example, a 977 front end loader weighs approximately 47,641 pounds, and at least

28   one was cut apart and sold as scrap.  Cranes can be heavier.  The embezzled sale

proceeds frequently exceeded $100,000 per year, but that money was not delivered to OETT's operating account, as it should have been.  Money obtained through these improper sales was delivered to Bert Tolbert.  William Waggoner knew of this unlawful embezzlement for years but did nothing to stop it.

179.    The Plaintiffs, as beneficiaries of the OETT Trust Fund, and the other members of Local 12 who are also beneficiaries, were injured by the embezzlement of scrap metal sales revenue.

180.    Trustees of the OETT Trust Fund were negligent in their oversight and breached their fiduciary duties to the OETT Trust Fund on which they sit and/or sat as Trustees.  Officers of Local 12 breached their fiduciary duties to the membership of Local 12 by failing to stop this embezzlement of associated fund assets, despite having an awareness that it was occurring with William Waggoner's encouragement and permission.

**16.    William Waggoner Wrote Off Debts Without Approval of a Majority of the Trustees When the Debts Were Owed by an Employer Trustee's Company or the Relatives of Waggoner's Close Friends**

181.    Waggoner would write off debts owed by employers to Trusts by fiat, without full Trustee votes, when it suited him and certain other Trustees.  For example, Waggoner excused roughly $500,000 in contributions owed to the Local 12 Pension and Health & Welfare Funds by Majich Bros. at the same time that Leo Majich was the OEFI Administrator for Local 12's Trusts.  In another case, over $500,000 in contribution debts owed by Employer-Trustee C.W. Poss's company, CW Poss, Inc., to Funds including the Local 12 Pension Fund and the Health & Welfare Fund were excused by Waggoner while Poss was sitting as a Trustee of the Local 12 Health & Welfare Trust, the Local 12 Pension Fund, and OETT. Notably, the other Trustees, who were circumvented by Waggoner, did not resign

SPIRO MOORE LLP

1  or act in any way after-the-fact to correct Waggoner's misconduct.   Further,

2  despite Poss's failure to make his contributions, Waggoner allowed defendant Poss

3  to remain as a Trustee, in a position he still holds.

4      182.   Debts of other employers were also excused by virtue of their

5  relationship with William Waggoner or his close associates.  As a result, millions

6  of dollars owed to the various associated Funds were not collected, harming

7  Plaintiffs and the participants of those Funds as a result.  At present, delinquent

8  contributions exceed $2 million, excluding all delinquencies that were excused by

9  Waggoner from collection.

10      183.   The Plaintiffs, as beneficiaries of the Local 12 associated Trust Funds,

11  and the other members of Local 12 who are also beneficiaries of those Funds, were

12  injured by these write offs.

13      184.   Trustees of the affected Local 12 Trust Funds were negligent in their

14  oversight and breached their fiduciary duties to the various affected Funds on

15  which they sit and/or sat as Trustees.  Officers of Local 12 breached their fiduciary

16  duties to the membership of Local 12 by failing to stop this embezzlement of

17  associated fund assets, despite having an awareness that it was occurring at William

18  Waggoner's direction.

19

20      **17.   Patty Waggoner Used a Local 12 Ford Flex Without**

21      **Justification, Thereby Embezzling Local 12 Assets**

22      185.   For at least half a year, Patty Waggoner was provided access to a Ford

23  Flex, owned by Local 12.  Patty Waggoner frequently drove the vehicle to her

24  house.  Patty Waggoner also used the vehicle while conducting business as the Vice

25  President of Amalgamated Bank and as a board member of the Pasadena Chamber

26  of Commerce.  Patty Waggoner could not be properly authorized to utilize that

27  vehicle because she was not an employee of Local 12 or any related entity or Fund.

28  Her use of Local 12 property, valued in excess of $25,000, constitutes the

embezzlement of union assets.  Her husband, William Waggoner, is complicit in that embezzlement.

186.    Plaintiffs and all Local 12 members were harmed as a result of embezzlement of Local 12 assets by Patty Waggoner.  Her improper use of a Local 12 vehicle increased the number of vehicles that Local 12 had to own to conduct legitimate business.  William Waggoner was aware and permitted the embezzlement of Local 12 assets for his wife's benefit.  William Waggoner's conduct violated Title II of the LMRDA, and Plaintiffs and the Class were injured by that violation.

**18.    Various Defendants Used Southern California Training Trust Facilities, Assets, and Personnel to Service and Refurbish Their Personal Vehicles and Work on Their Homes**

187.    Over the years, Defendants William Waggoner, Bert Tolbert, Mickey Adams and others have repaired and/or restored personal vehicles, including collectible antique cars and boats, using Southern California Training Trust funds and staff.  Fred Young and Ray Horn's relative also had boats rebuilt at the training facility.

188.    A 1951 Chevrolet Bowtie owned by Bert Tolbert was also rebuilt using Trust assets and staff.

189.    William Waggoner's Model A Ford was rebuilt using Trust assets and staff.

190.    Bert Tolbert purchased a truck that was fully rebuilt using Trust assets and staff.

191.    Bert Tolbert purchased another truck previously owned by Local 12, had it fully reconditioned using Trust assets and staff, and gave it to his

**SECOND AMENDED CLASS ACTION COMPLAINT**

granddaughter to drive.  The vehicle's value was substantially increased by the full restoration.

192.    These fraudulent vehicle restorations were concealed through the use of dummy VIN numbers.  When Defendants embezzled these assets, they would direct office staff to record repairs under different VIN numbers.

193.    Bert Tolbert, Mickey Adams, and William Waggoner had annual landscaping projects performed on their homes by Trust staff, using Trust tools and assets.  In addition, welder Miley Salazar was sent to officers' homes to do ornamental welding.

194.    Kenneth Waggoner used employees of OETT on company time to replace a washer and dryer at Kenneth Waggoner's rental property, which property is also owned by William and Patty Waggoner.

195.    The Plaintiffs, as beneficiaries of the OETT Trust Fund, and the other members of Local 12 who are also beneficiaries, were injured by the embezzlement of assets (including tools and parts) and labor costs from OETT.

196.    Trustees of the OETT Trust Fund were negligent in their oversight and breached their fiduciary duties to the OETT Trust Fund on which they sit and/or sat as Trustees.  Officers of Local 12 breached their fiduciary duties to the membership of Local 12 by failing to stop this embezzlement of associated fund assets, despite having an awareness that it was occurring with William Waggoner's encouragement and permission.

**19.    William Waggoner Maintained Incompetent Employer Trustees on the Local 12 Associated Trusts to Guarantee That He Controlled All Local 12 Associated Trusts**

197.    In recent years, Defendant C.W. Poss has become mentally incompetent and unfit to serve in any fiduciary role.  William Waggoner, and every Trustee that has observed Mr. Poss, are aware of his mental incompetence.

SPIRO MOORE LLP

1  Nevertheless, William Waggoner continues to maintain Mr. Poss as a Trustee on
2  multiple Trust Funds.  No Trustee has attempted to remove Mr. Poss due to
3  incompetence.

4       198.   In recent years, Trustee Kenneth Bourguignon has become physically
5  unable to review documents that he is required by Waggoner to sign, and no other
6  Trustee takes any action to ensure that Kenneth Bourguignon is informed of and
7  understands the content of documents he signs.   Nevertheless, William Waggoner
8  continues to maintain Mr. Kenneth Bourguignon as a Trustee on multiple Trust
9  Funds and as the CEO of OEFI, the administrator for all of the Local 12 associated
10  funds.

11

12       **F.**      **IUOE's and Local 12's Leadership Used Threats of Physical and**
13                 **Economic Violence, and Suborned Perjury, to Suppress**
14                 **Investigations and Maintain Control Over Local 12**
15               **1.      David Casey Was Beaten at the Direction of William**
16                        **Waggoner for Running Against Waggoner for Business**
17                        **Manager**

18       199.   David Casey, a member, attended Local 12 meetings.  He also
19  campaigned against William Waggoner for Business Manager.   At Local 12
20  meetings, members have the right to make statements or ask questions at an open
21  microphone.  In and around 2005, Mr. Casey attempted to speak up at a meeting.
22  Two individuals assaulted Mr. Casey immediately after the meeting, beating him
23  violently.  On information and belief, they did so at the behest of William
24  Waggoner.  The assailants were the nephew and the son of the District 7
25  Representative.  David Casey filed a complaint with the Federal Bureau of
26  Investigation about the assault.

27

28

**SECOND AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

SPIRO MOORE LLP

### 2. William Waggoner Prevents Opposition Voices From Speaking at Any Meetings

200.  In and around about 2007, Waggoner directed Chris Norton, one of his enforcers, to "cover the microphone" and keep anyone who opposed Waggoner from speaking at any general membership meetings.  At one meeting, Chris Norton was involved in a physical altercation with David Casey to prevent Casey from speaking at the meeting, particularly about misuse of membership assets related to the purchase of the Cessna jet.

201.  On September 18, 2012, Mr. Waggoner and the entire leadership team attended a District 5 meeting.  At that meeting, Mr. Waggoner told Rodney Karr, who had sent Waggoner a letter raising issues, that "if you don't stop this shit, you're going to get hurt."  Generally, Waggoner and/or his co-conspirators at general membership and District meetings assign large individuals to take up positions near microphones to intimidate any individual that might attempt to speak up in opposition.  Such conduct violates the LRMDA Bill of Rights.

### 3. Local 12 Uses Its Job Referral Service to Suppress Opposition

202.  Local 12 operates an exclusive hiring hall.  All jobs for Local 12 members are dispatched through the centralized hiring hall.  Waggoner and Local 12's leadership use this arrangement to intimidate members who might express opposition to the activities of Local 12's leadership.  The fear of economic retaliation is extremely high.  Some members have children who are also members of Local 12 and will not speak out due to fear of physical and economic harm directed at their children.

**4.     Business Agents for Local 12 Carry Guns That Have Had Serial Numbers Removed**

203.     Waggoner requires Business Agents to carry firearms.  The weapons provided to Business Agents have had their serial numbers removed in some cases.  Waggoner negotiated a deal with Dwight Helmick, the former California Highway Patrol ("CHP") Commissioner, under which Local 12 would pay $25,000 to the surviving spouse or family members of any California Highway Patrol officer seriously injured or killed in the line of duty.  In exchange, Waggoner received a letter from Dwight Helmick authorizing Business Agents to stop at the side of road and talk to Local 12 members working on construction projects.  If a Business Agent was questioned by a CHP officer, they could produce Helmick's letter instructing the investigating CHP officers to take no action.

**G.     William Waggoner, Mickey Adams, Ron Sikorski, Larry Davidson and Dan Hawn Allow Employers Contracted With Local 12 to Operate Double-Breasted, Thereby Depriving Members of Protections and Benefits Available Under Union Agreements**

204.     William Waggoner, Mickey Adams, Ron Sikorski, Larry Davidson and Dan Hawn allow employers contracted with Local 12 to operate double-breasted, thereby depriving members of protections and benefits available under union agreements.  Union contracts with employers hiring Local 12 members require, at minimum, that employers unionized through Local 12 must remain unionized in subsequent labor contracts with Local 12.  The Business Manager, William Waggoner, was responsible for supervising all business representatives and ensuring that all collective bargaining agreements for Local 12 were negotiated, fully executed, and that all terms under the collective bargaining agreements were enforced.

**SECOND AMENDED CLASS ACTION COMPLAINT**

205.    Instead, employers subject to collective bargaining agreements operate "double breasted."  In labor parlance, "double breasted" refers to the side-by-side operation of unionized and non-unionized workforces.  For example, Morley Builders is signatory to a Local 12 collective bargaining agreement, but its alter ego, Benchmark Construction, is operated as though it is a non-unionized entity.  Benchmark Construction uses heavy equipment operators.  LKR Group is signatory to a Local 12 collective bargaining agreement, but its alter ego, Group Delta Consultants, Inc., is operated as though it is a non-unionized entity.  Group Delta Consultants, Inc. uses construction inspectors.  Twining Laboratories is signatory to a Local 12 collective bargaining agreement, but its alter ego, Quality Assurance International, is operated as though it is a non-unionized entity.  The operators of Twining Laboratories and Quality Assurance International are husband and wife, with the husband owning the former and the wife owning the latter to conceal double-breasted activity. Quality Assurance International uses heavy equipment operators.  Smith-Emery also operates double-breasted.  The unionized portion of Smith-Emery's operations, on information and belief, is limited to about 30% of Smith-Emery's total operations.

206.    On information and belief, Waggoner and other members of the Local's Executive Board, including Mickey Adams, were aware that double-breasting was occurring but did not do anything to stop it or otherwise fulfill their obligations in this regard.

**H.    Steve Montrie, Convicted of Vehicular Manslaughter, Remains a Business Agent Despite Killing an Individual While Driving a Union Vehicle Under the Influence of Alcohol**

207.    In December 2008, Steve Montrie admitted to killing an individual while driving a Local 12 union vehicle under the influence of alcohol.  Ron Sikorski, then the President of Local 12, was also present in the union vehicle.

Using its influence with local officials, Local 12 secured a sentence of vehicular manslaughter, rather than *gross* vehicular manslaughter, for Montrie.  He was sentenced to three years and served about 18 months.  Previously-ordered restitution to the family of victim, in the amount of about $24,881.99 to one family member and $32,829.05 to another, was rescinded.

208.   Immediately after his release, Mr. Montrie was employed as a business representative by Local 12, in violation of Section 504 of the LMRDA.  Waggoner was aware of the prohibition on hiring individuals convicted of crimes inflicting great bodily injury or death, but nevertheless hired him.  Waggoner recently campaigned for the expungement of Montrie's conviction so that Montrie could serve as an officer, confirming Waggoner's awareness of the restrictions imposed by Section 504.  The payment of a salary to Montrie, in violation of Section 504 of the LMRDA, is a breach of fiduciary duties by William Waggoner, Mickey Adams, Ron Sikorski, Larry Davidson and Dan Hawn.  Those breaches harmed Plaintiff and the Class.

209.   Waggoner's protection of Montrie is inconsistent with Waggoner's 2004 Driver Safety Policy, which acknowledged that safe-driving agents should not be punished or burdened by the reckless or careless drivers causing problems at Local 12 (because the cost of insuring the safe drivers would increase, thereby harming Local 12 itself).  Other Business Agents, including Business Agent Robert Paris, were terminated for a DUI conviction. Waggoner's Policy and Memorandum is attached as Exhibit "4."

210.   Montrie's conduct was such that he could not be insured under the standard liability insurance purchased by Local 12 for all of its employees.  Instead, Montrie was separately insured through a high-risk individual policy.  This policy was extraordinarily expensive.  Patty Waggoner's friend AJ Longo provided that policy.  This policy was initially purchased before Montrie was sentenced.  After his release from prison, when Montrie was re-employed by Local 12, a similarly

1  expensive policy was purchased for him using Local 12 funds.  It is a breach of

2  fiduciary duty and an actual harm to members of Local 12, including Plaintiffs, to

3  expend Local 12 assets for the unlawful employment of Montrie, in violation of

4  Section 504 of the LMRDA.

5

6        I.       **Miscellaneous Breaches of Fiduciary Duties**

7        211.    Employees of various Funds associated with Local 12 were instructed

8  by Bert Tolbert to fabricate receipts for goods and services not received when they

9  traveled for business purposes but did not exhaust the expense monies provided in

10 advance of their travels.  The purpose of this instruction was two-fold.  First, the

11 administration of the funds was so deficient that the procedures were not in place to

12 receive back unused funds.  The instruction eliminated the need to correct those

13 deficiencies.  Second, when Fund employees complied with this instruction, it was

14 believed by Defendants William Waggoner, Mickey Adams, Ron Sikorski, Larry

15 Davison and Dan Hawn that engaging in this improper activity, though at the

16 direction of superiors, would prevent employees from discussing the many

17 improprieties they observed.  In other words, these Defendant officers viewed these

18 excess funds as "hush" monies to buy the silence of potential whistle-blowers.

19       212.    Mr. Watson and trainers employed by OETT often performed political

20 activity while being paid out of OETT assets. Mr. Watson and other trainers

21 frequently were directed by Mr. Tolbert to work on Saturdays canvassing for

22 political candidates and causes favored by Waggoner and other IOUE officers. Mr.

23 Watson and other trainers were paid overtime wages for working on such Saturdays

24 from OETT assets. The work, however, was political activity, not for the benefit of

25 the OETT. The political expenditures were never reported as such. Thus Tolbert

26 and Waggoner caused the diversion of OETT assets and engaged in illegal

27 campaign activity.

28

SPIRO MOORE LLP

213.   At all times alleged herein, the Trustees and Officers named as Defendants, where not actively participating in the fraudulent schemes and embezzlements, acquiesced to all of the misconduct related to their positions, were aware of it, and did nothing to stop it.

**J.**   **Waggoner Used Pension Benefits That Should Have Been Universally Available to All Employees of Local 12 or Its Related Trusts as a Selective Reward Tool**

214.   A participant in the IUOE General Pension Plan is any full-time employee of an IUOE Local or of a Related Organization that is a Participating Employer in the Plan.  The General Pension Plan must either be made universally available to all employees within a Local or Related Organization or none of them.

215.   Local 12 is an IUOE Local.  Contract Compliance, an agency within Local 12 that audits employer compliance with CBAs, is a Related Organization for purposes of General Pension Plan participation.  OEFI, which manages all of Local 12's funds, is a Related Organization for purposes of General Pension Plan participation.  This action does not include the Southern California Training Trust with respect to allegations of violations of the Pension Plan's all-or-none rule, which is currently the subject of litigation in Washington, D.C.

216.   Pursuant to the General Pension Plan's all-or-none rule, all employees of Local 12 or its Related Organizations must be participants in the General Pension Plan or none may participate.

217.   Waggoner repeatedly violated this rule by selectively authorizing participation in the General Pension Plan.  For example, Waggoner initially offered participation in the General Pension Plan to pilot Bruce Timpe, but not Robert Squillace, another pilot.  After the filing of this action, Robert Squillace was included in the General Pension Plan.  And co-pilots were never offered the opportunity to participate in the General Pension Plan.

SPIRO MOORE LLP

1    218.    David Lanham, in Contract Compliance, is included in the General

2    Pension Plan, while other employees in Contract Compliance are excluded.  When

3    William Waggoner allowed David Lanham, and no other employee of Contract

4    Compliance, to participate in the General Pension Plan, William Waggoner

5    embezzled assets of Local 12 and violated his fiduciary duties as an officer.  The

6    other Officers of Local 12 similarly breached their fiduciary duties by permitting

7    William Waggoner to misuse Local 12 assets in this manner.

8

9    **K.**       **All Employees of Local 12, Other Than Some Clerical Workers,**

10            **Must Pay Union Dues Despite no Coverage Under Any Collective**

11            **Bargaining Agreement**

12    219.    Roughly 200 employees at Local 12 are not covered by any collective

13    bargaining agreement.  Nevertheless, they are required to pay $320 per year in dues

14    to Local 12, and $48 per week in supplemental dues (which is $2,496 annually).

15    These employees have never been covered by a collective bargaining agreement.

16    As alleged above, these employees are subject to the whims of Local 12

17    management when, for example, only some are provided the opportunity to

18    participate in the General Pension Plan.  For their $2,816 per year, these employees

19    have no guarantee that they will receive the sorts of benefits that Local 12's regular

20    members receive under their collective bargaining agreements.  Since they were not

21    covered, their dues should be reimbursed as unlawfully converted under false

22    pretenses.

23    220.    Plaintiff Mario Salas was charged a fee to work for Local 12, in

24    violation of California's Labor Code provisions that prohibit the imposition of a

25    charge to work.  The injury to this sub-class is more than $2,500,000 for the four

26    years prior to the filing of this action through to the present.  Plaintiff Mario Salas,

27    and similarly situated employees, were also denied the protections of a grievance

28    process that should have been their right by virtue of their dues payments.

1

2   **L.   Waggoner and His Team Issued Instructions to Shred or Hide**

3       **Documents That Could Be Used to Corroborate Allegations in**

4       **This Lawsuit**

5       221.   Since the filing of this lawsuit, Waggoner and his leadership team have

6   directed the destruction of evidence in the form of records that would tend to prove

7   the allegations of this action.  For example, records that would show asset

8   embezzlements and transfers between the Southern California Training Trust and

9   the Southern Nevada Training Trust were collected for shredding.  Once

10  Defendants were warned that their spoliation of evidence plans were known, they

11  changed tactics, instead collecting and hiding documents outside of their ordinary

12  places of filing.

13

14  **M.   After Destroying or Hiding Documents, Defendants Are Now**

15      **Moving Equipment Back to the Southern California Training**

16      **Sites, Including Devore, Whittier, and San Diego, to Hide Unlawful**

17      **Asset Transfers from the Southern California Training Trust to**

18      **the Southern Nevada Training Trust**

19      222.   After this lawsuit was filed, and as described above, a comprehensive

20  effort was undertaken to eliminate (or, as was frequently said at the Southern

21  California Training Trust, "un-marry") the connections between the Southern

22  California Training Trust and the Southern Nevada Training Trust.  This plan

23  included an initial document shredding campaign.  When Plaintiffs' counsel

24  warned certain Defendants through counsel of the consequences of evidence

25  spoliation, the shredding campaign morphed into a plan of document concealment

26  wherein documents were collected, boxed and secreted from the training site

27  offices.  Then, some of the equipment wrongfully transferred to Nevada was

28  brought back to California, at great expense.

**SECOND AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

SPIRO MOORE LLP

223.    Two Teamster drivers, James Capen and John Bader, are completing the transfers from the State of Nevada to the Southern California training sites. Many of these pieces of equipment exceed 8 feet in width and qualify as wide or oversize loads, requiring the use of a pilot car and permits from the Nevada Department of Transportation to complete.  Pursuant to DOT regulations, the drivers must stay overnight to comply with hours of service regulations.  These transfers, intended solely to conceal asset misuse and fraud between Trusts, are expensive.  The costs of these expensive transfers are falling upon the Southern California Training Trust, from which the equipment was originally pirated and deleted from its inventory.

**N.    Local 12 Habitually Purchases Its Vehicle Fleet From Ford and Services Its Own Vehicles, but Its LM-2 Filings Since at Least 2006 Show Inexplicably Variable Expenditures Classified As "Auto Leasing and Maintenance."**

224.    Local 12 habitually purchases its vehicle fleet from Ford and services its own vehicles, but its LM-2 filings since at least 2006 show inexplicably variable expenditures classified as "auto leasing and maintenance."  On past LM-2 filings, Waggoner reported payments to Wright Express Fleet Services, Inc. and Fleet Services, Inc.  In 2011, these expenditures totaled $281,153.00.  However, the monthly payments vary as much as fifty percent ($13,708 as a low and $20,514 as a high).  If these charges were lease payments, they would be stable.  If they are automobile fuel charges, they are unusually erratic.  These charges are actually jet fuel, which Waggoner was hiding to conceal the cost to Local 12 of owning and operating the Cessna jet. On the most recent LM-2, Waggoner finally reported the true nature of the expenses, fuel, that were previously camouflaged as vehicle lease expenses.  In the 2012 LM-2, payments to Wright Express *Financial* Services, Inc.

1   are classified as "Transportation Equipment Fuel."  The company is classified as a

2   "Gas and Oil Company."

3

4      **O.**      **Additional False Representations in Mandatory Union Reports**

5      225.    In the most recent LM-2 Filing by Local 12, William Waggoner falsely

6   claims that Local 12 was named as a defendant in this lawsuit.

7

8      226.    As alleged above, Defendants' conduct was criminal, oppressive,

9   malicious, willful and intended to harm and did harm Plaintiffs and the Class,

10   warranting imposition of exemplary damages in all instances where such damages

11   are recoverable under law.

12

13              **V.    CLASS ACTION ALLEGATIONS**

14      227.    Plaintiffs bring this action individually, as well as on behalf of each

15   and all other persons similarly situated in a concerted effort to improve wages and

16   working conditions for other, similarly situated employees, and thus, seek class

17   certification under Fed. R. Civ. Proc. 23.

18      228.    The proposed Class consists of and is defined as:

19      All individuals who are or have been members of the IUOE Local 12
        at any time within the five years prior to the filing of this action.
20      Excluded from this Class are all Defendants in this action, and all of
        their current and former officers, directors, management employees,
21      successors, and wholly or partly owned subsidiaries or affiliated
        companies; all OEFI employees who were terminated for cause by
22      Michael Graydon; Class Counsel and their employees and members;
        all persons within the third degree of relationship to any of the
23      excluded individuals and any judge who hears or decides any matter in
        this litigation.
24
25      229.    The "agency fee" sub-class is defined as follows:

26      All members of the Class who are "agency fee" members of Local 12,
        including all public entity employees who are members of Local 12 for
27      purposes of collective bargaining representation.

28      230.    The proposed Local 12 Fund Beneficiary Class consists of and is

SPIRO MOORE LLP

defined as:

> All individuals who are or have been beneficiaries of any of the Trust Funds associated with IUOE Local 12 at any time within the five years prior to the filing of this action.  Excluded from the Local 12 Fund Beneficiary Class are all Defendants in this action, all of the Defendants' family members, and all of their current and former officers, directors, management employees, successors, and wholly or partly owned subsidiaries or affiliated companies; all OEFI employees who were terminated for cause by Michael Graydon; Class Counsel and their employees and members; all persons within the third degree of relationship to any of the excluded individuals and any judge who hears or decides any matter in this litigation.

231.   The proposed Local 12 Employee Class consists of and is defined as:

> All individuals who are or have been employees of the IUOE Local 12 or its affiliated entities, including OEFI and the Trusts, at any time within the five years prior to the filing of this action.  Excluded from the Local 12 Employee Class are all Defendants in this action, and all of their current and former officers, directors, management employees, successors, and wholly or partly owned subsidiaries or affiliated companies; all OEFI employees who were terminated for cause by Michael Graydon; Class Counsel and their employees and members; all persons within the third degree of relationship to any of the excluded individuals and any judge who hears or decides any matter in this litigation.

232.   Plaintiffs reserve the right to establish sub-classes, or modify any Class or sub-Class definition, as appropriate.

233.   At all material times, Plaintiffs were or are members of the Class.

234.   There is a well-defined community of interest in the litigation and the class is readily ascertainable:

    (a)   Numerosity:  The members of the class (and each subclass, if any) are so numerous that joinder of all members would be unfeasible and impractical.  The membership of the entire class is unknown to Plaintiffs at this time, however, the class is estimated to be greater than 10,000 individuals and the identity of such membership is readily ascertainable by inspection of Defendants' records.

    (b)   Typicality:  Plaintiffs are qualified to, and will, fairly and

SECOND AMENDED CLASS ACTION COMPLAINT

adequately protect the interests of each class member with whom there is a shared, well-defined community of interest. Plaintiffs' claims are typical of other Class members' claims. For example, Plaintiffs were members of Local 12 within the class period, like all other Class members, and Plaintiffs were injured as all other Class members were.

(c)  Adequacy:  Plaintiffs are qualified to, and will, fairly and adequately protect the interests of each class member with whom there is a shared, well-defined community of interest and typicality of claims, as demonstrated herein.  Plaintiffs acknowledge that Plaintiffs have an obligation to make known to the Court any relationship, conflicts or differences with any class member.  Plaintiffs' attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement and experienced in class action litigation.

(d)  Superiority:  A Class Action is superior to other available methods for the fair and efficient adjudication of the controversy, including consideration of:

1)   The interests of the members of the class in individually controlling the prosecution or defense of separate actions;

2)   The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

3)   The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4)   The difficulties likely to be encountered in the management of a class action.

**SECOND AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

(e)    <u>Public Policy Considerations</u>:  Labor organizations are intended to protect employees from the potential for employer abuse of power, but when the parent union conspires with employers, a local union is powerless to protect itself from abuses origination from multiple directions.  Current union members are often afraid to assert their rights out of fear of direct or indirect retaliation.  Former union members know the reputation of large labor organizations as violent and dangerous when challenged.  Class actions provide the class members who are not named in the complaint with a type of anonymity that allows for the vindication of their rights at the same time as their privacy and safety is protected.

235.    There are common questions of law and fact as to the class (and each subclass, if any) that predominate over questions affecting only individual members, including but not limited to:

(a)    Whether Defendants engaged in racketeering;

(b)    Whether Defendants violated the LMRDA;

(c)    Whether Defendants unlawfully conspired to engage in racketeering;

(d)    Whether Defendants breached fiduciary obligations to the Class; and,

(e)    The appropriate amount of damages, restitution, or monetary penalties resulting from Defendants' violations of law.

236.    This Court should permit this action to be maintained as a class action pursuant to Fed. R. Civ. P. 23 because:

(a)    The questions of law and fact common to the class predominate over any question affecting only individual members;

(b)    A class action is superior to any other available method for the

fair and efficient adjudication of the claims of the members of the class;

(c) The members of the class are so numerous that it is impractical to bring all members of the class before the Court;

(d) Plaintiff, and the other members of the class, will not be able to obtain effective and economic legal redress unless the action is maintained as a class action;

(e) There is a community of interest in obtaining appropriate legal and equitable relief for the statutory violations, and in obtaining adequate compensation for the damages and injuries for which Defendants are responsible in an amount sufficient to adequately compensate the members of the class for the injuries sustained;

(f) Without class certification, the prosecution of separate actions by individual members of the class would create a risk of:

1) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants; and/or

2) Adjudications with respect to the individual members which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests, including but not limited to the potential for exhausting the funds available from those parties who are, or may be, responsible Defendants; and,

(g) Defendants have acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief appropriate with respect to the class as a whole.

237. Plaintiffs contemplate the eventual issuance of notice to the proposed

SPIRO MOORE LLP

members of the class that would set forth the subject and nature of the instant action.  The Defendants' own business records, and/or those of Local 12, may be utilized for assistance in the preparation and issuance of the contemplated notices. To the extent that any further notices may be required, Plaintiffs would contemplate the use of additional mailings.

**VI.   CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**(Violation of 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. §§ 1961-68])**

**By Plaintiffs against All Defendants William Waggoner, Patty Waggoner, Ron Sikorski, Mickey Adams, Dan Hawn, Larry Davidson and Bert Tolbert and Does 1-10**

238.    Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

239.    Defendants are each a "person" as that term is defined by 18 U.S.C. section 1961(3).

240.    Local 12 constitutes an enterprise as that term is defined by 18 U.S.C. § 1961(4).  Each separate trust fund operated by OETT also constitutes an enterprise as that term is defined by 18 U.S.C. § 1961(4).

241.    Local 12 and its associated funds, collectively, constitutes an enterprise as that term is defined by 18 U.S.C. § 1961(4).

242.    The enterprises alleged hereinabove are collectively referred to as the "LOCAL 12 ENTERPRISES".

243.    The LOCAL 12 ENTERPRISES are engaged in, and their activities affect, interstate and foreign commerce.

244.    The Defendants are, and at all relevant times were, associated with the LOCAL 12 ENTERPRISES.

**SECOND AMENDED CLASS ACTION COMPLAINT**

SPIRO MOORE LLP

245.    As described herein, the Defendants, beginning at least as early as 2000, and continuing to the present, knowingly and willfully set into motion an over-arching scheme to defraud the LOCAL 12 ENTERPRISE out of revenues, cost savings, and membership.  The primary goal in all instances was the unlawful enrichment of Defendants through activities of the LOCAL 12 ENTERPRISES. Numerous kickback schemes enabled employers to avoid contractual obligations while providing benefits to Defendants in return.  Assets in trust funds were co-mingled and diverted to personal uses.  To accomplish the over-arching goal of fraudulent and unlawful enrichment, the DEFENDANTS engaged in and/or authorized a variety of unlawful activities, including the use of threats of economic harm and violence to maintain control of Local 12 and prevent discovery of the many asset diversion and kickback schemes enriching the leadership of the IUOE.

246.    Assets intended to benefit Plaintiffs and Class members when deposited into trust account, including the Health & Welfare Fund and others, represent tangible assets subject to conversion in violation of the Hobbs Act.

247.    Plaintiff and Class members were and are aware of ties between the leadership of IUOE and organized crime syndicates in New York and New Jersey. As a result of that awareness, threats of economic and physical harm directed at the Plaintiffs and other Class members were viewed as highly credible and elicited substantial fear and concern amongst Plaintiffs and other Class members.  In fact, members of Local 12 were physically beaten for speaking up against leadership of Local 12.

248.    Beginning at least as early as 2000 and continuing to the present, the DEFENDANTS, in furtherance of and for the purpose of executing the schemes and artifices to defraud and divert Local 12 resources described herein, on numerous occasions engaged in the extortion of rights guaranteed to Plaintiffs and other Class members under the LMRDA and other laws.  Each such extortionate activity in connection with the described schemes and artifices to defraud and

divert Local 12 resources constitutes a distinct violation of the Hobbs Act, 18 U.S.C. § 1951, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  The unlawful extortion of property and rights secured under the LMRDA and other laws include, but is not limited to, the following acts whereby the Defendants:

(a)     Actively prevented members from speaking out at meetings against leadership;

(b)     Obtained assets belonging rightfully to Plaintiffs and other Class members by utilizing threats of economic and physical harm to control Local 12's ability to investigate asset diversions.

249.   Beginning at least as early as 2000 and continuing to the present, Defendants, in furtherance of and for the purpose of executing the schemes and artifices to defraud described herein, on numerous occasions used and caused to be used the United States Mails and other commercial interstate carriers by both placing and causing to be placed letters and other mailable matter in the authorized depositories of such carriers and receiving and causing to be received letters and other matter from such carriers.  Each such use of the United States mails and other carriers in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. § 1341, relating to mail fraud, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  The unlawful use of the mails includes, but is not limited to, the following:

(a)     Fraudulent mailing from Local 12's leadership (in the form of newsletters sent to members) indicating that Local 12's funds were in sound financial condition.

(b)     Fraudulent mailings concerning illegal transfers of assets between funds, including transfers of heavy equipment deleted from fund inventories.

250. By issuing threats of physical assault, as described above, Defendants engaged in racketeering activity as defined by 18 U.S.C. § 1961(1)(A).

251. Beginning at least as early as 2000 and continuing to the present, Defendants, in furtherance of and for the purpose of executing the schemes and artifices to defraud described herein, on numerous occasions used and caused to be used wire communications in interstate and foreign commerce by both making and causing to be made wire communications. Each such use of a wire communication in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. § 1343, relating to wire fraud, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B). The unlawful use of wire communications includes, but is not limited to, the following:

(a) False online information regarding the integrity of funds associated with Local 12;

(b) Acceptance via wire, on occasions too numerous to identify herein, and at times known exclusively by Defendants, of fraudulently obtained kickback payments from employers.

252. Beginning at least as early as 2000 and continuing to the present, Defendants named in this Claim for Relief, in furtherance of and for the purpose of executing the schemes and artifices to defraud described herein, on numerous occasions knowingly engaged in and caused to occur monetary transactions in criminally derived property with value in excess of $10,000. The transactions were accomplished by depositing, withdrawing or transferring funds by, through, or to a financial institution, as such an institution is defined by 18 U.S.C. § 1956. Funds used in such transactions were derived from offenses listed in 18 U.S.C. § 1961(1), including, but not limited to, funds derived from mail fraud, in violation 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343. Each such monetary transaction in connection with the described schemes and artifices to defraud

constitutes a separate and distinct violation of 18 U.S.C. § 1957, relating to unlawful monetary transactions and money laundering, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  The unlawful monetary transactions include, but are not limited to, the following:

(a)   Acceptance of payments by Waggoner and his co-conspirators from employers, at times known exclusively to Defendants;

(b)   Acceptance of payments by Waggoner for the sale of real estate belonging to Local, at times known exclusively to Defendants;

(c)   Deposits by Waggoner at Amalgamated Bank that were diverted from Local 12 fund assets and used to prop up Amalgamated Bank while under investigation by the FDIC.

253.   Beginning as least as early as 2000, and continuing to the present, the Defendants, in furtherance of and for the purpose of executing the schemes and artifices to defraud described herein, on numerous occasions knowingly traveled in interstate commerce and used facilities of interstate commerce (including, but not limited to, the mails) with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of unlawful activities (including violations of 18 U.S.C. § 1957), and thereafter performed or attempted to perform such violations.  Each such interaction with facilities of interstate commerce in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. section 1952 (the "Travel Act"), relating to travel in interstate commerce with intent to facilitate certain unlawful activities, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

254.   Beginning at least as early as 2000 and continuing to the present, Defendants, in furtherance of and for the purpose of executing the schemes and artifices to defraud described herein, on numerous occasions knowingly engaged in

SPIRO MOORE LLP

1    and caused to occur the embezzlement of assets from union welfare and benefit

2    funds, in repeated violation of 18 U.S.C. § 664.

3        255.    Defendants' repeated violations of 18 U.S.C. §§ 664, 1341, 1343,

4    1951, 1952 and 1957 extended over a period of years and involved distinct and

5    independent criminal acts.  Those criminal acts were neither isolated nor sporadic

6    events, but involved the regular and repeated violation as a way of doing business

7    and to accomplish Defendants' desired ends in the course of the continuing

8    business of the LOCAL 12 ENTERPRISE.  These predicate acts were related to

9    each other by virtue of (a) common participants, (b) similarly situated victims, (c)

10   common methods of commission through the habitual dissemination of fraudulent

11   and misleading information, and (d) the common purpose and common result

12   defrauding and looting the LOCAL 12 ENTERPRISE, all while enriching the

13   DEFENDANTS.  As such, this conduct constitutes a pattern of racketeering

14   activity within the meaning of 18 U.S.C. § 1961(5).

15       256.    The fraudulent, unlawful and improper activities of the Defendants

16   threatens to continue.  Based upon the past pattern of activity, other Local Unions

17   either have or will likely be defrauded by the Defendants.  Based upon the past

18   pattern of activity, the Defendants will likely continue to defraud Local Unions like

19   Local 12.  Furthermore, the Defendants are able, based upon their managerial and

20   controlling positions, to replace management in Local Unions, which could

21   thereafter be defrauded and looted without consequence in a manner similar to the

22   schemes and artifices outlined herein.

23       257.    The Defendants all violated or aided violation of 18 U.S.C. § 1962(c)

24   by directly or indirectly conducting or participating in the conduct of the affairs of

25   the LOCAL 12 ENTERPRISE through a pattern of racketeering activity.

26       258.    The Defendants' violation of 18 U.S.C. § 1962(c) caused the Plaintiffs

27   and the Class to suffer direct injury in amounts as may be shown according to proof

28   at time of trial.

SECOND AMENDED CLASS ACTION COMPLAINT

**SECOND CLAIM FOR RELIEF**

**(Violation of 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. §§ 1961-68])**

**By Plaintiffs against All Defendants William Waggoner, Patty Waggoner, Ron Sikorski, Mickey Adams, Dan Hawn, Larry Davidson and Bert Tolbert and Does 1-10**

259.    Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

260.    Defendants are each a "person" as that term is defined by 18 U.S.C. section 1961(3).

261.    Local 12 constitutes an enterprise as that term is defined by 18 U.S.C. § 1961(4).  Each separate trust fund operated by OETT also constitutes an enterprise as that term is defined by 18 U.S.C. § 1961(4).

262.    Local 12 and its associated funds, collectively, constitutes an enterprise as that term is defined by 18 U.S.C. § 1961(4).

263.    The enterprises alleged hereinabove are collectively referred to as the "LOCAL 12 ENTERPRISES".

264.    The LOCAL 12 ENTERPRISES are engaged in, and their activities affect, interstate and foreign commerce.

265.    From at least 1994 and continuing through to the present, Defendants William Waggoner, Patty Waggoner, Ron Sikorski, Mickey Adams, Dan Hawn, Larry Davidson and Bert Tolbert, being persons employed by or associated with the LOCAL 12 ENTERPRISES at all relevant times herein, unlawfully and willfully combined, conspired, confederated and agreed each with the other to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the LOCAL 12 ENTERPRISES through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1962(d).  The times and

locations and forms of such agreements constitute information uniquely within the control of the Defendants.

266.   As part of this conspiracy, Defendants William Waggoner, Patty Waggoner, Ron Sikorski, Mickey Adams, Dan Hawn, Larry Davidson and Bert Tolbert each personally plotted, conspired and agreed to commit two or more fraudulent and illegal racketeering acts and thereby conducted and agreed to conduct the affairs of the LOCAL 12 ENTERPRISES through the pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) described generally herein and specifically in the First Claim for Relief.

267.   In furtherance of the conspiracy and to effect the objects thereof, the Defendants committed and caused to be committed a series of overt acts, including, but not limited to, the following, although not all acts below were committed by each and every named defendant:

(a)   Obtained assets belonging rightfully to Plaintiffs and other Class members by utilizing threats of economic and physical harm to control Local 12's ability to investigate asset diversions;

(b)   Actively prevented members from speaking out at meetings against leadership;

(c)   Fraudulent mailing from Local 12's leadership (in the form of newsletters to members) indicating that Local 12's funds were in sound financial condition.

(d)   Fraudulent mailings concerning illegal transfers of assets between funds, including transfers of heavy equipment deleted from fund inventories.

(e)   Fraudulent mailings concerning the source of "in-kind" political contributions.

(f)   False online information regarding the integrity of funds associated with Local 12;

(g)     Acceptance via wire, on occasions too numerous to identify herein, and at times known exclusively by Defendants, of fraudulently obtained kickback payments from employers.

(h)     Acceptance of payments by Waggoner and his co-conspirators from employers, at times known exclusively to Defendants;

(i)     Acceptance of payments by Waggoner for the sale of real estate belonging to Local, at times known exclusively to Defendants;

(j)     Deposits by Waggoner at Amalgamated Bank that were diverted from Local 12 fund assets and used to prop up Amalgamated Bank while under investigation by the FDIC.

(k)     Upon information and belief, similar violations constituting predicate acts were perpetrated upon other local union chapters around the country.

(l)     Embezzlement of assets from union welfare and benefit trust funds.

268.   The Defendants' violation of 18 U.S.C. § 1962(d) caused the Plaintiffs and the Class to suffer direct injury in amounts as may be shown according to proof at time of trial.

## **THIRD CLAIM FOR RELIEF**

### **(Violations of Labor Management Reporting and Disclosure Act, 29 U.S.C. §§ 411, 431 and 501)**

### **By Plaintiffs against Specific Defendants and Does 1-10**

269.   Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

270.   Jurisdiction is conferred on this Court pursuant to 29 U.S.C. § 412.

271.   This Claim for Relief is asserted against the Defendants named below.

SPIRO MOORE LLP

272.    Violations of the Labor Management Reporting and Disclosure Act ("LMRDA"), Title I (Bill of Rights), occurred within the Central District of California where Local 12 is headquartered.  As such, venue is proper in this District pursuant to 29 U.S.C. § 412.

273.    Violation of 29 U.S.C. § 431, regulating reports filed by a labor organization, occurred in the Central District of California, where Local 12 is headquartered and prepared inaccurate and false filings, including false and inaccurate LM-2 forms.  The policy of this section is to provide union members with access to the tools necessary to monitor the conduct of their union leadership.

274.    Plaintiffs are members of the IUOE, in the Local 12 Chapter of that labor union.

275.    Defendant IUOE is a labor organization as defined in 29 U.S.C. § 402(i).  Defendants William Waggoner, Ron Sikorski, Mickey Adams, Dan Hawn, and Larry Davidson, are officers of a labor organization and have reporting duties imposed pursuant to 29 U.S.C. § 431.

276.    Section 411 of the LMRDA, 29 U.S.C. § 411, provides in part:

(a)(1) Equal rights

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of speech and assembly

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

SPIRO MOORE LLP

29 U.S.C. § 411(a)(1) and (2).  Defendants, through their schemes to usurp and maintain control of Local 12 described above, deprived Plaintiffs of their right to honest, open, fair and free elections to determine the leadership of Local 12.

277.    Section 431 of the LMRDA, 29 U.S.C. § 431, provides, in part:

(b)

Annual financial report; filing; contents

Every labor organization shall file annually with the Secretary a financial report signed by its president and treasurer or corresponding principal officers containing the following information in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year—

(1) assets and liabilities at the beginning and end of the fiscal year;

(2) receipts of any kind and the sources thereof;

(3) salary, allowances, and other direct or indirect disbursements (including reimbursed expenses) to each officer and also to each employee who, during such fiscal year, received more than $10,000 in the aggregate from such labor organization and any other labor organization affiliated with it or with which it is affiliated, or which is affiliated with the same national or international labor organization;

(4) direct and indirect loans made to any officer, employee, or member, which aggregated more than $250 during the fiscal year, together with a statement of the purpose, security, if any, and arrangements for repayment;

(5) direct and indirect loans to any business enterprise, together with a statement of the purpose, security, if any, and arrangements for repayment; and

(6) other disbursements made by it including the purposes thereof;

all in such categories as the Secretary may prescribe.

(c)

Availability of information to members; examination of books, records, and accounts

Every labor organization required to submit a report under this subchapter shall make available the information required to be contained in such report to all of its members, and every such labor organization and its officers shall be under a duty enforceable at the suit of any member of such organization in any State court of competent jurisdiction or in the district court of the United States for the district in which such labor organization maintains its principal office, to permit such member for just cause to examine any books,

SPIRO MOORE LLP

records, and accounts necessary to verify such report. The court in such action may, in its discretion, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.

278.    Defendants named herein caused the filing of false documents with the DOL, in violation of the LMRDA, Title II.

279.    Defendants named herein engaged in prohibited, self-dealing transactions, as alleged above, in violation of the LMRDA, Title V.

280.    By virtue of the total control and domination of Local 12 by the Defendants identified in this Claim for Relief, any attempt to correct these violations through administrative process was futile.  Plaintiffs and union members, at all relevant time, had a statutory right to access and examine all documents relevant to their right to review and audit the truth of filings made pursuant to the LMRDA.  Defendants deprived them of that right and continue to attempt to do so, including by destroying or sequestering documents that would reveal the falsity of Defendants' DOL filings.

281.    The violations of the LMRDA by the identified Defendants in this claim for relief are current and ongoing in nature.

282.    Plaintiffs are suing under Titles 1, 2 and 5 of the LMRDA, which provide for private rights of action.

283.    Because Defendants concealed the falsity of the LM-2 and 5500 filings with fraudulent information, Plaintiffs and the Class were not on reasonable notice of the true magnitude of these falsified reports until 2012.  As such, any statute of limitation was tolled due to fraudulent concealment.

284.    Plaintiffs seek equitable orders requiring the correction of past filing with the DOL and prohibiting further false filing with the DOL.  Plaintiffs also request attorneys' fees for the violations of their LMRDA rights.

SPIRO MOORE LLP

**FOURTH CLAIM FOR RELIEF**

**BREACHES OF FIDUCIARY DUTIES ARISING UNDER ERISA**

**By Plaintiffs Against Specific Defendants and Does 1-10**

285.    Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

286.    ERISA § 502(a)(2), 29 U.S.C.A. § 1132(a)(2), authorizes a plan participant or beneficiary to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C.A. § 1109. Section 409 requires "any person who is a fiduciary … who breaches any of the … duties imposed upon fiduciaries … to make good to such plan any losses to the plan …" Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate …"

287.    Plaintiffs and Class Members are or were at relevant times participants and/or beneficiaries in the ERISA-governed plans alleged herein and associated with Local 12, including, but not limited to, the Local 12 Pension Fund, the Health & Welfare Fund, and the Operating Engineers Training Trusts, among others.

288.    Defendants identified hereinabove as Administrators and/or Trustees and/or IUOE Executives and/or Local Executives have assumed fiduciary obligations to Plaintiffs and Class Members.   They are the defendants sued herein.

289.    Among other things, the Trustees for Local 12 Pension Fund, the Health & Welfare Fund, and the Operating Engineers Training Trusts allowed or permitted OEFI to bill the trusts for thousands of dollars a year in bogus employee wages and other expenses, which were not for the benefit of the trusts but for the benefit of Waggoner's friends and family.

290.    Among other things, Trustees for the Local 12 Pension Fund and Health & Welfare Fund chose investment management companies that employed Waggoner's son, Kenneth Waggoner, for the benefit of Waggoner's son, not for the benefit of the Trusts.

SPIRO MOORE LLP

291.    Among other things, the Trustees of the OETT and the OETT Administrator Burt Talbert breached their fiduciary duties to the OETT and caused the OETT to engage in numerous prohibited transactions, including the following:

    (a)    Paying Mr. Watson and other instructors employed by OETT from OETT assets $550 month for expenses without ever determining whether such monies were expended for the benefit of the OETT;

    (b)    Knowingly or negligently permitting a portion of the $550 a month paid to Mr. Watson and others to be kicked back to Waggoner for the BA Fund;

    (c)    Paying Mr. Watson and other instructors employed by OETT overtime wages on Saturdays from OETT assets when such work was political activity and not for the benefit of OETT;

    (d)    Allowing or permitting OETT equipment, materials, and personnel to be used for the personal benefit of union officers without reimbursement to OETT, including refurbishing automobiles and vehicles for the benefit of such union officers;

    (e)    Allowing or permitting scrap metal owned by OETT to be sold for the benefit of Tolbert who converted thousands of dollars a year of OETT assets to his personal use through keeping proceeds from the sale of OETT-owned scrap metal.

292.    Defendants engaged in multiple breaches of fiduciary duty.

## FIFTH CLAIM FOR RELIEF
## COMMON LAW BREACH OF FIDUCIARY DUTY
### By Plaintiffs Against Specific Defendants and Does 1-10

293.    Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

294.   Defendants identified hereinabove as IUOE executives and/or Local officers or executives have assumed fiduciary obligations to Plaintiffs and Class Members.   They are the defendants sued herein.

295.   The relations between Defendants herein, on the one hand, and Plaintiffs and Class members, on the other hand, impose a duty on the Defendants to act with the utmost good faith for the benefit of Plaintiffs and Class members, who were entitled to believe in the integrity of Defendants, but instead were left the victims of Defendants who chose not to serve their best interests.  Unquestionably, union members are entitled to repose confidence in their Business Manager, their national union officers, and their local union officers.

296.   Defendants have violated their common law fiduciary duties and are liable under California law for those breaches of fiduciary duty that are unrelated to ERISA-governed employee benefit plans.    Claims against union officials for breach of fiduciary duty under California law have been recognized by the courts.[3]

297.   Defendants breached their fiduciary duties by the acts set forth above that are not related to employee benefit plans, and Plaintiffs suffered damages as a proximate result thereof.  Examples of Defendants' breaches of duty alleged above and incorporated herein include, but are not limited to, the improper and uncompensated use of the Local's jet, the improper and uncompensated use of the Local's printing press, the forced contribution by Plaintiffs and union members to the BA's Fund and to EPEC, Patty Waggoner's use of the union's Ford Flex, and the use by union officials of the labor of union employees for work at their homes. None of these acts was consistent with Defendants' fiduciary duties under California law.

298.    By embezzling or otherwise unlawfully securing Plaintiffs' and class members' monies or services, and embezzling union assets, labor and/or services in this fashion, Plaintiffs and the class were damaged.  Plaintiffs should be made

SPIRO MOORE LLP

1   whole, and all profits earned by Defendants in breach of their common law

2   fiduciary duty should be disgorged. *People ex rel. Harris v. Rizzo*, 214

3   Cal.App.4th 921, 951, n. 30 (2013).

4

5   ## SIXTH CLAIM FOR RELIEF

6   **VIOLATION OF CALIFORNIA LABOR CODE § 221 and 2802**

7   **By Plaintiffs Against Defendants William Waggoner, Ron Sikorski, Mickey**

8   **Adams, Dan Hawn, Larry Davidson and OEFI and Does 1-10**

9   299.   Plaintiffs re-allege, and incorporate by reference, each and every

10   paragraph herein.

11   300.   This Claim for Relief is brought by the Local 12 Employee Class.

12   301.   At all relevant times, Plaintiff Salas and the other members of the

13   Local 12 Employee Class were entitled to receive their wages for work performed

14   and be free from collection of wages previously paid by Local 12 or affiliated

15   entity Defendant OEFI.

16   302.   Defendant William Waggoner and the Defendant Officers of Local 12

17   require employees of Local 12 and affiliated entity Defendant OEFI to pay union

18   membership dues and supplemental dues to work.  However, these employees, of

19   which Plaintiff Salas was a Class Member, did not and do not have any collective

20   bargaining agreement that protects them from abuse and provides a grievance

21   process in the event of termination.  Thus, the charges to the Local 12 Employee

22   Class are nothing more than a subterfuge by Defendant William Waggoner and the

23   Defendant Officers of Local 12 to collect back from employees a portion of the

24   wages previously paid by Local 12 or affiliated entity Defendant OEFI, in violation

25   of California Labor Code § 221.

26   303.   To the extent union membership is required for employment,

27   Defendant William Waggoner and the Defendant Officers of Local 12, as well as

28

SPIRO MOORE LLP

Defendant OEFI, failed to indemnify Plaintiff Salas and other members of the Local 12 Employee Class for mandatory dues payments in violation of California Labor Code § 2802.

304.    As a result of conduct by Defendants William Waggoner, Ron Sikorski, Mickey Adams, Dan Hawn, Larry Davidson and OEFI, Plaintiff Salas and other members of the Local 12 Employee Class have suffered damages in an amount, subject to proof, to the extent they were forced to give back wages already paid and/or were not indemnified for employer-mandated membership charges.

305.    Pursuant to Labor Code § 218.5, Plaintiff Salas and the Local 12 Employee Class are entitled to recover their wrongfully collected wages, reasonable attorney's fees and costs of suit, along with interest.

306.    Alternatively, pursuant to Labor Code § 2802, Plaintiff Salas and the Local 12 Employee Class are entitled to indemnification in the form of reimbursement of dues and supplemental dues payments while employed by either Local 12 or OEFI, reasonable attorney's fees and costs of suit.

## SEVENTH CLAIM FOR RELIEF
## NEGLIGENCE AND NEGLIGENT SUPERVISION
### By Plaintiffs Against Certain Defendants and Does 1-10

307.    Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein, as if fully set forth herein

308.    A principal who conducts an activity through an agent is subject to liability for harm to a third party caused by the agent's conduct if the harm was caused by the principal's negligence in selecting, training, retaining, supervising, or otherwise controlling the agent.  (Rest.3d Agency, § 7.05, p. 177.)

309.    In performing many of the acts set forth above, Defendant William Waggoner, in his role as IUOE First Vice President and Local 12 Business Manager, was acting as the agent of IUOE, the principal.   IUOE knew that

1  Waggoner was engaged in improprieties and illegal conduct, as discussed above.

2  IUOE had the right and duty to supervise and control Waggoner and to prevent him

3  from engaging in said illegal conduct, but failed to do so, in dereliction of IUOE's

4  duty, as a fiduciary and otherwise, to Plaintiffs and the class members.   As a direct

5  result of IUOE's negligence and negligent supervision, Plaintiffs and class

6  members have suffered damages, as alleged above, in an amount to be proven at

7  trial.

8      310.   In performing the wrongful acts set forth above, Defendant Vince

9  Giblin, as President of the IUOE, was acting as the agent of IUOE, the principal.

10  IUOE knew that Giblin was engaged in improprieties and illegal conduct, as

11  discussed above.   IUOE had the right and duty to supervise and control Giblin and

12  to prevent him from engaging in said illegal conduct, but failed to do so, in

13  dereliction of IUOE's duty, as a fiduciary and otherwise, to Plaintiffs and the class

14  members.   As a direct result of IUOE's negligence and negligent supervision,

15  Plaintiffs and class members have suffered damages, as alleged above, in an

16  amount to be proven at trial.

17      311.   In performing the wrongful acts set forth above, Defendant Vince

18  Giblin, as President of the IUOE, was acting as the agent of the General Executive

19  Board and its member defendants, identified above.   The GEB defendants knew

20  that Giblin was engaged in improprieties and illegal conduct, as discussed above.

21  The GEB defendants had the right and duty to supervise and control Giblin and to

22  prevent him from engaging in said illegal conduct, but failed to do so, in dereliction

23  of their duty, as fiduciaries and otherwise, to Plaintiffs and the class members.   As

24  a direct result of their negligence and negligent supervision, Plaintiffs and class

25  members have suffered damages, as alleged above, in an amount to be proven at

26  trial.

27      312.   In performing many of the acts set forth above, Defendants Mickey

28  Adams, Ron Sikorski, Larry Davidson and Dan Hawn were acting as the agent of

Waggoner, the principal.  Defendant Waggoner knew that they were engaged in improprieties and illegal conduct, as discussed above.   Waggoner had the right and duty to supervise and control Adams, Sikorski, Davidson and Hawn and to prevent them from engaging in said illegal conduct, but failed to do so, in dereliction of his duty, as a fiduciary and otherwise, to Plaintiffs and the class members.  As a direct result of Waggoner's negligence and negligent supervision, Plaintiffs and class members have suffered damages, as alleged above, in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF

### VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, *ET SEQ.*

### By Plaintiffs Against All Defendants

313.    Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein, as well as the allegations in Claim for Aiding and Abetting below, as though fully set forth herein.

314.    The wrongful conduct of Defendants alleged herein violates California's "Unfair Competition Law (the "UCL"), set forth in Cal. Bus. & Prof. Code §§ 17200, *et seq.*, in that it constitutes unfair, unlawful and fraudulent business acts and practices.  This claim is brought by Plaintiffs individually, as representatives on behalf of the Class Members, and in their capacities as private attorneys general, against all Defendants for their unlawful, unfair, and/or fraudulent business acts and/or practices pursuant to the UCL.  Plaintiffs seek to enforce important rights affecting the public interest within the meaning of Code of Civil Procedure § 1021.5.

315.    As a result of the unfair, unlawful and fraudulent conduct alleged herein, Plaintiffs have suffered injury and lost money and/or property.   Defendants engaged in false, unfair, and misleading business practices, and received ill-gotten

gains therefrom, by engaging in the acts and omissions described herein. Defendants have obtained valuable money and services from Plaintiffs and others similarly situated, and/or have failed to pay or turn over money and property in which Plaintiffs, class members and/or the Trusts and other entities in which Plaintiffs and others similarly situated are participants, members and/or beneficiaries, have a vested interest, to the detriment of Plaintiffs and class members.  Such monies and property should be awarded to Plaintiffs and class members as restitution.

316.   Defendants, and each of them, are "persons" as defined in the UCL.

### "Unlawful" Conduct Under the UCL

317.   Defendants' acts and practices alleged above constitute unlawful business acts and/or practices within the meaning of the UCL.

318.   A violation of the UCL's "unlawful" prong may be predicated on the violation of virtually any state or federal law, rule or regulation.  Defendants' unlawful business acts and/or practices as alleged herein have violated numerous laws and/or regulations - federal and/or state, statutory and/or common law - and said predicate acts are therefore *per se* violations of the UCL.  These predicate unlawful business acts and/or practices include, but are not limited to, the following:

      (a)   Violations of RICO, as alleged above;

      (b)   Embezzlement under the California Penal Code (*see* Cal. Penal Code §§504, 506 and 508; *see also* § 490a, stating that embezzlement now constitutes the crime of theft);

      (c)   Grand theft under the California Penal Code (Penal Code § 487), in connection with the theft and appropriation of monies, property and/or labor, worth in excess of $950, such as the theft of recycled metals, and the appropriation of labor for repairs or restoration of personal property such as boats or automobiles;

SPIRO MOORE LLP

(d)    Petty theft under the California Penal Code (Penal Code § 487), in connection with the theft of monies and property worth $950 or less;

(e)    Grand theft auto, in connection with the embezzled former union automobiles secured by certain Defendants, as alleged above, by buying vehicles at auction, restoring them with OETT assets, and purchasing them at below-market value (Penal Code § 487(d)(1));

(f)    Receipt of stolen or extorted property, knowing that said property was stolen or extorted (Cal. Penal Code § 496);

(g)    The crime, set forth in Penal Code §496(d), of receiving, purchasing, selling, concealing or withholding of automobiles and construction equipment while knowing that such property was obtained in any manner constituting extortion or theft (the latter of which includes embezzlement; *see* Penal Code § 490(a)), committed here where, as alleged, construction equipment belonging to the Southern California Training Trust was sold, transferred, withheld and concealed, without compensation to the Trust, and where, as alleged, Defendants received and purchased former union automobiles at below-market value, knowing such property was obtained in a manner constituting theft or embezzlement;

(h)    Extortion (Penal Code §§ 518, 519 *et seq.*);

(i)    Theft by false pretenses (Cal. Penal Code § 532), in those instances, e.g., where defendant Waggoner and/or his agents, with intent to deceive, told employees that they were required to contribute to the BA's Fund, and the employees, at least in part based on that false pretense, contributed their monies.

SECOND AMENDED CLASS ACTION COMPLAINT

(j)     Violations of the federal Hobbs Act and the other federal acts which, as alleged above, serve as predicate acts in connection with Plaintiffs' claims against Defendants for racketeering;

(k)     Violations of the LMRDA, as alleged above;

(l)     Violations of 18 U.S.C. § 664 (theft or embezzlement from employee welfare benefit or pension benefit plan or any fund associated therewith), as alleged above;

(m)     Violations of 18 U.S.C. § 665 (theft or embezzlement from employment and training funds that involve federal funding assistance)

(n)     Violations of 18 U.S.C. § 666 (prohibiting the theft or embezzlement of property valued at $5,000 or more in connection with a program receiving federal funding assistance of at least $10,000 in one year, and prohibiting bribery, which is defined to include including giving or offer, or agreement to give anything of value to influence or reward an agent of an organization or of a State or local government, or any agency thereof, in connection with any business, transaction, or series of transaction of such organization, government or agency involving anything of value of $5,000 or more, where the organization, government or agency receives federal funding assistance of at least $10,000 in one year).

(o)     Violations of the California Labor Code, as set forth above.

While not every named Defendant is alleged to have committed each and every one of the predicate acts above, all Defendants engaged in at least one such unlawful practice.

<u>"Unfair" Conduct Under the UCL</u>

SPIRO MOORE LLP

1        319.   Defendants' conduct, as alleged above, also is "unfair" under the UCL.

2   It violates established law and/or public policies which seek to ensure the

3   protection of union members and consumers from theft and embezzlement schemes

4   of the sort employed here.  The conduct engaged in by Defendants was and is

5   directly contrary to established legislative goals and public policies of the State of

6   California and the United States, and was and is unfair under the UCL.  In addition,

7   the harm to Plaintiffs, members of the general public and Class Members

8   outweighs the utility, if any, of Defendants' wrongful acts and/or practices as

9   alleged herein.   Further, the conduct at issue is and was immoral, unethical,

10  oppressive, unscrupulous or substantially injurious to Plaintiffs and class members

11  and thus unfair under the UCL.   At all times relevant, the conduct at issue alleged

12  herein caused:  1) substantial injury to Plaintiffs, Class members and the public

13  (i.e., the loss of money and loss or diminution of Trust benefits and damage to the

14  financial condition of the Local and the Trusts), 2) had no countervailing benefit to

15  Class members, consumers or competition that could possibly outweigh this

16  substantial injury; and 3) caused injury that could not have reasonably been

17  avoided by Plaintiffs and others similarly situated.

18

19                    "Fraudulent" Conduct Under the UCL

20        320.   By virtue of the incorporated allegations discussed above, Defendants

21  also engaged in conduct that was "fraudulent" under the UCL – i.e., likely to

22  mislead a reasonable person.   For example, the union Defendants' demands for

23  political contributions, in violation of the law, were fraudulent under the UCL, in

24  that such demands were likely to mislead a reasonable person into believing that

25  mandatory contributions to Defendants' political action funds were in fact required

26  conditions of their employment, and to therefore part with their money.   In

27  addition, Defendants actively concealed and omitted to disclose, despite a duty of

28  disclosure imposed by virtue of, *inter alia*, their roles as fiduciaries, the material

**SECOND AMENDED CLASS ACTION COMPLAINT**

fact that certain employers were engaging in massive double-breasting, known to Waggoner and his cronies.  This material omission was likely to mislead a reasonable person into believing that there was no need to audit and demand lost monies due to double-breasting, and to therefore forego obtaining those monies. In addition, William Waggoner and the defendant trustees concealed and omitted to disclose the material fact that Waggoner was unilaterally writing off unpaid contributions owed by employers, to the detriment of Plaintiffs and the Trusts. This conduct was likely to mislead a reasonable person into believing that contributions due and owing by the employer defendants were being made as required, and, thus, that audit and collection activity did not need to be commenced. In addition, Defendants, including but not limited to William Waggoner, concealed and failed to disclose that they were stealing and embezzling Local 12 and Trust fund monies, as alleged above.   These omitted facts were plainly material to any reasonable person, and the omission of these facts was likely to deceive a reasonable person into believing that there was no need to audit and demand the return of such monies, and, potentially, to mislead members into voting for Waggoner and his cronies despite their illegal actions.   Had Defendants not engaged in, and failed to disclose, the acts and practices alleged herein, Plaintiffs would have acted differently.

321.   Plaintiffs, individually, and on behalf of Class members, are entitled to, and do, seek such relief as may be necessary to disgorge money and/or property that the Defendants have wrongfully acquired, or money and property in which Plaintiffs and the class members have a vested ownership interest but which has been withheld from Plaintiffs and the class members.

322.   Plaintiffs, individually, and on behalf of Class members, are further entitled to and do seek a declaration that the above described business practices are unfair, unlawful and/or fraudulent, and injunctive relief restraining the Defendants, and each of them, from engaging in any of the above-described unfair, unlawful

**SECOND AMENDED CLASS ACTION COMPLAINT**

1 | and/or fraudulent business practices in the future.

2 | 323. Plaintiffs, individually, and on behalf of Class members have no plain,

3 | speedy, and/or adequate remedy at law to redress the injuries which they have

4 | suffered as a consequence of the Defendants' unfair, unlawful and/or fraudulent

5 | business practices. As a result of the unfair, unlawful and/or fraudulent business

6 | practices described above, the Plaintiffs, individually, and on behalf of members of

7 | the putative Class, have suffered and will continue to suffer irreparable harm unless

8 | the Defendants, and each of them, are restrained from continuing to engage in the

9 | previously alleged violations of the UCL.

10 | 324. Wherefore, Plaintiffs and Class members are entitled to equitable

11 | relief, including restitution of all monies and property wrongfully taken from them,

12 | and of all monies and property withheld or owed to them in which they have a

13 | vested interest, and restitutionary disgorgement of all profits accruing to

14 | Defendants due to their practices, to the extent such relief would be restitutionary

15 | in nature; injunctive relief including but not limited to a permanent injunction

16 | requiring Defendants to cease their illegal unfair practices and to comply with the

17 | law; declaratory relief of an equitable nature, an award of attorneys' fees pursuant

18 | to California Code of Civil Procedure § 1021.5 and other applicable laws; and an

19 | award of costs.

## NINTH CLAIM FOR RELIEF
## AIDING AND ABETTING OF CONDUCT ALLEGED IN PRIOR CLAIMS
### By Plaintiffs Against All Defendants

24 | 325. Plaintiffs re-allege, and incorporate by reference, each and every

25 | paragraph herein.

26 | 326. All Defendants in this case aided and abetted at least some other

27 | Defendants in some respects, in connection with the claims pled above. That is, all

28 | Defendants actually knew that other Defendants, such as William Waggoner, were

SPIRO MOORE LLP

1  engaging in breaches of duty and illegal or otherwise wrongful acts, at least in

2  some respects, that were harmful to the union membership and fund beneficiaries.

3  Each Defendant also enabled and substantially assisted in the accomplishment of

4  one or more of the breaches of duty and wrongs committed by the primary violators

5  constituting the actionable wrong in each claim, and thereby substantially assisted

6  in the wrongs, crimes, torts, statutory violations and unfair practices alleged herein.

7  Examples follow.

8       327.   The defendant members of the local executive board, like Mickey

9  Adams and Ron Sikorski, on numerous occasions and dates that are known to them

10  but that not presently known to Plaintiffs, voted in favor of  William Waggoner's

11  acts and practices of wrongful conduct, where votes were required to permit that

12  conduct, and thus substantially assisted in its accomplishment.   Despite their

13  fiduciary duties to the union membership and to the local union intended to benefit

14  the members, such executive board defendants knowingly and substantially assisted

15  Waggoner in his wrongs, rather than voting against him or taking other steps to

16  stop him or even abstaining from voting in favor of his wrongful conduct.    Such

17  conduct also constituted ratification of Waggoner's acts.

18       328.   The named defendant trustees, for their part, voted with William

19  Waggoner - on numerous dates and occasions known to them but not to Plaintiffs -

20  to allow and enable the misuse and diversion of trust assets and to halt OEFI audits

21  into delinquent contributions to the Trusts, and failed to failed to otherwise attempt

22  to stop his conduct, despite their fiduciary duty to do so in the interests of the fund

23  beneficiaries. They thereby substantially assisted in the wrongs alleged above.

24  Such conduct also constituted ratification of Waggoner's acts.

25       329.   William Waggoner, for his part, also knew of and substantially assisted

26  in the breaches of duty by others including his wife Patty Waggoner and his son

27  Kenneth Waggoner, as alleged above.

28

SPIRO MOORE LLP

SECOND AMENDED CLASS ACTION COMPLAINT

330.   In addition, William Waggoner and other Local 12 officer defendants, such as Local president Adams, flew together for personal reasons on the local's jet, thereby knowingly and substantially assisting one another in embezzling from Local 12 (and from members like Plaintiffs, who the Local's assets are intended to benefit).  Each of the officer defendants who took such flights knew that flying on the union jet for personal reasons, without compensation, was improper, illegal, and in breach of their fiduciary duties, yet they went ahead.   After all, flying on a private jet where poker games can be played with one's cronies is far more economical and enjoyable than paying for one's travel on a public airline.  Waggoner and his cronies treated the union jet and union resources like their personal slush fund.

331.   Further, Patty Waggoner would, as alleged, sometimes take the union jet to go shopping in Las Vegas for personal reasons;  she or William Waggoner would ask a union officer, such as defendant Mickey Adams, to accompany her under the pretext that the officer was going to Las Vegas to handle Southern Nevada Local 12 business there.   Officers who accepted such invitations to "ride along" with Ms. Waggoner knowingly aided and abetted her embezzlement of union resources and unlawful, unfair business practices.  Any of these officers, who had fiduciary duties to the Local and its members and who, as officers, undoubtedly were vested with the authority to prevent the illegal use of the union jet, could have – and should have - stopped non-member Patty Waggoner from taking the jet on her personal jaunts, but instead they assisted her in doing so by riding along in an artificial effort to make her wrongful conduct appear less improper.

332.   In addition, William Waggoner knew of and substantially assisted in the breaches of duty by others, like his loyalist trustee, Mr. Poss.   Defendant Poss, as previously alleged, failed to make required employer contributions to the funds, which Waggoner then wrote off.  In addition, Mr. Poss, with Waggoner's knowledge, served as Waggoner's loyal vote on several trust boards, despite the

knowledge of Waggoner and other trustees that Poss was mentally incompetent. Mr. Poss – at least before he became incompetent - knowingly voted with Waggoner to permit Waggoner's schemes to go forward, in part because of Waggoner's contribution write-offs and other improper diversions of fund assets to Poss, such as the expensive vacations that Poss and his family were annually provided using fund assets, in violation of both Waggoner and Poss's fiduciary duties.

333.    Because of their aiding and abetting of each others' wrongs and illegal conduct, which contributed to the losses suffered by Plaintiffs and the Class, Defendants are jointly liable for all of the primary violations alleged herein that they knowingly and substantially assisted in accomplishing. Class members have been damaged, in the aggregate, in amounts believed to exceed many millions of dollars, with the actual amount to be proven later.  Defendants should be required to pay back those monies, with punitive damages thereon, based on their malicious and oppressive conduct.

## **PRAYER FOR RELIEF**

Plaintiffs, individually, and on behalf of all others similarly situated, pray for relief and judgment against Defendants, jointly and severally, as follows:

### Class Certification

1. That this action be certified as a class action;

2. That Plaintiffs be appointed as the representative of the Class; and

3. That counsel for Plaintiffs be appointed as Class Counsel.

### As to the First Claim for Relief

4. For compensatory and general damages, as shown according to proof;

5. For treble damages;

SPIRO MOORE LLP

6.  For exemplary damages;

7.  For an accounting;

8.  For temporary and permanent injunctive relief;

9.  For disgorgement of monies improperly obtained;

10. For prejudgment interest according to law;

11. For attorney's fees;

12. For costs of suit; and,

13. For such other and further relief as this Court may deem proper.


### As to the Second Claim for Relief

14. For compensatory and general damages, as shown according to proof;

15. For treble damages;

16. For exemplary damages;

17. For an accounting;

18. For temporary and permanent injunctive relief;

19. For disgorgement of monies improperly obtained;

20. For prejudgment interest according to law;

21. For attorney's fees;

22. For costs of suit; and,

23. For such other and further relief as this Court may deem proper.


### As to the Third Claim for Relief

24. For compensatory and general damages, as shown according to proof;

25. For temporary and permanent injunctive relief;

26. For attorney's fees and costs pursuant to the LMRDA;

27. For such other and further relief as this Court may deem proper.

SECOND AMENDED CLASS ACTION COMPLAINT

As to the Fourth Claim for Relief

28. For temporary and permanent injunctive relief;

29. For declaratory relief;

30. For a declaration that the Trustees have breached their ERISA fiduciary duties to the Funds and their participants;

31. For appropriate "make whole" equitable relief authorized pursuant to ERISA;

32. The Trustees be found liable for the failure to exercise their fiduciary duties;

33. For attorney's fees and costs pursuant to ERISA;

34. For such other and further relief as this Court may deem proper.

As to the Fifth Claim for Relief

35. For compensatory and general damages, as shown according to proof;

36. Disgorgement of profits;

37. For temporary and permanent injunctive relief;

38. For declaratory relief;

39. For appropriate "make whole" equitable relief;

40. For such other and further relief as this Court may deem proper.

As to the Sixth Claim for Relief

41. For compensatory and general damages, as shown according to proof;

42. For prejudgment interest according to law;

43. For attorney's fees and costs pursuant to California's Labor Code;

44. For costs of suit; and,

45. For such other and further relief as this Court may deem proper.

SECOND AMENDED CLASS ACTION COMPLAINT

As to the Seventh Claim for Relief

46. For compensatory and general damages, as shown according to proof;

47. For prejudgment interest according to law;

48. For costs of suit; and,

49. For such other and further relief as this Court may deem proper.

As to the Eighth Claim for Relief

50. That the Court declare, adjudge and decree that Defendants violated California Business and Professions Code §§ 17200, et seq. by For restitution to Plaintiffs and all class members and prejudgment interest from the day such amounts were due and payable;

51. For the appointment of a receiver to receive, manage and distribute any and all funds disgorged from Defendants and determined to have been wrongfully acquired by Defendants as a result of violations of California Business & Professions Code §§ 17200 et seq.;

52. For reasonable attorneys' fees and costs of suit incurred herein pursuant to California Code of Civil Procedure § 1021.5;

53. For injunctive relief to ensure compliance with this section, pursuant to California Business & Professions Code § 17200, et seq.; and,

54. For such other and further relief as the Court may deem equitable and appropriate.

As to the Ninth Claim for Relief

55. For compensatory and general damages, as shown according to proof;

56. For exemplary damages;

57. For disgorgement of monies improperly obtained;

58. For prejudgment interest according to law;

59. For costs of suit; and,

SECOND AMENDED CLASS ACTION COMPLAINT

60. For such other and further relief as this Court may deem proper.

Dated: July 22, 2013                     Respectfully submitted,

SPIRO MOORE LLP

By:_____
H. Scott Leviant
J. Mark Moore

Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Dated: July 22, 2013

Respectfully submitted,

SPIRO MOORE LLP

By: _____

H. Scott Leviant
J. Mark Moore

Attorneys for Plaintiffs

# EXHIBIT "2"

# BILL WAGGONER
## BUSINESS MANAGER

# State of the Union

At the start of 2011, it seemed as if the struggling economy and the high unemployment numbers were going to take forever to improve. The recession isn't over yet, and not everybody's back to work, but it's looking a whole lot better than it was this time last year.

Our stated goal at the beginning 2011 was to get the economy moving again. That would make the out-of-work list shorter.

The loss of reported hours hit every union organization even harder in early 2011, and we were no exception. The Officers and I had to learn how to become familiar with the ins and outs of the Pension Rehabilitation Agreement and compliance with federal regulations.

If you will recall, I reported at the General Membership Meeting in December 2010 that our Health and Welfare Fund was in serious financial condition. Estimates were that we had to come up with an increase amounting to $4.60 per hour, which included $1.00 an hour in the hourly wage rate, a $1.90 reduction in benefits and a $1.50 per hour increase from the employer.

Also in the early part of 2011, you read in the News-Record how the Pension Fund fell below acceptable levels. The Southern California Operating Engineers Training Trust, and to a lesser degree the Las Vegas Training Trust, were running at a loss every month, and were scrambling to reduce their expenditures. The Survey Training Trust was also experiencing financial problems.

Even though many unions were in worse shape than we were, this was a very difficult time for all of us.

You, the membership, are the reason why things started to turn around mid-2011. Your vote to allocate the negotiated increase at the June Semi-Annual Membership Meeting created an infusion of funds into the Health and Welfare Fund, Pension Fund, Joint Apprentice Training/Journeyman Retraining Fund and The Engineers Contract Compliance Committee Fund.

Without your support, without that membership vote, there is no way we Officers could accomplish what we needed to do.

The Health and Welfare Trust Fund was the hardest hit, and the one that needed the most attention. We had almost daily meetings with trustees and auditors in the summer and fall of 2011 to try to address the critical losses we were experiencing, despite record cutbacks in spending.

Then things finally started looking up. The $10 million loan by Local 12 to rescue the Health and Welfare Fund and the subsequent $10 million line of credit has finally stopped the bleeding.

At the latest Trust Fund Meeting, a report revealed

a number of positive trends. The hours reported were improving, the backlog of claims was shrinking, they are in the process of catching up and the newer claims were also being processed.

And I received a report recently from the International which stated that there are almost 17,000 more Operating Engineers working now than there were three months ago. Overall employment percent fell from 15.8 to 9.8. It may not be that low here in California and Nevada, but judging from the out-of-work list, it is definitely lower.

Another item in the good news department - our new Dispatch Hall in San Diego is open for business.

### Labor-Friendly Politicians

There were a few other things that were going our way in 2011. With Jerry Brown in Sacramento, we had the ear of the Governor's office, including his Labor-friendly departmental appointments. These departments, such as the Employment Development Department, which handles unemployment insurance issues dealing with wage and hour situations, are important when we encounter a major problem with respect to the membership of Local 12.

One of Brown's key choices was Christine Baker, now head of the Department of Industrial Relations (DIR). She's agreed to merge the formerly independent divisions of the DIR, so it is going to be easier to get help with our problems regarding the enforcement of



*Business Manager William C. Waggoner addresses the January meeting in District 4.*

the State Prevailing Laws and the registration of our Prevailing Rates.

Another good choice was Labor Commissioner Julie Su, who has a record of prosecuting employers who take advantage of workers.

Jerry Brown is a classic example of why we need to elect Labor-friendly people in government. The major priority in the presidential election this

year must be to keep Barack Obama and Labor Secretary Hilda Solis in office. The working men and women of our country must protect their rights to earn a decent wage and work in safe conditions, and they can do that by choosing candidates who value those rights.

### Labor-UNfriendly politicians

Some of the Labor-UNfriendly politicians, especially in Nevada, worked hard last year, as they always do, to try to undo legislation that we have fought hard to get enacted to benefit the working men and women of our country.

Somebody in Nevada came up with Bill 312, which would delete the overtime provision in our negotiated contracts. Prevailing rates would be the prevailing rates

Continued on page 10

**ABOUT THE COVER**

*For more information on the Porter Ranch Project turn to our centerspread.*

*Cover photo courtesy of Business Representative Ed Guthrie.*

EXHIBIT "3"





*International Union of Operating Engineers*   AFL-CIO

Southern California & Southern Nevada

**WM. C. WAGGONER**
*Business Manager*
*and*
**General Vice-President**

August 19, 2011

TO:     All Officers and Local 12 Employees

FROM:   Wm. C. Waggoner, Business Manager
        I.U.O.E., Local Union No. 12

=====================================================================

At the Executive Board Meeting held on August 6, 2011, the Executive Board took certain actions that will affect practically all of the employees of Local 12.

First, a motion was passed unanimously that Executive Board Meetings will be held every other month instead of the usual schedule of meetings every month.  Therefore, there will not be a Board Meeting in September.

Secondly, I recommended that we ask the employees to take two days off per month without pay.  We will work out a schedule to determine which day of the week each employee will be off work.

This will allow us to reduce the number of employees in each department by 50 percent for those days off.

In other words, half of the staff will be working five days per week and the other half will receive pay for four days.

Between December 31, 2009 and December 31, 2010, the General Fund's loss was $5,727,742.  According to the number generated in the first six months of this year, we estimate that we will lose approximately $4 million this year.

As we all know, you cannot continue to operate creating a deficit in the amounts reflected in the above paragraph.

In the event the economy improves, the membership goes back to work and we stop the bleeding, we will discontinue this program and return to a five day week operation.

Thank you for your assistance and cooperation in adopting this program until we see better days ahead.

# EXHIBIT "4"





AFL-CIO



Southern California & Southern Nevada

**WM. C. WAGGONER**
*Business Manager*
*and*
*General Vice-President*

## MEMORANDUM

TO:      ALL LOCAL 12 OFFICERS, DISTRICT REPRESENTATIVES,
         BUSINESS AGENTS AND OTHER DRIVERS

FROM:    WILLIAM C. WAGGONER, BUSINESS MANAGER

DATE:    9/13/04

Please be advised, I am sending this memo that is of utmost importance. This is not just a memo from the main office and like similar memos you toss in a file. Local 12 is having a serious problem of obtaining automobile insurance coverage at a reasonable rate. In fact, Hartford Insurance our present carrier was the only insurance company that would agree to underwrite our auto insurance coverage.

The reason is very simple. Some of the agents driving records are horrible. It is not fair that the agents who drive very carefully and sensibly are "burdened" by those who take to many risks in their driving habits. Like everything else we have to mix their good driving records with those who think they are "Jeff Gordon". In other words, clean up your act, because we don't intend to buy "tanks" for you to perform your every day activities.

Please review the attached Driver Safety Policy and acknowledge by signing the white copy and sending it to me no later than September 30, 2004.

WCW:sdh

# DRIVER SAFETY POLICY

Local 12 considers the prevention of vehicle accidents essential to the well being of our employees, union equipment and the general public.  All drivers are expected to practice defensive driving by following traffic regulations and our established procedures.

## *DEFINITION OF DEFENSIVE DRIVER*

"Defensive Drivers are persons who commit no driving errors themselves and make allowances for the lack of skill or improper driving practice of the other driver.  Defensive Drivers adjust their own driving to compensate for unusual weather, road and traffic conditions and are not tricked into an accident by the unsafe actions of pedestrians and other drivers.  Being alert to accident producing situations, they recognize the need for preventive action in advance and take the necessary precaution to prevent the accident.  As Defensive Drivers, they know when it is necessary to slow down, stop or yield the right-of-way to avoid involvement."

- A Department of Motor Vehicle report will be run routinely on all of our drivers each year to insure safety and compliance to this policy.

## *PREDOMINATE VEHICLE ACCIDENT CAUSES:*

Disregard For Signs & Lights          Following to Close
Not Driving Defensively                   Inattention/Poor Judgment
Speeding/Attitude                            Unsafe Backing
Unsafe Stopping or Parking             Too Fast For Conditions
Alcohol, Drugs, Tired                        Momentarily Distracted
Unsafe Entry Onto Highway             Failure to Stop or Signal

## *PROCEDURES WHEN ACCIDENT OCCURS*

1.  Report an accident promptly to the executive offices.
2.  Give a detailed report of how the accident occurred with a diagram.
3.  Get information from the other driver such as:
    a. Name
    b. Address

Page 2

    c.  Name of Insurance Company
           i.  Policy number
          ii.  Agent
        iii.  Phone number

(A copy of an Accident Report Brochure, which has been given to you recently is attached for your reference)

By: _____      Date: _9 - 10 - 04_____
    William C. Waggoner
    Business Manager


Acknowledged and Understood:


_____      Date:_____

EXHIBIT "5"

## SCANLON: Hilda Solis' legacy of pandering

*She enabled union corruption*

COMMENTS (4)   SIZE: + / -   PRINT

| By Terrence Scanlon | Thursday, January 17, 2013 |
| --- | --- |

Hilda Solis is leaving her position as secretary of labor ⬚(#) -- or, as she saw the job, secretary for the Support of Unions.

The official mission of he Labor Department is "To foster, promote, and develop he welfare of the wage earners, job seekers, and retirees of the United States; improve working conditions; advance opportunities for profitable employment; and assure work-related benefits and rights." There's nothing in that description about unions, which today represent fewer than 1 in 16 workers in he private sector. From her first day in office to the last, however, Ms. Solis was the unions' faithful servant.

Ms. Solis was born into the labor union movement. Her father was a Teamster and her mother a member of what is now the United Steelworkers. During her time in Congress (2001-09), she received more than $900,000 in contributions from unions, and she was a member of the so-called Progressive Caucus, the far left among members of Congress.

When President Obama picked her as his labor secretary, John Sweeney, then the president of the AFL-CIO, said he was "thrilled." At a United Food and Commercial Workers Union convention, she told conventioneers, "President Obama has your back, and so do I."

At a conven ion of the plumbers and pipe fitters union, she called her audience "brothers and sisters" and called he labor union movement "our movement."

In the Bush administration, the Labor Department had conducted a program of "compliance assistance," a good-cop approach that sought to avoid crippling fines for businesses ⬚(#) even as it resulted in record-low workplace death and injury rates and record-high back pay collected for workers. When she became labor secretary, Ms. Solis abandoned that approach and hired hundreds of investigators (710 of them by early 2010) to go after businesses that, she said, were shortchanging workers, denying them rightful benefits and endangering their safety. She would be, in her words, a "new sheriff in town."

She sought scores of new rules and regulations on business ⬚(#) , 90 in 2010 alone, but she got rid of rules that unions didn't like.

One of her biggest changes in direction was her reversal of Bush administration efforts to fight union corruption. Ms. Solis' predecessor, Elaine Chao, had issued several rule changes to make it easier for union members and watchdogs to detect wrongdoing, especially conflicts of interest among union officials and the people with whom they do business.

Regarding a conflict-of-interest form that union officials file, the Bush administration offered amnesty to first-time filers in 2005, and the number of filers went from 96 to 13,326. The form, which had not been updated for 40 years, was made more detailed, and coverage was extended to include more officials such as, in some cases, shop stewards.

The new disclosure rules helped union members by exposing corruption. For example, they forced Tyrone Freeman, head of California's largest union local, out of office after the revelation of the union's contract with his wife's video production firm and of he expenditure of nearly $10,000 of union money at a cigar bar.

Case 2:12-cv-10506-DDP-VBK    Document 82    Filed 07/22/13    Page 124 of 161    Page ID
#:846

In Denver, a local president of the United Food and Commercial Workers was voted out of office and replaced with a Safeway bakery clerk after disclosures that  he president spent union money on alcohol and Broncos tickets and that, while making $162,000 a year, he put his wife and son on the payroll for a combined $268,000.

The Chao rules helped the Labor Department's Office of Labor-Management Standards obtain 929 convictions, mostly for embezzlement, and recover some $93 million. Other rules would have made it easier to track the operation of union trusts such as those set up for health benefits, pensions ⧉ (#) , training programs and strike funds.

Ms. Solis rolled back the Chao reforms.

Her excuse? The changes "had a detrimental impact on workers" and "made the union financial ⧉ (#) reporting requirements not only overly burdensome but ineffective." In response, Ms. Chao accused the Obama administration of "not enforcing laws on union transparency and democracy" and "telling unions that they don't have to comply."

Today, private-sector unions are failing enterprises. They seem unable to adapt to a changing environment -- to global trade, to the advance of information technology ⧉ (#) and robotics, and to the rise, in states like Indiana and Michigan, of poli ical leaders who do not fear them. In the private sector, 38 percent of workers belonged to unions 60 years ago; today the figure is 6 2 percent.

Ironically, given unions' critical role in electing and re-elec ing Mr. Obama, the jobs-destroying taxes and hyper-regulation of the Obama era may make it even worse for unions. Unionized businesses, lacking the flexibility of non-union businesses, will be less likely to grow and more likely to fail, which will further diminish the influence and membership of unions.

Hilda Solis ran the Labor Department as an extension of the union movement, but her heavy-handed approach -- seeing business as an enemy rather than as a partner in creating jobs -- may have simply been another nail in the movement's coffin.

*Terrence Scanlon is president of the Capital Research Center.*

# EXHIBIT "6"

Bloomberg.com | Business Exchange

**Bloomberg Businessweek**

# Wilbur Ross, the Bank Eater

Troubled financial institution lying on the side of the road? Ross will have a bite—and might even ask for seconds

By Devin Leonard


Ross describes himself as "a guy who likes to run into burning buildings"
Bruce Gilden

Early one October morning, Wilbur Ross sits before a dozen or so colleagues at the head of a long table in his Manhattan office, considering in his quiet way the purchase of a business worth more than a billion dollars. Ross, 74, is the chairman of WL Ross & Co., among the largest and most active firms specializing in the purchase of distressed companies; in other words, he is a vulture, albeit a well-dressed one, favoring crisp pinstripe suits and freshly shined shoes.

His investment committee is presenting the final details of the firm's $1.2 billion bid for Northern Rock, the English bank seized by the British government in 2008 after panicked depositors withdrew their funds. WL Ross is partnering with Richard Branson's Virgin Money. "Who is our competition?" asks Pamela Wilson, a WL Ross managing director.

"J.C. Flowers is always our competition on everything," says Stephen Johnson, one of the firm's vice-presidents, referring to J. Christopher Flowers, another private equity investor. Johnson adds, "The word at the moment is that he won't be able to bid on this." That leaves the field open for Ross, who describes himself as "a guy who likes to run into burning buildings" and who has been running into a lot of them lately. The committee spends much of its time talking about the need to structure the bid so it won't embarrass the British government, which has spent an estimated $2.2 billion on the Northern Rock bailout. The firm plans to offer the Cameron administration a slice of the proceeds if it takes the bank public.

Ross himself says little, and when he does, he does so in his characteristic near- whisper. It would not be overstating it to say Ross coos. He scrutinizes a pile of documents before him. From time to time he asks a question. He wants to make sure there will be no last-minute regulatory issues. Finally, he says, "I think we are ready to vote on this."

On Oct. 25, Virgin and WL Ross make their offer. Three weeks later, the British government accepts it and controversy soon follows. Ed Balls, the Labour Party's shadow chancellor, assails England's Conservative Party leaders for taking a loss on the bank. Ross arguably makes matters worse by telling British reporters that he hopes to make a substantial profit—unless, of course, Northern Rock is swamped by the European financial crisis that enabled him to buy it so cheaply in the first place. This is a familiar scenario these days. Ross stands to make a lot, if he doesn't lose even more.

**Since 2008, Ross has invested $1.8 billion** in faltering banks, a major play by a high-profile player. Ross is an investor's investor; he's not a household name like Warren Buffett or a constant presence on the cable channels like Pimco's Bill Gross, but he's revered and followed in his field. "He's charming, and he's smart," says Steven Kaplan, a professor of finance at the University of Chicago Booth School of Business. "And he has been brilliant and contrarian in discerning opportunities." He is also worth an estimated $2.1 billion, according to *Forbes*.

His firm was one of four private equity groups that paid $900 million for the failed BankUnited, a large Florida thrift, purchasing it from the Federal Deposit Insurance Corp. in May 2009. He has taken stakes in ailing institutions such as Oregon's Cascade Bancorp, New Jersey's Sun Bancorp, and the union-owned Amalgamated Bank in New York, all of which required his financial aid after writing down bad real estate loans. Ross has also looked abroad for bargains—and not just in England. In July he and four other investors spent $1.6 billion to buy 35 percent of the Bank of Ireland.

**Ross assiduously promotes his successes** and had little trouble raising $4 billion in 2008 to invest in banks on the heels of the financial crisis. In May 2009, WL Ross, Blackstone Group, Carlyle Group, and Centerbridge Partners bought BankUnited from the FDIC. It was predicted at the time that BankUnited's failure would cost the agency $4.9 billion. As part of the deal, the FDIC assumed up to 80 percent of BankUnited's copious losses.

The U.S. was still mired in a recession. The country had spent billions of dollars bailing out the banking system and now private equity speculators such as Ross were scooping up banks, apparently taking advantage of the FDIC's safeguards. On Oct. 22, Democratic Senator Jack Reed of Rhode Island wrote to Treasury Secretary Timothy Geithner and former FDIC Chairman Sheila Bair, urging them to put curbs on such acquisitions. The FDIC issued rules requiring buyout firms investing in banks to hold them for three years and maintain profit-crimping amounts of capital.

So Ross changed his strategy. He funneled money into troubled banks that needed cash but hadn't yet fallen into the FDIC's hands, such as Oregon's Cascade and New Jersey's Sun Bancorp. "Their stocks were trading at very, very big discounts from book value," Ross says. "We felt that provided enough cover we'd be O.K. if they had more losses."

He also began to indirectly invest in banks that had been seized by the FDIC. In April 2010, WL Ross became the largest investor in First Michigan Bank in Troy. It was a tiny institution with only 30 employees. But First Michigan CEO David Provost had grand ambitions. Banks were failing left and right in Michigan. He wanted to buy them from the FDIC. Provost says Ross understood his strategy immediately and invested $100 million of his firm's money in First Michigan.

On the day First Michigan announced Ross's cash infusion, it bought CF Bancorp, a bank in Port Huron, Mich., with 368 employees and $1.3 billion in assets. Its collapse had been the largest in the state. First Michigan, now known as Talmer Bank and Trust, has since bought three more failed banks. Provost aims to create a network of community banks that profit from problems in their larger rivals. It seems to be working. Talmer earned more than $40 million last year. "The Bank of Americas get picketed," Provost says. "The customers close out their accounts. Then they come over and see us."

In November, Ross crossed the Atlantic to check on his new investment in the Bank of Ireland. When it was time to leave, CEO Boucher offered Ross a ride to the airport. On the way, they made an unannounced visit to a Bank of Ireland branch in a Dublin suburb. Ross spent nearly an hour at the bank, wandering around and asking questions. "It went down extremely well," says Boucher. "There was a lot of positive buzz among the employees afterwards."

For his part, Ross can't understand why anybody at the Bank of Ireland would be surprised by his interest. "We just put a big chunk of money into it," he says. "It was kind of under the control of the government. I guess the employees weren't used to the Prime Minister dropping by."

There is one banking investment of which Ross is particularly proud. In September his firm pledged $50 million to Amalgamated Bank, which is controlled by unions representing hotel and garment industry workers and has become known as the financial institution guarding the deposits of Occupy Wall Street. On Dec. 8, Ross visits the bank's art deco headquarters in New York to meet with Edward Grebow, its president. Sitting around a coffee table, the two explain how Ross, a loyal member of the 1 percent, came to be interested in the self-styled bank of the other 99 percent. "Well, the bank, like lots of others, made some bad real estate loans," Grebow says. "That left us of short of capital."

He knew there were private equity investors interested in banks. There weren't many, though, who would put their cash into a bank that is not only union-owned but also has a unionized staff. He could think of only two. One was obvious: Ron Burkle, managing partner of Yucaipa and a major Democratic Party contributor. The other was Ross. Grebow knew Ross had good relationships with labor leaders representing steel and textile workers. "We never had a strike at any of our facilities," says Ross. "For us, there is nothing strange about having breakfast with a labor leader. We do it all the time." Together, they agreed to put $100 million in the bank. The deal is awaiting regulatory approval, but Grebow is already talking about using the new funds to create progressive products, such as prepaid credit cards for customers with "uncertain" immigration status and mortgages for city sanitation workers.

Then there are the benefits of being associated with the Occupy Wall Street protests that began in September. Grebow produces a chart showing that 131 new depositors signed up online in October, up from 13 the previous month. The influx of new customers was roughly the same in November. "That's with no marketing," he says. Ross listens, quiet as ever. He says he has no problem with Amalgamated Bank's connection to Occupy Wall Street. It's clearly good for the bank's bottom line and therefore his investment. "The bank by its nature is a so-called progressive, liberal bank," Ross says. "Ed Grebow even marched in one of its demonstrations."

You won't see the 74-year-old billionaire accompanying him anytime soon, however. Says Ross, "I myself wouldn't have anything to do with Occupy Wall Street." Nevertheless, he's thinking about putting more money into Amalgamated Bank. Ross may not cotton to protesters who want to share his wealth, but his investments are strictly nonpartisan.

*Leonard is a reporter for Bloomberg Businessweek in New York.*

http://www.businessweek.com/magazine/wilbur-ross-the-bank-eater-01052012.html

# EXHIBIT "7"

**LAWYERS TITLE COMPANY**

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO:

Cox, Castle & Nicholson LLP
2049 Century Park East, 28th Floor
Los Angeles, California 90067
Attention: Adam B. Weissburg, Esq.
Mortgage Loan No.: 10713
*124/57/4 -27.*

(Space above line for Recorder's use only)

Recorded In Official Records, County of San Bernardino        3/10/2011
8:00 AM
**DENNIS DRAEGER**        EM
ASSESSOR – RECORDER – CLERK

803 LandAmerica Commonwealth

Doc#:  **2011 – 0097549**



| Titles: | 5 | Pages: | 45 |
|---|---|---|---|
| Fees | | | 210.00 |
| Taxes | | | 0.00 |
| Other | | | 0.00 |
| PAID | | | $210.00 |

### DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

Cover Sheet

| | |
|---|---|
| Date: | As of March 8, 2011 |
| Borrower: | **VINTAGE PARK EAST, LLC** |
| Borrower's State of Organization: | California |
| Borrower's Organizational ID Number: | 200825310276 |
| Trustee: | **COMMONWEALTH LAND TITLE INSURANCE COMPANY**, a Nebraska corporation |
| Lender: | **MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**, a Massachusetts corporation |
| Note Amount: | $50,000,000.00 |
| Maturity Date: | April 1, 2018 |
| State: | California |
| Record Owner of the Land: (as defined herein) | **VINTAGE PARK EAST, LLC**, a California limited liability company |

THIS DOCUMENT IS ALSO A FIXTURE FILING IN ACCORDANCE WITH SECTION 9402(b) OF THE CALIFORNIA COMMERCIAL CODE

DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING

THIS DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "**Deed of Trust**") is made as of March 8, 2011, by and between **VINTAGE PARK EAST, LLC**, a California limited liability company, with an address in care of Invesco Advisers, Inc., 13155 Noel Road Suite 500, Dallas TX 75240 ("**Borrower**"), to **COMMONWEALTH LAND TITLE INSURANCE COMPANY**, a Nebraska corporation, having an address at 801 S. Figueroa Street, Suite 870, Los Angeles, CA 90017 ("**Trustee**"), for the use and benefit of **MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**, a Massachusetts corporation having an address in care of Cornerstone Real Estate Advisers LLC, One Financial Plaza, Hartford, Connecticut 06103, Attention: Paralegal, Finance Group ("**Lender**" and, to the extent applicable under Article 13 of the Loan Agreement, "**Administrative Agent**").

GRANTING CLAUSES

For good and valuable consideration and to secure the payment of an indebtedness in the principal sum of **FIFTY MILLION AND 00/100 DOLLARS ($50,000,000.00)** in lawful money of the United States, to be paid according to (i) that certain Loan Agreement of even date herewith between Borrower and Lender (as the same may hereafter be amended or modified, the "**Loan Agreement**"), and (ii) that certain Promissory Note of even date herewith from Borrower to Lender in said principal sum with a maturity date of April 1, 2018 (the "**Maturity Date**"), and any replacement(s) or substitution(s) of said Promissory Note held by Lender or by any successor or assignee of Lender (as the same may hereafter be amended, modified, split, consolidated or extended, the "**Note**"), which Loan Agreement and Note are hereby incorporated herein by this reference and made a part hereof, together with all other obligations and liabilities due or to become due to Lender, all amounts, sums and expenses paid hereunder by or payable to Lender according to the terms hereof (including, without limitation, all Advances (as hereinafter defined) and interest thereon as provided herein and in the Loan Agreement), and all other covenants, obligations and liabilities of Borrower under the Note, the Loan Agreement, this Deed of Trust, the Assignment (as hereinafter defined) and any other instrument executed by Borrower evidencing, securing or delivered in connection with the loan evidenced by the Note (all of the foregoing instruments, as the same may be amended or modified from time to time, collectively, the "**Loan Documents**"), and together with all interest on said indebtedness, obligations, liabilities, amounts, sums, Advances and expenses (all of the foregoing, collectively, the "**Indebtedness**"), Borrower has created in favor of Lender a security interest in and mortgaged, warranted, granted, bargained, sold, conveyed, assigned, pledged, transferred and set over, and does by these presents create a security interest in and WARRANT, GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER AND SET OVER unto Trustee, as trustee for the benefit of Lender, to its successors in the trust created by this Deed of Trust, and to its and their respective assigns forever, in trust, with all POWERS OF SALE and RIGHTS OF ENTRY AND POSSESSION and all STATUTORY RIGHTS AND COVENANTS in the State (as hereinafter defined), together with all interest and estate which Borrower may hereafter acquire in the following property:

The parcel or parcels of land described in Exhibit A attached hereto and by this reference made a part hereof (the "**Land**");

TOGETHER with the buildings, foundations, structures and improvements (including fixtures) now or hereafter located on or in the Land (collectively, the "**Improvements**");

TOGETHER with all right, power, privilege, option, title and interest, if any, of Borrower in and to the streets and roads, opened or proposed, abutting the Land, all strips and gores within or adjoining the Land, the air space and right to use the air space above the Land, all rights of ingress and egress to and from the Land, all easements, rights of way, reversions, remainders, estates, rights, titles, interests, privileges, servitudes, tenements, hereditaments, and appurtenances now or hereafter affecting the Land or the Improvements, all royalties and rights and privileges appertaining to the use and enjoyment of the Land or the Improvements, including all air, lateral support, streets, alleys, passages, vaults, drainage, water, oil, gas and mineral rights, development rights, all leases and licenses and options to purchase or lease, and all other interests, estates or claims, in law or in equity, which Borrower now has or hereafter may acquire in or with respect to the Land or the Improvements (collectively, the "**Appurtenances**");

The Land, the Improvements and the Appurtenances are hereinafter collectively referred to as the "**Premises**";

TOGETHER with all equipment, fittings, furniture, furnishings, appliances, apparatus, and machinery in which Borrower now or hereafter has a possessory or title interest and now or hereafter installed in or located upon the Premises and all building materials, supplies and equipment now or hereafter delivered to the Premises and intended to be installed therein or located thereon; all fixtures, inventory, other goods and personal property of whatever kind and nature now contained on or in or hereafter placed on or in the Premises and used or to be used in connection with the letting or operation thereof, in which Borrower now has or hereafter may acquire a possessory or title interest and all renewals or replacements of any of the foregoing property or articles in substitution thereof, including chairs, desks, lamps, mirrors, bookcases, tables, rugs, carpeting, drapes, draperies, curtains, shades, venetian blinds, screens, paintings, hangings, pictures, keys or other entry systems, intercom and paging equipment, electric and electronic equipment, dictating equipment, private telephone systems, medical equipment, potted plants, heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, ash and fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washers and dryers, and other equipment used in the operation of the Premises (collectively, the "**Equipment**");

TOGETHER with all right, power, privilege, option, title and interest of Borrower in and under all present or future accounts, deposit accounts, documents, instruments, chattel paper, and general intangibles (including "payment intangibles"), as the foregoing terms are defined in the Code (as hereinafter defined), all deposits, monies or escrows held by Lender or Lender's agent or any accounts established pursuant hereto or pursuant to any other Loan Documents, and all

contract rights, equipment leases, operating leases and licenses, Operating Agreements (as
hereinafter defined), derivative investments, letters of credit, and rate cap agreements, including
casualty insurance policies and liability insurance policies (irrespective of whether such policies
are required to be obtained or maintained in force pursuant to this Deed of Trust or other Loan
Documents), trade names, trademarks, servicemarks, logos, copyrights, goodwill, franchises,
books, records, plans, specifications, permits, licenses, approvals, actions, claims under the
Federal Bankruptcy Code (as hereinafter defined)  and causes of action which now or hereafter
relate to, are derived from or are used in connection with the Premises or the use, operation,
maintenance, occupancy or enjoyment thereof or the conduct of any business or activities
thereon (collectively, the "**Intangibles**");

TOGETHER with all right, power, privilege, option, title and interest of Borrower in and
under all existing and future leases, lettings, tenancies, occupancy agreements, licenses to occupy
and other similar arrangements affecting the Premises or any part thereof now or hereafter
entered into and all amendments, extensions, renewals and guaranties thereof, all security
therefore, including letter of credit rights, guaranties and other supporting obligations, and all
moneys payable thereunder, whether entered into before or after the filing by or against
Borrower of any petition for relief under the Federal Bankruptcy Code (collectively, the
"**Leases**");

TOGETHER with all rents, income, accounts, receivables, issues, profits, security
deposits, including the proceeds from letters of credit, guarantees and other supporting
obligations, all other payments and profits from the Leases and the use and occupation of the
Premises, including fixed and additional rents, cancellation payments, option payments, all
revenues and credit card receipts collected from restaurants, bars, and recreational facilities and
otherwise, all receivables, customer obligations, installment payment obligations and other
obligations now existing or hereafter arising or created out of sale, lease, sublease, license,
concession or other grant of the right of the possession, use or occupancy of all or any portion of
the Premises, or personally located thereon, or rendering of services by Borrower or any operator
or manager of any commercial space located in the Premises or acquired from others including
from the rental of any office space, retail space, commercial space, or other space, halls, stores or
offices, including any deposits securing reservations of such space, exhibit or sales space of
every kind, license, lease, sublease and concession fees and rentals, health club membership fees,
food and beverage wholesale and retail sales, telephone and television systems, the provision or
sale of other goods and services, service charges, vending machine sales, and any other payments
and benefits to which Borrower may now or hereafter be entitled from the Premises, the
Equipment or the Intangibles or under or in connection with the Leases (collectively, the
"**Property Income**"), including the immediate and continuing right to make claim for, receive,
collect and receipt for Property Income, including the right to make claim in a proceeding under
the Federal Bankruptcy Code and to apply the same to the payment of the Indebtedness, all
whether before or after the filing by or against Borrower of any petition for relief under the
Federal Bankruptcy Code; and

TOGETHER with all proceeds, judgments, claims, compensation, awards of damages
and settlements pertaining to or resulting from or in lieu of any condemnation or taking of the
Premises by eminent domain or any casualty loss or damage to any of the Premises, the
Equipment, the Intangibles, the Leases or the Property Income, and including also, the right to

assert, prosecute and settle claims arising out of or pertaining to such condemnation or taking or such casualty loss under insurance policies constituting an Intangible and to apply for and receive payments of proceeds under such insurance policies and in any condemnation or taking, the right to apply for and receive all refunds with respect to the payment of property taxes and assessments and all other proceeds from the conversion, voluntary or involuntary, of the Premises, the Equipment, the Intangibles, the Leases or the Property Income, or any part thereof, into cash or liquidated claims. Collectively, all of the foregoing, are herein referred to as the "**Proceeds**".

The Equipment, the Intangibles, the Leases, the Property Income and the Proceeds are hereinafter collectively referred to as the "**Collateral**". The Premises and the Collateral are hereinafter collectively referred to as the "**Mortgaged Property**".

TO HAVE AND TO HOLD the Mortgaged Property, with all the privileges and appurtenances to the same belonging, and with the possession and right of possession thereof, unto Trustee, as trustee for the benefit of Lender as beneficiary, to its successors in the trust created by this Deed of Trust, and to its and their successors and assigns forever, in trust, upon the terms and conditions set forth herein.

All initially capitalized terms not defined in this Deed of Trust shall have the respective meanings ascribed to such terms in the Loan Agreement.

## ARTICLE I

### Definition of Terms

As used in this Deed of Trust, the terms set forth below shall have the following meanings:

"Advances" means all sums, amounts or expenses advanced or paid and all costs incurred by Lender, as provided in this Deed of Trust or in any other Loan Document, upon failure of Borrower to pay or perform any obligation or covenant contained herein or in such other Loan Document.

"Appurtenances" has the meaning assigned in the Granting Clauses.

"Assignment" means the Assignment of Leases and Rents from Borrower to Lender of even date herewith.

"Borrower" means the party or parties identified and defined as Borrower on the Cover Sheet and in the preamble of this Deed of Trust, any subsequent owner of the Mortgaged Property, and its or their respective heirs, executors, legal representatives, successors and assigns.

"Code" means the Uniform Commercial Code of the State, as the same may be amended from time to time or any successor statute thereto.

"Collateral" has the meaning assigned in the Granting Clauses.

"Default Rate" has the meaning assigned in the Loan Agreement.

"Equipment" has the meaning assigned in the Granting Clauses.

"Event of Default" means any one or more of the events described in Section 9.1 of the Loan Agreement.

"Federal Bankruptcy Code" means Title 11 of the United States Code, as the same may be amended from time to time or any successor statute thereto.

"Impositions" has the meaning assigned in the Loan Agreement.

"Indebtedness" has the meaning assigned in the Granting Clauses.

"Intangibles" has the meaning assigned in the Granting Clauses.

"Land" has the meaning assigned in the Granting Clauses.

"Leases" has the meaning assigned in the Granting Clauses.

"Lender" means Massachusetts Mutual Life Insurance Company, the lender identified as such on the Cover Sheet and in the preamble of this Deed of Trust, and its successors and assigns (including any other holders from time to time of the Note).

"Loan" means the loan made by Lender to Borrower evidenced by the Note and governed by the Loan Agreement.

"Loan Agreement" has the meaning assigned in the Granting Clauses.

"Loan Documents" has the meaning assigned in the Granting Clauses.

"Maturity Date" has the meaning assigned in the Granting Clauses.

"Mortgaged Property" has the meaning assigned in the Granting Clauses.

"Note" has the meaning assigned in the Granting Clauses.

"Permitted Encumbrances" means the liens and security interests created by this Deed of Trust and the other Loan Documents and those exceptions to title set forth in Exhibit B.

"Person" means and includes any individual, corporation, partnership, joint venture, limited liability company, association, bank, joint-stock company, trust, unincorporated organization or government, or an agency or political subdivision thereof.

"Premises" has the meaning assigned in the Granting Clauses.

"Proceeds" has the meaning assigned in the Granting Clauses.

"Property Income" has the meaning assigned in the Granting Clauses.

"State" means the State or Commonwealth in which the Land is situated.

"Trustee" means the party or parties identified and defined as Trustee on the Cover Sheet and in the preamble of this Deed of Trust, and its or their respective successors in trust created by this Deed of Trust, and its or their respective successors and assigns.

"Upstream Owner" has the meaning assigned in the Loan Agreement.

## ARTICLE II

### Covenants, Warranties and Representations of Borrower

Borrower covenants, warrants, represents and agrees as follows:

Section 2.01   Interest on Advances and Expenses.   All Advances made and any reasonable expenses incurred at any time by Lender or Trustee pursuant to the provisions of this Deed of Trust or the other Loan Documents or under applicable law shall be secured by this Deed of Trust as part of the Indebtedness, with equal rank and priority.  All such Advances and expenses shall bear interest at the Default Rate from the date that each such Advance or expenses is made or incurred to the date of repayment and all such Advances and expenses with interest thereon shall be paid to Lender by Borrower upon demand therefor.

Section 2.02   Prohibition Against Conveyances, Encumbrances and Borrowing.  Except as expressly permitted under Article 8 of the Loan Agreement, neither Borrower nor any Person shall convey, assign, sell, mortgage, encumber, pledge, hypothecate, grant a security interest in, grant options with respect to, or otherwise dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) all or any portion of any legal or beneficial interest in: (a) all or any portion of the Mortgaged Property including the Leases; or (b) all or any ownership interest in Borrower or in any Upstream Owner.

Section 2.03   Assignment of Leases and Property Income.

(a)   Borrower hereby absolutely, presently, unconditionally and irrevocably assigns, transfers and sets over to Lender all of the right, title and interest of Borrower in and to the Leases and the Property Income.  Borrower shall not otherwise assign, transfer or encumber in any manner the Leases or the Property Income or any portion thereof, except as expressly permitted for in the Loan Agreement.  Borrower shall have a license, revocable by Lender, to collect and use the Property Income as the same becomes due and payable so long as no Event of Default has occurred, but may not collect any Property Income more than thirty (30) days in advance of the date the same becomes due.  The assignment in this Section 2.03 shall constitute an absolute, irrevocable and present assignment of the Leases and the Property Income, and not an additional assignment for security, and the existence or exercise of Borrower's revocable license to collect Property Income shall not operate to subordinate this assignment to any subsequent assignment. The exercise by Lender of any of its rights or remedies under this Section 2.03 shall not be deemed or construed to make Lender: (i) a mortgagee-in-possession; (ii) responsible for the payment of any taxes or assessments with respect to the Premises, (iii) liable to perform any obligation of the lessor under any Lease(s) or under applicable law, (iv)

liable to any person for any dangerous or defective condition in the Premises or for any negligence in the management, upkeep, repair, or control of the Premises resulting in loss or injury or death to any Person, or (v) be liable in any manner for the remediation of any environmental impairment.

(b)     Borrower shall comply with the terms and conditions of <u>Section 5.1</u> of the Loan Agreement with respect to Leases of all or any portion of the Mortgaged Property.

Section 2.04   <u>Environmental Matters</u>.   Borrower shall comply with the terms and conditions of <u>Article 4</u> of the Loan Agreement, expressly including the indemnification provisions contained therein.

Section 2.05   <u>Condemnation Awards</u>.   Borrower hereby unconditionally assigns all awards and compensation for any condemnation or other taking of the Mortgaged Property or any portion thereof, or any purchase in lieu thereof, to Lender and authorizes Lender to collect and receive such awards and compensation and to give proper receipts and acquittances therefor, subject to the terms of the Loan Agreement.

Section 2.06   <u>Insurance Proceeds</u>.   Borrower hereby (a) unconditionally assigns to Lender all Proceeds of any insurance policies insuring against loss or damage to the Mortgaged Property, and (b) authorizes Lender to collect and receive such Proceeds and authorizes and directs the issuer of each of such insurance policies to make payment for all such losses directly to Lender, instead of to Borrower and Lender jointly, all subject to the terms of the Loan Agreement.

Section 2.07   <u>No Discrimination.</u>   Borrower hereby covenants and agrees that there shall be no discrimination against or segregation of, any person or group of persons on account of race, color, creed, religion, sex, marital status, national origin, or ancestry in the sublease or enjoyment of the land, nor shall the Borrower himself or any person claiming under or through Borrower establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use, or occupancy of sublessees or vendees of the land.

## ARTICLE III

Security Agreement

Section 3.01   <u>Warranties, Representations and Covenants of Borrower</u>.   Borrower covenants, warrants, represents and agrees with and to Lender as follows:

(a)     This Deed of Trust constitutes a security agreement under the Code and serves as a fixture filing in accordance with the Code. This Deed of Trust creates, and Borrower hereby grants to Lender, a security interest in favor of Lender as secured party under the Code with respect to all of the Mortgaged Property which is covered by the Code. The mention of any portion of the Mortgaged Property in a financing statement filed in the records normally pertaining to personal property shall not derogate from or impair in any manner the intention of Borrower and Lender hereby declared that all items of the Collateral are part of the real property encumbered hereby to the fullest extent permitted by law, regardless of whether any such item is

physically attached to the Improvements or whether serial numbers are used for the better identification of certain items. Specifically, the mention in any such financing statement of: (i) the rights in or to the Proceeds of any policy of insurance; (ii) any condemnation Proceeds; (iii) Borrower's interest in any Leases or Property Income; or (iv) any other item included in the Mortgaged Property, shall not be construed to alter, impair or impugn any rights of Lender as determined by this Deed of Trust or the priority of Lender's lien upon and security interest in the Mortgaged Property. Any such mention shall be for the protection of Lender in the event that notice of Lender's priority of interest as to any portion of the Mortgaged Property is required to be filed in accordance with the Code to be effective against or take priority over the interest of any particular class of Persons, including the federal government or any subdivision or instrumentality thereof.

(b)     Except for the Permitted Encumbrances and the security interest granted by this Deed of Trust, Borrower is and, as to portions of the Mortgaged Property to be acquired after the date hereof, will be the sole owner of the Mortgaged Property, free from any lien, security interest, encumbrance or adverse claim thereon of any kind whatsoever. Borrower shall notify Lender of, and shall defend the Mortgaged Property against, all claims and demands of all Persons at any time claiming the same or any interest therein.

(c)     Except as expressly provided in the Loan Agreement and this Deed of Trust, Borrower shall not lease, sell, convey or in any manner transfer the Mortgaged Property without the prior consent of Lender.

(d)     The Mortgaged Property is not and will not be used or bought for personal, family or household purposes.

(e)     The Collateral shall be kept on the Land or in the Improvements, and Borrower shall not remove the Collateral from the Land or the Improvements without the prior consent of Lender, which consent shall not be unreasonably withheld or delayed, except such portions or items of the Collateral as are consumed or worn out in ordinary usage, all of which shall be promptly replaced by Borrower with items of equal utility and similar or greater value.

(f)     Borrower shall provide Lender upon Lender's request from time to time with an inventory of the Collateral by serial number and account number, as appropriate.

(g)     Borrower shall not change its place of formation or its entity name without providing Lender with at least sixty (60) days' prior written notice. In the event of any change in name, identity or structure of Borrower, Borrower shall notify Lender thereof and promptly after request shall execute, file and record such Code forms as are necessary to maintain the priority of Lender's lien upon and security interest in the Mortgaged Property, and shall pay all expenses and fees in connection with the filing and recording thereof. If Lender shall require the filing or recording of additional Code forms or continuation statements, Borrower shall, promptly after request, execute, file and record such Code forms or continuation statements as Lender shall deem necessary (subject to Lender's right to sign such statements on behalf of Borrower as provided in Section 3.01(h)), and shall pay all expenses and fees in connection with the filing and recording thereof. If Lender shall initially pay such expenses, Borrower shall promptly reimburse Lender for the expenses.

(h)     Borrower hereby authorizes Lender to file with the appropriate public office, at Borrower's expense any financing statements, amendments or continuations thereof, identifying Borrower as debtor and Lender as secured party in connection with the Mortgaged Property.

(i)     Borrower represents that its exact legal name is as set forth on the Cover Sheet of this Deed of Trust.

(j)     Borrower's Federal Tax Identification Number is 71-0935159 and Borrower's Organizational Number is 200825310276.

(k)     Borrower shall not file any termination statements concerning the Mortgaged Property without Lender's prior consent unless the Indebtedness has been repaid and this Deed of Trust has been released.

(l)     Where Collateral is in possession of a third party, Borrower will join with Lender in notifying the third party of Lender's interest and obtaining an acknowledgment from the third party that it is holding the Collateral for the benefit of Lender.

(m)     Borrower will cooperate with Lender in obtaining control with respect to Collateral consisting of deposit accounts, investment property, letter of credit rights and electronic chattel paper.

Section 3.02   Financing Statements.   A CARBON, PHOTOGRAPHIC OR OTHER REPRODUCTION OF THIS DEED OF TRUST OR ANY FINANCING STATEMENT RELATING TO THIS DEED OF TRUST SHALL BE SUFFICIENT AS A FINANCING STATEMENT.

Section 3.03   Addresses.   The state of organization, organizational ID number and mailing address of Borrower and the address of Lender from which information concerning the security interest granted hereby may be obtained are set forth on the Cover Sheet and in the preamble of this Deed of Trust.   Borrower maintains its sole place of business or its chief executive office at the address shown in said preamble, and Borrower shall immediately notify Lender in writing of any change in said place of business or chief executive office.

Section 3.04   Fixture Filing.   This Deed of Trust shall constitute a fixture filing under the Code as to any goods and other personal property included in the Mortgaged Property in which Borrower has granted to Lender a security interest as provided in this Article III which are or may become fixtures under applicable law.   Borrower is the "debtor" and Lender is the "secured party" as such terms are defined in the Code.   This fixture filing is to be recorded in the Official Records of San Bernardino County, California.

## ARTICLE IV

### Default and Remedies

Section 4.01   Remedies.   Upon the occurrence of any Event of Default, Lender may take such actions against Borrower and/or the Mortgaged Property or any portion thereof as it deems

advisable to protect and enforce its rights against Borrower and in and to the Mortgaged Property, without notice or demand except as set forth herein. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Such actions may include the following:

(a)  Lender may declare the entire principal balance under the Note then unpaid, together with all accrued and unpaid interest thereon, prepayment fees thereunder, and all other unpaid Indebtedness, to be immediately due and payable.

(b)  Lender may enter into or upon the Mortgaged Property, personally or by its agents, nominees or attorneys, and may dispossess Borrower and its agents and servants therefrom, and thereupon Lender at its sole discretion may:  (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every portion of the Mortgaged Property and conduct business thereon, in any case either in the name of Lender or in such other name as Lender shall deem best; (ii) complete any construction on the Mortgaged Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Mortgaged Property; (iv) exercise all rights and powers of Borrower with respect to the Mortgaged Property, whether in the name of Borrower or otherwise, including the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Property Income; and (v) apply the receipts of Property Income to the payment of the Indebtedness (including any prepayment fee payable under the Loan Agreement) in such order as Lender shall determine in its sole discretion, after deducting therefrom all expenses (including reasonable attorneys' fees, costs and expenses) incurred in connection with the aforesaid operations and all amounts necessary to pay the Impositions, insurance and other charges in connection with the Mortgaged Property, as well as just and reasonable compensation for the services of Lender, its agents, nominees and attorneys.

(c)  With or without entry, personally or by its agents, nominees or attorneys, Lender may require Trustee to sell all or any portion of the Mortgaged Property and all or any portion of Borrower's estate, right, title, interest, claim and demand therein and right of redemption thereof at one or more private or public sales in the manner and to the extent permitted by law, as an entirety or in parcels or portions, and Trustee shall have any statutory power of sale as may be provided by law in the State.

(d)  Lender may institute proceedings for the complete foreclosure of this Deed of Trust, in which case the Mortgaged Property may be sold for cash or upon credit, as an entirety or in parcels or portions.

(e)  Lender may institute, or require Trustee to institute, proceedings for the partial foreclosure of this Deed of Trust for the portion of the Indebtedness then due and payable, subject to the continuing lien of this Deed of Trust for the balance of the Indebtedness not then due.

(f)     Lender may institute, or require Trustee to institute, an action, suit or proceeding at law or in equity for the specific performance of any covenant, condition or agreement contained in the Note, this Deed of Trust or any other Loan Document, or in aid of the execution of any power granted hereunder or for the enforcement of any other appropriate legal or equitable remedy.

(g)     Lender and Trustee shall have the rights and may take such actions as are set forth, described or referred to in Article VII of this Deed of Trust entitled "State Law Provisions" or as are permitted by the laws of the State.

(h)     Lender may recover judgment on the Loan Agreement and the Note, either before, during or after any proceedings for the foreclosure or enforcement of this Deed of Trust.

(i)     Lender may secure the appointment of a receiver, trustee, liquidator or similar official of the Mortgaged Property or any portion thereof, and Borrower hereby consents and agrees to such appointment, without notice to Borrower and without regard to the adequacy of the security for the Indebtedness and without regard to the solvency of Borrower or any other Person liable for the payment of the Indebtedness, and such receiver or other official shall have all rights and powers permitted by applicable law and such other rights and powers as the court making such appointment may confer, but the appointment of such receiver or other official shall not impair or in any manner prejudice the rights of Lender to receive the Property Income pursuant to this Deed of Trust or the Assignment.

(j)     Lender may exercise any or all of the remedies available to a secured party under the Code.

(k)     Lender may pursue, or require Trustee to institute, any other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.

(l)     Lender may, in its sole discretion, apply any funds then on deposit with Lender, including but not limited to such funds on deposit for the payment of Impositions, ground rent or insurance premiums, to the payment of such items or to the repayment of the Indebtedness.

(m)     Lender in its sole discretion may surrender any insurance policies and collect the unearned premiums and apply such sums against the Indebtedness.

(n)     To the extent permitted by law, exercise any power of sale.

Section 4.02   General Provisions Regarding Remedies.

(a)     Proceeds of Sale. The proceeds of any sale of the Mortgaged Property or any part thereof received by Lender shall be distributed and applied to the amounts set forth in Section 2.7 of the Loan Agreement in such order and priority as Lender deems appropriate in its sole discretion.

(b)      *Effect of Judgment*.  No recovery of any judgment by Lender or Trustee and no levy of an execution under any judgment upon the Mortgaged Property or upon any other property of Borrower shall affect in any manner or to any extent the lien of this Deed of Trust upon the Mortgaged Property or any portion thereof, or any rights, powers or remedies of Lender hereunder.  Such lien, rights, powers and remedies of Lender and Trustee shall continue unimpaired as before.

(c)      *Continuing Power of Sale*.  The power of sale conferred upon Lender in this Deed of Trust shall not be exhausted by any one or more sales as to any portion of the Mortgaged Property remaining unsold, but shall continue unimpaired until all of the Mortgaged Property is sold or all of the Indebtedness is paid.

(d)      *Right to Purchase*.  At any sale of the Mortgaged Property or any portion thereof pursuant to the provisions of this Deed of Trust, Lender or Trustee shall have the right to purchase the Mortgaged Property being sold, and in such case shall have the right to credit against the amount of the bid made therefor (to the extent necessary) all or any portion of the Indebtedness then due.

(e)      *Right to Terminate Proceedings*.  Lender or Trustee may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided in Section 4.01 at any time before the conclusion thereof, as determined in Lender's sole discretion and without prejudice to Lender.

(f)      *No Waiver or Release*.  Lender may resort to, or require Trustee to resort to, any remedies and the security given by the Loan Documents, in whole or in part, and in such portions and in such order as determined in Lender's sole discretion.  No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by the Loan Documents.  The failure of Lender or Trustee to exercise any right, remedy or option provided in the Loan Documents shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by the Loan Documents.  No acceptance by Lender or Trustee of any payment after the occurrence of an Event of Default and no payment by Lender or Trustee of any Advance or obligation for which Borrower is liable hereunder shall be deemed to waive or cure such Event of Default or Borrower's liability to pay such obligation.  No sale of all or any portion of the Mortgaged Property, no forbearance on the part of Lender or Trustee, and no extension of time for the payment of the whole or any portion of the Indebtedness or any other indulgence given by Lender or Trustee to Borrower or any other Person, shall operate to release or in any manner affect Lender's or Trustee's interest in the Mortgaged Property or the liability of Borrower to pay the Indebtedness, except to the extent that such liability shall be reduced by proceeds of the sale of all or any portion of the Mortgaged Property received by Lender.  No waiver by Lender or Trustee shall be effective unless it is in a writing executed by Lender and then only to the extent specifically stated therein.

(g)      *No Impairment; No Release*.  The interests and rights of Lender or Trustee under the Loan Documents shall not be impaired by any indulgence, including: (i) any renewal, extension or modification which Lender may grant with respect to any of the Indebtedness; (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender or Trustee may grant with respect to the Mortgaged Property or any portion thereof; or (iii) any

release or indulgence granted to any maker, endorser, guarantor or surety of any of the Indebtedness. If the Mortgaged Property is sold and Lender enters into any agreement with the then owner of the Mortgaged Property extending the time of payment of the Indebtedness, or otherwise modifying the terms hereof or of any other Loan Document, Borrower shall continue to be liable to pay the Indebtedness according to the tenor of any such agreement unless expressly released and discharged in writing by Lender.

        (h)    <u>Waivers and Agreements Regarding Remedies</u>.  To the fullest extent that Borrower may legally do so, Borrower:

        (i)    agrees that Borrower will not at any time insist upon, plead, claim or take the benefit or advantage of any laws now or hereafter in force providing for any appraisal or appraisement, valuation, stay, extension or redemption, and waives and releases all rights of redemption, valuation, appraisal or appraisement, stay of execution, extension and notice of election to accelerate or declare due the whole of the Indebtedness;

        (ii)    waives all rights to a marshalling of the assets of Borrower, Borrower's partners, if any, and others with interests in Borrower, including the Mortgaged Property, or to a sale in inverse order of alienation in the event of foreclosure of the interests hereby created, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Mortgaged Property for the collection of the Indebtedness without any prior or different resort for collection, or the right of Lender or Trustee to the payment of the Indebtedness out of the proceeds of sale of the Mortgaged Property in preference to every other claimant whatsoever;

        (iii)    waives any right to bring or utilize any defense, counterclaim or setoff, other than one in good faith, which denies the existence or sufficiency of the facts upon which the foreclosure action is grounded or which is based on Lender's or Trustee's wrongful actions. If any defense, counterclaim or setoff (other than one permitted by the preceding sentence) is raised by Borrower in such foreclosure action, such defense, counterclaim or setoff shall be dismissed. If such defense, counterclaim or setoff is based on a claim which could be tried in an action for money damages, the foregoing waiver shall not bar a separate action for such damage (unless such claim is required by law or applicable rules of procedure to be pleaded in or consolidated with the action initiated by Lender or Trustee), but such separate action shall not thereafter be consolidated with Lender's or Trustee's foreclosure action. The bringing of such separate action for money damages shall not be deemed to afford any grounds for staying any such foreclosure action;

        (iv)    waives and relinquishes any and all rights and remedies which Borrower may have or be able to assert by reason of the provisions of any laws pertaining to the rights and remedies of sureties;

        (v)    waives the defense of laches and any applicable statutes of limitation; and

(vi)   waives any right to have any trial, action or proceeding tried by a jury.

(i)   Lender's Discretion.  Except as expressly set forth herein or in any other Loan Document to the contrary, Lender may exercise its rights, options and remedies and may make all decisions, judgments and determinations under this Deed of Trust and the other Loan Documents in its sole and absolute discretion.

(j)   Recitals of Facts.  In the event of a sale or other disposition of the Mortgaged Property pursuant to Section 4.01 and the execution of a deed or other conveyance pursuant thereto, the recitals therein of facts (such as default, the giving of notice of default and notice of sale, demand that such sale should be made, postponement of sale, terms of sale, purchase, payment of purchase money and other facts affecting the regularity or validity of such sale or disposition) shall be conclusive proof of the truth of such facts.  Any such deed or conveyance shall be conclusive against all Persons as to such facts recited therein.

(k)   Lender's Right to Waive, Consent or Release.  Lender may at any time, in writing: (i) waive compliance by Borrower with any covenant herein made by Borrower to the extent and in the manner specified in such writing; (ii) consent to Borrower's doing any act which Borrower is prohibited hereunder from doing, or consent to Borrower's failing to do any act which Borrower is required hereunder to do, to the extent and in the manner specified in such writing; or (iii) release, or require Trustee to release, any portion of the Mortgaged Property, or any interest therein, from this Deed of Trust and the lien of the other Loan Documents.  No such act shall in any way impair the rights of Lender or Trustee hereunder except to the extent specified by Lender in such writing.

(l)   Possession of the Mortgaged Property.  Upon the occurrence of any Event of Default hereunder and demand by Lender at its option, Borrower shall immediately surrender or cause the surrender of possession of the Premises to Lender.   If Borrower or any other occupant is permitted to remain in possession, such possession shall be as tenant of Lender and such occupant: (i) shall on demand pay to Lender monthly, in advance, reasonable use and occupancy charges for the space so occupied; and (ii) in default thereof, may be dispossessed by the usual summary proceedings.  Upon the occurrence of any Event of Default and demand by Lender, Borrower shall assemble the Collateral and make it available at any place Lender may designate to allow Lender to take possession and/or dispose of the Collateral.  The covenants herein contained may be enforced by a receiver of the Mortgaged Property or any portion thereof.  Nothing in this Section 4.02(l) shall be deemed a waiver of the provisions of this Deed of Trust prohibiting the sale or other disposition of the Mortgaged Property without the prior consent of Lender.

(m)   Limitations on Liability.  Notwithstanding anything contained herein to the contrary, Borrower's liability hereunder is subject to the limitation on liability provisions of Article 11 of the Loan Agreement, which Article 11 is incorporated herein by reference, mutatis mutandis, as if such Article 11 was set forth in full herein.

(n)   Subrogation.  If all or any portion of the proceeds of the Note or any Advance shall be used directly or indirectly to pay off, discharge or satisfy, in whole or in part,

any prior lien or encumbrance upon the Mortgaged Property or any portion thereof, then Lender and Trustee shall be subrogated to, and shall have the benefit of the priority of, such other lien or encumbrance and any additional security held by the holder thereof.

## ARTICLE V

### Miscellaneous

Section 5.01   Notices.   All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if delivered to the Persons and locations and in the manner set forth in Section 12.1 of the Loan Agreement.

Section 5.02   Binding Obligations; Joint and Several.   The provisions and covenants of this Deed of Trust shall run with the land, shall be binding upon Borrower, its successors and assigns, and shall inure to the benefit of Lender and Trustee and their respective successors and assigns.  If there is more than one Borrower, all their obligations and undertakings hereunder are and shall be joint and several.

Section 5.03   Captions.   The captions of the sections and subsections of this Deed of Trust are for convenience only and are not intended to be a part of this Deed of Trust and shall not be deemed to modify, explain, enlarge or restrict any of the provisions hereof.

Section 5.04   Severability.   If any one or more of the provisions contained in this Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Deed of Trust, but this Deed of Trust shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

Section 5.05   Amendments; Consents.   This Deed of Trust cannot be altered, amended, modified or discharged orally and no executory agreement shall be effective to modify or discharge it in whole or in part, unless in writing and signed by the party against which enforcement is sought. No consent or approval required hereunder or under any other Loan Document shall be binding unless in writing and signed by the party sought to be bound.

Section 5.06   Other Loan Documents and Exhibits.   All of the agreements, conditions, covenants, provisions and stipulations contained in the Loan Agreement, the Note and the other Loan Documents, and each of them, which are to be kept and performed by Borrower are hereby made a part of this Deed of Trust to the same extent and with the same force and effect as if they were fully set forth in this Deed of Trust, and Borrower shall keep and perform the same, or cause them to be kept and performed, strictly in accordance with their respective terms.  The Cover Sheet and each exhibit, schedule and rider attached to this Deed of Trust are integral parts of this Deed of Trust and are incorporated herein by this reference.  In the event of any conflict between the provisions of any such exhibit, schedule or rider and the remainder of this Deed of Trust, the provisions of such exhibit, schedule or rider shall prevail.

Section 5.07   Legal Construction.

(a)     In all respects, including, without limitation, matters of construction and performance of this Deed of Trust and the obligations arising hereunder, this Deed of Trust shall be governed by, and construed in accordance with, the laws of the State in which the Premises are located applicable to contracts and obligations made and performed in such State and any applicable laws of the United States of America.  Interpretation and construction of this Deed of Trust shall be according to the contents hereof and without presumption or standard of construction in favor of or against Borrower or Lender.  All terms contained herein shall be construed, whenever the context of this Deed of Trust so requires, so that the singular number shall include the plural, and the plural the singular, and the use of any gender shall include all genders.

(b)     The terms "include" and "including" as used in this Deed of Trust shall be construed as if followed by the phrase "without limitation".  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Deed of Trust shall refer to this Deed of Trust as a whole and not to any particular provision of this Deed of Trust, and Article, Section and Exhibit references contained in this Deed of Trust are references to Articles, Sections and Exhibits in or to this Deed of Trust unless otherwise specified.

(c)     Any provision of this Deed of Trust or in the other Loan Documents permitting the recovery of "attorneys' fees", "attorneys' fees and expenses",  "attorneys' fees and costs" or "attorneys' fees, costs and expenses" or any similar term shall be deemed: (i) to include such attorneys' fees, costs and expenses; (ii) to include such fees, costs and expenses incurred in all probate, appellate and bankruptcy proceedings, as well as any post-judgment proceedings to collect or enforce any judgment or order relating to the Indebtedness or any of the Loan Documents; and (iii) shall be deemed to be separate and several, and shall survive merger into judgment.

Section 5.08   Merger.  So long as any Indebtedness shall remain unpaid, fee title to and any other estate in the Mortgaged Property shall not merge, but shall be kept separate and distinct, notwithstanding the union of such estates in any Person.

Section 5.09   Time of the Essence.  Time shall be of the essence in the performance of all obligations of Borrower under this Deed of Trust.

Section 5.10   Repayment and Release.  If all of the Indebtedness is paid in full in accordance with the Loan Agreement, the Note, this Deed of Trust and the other Loan Documents and all of the covenants, warranties, conditions, undertakings and agreements made in the Loan Agreement, the Note, this Deed of Trust and the other Loan Documents are fully kept and performed, then in that event only all rights of Lender under this Deed of Trust and the other Loan Documents shall terminate and the Mortgaged Property shall become wholly clear of the liens, grants, security interests, conveyances and assignments evidenced hereby and thereby, and Lender shall release or cause to be released such liens, grants, assignments, conveyances and security interests in due form at Borrower's cost (to the extent permitted by the law of the State), and this Deed of Trust shall be void; provided, however, that no provision of this Deed of Trust or any other Loan Document which, by its own terms, is intended to survive such payment, performance, and release (nor the rights of Lender or Trustee under any such provision) shall be affected in any manner thereby and such provision shall, in fact, survive.  Recitals of any matters

or facts in any release instrument executed by Lender or Trustee under this Section 5.10 shall be conclusive proof of the truthfulness thereof. To the extent permitted by law, such an instrument may describe the grantee or releasee as "the person or persons legally entitled thereto" and Lender and Trustee shall not have any duty to determine the rights of persons claiming to be rightful grantees or releasees of any of the Mortgaged Property. When this Deed of Trust has been fully released or discharged by Lender and/or Trustee, the release or discharge hereof shall operate as a release and discharge of the Assignment and as a reassignment of all future Leases and Property Income with respect to the Mortgaged Property to the person or persons legally entitled thereto, unless such release expressly provides to the contrary.

Section 5.11   Conflict.   Notwithstanding anything to the contrary herein, this Deed of Trust shall be subject to the terms and conditions of the Loan Agreement and in the event of any conflict between the terms and conditions of this Deed of Trust and the terms and conditions of the Loan Agreement, the terms and conditions of the Loan Agreement shall prevail.

## ARTICLE VI

### Trustee

Section 6.01   Certain Actions of Trustee.   Upon the written request of Lender, Trustee may at any time: (a) reconvey all or any portion of the Mortgaged Property; (b) consent to the making of any map or plat thereof; (c) join in granting any easement thereon or in creating any covenants or conditions restricting the use or occupancy thereof; or (d) join in any extension agreement or in any agreement subordinating the lien or charge hereof. Any such action may be taken by Trustee without notice, and shall not affect the personal liability of any person for the payment of the Indebtedness or the lien of this Deed of Trust upon the Mortgaged Property for the full amount of the Indebtedness.

Section 6.02   Reconveyances.   Upon the written request of Lender stating that all sums secured hereby have been paid, and upon payment of its fees, Trustee shall reconvey without warranty the Mortgaged Property then held by Trustee hereunder.

Section 6.03   Trustee's Covenants and Compensation.   Trustee, by its acceptance hereof, covenants faithfully to perform and fulfill the trust herein created, being liable, however, only for negligence or willful misconduct. Trustee hereby waives any statutory fee and shall be entitled to, and hereby agrees to accept, reasonable compensation in lieu thereof for all services rendered and expenses incurred in the administration or execution of the trust hereby created. Borrower hereby agrees to pay such compensation subject to any applicable legal limitations.

Section 6.04   Substitution of Trustee.   Lender at any time in its sole discretion may select and appoint a successor or substitute Trustee hereunder by instrument in writing in any manner now or hereafter provided by law. Such writing, upon recordation in the county where the Land is located, shall be conclusive proof of proper substitution of such successor or substitute Trustee which shall thereupon and without conveyance from the predecessor Trustee succeed to all its title, estate rights, powers and duties.

Section 6.05    Resignation of Trustee.   Trustee may resign at any time upon giving at least thirty (30) days' prior written notice to Borrower and Lender.

Section 6.06    Ratification of Acts of Trustee.   Borrower hereby ratifies and confirms any and all acts which Trustee named herein or its successors or assigns in this trust shall do lawfully by virtue hereof.

## ARTICLE VII

### State Law Provisions

Section 7.01    Notice Addresses.   Pursuant to Section 2924b(d) of the California Civil Code, Borrower and Lender request that a copy of any notice of default and a copy of any notice of sale be mailed to Borrower and Lender, respectively, at the address for such party set forth herein.

Section 7.02    Uniform Commercial Code.

(a)    This Deed of Trust shall constitute a security agreement pursuant to the California Uniform Commercial Code (the "**UCC**") for any portion of the Mortgaged Property which, under applicable law, may be subject to a security interest pursuant to the UCC (such portion of the Premises is hereinafter called the "**Personal Property**") and Borrower hereby grants to Lender a security interest in the Personal Property.  Lender shall have all of the rights and remedies of a secured party under the UCC as well as all other rights and remedies available at law or in equity.

(b)    Borrower agrees to execute and deliver to Lender any financing statements, as well as extensions, renewals and amendments thereof, and reproductions of this Deed of Trust in such form as Lender may require to perfect a security interest with respect to the Personal Property.  Borrower hereby authorizes and empowers Lender and irrevocably appoints Lender its agent and attorney-in-fact to execute and file, on Borrower's behalf, all financing statements and refilings and continuations thereof as Lender deems necessary or advisable to create, preserve and protect such lien.  Borrower shall pay all costs of filing such financing statements and any extensions, renewals, amendments and releases thereof, and shall pay all reasonable costs and expenses of any record searches for financing statements as Lender may reasonably require.

(c)    Borrower shall not, without the prior written consent of Lender, sell, assign, transfer, encumber, remove or permit to be removed from the Premises any of the Personal Property.  So long as no Event of Default exists, Borrower may sell or otherwise dispose of the Personal Property when obsolete, worn out, inadequate, unserviceable or unnecessary for use in the operation of the Premises, but only upon replacing the same with other Personal Property at least equal in value and utility to the disposed Personal Property.  Any replacement or substituted Personal Property shall be subject to the security interest granted herein.

(d)    To the extent permitted by law, Borrower and Lender agree that with respect to all items of Personal Property which are or will become fixtures on the Land, this

Deed of Trust, upon recording or registration in the real estate records of the proper office, shall constitute a "fixture filing" within the meaning of the UCC Sections 9501(a)(1) and 9502(b) and (c). Borrower is the record owner of the Land.

(e)     Upon the occurrence of an Event of Default under this Deed of Trust, Lender, pursuant to the appropriate provisions of the UCC, shall have an option to proceed with respect to both the real property portion of the Premises and the Personal Property in accordance with its rights, powers and remedies with respect to such real property, in which event the default provisions of the UCC shall not apply. Such option shall be revocable by Lender as to all or any portion of the Personal Property at any time prior to the sale of the remainder of the Premises. In such event Lender shall designate Trustee to conduct the sale of the Personal Property in combination with the sale of the remainder of the Premises. Should Lender elect to sell the Personal Property or any part thereof which is real property or which Lender has elected to treat as real property or which may be sold together with the real property as provided above, Lender or Trustee shall give such notice of default and election to sell as may then be required by law. The parties agree that if Lender shall elect to proceed with respect to any portion of the Personal Property separately from such real property, five (5) days notice of the sale of the Personal Property shall be reasonable notice. The reasonable expenses of retaking, holding, preparing for sale, selling and the like incurred by Lender shall include, but not be limited to, reasonable attorneys' fees, costs and expenses, and other expenses incurred by Lender.

Section 7.03   Notice and Cure Periods.   All notices and cure periods described herein shall not be applicable to any event which with the giving of notice, the passage of time or both would constitute an Event of Default, if such event has occurred as of the date on which Lender commences a nonjudicial foreclosure proceeding with respect to another Event or Events of Default. Such event shall constitute an independent Event of Default hereunder.

Section 7.04   Trustee's Sale.   Should Lender elect to foreclose by exercise of the power of sale contained herein, Lender shall notify Trustee and shall, if required, deposit with Trustee the Note, the original or a certified copy of this Deed of Trust, and such other documents, receipts and evidences of expenditures made and secured hereby as Trustee may require.

(a)     Upon receipt of such notice from Lender, Trustee shall cause to be recorded and delivered to Borrower such notice of default as may then be required by law and by this Deed of Trust. Trustee shall, without demand on Borrower, after lapse of such time as may then be required by law and after recordation of such notice of default and after notice of sale has been given as required by law, sell the Mortgaged Property at the time and place of sale fixed by it in said notice of sale, either as a whole or in separate lots or parcels or items as Trustee shall deem expedient, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale. Trustee shall deliver to the purchaser or purchasers at such sale its good and sufficient deed or deeds conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including, without limitation, Borrower, Trustee or Lender, may purchase at such sale, and Borrower hereby covenants to warrant and defend the title of such purchaser or purchasers. To the extent permitted by law, during any sale conducted by Trustee pursuant to the power of sale contained in this Deed of Trust, Lender may, at Lender's option, direct the Trustee to (i) sell the Mortgaged

Property either as a whole or in separate parcels and in such order as Lender may determine and (ii) postpone the sale of all or any portion of the Mortgaged Property from time to time in accordance with the laws of the State of California.

(b)     Trustee may postpone the sale of all or any portion of the Mortgaged Property from time to time in accordance with the laws of the State in which the Land is located.

(c)     To the fullest extent allowed by law, Borrower hereby expressly waives any right which it may have to direct the order in which any of the Mortgaged Property shall be sold in the event of any sale or sales pursuant to this Deed of Trust.

(d)     Upon any foreclosure sale, Lender may bid for and purchase the Mortgaged Property and shall be entitled to apply all or any part of the Indebtedness as a credit to the purchase price.

(e)     Lender may from time to time rescind any notice of default or notice of sale before any Trustee's sale as provided above in accordance with the laws of the State in which the Land is located. The exercise by Lender of such right of rescission shall not constitute a waiver of any breach or default then existing or subsequently occurring, or impair the right of Lender to execute and deliver to Trustee, as above provided, other declarations or notices of default to satisfy the obligations of this Deed of Trust, or otherwise affect any provision, covenant or condition of any Loan Document or any of the rights, obligations or remedies of Trustee or Lender hereunder or thereunder.

(f)     Trustee and Lender shall have all powers, rights and remedies under applicable law whether or not specifically or generally granted or described in this Deed of Trust. Nothing contained herein shall be construed to impair or to restrict such powers, rights and remedies or to preclude any procedures or process otherwise available to trustees or beneficiaries under deeds of trust in the State in which the Land is located. Trustee and Lender, and each of them, shall be entitled to enforce the payment and performance of the Indebtedness or the obligations hereunder and to exercise all rights and powers under this Deed of Trust or under any other Loan Document or other agreement or any laws now or hereafter in force, notwithstanding the fact that some or all of the Indebtedness and the obligations hereunder may now or hereafter be otherwise secured, whether by Deed of Trust, mortgage, pledge, lien, assignment or otherwise. Neither the acceptance of this Deed of Trust nor its enforcement, whether by court action or pursuant to the power of sale or other powers contained herein, shall prejudice or in any manner affect Trustee's or Lender's right to realize upon or enforce any other rights or security now or hereafter held by Trustee or Lender. Trustee and Lender, and each of them, shall be entitled to enforce this Deed of Trust and any other rights or security now or hereafter held by Lender or Trustee in such order and manner as they or either of them may in their absolute discretion determine. No remedy herein conferred upon or reserved to Trustee or Lender is intended to be exclusive of any other remedy contained herein or by law provided or permitted, but each shall, to the extent permitted by law, be cumulative and in addition to every other remedy given hereunder or now or hereafter existing at law or in equity. Every power or remedy given by any of the Loan Documents to Trustee or Lender, or to which either of them may be otherwise entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Trustee or Lender, and either of them may pursue

inconsistent remedies.  By exercising or by failing to exercise any right, option or election hereunder, Lender shall not be deemed to have waived any provision hereof or to have released Borrower from any of the obligations secured hereby unless such waiver or release is in writing and signed by Lender.  The waiver by Lender of Borrower's failure to perform or observe any term, covenant or condition referred to or contained herein to be perform or observed by Borrower shall not be deemed to be a waiver of such term, covenant or condition or of any subsequent failure of Borrower to perform or observe the same or any other such term, covenant or condition referred to or contained herein, and no custom or practice which may develop between Borrower and Lender during the term hereof shall be deemed a waiver of or in any way affect the right of Lender to insist upon the performance by Borrower of the obligations secured hereby in strict accordance with the terms hereof or of any other Loan Document.

Section 7.05   Remediation.  Lender shall have the right to appoint a receiver when permitted under Section 564 of the California Code of Civil Procedure, including, without limitation, in order to enforce Lender's rights under Section 2929.5 of the California Civil Code.  The receiver shall have all of the rights and powers to the fullest extent permitted by law.  The receiver shall have the right to apply Property Income to cleanup, Remediation or other response action concerning the release or threatened release of Hazardous Substances, whether or not such actions are pursuant to an order of any federal, state or local governmental agency.

Section 7.06   Waiver of Lien.  In accordance with California Code of Civil Procedure Section 726.5, Lender may waive its lien against the Mortgaged Property or any portion thereof, together with fixtures or personal property thereon, to the extent such property is found to be environmentally impaired, and may exercise any and all rights and remedies of an unsecured creditor against Borrower and all of Borrower's assets and property for the recovery of any deficiency, including, without limitation, seeking an attachment order under California Code of Civil Procedure Section 483.010.  No such waiver shall be final or binding on Lender unless and until a final money judgment is obtained against Borrower.  As between Lender and Borrower, for purposes of California Code of Civil Procedure Section 726.5, Borrower shall have the burden of proving that the release or threatened release was not knowingly or negligently caused or contributed to, or knowingly or willfully permitted or acquiesced to by Borrower or any related party (or any affiliate or agent of Borrower or any related party) and that Borrower made written disclosure of the release to Lender or that Lender otherwise obtained actual knowledge thereof prior to the making of the loan evidenced by the Note.  Notwithstanding anything to the contrary contained in this Deed of Trust or the other Loan Documents, Borrower shall be fully and personally liable for all judgments and awards entered against Borrower pursuant to California Code of Civil Procedure 726.5 and such liability shall be an exception to any non-recourse or exculpatory provision in this Deed of Trust or the other Loan Documents and shall not be limited to the original principal amount of the obligations secured by this Deed of Trust.  Borrower's obligations hereunder shall survive the foreclosure, deed in lieu of foreclosure, release, reconveyance or any other transfer of the Mortgaged Property or this Deed of Trust.  For the purpose of any action brought under this Section, Borrower hereby waives the defense of laches and any applicable statute of limitations.  For purposes of California Code of Civil Procedure 726.5, the acts, knowledge and notice of each "726.5 Party" shall be attributed to and be deemed to have been performed by the party or parties then obligated on and liable for payment of the Note.  As used herein, "726.5 Party" shall mean Borrower, any successor owner to Borrower of all or any portion of the Mortgaged Property, any related party of Borrower or

any such successor and any affiliate or agent of Borrower, any such successor or any such related party.

Section 7.07   Action for Environmental Claims.   In accordance with, and subject to limitations of, California Code of Civil Procedure Section 736, Lender may seek a judgment that the Borrower has breached its covenants, representations and/or warranties with respect to the environmental matters contained in Sections 4.1 through 4.4 of the Loan Agreement (the "**Environmental Provisions**"), and may commence and maintain an action or actions in any court of competent jurisdiction for enforcement of the Environmental Provisions and/ or recovery of any all costs, damages, expenses, fees, penalties, fines, judgments, indemnification payments to third parties, and other out-of-pocket costs or expenses (including, without limitation, court costs, consultants' fees and attorneys' fees, whether incurred in litigation or not and whether before or after judgment), incurred or advanced by Lender pursuant to the Environmental Provisions (collectively, the "**Environmental Costs**"), excluding, however, any Environmental Costs not permitted to be recovered pursuant to Section 736 of the California Code of Civil Procedure. Environmental Costs that are not permitted to be recovered pursuant to Section 736 may be referred to hereinafter as the "Unsecured Environmental Costs", and Environmental Costs other than the Unsecured Environmental Costs may be referred to hereinafter as the "Secured Environmental Costs". Any Unsecured Environmental Costs shall not be secured by this Deed of Trust; provided, however, nothing herein shall prevent Lender from recovering any Unsecured Environmental Costs pursuant to the unsecured Environmental Indemnification Agreement of even date herewith among Borrower, Lender and certain other parties, to the extent they are recoverable in accordance with said Indemnity Agreement. All Secured Environmental Costs incurred by Lender shall bear interest at the default rate provided under the Note. All Secured Environmental Costs together with interest thereon at the rate then in effect under the Note shall be secured by this Deed of Trust and shall enjoy the same priority as the original principal amount of the Note.   Borrower acknowledges and agrees that notwithstanding any term or provision contained in this Deed of Trust or in the other Loan Documents, Environmental Costs shall be exceptions to any nonrecourse or exculpatory provision, if any, and Borrower shall be fully and personally liable for Environmental Costs. Such liability shall not be limited to the original principal amount of the obligations secured by this Deed of Trust. Borrower's obligations hereunder shall survive foreclosure, deed in lieu of foreclosure, release, reconveyance or any other transfer of the Mortgaged Property or this Deed of Trust. For the purposes of any action brought under this subparagraph, Borrower hereby waives the defense of laches and any applicable statute of limitations.

Section 7.08   Appointment of Receiver.   In addition, Lender shall have the right to appoint a receiver when permitted under Section 564 of the California Code of Civil Procedure, including, without limitation, in order to enforce Lender's rights under Section 2929.5 of the California Civil Code. The receiver shall have all of the rights and powers to the fullest extent permitted by law. The receiver shall have the right to apply Rents to cleanup, remediation or other response action concerning the release or threatened release of Hazardous Substances, whether or not such actions are pursuant to an order of any federal, state or local governmental agency. Borrower hereby confirms the right of Lender (or a receiver appointed by Lender) to enter upon and inspect all or any portion of the Mortgaged Property for the purpose of determining the existence, location, nature and magnitude of any past or present release or threatened release of any hazardous substance into, onto, beneath, or from the Mortgaged

Property in accordance with Section 2929.5 of the California Civil Code. All reasonable costs and expenses incurred by Lender pursuant to this provision or pursuant to Section 2929.5 of the California Civil Code, including, without limitation, costs of consultants and contractors, costs of repair of any physical injury to the Mortgaged Property normal and customary to the tests and studies, court costs and attorneys' fees, costs and expenses, whether incurred in litigation or not and whether before or after judgment, shall be payable by Borrower and, to the extent advanced or incurred by Lender, shall be reimbursed to Lender by Borrower upon demand. This provision is separate and several, and shall survive merger into any judgment.

Section 7.09   Costs.   Borrower shall pay all reasonable Costs incurred by Lender in connection with the documentation, modification, workout, collection or enforcement of the Loan or any of the Loan Documents (as applicable), including probate, appellate and bankruptcy proceedings, any post-judgment proceedings to collect or enforce any judgment or order relating to the Loan or any of the Loan Documents (as applicable), and all such Costs shall be included as additional Indebtedness bearing interest at the Default Rate set forth in the Loan Agreement until paid. In any action to foreclose the lien hereof or otherwise enforce Lender's rights and remedies hereunder, there shall be allowed and included as additional Indebtedness all Costs which may be paid or incurred by or on behalf of Lender. For the purposes hereof "**Costs**" means all expenditures and expenses which may be paid or incurred by or on behalf of Lender including repair costs, payments to remove or protect against liens, attorneys' fees (including fees of Lender's inside counsel), receivers' fees, appraisers' fees, engineers' fees, accountants' fees, independent consultants' fees (including environmental consultants), all costs and expenses incurred in connection with any of the foregoing, Lender's out-of-pocket costs and expenses related to any audit or inspection of the Mortgaged Property, outlays for documentary and expert evidence, stenographers' charges, stamp taxes, publication costs, and costs (which may be estimates as to items to be expended after entry of an order or judgment) for procuring all such abstracts of title, title searches and examination, title insurance policies, and similar data and assurances with respect to title as Lender may deem reasonably necessary either to prosecute any action or to evidence to bidders at any sale of the Mortgaged Property the true condition of the title to, or the value of, the Mortgaged Property. Further, all "Costs" shall include such other costs, expenses and fees as may be incurred by Lender in the protection of the Mortgaged Property and the maintenance of the lien of this Deed of Trust, including, attorneys' fees, expenses and costs in any litigation or proceeding affecting this Deed of Trust, the Note, the other Loan Documents, the Mortgaged Property or the Personal Property, including probate, appellate, and bankruptcy proceedings, and any post-judgment proceedings to collect or enforce any judgment or order relating to this Deed of Trust or the other Loan Documents, to obtain any court order or the appointment of a receiver to enforce Lender's rights pursuant to Section 564 of the California Code of Civil Procedure and/or Section 2929.5 of the California Civil Code or in preparation for the commencement or defense of any action or proceeding, shall be immediately due and payable to Lender, with interest thereon at the Default Rate, and shall be secured by this Deed of Trust. This provision is separate and several, and shall survive the merger of this provision into any judgment.

Section 7.10   Waivers.

(a)   Borrower waives, to the extent permitted by law, (i) the benefit of all Laws now existing or that may hereafter be enacted providing for any appraisement before sale

of any portion of the Mortgaged Property, (ii) all rights of redemption, valuation, appraisement, stay of execution, notice of intent to accelerate, notice of acceleration, notice of election to mature or declare due the whole of the Indebtedness in the event of foreclosure of the liens hereby created, (iii) all rights and remedies which Borrower may have or be able to assert by reason of the laws of the State of California pertaining to the rights and remedies of sureties, (iv) the right to assert any statute of limitations as a bar to the enforcement of the lien of this Deed of Trust or to any action brought to enforce the Note or any other obligation, and (v) any rights, legal or equitable, to require marshaling of assets or to require foreclosure sales in a particular order, including any rights under California Civil Code Sections 2899 and 3433, and all rights of Borrower under California Civil Code Section 2822. Lender shall have the right to determine the order in which any or all of the Project shall be subjected to the remedies provided herein. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of the remedies provided herein. Nothing contained herein shall be deemed to be a waiver of Borrower's rights under Section 2924c of the California Civil Code.

(b)     Lender may, in its sole discretion, elect to (a) apply the net proceeds of any condemnation award (after deduction of Lender's reasonable costs and expenses, if any, in collecting the same) in reduction of the Indebtedness in such order and manner as Lender may elect, whether due or not or (b) make the proceeds available to Borrower for the restoration or repair of the Mortgaged Property. Any implied covenant in this Deed of Trust restricting the right of Lender to make such an election is waived by Borrower. In addition, Borrower hereby waives the provisions of any law prohibiting Lender from making such an election, including, without limitation, the provisions of California Code of Civil Procedure commencing with Section 1265.210.

Section 7.11   Beneficiary Statement. Lender may collect a fee not to exceed the maximum allowed by applicable law for furnishing the statement of obligation as provided in Section 2943 of the California Civil Code.

Section 7.12   Enforcement of Assignment of Leases and Income. Without limiting any other rights or remedies of Lender set forth in this Deed of Trust or under any of the other Loan Documents, or available at law or in equity, at any time upon or following the occurrence of any Event of Default, Lender shall have the right to enforce all of the rights and remedies of an assignee under Section 2938 of the California Civil Code ("**Section 2938**"). In the event that Lender shall elect to enforce this Deed of Trust in accordance with Section 2938, the following procedures shall apply, as applicable:

(a)     Lender may send a demand notice in the form prescribed by Section 2938 to, in the case of enforcement under Section 2938(c)(3), one or more of the tenants of the Mortgaged Property, with a copy to Borrower and any other assignee under a recorded assignment of leases, rents, issues and profits with respect to the Mortgaged Property, or, in the case of enforcement under Section 2938(c)(4), to Borrower with a copy to any such other assignees in accordance with the procedures set forth therein. Without limiting Lender's rights to any amounts received by Borrower after an Event of Default under this Deed of Trust, Borrower shall immediately turn over to Lender any Property Income received by Borrower from any tenant of the Mortgaged Property from and after Lender's enforcement of this Deed of

Trust under either of such Sections 2938(c)(3) or (4), it being understood that Borrower shall be deemed to hold such amounts as trustee for Lender until such amounts have been paid to Lender. In addition, Borrower shall also cause any collection agent for Borrower or any other person who has collected for Borrower's benefit relating to the period from and after Lender's enforcement of the assignment of Leases and Property Income contained in this Deed of Trust under either of such Sections 2938(c)(3) or (4), to turn such Property Income over to Lender.

(b)     Notwithstanding anything to the contrary contained in this Deed of Trust or any other Loan Document, if Lender shall proceed to enforce this Deed of Trust by means other than the appointment of a receiver and consequently receives Property Income as a result thereof, and Lender receives written demand from Borrower (or any other party entitled under law to make demand on Lender) to pay the reasonable costs of protecting and preserving the Mortgaged Property, Lender may elect either to pay (either directly to the party to whom owed, or by joint check payable to Borrower and such party) or authorize Borrower to pay, such costs (such payments being referred to herein as "Protective Payments"), conditioned upon Borrower furnishing to Lender all information (such as invoices, bills, contracts, or purchase orders) necessary in order for Lender to identify the party to whom payment is owed or the work, service or item for which payment is requested and to establish that such Protective Payments are required to be paid or authorized under this Section. If Borrower is authorized to pay any Protective Payments under this Section, Lender reserves the right to deposit the amounts necessary to pay such Protective Payments into a non-interest bearing checking account, in which Borrower shall have granted to Lender a perfected, first priority security interest, from which Borrower shall be obligated to draw the funds necessary to pay such Protective Payments. In the event that Lender agrees or is required under any circumstances to pay or authorize the payment of any Protective Payments consisting of costs of improvement of the Mortgaged Property or any portion thereof (or any other costs the non-payment of which would entitle the payee to enforce mechanic's or materialman's liens or similar rights), Lender shall be authorized, before paying or authorizing the payment of any such payments, to require compliance with standard construction loan disbursement conditions with respect to such costs, including, without limitation, the receipt of unconditional mechanics' lien waivers with respect to the work for which such costs are to be paid.

(c)     In no event shall Lender be obligated to pay or authorize the payment of Protective Payments in excess of any Property Income actually received by Lender as a result of the enforcement of this clause of this Section.

(d)     Nothing contained in this Section shall limit the rights of Lender under any other provision of this Deed of Trust.

(e)     Nothing contained in this Section shall limit either (x) Lender's right to cease at any time any further enforcement of this Deed of Trust under Section 2938 by sending written notice of the cancellation thereof to each party to whom a demand notice was sent, or (y) Lender's right to seek the appointment of a receiver, either of which if enforced by Lender, shall terminate Lender's obligations under this Section.

(f)     In no event shall any enforcement of Lender's rights under this Section, including, without limitation, the payment or authorization of payment of any Protective

Payments, make Lender a "mortgagee-in-possession" or limit, waive, or otherwise derogate any of Lender's other rights and remedies available to it under the Loan Documents to which Borrower is a party or at law. In no event shall any exercise of rights by the Lender under this Section, including, without limitation, the payment or authorization of payment of any Protective Payments, be construed to require the Lender to operate or manage the Mortgaged Property or be construed as an assumption by Lender of any obligation to operate or manage the Mortgaged Property, and all liabilities and obligations in relation to the operation and management of the Mortgaged Property shall remain exclusively that of the Borrower.

(g) Any Property Income received by Lender as a result of any enforcement measures shall be applied as provided in this Deed of Trust.

(h) Without in any way limiting Borrower's other indemnification obligations set forth in this Deed of Trust and in any of the Loan Documents to which Borrower is a party, Borrower shall indemnify, defend, protect, and hold harmless Lender, and its successors and assigns, from and against any and all losses, costs, expenses (including, without limitation, reasonable attorneys' fees, costs and expenses), damages, liabilities, or claims asserted against or suffered by Lender (i) arising from any Protective Payments made, or authorized to be made, by Lender in good faith, and (ii) arising from any work performed or goods or services furnished in connection with the ownership or operation of the Mortgaged Property at any time during which Lender shall be enforcing its rights under this Section.

(i) Without limiting the restrictions on assignment set forth in this Deed of Trust and any of the other Loan Documents to which Borrower is a party, each assignee of any interest in the Property Income shall acquire its interest in the Property Income subject to the rights of the Lender set forth in this Deed of Trust, and shall acquire no greater rights with respect to the payment of Protective Payments than the rights of Borrower as set forth in this Section.

Section 7.13   Leases. Lender is authorized to foreclose this Deed of Trust subject to the rights of any tenants of the Mortgaged Property, and the failure to make any such tenants parties defendant to any such foreclosure proceedings and to foreclose their rights will not be, nor be asserted by Borrower to be, a defense to any proceedings instituted by Lender to collect the sums secured hereby or to collect any deficiency remaining unpaid after the foreclosure sale of the Mortgaged Property. Unless otherwise agreed by Lender in writing, all leases and tenancies of the Mortgaged Property executed subsequent to the date hereof, or any part thereof, shall be subordinate and inferior to the lien of this Deed of Trust, but superior to any other lien on the Mortgaged Property and such leases and tenancies shall contain an attornment provision pursuant to which the tenant agrees to attorn to the successful bidder at the foreclosure sale of this Deed of Trust at the option of such successful bidder. Additionally, from time to time Lender may execute and record among the land records of the jurisdiction where this Deed of Trust is recorded, subordination statements with respect to such of said leases as Lender may designate, whereby the leases so designated by Lender will be made superior to the lien of this Deed of Trust. From and after the recordation of such subordination statements, the leases therein referred to shall be superior to the lien of this Deed of Trust and shall not be affected by any foreclosure hereof. All such leases and tenancies shall contain a provision to the effect that the tenant recognizes the right of Lender to effect such subordination of this Deed of Trust and

consents thereto. Further, all such leases and tenancies shall contain a provision obligating the tenant to attorn to the Lender or the successful bidder at a foreclosure sale following such foreclosure sale.

[No Further Text on this Page]

IN WITNESS WHEREOF, this Deed of Trust has been duly executed and delivered as of the day and year first above written.

Borrower:

**VINTAGE PARK EAST, LLC,**
a California limited liability company

By: Invesco Advisers, Inc.,
    Its Manager

By: _____

Printed Name: RON RAGSDALE

Title: _____ ASSISTANT VICE PRESIDENT

## ACKNOWLEDGMENT

STATE OF ___TEXAS___   )
            ) ss:
COUNTY OF ___DALLAS___ )

On ___March 8___, 20_11_ before me, ___M.K. Beavans___ (here insert name of the officer), Notary Public, personally appeared ___Ron Ragsdale___, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



_____
    Signature of Notary Public

[Seal]

M. K. BEAVANS
MY COMMISSION EXPIRES
March 27, 2015

## EXHIBIT A

### DESCRIPTION OF LAND

All that certain real property situated in the County of San Bernardino, State of California, described as follows:

Parcel A: (APN: 0238-174-44)

Lots 1 and 2 of Tract No. 13974, in the City of Fontana, as per Map recorded in Book 226, Pages 49 through 54, inclusive, of Maps, in the Office of the County Recorder of said County.

Except all minerals and all mineral rights of every kind and character now known to exist or hereafter discovered, including, without limiting the generality of the foregoing, oil and gas and rights thereto, together with the sole, exclusive and perpetual right to explore for, remove and dispose of, said minerals by any means or methods suitable to grantor, its successors and assigns, but without entering upon or using the surface of the property, and in such manner as not to damage the surface of said lands or to interfere with the use thereof by grantor, its successors or assigns, as reserved by Union Pacific Land Resources Corporation, a Nebraska Corporation, by Deed recorded October 18, 1989 as Instrument No. 392211, Official Records.

Parcel B: (APN: 0238-174-48)

Lot 3 of Tract No. 13974, in the City of Fontana, County of San Bernardino, State of California, as per the Map filed in Book 226, Pages 49 through 54, inclusive, of Maps, in the Office of the County Recorder of said County.

Except that portion described as follows:

Beginning at the Northwesterly corner of said Lot 3; Thence Southerly along the Westerly line of said Lot, South 0°05'49" West 350.27 feet; Thence leaving said Westerly line and along a line parallel with the Northerly line of said Lot, South 89°55'45" East 880.64 feet to a point on the Easterly line of said Lot distant thereon South 0°04'15" West 350.27 feet from the Northeast corner of said Lot; Thence, along said Easterly line, North 0°04'15" East 350.27 feet to the Northerly line of said Lot; Thence, Westerly along the general Northerly lines of said Lot the following 3 courses, North 89°55'45" West 348.00 feet to a point on a non-tangent curve concave Northerly having a radius of 52.00 feet, said last course being radial to said curve; Thence, along the arc of said curve, Southerly, Westerly and Northerly through a central angle of 180°00'00" a length of 163.36 feet; Thence, leaving said curve in a direction radial from said curve, North 89°55'45" West 428.47 feet to the Point of Beginning.

Except from any portion thereof lying within the Northeast quarter of the Southeast quarter of Section 33, Township 1 South, Range 6 West, San Bernardino Meridian, all mineral rights below

a depth of 500 feet with no rights of surface entry as reserved to J.J. Forman by Deed recorded August 7, 1981 as Instrument No. 81-174859, Official Records.

Said division of land is pursuant to Certificate of Compliance for Lot Line Adjustment No. 99-12, recorded November 12, 1999 as Instrument No. 99-469978 of Official Records in said Office of the County Recorder.

Parcel C: (APN: 0238-174-39)

Lots 6, 7, 8 and 9 of Tract No. 13974, in the City of Fontana, County of San Bernardino, State of California, as per the Map filed in Book 226, Pages 49 through 54, inclusive, of Maps, in the Office of the County Recorder of said County.

Except from any portion thereof lying within the Northeast quarter of the Southeast quarter of Section 33, Township 1 South, Range 6 West, San Bernardino Meridian, all mineral rights below a depth of 500 feet with no rights of surface entry as reserved to J.J. Forman by Deed recorded August 7, 1981 as Instrument No. 81-174859, Official Records.

Said land is pursuant to Certificate of Compliance for Lot Line Adjustment, Lot Line Merger recorded November 12, 1999 as Instrument No. 19990469980 of Official Records in said Office of the County Recorder.

Parcel D: (APN: 0238-174-45)

Lots 12, 13 and 14 of Tract No. 13974, in the City of Fontana, County of San Bernardino, State of California, as per the Map filed in Book 226, Pages 49 through 54, inclusive, of Maps, in the Office of the County Recorder of said County.

Except from any portion thereof lying within the Northeast quarter of the Southeast quarter of Section 33, Township 1 South, Range 6 West, San Bernardino Meridian, all mineral rights below a depth of 500 feet with no rights of surface entry as reserved to J.J. Forman by Deed recorded August 7, 1981 as Instrument No. 81-174859, Official Records.

Parcel E: (APN: 0238-174-32)

Lot 16 of Tract No. 13974, in the City of Fontana, County of San Bernardino, State of California, as per the Map filed in Book 226, Pages 49 through 54, inclusive, of Maps, in the Office of the County Recorder of said County.

Together with the Easterly 110.00 feet of Lot 15 of said Tract No. 13974.

Except from any portion thereof lying within the Northeast quarter of the Southeast quarter of Section 33, Township 1 South, Range 6 West, San Bernardino Meridian, all mineral rights below a depth of 500 feet with no rights of surface entry as reserved to J.J. Forman by Deed recorded August 7, 1981 as Instrument No. 81-174859, Official Records.