J. Mark Moore, State Bar No. 180473
    jmm@mllawyers.net
H. Scott Leviant, State Bar No. 200834
    hsl@mllawyers.net
**MOORE & LEVIANT LLP**
20700 Ventura Blvd., Suite 140
Woodland Hills, CA 91364
Telephone:  (877) 360-7020
Facsimile:   (310) 870-7020

Jeffrey K. Berns (SBN 131351)              Lee A. Weiss (admitted *pro hac vice*)
    jberns@law111.com                          lweiss@bernsweiss.com
Albert G. Lum (SBN 259053)                 **BERNS WEISS LLP**
    alum@law111.com                        585 Stewart Avenue, Suite L-20
**BERNS WEISS LLP**                        Garden City, NY 11530
20700 Ventura Blvd. Suite 140              Telephone: (516) 222-2900
Woodland Hills, CA 91364                   Facsimile: (818) 999-1500
Telephone: (818) 961-2000
Facsimile: (818) 999-1500

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIO SALAS, individually, and on behalf of all others similarly situated; MELVIN CHAMBERLAIN, individually, and on behalf of all others similarly situated; ALBIN WATSON, individually, and on behalf of all others similarly situated; JOHN PAXIN, individually, and on behalf of all others similarly situated; <br><br> Plaintiffs, <br><br> vs. <br><br> INTERNATIONAL UNION OF OPERATING ENGINEERS, a trade union; WILLIAM C. WAGGONER, an individual; VINCE GIBLIN, an individual; | Case No.: 12-cv-10506 DDP (VBKx) <br><br> CLASS ACTION <br><br> **FOURTH AMENDED CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

1    JAMES T. CALLAHAN, an individual;
2    RUSSELL E. BURNS, an individual;
     PATRICK L. SINK, an individual;
3    PATRICIA M. WAGGONER, an individual;
4    BERT TOLBERT, an individual;
     MICKEY J. ADAMS, an individual;
5    RON SIKORSKI, an individual;
     DAN BILLY, an individual;
6    DAN HAWN, an individual;
     LARRY DAVISON, an individual;
7    C. W. POSS, an individual;
     WALT ELLIOT, an individual;
8    MICHAEL CRAWFORD, an individual;
9    BRUCE COOKSEY, an individual;
     MIKE PRLICH, an individual;
10   DON BOURGUIGNON, an individual;
11   KENNETH BOURGUIGNON, an individual;
12   PAUL VON BERG, an individual;
     JIM HULSE, an individual;
13   MIKE GOMEZ, an individual;
     OPERATING ENGINEERS FUNDS
14   INC. a non-profit corporation;
     KENNETH D. WAGGONER, an
15   individual;
     CHRIS LAQUER, an individual; and
16   DOES 1 through 10, inclusive,

17           Defendants.

18

19

20

21

22

23

24

25

26

27

28

**FOURTH AMENDED CLASS ACTION COMPLAINT**

1

# TABLE OF CONTENTS

2

3  TABLE OF CONTENTS ........................................................................... i

4  I.    INTRODUCTION ....................................................................... 1

5  II.   JURISDICTION AND VENUE.................................................... 2

6  III.  THE PARTIES ........................................................................... 3

7        A.   Plaintiffs ........................................................................ 3

8        B.   Defendants.................................................................... 4

9             1.   The IUOE, the GPs, Senior GEB Members and William

10                 Waggoner.......................................................... 4

11            2.   Officers and Other Fiduciaries of Local 12 ....................... 6

12            3.   Non-Union Trustees for the Local 12-Affiliated Employee

13                 Benefit Plans...................................................... 7

14                 a)   The Employee Benefit Plans................................ 7

15                 b)   Management-Side Trustee Defendants ............... 12

16            4.   Other Defendants....................................................... 15

17       C.   Significant Non-Parties ................................................. 16

18  IV.  STATEMENT OF FACTS .......................................................... 17

19       A.   The IUOE ...................................................................... 17

20       B.   The Union IUOE and Local 12 Defendants Have For Years

21            Illegally Required Employee Class Members To Make Mandatory

22            Contributions from Their Wages to Political and/or Union Slush

23            Funds ........................................................................... 19

24            1.   Defendant Waggoner Has Forced Plaintiffs and Other

25                 Employees of Local 12 and Its Related Entities, including

26                 OETT and OEFI, to Contribute to The BA's Fund.......... 19

27

28

2.    All Employees of Local 12 and Its Affiliated Trusts, Other
      Than Some Clerical Workers, Must Pay a Portion of their
      Compensation to Local 12 As Purported "Union Dues" Despite
      Not Being Covered By Any Collective Bargaining Agreement ......25

3.    IUOE, With the Willing Assistance of Its First Vice President,
      Defendant Waggoner, Forced Union Members, Plaintiffs and
      Class Members Serving As Officers or Employees of Local 12
      to Contribute to a Political Action Fund ...........................................26

      a)    The Scheme to Extort Employee Contributions ...............26
      b)    The Scheme to Extort Member Contributions ..................30

C.  The Defendant Trustees and Trust Fund Fiduciaries Breached
    Their Fiduciary Duties and Violated ERISA in Many Respects ............33

1.    Defendant-Trustee William Waggoner Wrote Off or Declined
      to Collect Millions of Dollars of Employer Debts Without
      Obtaining Approval of a Majority of the Trustees When the
      Debts Were Owed by Employers Management-Side Trustees or
      Employers Favored by Waggoner or His Long-time Close
      Associate, OEFI Funds Manager Leo Majich .................................34

      a)    Leo Majich and Majich Bros. .................................................35
      b)    Defendant C.W. Poss and C.W. Poss, Inc. ...........................36
      c)    The Millions of Dollars of Unpaid Contributions in
            the "Secret" Files .....................................................................38

2.    Misconduct and Embezzlement as to the Training Trust ................39

      a)    Waggoner and Other Local 12 Defendants Embezzled
            Property Purchased by OETT and Embezzled OETT
            Labor .........................................................................................39

     b)    The OETT Fiduciaries Diverted and/or Allowed the Diversion of Trust Assets from the Southern California Training Trust ..................................................... 47

     c)    Bert Tolbert, the Administrator of the OETT, Embezzled and/or Secured Other Trust Assets For His Own Benefit or the Benefit of Family Members, and the Defendant OETT Trustees Took No Steps to Recover Those Assets or to Otherwise Remedy His Misconduct ................................................................ 49

  3.    Conduct During This Lawsuit Demonstrating Defendants' Awareness of the Impropriety of Their Actions ............................... 55

  4.    Fiduciary Breaches in Connection with Real Estate Owned by the Pension Fund .................................................................. 56

     a)    Misconduct in Connection with the Washington Court Hotel ............................................................... 56

     b)    Misconduct Regarding the Pension Fund's Texas Parking Facilities ..................................................... 59

     c)    Misconduct Regarding the Sheraton Grand Hotel in Texas ............................................................................ 59

     d)    Other Misconduct with Pension Fund-Owned Properties in California and Nevada .................................. 60

     e)    The Pension Fund Trustees Have Failed To Prudently Diversify the Pension Fund's Assets by Vastly Over-Investing in Real Estate, Which Has Not Performed ....... 61

  5.    The Health & Welfare Fund Trustees Caused a Prohibited Transaction with a Party in Interest in the Form of a Local 12 Loan of $10 Million Dollars to the Health & Welfare Fund ............ 63

6.    William and Patty Waggoner Improperly Steered Health &
      Welfare Fund Investments to Their Son's Employer, Without
      Disclosing the Conflict of Interest in LM-30 Filings ...................... 67

7.    William Waggoner for Many Years Demanded and Obtained
      the Diversion of Real Estate Account Funds from the Pension
      Fund to Pay for Roughly $90,000 in Rose Parade Tickets Every
      Year .............................................................................................. 68

8.    Leo Majich's Daughter, Theresa Goodell, Used an OEFI Credit
      Card to Travel to Jamaica to Visit Her Boyfriend and Stole
      Other OEFI Funds, Yet the Trustees Took No Steps To Stop
      Her Embezzlement or to Recover Those Funds .............................. 69

9.    Bernard Kotkin & Co., LLP, a Certified Public Accounting
      Firm, Was Hired by OEFI to Conduct Annual Audits,
      Uncovering Massive Financial Misconduct, Including
      Embezzlement and the Misuse of Hundreds of Credit Cards .......... 72

10.   William Waggoner Engaged in Self-Dealing by Causing Local
      12 to Hire Patty Waggoner's Company, Spacemaker Tenant
      Improvements, to Perform Work at Local 12's Headquarters,
      OEFI-Owned Properties ................................................................ 73

11.   The Local 12 Officer Defendants Allow Employers Contracted
      With Local 12 to Operate Double-Breasted, Thereby Depriving
      Members of Protections and Benefits Available Under Union
      Agreements .................................................................................... 75

12.   OEFI Paid Employees' Payroll Taxes Out of OEFI's General
      Fund .............................................................................................. 77

13.   The Pension Fund Defendant Trustees Violated ERISA by
      Making Extra Pension Payments to Retirees Who Have Been
      Waggoner's Most Loyal Voting Bloc ............................................. 80

FOURTH AMENDED CLASS ACTION COMPLAINT

14. William Waggoner Maintained Incompetent Employer Trustees on the Local 12 Associated Trusts to Guarantee That He Controlled Those Trusts ...................................................81

    a) C.W. Poss.................................................................81

    b) Kenneth Bourguignon...........................................82

D. Defendant Waggoner and His Fellow Officer Defendants Embezzled, Diverted and Misused Union Assets, Harming Local 12 and Its Members ...................................................83

  1. The Weak State of Local 12's General Fund .................83

  2. Misconduct Regarding the Union Jet ...........................84

    a) Defendants William Waggoner, Patty Waggoner, Kenneth Waggoner, Mickey Adams, Ron Sikorski, Larry Davison, Dan Hawn, and Others Used Local 12's Aircraft for Their Personal Use ....................................84

    b) Defendants Waggoner and the Local 12 Officers Hid the Misuse and Cost of the Jet By Falsely Claiming Its Fuel Costs Represented Automobile Lease Charges........90

    c) William Waggoner Provided Politicians With Transportation on the Local 12 Jet, But that In-Kind Contribution Was Frequently Not Reported.....................91

  3. Fiduciary Breaches with Respect to Local 12's Printing Press Operations...........................................................94

  4. William and Patty Waggoner Embezzled Union Assets When Waggoner Allowed His Wife to Use a Local 12 Ford Flex Without Justification ...............................................96

  5. William Waggoner and Kenneth Waggoner Conspired to Allow the Latter to Embezzle Union Assets and Services.........96

6.   Waggoner and His Fellow Defendant Officers and Administrators Embezzle Union Funds to Subsidize Their Expensive Food and Alcohol Tastes ................................................. 97

7.   Defendant Waggoner Has Diverted Assets from the Work Preservation (Strike) Fund and the Local 12 PAC to the General Fund ............................................................................... 101

8.   Steve Montrie, Who was Convicted of Vehicular Manslaughter in 2008 for Killing an Individual While Driving a Union Vehicle Under the Influence of Alcohol, Illegally Remains a Business Agent and Receives Tens of Thousands of Dollars Per Year from Local 12 ..................................................... 102

E.   Local 12's Leadership Has Used Threats of Violence, or Actual Violence, to Suppress Dissent ................................................. 103

G.   Litigation-Related Misconduct After the Filing of this Lawsuit ........... 104

V.   CLASS ACTION ALLEGATIONS ................................................. 105

VI.   THE ERISA PROVISIONS VIOLATED IN THIS CASE ......................... 110

A.   Breaches of Fiduciary Duties Under ERISA § 404(a)(1) ..................... 110

B.   Violations of § 406(b)'s Prohibition on Self-Dealing Transactions ...... 111

C.   Violations of § 406(a)' Prohibition on Transactions With Parties in Interest ................................................................................. 111

D.   Co-Fiduciary Liability Under § 405 ............................................. 112

E.   § 408(c)(2)'s Provision that Fiduciaries Who are Already Receiving Full-Time Pay May Receive No Compensation From a Plan Other Than For Reimbursement of Expenses Properly and Actually Incurred .......................................................................... 114

VII. CLAIMS FOR RELIEF .................................................................. 114

FIRST CLAIM FOR RELIEF ................................................................. 114

**FOURTH AMENDED CLASS ACTION COMPLAINT**

ERISA VIOLATIONS WITH RESPECT TO THE OETT PURSUANT TO ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), ERISA § 409, 29 U.S.C. § 1109 ................................................................................................114

A.   Statutory Basis For This Claim ................................................................115

B.   Parties to this Claim ................................................................................115

C.   Bases for ERISA Liability........................................................................117

    1.   ERISA Liability Based on Acts and Omissions Described Section IV.C.2.a Above (Embezzlement and Personal Use of OETT Assets, Including Equipment, Vehicles, Parts, Labor and Services) ................................................................................117

    2.   ERISA Liability Based On Acts and Omissions Discussed In Section IV.C.2.b Above (Asset Diversion from OETT to Southern Nevada Training Trust)................................................119

    3.   ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.2.c Above (Losses due to Additional Embezzlement and Wrongdoing by Tolbert) ................................122

    4.   ERISA Liability Based on Acts and Omission Discussed in Section IV.C.1 Above (Losses due to Write-offs and Failures to Collect Debts/Contributions Owed to the Plan By Employers).....126

    5.   ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.8 Above (Losses due to Misconduct by Theresa Goodell at OEFI) ................................................................128

    6.   ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.9 Above (Losses due to Credit Card Fraud by OEFI Employees) ................................................................129

    7.   ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.11 Above (Failure to Address Improper Double-Breasting and Resulting Lack of Contributions)............................131

8.   ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.12 Above (Payment of Employee FICA Taxes From Fund Monies) ...................................................................... 132

9.   ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.14 Above (Maintenance of Incompetent Employer Trustees on Trusts) ........................................................... 133

10.  ERISA Liability Based on Acts and Omissions Discussed in Section IV.B.2 Above (Relating to BA's Fund) ............................ 134

SECOND CLAIM FOR RELIEF ................................................................. 136

EQUITABLE RELIEF, WITH RESPECT TO OETT, PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). ............................................................. 136

A.   Statutory Basis for this Claim ................................................. 137

B.   Parties to this Claim ............................................................... 137

C.   Acts or Practices Violating Title I of ERISA ......................... 137

D.   Equitable Relief Sought on Behalf of the Plan for Acts and Practices Violating Title I of ERISA ...................................... 138

THIRD CLAIM FOR RELIEF ................................................................... 140

ERISA VIOLATIONS WITH RESPECT TO THE PENSION FUND PURSUANT TO ERISA § 409, 29 U.S.C. § 1109, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) .................................................................................. 140

A.   Statutory Basis For This Claim .............................................. 140

B.   Parties to this Claim ............................................................... 141

C.   Bases for ERISA Liability ...................................................... 142

1.   ERISA Liability Based on Acts and Omission Discussed in Section IV.C.1 Above (Losses due to Write-offs and Failures to Collect Debts/Contributions Owed to the Plan By Employers) ..... 142

**FOURTH AMENDED CLASS ACTION COMPLAINT**

2. ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.8 Above (Losses due to Misconduct by Theresa Goodell at OEFI) ........................................................................ 144

3. ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.9 Above (Losses due to Credit Card Fraud by OEFI Employees) ........................................................................ 145

4. ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.11 Above (Failure to Address Improper Double-Breasting and Resulting Lack of Contributions) ............................ 147

5. ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.12 Above (Payment of Employee FICA Taxes From Fund Monies) ...................................................................... 148

6. ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.14 Above (Maintenance of Incompetent Employer Trustees on Trusts) ........................................................... 150

7. ERISA Liability Based on Acts and Omissions Discussed in § IV.B.2 Above (Relating to BA's Fund) ......................................... 150

8. ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.4 Above (Regarding Pension Fund Real Estate Holdings) ................................................................................ 152

9. ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.10 Above (Hiring of Patty Waggoner Company to Improve Pension Fund Properties) .............................................. 153

10. ERISA Liability Based on Other Party in Interest Transactions .... 155

FOURTH CLAIM FOR RELIEF ....................................................................... 156

EQUIITABLE RELIEF, WITH RESPECT TO THE PENSION FUND, PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) .................. 156

**FOURTH AMENDED CLASS ACTION COMPLAINT**

A.  Statutory Basis for this Claim ............................................... 156

B.  Parties to this Claim .................................................................. 157

C.  Acts or Practices Violating Title I of ERISA ......................... 157

D.  Equitable Relief Sought on Behalf of the Plan for Acts and Practices Violating Title I of ERISA ...................................... 157

FIFTH CLAIM FOR RELIEF ....................................................... 160

ERISA VIOLATIONS WITH RESPECT TO THE PENSION FUND PURSUANT TO ERISA § 409, 29 U.S.C. § 1109, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) ........................................... 160

A.  Statutory Basis For This Claim ............................................. 160

B.  Parties to this Claim .................................................................. 161

SIXTH CLAIM FOR RELIEF ...................................................... 164

ERISA VIOLATIONS WITH RESPECT TO THE HEALTH & WELFARE FUND PURSUANT TO ERISA § 409, 29 U.S.C. § 1109, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) ........................................... 164

A.  Statutory Basis For This Claim ............................................. 164

B.  Parties to this Claim .................................................................. 165

C.  Bases for ERISA Liability...................................................... 166

  1.  ERISA Liability Based on Acts and Omission Discussed in Section IV.C.1 Above (Losses due to Write-offs and Failures to Collect Debts/Contributions Owed to the Plan By Employers)..... 166

  2.  ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.8 Above (Losses due to Misconduct by Theresa Goodell at OEFI) .......................................................... 167

  3.  ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.9 Above (Losses due to Credit Card Fraud by OEFI Employees) ...................................................... 168

4. ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.11 Above (Failure to Address Improper Double-Breasting and Resulting Lack of Contributions)............................170

5. ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.12 Above (Payment of Employee FICA Taxes From Fund Monies)........................................................171

6. ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.14 Above (Maintenance of Incompetent Employer Trustees on Trusts) ..................................................173

7. ERISA Liability Based on Acts and Omissions Discussed in § IV.B.1 Above (Relating to BA's Fund) ...........................173

8. ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.6 Above (Steering of H&W Investments to Kenny Waggoner) ....................................................175

9. ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.5 Above (Prohibited Loan Transaction Between Local 12 and Health & Welfare Fund)...........................175

SEVENTH CLAIM FOR RELIEF ....................................................176

EQUITABLE RELIEF, WITH RESPECT TO THE HEALTH & WELFARE FUND, PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) ......176

A. Statutory Basis for this Claim ...........................................176

B. Parties to this Claim ...................................................177

C. Acts or Practices Violating Title I of ERISA.........................177

D. Equitable Relief Sought on Behalf of the Plan for Acts and Practices Violating Title I of ERISA ....................................178

EIGHTH CLAIM FOR RELIEF ....................................................180

ERISA VIOLATIONS PURSUANT TO ERISA § 409, 29 U.S.C. § 1109, ERISA §502(a)(2), 29 U.S.C. § 1132(a)(2) ................................180

NINTH CLAIM FOR RELIEF ........................................................................183

EQUITABLE RELIEF PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. §
    1132(a)(3) ..............................................................................................183

TENTH CLAIM FOR RELIEF .......................................................................186

COMMON LAW BREACH OF FIDUCIARY DUTY .....................................186

ELEVENTH CLAIM FOR RELIEF ................................................................188

COMMON LAW BREACH OF FIDUCIARY DUTY .....................................188

TWELFTH CLAIM FOR RELIEF ..................................................................190

COMMON LAW BREACH OF FIDUCIARY DUTY .....................................190

THIRTEENTH CLAIM FOR RELIEF ............................................................192

VIOLATION OF 18 U.S.C. § 1962(C) OF THE RACKETEER INFLUENCED
    AND CORRUPT ORGANIZATIONS ACT [18 U.S.C. §§ 1961-68] ........192

FOURTEENTH CLAIM FOR RELIEF ...........................................................198

VIOLATION OF 18 U.S.C. § 1962(C) OF THE RACKETEER INFLUENCED
    AND CORRUPT ORGANIZATIONS ACT [18 U.S.C. §§ 1961-68] ........198

FIFTEENTH CLAIM FOR RELIEF ................................................................204

CONVERSION ...............................................................................................204

SIXTEENTH CLAIM FOR RELIEF ...............................................................206

VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §
    17200, *ET SEQ.* .....................................................................................206

SEVENTEENTH CLAIM FOR RELIEF .........................................................210

VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §
    17200, *ET SEQ.* .....................................................................................210

EIGHTEENTH CLAIM FOR RELIEF ............................................................214

VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §
    17200, *ET SEQ.* .....................................................................................214

PRAYER FOR RELIEF ..................................................................................220

**FOURTH AMENDED CLASS ACTION COMPLAINT**

1  **I.     INTRODUCTION**

2       1.     This action arises from years of illegal activity and embezzlement by

3  Defendant William C. Waggoner, the First Vice President of the International

4  Union of Operating Engineers ("IUOE"), and his fellow officers and subordinates

5  at Local 12, a Southern California local union headquartered in Pasadena

6  encompassed within the IUOE.  Local 12's members, including Plaintiffs and class

7  members herein, were victimized by this extensive illegal activity, which harmed

8  both Local 12 itself and its members.  In addition, Local 12 established and

9  currently maintains certain employee benefit plans for its members and their

10 beneficiaries.  Three of these employee benefit plans are at issue in this action – the

11 Operating Engineers Pension Trust ("The Pension Fund"), the Operating Engineers

12 So. California and Journeyman-Apprentice Training Trust ("OETT" or the

13 "Training Trust") and the Operating Engineers Health & Welfare Fund (the "Health

14 & Welfare Fund").   These three employee benefit plans are sometimes collectively

15 referred to herein as "the Trusts."   Plaintiffs seek redress for massive breaches of

16 fiduciary duty and asset mismanagement by the Trustees and fiduciaries of the

17 Trusts, including Mr. Waggoner and the other ERISA fiduciary defendants named

18 herein, which resulted in millions of dollars of losses to the Trusts.   Often, the plan

19 assets and monies in question were diverted from the plans to Defendant William

20 Waggoner and his circle of co-conspirators for their personal use and benefit.  Any

21 Trustees and fiduciaries who did not themselves personally benefit from such plan -

22 related misconduct nevertheless allowed this to happen, in breach of their own

23 fiduciary duties under ERISA.  Defendant IUOE and certain of its General

24 Executive Board ("GEB") members, including its current and former General

25 Presidents ("GPs"), also violated the law by extorting political contributions from

26 Plaintiffs and other employees of Local 12 and its affiliated employee benefit plans.

27      2.     Plaintiffs, individually and on behalf of those similarly situated, and,

28 in connection with the harm to the Trusts, on behalf of the victimized Trusts as a

1  whole, now seek monetary and equitable relief to remedy all of the wrongdoing
2  addressed herein.

3

4  **II.    JURISDICTION AND VENUE**

5  3.      The action is brought, among other bases, under the Interstate
6  Commerce Clause of the United States Constitution, and the Racketeering and
7  Money Laundering laws of the United States.

8  4.      Jurisdiction is specifically conferred on this Court by various federal
9  statutes including, but not limited to, the following:  ERISA, including but not
10 limited to 29 U.S.C. § 1132(e)(1), and Section 1964 of the Racketeer Influenced
11 and Corrupt Organizations Act of the Organized Crime Control Act of 1970 as
12 amended, 18 U.S.C. § 1964.

13 5.      Original jurisdiction lies with this Court as to the Federal questions
14 raised herein, pursuant to 28 U.S.C. § 1331.

15 6.      Jurisdiction over any California state claims for relief contained in this
16 Complaint arises under the doctrine of supplemental jurisdiction, 28 U.S.C. §
17 1367(a).

18 7.      Venue as to each defendant is proper in this District pursuant to 18
19 U.S.C. § 1965, because each of the Defendants resides, is found, has an agent,
20 controls and/or transacts or transacted affairs in this District.  In addition,
21 Defendants are engaged in interstate and foreign commerce, and a substantial part
22 of the events giving rise to the claims for violations of Federal law occurred in this
23 District, all in the course of interstate and foreign commerce.  Venue is also proper
24 in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

25

26

27

28

III.    **THE PARTIES**

      A.    **Plaintiffs**

      8.    Plaintiff Mario Salas is, and at all relevant times was, a member of Local 12.  Plaintiff Salas is a former Business Agent for (and employee of) Local 12.   He was terminated in 2012.  Plaintiff Salas is a member of the BA's Fund Class and a proposed representative thereof.  As an employee, Mr. Salas was wrongfully required to and did contribute to Defendant IUOE's President's Club, formerly known as EPEC (the President's Club/EPEC contribution scheme is discussed in paragraphs 83-102 below), and to Local 12's "BA's Fund" (the BA's Fund contribution scheme is discussed in paragraphs 65-79 below).  Since his termination as a Local 12 employee, Plaintiff Salas has returned to work in the field and has, in that capacity, had wages wrongfully deducted without his consent and diverted to the President's Club.  Mr. Salas is a participant in the Pension Fund, the Local 12 Health & Welfare Fund, and the OETT, having satisfied any and all conditions required to so participate.

      9.    Plaintiff Melvin Chamberlain is, and at all relevant times was, a member of Local 12.  Plaintiff Chamberlain is a former Instructor for OETT at the San Diego training center (and, as such, a former employee of OETT).  He is now retired.   As an OETT employee, Mr. Chamberlain was wrongfully required to and did contribute to the President's Club, formerly known as EPEC, and to the BA's Fund.  Mr. Chamberlain is a participant in the Pension Fund, the Local 12 Health & Welfare Fund, and the OETT, having satisfied any and all conditions required to so participate.

      10.    Plaintiff Albin Watson is, and at all relevant times was, a member of Local 12.  Plaintiff Watson is a former Coordinator for the OETT at the Whittier training center (and, as such, a former employee of OETT).  He is now retired.  As an OETT employee, Mr. Watson was required to contribute to the BA's Fund.  Mr.

Watson is a participant in the Pension Fund, the Local 12 Health & Welfare Fund, and the OETT, having satisfied any and all conditions required to so participate.

11.     Plaintiff John Paxin is, and at all relevant times was, a member of Local 12.  Plaintiff Paxin is a former Local 12 Executive Board member (and thus a former employee of Local 12) and Instructor for the OETT at the Whittier and Devore training centers (and thus a former employee of OETT).   Mr. Paxin is retired from his positions with the union, though he sometimes still works as a crane instructor and is required to maintain crane certifications for that purpose.  Mr. Paxin is a participant in the Pension Fund, the Local 12 Health & Welfare Fund, and the OETT, having satisfied any and all conditions required to so participate.  He was required to participate contribute to the EPEC Fund.

**B.     Defendants**

**1.     The IUOE, the GPs, Senior GEB Members and William Waggoner**

12.     Defendant IUOE is a trade union that primarily represents operating engineers, who work as heavy equipment operators, mechanics, and surveyors in the construction industry, and stationary engineers, who work in operations and maintenance in building and industrial complexes, and in the service industries.  IUOE also represents nurses and other health industry workers, a significant number of public employees engaged in a wide variety of occupations, as well as a number of job classifications in the petrochemical industry.  Local 12 of the IUOE is a hoisting and portables local, which principally engages in the construction industry.

13.     Defendant James T. Callahan is the GP of the IUOE, who was purportedly "elected" to that position in November 2011.   In fact, his election by the GEB was little more than an appointment by outgoing GP, Defendant Vincent Giblin, as all officers of the GEB swear allegiance to the GP and to his named

successor.  There has never been a contested "election" in the history of the IUOE for the position of General President.  Prior to becoming GP, Mr. Callahan served as the IUOE General Secretary-Treasurer and was elected as an IUOE Vice President in 2008.  Defendant Callahan is also a Trustee of the IUOE General Pension Fund.

14.    Defendant William C. Waggoner (sometimes, "Mr. Waggoner" or "Waggoner") is the First Vice President of the IUOE.  Mr. Waggoner was first elected as an IUOE Vice President in 1980.  Mr. Waggoner is also the Western States Director and the Business Manager (the top elected official) of Local 12.  Mr. Waggoner views Local 12 as "his" union, and he is the dominating, controlling force in the union and the affiliated employee benefit plans providing benefits to members of the union.

15.    Defendant Vincent (Vince) Giblin was General President of IUOE from 2005 until his unexpected retirement in November 2011.

16.    Defendant Russell E. Burns is the Fourth Vice President of IUOE.  Mr. Burns was first elected as an IUOE Vice President in October 2006.  Mr. Burns is the Business Manager for IUOE Local 3 headquartered in Alameda, California.

17.    Defendant Patrick L. Sink is the Second Vice President of IUOE.  Mr. Sink was first elected as an IUOE Vice President in 2004.  Mr. Sink is the Business Manager of IUOE Local 18 headquartered in Cleveland, Ohio.

18.    Defendant IUOE, Callahan, Giblin, Burns and Sink (sometimes referred to collectively as "the IUOE Defendants") are named exclusively for their role in unlawfully demanding and obtaining mandatory contributions to the President's Club, formerly known as EPEC.   As alleged, this conduct violates RICO, the California Unfair Competition Law, and the fiduciary duties of Defendants Callahan, Giblin, Burns and Sink to IUOE members, including Plaintiffs.  The IUOE Defendants have been aware of Defendant Giblin's decision to force contributions upon union members and have continued to ratify and

support that conduct since Mr. Giblin's unlawful plan was first approved by the GEB.

### 2.  Officers and Other Fiduciaries of Local 12

19.  Defendant Bert Tolbert was until very recently the administrator of the OETT and the Southern Nevada Training Trust (sometimes he was referred to as the Director of Training; herein he is simply referred to as the "Administrator" of those two training trusts).   He recently retired due at least in part to concerns that he would be charged by criminal authorities for his conduct at issue herein.

20.  Defendant Mickey J. Adams, the President of Local 12, is and/or has been, during relevant times, a Trustee of the Health & Welfare Fund, the Pension Fund, and the Training Trust.

21.  Defendant Ron Sikorski, the Vice President of Local 12, is and/or has been, during relevant times, a Trustee of the Health & Welfare Fund, the Pension Fund, and the Training Trust.

22.  Defendant Dan Billy, a District Representative for Local 12, is and/or has been, during relevant times, a Trustee of the Health & Welfare Fund and the Pension Fund.

23.  Defendant Dan Hawn, the Financial Secretary of Local 12, is and/or has been, during relevant times, a Trustee of the Health & Welfare Fund, the Pension Fund, and the Training Trust.

24.  Defendant Larry Davison, who has been Local 12's Treasurer and is now its Recording-Corresponding Secretary, is and/or has been, during relevant times, a Trustee of the Health & Welfare Fund, the Pension Fund, and the Training Trust.

25.  Defendants William Waggoner, Ron Sikorski, Mickey Adams, Dan Hawn and Larry Davison are sometimes collectively referred to herein as the "Local 12 Officer Defendants."

### 3. Non-Union Trustees for the Local 12-Affiliated Employee Benefit Plans

#### a) *The Employee Benefit Plans*

26.     Local 12 established and currently maintains certain employee benefit plans for its members.  Three of them are at issue in this action -- the Operating Engineers Pension Trust ("The Pension Fund"), the Operating Engineers So. California and Journeyman-Apprentice Training Trust ("OETT" or the "Training Trust") and the Operating Engineers Health & Welfare Fund (the "Health & Welfare Fund").   These three employee benefit plans are sometimes collectively referred to herein as "the Trusts."   The assets of each of the Trusts are held in trust by its respective Board of Trustees.

27.     Each of the Trusts is an employee benefit plan under the Employee Retirement Income Security Act ("ERISA").

28.     Each of the Trusts is governed by a Board of Trustees.  One-half of the Trustees are representatives of employers who have signed collective bargaining agreements ("CBAs") with Local 12 or representatives of employer organizations with member-employers that are signatories to CBAs with Local 12. The remaining Trustees are Local 12 officers or employees (like Defendant Billy) selected by Defendant William Waggoner (regardless whether they have any knowledge of employee benefit plans or their duties under ERISA at the time of their appointment).   Defendant Waggoner, in practice, dominates and controls the Trusts, notwithstanding ERISA's rule requiring that all Trustees jointly manage and control the assets of the plan for which they are Trustees and that they exercise reasonable care to ensure that co-Trustees do not breach their duties under ERISA. *See* ERISA, § 405(b).

29.     Each Board of Trustees has a Chairman and a Secretary-Treasurer. The Chairman and Secretary-Treasurer positions typically rotate among Trustees

on a periodic basis.  Defendant Waggoner, who sits on the Board of each of the Trusts, is frequently either the Chairman or the Secretary-Treasurer of each Board.

30.    Defendant Operating Engineers Funds Inc. ("OEFI") is a non-profit corporation that administers the employee benefit programs for the Trusts.  Each of the Trusts is supposed to pay only its *pro rata* share of the expenses incurred by OEFI.  OEFI's Chairman at certain relevant times including during the last four years, has been Defendant Kenneth Bourguignon.   Defendant William Waggoner has also filled that position at times.   At least some of the employees of OEFI are Local 12 members, entitled to participate in the Pension Fund, Health & Welfare Fund, and Training Trust under the terms of those Plans.   Some OEFI employees belong to a different union, the OPEIU.

**The Pension Fund**

31.    The Pension Fund is a pension benefit plan established by the IUOE, Local 12 and participating employers through collective bargaining.  It is subject to the provisions of ERISA.  OEFI administers the Pension Fund (though Invesco Advisers has management power over some Pension Fund assets, including real estate, by virtue of delegation of that role by OEFI and/or the Pension Fund Trustees to Invesco within the last several years and by its designation as the managing member of LLC's that serve effectively as holding companies for various Pension Fund real estate assets).

32.    The Pension Fund is in critical condition and at a vastly increased risk of default, at least in part due to the fiduciary breaches alleged herein, including the mismanagement of real estate assets and the over-investment in real estate.    At the time of the filing of this lawsuit, on information and belief, the Pension Fund was more than 30% under-funded.   In addition, in order to improve the financial health of the Pension Fund, in recent months, Local 12 members working in the field, including Plaintiff Mario Salas, have been required to begin paying extra monies into the Pension Fund, over and above the amounts previously deducted from their

pay for their own pension contributions.   For example, in or about July 2013, Local 12's new form CBA (Local 12 endeavors to use CBAs with standardized terms for the majority of employers) provided members with a $2.00 per hour raise, but of that amount, $1.10 per hour (or $44 per 40-hour work week) is being deducted to prop up the condition of the Pension Fund.   That money is not being credited to Plaintiff Salas or other workers for purposes of their own pensions, but rather is being used solely to attempt to shore up the condition of the fund.[1]

**The Training Trust**

33.    The Training Trust is an employee benefit plan established by Local 12 and participating employers through collective bargaining. It is subject to the provisions of ERISA.  OEFI administers the Training Trust.  The Training Trust employs Local 12 members directly for the purpose of administration and training. Salaries, expenses, equipment, training, and other activities are paid out of Training Trust assets.  The Training Trust was established in 1964 to provide initial training and re-training to apprentice and journeymen members of Local 12 in various disciplines of construction covered under local 12's collective bargaining agreements.  The Training Trust main office is located in Whittier, California and has six other training sites located throughout Southern California and Southern Nevada.  The Training Trust site in Whittier hosts a variety of training courses such as welding, inspection, hazardous materials, heavy equipment repair, crane training, many certification courses, and other training related to the work that operating engineers perform.  Regardless whether they are currently employed, all members in good standing, including Plaintiffs, are entitled to make use of the Training Trust and are participants therein.

---

[1] Of the newly negotiated $2.00 per hour raise, members receive only 80 cents per hour, before taxes, as in addition to the $1.10 that goes to the Pension Fund, an additional 10 cents purportedly goes to "supplemental dues."

34.    The Training Trust is presently governed by a Board of Trustees.    Six of the Trustees are union-side Trustees (namely, Defendants Adams, Sikorski, Hawn and Davison, as well as non-defendant Dave Garbarino and Defendant Waggoner himself).    The union-side Trustees do Defendant Waggoner's bidding on the Board or face serious consequences for disloyalty.   The other six Trustees (Defendants Cooksey, Poss, Hulse, Gomez, Von Berg, as well as non-defendant Brian Laird) and are purportedly independent; they represent contractors from the management side (either directly, as representatives of specific employers, or indirectly, appointed by employer organizations with seats on the Trust's Board), but Defendant Waggoner exercises influence over their selection (in part, through employers' knowledge that Waggoner will call financially devastating strikes on specific employers if he is challenged) to ensure that he always gets his way on the Board.  Once on the Board, Waggoner maintains his influence over management-side Trustees; Waggoner is well known for selectively calling for financially punishing strikes on specific employers, rather than general strikes, and he has used this tactic to punish former Trustee Tim MacDonald, when Mr. MacDonald questioned the propriety of Waggoner's decisions related to the various Local 12-affiliated Trusts.

35.    Through coercion and careful selection, Defendant Waggoner ensures that at least one management-side Trustee will always vote in the manner that he desires and/or directs, to the extent votes are even held.  At present, management-side Trustee C.W. Poss is a reliable Waggoner vote and supporter on the Training Trust.  Thus, since Defendant Waggoner has the union-side Trustees who do his bidding vote as he directs, he controls a majority of the OETT Trustee votes at all times.  One way that Defendant Waggoner accomplishes this control is through the inclusion of Trustees who are no longer capable of understanding the materials presented to Trustees as a result of physical infirmity.   One such person, at present, is Defendant C.W. Poss (discussed below), who is no longer sufficiently mentally

competent, on a consistent basis, to fulfill his duties as a Trustee.  Another way that Defendant Waggoner accomplishes this control is by providing gifts from the Trusts to management-side Trustees, such as expensive vacation travel, where luxury resorts and airfare are covered by the Trust and concealed as travel for "educational" reasons.   Waggoner is, in practice, effectively in control of OETT and has in practice exercised control and authority over OETT and its administrators, managers and employees for years, including in matters of hiring and termination and in directing the use of OETT labor and assets.

**The Health & Welfare Fund**

36.    The Health & Welfare Fund is a benefit plan established by Local 12 and participating employers through collective bargaining.  It provides health and welfare benefits to participants, including Plaintiffs, and other participants and beneficiaries, and is subject to the provisions of ERISA.   OEFI manages mostly routine aspects of the Health & Welfare Fund.  The Board of Trustees is the Health & Welfare Fund Plan Administrator.

37.    The Health & Welfare Fund's Board of Trustees is "authorized and has the power to do all things necessary in the establishment, maintenance and administration of the Plan."   January 2009 Health & Welfare Fund Benefit Information document, p. 7, a relevant excerpt of which is attached hereto as Exhibit 2.[2]   "The people who operate your plan, called 'fiduciaries of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries." *Id.*, p. 11.   "If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a state or federal court." *Id.*

---

[2] The same is true of the Pension Fund and the Training Trust.

38.     The Health & Welfare Fund is funded by employer contributions, pursuant to CBAs, which, according to Plan documents provided to members (*id.*, p. 6), require contributions at a fixed rate per hour worked by the employers' union member employees.[3]

39.     The Health & Welfare Fund, like the Pension Fund, is in very poor financial condition and has been for years during the period of time that Defendants have breached their fiduciary duties with respect to the Fund as alleged herein.

**b)**     *Management-Side Trustee Defendants*

40.     Defendant C. W. Poss has at relevant times including within the applicable ERISA statute of limitations period, been a management-side Trustee of the Health & Welfare Fund, the Pension Fund, and the Training Trust, and thus a fiduciary thereof.   Recently, after being sued in this action, he resigned, on information and belief, from his positions with the Health & Welfare Fund and the Pension Fund, but, on information and belief and according to Defendant OEFI's own new website, he has maintained his position as a Trustee of OETT.  On information and belief, Mr. Poss is now mentally incompetent, though in years past, including within the applicable ERISA statute of limitations period, Mr. Poss was sufficiently competent to understand his obligations as a Trustee.  During his time as a Trustee, Mr. Poss has regularly supported the positions of Defendant Waggoner, in exchange for which he and his family receive expensive paid vacations, funded by Local 12 Trusts, each year.  Previously, Mr. Poss's company had substantial contributions to the Health & Welfare and Pension Funds written off and/or excused by Defendant Waggoner, as alleged below, while he sat as a Trustee on the Boards of those funds.

41.     Defendant Walt Elliot is a management-side Trustee of the Health & Welfare Fund, the Pension Fund, and the Operating Engineers So. Nevada

---

[3] The Pension Fund and the Training Trust also are funded by contributions

Journeyman-Apprentice Training Trust, and has been for several years.   He is thus a fiduciary of those three trusts (but not OETT).  Though presently serving as a management-side Trustee for the Nevada Contractors Association, before Defendant Elliot became a Trustee he was for many years a high-ranking officer with another union in Las Vegas.  Defendant Walt Elliot has generally been a reliable management-side supporter of Defendant Waggoner in connection with the activities of the three trusts on which he has sat as Trustee, including when other management-side Trustees, such as non-defendants Mike Roddy and John Nelson, sometimes opposed Waggoner's positions regarding trust fund business and decisions.  Defendant Walt Elliot's son John Elliot also serves as investment advisor to the Pension Fund, earning substantial monies in that role, which Defendant Elliot knows Defendant Waggoner could terminate at any time in the event he were displeased with Defendant's Elliot's actions as Trustee.  In past years, Jack Schaefer (now deceased) served as a management-side Trustee on certain Local 12-affiliated trusts for the Nevada Contractors Association.   Mr. Schaefer was almost invariably - if not invariably - a rubber stamp for Waggoner, as other Trustees knew.   Schaefer would show up to meetings primarily when Waggoner needed Schaefer's vote to ensure that his position prevailed, but was otherwise a frequent "no-show" at meetings missing well over half the meetings of the Health & Welfare Trust from about 2008 to 2011.   Defendant Elliot filled Schaefer's shoes and continued this activity.

42.   Defendant Michael Crawford is and/or was, during relevant times including within the applicable ERISA statute of limitations period, a management-side Trustee of the Local 12 Health & Welfare Fund and the Pension Fund, and thus a fiduciary thereof.

at a fixed rate per hour worked.

43.     Defendant Bruce Cooksey is and/or was, during relevant times
including within the applicable ERISA statute of limitations period, a management-
side Trustee of the Health & Welfare Fund and the Training Trust, and thus a
fiduciary of those two trusts.

44.     Defendant Mike Prlich is and/or was, during relevant times including
within the applicable ERISA statute of limitations period, a management-side
Trustee of the Pension Fund and thus a fiduciary thereof.

45.     Defendant Don Bourguignon was, during relevant times including
within the applicable ERISA statute of limitations period, a management-side
Trustee of the Training Trust, and thus a fiduciary thereof.  On information and
belief, he ceased being a Trustee in or around the beginning of 2012.

46.     Defendant Kenneth Bourguignon has, at relevant times, been a
management-side Trustee of the Pension Fund, and has, at some time in the past,
been a management-side Trustee of the OETT.  From time to time during the last
several years and earlier than that, he has also served as Chairman of the Board of
Directors of Defendant OEFI (a position he often alternated with William
Waggoner).   By virtue of his position as OEFI Chairman, he has exercised some
authority and control respecting management and disposition of each of the Trusts'
assets and has had discretionary authority and responsibility in the administration
of the Trusts during relevant times.  As such, he is and/or has been a fiduciary of
each of the Trusts by virtue of his OEFI Chairman position, and is a fiduciary of the
Pension Fund by virtue of being a Trustee thereof.

47.     Defendant Paul Von Berg is and/or was, during relevant times
including within the applicable ERISA statute of limitations period, a management-
side Trustee of the Training Trust, and thus a fiduciary thereof.

48.     Defendant Jim Hulse is and/or was, during relevant times including
within the applicable ERISA statute of limitations period, a management-side
Trustee of the Training Trust, and thus a fiduciary thereof.

49.     Defendant Mike Gomez is and/or was, during relevant times including within the applicable ERISA statute of limitations period, a management-side Trustee of the Training Trust, and thus a fiduciary thereof.

50.     Defendant OEFI is a non-profit corporation that administers the employee benefit programs for over 35,000 participants in Local 12's various benefit funds, including the Trusts at issue herein.

51.     Defendants William Waggoner, Mickey Adams, Ron Sikorski, Dan Hawn, Larry Davison,  Don Bourguignon, C.W. Poss, Paul Von Berg, Jim Hulse, Mike Gomez, and Bruce Cooksey are sometimes referred to collectively herein as the "OETT Defendant Trustees."

52.     Defendants William Waggoner, Mickey Adams, Ron Sikorski, Dan Hawn and Larry Davison, Dan Billy, Walt Elliot, C.W. Poss, Michael Crawford, Mike Prlich and Kenneth Bourguignon are sometimes referred to collectively herein as the "Pension Fund Defendant Trustees."

53.     Defendants William Waggoner, Mickey Adams, Ron Sikorski, Dan Hawn and Larry Davison, Dan Billy, Walt Elliot, C.W. Poss, Michael Crawford, and Bruce Cooksey are sometimes referred to collectively herein as the "Health & Welfare Fund Defendant Trustees."

### 4.     Other Defendants

54.     Defendant Patricia M. ("Patty") Waggoner is the wife of defendant William Waggoner and a Senior Vice President of Amalgamated Bank.   She has exercised authority and control with respect to management and disposition of OETT assets, as described further below, and is thus a fiduciary under ERISA with respect to the OETT to that extent.   29 U.S.C. § 1002(21)(A).

55.     Defendant Kenneth D. Waggoner is an individual residing in Los Angeles County, California.  Kenneth D. Waggoner is the son of Defendants Patty and William Waggoner.  Kenneth D. Waggoner is the Vice President, Client

Services, in the Taft-Hartley Group of McMorgan & Company LLC ("McMorgan").  Kenneth D. Waggoner has repeatedly embezzled and diverted union and trust assets for his own benefit, as alleged herein.   He has also provided paid investment advice to the Health & Welfare Fund, on information and belief, and is a fiduciary of that Fund for that reason.

56.    Defendant Chris Laquer, formerly sued as a Doe defendant, is an individual believed to be residing in Los Angeles County, California.  He is counsel to the management-side Trustees of the Trusts.

57.    Plaintiffs do not know the true names or capacities of the persons or entities sued herein as DOES 1-10, inclusive, and therefore sue said Defendants by such fictitious names.  Each of the DOE Defendants was in some manner legally responsible for the violations alleged herein.  Plaintiffs will amend this complaint to set forth the true names and capacities of these Defendants when they have been ascertained, together with appropriate charging allegations, as may be necessary.

58.    At all times mentioned herein, the Defendants named as DOES 1-10, inclusive, and each of them, were residents of, doing business in, availed themselves of the jurisdiction of, and/or injured Plaintiffs and aggrieved employees in the State of California, among other locations.

C.    <u>**Significant Non-Parties**</u>

59.    Defendant Local 12 is a local union in the IUOE headquartered in Pasadena, California.   Local 12, a local IUOE union, is a "hoisting and portable" local (sometimes also known as a Heavy Equipment Operators local).  Local 12's geographic reach is substantial, covering territory in Southern California and Southern Nevada.  Local 12 reports having more than 20,000 members as of 2013.

## IV.   **STATEMENT OF FACTS**

### A.   **The IUOE**

60.    The IUOE is a trade union that primarily represents operating engineers, who work as heavy equipment operators, mechanics, and surveyors in the construction industry, as well as stationary engineers, who work in operations and maintenance in building and industrial complexes, and in the service industries. IUOE also represents, *inter alia*, nurses and other health industry workers, a significant number of public employees engaged in a wide variety of occupations, as well as a number of job classifications in the petrochemical industry.

61.    Founded in 1896, IUOE has approximately 400,000 members in 123 local unions throughout the United States and Canada. IUOE is the 10th largest union in the AFL-CIO.  IUOE and many of its local unions have an established history of criminal activity, including associations with other criminal enterprises engaged in racketeering and related activities.  In recent years, numerous individuals have been sentenced in criminal cases arising out of wrongful conduct connected to various IUOE local unions, including, for example:

- John L. Dorrier, a former business agent of Local 66 (sentenced to 12 months imprisonment in 2003 for embezzlement, forgery, and interfering with the administration of Internal Revenue Laws).

- James Roemer, a former treasurer of the Local 14 (sentenced to 41 months imprisonment in 2003 and ordered to pay nearly $3 million in restitution and tax penalties for fraud, making and receiving unlawful union payments, tax evasion, obstruction of justice and other crimes).

- Morris Diminno, a former union representative of the Local 14 (sentenced to 70 months imprisonment in 2004 for fraud, unlawful labor payment, unlawful monetary transaction, and obstruction of justice).

- Louis Moscatiello, an organized crime associate (sentenced to more than six years imprisonment in 2005 for racketeering, extortion, and conspiracy to commit union embezzlement).  Moscatiello admitted to using his influence over Locals 14 and 15 to obtain preferential and no-show jobs for other organized crime associates.

- Kenneth Campbell, a former business manager of Local 825 (sentenced to 46 months imprisonment in 2009 for embezzlement and taking bribes from contractors).

- Andrew Merola, an organized crime-associated individual (sentenced to 11 years in prison for numerous crimes, including wire fraud involving a no-show job he had as a member of the Local 825).

- Ten leaders and members of the Local 17 (indicted on counts of racketeering and extortion involving vandalism and damage to machinery at non-union work sites).

- William Dugan (sentenced in 2010 to three years of probation for violating federal law while serving as Business Manager of Local 150, including for the misuse for his personal benefit of a semi-tractor and trailers belonging to the local's apprenticeship program).  *See, e.g.*, http://www.justice.gov/usao/iln/pr/chicago/2010/pr1014_02.pdf.

- In 2010, Dennis Giblin, an employee of Local 68 and the son of former IUOE GP, Defendant Vince Giblin, pleaded guilty in Newark federal court to receiving kickbacks and embezzlement in connection with a business transaction during his tenure as head of Local 68's job training and education program.

62.     The members of the IUOE GEB, led by the GP, at all times during their term of service, have both the authority and the fiduciary obligation to protect the members of IUOE.  At no time, to Plaintiffs' knowledge, has any member of the GEB acted to curtail the long-running illegal conduct of the GEB's most senior

Vice President and Local 12 Business Manager, Defendant Waggoner, and the other Local 12 officers and employees named as Defendants in this complaint.

63.     The members of the GEB, past and present, including Defendant Waggoner, serve at the pleasure of the GP and maintain their positions as members of the GEB by acceding to the demands of the GP, despite their IUOE constitution-based and statutory fiduciary obligations to IUOE and its members. The ability of the GEB members to meaningfully question the actions of the GP is extremely limited or non-existent by virtue of the fact that, in total disregard for their constitutional and statutory fiduciary role, the GEB members agree that they will not question the conduct of the GP and will ratify any activity, even if it is illegal.

64.     This agreement by all GEB members to disregard their duties and instead affix their loyalty to the GP is evident in the voting history of the GEB – there are no known instances in the history of the GEB, in which any GEB member voted contrary to the GP's wishes.  More bluntly, before he rose to the position of GP, Defendant Vince Giblin was heard on occasion to say that as a GEB member, the biggest decision he had to make as an IUOE Vice President and GEB member was whether he wanted a chicken or a turkey sandwich.

**B.**     **The Union IUOE and Local 12 Defendants Have For Years Illegally Required Employee Class Members To Make Mandatory Contributions from Their Wages to Political and/or Union Slush Funds**

**1.**     **Defendant Waggoner Has Forced Plaintiffs and Other Employees of Local 12 and Its Related Entities, including OETT and OEFI, to Contribute to The BA's Fund**

65.     Plaintiff Albin "Skip" Watson became the Curriculum Coordinator of the OETT in approximately November 1997, after which he was given a monthly

expense check in the amount of $550.  This monthly expense payment was made to all OETT employees at the Coordinator level or higher from OETT assets.  When Mr. Watson asked Bert Tolbert if he was required to submit receipts or document the expenses that he incurred, he was told no.  Neither the OETT Board nor the OETT Administrator made any attempt to verify that expenditures from the $550 a month expense checks were for the benefit of the OETT.

66.     After Mr. Watson had been in the Curriculum Coordinator position for about two years, the OETT Administrator Bert Tolbert called him into his office and reprimanded him for failing to contribute to the "BA's Fund" (i.e., the Business Agents' Fund, referred to at the time internally at Local 12 as the "slush fund"). Mr. Watson had no idea what the Administrator was talking about.  The Administrator explained that anyone who received a monthly expense check was expected to contribute $50 in cash each month to the BA's Fund."  In fact, the BA's Fund, as discussed below, existed to directly benefit Defendant Waggoner.[4]

67.     The Administrator made it clear to Plaintiff Watson that the contribution was not voluntary.  While the Administrator excused Mr. Watson for his lack of contributions in the past, he told Mr. Watson to begin contributions immediately. Mr. Watson did so, as he was concerned that if he did not, his employment would be terminated or at least adversely affected.  Plaintiff Watson retired after years of making mandatory BA's Fund contributions, including within the four years prior to the filing of this action.

68.     When Mr. Watson later asked what the money was for, a business agent explained to him that it was for the "Bill Waggoner Re-Election Fund."  That

_____

[4] The $50 payments that go to the "BA's Fund," as employees at Local 12 refer to it, is actually divided into two separate "pots" of money.  The first is the "contingency fund" or "Re-Election Fund."  The remainder stays in the BA's Fund, and Waggoner uses that money as he sees fit.  Despite this allocation, most victims refer to the $50 payment as a payment into the "BA's Fund," without distinction between the two pots of money into which Waggoner separates their extorted payments.

business agent told Mr. Watson that the money went to Pasadena and was given to Defendant Waggoner's secretary.  Thus, Defendant Waggoner was embezzling OETT funds by using employees controlled by threat of termination to direct those funds to him.  In order to cover up this embezzlement, Defendant Waggoner and the other OETT Trustees falsely certified, in the OETT's form 5500 filing, that the entire $550 disbursed each month to OETT employees was an expense reimbursement.

69.     Thus, Defendant Waggoner received $600 from each OETT employee annually (assuming the employee worked for a full year), as an untaxed transfer of assets from the OETT to Defendant Waggoner. When employees asked Tolbert and others if they could pay their mandatory BA's Fund contribution by check, they were told, "No. This fund does not exist. Cash only."  The insistence upon cash payments further confirms that Defendant Waggoner and OETT Administrator Tolbert were aware of the unlawful nature of this contribution demand.

70.     Plaintiffs Salas was also forced to contribute to the BA's Fund under threat of termination, as the requirement applied to employees of Local 12 and its affiliated entities, if they received monthly expense reimbursement checks. Plaintiff Chamberlain was also forced to contribute to the BA's Fund under threat of termination as an employee of OETT.  Scores upon scores of other employees of Local 12, OETT, and OEFI (including, at least, OEFI auditors) have made such payments over the years under the same threat of termination for failure to comply.

71.     The foregoing cash payments from employees (including Plaintiffs Salas, Chamberlain and Watson) were eventually delivered, either directly or through District Representatives, to either Patricia Harvey, Defendant Waggoner's secretary, or Karen Best, another administrative assistant at Local 12.  Patricia Harvey or Karen Best then issued receipts to District Representatives or Coordinators for the cash payments.  Payments collected by Patricia Harvey were turned over to Karen Best for deposit.  A portion of the payments went towards the

1   Bill Waggoner Re-Election Fund, which were delivered to Defendant Waggoner on

2   a quarterly basis, and the rest remained in the BA's Fund, where Defendant

3   Waggoner was free to, and did, use it however he desired.

4       72.   Over the past 3 years, on information and belief, approximately

5   $70,000, in the aggregate, has been received by Defendant Waggoner via the Bill

6   Waggoner Re-Election Fund, which has also been called a "contingency fund."

7   This unlawful, additional income to William Waggoner was never reported on any

8   LM-2 filing by Local 12.

9       73.   Local 12 office employees Karen Best and Patricia Harvey were

10   rewarded with a $400 per month car allowance, despite the fact that they never

11   drove their personal vehicles on union business.  Instead, the car allowance was a

12   reward for loyalty to Waggoner, including loyalty in administration of the illegal

13   Bill Waggoner Re-Election Fund and the BA's Fund, which were funded with

14   extorted monies.   Paying these employees this car allowance was a breach of

15   fiduciary duty and a misuse of union funds by Waggoner and the other Defendant

16   union officers who knowingly went along with it, and is actionable under both

17   common law and Title V of the LMRDA.

18       74.   On information and belief, Waggoner waited until July 22, 2013 (the

19   date the Second Amended Complaint in this action was filed) to issue a written

20   notice to "All Local 12 Employees" that a litigation hold was in place and to cease

21   destroying or altering documents related to this case.  By that time, many

22   documents related to this case had, on information and belief, already been

23   spoliated.   In addition, spoliation continued to occur after July 22, 2013, despite

24   Waggoner's articulated and purported desire to ensure that it cease, with at least

25   one Local 12 employee traveling from site to site retrieving the contents of

26   shredders.   Notably, prior to this litigation, it has been the longstanding general

27   practice of Local 12 and Waggoner to dispose of virtually nothing, but rather to

28   maintain years upon years (or decades) of voluminous paper files with little effort

to purge or dispose of anything on any regular basis.   Plaintiffs have demanded, through their counsel, that relevant documents be preserved on multiple occasions, as shown by Exh. "7" hereto.

75.    Karen Best and Mickey Adams were both signatories to the bank account for the Bill Waggoner Re-Election Fund.  Defendant Adams, therefore, directly participated in Waggoner's extortion scheme. When any banking transactions occurred, both Karen Best and Mickey Adams were required to be present, though Ron Sikorski was an alternate signatory if one of the other two was not available.  Dan Hawn, in District 1 (Los Angeles County, excluding Long Beach), and Larry Davison, in the Ventura County area, directly participated in Defendant Waggoner's extortion scheme by helping to collect the extorted payments.

76.    At present, there are, on information and belief, roughly 65-68 employees paying $50 each into the BA's/Re-Election Fund on a monthly basis, though the exact number has varied over time and may be higher, since certain other employees received expense reimbursement payments.  The Re-Election Fund money is typically given to Waggoner on a quarterly basis.

77.    On information and belief, since the filing of this action, Local 12 has changed its practices and is no longer issuing the uniform $550 "expense" payments separate checks to employees.  Instead, on information and belief, the "expense" monies are now provided to employees of Local 12 and its affiliates, including OETT employees, through their normal payroll checks (i.e., they receive an extra $550, on top of their regular wages).  However, those employees entitled to the "expense" monies are still required to contribute $50 per month that ends up in the coffers of Defendant Waggoner.  The purpose of this change (from separate check to inclusion in payroll) was to create the subterfuge that the $50 taken by threat from OETT employees, paid with the OETT Trust's money, was not a diversion of Training Trust monies, but was rather *just* payment of money from

individuals.  This action is filed, in part, to remedy this ongoing injury to the Training Trust (as well as the ongoing injury to Locals 12's employees).

Defendants William Waggoner, Mickey Adams, Ron Sikorski, Dan Hawn, Larry Davison, Don Bourguignon, C.W. Poss, Paul Von Berg, Jim Hulse, Mike Gomez, and Bruce Cooksey, all OETT Trustees at relevant times, either participated in this scheme to divert monies from the Training Trust to Defendant Waggoner (William Waggoner, Mickey Adams, Ron Sikorski) or sat by, in dereliction of their duties as Trustees, and allowed Defendant Waggoner and other officers assisting him to steal Training Trust monies without any scrutiny or oversight whatsoever (Dan Hawn, Larry Davison Don Bourguignon, C.W. Poss, Paul Von Berg, Jim Hulse, Mike Gomez, and Bruce Cooksey).

78.  Forcing a cash contribution to a fund in connection with an express or implied threat to ongoing employment is a Hobbs Act violation, namely, extortion. Each employee who was compelled to contribute to the BA's Fund suffered an independent Hobbs Act violation, which is recognized as an ongoing violation that continues without termination until all such payments from an individual terminate. *See* 18 U.S.C. § 1951(b)(2) (defining extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear.")  In addition, such conduct – extorting contributions from member earnings – is a violation of Title V of the LMRDA and of California's Unfair Competition Law, Cal. (the "UCL"), Bus. & Prof. Code § 17200, *et seq.* Additionally, in executing his scheme to extort cash from employees of Local 12 and its affiliated entities, Defendant Waggoner has avoided income tax obligations on the cash he took.

79.  Additionally, all Local 12 staff members are required to contribute to a fund to purchase birthday and Christmas gifts for Waggoner.  The amount of the expected contribution is related to the position of the employee.  For example, all coordinators or district representatives are required to contribute $40-$50 towards

the purchase of the gifts.   These mandatory contributions are also unlawful, as well as unfair under the UCL.

    2.    **All Employees of Local 12 and Its Affiliated Trusts, Other Than Some Clerical Workers, Must Pay a Portion of their Compensation to Local 12 As Purported "Union Dues" Despite Not Being Covered By Any Collective Bargaining Agreement**

    80.    There are more than 200 current and former employees of Local 12. These employees are not, and have never been, covered by *any* collective bargaining agreement in connection with their employment at Local 12. Nevertheless, they (including Plaintiff Salas, when he was employed) are required to pay purported "dues" of $320 per year to Local 12, and are required to pay $48 per week in purported "supplemental dues" ($2,496 annually) to Local 12.  For their $2,816 per year, these employees have no guarantee that they will receive the same types of benefits that Local 12's regular members who are not Local 12 employees receive under their collective bargaining agreements.  Their purported "dues" payments are in reality just an improper forced repayment of portion of their wages to their employer.  This practice is obviously improper, just as would be the case if any individual or corporate employer demanded that employees return a portion of their wages as supposed dues.

    81.    Plaintiff Mario Salas and other employees like him have, as a practical matter, been charged a fee to work for Local 12, in violation of California's Labor Code provisions that prohibit the imposition of a charge to work, and in violation of the UCL.  The injury to this sub-class amounts to more than $2,500,000 from four years prior to the filing of this action through to the present.   Defendants' practice of calling the unlawfully taken monies "dues" – when no reasonable basis to require payment of such dues exists in the absence of *any* CBA whatsoever – does

not change the fact that taking such monies from employees' wages, under these circumstances, is illegal.

82.     The fact that a labor organization that professes to be interested in protecting worker rights would engage in such conduct with respect to its own dedicated workers is despicable.

**3.     IUOE, With the Willing Assistance of Its First Vice President, Defendant Waggoner, Forced Union Members, Plaintiffs and Class Members Serving As Officers or Employees of Local 12 to Contribute to a Political Action Fund**

**a)**     *The Scheme to Extort Employee Contributions*

83.     Defendant Vince Giblin, as GP of IUOE, dramatically increased contributions to IUOE's Political Action Fund, the President's Club, which was previously known as EPEC, <u>by illegally requiring all officers of local unions, as well as officers and/or management and supervisory level employees of IUOE affiliated trusts, to contribute to the President's Club</u>. ***Local union officers, Directors, Coordinators, District Representatives, Business Agents and Organizers*** (as well as officers and/or senior employees of affiliated trusts, including Plaintiffs Paxin and Chamberlain) were told and/or made otherwise aware that if they wanted to serve in their positions, they had no choice but to contribute to the President's Club in amounts up to $800 per year, calculated as one percent of $80,000, the salary cap for this contribution.  (Clerical staff were not required to contribute.)

84.     Vince Giblin stated at a GEB meeting to members of the GEB, including GEB members Jim McLaughlin and William Waggoner, that all of them and all employees of their local unions would be required to contribute to the President's Club   Defendant Giblin also stated that while the IUOE would like clerical staff to contribute, they would not be forced to contribute.  Mr. Giblin left

no room for doubt that the contribution mandate had to be communicated to all local unions and that local union employees had to comply or face harsh consequences.

85.   The GEB members, such as Jim McLaughlin and William Waggoner, took this instruction from Defendant Giblin to heart, consistent with their general acquiescence to the demands of the GP, as discussed in paragraphs 13, 62-64, *supra*, and made their employees aware of the mandate from Defendant Giblin, as the agent of IUOE.

86.   On information and belief, the IUOE attempted to monitor the contributions to the President's Club by new union employees by, *inter alia*, improperly accessing confidential documents submitted for new hire participation in its General Pension Plan and comparing the numbers of employees identified in the pension records with the number of employees last reported by the local union. James Van Dyke, Giblin's enforcer, would call local union officers if it appeared that there were employees appearing in pension records who were not contributing to the President's Club, and demand that the contributions begin immediately.  For example, Mr. Van Dyke called former Local 501 Business Manager, Jim McLaughlin, for this reason on more than one occasion. When Defendant James Callahan became the IUOE's GP, he continued to require enforcement of the contribution mandate by threat of retaliation against non-compliant local union employees, and William Waggoner, the First Vice President of IUOE, and all of the GEB members were aware that they were to continue to use extortive pressure to compel contributions from local union employees.

87.   Chris Hanley was Secretary-Treasurer of the IUOE when Defendant Giblin announced the President's Club contribution requirement for many union employee positions and filled a key role with respect to EPEC/President's Club practices, including signing EPEC-related submissions to the federal government. At the time, he was also Chairman of the Board of Trustees for the IUOE General

Pension Plan.   In this convenient dual role, Hanley, on information and belief, used confidential pension plan documents to assist in enforcing the mandatory EPEC extortion scheme.

88.     The President's Club contributions have at all relevant times been accomplished through compulsory payroll deductions.  New employees such as Business Agents are typically presented with the "authorization" form for the payroll deductions upon being hired.  Individuals are first encouraged to complete the authorization paperwork.  When mere encouragement fails, hardball tactics are applied, and the resisting individual is told that they must contribute if they want to keep their job.  Threats to employment to obtain contributions constitute a type of embezzlement that also amounts to a violation of the Hobbs Act each time it occurs to another employee.  Purported "consent" was thereby sometimes obtained, but it was coerced, as new employees knew they had no choice but to contribute.    Those who declined to sign the "consent" forms have *sometimes had payroll deductions taken anyway*, and those compulsory deductions are still being forced on employees.

89.     Plaintiff Paxin attended a mandatory attendance staff meeting at which he and other employees learned that OETT employees would contribute to EPEC "without exception."  At another meeting of Business Agents, an authorization form consenting to EPEC contributions was handed out by the District Representative, believed to be Steven Montrie at that time.   The Business Agents were told to sign it and pass it back to him.  As with the BA's Fund, opting out was not an option.  When Steve Montrie was asked why they had to pay, Mr. Montrie said, "If you like working here you've got to pay it," or substantially similar words to that effect.

90.     Employees, to this day, have been required to contribute money to the President's Club as a condition of their employment, in violation of the law.  This constitutes extortion.  Defendant Waggoner, acting as an agent of, and for the

benefit of, the IUOE, as its First Vice President, has enforced the requirement in Local 12.   Defendant Waggoner's participation in, and enforcement of, this mandatory enforcement scheme, whereby employees of Local 12 and affiliated trusts, including Plaintiffs Salas, Chamberlain and Paxin, were forced to pay portions of their compensation to the IUOE's political action committee, was a breach of the fiduciary duties Waggoner owed under common law and under Title V of the LMRDA as a union officer.

91.     Defendant Waggoner affirmatively assisted Defendant Giblin's forced-donation campaign by demanding contributions from his own Local's employees, consistent with Giblin's demand at the aforementioned GEB meeting.  Defendant Waggoner sent out a memo to staff members (excluding clerical employees) informing them that they had to sign an authorization for payroll deductions for the mandatory President's Club contributions.  Pursuant to this mandatory contribution scheme, falsely characterized as voluntary by the IUOE, Plaintiffs Salas, Chamberlain, and Paxin, among other employees of Local 12 and its affiliated entities, were required to pay and did in fact pay mandatory contributions to the President's Club.  All of them did so because they knew that they had no choice but to do so in order to avoid adverse consequences to their employment.  Forcing an President's Club contribution in connection with an express or implied threat to ongoing employment is a Hobbs Act violation, namely, extortion.  Each employee that was compelled to contribute suffered an independent Hobbs Act violation, on each occasion that this occurred during the statute of limitations period.  *See* 18 U.S.C. § 1951(b)(2) (defining extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear.")

92.     The IUOE purports to maintain records identifying the amount of contributions made by each employee, including contributions to the President's Club, on a yearly basis.

93.   The annual aggregate contribution to the President's Club from the employees and officers of all local unions and affiliated entities is estimated to exceed $2.5 million per year.  In 2012, the total contributions to the President's Club were $3,023,901.12.  A small portion of those contributions were additional contributions from IUOE members, but the vast portion consisted of mandatory contributions from officers and employees of locals and affiliated entities around the country

**b)**   *The Scheme to Extort Member Contributions*

94.   In 2008, after already pressing for increased contributions from officers and employees, Defendants Giblin and IUOE ratified Giblin's plan to obtain additional contributions from IUOE members by circumventing union member consent and collecting a five-cent per hour political contribution directly from employers, through CBAs.  The local unions were directed to negotiate this provision and then supply employers with checklists of union members from whom the contributions would be automatically deducted from their paychecks, even though the union members were often unaware that this was occurring and had not consented to it.  At the 2008 IOUE General Convention, IUOE resolved, in Resolution 12, that:

> NOW THEREFORE. BE IT RESOLVED that each IUOE local union make it a top priority to negotiate at least a five-cents per hour check-off in all collective bargaining agreements for the purpose or raising voluntary political contributions;
>
> BE IT FURTHER RESOLVED that it is mandatory that the International negotiate at least a five-cents per hour check-off in all national collective bargaining agreements for the purpose or raising voluntary political contributions;

95.   However, this practice was already underway in IUOE, and the IUOE Board merely ratified this illegal practice that Giblin had already instituted prior to the 2008 Convention.

96.   IUOE First Vice President William Waggoner, fully in agreement with Giblin's mandatory "voluntary" donation extortion scheme, required that all CBAs

negotiated by Local 12 include a similar five cent per hour contribution to the
EPEC fund.

97.     The end result was that members of Local 12 working for signatory
employers – including Plaintiff Salas, while employed in the field after his
termination as a Local 12 employee – have been forced to pay into the President's
Club without voluntarily and affirmatively consenting to participation.

98.     The results of this illegal behavior speak for themselves, as IUOE's
political collections and expenditures skyrocketed under Giblin's control.  In the
37th Convention Program, Giblin boasted about the results of his unlawful political
contribution collection schemes when he wrote:

> Also, the IUOE today ranks near the top of national lists as one of the
> most active union political players in terms of influence and voluntary
> contributions.  Considering that three years ago we couldn't be found
> on anyone's political list, this is a very noteworthy accomplishment –
> and one we have every intention of continuing to improve on as we
> move forward.

99.     What is implausible about this claim is the characterization of these
contributions as "voluntary."  At that same convention, contributions from
members were mandated to be included in collective bargaining agreements, and
officers and employees of locals around the country experienced coercive pressure,
rising to the level of extortion, to contribute upon threat of job loss, eliminating any
pretense of choice.  Financial threats of economic harm and retaliation, in violation
of the Hobbs Act, among other laws, were used, at the direction of IUOE and
Giblin, to obtain the dramatically increased contribution levels about which GP
Giblin boasted.  On information and belief, the practice of collecting mandatory
contributions continues under the present IUOE administration that includes IUOE
itself, GP Callahan and the current GEB.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

100.   The required contributions were part of IUOE's and Defendant Giblin's desire to elevate the stature of IUOE as a political force through aggressive donations to political candidates.  These contributions are used, in part, to shield IUOE from the full intensity of regulatory scrutiny.  IUOE's average expenditures doubled in 2006 and reached an unprecedented level in 2012:



101.   In June, 2013, the President's Club gave $900,000 to members of Congress.

102.   The IUOE and its current and former GPs, James T. Callahan and Vince Giblin, are sued herein based on their wrongful practices of extorting monetary contributions from IOUE members (in this case, Local 12 members, all of whom are members of the IUOE) for purposes of the IUOE's political action fund, the President's Club, formerly known as EPEC.

C.     **The Defendant Trustees and Trust Fund Fiduciaries Breached Their Fiduciary Duties and Violated ERISA in Many Respects**

103.   Numerous violations of ERISA's fiduciary duties and other prohibitions on self-dealing and party-in-interest transactions are set forth below. The misconduct is wide-ranging and extensive, and Plaintiffs have attempted to segregate it by subject matter and by the involved trust fund, to the extent possible, although some ERISA violations concern more than one trust fund.

104.   Much, although by no means all, of the misconduct alleged herein was done at the instigation of Defendant Waggoner and the Local 12 officer Defendants and/or for their benefit.  However, as shown below, the management-side Trustees often also participated directly in ERISA violations, acquiesced and allowed them to occur, and/or failed to take appropriate steps to remedy breaches by co-trustees after learning of those breaches.   Given their ERISA duties, *inter alia*, to act prudently and with a single eye to protecting the interests of trust beneficiaries and participants (ERISA § 404(a), 29 U.S.C. § 1104(a)), to exercise due care to prevent the breaches of co-trustees while jointly managing trust assets (ERISA § 405(b)) and to take reasonable steps to remedy breaches after the fact (ERISA § 405(a)) – which they plainly violated, repeatedly - the management-side Trustees are responsible regardless of whether the schemes and wrongs alleged were primarily their own or those of Defendant Waggoner and the other Local 12 officer Defendants.

105.   Subjective motives for ERISA violations are generally irrelevant, but it appears that the management-side Trustees breached their duties and/or at least failed to remedy the fiduciary breaches of the Defendant Waggoner and the other Local 12 officer Defendants in part because they desired to stay in Defendant Waggoner's good graces.   Although he has not typically ordered general strikes in his decades-long tenure as Business Manager, Defendant Waggoner has, including in recent years, ordered strikes of particular employers for reasons related to

negotiating leverage or even simple retaliation against employers who anger him, such as Tim McDonald, a former Trustee.   The management-side Trustees, including Defendants Kenneth Bourguignon, Don Bourguignon, C.W. Poss, Paul Von Berg, Jim Hulse, Mike Gomez, Bruce Cooksey, Walt Elliot, Michael Crawford, and Mike Prlich, are aware of this.  Their fear of retaliation, including of Waggoner-ordered strikes by union workers, if they oppose or fail to acquiesce to the fiduciary breaches of Waggoner and the other union Defendants, cannot justify their violations of the high standards imposed on them as ERISA fiduciaries. ERISA liability cannot be avoided simply because a fiduciary may be more concerned about disruption to his own business than protecting the interests of the participants and beneficiaries whose interests he is obligated to serve.  To the contrary, ERISA expressly imposes duties to put the interests of participants and beneficiaries first.

> **1.  Defendant-Trustee William Waggoner Wrote Off or Declined to Collect Millions of Dollars of Employer Debts Without Obtaining Approval of a Majority of the Trustees When the Debts Were Owed by Employers Management-Side Trustees or Employers Favored by Waggoner or His Long-time Close Associate, OEFI Funds Manager Leo Majich**

106.   29 U.S.C. § 1145 provides:  "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."   Attorneys' fees to prevailing trustees are *mandatory* under 29 U.S.C. § 1132(g) when collection suits for unpaid contributions under § 1145 are successful.  *Kemmis v. McGoldrick*, 706 F.2d 993, 997 (9th Cir. 1983) (in case involving IUOE Local 12, the Ninth Circuit stating:

"However, 29 U.S.C. § 1132(g)(2) (Supp. V 1981) now makes the award of attorney's fees mandatory when the trustees prevail in actions to enforce and collect benefit fund contributions.")

107.   In gross dereliction of his fiduciary duties as a union officer and a Trustee, Defendant Waggoner has written off and/or declined to collect large debts for benefit contributions owed by employers to all three of the involved Trusts (OETT, Pension Fund and Health & Welfare Fund).   In at least some instances, he has done so unilaterally and without obtaining proper votes of a majority of the Trustees approving such decisions.  In allowing him to do so and failing to take any steps to remedy his misconduct, the other Trustee Defendants violated their fiduciary duties under ERISA § 404 and also are liable as co-fiduciaries under ERISA §§405(a) and 405(b).

**a)**   *Leo Majich and Majich Bros.*

108.   Defendant Waggoner excused roughly $500,000 in contributions owed to the Local 12 Pension and Health & Welfare Funds by Majich Bros., Inc. (Leo Majich's company) at the same time that Leo Majich – an ERISA fiduciary – was the OEFI Funds Manager for Local 12's Trusts.

109.   Other Trustees on the Boards of those two Trusts knew of Waggoner's misconduct, or certainly should have known of it, if they were faithfully fulfilling their responsibilities under ERISA to preserve trust assets, to exercise reasonable care to prevent breaches by their co-trustees, and to jointly manage and control plan assets.   However, they did nothing to stop Waggoner's misconduct or to remedy it after the fact, in breach of their fiduciary duties.  The Trustees certainly know how to sue for unpaid contributions, as demonstrated by recent litigation in this very Court. *See*, *Trustees of Operating Engineers Pension Trust v. Smith-Emery Co.*, CV 09-1476 CAS VBKx.

110.   To the extent some of the other Trustees were not initially involved in or aware of Waggoner's decision to forego collecting Majich Bros., Inc.'s owed

1    contributions, they have had notice of Waggoner's misconduct for some time

2    (including at least during the pendency of this litigation), and yet still, to Plaintiffs'

3    knowledge, have done nothing to remedy Waggoner's breach of duty, thereby

4    breaching their own fiduciary duties under ERISA § 404 and also rendering

5    themselves liable as co-fiduciaries under ERISA § 405(a).

6        111.   Waggoner, Leo Majich and the other Trustees have to date failed to

7    disclose and instead actively concealed from Local 12 members (no doubt due to

8    the obvious fiduciary breaches involved) the failure to collect these contributions to

9    the detriment of the involved Trust Funds.  Due to the concealment of this conduct

10   from Local 12 members, Plaintiffs did not discover it until the latter half of 2013,

11   when they learned via the former OEFI Administrator Michael Graydon that a

12   huge, secret write-off file existed that included Majich's company, C.W. Poss, Inc.

13   (discussed in the following subsection), and a host of others.  All of the Trustees

14   should be removed for failure to pursue Majich Bros., Inc. for delinquent

15   contributions.

16            **b)**    *Defendant C.W. Poss and C.W. Poss, Inc.*

17       112.   In another instance, over $500,000 in contribution debts owed by

18   management-side Trustee C.W. Poss's company, C.W. Poss, Inc., to the Pension

19   Fund and the Health & Welfare Fund were excused by Waggoner while Mr. Poss

20   was sitting as a Trustee of those two employee benefit plans and of the Training

21   Trust.  Waggoner's conduct breached his fiduciary duties under ERISA § 404 to act

22   in the interests of the fund participants and beneficiaries and to preserve the assets

23   of the Trusts.

24       113.   Likewise, Mr. Poss's failure to ensure that his own company made

25   required contributions to the Trusts, while siting as a Trustee on the Boards of those

26   Trusts, was plainly a breach of his own duties to act in the best interests of fund

27   participants and beneficiaries. Poss was fully aware that his company owed

28   substantial contributions to the Trusts and yet, despite his fiduciary duties to serve

the interests of fund participants – which he was legally required to place above his own interests and those of his company – he did not ensure that those contributions were made.   Because this conduct occurred before his mental competence was in question, as it now is, Poss knew full well what Waggoner was doing – i.e., excusing his company from making required contributions to the Pension and Health & Welfare Funds.  Yet, far from objecting and insisting that his company's contributions be made, he willingly acquiesced to Waggoner's breach of fiduciary duty and concealed it from union members.

114.   Waggoner, in addition to being liable for his own conduct, is liable as a co-trustee under ERISA § 405(a) for Poss's breach, as he directly participated in and enabled it.   All other Defendant Trustees are liable for failing to exercise reasonable care to prevent Waggoner's breach of duty and for failing to take reasonable or timely steps to remedy his misconduct.

115.   For their part, the other Defendant management-side Trustees, at least some of whom on information and belief were circumvented by Waggoner in the sense that their approval was not sought or obtained for his conduct, they did not resign or act in any way at any time thereafter to correct or remedy the misconduct of their co-trustees, Waggoner and Poss, including even after this lawsuit was filed more than a year ago.   They have not, for example, demanded or otherwise forced Waggoner and Poss to remedy their breaches, by litigation or otherwise.   As noted above, the Trustees certainly know how to sue for unpaid contributions when Waggoner wants them to.

116.   Waggoner, Poss and the other Trustees failed to disclose and instead actively concealed from Local 12 members (no doubt due to the obvious fiduciary breaches involved) that these contributions of C.W. Poss, Inc. had simply been excused, to the detriment of the involved Trusts.  Due to the concealment of this conduct, Plaintiffs did not discover it until, as noted above, the latter half of 2013, when they learned of the existence of the huge, secret write-off file.

117.   While Defendant Poss, on information and belief, resigned from his positions with the Health & Welfare Trust and the Pension Fund after this action was filed raising these allegations, he is still serving as an OETT Trustee according to OEFI's website.  Given his past misconduct and his current incompetence, he should be removed as a Trustee of the Training Trust and enjoined from serving as a Trustee in the future, as should all of the other Trustees who failed to pursue Poss and his company.

        **c)**    *The Millions of Dollars of Unpaid Contributions in the "Secret" Files*

118.   Substantial debts of other employers also were excused (or simply not collected) due to those employers' special relationships with William Waggoner or his close associates, including OEFI Funds Manager Leo Majich.  For example, Steve Bubalo construction, owned by a relative of Leo Majich, was not pursued for delinquent contributions, and was not pursued for operating double-breasted, through Peck Road Gravel ("double-breasted" refers, generally, to a business owner that runs two companies in parallel – one subject to a CBA with a union and one that is not subject to a CBA – in order to circumvent the CBA some of the time). The Defendant Trustees of the Pension Fund, the Health & Welfare Fund and OETT (including William Waggoner), and Defendant OEFI all breached their fiduciary duties by permitting such contractors to *incur tens of millions of dollars of unpaid obligations* to the Local 12-affiliated Trusts without taking steps to collect those unpaid obligations due to the close ties between those contractors and Leo Majich and/or Waggoner.

119.   Each of the Defendant Trustees of the involved funds, named herein, had duties under ERISA § 404 to ensure that the Trusts for which they sat as Trustees were properly protected, which they breached by allowing tens of millions of dollars owed to the funds to not be collected.  Likewise, each of the Defendant Trustees, in allowing this to occur, violated ERISA § 405(b)(1), which imposes a

**FOURTH AMENDED CLASS ACTION COMPLAINT**

duty on each of them to "use reasonable care to prevent a co-trustee from committing a breach" and to "jointly manage and control the assets of the plan." The Trustees were obligated to ensure that contractors, such as Majich Bros., Inc., C.W. Poss, Inc. and the other contractors who were allowed to employ Local 12 members without making good on their contractual contributions, were in fact making good on their contributions. They failed miserably in fulfilling that obligation, to the extent they did not actively and knowingly participate in breaching it. Millions of dollars in contributions owed to the Trusts were lost as a result.

120. Since filing this litigation, Plaintiffs have been informed and believe that a six-foot shelf of "secret" files at OEFI contained records of these "secret" unpaid contributions.

121. The massive failure to collect employer contributions was not known to Plaintiffs until the latter half of 2013, when the Plaintiffs learned that a huge, secret write-off file existed that included Majich's company, C.W. Poss, Inc., and a host of others.

122. As of mid-2012, delinquent contributions to the Trusts exceeded $2 million, not including delinquencies that Waggoner wrote off or excused from collection and situations where the delinquent contractors had entered into some form of extended payment plan. The failure to collect delinquent contributions without justification is a breach of fiduciary duty under ERISA.

      **2.**    **Misconduct and Embezzlement as to the Training Trust**

      **a)**    *Waggoner and Other Local 12 Defendants Embezzled Property Purchased by OETT and Embezzled OETT Labor*

123. In and around 2004, OETT purchased a semi trailer. The semi trailer was gutted and apprenticeship staff turned it into a mobile barbeque facility. It is

capable of producing enough food to feed tens of thousands of individuals.  Later, Defendant William Waggoner took the converted semi trailer and parked it in his own backyard.  In recent years, it has been Waggoner's practice to lease the trailer back to Local 12, retaining the revenue for himself and his wife, when Local 12 wants to use it for a Local 12 barbeque or other Local 12-sponsored event.  This constitutes embezzlement and a breach of his fiduciary duties under ERISA § 404(a) as well as prohibited self-dealing under ERISA § 406(b).  The other Defendant officer Trustees of the OETT, identified above, have been aware of this misconduct and are complicit in it.  As alleged above, the former Business Manager for Local 150 was sentenced to three years of probation in 2010 for similar criminal misconduct.

124.   Vehicles owned by the OETT training center that were scheduled to be sold at auction after their useful life were often pulled from sale and purchased by Administrators (like Bert Tolbert), Board Members, officers and upper management of Local 12, including line officers, at a sub-market rate price from the auction house.  When ERISA fiduciaries (such as the Local 12 Officer Trustees or Tolbert) purchased these OETT vehicles, these transactions were prohibited "party-in-interest" transactions under ERISA § 406(a), and constituted prohibited self-dealing under § 406(b). The vehicles were then restored by staff members at the OETT Whittier training center ("OETT Whittier"), during working hours by employees on the OETT payroll.  To conceal these transactions, all replacement parts for such vehicles were charged to the identification numbers for other equipment owned by OETT.

125.   The time required for OETT Whittier employees to restore the vehicles was not reimbursed to the OETT.  The restored vehicle's ownership would then be transferred to the union officer who purchased the vehicle at the sub-market rate. Administrators (like Bert Tolbert), Board Members, officers and upper management of Local 12, including line officers, have taken advantage of this

1    scheme.  This conduct constituted the embezzlement of OETT resources (including

2    the labor of employees) that should have been dedicated to serve the interests of

3    participants and beneficiaries, and harmed the OETT and its participants and

4    beneficiaries, including Plaintiffs.

5        126.   Many of those same individuals receive free service on their personal

6    vehicles at OETT Whittier, constituting further embezzlement of union resources.

7    For example, Bert Tolbert's brother-in-law received a full restoration on a Dodge

8    Stakebed pick up, by on-duty employees.  This conduct constituted the

9    embezzlement of OETT resources (including the labor of employees) that should

10   have been dedicated to serve the interests of participants and beneficiaries, and

11   harmed the OETT and its participants and beneficiaries, including Plaintiffs.

12   Tolbert breached his fiduciary duties by enabling such conduct as OETT

13   Administrator for the benefit of his brother.

14       127.   Bert Tolbert also had personal riding lawnmowers repaired by staff at

15   OETT Whittier, during working hours, while staff was on duty.   This conduct

16   constituted the embezzlement of OETT resources (including the labor of

17   employees) that should have been dedicated to serve the interests of participants

18   and beneficiaries, and harmed the OETT and its participants and beneficiaries,

19   including Plaintiffs.  Tolbert also had OETT staff restore for him a motorized,

20   antique wheelbarrow on tracks.  Again, Tolbert breached his fiduciary duties under

21   § 404(a) of ERISA by engaging in such conduct, and engaged in prohibited self-

22   dealing in violation of § 406(b).

23       128.   Bert Tolbert would also dispatch OETT Whittier vehicles (during work

24   hours) to pick up and then repair equipment, recreational vehicles and boats or

25   vehicles owned by Administrators, officers, Board Members, or upper management

26   employees.  The use of OETT Whittier vehicles and staff in connection with such

27   activities constituted embezzlement of Trust assets and harmed the OETT and its

28   participants and beneficiaries, including Plaintiffs.   All such transactions were in

1    breach of Tolbert's fiduciary duties under § 404(a) of ERISA and constituted

2    prohibited transactions with parties in interest under § 406(a).

3        129.   Union leaders, including Waggoner, Bert Tolbert, and Fred Young,

4    also store or stored personal vehicles at the OETT Whittier training center without

5    paying fair rental compensation for use of the space, thus providing value to such

6    union officers that they are not entitled to receive.  For example, Waggoner has for

7    a long period of time store a vintage Cadillac at the OETT Whittier training center.

8    Were he to store it in another secure facility, he would have to pay, but instead he

9    takes advantage of OETT facilities to store his vintage Cadillac for free.  Waggoner

10   also stores a Jeep at OETT facilities and has it periodically serviced there, with

11   parts paid for by OETT.  Bert Tolbert stored a boat at OETT facilities.  Such

12   conduct violates the fiduciary duties of Waggoner and constitutes prohibited self-

13   dealing under ERISA § 406(b).

14       130.   Special devices were constructed – without cost to Waggoner, but

15   rather at the expense of the OETT – to allow OETT Whittier staff to move

16   Waggoner's vehicle when they require access to the bay space the Cadillac

17   occupies.   In allowing the OETT to bear the costs of construction of such devices

18   for non-trust purposes, Waggoner breached his fiduciary duties and engaged in

19   prohibited self-dealing.   The other OETT Trustees are liable for his breach as co-

20   fiduciaries, since they know of it and to date (to Plaintiffs' knowledge) have done

21   nothing to remedy his misconduct (such as demanding reimbursement of the costs

22   or instituting litigation).

23       131.   Over the years, Defendants William Waggoner, Bert Tolbert, Mickey

24   Adams and others have repaired and/or restored personal vehicles, including

25   collectible antique cars and boats, using OETT funds and staff.  Fred Young, along

26   with Ray Horn's relative, also had boats rebuilt at the training facility.

27       132.   A 1951 Chevrolet Bowtie owned by Bert Tolbert was also rebuilt

28   using Trust assets and staff, without reimbursement to the Trust.

FOURTH AMENDED CLASS ACTION COMPLAINT

133.   William Waggoner's Model A Ford was rebuilt using Trust assets and staff, without reimbursement to the Trust.  The Model A Ford was, at least until very recently, stored at the Local 12 union hall parking garage.  In a recent occurrence, the gate is now customarily locked, likely to prevent members from gaining access and confirming Waggoner's use of union property to store his Model A Ford.

134.   Bert Tolbert purchased a truck that was fully rebuilt using Trust assets and staff, without reimbursement to the Trust.

135.   Bert Tolbert purchased another truck previously owned by Local 12, had it fully reconditioned using Trust assets and staff, without reimbursement to the Trust, and gave it to his granddaughter to drive.  The vehicle's value was substantially increased by the full restoration.

136.   These embezzled vehicle restorations were concealed through the use of dummy VIN numbers.  When Defendants embezzled these assets, they would direct office staff to record repairs under different VIN numbers, demonstrating their awareness of their wrongful conduct.

137.   Bert Tolbert, Mickey Adams, and William Waggoner had annual landscaping projects performed on their homes by Training Trust staff, using Trust tools and assets, while staff was on duty.  In addition, welder Miley Salazar was sent to officers' homes to do ornamental welding.

138.   Ron Sikorski had work done on his home by on-duty OETT staff in preparation for its sale.

139.   Kenneth Waggoner used employees of OETT on OETT time to replace a washer and dryer at his rental property, which property is also owned by William and Patty Waggoner.

140.   In the summer of 2012, OETT employee Pete Majich was directed by defendant Patty Waggoner to do work on Mrs. Waggoner's church in Pasadena.  While on OETT's payroll, during regular working hours, Pete Majich spent weeks

1   at the church performing exterior and interior painting.  Majich's labor, at OETT's

2   expense, was thus diverted from serving OETT to serving the whims of Patty

3   Waggoner.

4       141.   Patty Waggoner is a fiduciary of the OETT pursuant to the definition

5   of "fiduciary" set forth in 29 U.S.C. § 1002(21)(A), which provides, in pertinent

6   part, that "a person is a fiduciary with respect to a plan to the extent (i) he exercises

7   any discretionary authority or discretionary control respecting management of such

8   plan or exercises any authority or control respecting management or disposition of

9   its assets, (ii) he renders investment advice for a fee or other compensation, direct

10  or indirect, with respect to any moneys or other property of such plan, or has any

11  authority or responsibility to do so, or (iii) he has any discretionary authority or

12  discretionary responsibility in the administration of such plan."

13      142.   Patty Waggoner, as the spouse of William Waggoner, has

14  unquestionably exercised authority and control regarding the management and

15  disposition of OETT assets, as evidenced by her ability to send OETT employee

16  Pete Majich to paint, on OETT time, her church for an extended period of time.

17      143.   OETT employees, as well as Local 12 employees, typically follow any

18  and all instructions received from Mrs. Waggoner, knowing that their continued

19  employment may depend on it.

20      144.   The conduct described above constituted embezzlement of fund assets.

21  To the extent such conduct was engaged in or authorized by OETT fiduciaries such

22  as William Waggoner, Mickey Adams, Ron Sikorski, Patty Waggoner and Bert

23  Tolbert, it was a violation of their fiduciary duties under ERISA § 404.   Using

24  fund assets (including labor, services and equipment) to repair personal vehicles or

25  boats is in gross violation of these Trustees' duties under ERISA to preserve fund

26  assets and to act only in the interests of beneficiaries and participants.  Such

27  conduct also plainly constitutes prohibited self-dealing under ERISA § 406(a).

28

**FOURTH AMENDED CLASS ACTION COMPLAINT**

145.   Employees of OETT also have been dispatched to repair or service Mickey Adams' boat, which was docked at a river, while on payroll.  Mickey Adams embezzled the staff time, OETT vehicle usage, fuel costs, and parts for the repair of his boat.  In at least one instance, Pete Majich was dispatched to provide repairs to Adams' boat, during working hours while he was on OETT's payroll.  On another occasion, Adams had work done on his boat trailer by OETT staff.  Such repairs plainly do not fall within the scope of permissible functions of the Taft-Hartley-regulated OETT.  The parts for Adams' boat repair were purchased by OETT and falsely reported as OETT operating costs on the 5500 forms filed for OETT and transmitted by wire to the DOL.  Defendant Adams, an OETT Trustee, embezzled monies from the OETT in connection with his boat repairs, in violation of his fiduciary duties under ERISA § 404 and in violation of § 406's prohibitions on self-dealing and party-in-interest transactions.

146.   Tolbert and the OETT Defendant Trustees breached their fiduciary duties by allowing such conduct to occur, knowing that the Local 12 officers regularly engaged in such conduct at OETT and doing nothing, rather than, consistent with their duties under ERISA § 404 and 405(b) (imposing a duty to exercise reasonable care to prevent co-trustee breaches) putting in place procedures to ensure that fund assets were not embezzled in this fashion as they were on a regular basis.

147.   In short, those individuals receiving these embezzled benefits, including at least Defendants Waggoner, Sikorski, Tolbert and Adams, breached their fiduciary duties under ERISA by embezzling fund assets in a manner that was neither reasonable nor necessary to OETT operation and administration, or consistent with their fiduciary duties under ERISA § 404.  The other OETT Defendant Trustees, with knowledge of these breaches, have done nothing to remedy them, rendering themselves liable regardless whether they participated in the breaches themselves.

**FOURTH AMENDED CLASS ACTION COMPLAINT**

148.   The Defendant OETT Trustees, as well as Bert Tolbert and the defendant officers of Local 12 who are not Trustees, actively concealed the misuse of OETT assets from members, including even Plaintiffs, who were not reasonably able to discover the embezzlement and related criminal activity until 2012. Plaintiffs were not provided with access to the financial records of OETT as part of their duties and had no way of discovering that the OETT assets used by Waggoner, Sikorski, Tolbert, Adams and others were not later paid for by the officers and other fiduciaries who were in fact embezzling those assets.  Plaintiffs were not included in discussions between Tolbert and officers of Local 12.

149.   Any Defendant OETT Trustees who did not personally participate in the embezzlement and asset diversion described in the foregoing paragraphs failed to exercise reasonable care to prevent their co-trustees' wrongdoing and breached their fiduciary duties to the OETT Trust Fund on which they sit and/or sat as Trustees by allowing the embezzlements to occur over many years without instituting effective practices or procedures to preserve fund assets in the face of such abuses.   Such omissions are in no way consistent with their fiduciary duties under ERISA.   The officer Trustee defendants who are not presently alleged to have embezzled themselves (Hawn and Davison) were unquestionably aware of the misuse and embezzlement of OETT assets by their co-defendants (Waggoner, Sikorski, Adams and Tolbert), and yet they did nothing to remedy the misconduct, such as demanding that the OETT be reimbursed for the value of labor and parts used to fix personal vehicles.

150.   Indeed, even after this litigation was filed and the Defendant OETT Trustees who may not have personally participated in embezzling OETT assets were unquestionably on notice of the embezzlements described above, Defendants have, on information and belief, done nothing to remedy the misconduct, such as instituting audits, demanding reimbursement, instituting legal actions, or reporting

1    the embezzlement to appropriate authorities with the DOL or other law

2    enforcement.

3         151.   The OETT (and, indirectly, Plaintiffs and other participants in it) was

4    harmed by Defendants' breaches of fiduciary duties and by the embezzlement of

5    assets, including tools, parts and labor, from OETT.

6              **b)**    *The OETT Fiduciaries Diverted and/or Allowed the*

7                        *Diversion of Trust Assets from the Southern California*

8                        *Training Trust*

9         152.   During the last several years, the OETT, a Taft-Hartley fund

10   established to provide member training services to the Local 12 members in

11   California, has purchased equipment initially identified as purchased for OETT.[5]

12   However, the equipment would then be deleted from the OETT inventory, and

13   transferred to the Southern Nevada Training Trust, without compensation from the

14   Southern Nevada Training Trust to the OETT.

15        153.   OETT training personnel and equipment were used to transfer

16   equipment from the OETT to the Southern Nevada Training Trust.  OETT

17   personnel, including Pete Majich, an employee of the OETT, applied for and

18   received DOT permits to transfer "wide load" equipment.  Peter Majich operated

19   the lead vehicle during the transport of large construction equipment to the

20   Southern Nevada Training Trust.  When equipment is deleted from the OETT

21   inventory, it is not returned to the OETT.  However, some equipment also has been

22   "loaned" from the OETT to the Southern Nevada Training Trust for periods of time

23

24        [5] Local 12 creates some confusion with nomenclature in that it often refers to
25   both the Southern California Training Trust and the Southern Nevada Training
     Trust as "OETT."  (Plaintiffs, in using the term "OETT," are referencing only the
26   Southern California Training Trust.) The main location in Southern California is
     often called OETT Whittier.  However, these two Taft-Hartley trust funds are (in
27   theory) distinct legal entities, though the management employees co-mingled assets
     of the two trusts and treated them, at times, as though they were a single entity.
28   This reckless disregard for fund separateness places the status of both funds at risk
     under IRS regulations.

including one month to many years.  In these cases, fair market rental value has not
been paid by the Southern Nevada Training Trust to the OETT.  The OETT (and,
indirectly, Plaintiffs and other participants whose contributions fund OETT) was
injured when OETT assets were embezzled and when fair rental rates were not paid
for the extended use of those equipment pieces.  At least until this lawsuit was
filed, all costs associated with the transfer of equipment to Nevada, including
employee costs, e.g. salaries, benefits, and expense monies, were paid by the OETT
without reimbursement thereto from the Southern Nevada Training Trust. The
Defendant OETT Trustees (i.e., the officers of Local 12, Dan Billy and Defendants
Hulse, Poss, Gomez, Cooksey and Von Berg), breached their fiduciary duties to
that Taft-Hartley fund by this scheme, harming the OETT (and, indirectly, its
participants, including Plaintiffs) in an amount to be proven at trial.

154.   Employees of the OETT create the curriculum, testing, interview
applicants and actually instruct and/or teach apprentices in Southern Nevada.
However, the Southern Nevada Training Trust does not repay the OETT for the use
of its employees who remain at all times on the latter's payroll.  The Southern
Nevada Training Trust also fails to share in the cost of benefits provided to
instructors on the payroll of the OETT.  Jim Leslie, Plaintiff Skip Watson, and
Dave Barton were sent to Southern Nevada to provide trainings at that Trust, but
the Southern Nevada Training Trust did not pay for their time or training materials.
During testing, proctors would be sent from Southern California to Southern
Nevada, but, again, the Southern Nevada Training Trust did not pay for the OETT
staff time.  Lee Landers and Ron Havlick of the OETT also were sent to provide
services to the Southern Nevada Training Trust, but the value of their services was
not reimbursed.  Handbooks were printed and shipped to the Southern Nevada
Training Trust from Southern California, at Southern California's expense.

155.   Allowing the diversion of fund resources from the OETT, without
reimbursement, to the Southern Nevada entity (the Southern Nevada Operating

Engineers Journeyman and Apprentice Training Trust) was a breach of fiduciary duty by the defendants who sit as Trustees or are otherwise fiduciaries of OETT, including Defendant officers of Local 12, Dan Billy and Hulse, Poss, Gomez, Cooksey and Von Berg, and OETT Administrator Bert Tolbert, and harmed the trust in an amount to be proven at trial.

156.   After this lawsuit was filed, a comprehensive effort was undertaken to eliminate (or, as was frequently said at the OETT, "un-marry") the connections between the OETT and the Southern Nevada Training Trust.  This plan included an initial document shredding campaign.  When Plaintiffs' counsel warned certain Defendants through counsel of the consequences of evidence spoliation, the shredding campaign morphed into a plan of document concealment wherein documents were collected, boxed and secreted from the training site offices.  Then, some of the equipment wrongfully transferred to Nevada was brought back to California, at great expense.

        **c)**   *Bert Tolbert, the Administrator of the OETT, Embezzled and/or Secured Other Trust Assets For His Own Benefit or the Benefit of Family Members, and the Defendant OETT Trustees Took No Steps to Recover Those Assets or to Otherwise Remedy His Misconduct*

**Tolbert's Salary**

157.   Defendant Bert Tolbert was, until his recent resignation in late 2013, the Administrator (sometimes referred to as the Director of Training) for both the OETT and the Southern Nevada Training Trust.  But Tolbert remained at all times exclusively on the OETT payroll.  No compensation for Tolbert is listed on the Southern Nevada Training Trust's DOL 5500 filings or IRS form 990.  The total value of Tolbert's compensation package was approximately $200,000 per year, including salary and benefits.  Some of that money should have come from the Nevada Training Trust.   By taking his entire salary and compensation package

from the OETT, Tolbert improperly diverted monies from the OETT to the detriment of that trust and its participants.

158.   Moreover, the OETT Defendant Trustees allowed Tolbert's entire salary to be charged only against OETT despite his work for the Southern Nevada Training Trust, which should have borne a reasonable portion of his salary given his work for that entity.  By doing so, they breached their fiduciary duties under § 404(a) to act loyally, prudently and solely in the interests of the beneficiaries and participants of the OETT and solely in the interests of its beneficiaries and participants, and to defray its expenses of administration.

159.   The defendant officer Trustees of the OETT, for their part, violated ERISA for an additional reason:  they also sit as Trustees of the Southern Nevada Training Trust.   Thus, in approving and paying the salary of Tolbert from only the OETT, they violated ERISA's prohibition on participating in transactions involving adverse, conflicting interests.   29 U.S.C. § 1106(b)(2) (ERISA § 406(b)(2)). Plainly, in allocating the salary between the two entities, the two entities (as well as their participants) had adverse interests, since the payment of the entire salary from the OETT necessarily reduced the assets of that entity to the advantage of the other entity.

**Tolbert's Recycling Embezzlement**

160.   In addition, with Waggoner's knowledge, Defendant Tolbert has directed or caused the sale of metal belonging to the OETT at SA Recycling and other recyclers for cash, which he did not deliver to the Trust.

161.   For many years, including within the statute of limitations period and without the knowledge of Plaintiffs, scrap metal was taken from the OETT and recycled in exchange for money, often at SA Recycling, which is located at 12301 E. Valley Blvd., El Monte, CA 91732.  Teamsters Union drivers Jim Capen or John Bader, or Pete Majich, Leo Majich's son, took that metal to the recycling yards.

While "scrap metal" suggests a nominal amount of waste metal, the "scrap metal" sold in this case included dismembered heavy construction equipment no longer in use, constituting tens or even hundreds of thousands of pounds of metal annually. For example, a 977 front end loader weighs approximately 47,641 pounds, and at least one was cut apart and sold as scrap.  Cranes can be heavier.  The embezzled sale proceeds frequently exceeded $100,000 per year, but that money was not delivered to OETT's operating account, as it should have been.  Money obtained through these improper sales was delivered to Bert Tolbert.  William Waggoner knew of this unlawful embezzlement for years but did nothing to stop it.

162.   Plaintiffs, as OETT participants, and the other members of Local 12 who are also participants, were injured by the embezzlement of scrap metal sales revenue.

163.   Trustees of the OETT Trust Fund (the Local 12 Officer-Defendants, and Defendants Dan Billy and Hulse, Poss, Gomez, Cooksey and Von Berg) were breached their fiduciary duties by allowing Tolbert to convert OETT assets for his personal profit, and by failing to take reasonable steps to remedy his conduct after the fact, such as demanding reimbursement or, failing that, suing him to recover the lost monies.

**Tolbert's Habitual Charging of Expensive Lunches to the Training Trust**

164.   In addition, Defendant Tolbert habitually ate at Celestino Pasadena with others from the Training Trust, often charging hundreds of dollars for lunch expenses each time he ate there to the Training Trust.  This conduct occurred for years, including within the statute of limitations period.  Plaintiffs were not aware of it, because, not surprisingly, Tolbert and his colleagues failed to disclose to Plaintiffs or Trust participants that they were bilking the Trust for expensive lunches on a regular basis, nor were the improper expenses evidenced in any report made available to Plaintiffs or participants.

165.   Frequently, the lunches had no business purpose.   Regardless charging such exorbitant lunches to the Training Trust on a regular basis in order to lunch with colleagues violated not only the Trust Document's requirement that expenditures be reasonable and necessary but also violated Tolbert's duties under § 404(a) of ERISA to act in the interests of fund participants and beneficiaries and with the goal of preserving fund assets and defraying the expenses of administration.

166.   Notably, the DOL previously found Local 12-affiliated Trustees (in that case, Trustees of the Health & Welfare Fund) to be in violation of ERISA for similar conduct in the past.  *See* Exhibit 1 hereto.

**Tolbert Placed His Granddaughter on OETT's Payroll and Allowed Her to Be Paid from Trust Assets Even Though She Was Not Performing Her Job Duties So That She Could Obtain Insurance Coverage for an Expensive Liver Transplant**

167.   Defendant Bert Tolbert also placed his granddaughter Jodi McMullen on the OETT payroll in order to provide her with health insurance benefits through the Health & Welfare Fund.  Ms. McMullen, about 25 years old at the time, needed a liver transplant as a result of substance abuse.   She was on the liver donor list and received a liver at the expense of the Trust.  Ms. McMullen did almost no work for OETT while she was on its payroll.  On information and belief, because of her drug and alcohol abuse, she was cognitively and/or emotionally unable to perform the duties of her job, as her grandfather Tolbert was well aware. Instead of doing her job, which she did not perform to a level that would justify her employment, Ms. McMullen spent her days printing color pictures, going through several color printer cartridges in a week.  Defendant Bert Tolbert would, with OETT funds, purchase more expensive color printer cartridges to keep her entertained.  During this time, Ms. McMullen maxed out the total limit on healthcare coverage available

through the Health & Welfare Fund.  While her circumstances are undeniably tragic, Tolbert violated his fiduciary duties as a Taft-Hartley fund administrator by hiring and paying a relative who did little or no work in order to allow her to obtain a very expensive medical procedure at the expense of the Trust.

168.   Waggoner and the other officer defendants and Local 12 representatives who were Health & Welfare Trustees (Adams, Sikorski, Dan Billy) were aware of Tolbert's conduct and of the consequences of it.  The defendant Health & Welfare Trustees who went along with this scheme violated their own fiduciary duties under § 404 of ERISA and are also liable for Tolbert's breach under § 405(a), particularly since they still have done nothing to remedy his breach despite notice of it.   The Health & Welfare Fund, already in poor financial condition, and, indirectly, its participants and beneficiaries, was damaged by this improper diversion of fund assets for an expensive transplant procedure for Tolbert's relative.

**Tolbert Paid Southern Nevada Training Trust Bills with OETT Monies**

169.   During recent years, bills for the Southern Nevada Training Trust have - unless practices have been changed recently, which is unknown - been received by the OETT.  Defendant Tolbert, until his recent retirement, has reviewed those bills and then approved them for payment, sending them to office staff to process and pay.  Unless systems have changed in recent months after the institution of this action, which is unknown, there is no system in place between the training centers in California and Nevada to bill the Southern Nevada Training Trust for services provided by the OETT.  In substance, two separate employee benefit programs are operated out of a single office, without fair allocation of the expenses and overhead between them.  Bills were sent from Southern Nevada to Southern California on an almost weekly basis, and paid by Southern California, to the financial detriment of

the OETT and its beneficiaries, whose trust assets are wrongly diminished in this fashion.

**Tolbert Approved and Advocated the Misuse of Trust Fund Monies in the Nature of "Expenses" In Breach of His Fiduciary Duties**

170.   As directed by William Waggoner, who conceived of the plan, Defendant Bert Tolbert instructed OETT employees to fabricate receipts for goods and services not received when they traveled for business purposes but did not exhaust the expense monies provided in advance of their travels.  The purpose of this instruction was two-fold.  First, the administration of the funds was so deficient that the procedures were not in place to receive back unused funds.  Thus, the instruction eliminated the need to correct those deficiencies.  Second, Defendants William Waggoner, Mickey Adams, Ron Sikorski, Larry Davison and Dan Hawn, who were aware of this receipt fabrication instruction, believed that when Fund employees complied with this instruction to engage in such improper activity, they would be less likely to discuss the many improprieties they observed.  In other words, these defendant officers viewed these excess funds as "hush" monies to buy the silence of potential whistle-blowers.[6]

171.   The OETT Defendant Trustees who permitted these unused expense monies to be kept, rather than returned to the trust, breached their fiduciary duties under ERISA to ensure the preservation of OETT assets for beneficiaries and participants.

172.   In sum, Tolbert engaged in widespread, repeated breaches of his fiduciary duties under ERISA, as discussed in Section IV.C.2.c above with respect to his embezzlements of OETT staff services, etc., and in the allegations in this

---

[6] Waggoner also used receipts as a way for him and his officers to skim money from Local 12.  When he travelled with other officers, they would collect and submit multiple receipts for the same expenses, such as taxis and meals.

1    Section of the complaint.   To Plaintiffs' knowledge, except to a brief extent as

2    discussed below, the OETT Defendant Trustees have taken no reasonable steps to

3    remedy Tolbert's ERISA breaches and violations.   Even after this lawsuit was filed

4    and all the OETT Defendant Trustees unquestionably had notice of Tolbert's

5    wrongdoing, the OETT Defendant Trustees have taken no steps to rectify Tolbert's

6    wrongdoing (putting aside the return of some trust assets from Nevada to

7    California) such as (1) demanding and obtaining the return of embezzled fund

8    monies, or (2) failing that, suing Tolbert, or (3) at least reporting his conduct to the

9    DOL's EBSA division, which handles misuse of trust assets.  Instead, Tolbert

10   recently was permitted to retire without consequence, and a retirement party was

11   held in his honor at or around the end of November, 2013.  Years of self-dealing

12   with respect to trust fund assets are cause for celebration at Local 12.

13

14                    **3.    Conduct During This Lawsuit Demonstrating Defendants'**

15                           **Awareness of the Impropriety of Their Actions**

16          173.   At least since the First Amended Complaint in this case was filed,

17   some of the vehicles and equipment formerly owned by the OETT but used by the

18   Southern Nevada Training Trust have been returned to Southern California,

19   demonstrating Defendants' recognition of their wrongful conduct.  The equipment

20   was moved back to Southern California by drivers Jim Capen and John Bader, two

21   Teamsters employed by OETT and permanently assigned to its Whittier, California

22   facility.

23          174.   In addition, in an unprecedented step after the filing of the Second

24   Amended Complaint, the Southern Nevada Training Center has paid the Southern

25   California Training Center for the transfer of equipment from the Southern Nevada

26   Training Trust back to the OETT.  On information and belief, the total amount of

27   compensation paid was roughly $62,000. However, that payment and transfer back

28   to OETT does not eliminate all of the injury caused to OETT by the longstanding

practice of disregarding the integrity of Trust assets and falsifying records to hide
those illegal practices.

> **4.      Fiduciary Breaches in Connection with Real Estate Owned
> by the Pension Fund**
>
> > **a)**      *Misconduct in Connection with the Washington Court
> > Hotel*

175.   The Pension Fund owns several buildings, including the Washington
Court Hotel in Washington, D.C.  The Harbaugh Hotel Management Company
("Harbaugh Co."), owned by George Harbaugh, manages day-to-day operations
under lease agreements with the Pension Fund.   George Harbaugh is a friend and
close associate of Defendant William Waggoner, and has been for years.

176.   The terms of the between the Pension Fund and Harbaugh Co. are and
have for years been very unfavorable to the Pension Fund, as Defendant Waggoner
has provided his close friend with a sweetheart, below-market deal.  The Pension
Fund Trustees' approval of these leases is inconsistent with their fiduciary duties,
including their duties of overseeing the interests of fund participants and
beneficiaries and protecting the assets of the fund by, *inter alia*, entering into
prudent, reasonable contracts in connection with revenue-generating properties like
the Washington Court Hotel.   Here, under the lease that existed until January 2013,
the total annual lease payment received by the Pension Fund, roughly $3 million,
was substantially below market value.   The Pension Fund Trustees breached their
fiduciary duties by entering into such a flawed lease agreement, to the detriment of
the Fund and, indirectly, its beneficiaries and participants.

177.   In January 2013, after this lawsuit was filed, the Pension Fund and
Harbaugh Co. entered into a new lease agreement for the Washington Court Hotel.
The Pension Fund Defendant Trustees knew, or in the proper exercise of their
ERISA § 404 duties as Trustees, certainly should have known, of the new terms of

1  this agreement with respect to a Pension Fund asset as large as the Washington

2  Court Hotel.

3      178.   The new lease terms were even less favorable for the Pension Fund

4  than the terms that existed under the prior lease, as the payments due to the Pension

5  Fund have decreased substantially even though real estate values have risen.  There

6  is no prudent, market-based reason for this, nor any reason consistent with the

7  Pension Fund Trustees' duties of preserving and growing the assets of the Pension

8  Fund.   No Pension Fund Trustee acting prudently and with the interests of fund

9  participants and beneficiaries at the top of their priorities would have agreed to this

10  new lease agreement.  Entering into this new, even more inferior lease agreement

11  between the Pension Fund and Harbaugh Co. was a further breach of duty by the

12  Pension Fund Trustee Defendants.

13      179.   Plaintiffs did not learn anything about the terms of the lease

14  arrangements between the Pension Fund and Harbaugh Co. until 2012 at the

15  earliest, since the information was not disclosed to Local 12 members.

16      180.   In addition, in 2007 to 2009, the hotel converted two of its rooms into

17  an apartment that is occupied by Joel Manion, the General Manager of the hotel

18  and the son of Harbaugh Co. Chief Operating Officer Jim Manion (in the original

19  Complaint, Joel Manion was inadvertently identified as the son of George

20  Harbaugh).  The funds for that conversion were misappropriated from the Pension

21  Fund's Furniture, Fixtures & Equipment account ("FF&E"), which is comprised

22  primarily of Pension Fund monies designated for maintenance and improvement of

23  Pension Fund real estate to remedy wear and tear, and maintain property values.

24  The funds used to create the apartment for Mr. Manion had been set aside for the

25  construction of a restaurant in the hotel.

26      181.   The conversion was never formally voted on by the Trustees of the

27  Pension Fund.  However, the Pension Fund Defendant Trustees herein have known

28  about the conversion for some time, and certainly have known about it since

Plaintiffs raised the allegations in earlier pleadings in this action, but no steps have been taken, to Plaintiffs' knowledge, by the Pension Fund Trustees to remedy this misuse of Pension Fund assets.

182.   The Pension Fund lost revenue due to the room conversion in the form of (1) conversion costs for which it paid, and (2) lost room rental revenue.  The Pension Fund lost revenue due to the room conversion in the form of (1) conversion costs for which it paid, and (2) lost room rental revenue.

183.   When Kurt Glass, then an officer of Local 12 and a Pension Fund Trustee, raised concerns regarding the use of Pension Fund assets for the room conversion costs with Jim Manion in the lobby of the Washington Court Hotel in or about mid-2011, he was rebuffed and told to stay out of it.

184.   Kurt Glass also approached Mr. Pham, an Invesco representative who worked with the Pension Fund's real estate investments, about Mr. Glass's concerns regarding the Washington Court Hotel.   Mr. Pham advised Kurt Glass to drop the issue.

185.   Further, Mr. Glass spoke to Chris Laquer, management counsel for the Pension Fund, who also told him not to raise issues concerning the Washington Court Hotel.

186.   In addition, Defendant Waggoner himself advised Mr. Glass to stop raising issues about the hotel, which, as alleged above is managed by the company of his longtime friend and associate, George Harbaugh.

187.   Joel Manion's improper living arrangement constitutes misuse of assets from the Pension Fund FF&E account.  This misuse was authorized by William Waggoner as part of Waggoner and George Harbaugh's agreement to use their Washington Court lease arrangement as a means of diverting assets away from the Pension Fund.

**b)** *Misconduct Regarding the Pension Fund's Texas Parking Facilities*

188.   The Pension Fund owned parking facilities near the Dallas-Fort Worth Airport.  Rather than collect the substantial revenue generated by the parking facilities and simply pay a local parking management company to service them, the Pension Fund leased the garages out at a fixed rate well below the revenue that could be collected if the Pension Fund would simply hire management to operate the facilities.  This arrangement was a breach of the fiduciary duties of the Pension Fund Trustees, who are required to jointly manage the plan assets and to act prudently and loyally in the interests of plan participants and beneficiaries.

**c)** *Misconduct Regarding the Sheraton Grand Hotel in Texas*

189.   The Sheraton Grand Dallas Ft. Worth is another valuable hotel property owned by the Pension Fund that was leased to the Harbaugh Co.  The Sheraton caused a loss for the Pension Fund each year due to an unreasonable, sweetheart lease deal between the Pension Fund and Harbaugh Co., which no prudent Pension Fund Trustee acting consistent with the duties imposed by ERISA would have allowed.   Under that lease agreement, the Pension Fund agreed to unusually low, below market lease fees without good justification, and also assumed various costs of operation of the property which it should not reasonably have been acquired to assume, but for the sweetheart deal provided by the Pension Fund and Waggoner to Harbaugh Co..

190.   Prior to Invesco's assumption of certain responsibilities regarding the management of Pension Fund real estate assets, Strategic Property Advisors, Inc. provided advice to the Pension Fund regarding its real estate holdings, although its advice was not always welcome.  When Strategic Property Advisors' Peter Alyward attempted to convince Defendant Waggoner to sell the Sheraton due to the reported losses, Waggoner, in breach of his duties as a Pension Fund Trustee, refused to consider the idea, criticized Alyward in front of the other Trustees and caused

Alyward to resign as an advisor to the Pension Fund.  Waggoner's fellow officer defendants went along with him, as always.   Thereafter, Invesco took over some of the responsibilities of Strategic Property Advisors in connection with the Fund's real estate holdings, despite having no experience with hotel property management.

191.   Maintaining ownership of a property that loses Pension Fund money for years, without considering any alternatives such as the sale of the property, is unquestionably a breach of fiduciary duty under ERISA.  Online records show that a sale of the Sheraton by the Pension Fund is at least pending, if not yet completed; that sale was initiated only after this lawsuit was filed.

**d)**     *Other Misconduct with Pension Fund-Owned Properties in California and Nevada*

192.   Other Pension Fund-owned properties in Southern California and Nevada – the specific identities of which are known to the Pension Fund Defendant Trustees but presently not fully known to Plaintiffs – have not been put to their best use to generate income for the benefit of the Fund and its participants and beneficiaries.   In addition, on information and belief, millions of dollars in Pension Fund monies have been improperly diverted to non-parties for contracted-for improvements at certain such properties – the identities of which are known to the Pension Fund Defendant Trustees but presently not fully known to Plaintiffs – notwithstanding that, ultimately, the contractors in question did not in fact make the contracted improvements so as to justify their receipt of such Pension Fund monies.  On information and belief, millions of dollars in Pension Fund monies have been lost as a result, including within the last six years, as a result of misconduct at such properties which was concealed by Defendants and not discovered until recently.

**FOURTH AMENDED CLASS ACTION COMPLAINT**

**e)**   *The Pension Fund Trustees Have Failed To Prudently Diversify the Pension Fund's Assets by Vastly Over-Investing in Real Estate, Which Has Not Performed*

193.   The Pension Fund is far too invested in real estate.   Nearly 40% of the value of the fund's total assets consists of real estate holdings (the real estate holdings have been as "low" as about 35% in certain recent years and are climbing), which is an extraordinarily high percentage for a Taft-Hartley pension fund.   Most Taft-Hartley pension funds are comprised of less than 25% real estate as an industry norm.   In this case, despite their duties under § 404(a) to prudently diversify plan investments, the Pension Fund Trustees chose to over-invest in real estate.   The real estate portfolio has not performed to the extent other assets have.

194.   Under the Pension Fund's stated Policy for its Target Asset Mix, real estate should comprise 25% of the assets and never exceed 40%.   Instead of following its own Policy, the Pension Fund has, for more than four years prior to the filing of this action, ignored the optimal percentage for real estate investments and instead consistently approached the declared maximum.   Thus, the Pension Fund Trustees have willfully disregarded the advice and expertise of their investment consultants who helped establish the investment allocation policy.

195.   For many years, the Pension Fund managed its own real estate investments, unlike most other unions which use qualified outsiders to manage their real estate portfolios. Trustees Ken Bourguignon and C.W. Poss were enthusiastic proponents of the heavy investment in real estate and participants in the process of buying and developing real estate, including during the last six years.   In or about 2009, Invesco was handed the real estate portfolio.

196.   One reason for the over-investment in real estate is to provide more opportunities for Defendant Waggoner to divert or misuse Pension Fund assets for his own benefit and/or the benefit of third parties.   Relatedly, insiders such as Leo Majich and Waggoner believed that DOL audits of real estate, rather than equities,

would be very difficult.   (When DOL auditors came to visit, Majich would dump hundreds of boxes of real estate files in a conference room to frustrate the busy auditors, saying that he was simply giving them everything he had.)

197.   The topic of over-investment in real estate was generally avoided at Board meetings, given Defendant Waggoner's great interest in real estate holdings. Moreover, if a Trustee did raise the issue, Waggoner took punitive action to insure that the other Trustees did not follow suit.  For example, former Trustee Tim McDonald, who resigned in or about 2009, was concerned about over-investment in real estate and at times discussed those concerns with his fellow Trustees.   Tim McDonald was regularly at odds with Waggoner, which ultimately led him to resign, and to send a scathing resignation letter to Waggoner which, on information and belief, outlined misconduct by Waggoner.  After receipt of that letter, Waggoner ordered a targeted strike of his company, C.W. Rasmussen, costing that company millions of dollars.

198.   Waggoner had many such tools of potential retaliation at his disposal against non-cooperative Trustees; in addition to the threat of targeted strikes (demonstrated as a real one in the case of McDonald), management-side Trustees knew that Waggoner could order expensive, potentially troublesome audits of their companies if they opposed his positions, whereas favored Trustees who were cooperative were, on information and belief, rarely if ever audited or otherwise targeted or retaliated against (individually or as employers of Local 12 members) by Waggoner and Local 12.  Thus, the Trustees did not force the issue on the over-investment of real estate, as being the target of Waggoner's wrath and retaliation was not something the Trustees relished.

199.   However, over-investment in real estate *was* a topic of discussion among the Pension Fund investment professionals and consulting staff, including John Elliot (Defendant Walt Elliot's son and therefore a party in interest under 29

FOURTH AMENDED CLASS ACTION COMPLAINT

U.S.C. § 1002) but these persons were aware that they would not be retained by Waggoner if they attempted to significantly alter the investment mix.

> **5.     The Health & Welfare Fund Trustees Caused a Prohibited Transaction with a Party in Interest in the Form of a Local 12 Loan of $10 Million Dollars to the Health & Welfare Fund**

200.   The Health & Welfare Fund, like the Pension Fund, is in very poor financial condition and has been for years during the period of time that Defendants have breached their fiduciary duties with respect to that fund as alleged herein.

201.   On April 27, 2011, at a meeting of the Health & Welfare Benefits Appeals Committee, a motion was seconded and carried authorizing the preparation of documents enabling borrowing of up to **$20 million** to shore up the deteriorating Health & Welfare Fund, which was spending far more each month than it received and would be entirely depleted in about 18 months at its then-current burn rate.  As the committee recognized that the easiest source of loan funds would be Local 12, the motion expressly noted the need to obtain a Prohibited Transaction Exemption from the DOL, since any loan from Local 12 to the Health & Welfare Fund was per se illegal, absent such an exemption.  Defendants Charles W. Poss, Ron Sikorski, Bruce Cooksey, Mickey J. Adams, William C. Waggoner and Walt Elliot, among others, were in attendance at that April 27, 2011 meeting.

202.   On June 22, 2011, at a meeting of the Board of the Health & Welfare Fund, and despite the opinion by Tim Biddle of The Segal Co. that it would be imprudent to reduce the Health & Welfare Fund's investment account from $10 million to $5 million to use the $5 million to pay outstanding benefit claims, the Trustees nevertheless agreed to use half the Fund's investment account to pay delinquent benefit claims.  At that same June meeting, the Trustees reviewed and approved a proposal from Local 12 under which Local 12 would make an

unsecured no-interest loan of $10 million to the Health & Welfare Fund.  The loan
proceeds would be utilized by the Fund for the sole purpose of prompt payment of
indemnity medical claims.  Repayment would commence no earlier than six months
subsequent to the closing of the loan, whenever a current monthly internal financial
statement of the Health and Welfare Fund disclosed net cash deposits and
investments of $27 million or more.  In any such month, the Health & Welfare
Fund would repay to Local 12 $1 million of the loan. This repayment schedule
would continue until the full amount of the loan had been repaid to Local 12.  At
the same June meeting, the Trustees reviewed and approved a plan under which the
Health & Welfare Fund would continue its efforts to secure a line of credit with a
financial institution for up to an additional $10 million.  Defendants Charles W.
Poss, Ron Sikorski, Bruce Cooksey, Mickey J. Adams, William C. Waggoner, Walt
Elliot, and Dan Billy, among others, were in attendance at that June 22, 2011
meeting.

203.   On June 27, 2011, the loan agreement between Local 12 and the
Health & Welfare Fund was signed, and Local 12 delivered $10 million dollars to
the Health & Welfare Fund.  This transaction was illegal under ERISA, since Local
12 is a party in interest no Prohibited Transaction Exemption was first obtained
from the DOL.  Defendant Waggoner and the other Defendant Health & Welfare
Trustees caused this prohibited transaction with a party in interest to occur.

204.   On September 28, 2011, at a Health & Welfare Fund Board meeting,
the Trustees learned that the June 27, 2011 loan from Local 12 to the Health &
Welfare Fund was not properly documented, as would have been required to obtain
a Prohibited Transaction Exemption, despite the fact that Defendants Waggoner
and Walt Elliot had purportedly prepared an application for such an exemption and
submitted it to the DOL.  Defendants Charles W. Poss, Ron Sikorski, Bruce
Cooksey, Mickey J. Adams, William C. Waggoner, Walt Elliot, Mike Crawford
and Dan Billy, among others, were in attendance at that September 28, 2011

1   meeting.  No steps were taken to remedy the illegal conduct, despite the knowledge

2   of all of the Trustees that the illegal transaction had occurred.

3   205.   On December 7, 2011, at another Health & Welfare Fund Board

4   meeting, the Trustees ratified, by carried motion, that the Prohibited Transaction

5   Exemption application purportedly submitted by Defendants Waggoner and Elliot

6   to the DOL had been withdrawn as soon as Professional Business (aka "ProBiz")

7   Bank had withdrawn its insistence, as a condition precedent to offering a $10

8   million line of credit/loan to the Health & Welfare Fund, of written approval of the

9   loan from Local 12 to the Health & Welfare Fund from the DOL.  The Trustees

10  also ratified the signing of a $10 million Loan Agreement and Promissory Note to

11  ProBiz Bank and all conduct by Waggoner and Elliot in connection with that loan

12  and the loan from Local 12 to the Health & Welfare Fund.  Defendants Charles W.

13  Poss, Ron Sikorski, Bruce Cooksey, Mickey J. Adams, William C. Waggoner, Walt

14  Elliot, Mike Crawford and Dan Billy, among others, were in attendance at that

15  December 7, 2011 meeting.

16  206.   By February 7, 2012, the Health & Welfare Fund had made two

17  payments of $1 million each on account of the Local 12 loan.  William Waggoner,

18  however, was not satisfied with that, having dangerously over-extended Local 12

19  with his unlawful decision to loan money to the Health & Welfare Fund without a

20  written Exemption approved by the DOL.  During February 2012, when the current

21  monthly internal financial statement of the Health and Welfare Fund disclosed a net

22  cash deposits and investment balance of just under $27 million (the amount needed

23  to trigger the Fund's million-dollar repayment obligation), William Waggoner

24  demanded that Michael Graydon borrow approximately $70,000 from the Health &

25  Welfare Fund's line of credit, deposit that amount into the Fund's account, and

26  thus, though a sham, inflate the Fund's net cash deposits to trigger an obligation to

27  pay $1 million to Local 12.  That demand was not consistent with any reasonable

28  loan term and certainly not consistent with any loan agreement that could have

obtained a Prohibited Transaction Exemption under the procedure set forth in 29 U.S.C. § 1108(a).  In fact, had a Prohibited Transaction Exemption been issued, Waggoner's demand that Michael Graydon engage in financial misconduct to force a repayment event would likely have nullified the validity of the Prohibited Transaction Exemption.

207.    Since it appears that the Prohibited Transaction Exemption application was withdrawn by Waggoner and Elliot, if it was ever actually submitted, it follows that it could not have been approved.    Regardless, the loan was in fact made without *first* obtaining an exemption under the rules provided for under ERISA, and thus was a violation of ERISA § 406(a)(1)(B), forbidding loans between an ERISA fund and a party in interest.

208.   In or about late 2011, management counsel to the Health & Welfare Fund, Defendant Chris Laquer, claimed at a meeting of the Health & Welfare Board that he had an "off-the-record" discussion with an unnamed senior DOL official, who, following that "off the record" phone call, reportedly sent an email to Laquer stating that the DOL would not have a problem with the transaction if it were of the nature described by Laquer.  Defendant Chris Laquer was paid substantial sums of money from the Health & Welfare Fund for his direct participation and facilitation of this prohibited transaction and must refund that money to the plan.

209.   Notably, before the ProBiz bank loan transaction, Michael Graydon, attorney Laquer and other Fund representatives spent at least 40 hours with Karen Brown, an Executive Vice President at Pacific Western Bank, attempting without success to secure the loan.   Eventually, the Fund representatives handling the loan process concluded that Pacific Western would never drop its requirement that the Fund obtain a formal exemption from the DOL for the loan transaction with Local 12 before proceeding with its own loan.   For attempting to ensure that his bank not run afoul of ERISA, Jory Potts, Pacific Western's representative for Taft-Hartley

1 | plans, received a blistering call from Waggoner complaining about the bank's

2 | refusal to do what he wanted.

3 | 210. It was Patty Waggoner who ultimately found lesser-known ProBiz

4 | Bank, which was more interested in a deal, regardless of ERISA rules. For going

5 | forward with the (illegal) loan deal, ProBiz Bank believed it would secure both the

6 | loan and the commercial banking services for the Health & Welfare Fund.

7 |

8 |       **6.**   **William and Patty Waggoner Improperly Steered Health &**

9 |          **Welfare Fund Investments to Their Son's Employer,**

10 |          **Without Disclosing the Conflict of Interest in LM-30 Filings**

11 | 211. When Kenneth Waggoner went to work at Chelsea Management

12 | ("Chelsea"), Chelsea was awarded, for the first time, the business of investing

13 | Local 12's Health & Welfare Fund assets.  Chelsea and Kenneth Waggoner thus

14 | received investment business from the Health & Welfare Fund entirely because of

15 | Kenneth Waggoner's party in interest relationship to Trustee William Waggoner.

16 | All investment transactions between Kenneth Waggoner and the Health & Welfare

17 | Fund were per se illegal prohibited transactions between the Fund and a party in

18 | interest (*see* 29 U.S.C. § 1002(15), defining relatives as parties in interest) under

19 | ERISA § 406(a) and any monies made by Kenneth Waggoner as a result of such

20 | transactions should be disgorged pursuant to ERISA § 502(a)(3).  In addition,

21 | William Waggoner did not disclose this conflict of interest in his LM-30 filings,

22 | despite the fact that Kenneth Waggoner lived in William Waggoner's home at the

23 | time.  This failure to disclose, as required by Title II of the LMRDA, among other

24 | laws, prevented discovery by Plaintiffs and the Class that William Waggoner

25 | engaged in transactions prohibited by ERISA.

26 | 212. Shortly after Kenneth Waggoner left Chelsea, Chelsea lost the Health

27 | & Welfare Fund investment account.  Kenneth Waggoner then went to work at

28 | McMorgan & Company.  Shortly after he joined McMorgan, in December 2011,

Defendant Patty Waggoner sent an e-mail to John Elliot of New England Pension Advisers (Defendant Walt Elliot's son), asking him to direct clients to Kenneth Waggoner at McMorgan because Kenneth Waggoner was not successfully attracting enough business to McMorgan.

213.   Demonstrating her ability to influence fund business and the use of fund assets, Patty Waggoner stated in her email that she had cleared her request with her husband, William Waggoner, and that he approved the request.  At the time, John Elliot was advising the Trustees of the Pension Fund regarding the selection of pension fund investment managers.  All of the Trustees were aware of Patty Waggoner's actions because John Elliot openly discussed the matter in their presence.

### 7.   William Waggoner for Many Years Demanded and Obtained the Diversion of Real Estate Account Funds from the Pension Fund to Pay for Roughly $90,000 in Rose Parade Tickets Every Year

214.   Prior to his death in 2008, Leo Majich, the OEFI Funds Manager before Michael Graydon, would provide tickets to attend the Rose Parade to all employees of the Local 12 Trusts and Local 12.  Majich did so at the demand of William Waggoner.   However, as Waggoner knew, in doing so, Majich was diverting funds from real estate maintenance accounts for the Pension Fund to pay for the tickets, which cost approximately $90,000 per year.   This diversion of Pension Fund monies occurred for years, including as late as 2008.

215.   Michael Graydon assumed the position of Funds Manager at OEFI for the Trusts after Majich's death.  Graydon refused to continue the illegal asset diversion, despite William Waggoner's demands that he do so.

216.   Despite his fiduciary duties that required him to disclose such material information, Waggoner actively concealed from members and Plan participants and

1   beneficiaries that he was diverting Pension Fund monies to pay for the Rose Parade

2   tickets.   Plaintiffs were unaware of this breach of fiduciary duty until 2013, when

3   they first learned about this asset diversion from Michael Graydon.

4       217.   The other Pension Fund Trustees either knew about this practice

5   (unquestionably, the officers did) or breached their fiduciary duties by having no

6   practices in place to prevent the OEFI Funds Manager from diverting $90,000

7   annually from the Fund – on a yearly basis, over many years – for non-fund

8   purposes.   Since the filing of this action, to Plaintiffs' knowledge no steps have

9   been taken to demand that Waggoner repay the Fund for its losses.

10

11      **8.      Leo Majich's Daughter, Theresa Goodell, Used an OEFI**

12              **Credit Card to Travel to Jamaica to Visit Her Boyfriend and**

13              **Stole Other OEFI Funds, Yet the Trustees Took No Steps To**

14              **Stop Her Embezzlement or to Recover Those Funds**

15      218.   Theresa Goodell was employed at OEFI under her father, Leo Majich.

16  On multiple occasions, Ms. Goodell used a credit card belonging to OEFI to pay for

17  her personal trips to Jamaica to visit her boyfriend and to operate a soap business in

18  which she was part owner in Jamaica.  OEFI expenses are paid entirely by the

19  Local 12 employee benefit trusts. [7]

20      219.   OEFI served (and serves) as a fiduciary for the Local 12 employee

21  benefit trusts in that it "administers the employee benefit programs" of Local 12.

22  Among other things, it determines how much in expenses to charge each of Local

23  12's employee benefit trusts on a pro rata basis, depending on the relevant amount

24  of work performed and expenses incurred in connection with administering each

25  trust. Accordingly, it has a fiduciary duty to ensure that all expenses, including

26  salary, and employee reimbursements, are necessary, appropriate, and for the

27

28

benefit of one of the trusts.   OEFI breached that duty consistently when Leo Majich was Funds Manager, to the detriment of the Trusts and, indirectly, their participants and beneficiaries, including Plaintiffs.

220.   Because OEFI has no independent source of revenue and engages in no business other than administration of the Local 12-associated Trust Funds, every misappropriation by Ms. Goodell was a conversion of trust fund assets from the fund to which such expenses were billed.   Yet Defendants OEFI and its Chairman, Kenneth Bourguignon, took no steps to obtain restitution for or otherwise remedy Ms. Goodell's embezzlements, in breach of their fiduciary duties under ERISA § 404.

221.   Defendant Waggoner and the other Defendant Trustees also took no steps to ensure that Ms. Goodell was not embezzling trust fund assets, despite their duties to preserve the assets of the involved Taft-Hartley employee benefit plans. Instead, Defendant Waggoner, with the complicity of the other Trustees, sought to protect Ms. Goodell when her father's successor, Michael Graydon, attempted to fire her.   Even if the management-side defendant Trustees had no ability to out-vote Waggoner and his loyal cabal of supporters, they had a duty to take steps to remedy the misconduct, even if that meant reporting the embezzlements to the authorities, including the Department of Labor, and yet, to Plaintiffs' knowledge, they never did so.

222.   On weekends, Theresa Goodell often logged onto the OEFI computer network from home, did no work, but turned in overtime hours to illegally increase her pay.  She frequently falsely claimed that she worked a significant amount of overtime each weekend.  For example, in fiscal year 2008, Theresa Goodell approved *for herself* the payment of overtime wages in the amount of $77,948 (which included her self-approved weekend overtime and the additional paychecks

---

[7] http://www.oefunds.org/ (viewed July 22, 2013), and the new site,

she issued to herself and her father), despite the fact that she was an exempt managerial employee not entitled to overtime pay.  Her embezzled overtime wages ultimately were diverted from the Trusts administered by OEFI.

223.   This and other embezzlements were hidden from Local 12 members (who are also fund beneficiaries) by Defendant William Waggoner and the complicit officers of Local 12, the Trustees of the Trusts, and loyal upper management of Local 12 and OEFI, who were all fully aware of the embezzlements by virtue of audit findings provided to the Trustees by Bernard Kotkin & Co., an accounting firm hired to provide accounting services to the Trusts.  Those audit findings were not provided to any Local 12 member, and no collection actions were instituted to recover the funds identified as embezzled by the auditing accountant firm.

224.   Theresa Goodell also periodically required the issuance of an additional payroll check, equal to a week of pay, for herself and her father, Fund Administrator Leo Majich.  These improper distributions, occurring roughly five times a year, amounted to the embezzlement of tens of thousands of dollars from OEFI-administered funds.

225.   After Michael Graydon, Leo Majich's successor, discovered the embezzlements by Theresa Goodell, he eventually terminated her, but only after William Waggoner had three times told him not to do so, once stating "I wouldn't do that if I were you."  William Waggoner ultimately fired Michael Graydon for, among several improper reasons, terminating Theresa Goodell and other employees involved in the embezzlement schemes and for refusing to follow past practices of diverting assets to pay for such indulgences as Rose Parade tickets.

226.   Like OEFI, the Defendant Trustees of the Trusts impacted by Ms. Goodell's embezzlement breached their fiduciary duties to the respective employee

http://www.oefi.org/about (viewed December 5, 2013).

**FOURTH AMENDED CLASS ACTION COMPLAINT**

benefit plans for which they served as Trustees at the time of Ms. Goodell's embezzlements.

9.    **Bernard Kotkin & Co., LLP, a Certified Public Accounting Firm, Was Hired by OEFI to Conduct Annual Audits, Uncovering Massive Financial Misconduct, Including Embezzlement and the Misuse of Hundreds of Credit Cards**

227.   Bernard Kotkin & Co., LLP, a Certified Public Accounting firm, was hired by OEFI to conduct annual audits.  During the course of those audits, auditor Angelo Nicodemo, CPA, determined that hundreds of credit cards had been misused by employees and other embezzlements had occurred.  A report was prepared after each audit and provided to Leo Majich.  As OEFI bills all of its expenses to Local 12 trusts, every misappropriation by an OEFI employee was an embezzlement from every Fund administered by OEFI, which allocates its administrative expenses across the funds proportionately.  Deficits in a Fund are corrected by an increase in contribution levels from Plaintiffs and the Local 12 members.  Plaintiffs, who are beneficiaries of the Trusts impacted by OEFI employee embezzlements, suffered injuries as a result of the harm to their Trusts. The Trustees failed to demand (let alone obtain) the return of the improperly diverted trust fund monies uncovered by the audit, in breach of their fiduciary duties.

228.   Each year, the report of asset misuse from Bernard Kotkin & Co., LLP grew in size.  Eventually, after the issues identified by Mr. Nicodemo were not addressed during Leo Majich's tenure, Mr. Nicodemo sent the audit findings to Michael Graydon.  Mr. Graydon set out to first verify and later remedy the misconduct uncovered by the audit.  Mr. Graydon was able to obtain some reimbursements for embezzlements from OEFI, but most of the embezzled funds have never been recovered.

229.   Mr. Graydon and an OEFI employee, Margaret Bowen, worked to get rid of the corruption that permeated OEFI.  However, some time after Mr. Graydon terminated Theresa Goodell for obtaining overtime wages under false pretenses, Mr. Graydon and Ms. Bowen were both fired by William Waggoner.

## 10.   William Waggoner Engaged in Self-Dealing by Causing Local 12 to Hire Patty Waggoner's Company, Spacemaker Tenant Improvements, to Perform Work at Local 12's Headquarters, OEFI-Owned Properties

230.   Patty Waggoner was an officer of the contracting company, Spacemaker Tenant Improvements ("Spacemaker").  Spacemaker is a California licensed contractor.  At all times relevant, Spacemaker had offices in buildings owned by Local 12's General Pension Fund, including 301 N. Lake Avenue, Pasadena, California 91101 and 3699 Wilshire Blvd., Los Angeles, California 90010.

231.   According to the California State Contractor License Board, the holder of Spacemaker contractor's license was Stanley W. Smith, and Patty Waggoner was Spacemaker's President.  Later records show that Richard A. Marker, currently a lawyer at the Green & Marker law firm, was also an officer and may be the sole remaining officer of Spacemaker.

232.   At least as far back as 1980, and up to 2002, Patty Waggoner, through her contracting company Spacemaker, performed work on Local 12 facilities and facilities owned by Local 12's General Pension Fund.  After 2002, Patty Waggoner used other contractors' licenses to perform the same work on Local 12 facilities. Patty Waggoner is a member of Local 12.  However, it was never disclosed to the members of Local 12 that William Waggoner's wife was hired to perform construction work at Local 12 facilities, and no filed disclosures by Local 12 would reasonably permit discovery of this conflict of interest. Local 12 members,

including Plaintiffs, were prevented from immediately discovering this improper arrangement due to the false and misleading filings by Defendant Waggoner or at Waggoner's behest.  These false filings violated Title II of the LMRDA.

233.   The contracting services provided by Spacemaker to Local 12 facilities and facilities owned by Local 12's Pension Fund were not provided on the basis of arms-length bidding processes.  Rather, Spacemaker received those construction jobs simply by virtue of the fact that Patty Waggoner was married to William Waggoner.  Moreover, even had they used a bidding process, Spacemaker, due to the spousal relationship between the Waggoners, could not appropriately have performed that work in view of ERISA's prohibition on transactions with parties in interest, such as spouses of Pension Fund Trustees like Waggoner.  *See* 29 U.S.C. § 1106(a)(1)(C), 29 U.S.C § 1002(14)(F).

234.   The Pension Fund, as well as Plaintiffs and other members of Local 12, were harmed as a result of this self-dealing because William Waggoner prevented Local 12 and/or OEFI from demanding corrective action for the substandard work provided by Spacemaker.  Instead, additional costs were incurred by Local 12 and its affiliated organizations, including the Pension Fund, to correct and repair the defective work done by Patty Waggoner's company.

235.   Spacemaker, Patty Waggoner's company, also failed to make required Pension Fund contributions for the member employees working for it on these properties, and William Waggoner and the other Pension Fund Trustees took no efforts to recover those contributions, in further breach of their fiduciary duties.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**11.    The Local 12 Officer Defendants Allow Employers Contracted With Local 12 to Operate Double-Breasted, Thereby Depriving Members of Protections and Benefits Available Under Union Agreements**

236.   William Waggoner, Mickey Adams, Ron Sikorski, Larry Davison and Dan Hawn allow employers contracted with Local 12 to improperly operate double-breasted, thereby depriving members of protections and benefits available under union agreements ("double-breasted" refers, generally, to a business owner that runs two companies in parallel – one subject to a CBA with a union and one that is not subject to a CBA – in order to circumvent the CBA some of the time).

237.   For example, Morley Builders is signatory to a Local 12 CBA, but its alter ego, Benchmark Construction, which employs heavy equipment operators, is operated as though it is a non-unionized entity, in an effort to avoid Morley Builders' obligations under its CBA.  In other words, Morley Builders diverts non-union workers to Benchmark Construction to avoid the obligation of using union employees for the work done at Benchmark.

238.   Similarly, LKR Group is signatory to a Local 12 collective bargaining agreement, but its alter ego, Group Delta Consultants, Inc., is operated as though it is a non-unionized entity, in an effort to avoid its obligations under its CBA.  Group Delta Consultants, Inc. uses non-union construction inspectors to avoid paying union inspectors the benefits and wages required under the Local 12 CBA.

239.   Twining Laboratories is signatory to a Local 12 collective bargaining agreement, but its alter ego, Quality Assurance International, is operated as though it is a non-unionized entity, in an effort to avoid its obligations under its CBA.  The operators of Twining Laboratories and Quality Assurance International are husband and wife, with the husband owning the former and the wife owning the latter to conceal double-breasted activity. Quality Assurance International uses heavy equipment operators.  Smith-Emery also operates double-breasted.  The unionized

portion of Smith-Emery's operations, on information and belief, is limited to about 30% of Smith-Emery's total operations.  Whenever non-union workers are employed in a double-breasted operation, union members lose employment opportunities, and the owner of the double-breasted entities avoids the obligation (and associated benefits costs) of using union employees for the work done at the entity operated outside the Local 12 CBA.

240.   This double-breasting allows employers to fail to make contributions that would otherwise be made to the involved employee benefit funds (Health & Welfare Fund, Pension Fund and Training Trust), to the detriment of the Trusts (and, indirectly, participants and beneficiaries).  The Local 12 Officer Defendants breach their fiduciary duties under common law, Section 501 of the LMRDA, and under ERISA, in allowing such practices to occur.  Likewise, the employer-side Trustees who know about such double-breasting and allow it to occur without taking action to recover contributions that would be made but for such double-breasting, breach their fiduciary duties under ERISA.

241.   Union contracts with employers hiring Local 12 members require, at minimum, that employers unionized through Local 12 must remain unionized in subsequent labor contracts with Local 12. Defendant William Waggoner was responsible for supervising all business representatives and ensuring that all CBAs for Local 12 were negotiated, fully executed, and that all terms under the CBAs were enforced.  Nevertheless, Defendant Waggoner and the other Local 12 Defendant Officers were aware that double-breasting in violation of Local 12 CBAs was occurring but did not do anything to stop it or otherwise fulfill their obligations in this regard, in breach of their fiduciary duties.

**12.    OEFI Paid Employees' Payroll Taxes Out of OEFI's General Fund**

242.   Employees are normally obligated to pay their own share of FICA out of their gross wages.  However, in order to provide OEFI employees (including Leo Majich and his daughter Teresa Goodell) with a concealed raise that was paid for with funds from the Trusts, Defendant Waggoner and his close associate, former OEFI Funds Manager Leo Majich, conceived of a plan to pay the employee share of taxes for OEFI employees out of OEFI's General Fund.   This, in fact, occurred for years, including within the last six years, with the full knowledge and approval of Mr. Waggoner and sometimes OEFI Chairman Kenneth Bourguignon.   The additional costs to OEFI were then passed on to the Trusts administered by OEFI, including the three at issue in this case.

243.   In similar fashion, OEFI paid the FICA shares of Pension Fund, Health & Welfare Fund, OETT and Vacation Fund employees.

244.   As OEFI is funded entirely from the Trust Funds at Local 12, including the three at issue here, OEFI has a fiduciary duty to avoid excessive or improper expenditures that are coming from Taft-Hartley Trust Fund contributions that it administers.  Because OEFI has no independent source of revenue and engages in no business other than administration of the Local 12-associated funds, every misappropriation of OEFI (and, thus, Trust) funds for the payroll taxes of an OEFI, Pension Fund, Health &Welfare Fund, OETT or Vacation Fund employee was an embezzlement or at least an improper diversion of assets from every Local 12 Trust Fund administered by OEFI, which allocates its administrative expenses across the funds proportionately, and William Waggoner is jointly and severally responsible for all such improper diversions from Trust Fund assets.  The Defendant Trustees of the Trusts are separately responsible for the fiduciary breaches that occurred when they failed to take action to preclude this practice and

1   to recover the diverted funds from William Waggoner, Leo Majich and Kenneth

2   Bourguignon, who instituted and/or continued the practice for many years.

3      245.   The Trusts (and, indirectly, their beneficiaries and participants) were

4   harmed by these imprudent, unnecessary payments of employee FICA taxes that

5   were not for the benefit of participants and beneficiaries and were inconsistent with

6   the obligation of the Defendant Trustees to defray administration expenses of the

7   Trusts.

8      246.   Defendant OEFI and its sometimes Chairman, Kenneth Bourguignon,

9   breached their fiduciary duties by engaging in the practice of paying employee

10   shares of FICA with trust fund monies. Defendant William Waggoner (who has

11   also been OEFI Chairman at relevant times and breached his duties in the same

12   manner) also breached his fiduciary duties by conceiving of, approving and/or

13   requiring the practice.   The union officer Trustees other than Waggoner (Adams,

14   Sikorski, Hawn, Davison) were aware of this practice while it occurred, as the

15   practice, insofar as OEFI was concerned, was in fact simply a ruse engineered by

16   Waggoner, OEFI and Leo Majich, with the knowledge of the union officers, to

17   allow OEFI employees (including Leo Majich and his daughter Teresa Goodell) to

18   have a disguised raise that was paid for with trust fund monies.

19      247.   OEFI and all Defendant Trustees, as well as OEFI Chairman Ken

20   Bourguignon (also a Pension Fund Trustee), breached their fiduciary duties under

21   ERISA § 404(a) by allowing this conduct to occur.   The Trustees, with their duties

22   of loyalty and prudence and their related obligation to act with the purpose of

23   defraying fund expenses under § 404(a)(1), were required to reasonably monitor

24   trust fund outlays to ensure that the Trusts on which they sat were not improperly

25   paying thousands of dollars for OEFI and Trust employee FICA taxes.   The

26   Trustees also had a duty to jointly manage and control plan assets and to exercise

27   reasonable care to prevent fiduciary breaches by co-Trustees, under ERISA §

28   405(b).  They breached this duty by allowing Defendant Waggoner to engage in

whatever improper conduct he wished to engage in by, for example, entirely deferring to him on all matters of compensation to OEFI and Trust employees. These Defendants, including Waggoner, the other Trustee defendants, and OEFI, are liable to make good on the losses to the Trusts resulting from the improper payment of payroll taxes.  *See* ERISA § 409, 29 U.S.C. § 1109; ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

248.   Michael Graydon discontinued this practice when he learned of it in 2010 (though it may well have resumed when Joe Erhbar, Leo Majich's protégé, took over after Graydon's termination).   Plaintiffs were not aware of the practice until 2013.   Mr. Graydon first discontinued the practice with respect to the employees of OEFI, the Pension Fund, Health & Welfare Fund, and Vacation Fund, and, shortly thereafter, the OETT.

249.   The Trustees of the three Trusts sued herein, including the management-side Trustees who did not participate directly in the practice themselves, have all had knowledge of this practice for some time, but have taken no steps to remedy the misconduct, such as demanding reimbursement of the misused funds from employees or, in the alternative, from Waggoner and Kenneth Bourguignon, OEFI's Chairman at relevant times.   They are therefore all liable as co-fiduciaries under ERISA § 405(c) for, at minimum, failing to take steps to remedy the loss of fund monies for such non-fund purposes after they became aware of the losses.

250.   In addition, fiduciary Defendants Waggoner, OEFI and OEFI Chairman Kenneth Bourguignon are liable under § 406(a) for causing prohibited transactions between the Trusts and parties in interest, in that paying employees shares of FICA taxes resulted in the improper transfer of fund monies for the use or benefit of parties in interest, namely employees of OEFI (29 U.S.C. § 1002(14(g)). Defendants Waggoner and Kenneth Bourguignon are liable to make good for the losses on this additional basis.

### 13.    The Pension Fund Defendant Trustees Violated ERISA by Making Extra Pension Payments to Retirees Who Have Been Waggoner's Most Loyal Voting Bloc

251.   The Pension Fund Defendant Trustees for many years approved, or at least knowingly acquiesced in, Waggoner's longstanding practice of issuing a thirteenth (i.e., additional) annual pension payment to retirees at the end of each year, which was done for the purpose of securing votes for Waggoner and his slate from retirees, a group that is typically has the highest participation rate in union elections.

252.   This *additional* payment to retirees, which occurred through the end of 2011, was not planned for in retirees' original contributions.  It places additional stress on the Pension Fund and certainly not is consistent with any purpose to ensure the continuing soundness of the Plan.   To their (very belated) credit, the Trustees finally discontinued the practice in 2012 because of the restoration status of the Plan, which, as previously alleged, is in critical condition.   Giving extra pension payments to retirees while actually demanding restoration payments from members was too much even for the Pension Fund Defendant Trustees.

253.   However, by allowing this practice in prior years, including through the end of 2011, they violated their duty of loyalty owed to all Plan participants and beneficiaries, as well as their duty of prudence, since no prudent man would act in such a fashion under similar circumstances.   Assisting Waggoner in ensuring his re-election as Business Manager and his ability to continue his illegal practices does not qualify as prudence under ERISA.   Further, the duty of loyalty is owed to the Plan and its participants and beneficiaries, not to William Waggoner.   As such, the Plan Trustees breached their fiduciary duties under § 404(a) by approving and enabling this practice and knowingly allowing it to continue through 2011.

254.   By paying millions of dollars of extra Pension Fund benefits to retirees not contemplated by their contributions and by incurring the extra associated administration costs of doing so, in order to serve Waggoner's political purposes, the Plan Trustees breached their fiduciaries duties under § 404(a)(1)(A) (duty of loyalty) to act solely in the interests of Plan participants and beneficiaries and for the purpose of defraying reasonable administration expenses  and § 404(a)(1)(B) (duty of prudence), since paying out additional pension fund benefits, to the detriment of the Plan as a whole, for such political reasons is not consistent with ensuring the solvency and continuation of the Plan.

### 14.   William Waggoner Maintained Incompetent Employer Trustees on the Local 12 Associated Trusts to Guarantee That He Controlled Those Trusts

#### a)   *C.W. Poss*

255.   In recent years, defendant C.W. Poss has become mentally incompetent and unfit to serve in any fiduciary role.  William Waggoner and every Trustee that has observed Mr. Poss are aware of his mental incompetence.

256.   Defendants William Waggoner, Adams, Sikorski, Hawn, Davison, Don Bourguignon, Von Berg, Hulse, Gomez, and Cooksey, all observed the gradual deterioration of Mr. Poss into incompetence and incontinence by virtue of physically observing him at OETT Trustee meetings, particularly in the last few years.

257.   Despite the foregoing, William Waggoner, until 2013, continued to support Mr. Poss's service as a Trustee on multiple Trusts.  Not one Trustee ever attempted to remove Mr. Poss due to incompetence.

258.   Earlier this year, after being sued in this action, Mr. Poss resigned from certain of his Trustee positions.   In previous years, Mr. Poss was mentally competent to serve as a Trustee yet breached his fiduciary duties under ERISA by,

**FOURTH AMENDED CLASS ACTION COMPLAINT**

among other things, serving as a Trustee while his own company was not making required contributions to the funds on which he sat a as Trustee.

### b)    *Kenneth Bourguignon*

259.   In recent years, Pension Fund Trustee Kenneth Bourguignon has become physically unable to review documents that he is required by Waggoner to sign, and no other defendant Trustee has, to Plaintiffs' knowledge, taken any action to ensure that Kenneth Bourguignon is informed of and understands the content of documents he signs.  Nevertheless, Mr. Bourguignon has been allowed to remain as a Trustee and, until recently, as the Chairman of OEFI, which provides administration services for all of the Local 12 associated funds.  Likewise, the other Defendant Trustees who have served with Mr. Bourguignon have not, on information and belief, taken any action to have him removed despite knowing of his inability and failure to perform his duties.

260.   Maintaining incompetent Trustees, as alleged above, is a violation of the fiduciary duties of Defendant Waggoner and the Trustees who have served with Messrs. Poss and Bourguignon.   Such conduct plainly is not consistent with the duty to act solely in the interests of participants and beneficiaries, nor does it satisfy ERISA § 404(a)(1)'s requirement that trustees act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."   No prudent man would allow incompetent Trustees to continue to oversee the affairs of a business worth billions of dollars, though here both Poss and Bourguignon were allowed to continue to serve on the Board of a Pension Fund with nearly two billion dollars in assets.   The fact that Poss finally resigned from the Pension Fund and Health & Welfare Fund Boards after allegations of improper write-offs of his company's delinquent contributions to the Local 12 Trusts were raised by Plaintiffs in this case does not

diminish the fact that he sat on these Boards for some period of time without the consistent mental faculties to satisfy his fiduciary duties.

**D.** **Defendant Waggoner and His Fellow Officer Defendants Embezzled, Diverted and Misused Union Assets, Harming Local 12 and Its Members**

### 1. The Weak State of Local 12's General Fund

261.   One of the more tragic aspects of the Local 12 Officer Defendants' rampant misuse of Local 12 assets, as detailed below, is the dire financial impact on Local 12's General Fund.   Despite Local 12's poor financial condition, Defendants continue to misuse and embezzle its assets, thereby further worsening its financial condition.

262.   In 2010, the union's General Fund lost $5,727,742, according to William Waggoner.

263.   The General Fund also lost millions of dollars in 2011 and 2012 and, it is believed, in 2013.

264.   To address this deficit, Waggoner and the Local 12 Executive Board recommended asking Local 12 employees to take two days off without pay.  A true and correct copy of William Waggoner's letter is attached hereto as Exhibit "3." Employees, including Plaintiff Salas, were ultimately required to give up days of work to address the General Fund deficit.  Meanwhile, as shown below, Waggoner continues to misuse the union's jet, printing press and other assets, without compensation to the union to the detriment of its General Fund.

1

2. **Misconduct Regarding the Union Jet**

a) *Defendants William Waggoner, Patty Waggoner, Kenneth Waggoner, Mickey Adams, Ron Sikorski, Larry Davison, Dan Hawn, and Others Used Local 12's Aircraft for Their Personal Use*

265.   In 2002, Local 12 purchased a 2001 Cessna Citation XL jet ("the Local 12 jet"), with registration number N705SG.  The reported value of the Local 12 jet in 2002 was $8,644,396.00.  The value reported was false, because the Local 12 jet, though claimed by Waggoner to be new, was actually previously owned, which diminished its actual value.  The nine-passenger cabin was appointed with, among other things, leather seats, a couch, a lavatory, walnut trim, 110-volt electrical outlets, 4 writing tables, and a wine caddy.  The plane is pictured below:



Waggoner convinced the Executive Board to approve the purchase as an investment because, as promised by Waggoner, the "new" Local 12 jet would be leased when it was not in use (at least 51% of the time, as projected by Waggoner), generating

income.  In fact, Local 12 has never reported lease income for the Local 12 jet.

266.    In both 2009 and 2010, the Local 12 jet was advertised for lease.  In 2009, the advertised hourly lease rate was $3,325 per hour.  Yet to Plaintiffs' knowledge, no lease proceeds were ever reported in any LM-2 filing by Local 12. Assuming there *were* lease proceeds, Local 12 either failed to report them or they were received by an entity or person(s) other than Local 12, despite being the property of Local 12.  Since the filing of this action, the website listing for the Local 12 jet is no longer available.  The agent handling lease arrangements for the Local 12 jet was Guardian Air, owned by James Previti. A parent company of Guardian Air, KMR Aviation, served as the custodian of records for the Local 12 jet.

267.   In the 2010 LM-2 filing, the value of the Local 12 jet is not reported or not accurately reported.  The total value of reported "other fixed assets" is $11,342.00, far below the value of the Local 12 jet.   Likewise, in the 2011 LM-2 filing, the value of the Local 12 jet is not reported or not accurately reported.  The total value of reported "other fixed assets" is $22,560.00, far below the value of the Local 12 jet.

268.   William Waggoner required the union officers, who frequently travelled in the Local 12 aircraft, to occasionally take commercial flights "just to make it look good."   There was no need for Local 12 to purchase the Local 12 jet, as the locations where this aircraft flew and does fly are adequately serviced by commercial airlines.

269.   Defendant Vince Giblin utilized the Local 12 jet on multiple occasions without compensating Local 12 for the rental time and expense of operating the plane, including in 2009.  Defendant Giblin thus embezzled union assets, and the Defendant union officers, in breach of their fiduciary duties to members, let him do so.

270.   There are numerous instances in which William Waggoner and/or Patricia Waggoner have used the Local 12 jet for personal travel.  For example, William Waggoner flew to Bakersfield to attend the August 25, 2011 Ray Price concert.  Local 12 paid for that excursion.  William Waggoner also used the Local 12 jet to attend rodeo and NASCAR events in Las Vegas.  The rodeo events were annual trips for Waggoner.  There were no scheduled district meetings at the time of this roundtrip flight to Las Vegas.  The entire Waggoner family flew to Las Vegas to attend the wedding of Margaret Hammond, the former babysitter for Kenneth Waggoner.  None of the costs of these trips were reimbursed to Local 12, which had to pay the costs associated with the use of the Local 12 jet.

271.   On or about August 30, 2007, Waggoner used the Local 12 jet to fly to Bakersfield to attend the funeral of Dolly Adams, Mickey Adams' mother.  On this occasion, Waggoner and Local 12 chartered a second plane from Guardian Air (Air Charter operated by KMR Aviation Inc., certificate #DCUA716B), a King Air 200 (tail number N505SP or N550SP) to transport additional line officers and additional Local 12 headquarters staff to Ms. Adams's funeral. KMR notes that its King Air 200 aircraft are available to charter for hourly rates of $1,840 to $1,995. On information and belief, at least $8,000 was spent by Local 12 for the charter of the KMR King Air 200 flight to Bakersfield, California.  In addition to attending the funeral, Waggoner insisted that all of the Local 12 staff join him for lunch at his favorite Basque restaurant, the Wool Growers Restaurant in Bakersfield, which he paid for using Local 12 funds.  The members of Local 12 were not advised of this misuse of union assets and had no way to discover the misuse until learning of it within approximately the last year, after  a former union employee provided information about the systemic misuse of Local 12 assets in the form of unnecessary jet flights.

272.   Approximately three years ago, the mother-in-law of Mickey Adams died north of Las Vegas, Nevada. The Local 12 jet flew a few officers and the

Adams family to the funeral, including the family pet, a guide dog who traveled to the funeral in Bakersfield sitting in Waggoner's usual seat on the jet.  Local 12's general fund (and thus, its members) bore the expenses of this personal travel and, on information and belief, Local 12 and its general fund received no compensation or reimbursement from the passengers or anyone else for this personal use of Local 12's jet.

273.   Patty Waggoner also used the Local 12 jet for her own personal travel. For example, Mrs. Waggoner would use the Local 12 jet to fly to Las Vegas for shopping and golfing trips.  She sometimes travelled with a representative of ProBiz Bank, Valerie Prince, who brokered a $10 million loan to Local 12's Health & Welfare Fund, as discussed in Section IV.C.5 above, and/or other personal friends.  Patricia Waggoner also used the Local 12 jet to go on shopping trips with Maritza Adams, Mickey Adams' wife, and golfing trips with her son, Kenneth Waggoner.   On information and belief, the Local 12 General Fund received no reimbursement or compensation for this personal use of Local 12's jet.

274.   On flights to the east coast or the Midwest in the Local 12 jet, William Waggoner would stop over in Lawrence, Kansas to visit his brother and refuel the Local 12 jet, despite higher fuel costs for refueling there. On one such occasion, on or about September 16, 2009, on a return flight to Van Nuys, California from the AFL-CIO National Convention held in Pittsburgh, PA, the entire Local 12 contingent of officers had lunch with Geno in Lawrence, Kansas.[8]

---

[8] That trip can be documented in multiple ways, due to the coincidental involvement of local police.  Upon landing in Lawrence, Kansas, co-pilot Robert Squillace retrieved calls from the Pittsburgh Police Department asking for information on William C. Waggoner.  The reason for the calls was that William Waggoner had left Pittsburgh without paying a taxi fare in full, shorting the driver out of $120.00.  The driver contacted the police after advising Waggoner he was going to do so, to which Waggoner responded that  the police could catch the jet as it was running down the runway.  Upon speaking to the Pittsburgh police while in Lawrence, Robert Squillace denied to the officer he was speaking with that he had any knowledge of who was on the Local 12 jet, and, more specifically, denied that he knew William Waggoner.

275.   Through parts of 2009 and 2010, Maritza Adams, defendant Mickey Adams' wife, was frequently a guest on the Local 12 jet for the personal purpose of visiting her mother in Henderson, Nevada.  Later, while her mother was in an assisted living facility north of Las Vegas, Maritza Adams also frequently took the Local 12 jet to visit her mother at that facility.  On information and belief, the Local 12 General Fund received no reimbursement or compensation for this personal use of the Local 12 jet.

276.   Kenneth D. Waggoner, William Waggoner's son, was shuttled back and forth to college in Santa Clara on the Local 12 jet.  Local 12 was not reimbursed for this personal use of Local 12's property.  Kenneth Waggoner also used the jet with his mother, Patricia Waggoner, to shop and play golf in Las Vegas, Nevada and at Rancho Murieta, California.   On information and belief, the Local 12 General Fund received no reimbursement for this personal use of Local 12's jet.

277.   On or about April 9, 2012, Susan Holmes, an administrative employee at Local 12, along with her husband, Jim, flew on Local 12's jet to Washington D.C. The flight included Ron Sikorski, Mickey Adams, William and Patty Waggoner, and Dennis Lundy. The primary purpose of the trip was for William Waggoner to attend the IUOE General Executive Board Meeting.  There is no legitimate reason that that Susan and Jim Holmes or Patty Waggoner should have been included in that flight, and no apparent reason for the other officers or Dennis Lundy, an IUOE employee in the Western United States, to be on that flight.  Only Waggoner could attend the GEB meeting.   The group returned on or about April 12, 2012.  On information and belief, consistent with customary practice, the passengers on that flight stayed at the Washington Court Hotel without compensating Local 12 or its Pension Fund, which owns the hotel.

278.   Whenever Waggoner traveled any significant distance on the Local 12 jet, he required a poker cabal to accompany him (consisting, at various times, of the

other defendant officers of Local 12 and anyone else that Waggoner directed to accompany him on the Local 12 jet), irrespective of whether his poker companions had any legitimate business purpose for accompanying Waggoner on the Local 12 jet.  For example, when Waggoner would travel to the East Coast to attend IUOE GEB meetings, he would take officers of Local 12 and others with him, just to play poker, even though his poker companions had no reason to accompany Waggoner to an IUOE GEB meeting.  As they were not members of the GEB, the poker companions were not permitted to attend GEB meetings.

279.   In virtually every instance where William Waggoner used the Local 12 jet, he would require the pilots to fly the Local 12 jet from Ontario, California, where it was stored, to Van Nuys, California, because it was slightly closer to his home than the Ontario airport and the traffic was better.  Each of these short hops, requiring an extra landing and takeoff, cost Local 12 roughly $2,000 in additional fuel charges.  These additional charges, which caused damage to Local 12's General Fund and to its members, are an abuse by fiduciaries to the union and amount to embezzlement of union funds for personal benefit.

280.   Operation of aircraft by Local 12 imposed a substantial cost over many years on the members of Local 12.   The expensive operation of such aircraft is responsible, in part, for the supplemental dues payments imposed on members, including Plaintiffs.  By way of example only, as reported in Local 12's 2007 LM-2 report, pilot salaries of $156,370.00 and total disbursements to pilots of $186,811.00 were reported.  Transactions involving aircraft were reported in General Overhead, in amounts of $40,835, $136,464, $59,829, $36,138, $149,331, $ 5337, $49,119, $18,700, $204,034, totalling $699,787.00.

281.   Even after the filing of this action and in the midst of investigation regarding jet use by federal authorities, the willful misuse of union money in the form of frivolous jet flights has continued.  For example, on December 5, 2013, Defendant Mickey Adams, Defendant Ron Sikorski and John Adams (a Business

1   Representative for Local 12 in Bakersfield and Adams's nephew) flew from

2   Ontario, California to San Diego for a meeting with Granite Construction, at an

3   effective operational cost that likely exceeds $10,000, when they could have made

4   the two-hour drive in a union vehicle for the price of gas.  Particularly when union

5   members are perpetually being forced to replenish the General Fund of Local 12,

6   this extravagant misuse of Local 12's money is a breach of the fiduciary duties

7   owed to Local 12 and its members.

8   　　　282.   In sum, Defendants William Waggoner, Patty Waggoner, Kenneth

9   Waggoner, Mickey Adams, Ron Sikorski, Larry Davison, Dan Hawn, Dan Billy

10  and others used the Local 12 jet for their personal use, failed to account anywhere

11  for revenues that may have been generated by that jet which was advertised as

12  available for charter rental, and falsified many years of LM-2 filings to conceal

13  activities, and costs, and asset values from discovery by Local 12 members.

14  　　　　　　**b)**   *Defendants Waggoner and the Local 12 Officers Hid the*

15  　　　　　　*Misuse and Cost of the Jet By Falsely Claiming Its Fuel*

16  　　　　　　*Costs Represented Automobile Lease Charges*

17  　　　283.   Local 12 has consistently purchased its vehicle fleet from Ford and

18  services its own vehicles, but its LM-2 filings since at least 2006 show inexplicably

19  variable expenditures classified as "auto leasing and maintenance."  On past LM-2

20  filings, Defendant Waggoner has reported payments to Wright Express Fleet

21  Services, Inc. and Fleet Services, Inc.  In 2011, these expenditures totaled

22  $281,153.00.  However, the monthly payments vary by as much as fifty percent.

23  These charges are neither automobile lease payments nor automobile fuel charges,

24  but rather charges for jet fuel, which Waggoner was hiding to conceal the cost to

25  Local 12 of owning and operating the Local 12 jet.

26  　　　284.   On the most recent LM-2 for 2012, dated March 12, 2013, Waggoner

27  finally reported the true nature of the fuel expenses that he had previously

28  camouflaged as vehicle lease expenses.  In the 2012 LM-2, payments to Wright

1   Express *Financial* Services, Inc. are classified as "Transportation Equipment Fuel."

2   The company is classified as a "Gas and Oil Company."  In addition, nearly

3   $100,000 in costs are listed as "Transportation Equipment Fuel" provided by

4   Guardian Jet Center.  There is also a $36,588 payment to Guardian Air Services

5   LLC for additional expenses associated with the jet.  Since Guardian Air Services

6   also appeared on the 2011 LM-2 form, receiving a nearly identical payment, it

7   appears that the payment to Guardian Air Services represents storage charges, not

8   fuel charges.

9       285.   Waggoner's prior false filings violate Title II of the LMRDA, 29

10  U.S.C. §§ 431 and 432.   The destruction of records by Local 12 subsequent to the

11  filing of this lawsuit infringes upon the rights of every member of Local 12 to

12  freely access all of the information underlying the reports filed by Waggoner.  The

13  allegations contained herein provide the just cause for the right to examine any

14  books, records, and accounts necessary to verify such reports by Waggoner, which

15  should be retained for a minimum of five years.  29 U.S.C. § 436.

16      286.   On information and belief, since the filing of this action, federal

17  criminal authorities have begun actively investigating, and are considering filing

18  criminal charges related to, Defendants' misuse of the Local 12 jet.

19          **c)**     *William Waggoner Provided Politicians With*

20                  *Transportation on the Local 12 Jet, But that In-Kind*

21                  *Contribution Was Frequently Not Reported*

22      287.   Hilda Solis' congressional election campaign in 2008 was heavily

23  funded by the Operating Engineers and other unions.  In fact, during her time in

24  Congress (2001-09), she received more than $900,000 in contributions from unions

25  (not including the in-kind contributions discussed below).  Ms. Solis flew on Local

26  12's Cessna jet while serving in Congress, though it appears that she failed to

27  report the in-kind contributions from Local 12.

28      288.   Defendant Waggoner announced at the Western Conference (where he

1  was and remains the Director) that Ms. Solis had been flown to Washington D.C.

2  on the Local 12 Jet around the time that she was under active consideration and

3  confirmation for Labor Secretary in 2009.  Waggoner bragged openly that he was

4  flying Solis back to Washington D.C. for this purpose.  Vince Giblin responded to

5  this boasting by declaring, "We finally have a friend in the Department of Labor."

6  He then chastised other Business Managers for failing to make similar investments

7  in political candidates.

8  289.  In late 2012, Waggoner flew Larry Hopkins and Ron Havlick to

9  Washington D.C. to meet with Ms. Solis over a Local 12 problem involving the

10  Department of Labor ("DOL") when Waggoner believed that legal action was

11  imminent.  An article discussing Ms. Solis's policy of protecting unions is attached

12  as Exhibit "5", and there is little doubt about her close ties to Local 12, Waggoner,

13  and IUOE as pictured below:



**FOURTH AMENDED CLASS ACTION COMPLAINT**

290.   A comprehensive review of the 2008 election cycle data maintained by the Federal Election Commission, current through March 2013, shows no in-kind contributions from Local 12, whether in the form of Cessna jet time, or literature printing and postage provided by the Local 12 printing press operations for that election cycle.

291.   On information and belief, other politicians, including certain members of Congress, were also recipients of in-kind contributions consisting of uncompensated, undisclosed transportation on the Local 12 jet, sometimes as part of a detour trip when the Local 12 jet was en route for some other purpose. Waggoner (who had the exclusive authority to direct the destinations of the Local 12 jet), through this deceit, misused assets of Local 12 for the benefit of Local 12's PAC, which was not paying for the Cessna jet time and expense associated with these in-kind contributions.

292.   Local 12's General Fund and its members, including Plaintiffs, were harmed as a result of this misuse of the union's valuable jet which could and should have been leased out to financially benefit the union, or, if it could not be leased for some reason, at least left in its hangar when not needed for union business, rather than being misused at high operating costs and without compensation to the union by Waggoner for his personal benefit and the benefit of his relatives, friends and favored politicians.

293.   In sum, William Waggoner provided politicians with transportation on the Local 12 jet, but that in-kind contribution was frequently not paid for or reported.  Officers of Local 12, including Mickey Adams, Ron Sikorski, Larry Davison and Dan Hawn were aware of Waggoner's misuse of Local 12 assets, but did nothing to stop it and helped to conceal it from the members of Local 12.

FOURTH AMENDED CLASS ACTION COMPLAINT

1

2

### 3.   Fiduciary Breaches with Respect to Local 12's Printing Press Operations

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

294.   Local 12 owns a large Heidelberg printing press.  Local 501 ordered 10,000 calendars annually from Waggoner and Local 12.  Local 501 paid at least $1.25 for each calendar, resulting in orders of at least $12,500 in printing annually for Local 501. The income to Local 12 from this Local 501 purchase order appears nowhere on Local 12's IRS 990s or LM-2s, but the Local 12 assigned union "bug" appears on each and every calendar.  On information and belief, the printing press revenue was kept by Waggoner.

295.   An identical press operated by Local 3 reports income to Local 3 in excess of $250,000 per year.  With the same press and similar supporting staff, it is likely that Local 12 is receiving more than $250,000 in revenue per year for printing, but those revenues are not reported by Local 12, indicating that the funds are not accounted for in any filing by Local 12.  This is significant because Local 12 bears the cost of the press operation and its consumables.  Waggoner, by failing to report revenues and expenditures as required by law, was able to conceal the diversion of assets from Local 12 for, among other things, the benefit of Local 12's PAC, which was not paying for the printing expenses.  Thus, while Local 12 continued to print campaign materials for politicians at Waggoner's instruction, he failed to have the union's Political Action Fund reimburse its financially weak General Fund for the massive amount of printing supplies that Local 12 purchased and the labor costs that Local 12 incurred.  The union and its members were harmed as a result.

296.   In 2010, Local 12 provided campaign support to a Senator's campaign in the form of ten full-time Local 12 employees (business agents and organizers), rotated into Las Vegas on a weekly basis for roughly six weeks.  This effort was part of an IUOE program, manned by Jeff Fiedler (Director of Special Operations for IUOE), lobbyist Tim Cremins (Director of Education and Research for the

**FOURTH AMENDED CLASS ACTION COMPLAINT**

IUOE California-Nevada Conference of Operating Engineers), Richard Pound, Richard Spencer, and Dennis Lundy (Western Regional Director for IUOE), to support this politician.  In addition to providing manpower, Local 12 supplied printed campaign materials for the politician's campaign.  The materials were printed on the Local 12 printing press, the material costs for the printing were paid by Local 12 (not the Political Action Fund), and then the materials were flown to Las Vegas on the Local 12 jet.  The ten-member Local 12 team, all paid out of Local 12's payroll account, then distributed these printed materials for the Senator's campaign effort.    Under Title V of the LMRDA, members were injured as a result of embezzlement from Local 12, to the benefit of others.

297.   Defendants Sikorski, Adams, Hawn and Davison were aware of the embezzlement from Local 12, to the benefit of others, but they did nothing to stop it and helped to conceal the embezzlement from members of Local 12.

298.   Since the initial filing of this lawsuit, Local 12 has attempted to hide the widespread non-reporting by filing its own amended contribution reports.  The problem with this concealment tactic is that there is no coordination with those candidates who reported some contributions from a different contributing entity, namely, the Local 12 Political Action Fund.  Now Local 12 is in the position of having recently amended its reports to claim that *it* donated in-kind contributions, when, years ago, the candidate reported a contribution from the Political Action Fund.  As to those politicians who never reported an in-kind contribution, at least Local 12's suspiciously late amended reporting does not have to be reconciled with an inconsistent filing by a politician.  Notably, Local 12 failed to amend reporting for the in-kind contributions to Hilda Solis and the Nevada Senator.  These falsified filings tolled members' obligation to bring suit under Title V of the LMRDA.

FOURTH AMENDED CLASS ACTION COMPLAINT

1       **4.**   **William and Patty Waggoner Embezzled Union Assets When**

2              **Waggoner Allowed His Wife to Use a Local 12 Ford Flex**

3              **Without Justification**

4       299.   For at least six months in 2012, Patty Waggoner was provided access

5   to a Ford Flex owned by Local 12.  Patty Waggoner frequently drove the vehicle to

6   her house.  Patty Waggoner also used the vehicle while conducting business as the

7   Vice President of Amalgamated Bank and as a board member of the Pasadena

8   Chamber of Commerce, while socializing with friends, and while golfing.  Patty

9   Waggoner could not be properly authorized to utilize that vehicle because she was

10   not an employee of Local 12 or any related entity or Fund.  Her use of Local 12

11   property constitutes the embezzlement of union assets.  Her husband, William

12   Waggoner, knew of and allowed that embezzlement; by allowing her to use the

13   Flex, as well as the Local 12 jet as previously alleged, he defrayed his household's

14   transportation costs.

15       300.   Plaintiffs and all Local 12 members, as well as the union itself, were

16   harmed as a result of embezzlement of Local 12 assets by Patty Waggoner.  Her

17   improper use of a Local 12 vehicle increased the fuel expenses for Local 12 and

18   deprived Local 12 of the fair market value of the vehicle usage.

19       301.   William Waggoner's conduct violated Title II of the LMRDA by

20   failing to disclose the frequent use of the union's vehicle by a family member,

21   which also benefits him by defraying the costs of alternative transportation.

22

23       **5.**   **William Waggoner and Kenneth Waggoner Conspired to**

24              **Allow the Latter to Embezzle Union Assets and Services**

25       302.   On at least one occasion in 2009, Kenneth Waggoner charged his

26   expenses at the Washington Court Hotel to the Presidential Suite he shared with his

27   mother and father, knowing that those expenses ultimately would be paid by Local

28   12 (as they were).   In doing so, Kenneth Waggoner was, in effect, stealing from

Local 12.   For his part, William Waggoner -- who obviously knew the charges that he was paying for his (and his son's) hotel stay -- breached his fiduciary duties to the union and its members by allowing his son's expenses to be charged to Local 12 even though his son was not performing Local 12 business at the time.

303.   Kenneth Waggoner also had Local 12 employees Max Gomez and Christopher Totten, who were on the clock at Local 12, work extensively on construction projects at the home he co-owned with William and Patty Waggoner. In doing so, Kenneth Waggoner was embezzling from Local 12, for the benefit of both himself and his parents, the co-owners of the home.  William Waggoner was fully aware that his son was having Local 12 employees do work at this property, while on Local 12's payroll, and Waggoner breached his fiduciary duties under common law and under Section 501 of the LMRDA to the union and its members by allowing his son to misuse union assets, services and labor in this fashion for personal use.   Kenneth Waggoner, for his part, unjustly enriched himself at the expense of Local 12's members.

304.   The Local 12 Officer Defendants, other than Waggoner, were, and certainly now are, aware that Kenneth Waggoner has unjustly enriched himself in the manner alleged above.   Yet they have taken no steps to halt or remedy his misconduct, including, for example, demanding that he reimburse the union, in breach of their own fiduciary duties to Local 12 and its members.

## 6.   Waggoner and His Fellow Defendant Officers and Administrators Embezzle Union Funds to Subsidize Their Expensive Food and Alcohol Tastes

305.   As other Defendants have known for some time, defendants William Waggoner and Mickey Adams are and have for many years been heavy drinkers, frequently consuming several cocktails at lunch and continuing to drink throughout the day.  Their very expensive lunches, at which alcohol is generally consumed,

1   have, in many instances in the past, been *paid for with union credit cards*, with no

2   reimbursement to the union.   Generally, there was no business purpose for their

3   lunches, which frequently occurred at Colombo's (and occasionally Beckham's),

4   and, in any event, there was no business purpose to consuming several cocktails at

5   lunch at the cost of the union, particularly given the poor financial condition of its

6   General Fund.  In past years, unbeknownst to Plaintiffs and most members, the

7   officers would take turns charging the lunches to their Local 12 credit cards, for

8   lunches often costing $300 or more, so that the lunch bills would not all appear on

9   one officer's charge card bill.  These charges using Local 12 credit cards for

10  expensive lunches and alcohol were concealed from Plaintiffs and other members,

11  and Plaintiffs only learned about them recently from a former officer.

12      306.   Defendants breach their fiduciary duties to the union and its members

13  by financing their expensive eating and drinking habits with union monies,

14  particularly with a General Fund in as poor a condition as Local 12's.

15      307.   As his officer co-defendants know, William Waggoner has in fact

16  regularly been under the influence of alcohol while acting as Business Manager and

17  as Trustee in the various trusts on which he sits.  Such conduct is in breach of his

18  fiduciary duties to union members and trust beneficiaries, since regularly being

19  intoxicated while serving as a business manager and as a trustee can hardly be

20  deemed consistent with one's duties to ensure that members' rights are protected.

21      308.   It is the practice of certain Local 12 officers, Trustees and other Local

22  12 staff members to drink alcohol at essentially all union functions.  Alcohol

23  consumption during work hours is rampant and has the tacit approval by example

24  of the Local 12 officers, including Waggoner himself.  Staff members with Local

25  12-issued credit cards have used those credit cards to purchase alcoholic beverages

26  on a frequent basis.  Waggoner's allowing them to do so is a breach of his fiduciary

27  duties to members, as the union and its members should not be forced to pay for the

28  alcohol consumption of Waggoner and his staff.   These staff members then

1   sometimes drive Local 12-issued vehicles while intoxicated, placing the Local and

2   its members at risk of serious financial liability in the event innocent members of

3   the public are harmed by such intoxicated drivers.

4       309.   At all times relevant, William Waggoner acquiesces to this situation by

5   continuing to cover the cost of insurance increases due to the DWI or DUI

6   convictions of his employees or staff at Local 12 who continue to utilize union-

7   issued vehicles.

8       310.   For years, including within the last several years, at Local 12

9   Executive Board meetings at Local 12's Pasadena headquarters a fully stocked

10  open bar, with alcohol purchased with union funds, would be available to board

11  members following the meetings, both before lunch was served and during lunch.

12  After lunch, meeting business would continue.  It is by no means necessary or

13  consistent with the Defendant Officers' fiduciary duties to Local 12 and its

14  members for Local 12 to pay for liquor at Executive Board meetings for

15  Defendants and the other E-Board members, particularly when, as previously

16  discussed, Local 12's General Fund is and has for some time been in poor financial

17  condition.

18      311.   Waggoner's own wife Patricia Waggoner has driven a Local 12-owned

19  Ford Flex on numerous occasions during the last year after drinking, electing to use

20  a union vehicle at no cost to her in part because of the inconvenience to her posed

21  by the alcohol-detection device that was installed in her own vehicle due to her

22  own DUI history.  Waggoner's allowing his wife to use a union vehicle for non-

23  union business without compensation to the union – at least in part for the intended

24  purpose of enabling her to drive a union vehicle while intoxicated without detection

25  - is a breach of his fiduciary duties to the union and its members. The alcohol

26  consumption is so rampant at Local 12 that the Local 12 jet's carry-on bar is

27  generally replenished by the line officers, Mickey Adams in particular, before it

28  takes off.  Defendant Adams' practice has normally been to take a large rolling

1   briefcase to Local 12's main office when the jet's bar needs to be replenished.

2   Office employee Patricia Harvey (who generally has access to several hundred

3   dollars of petty cash in Local 12's office) then assures that the briefcase gets filled

4   with whatever is needed.  Generally, even on trips of less than 45 minutes of flying

5   time, the jet's carry-on bar contains many bottles of Tanqueray and Absolut Vodka,

6   the alcohol of choice of Waggoner and Adams.  This alcohol, on information and

7   belief, is paid for with union funds.  Defendants Waggoner, Adams and other

8   defendant officers who have purchased liquor with union funds for their jet trips -

9   trips which, as alleged above, are frequently not even union-related trips and often

10  include non-union guests - are embezzling union monies and breaching their

11  fiduciary duties to members, including Plaintiffs, by such conduct.

12        312.   Notably, the DOL has previously concluded that Local 12 officers and

13  Trustees, including Defendant Adams, violated ERISA by making "imprudent,

14  excessive and prohibited" charges at conferences, including alcohol charges, which

15  were improperly borne by the Health & Welfare Fund.  *See*, *e.g.,* pp. 1, 2 and 5 of

16  Exhibit 1 hereto (true and correct copy of March 1, 2007 correspondence from

17  Billy Beaver, Regional Director of the DOL's Employee Benefits Security

18  Administration ("EBSA") to Trusts counsel Chris Laquer, discussing substantial

19  bar tabs of Mickey Adams charged to the Health & Welfare Fund which EBSA

20  concluded were in violation of ERISA).  Mr. Adams evidently did not learn his

21  lesson, as he continues to charge food and alcohol purchases to the union in

22  violation of his fiduciary duties under common law and Section 501 of the

23  LMRDA.   For example, in recent years, under the guise of continuing union

24  business when going to lunch after a grievance or negotiation meeting, Defendant

25  Adams has often used his union credit card to buy lunch and drinks and then

26  attributes those expenses to the concluded meeting.

27

28

FOURTH AMENDED CLASS ACTION COMPLAINT

1
2
3

    **7.**    **Defendant Waggoner Has Diverted Assets from the Work Preservation (Strike) Fund and the Local 12 PAC to the General Fund**

4
5
6
7
8
9
10
11
12
13

    313.   The Strike Fund for Local 12 contains payments from members such as Plaintiff Salas, who is now working in the field following his termination as an employee of Local 12.  The Strike Fund is a benefit for members intended to protect them in the event that a strike prevents them from working.  Disregarding the promised purpose of the Strike Fund, Defendant Waggoner, in and around about 2002, 2009 and 2011, diverted money from the Strike Fund to the Local 12 General Fund to offset deficits in the Local 12 General Fund caused at least in part by the pandemic embezzlement of General Fund assets by William Waggoner and the other defendant officers of Local 12.  The funds diverted in 2002 were used as the down payment on the Local 12 jet.

14
15
16
17
18
19

    314.   The Strike Fund is not a Taft-Hartley-regulated fund.  Waggoner's conduct in connection with the diversion of assets from the Strike Fund violates his fiduciary duties under common law and under LMRDA § 501 and is harmful to the members whose monies are taken from the Strike Fund.   (While Waggoner has not called general strikes in the past, he has called strikes against certain employers, for assorted reasons.)

20
21
22
23

    315.   In 2013, Waggoner took money from the Local 12 PAC to shore up the ongoing deficit in the Local 12 General Fund.  He did so even though Local 12 members pay specific amounts into the Local 12 PAC for use exclusively by the Local 12 PAC.

24
25
26
27
28

**FOURTH AMENDED CLASS ACTION COMPLAINT**

1    **8.    Steve Montrie, Who was Convicted of Vehicular**
2    **Manslaughter in 2008 for Killing an Individual While**
3    **Driving a Union Vehicle Under the Influence of Alcohol,**
4    **Illegally Remains a Business Agent and Receives Tens of**
5    **Thousands of Dollars Per Year from Local 12**

6    316.   In December 2008, Local 12 Business Agent Steve Montrie admitted
7    to killing an individual while driving a Local 12 union vehicle under the influence
8    of alcohol.  Ron Sikorski, then the President of Local 12, was also present in the
9    union vehicle.  Using its influence with local officials, Local 12 secured a sentence
10   of vehicular manslaughter and Mr. Montrie was sentenced to three years in prison,
11   of which he served about 18 months.

12   317.   Immediately after his release, Mr. Montrie was employed again as a
13   Business Agent by Local 12, in violation of Section 504 of the LMRDA.
14   Defendant Waggoner was aware of the prohibition on hiring individuals convicted
15   of crimes inflicting great bodily injury or death, but nevertheless re-hired Mr.
16   Montrie.  Defendant Waggoner recently campaigned for the expungement of Mr.
17   Montrie's conviction so that Mr. Montrie could serve as a Local 12 officer,
18   confirming Waggoner's awareness of the restrictions imposed by § 504.  The
19   payment of a salary to Montrie, in violation of § 504 of the LMRDA, is a breach of
20   fiduciary duties by William Waggoner, Mickey Adams, Ron Sikorski, Larry
21   Davison and Dan Hawn.  Those breaches harmed the union, Plaintiffs and the
22   Class.

23   318.   Waggoner's protection of Montrie is inconsistent with Waggoner's
24   2004 Driver Safety Policy, which acknowledged that safe-driving agents should not
25   be punished or burdened by the reckless or careless drivers causing problems at
26   Local 12 (because the cost of insuring the safe drivers would increase, thereby
27   harming Local 12 itself).  Other Business Agents, including Business Agent Robert

28

**FOURTH AMENDED CLASS ACTION COMPLAINT**

Paris, were terminated for a DUI conviction. Waggoner's Policy and Memorandum is attached as Exhibit "4."

319.   Mr. Montrie's conduct was such that he could not be insured under the standard liability insurance purchased by Local 12 for all of its employees.  Instead, Mr. Montrie was separately insured through a high-risk individual policy.  This policy was extraordinarily expensive.  Patty Waggoner's friend AJ Longo provided that policy.  This policy was initially purchased before Montrie was sentenced.  After his release from prison, when Montrie was re-employed by Local 12, a similarly expensive policy was purchased for him using Local 12 funds.  It is a breach of fiduciary duty and an actual harm to members of Local 12, including Plaintiffs, to expend Local 12 assets for the unlawful employment of Montrie, in violation of § 504 of the LMRDA.

### E.   **Local 12's Leadership Has Used Threats of Violence, or Actual Violence, to Suppress Dissent**

320.   On September 18, 2012, Mr. Waggoner and the entire leadership team attended a Local 12 meeting in District 5.  At that meeting, Mr. Waggoner told Rodney Karr, who had sent Waggoner a letter raising various concerns about Local 12's operations, that "if you don't stop this shit, you're going to get hurt."

321.   Generally, Waggoner and/or his co-conspirators at general membership and District meetings assign large individuals to take up positions near microphones to intimidate any individual that might attempt to speak up in opposition.  Such conduct violates Title I, § 101(2) of the LRMDA Bill of Rights, particularly as to Plaintiff Salas, who is a working member of Local 12 and has seen such intimidation tactics at meetings.

322.   William Waggoner permits and/or condones acts of violence within Local 12 when those acts of violence are perpetrated by those who are friends of his or in the good graces of Local 12 officers or himself.

323.   During August of 2012, former Recording Secretary Kurt Glass was physically attacked by Local 12 President Mickey Adams.  This attack occurred following a meeting of the Board and was without provocation by Kurt Glass.  It was witnessed by defendants Sikorski and Hawn.  Other members subsequently heard about it.  Such conduct has a chilling effect on members' rights to express themselves freely.

324.   Local 12 and Waggoner took no steps to formally or informally discipline defendant Adams, nor, to the knowledge of Plaintiffs, did Waggoner or any other board members even instruct Adams or anyone else that this sort of physical violence was unacceptable and would subject violators to termination or other discipline in the future.

**G.**       **Litigation-Related Misconduct After the Filing of this Lawsuit**

325.   As of about November or December 2012, during the pendency of this litigation, records were being destroyed at the OETT Whittier training center by staff.  The records being destroyed are more recent records, rather than the very old files that date back to the 1970's.

326.   Two Teamster drivers, James Capen and John Bader, were completing the transfers from the State of Nevada to the Southern California training sites.  Many of these pieces of equipment exceed 8 feet in width and qualify as wide or oversize loads, requiring the use of a pilot car and permits from the Nevada Department of Transportation to complete.  Pursuant to DOT regulations, the drivers must stay overnight to comply with hours of service regulations.  These transfers, intended solely to conceal asset misuse involving the Trusts, are expensive.  Transfer costs of the equipment originally pirated and deleted from the OETT inventory have been borne by both the Nevada and Southern California Training Trusts.   Either way, the money should not have been spent, and Plaintiffs

1  and other fund beneficiaries and participants have been harmed by the depletion of

2  fund assets in this manner.

3

4  **V.  CLASS ACTION ALLEGATIONS**

5  327.  Plaintiffs bring this action individually, as well as on behalf of each

6  and all other persons similarly situated seeking class certification under Fed. R.

7  Civ. Pro. 23.

8  328.  The proposed Local 12 Member Class consists of and is defined as:

9  All individuals who are or have been members of Local 12 at any time
within the six years prior to the filing of this action. Excluded from
the Local 12 Member Class are all Defendants in this action, and all of
their current and former officers, directors, management employees,
successors, and wholly or partly owned subsidiaries or affiliated
companies; Class Counsel and their employees and members; all
persons within the third degree of relationship to any of the excluded
individuals and any judge who hears or decides any matter in this
litigation.

14  329.  The proposed Local 12 Fund Beneficiary Class consists of and is

15  defined as:

16  All individuals who are or have been participants or beneficiaries of
the IUOE Local 12 Pension Fund, Health & Welfare Fund and/or
Training Trust at any time within the six years prior to the filing of this
action. Excluded from the Local 12 Fund Beneficiary Class are all
Defendants in this action, all of the Defendants' family members, and
all of their current and former officers, directors, management
employees, successors, and wholly or partly owned subsidiaries or
affiliated companies; Class Counsel and their employees and members;
all persons within the third degree of relationship to any of the
excluded individuals and any judge who hears or decides any matter in
this litigation.

22  330.  The proposed EPEC Class consists of and is defined as:

23  All individuals who are or have been employees of IUOE Local 12 or
its affiliated entities, including OEFI and the Trusts, at any time within
the four years prior to the filing of this action and all Local 12
members who worked for any employer subject to a CBA that included
hourly contributions to the EPEC fund. Excluded from the EPEC
Class are all Defendants in this action, and all of their current and
former officers, directors, management employees, successors, and
wholly or partly owned subsidiaries or affiliated companies; Class
Counsel and their employees and members; all persons within the third
degree of relationship to any of the excluded individuals and any judge
who hears or decides any matter in this litigation.

**FOURTH AMENDED CLASS ACTION COMPLAINT**

331.   The proposed BA's Fund Class consists of and is defined as:

All individuals who are or have been employees of IUOE Local 12 or its affiliated entities, including OEFI and the Trusts, since the creation of the BA's Fund.  Excluded from the BA's Fund Class are all Defendants in this action, and all of their current and former officers, directors, management employees, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees and members; all persons within the third degree of relationship to any of the excluded individuals and any judge who hears or decides any matter in this litigation.

332.   The Local 12 Member Class, Local 12 Fund Beneficiary Class, EPEC Class and BA's Fund Class are hereinafter referred to collectively as the "Classes."

333.   Plaintiffs reserve the right to establish sub-classes, or modify any class or sub-class definition, as appropriate.

334.   At all material times, Plaintiffs have been members of the Local 12 Member Class and the Local 12 Fund Beneficiary Class.  Plaintiffs Chamberlain, Salas and Paxin are members of the EPEC Class.  Plaintiffs Chamberlain, Salas and Watson are members of the BA'S Fund Class.

335.   There is a well-defined community of interest in the litigation and the membership of the Classes is readily ascertainable from records in the possession of Local 12 and its affiliated entities.  Class certification pursuant to Fed. R. Civ. P. Rules 23(a) and (b)(3) with respect to the non-ERISA claims is appropriate because all of the elements required for such class certification are satisfied here:

(a)   Numerosity:  The members of the class (and each subclass, if any) are so numerous that joinder of all members would be unfeasible and impracticable.  The membership of the each of the Classes is unknown to Plaintiffs at this time, however, the Local 12 Member Class is estimated to be comprised of greater than 10,000 individuals and the identity of such membership is readily ascertainable by inspection of Defendants' records.  The same is true of the Local 12 Fund Beneficiary Class.   The size of the BA's Fund Class likely exceeds 100 individuals, and the

1          EPEC Class is likely comprised of thousands of individuals,

2          considering its inclusion of both employees and working

3          members subjected to mandatory contributions through CBA's.

4     (b)    <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the

5          other members of the Classes who they seek to represent.

6          Plaintiffs and the members of the Classes they seek to represent

7          were subjected to similar conduct, were damaged in a similar

8          fashion, and are advancing similar claims.  Like members of the

9          Classes, Plaintiffs were members of Local 12 and/or employees

10        of Local 12 and/or its affiliated entities within the class period,

11        and were injured in the same manner as all other members of the

12        Classes.

13    (c)    <u>Adequacy</u>:  Plaintiffs are qualified to, and will, fairly and

14        adequately protect the interests of each member of the Classes

15        with whom there is a shared, well-defined community of interest

16        and typicality of claims, as demonstrated herein.  Plaintiffs

17        acknowledge that Plaintiffs have an obligation to make known to

18        the Court any relationship, conflicts or differences with any

19        class member. To Plaintiffs' knowledge, there are no such

20        conflicts.  Plaintiffs' attorneys, the proposed class counsel, are

21        versed in the rules governing class action discovery,

22        certification, and settlement and very experienced in class action

23        litigation.

24    (d)    <u>Commonality and Predominance of Common Questions</u>:  There

25        are common questions of law and fact as to the Classes which

26        predominate over questions affecting only individual members,

27        and which can be answered with common evidence, including

28        but not limited to:

**FOURTH AMENDED CLASS ACTION COMPLAINT**

(i) Whether Defendants engaged in racketeering;

(ii) Whether Defendants breached fiduciary obligations to the Classes;

(iii) Whether Defendants engaged in unlawful or unfair business practices;

(iv) Whether the Local 12 Officer Defendants engaged in conversion in connection with the BA's Fund practice;

(v) Whether the EPEC contributions scheme constitutes RICO, violations of the UCL, breaches of fiduciary duty, and/or, insofar as Trust monies were diverted to the IUOE as a party in interest, violations of ERISA; and,

(vi) The appropriate amount of damages, restitution, or monetary penalties resulting from Defendants' violations of law.

(e) Superiority:  A Class Action is superior to other available methods for the fair and efficient adjudication of the controversy, including consideration of:

(i) The interests of the members of each of the Classes in individually controlling the prosecution or defense of separate actions;

(ii) The extent and nature of any litigation concerning the controversy already commenced by or against members of the Classes;

(iii) The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(iv) The difficulties likely to be encountered in the management of a class action.

336.   In addition, at least with respect to Plaintiffs' ERISA claims under ERISA § 502(a)(2) and potentially with respect to other claims, class certification is appropriate under Rule 23(b)(1) because without class certification, the prosecution of separate actions by individual members of the Classes would create a risk of: (a) Inconsistent or varying adjudications with respect to individual members of the Classes which would establish incompatible standards of conduct for Defendants; and/or (b) Adjudications with respect to the individual members which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests, including but not limited to the potential for exhausting the funds available from those parties who are, or may be, responsible Defendants.

337.   Similarly, at least with respect to Plaintiffs' ERISA claims for equitable relief under ERISA § 502(a)(3) and potentially with respect to other claims, class certification under Rule 23(b)(1) is appropriate because without class certification, the prosecution of separate actions by individual members of the Classes would create a risk of: (a) Inconsistent or varying adjudications with respect to individual members of the Classes which would establish incompatible standards of conduct for Defendants; and/or (b) Adjudications with respect to the individual members which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests, including but not limited to the potential for exhausting the funds available from those parties who are, or may be, responsible Defendants.  In addition, and in the alternative, class certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds generally applicable to each of the Classes, thereby making final injunctive relief appropriate with respect to each of the Classes as a whole.

338.   Plaintiffs contemplate the eventual issuance of notice to the proposed

1   members of the Classes that would set forth the subject and nature of the instant

2   action. Defendants' own business records, and/or those of Local 12, may be

3   utilized for assistance in the preparation and issuance of the contemplated notices.

4   To the extent that any further notices may be required, Plaintiffs would contemplate

5   the use of additional mailings.

6

7   **VI.**    **THE ERISA PROVISIONS VIOLATED IN THIS CASE**

8     **A.**    **Breaches of Fiduciary Duties Under ERISA § 404(a)(1)**

9     339.   ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides in relevant part

10   that a fiduciary shall discharge his duties with respect to a plan *solely in the interest*

11   *of the participants and beneficiaries* and--

12     **(A)** for the exclusive purpose of:

13       **(i)** *providing benefits to participants and their beneficiaries*;

14     and

15       **(ii)** *defraying reasonable expenses of administering the plan*;

16     **(B)** *with the care, skill, prudence, and diligence under the*

17   *circumstances then prevailing that a prudent man acting in a like capacity*

18   *and familiar with such matters would use in the conduct of an enterprise of*

19   *a like character and with like aims*;

20     **(C)** by *diversifying the investments of the plan* so as to minimize the

21   risk of large losses, unless under the circumstances it is clearly prudent not

22   to do so; and

23     **(D)** *in accordance with the documents and instruments governing the*

24   *plan* insofar as such documents and instruments are consistent with the

25   provisions of this subchapter and subchapter III of this chapter.

26     340.   Thus, as judicially construed, an ERISA fiduciary owes multiple

27   duties. First is a duty of loyalty pursuant to which all decisions regarding an

28   ERISA plan must be made with an eye single to the interests of the plan

participants and beneficiaries.  Second, ERISA imposes an unwavering duty to act both as a prudent person would act in a similar situation and with single-minded devotion to the plan participants and beneficiaries.  Third, ERISA fiduciaries must act for the exclusive purpose of providing benefits to plan participants and beneficiaries.

**B.**   **Violations of § 406(b)'s Prohibition on Self-Dealing Transactions**

341.   ERISA § 406(b), 29 U.S.C. § 1106(b) ("Transactions between plan and fiduciary") was also violated by some of Defendants.   That ERISA provision provides, in pertinent part, that plan fiduciaries shall not deal with plan assets in their own interest or for their own account and shall not receive any consideration for their own personal account from any party dealing with such plan in connection with a transaction involving plan assets.

**C.**   **Violations of § 406(a)' Prohibition on Transactions With Parties in Interest**

342.   ERISA § 406(a), 29 U.S.C. § 1106(a) ("Transactions between plan and party in interest") provides in pertinent part that (1) a plan fiduciary shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a *direct or indirect* (A) *sale or exchange, or leasing, of any property* between the plan and a party in interest; (B) *lending of money* or other extension of credit between the plan and a party in interest; (C) *furnishing of goods, services, or facilities between the plan and a party in interest*; (D) *transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…*" (Emphasis added.)

343.   Pursuant to 29 U.S.C. § 1002, "parties in interest" include, *inter alia*,

(a)   "any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such benefit plan" (§1002(14)(A));

(b)   persons providing services to the plan (§1002(14)(B));

(c)   employers who have any employees covered by the plan (§1002(14)(C);

(d)   any employee organization any of whose members are covered by the plan (i.e., including Local 12)) (§1002(14)(D));

(e)   any owner of an employer any of whose employees are covered by the plan (§1002(14)(E);

(f)   any relative of (i) any fiduciary or of (ii) any person providing services to the plan or of (iii) any employer of any employees covered by the plan or of (iv) any owner of any employer any of whose employees are covered by the plan (§1002(14)(F)), with relative defined as "a spouse, ancestor, lineal descendant, or spouse of a lineal descendant." (§1002(15));

(g)   any employee, officer or director of (i) the plan or (ii) a person providing services to the plan or (iii) an employer any of whose employees are covered by the plan or (iv) an employee organization (such as Local 12) any of whose members are covered by such plan or (v) an owner of an employer whose employees are covered by the plan (§1002(14)(H)).

**D.    Co-Fiduciary Liability Under § 405**

344.   ERISA § 405, 29 U.S.C. § 1105 ("Liability for breach of co-fiduciary") provides that in subsection (a):  "In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104 (a)(1) of this title in the

administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

345.   Section 405(b)(1) ("Assets held by two or more trustees") provides that, in with exceptions that Plaintiffs do not know to be at issue here, where there are multiple trustees, "(A) *each shall use reasonable care to prevent a co-trustee from committing a breach*; and (B) *they shall jointly manage and control the assets of the plan*, except that nothing in this subparagraph (B) shall preclude any agreement, authorized by the trust instrument, allocating specific responsibilities, obligations, or duties among trustees, in which event a trustee to whom certain responsibilities, obligations, or duties have not been allocated shall not be liable by reason of this subparagraph (B) either individually or as a trustee for any loss resulting to the plan arising from the acts or omissions on the part of another trustee to whom such responsibilities, obligations, or duties have been allocated." (Emphasis added.)

346.   Section 405(b)(2) states that "Nothing in this subsection shall limit any liability that a fiduciary may have under subsection (a) of this section or any other provision of this part."   Thus, § 405(b)(2) provides additional grounds for co-trustee liability, beyond those set forth in § 405(b)(1), where trustees either (1) do not use reasonable care to prevent a co-trustee (such as Waggoner) from committing a breach or (2) do not jointly manage and control the assets of the plan, in the absence of a specific authorized agreement regarding specialized allocation of duties or responsibilities.

**E.**   **§ 408(c)(2)'s Provision that Fiduciaries Who are Already Receiving Full-Time Pay May Receive No Compensation From a Plan Other Than For Reimbursement of Expenses Properly and Actually Incurred**

347.   ERISA § 408(c)(2), 29 U.S.C. § 1108(c)(2), provides in relevant part that no fiduciary who is already receiving full time pay "from an employer or an association of employers, whose employees are participants in the plan, or from an employee organization whose members are participants in such plan" shall receive any compensation from such plan "except for reimbursement of expenses properly and actually incurred."  (Emphasis added.)  The Department of Labor has previously found Local 12 Trustees, including Defendant Mickey Adams, to have violated this provision.  *See* Exh. 1 hereto.

348.   Certain of Defendants violated § 1108(c)(2).   Tolbert, for example, received uniform-in-amount monthly "expense" payments from OETT, a portion of which he – like all of the OETT employees who Waggoner caused to receive such unchanging "expense" monies from Taft-Hartley Funds - then kicked back to Waggoner.  Waggoner's "expense" kickback scheme, insofar as the OETT employees are concerned, allows him to illegally skim many tens of thousands of dollars of Taft-Hartley trust fund monies for his own benefit, just as his "expense" kickback scheme at Local 12 allows him to skim monies from Local 12 employee compensation that originates from member dues payments.

**VII.**   **CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**ERISA VIOLATIONS WITH RESPECT TO THE OETT PURSUANT TO ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), ERISA § 409, 29 U.S.C. § 1109 [By All Plaintiffs, on Behalf of the Plan As a Whole and the Local 12 Fund**

**Beneficiary Class, Against the OETT Defendant Trustees, Bert Tolbert,**

**Kenneth Bourguignon and Patty Waggoner]**

349.    Plaintiffs re-allege and incorporate by reference Section VI (ERISA Provisions) and paragraphs 106-174, 218-250, 259-260 set forth above, as though every such allegation were physically contained within the text of this Claim for Relief.

### A.    Statutory Basis For This Claim

350.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant or beneficiary to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C § 1109.   ERISA § 409(a) provides that  "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."  (Emphasis added.)

### B.    Parties to this Claim

351.    This Claim for Relief is brought against the Defendants who are fiduciaries of the OETT, namely, Bert Tolbert, the OETT Defendant Trustees, Kenneth Bourguignon (as former Chairman of OEFI), and Patty Waggoner, who is a functional fiduciary of OETT as previously alleged.  These Defendants have assumed fiduciary obligations to plan participants, including Plaintiffs, and are "fiduciaries" under ERISA.    ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), provides in relevant part that a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment

advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

352.   Tolbert and each of the OETT Defendant Trustees was given and accepted discretion to manage the Plan in his role as Trustee and, in fact, each such Defendant exercised at least some authority and control (regardless whether he did so in a manner consistent with his duties under ERISA) over the management and disposition of Plan assets.

353.   Trustees and plan administrators are, by definition, fiduciaries.  20 C.F.R. § 2509.75-8 ("a plan administrator or a trustee of a plan must, by the very nature of his position, have "discretionary authority or discretionary responsibility in the administration" of the plan within the meaning of § 3(21)(A)(iii) of the Act. Persons who hold such positions will therefore be fiduciaries.")

354.   Plaintiffs, as previously alleged, are participants in the OETT.  The goal of Title I of ERISA is to protect the interests of participants and their beneficiaries in employee benefit plans.

355.   This Claim is brought by Plaintiffs, not on their own behalf as individuals, but rather in a representative capacity on behalf of the OETT (sometimes referred to in this claim as the "Plan") as a whole, seeking to recover class relief for the Plan as authorized in § 409(a), pursuant to Fed. R. Civ. P. 23(b)(1).

C.     **Bases for ERISA Liability**

1.     **ERISA Liability Based on Acts and Omissions Described Section IV.C.2.a Above (Embezzlement and Personal Use of OETT Assets, Including Equipment, Vehicles, Parts, Labor and Services)**

356.   By engaging in the conduct set forth in Section IV.C.2.a above regarding embezzlement of OETT assets, vehicles, parts, equipment, parts, labor and services, the allegations of which are incorporated herein by reference, OETT fiduciary Defendants Tolbert, Waggoner, Sikorski and Adams violated their fiduciary duties to act solely in the interests of beneficiaries and participants as well as their duties of loyalty and prudence under § 404(a)(1).   They also engaged in prohibited self-dealing in violation of § 406(b) and intentionally caused the OETT to engage in prohibited transactions under § 406(a)(1)(A) (sale or exchange of property between plan and party in interest), (C) (furnishing of goods, services and/or facilities between plan and party in interest) and (D) (transfer to, or use by or for the benefit of party and interest of plan assets), where they themselves, or other officers or employees, were the parties in interest.

357.   By engaging in the conduct set forth in paragraph 142, incorporated herein by reference (regarding directing Pete Majich to do work at her church), Patty Waggoner, who exercised authority and control over disposition of OETT assets and was thus a fiduciary, breached her fiduciary duties to act solely in the interests of beneficiaries and participants as well as her duties of loyalty and prudence under § 404(a)(1).

358.   By permitting Kenneth Waggoner to use OETT employees, on OETT time, to work on the home he co-owned with his parents, William Waggoner breached his fiduciary duties to act solely in the interests of beneficiaries and participants as well as his duties of loyalty and prudence under § 404(a)(1).

359.   By permitting widespread misuse and embezzlement of OETT assets, as discussed in Section IV.C.2, knowing that such conduct was regularly occurring, the officer Trustees violated their fiduciary duties to act solely in the interests of beneficiaries and participants as well as their duties of loyalty and prudence under § 404(a)(1).

360.   As shown by the allegations incorporated by reference regarding embezzlements from OETT, in paragraphs 123-172 *supra*, the OETT Defendant Trustees also violated § 405(b)(1) by failing to use reasonable care to prevent co-trustees from committing breaches and to jointly manage and control OETT assets. No reasonable or effective policies or practices were put in place, let alone enforced, by the OETT Defendant Trustees, while jointly managing and controlling the assets of the plan, to ensure that Local 12 officers did not use OETT staff and assets for personal gain or for matters unrelated to serving the interests of participants and beneficiaries, despite the prevalence of such practices.  Nor were OETT employees clearly informed that it was prohibited and in violation of ERISA for them to perform work on the vehicles, boats, homes, etc. of officers and officers' family members while on OETT time, or informed that doing so would subject them to termination or other discipline, let alone actually disciplined.

361.   The management-side OETT Trustees (Don Bourguignon, C.W. Poss, Paul Von Berg, Jim Hulse, Mike Gomez, and Bruce Cooksey) are likewise liable for their co-fiduciaries' breaches under § 405(a), as well as for their own violations of § 405(b) (requiring them to jointly manage and control plan assets and to exercise reasonable care to prevent co-trustee breaches).   With the exception of Don Bourguignon, who left OETT's Board of Trustees before this action was filed, the management-side OETT Trustees are liable under § 405(a)(3) because they have had knowledge of these breaches of fiduciary duty at least since Plaintiffs raised these allegations many months ago, and yet have failed to make reasonable efforts under the circumstances to remedy the breaches by, e.g., demanding that

Waggoner, Tolbert, Adams and Sikorski reimburse the OETT for their self-dealing and use of Plan assets, labor and services.   They are also liable under § 405(a)(2) because, by failing to perform their own duties as Trustees under § 404(a)(1), they enabled the breaches of the officer defendants and Tolbert to occur.   Trustees are required to hold the assets of the Plan in trust and to ensure that Plan assets are used only for the benefit of Plan participants and beneficiaries and for the purpose of defraying reasonable Plan administration expenses (§ 404(a)), but instead of doing so, the management-side Trustees sat by and allowed the officer defendants and Tolbert to engage in whatever wrongful conduct, prohibited transactions and self-dealing in which they wished to engage.   They are liable as co-fiduciaries for the breaches of the Local 12 officer Trustees and Tolbert.

> **2.      ERISA Liability Based On Acts and Omissions Discussed In Section IV.C.2.b Above (Asset Diversion from OETT to Southern Nevada Training Trust)**

362.   As discussed in Section IV.C.2.b above, the OETT Defendant Trustees and Tolbert directed or at least permitted the diversion of expensive OETT trust assets (construction equipment) from the OETT to the Nevada Training Trust. This occurred on numerous occasions during the last six years, at times when each of the OETT Defendant Trustees was serving as a Trustee.   Without reciting every incorporated allegation, the OETT Trustees and Tolbert transferred and/or approved the transfer of valuable assets away from OETT for the benefit of non-OETT participants, with significant associated transportation and other costs, particularly given that cranes and wide-load equipment were being transported on interstate freeways, sometimes with the need to obtain DOT permits.   In addition, as alleged above, numerous OETT employees were sent to work in Nevada but were not compensated by the Southern Nevada Training Trust, but rather by OETT.

363.   The OETT Defendant Trustees, by permitting such conduct, violated their fiduciary duties to act solely in the interests of OETT participants as well as

their duties of loyalty and prudence under § 404(a)(1).  Shipping off employees and equipment without compensation was neither consistent with their duties of loyalty or prudence nor remotely consistent with the requirements that Defendants discharge their duties as fiduciaries with the "exclusive purpose" of providing benefits to OETT participants and defraying reasonable costs administration expenses.

364.   To the extent certain OETT Defendant Trustees were blissfully unaware that co-fiduciaries were causing the transfer of millions of dollars of OETT equipment from California to Nevada for the benefit of non-OETT participants, their failures to exercise reasonable care to prevent breaches by Waggoner, Tolbert and the officer Trustees and to jointly manage and control the disposition of OETT assets (including expensive cranes and other construction equipment) that were instead simply moved out of state, are violations of  ERISA § 405(b), rendering them liable on that basis.

365.   All of the OETT Defendant Trustees are also liable as co-fiduciaries under ERISA § 405(a).  Tolbert and the officer Trustees, for example, unquestionably have known that OETT equipment was being moved to Nevada, and they both participated in such conduct and undertook to conceal it from Plaintiffs and other members and participants, knowing that their conduct was improper, as evidenced in part by the fact that, as previously alleged, they have spent substantial monies (at OETT expense) since this litigation was filed to bring some (but not all) of the equipment back from Nevada.  They are thus liable under § 405(a)(1).

366.   To the extent any of the management-side OETT Trustees (Don Bourguignon, C.W. Poss, Paul Von Berg, Jim Hulse, Mike Gomez, and Bruce Cooksey) might not themselves have knowingly participated in the transfer of the assets and the unreasonable expenditure of OETT expenses for that improper purpose, they nevertheless failed to discharge their duties as Trustees under §

404(a)(1) by simply paying no heed to whether cranes and other heavy construction equipment worth millions of dollars – assets they were required to hold in trust for the benefit of participants in the Plan - was simply vanishing from OETT's Southern California premises without any explanation or compensation.  By failing to monitor the inventory and location of OETT's extremely valuable physical assets, as any "prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" would do, they failed to discharge their duties under § 404(a)(1) and enabled Tolbert, Waggoner and the other officer Trustees to breach their duties by giving away the Plan's  property.  Had they simply instituted practices to ensure that they were informed whenever heavy equipment was being moved out of state or otherwise monitored OETT practices in a prudent, careful fashion, this conduct could have been prevented.  As such, they are liable for their co-fiduciaries' breaches under § 405(a)(2), as well as for their violations of § 405(b) (requiring them to jointly manage and control plan assets and to exercise reasonable care to prevent co-trustee breaches).

367.   The management-side OETT Trustees (with the exception of Don Bourguignon, who left OETT's Board before this action was filed) are also liable under § 405(a)(3) because they have had knowledge of these breaches of fiduciary duty at least since Plaintiffs raised these allegations many months ago, and yet have failed to make reasonable efforts under the circumstances to remedy the breach. While some equipment has belatedly been returned after this suit was filed, other giant cranes and other OETT-owned equipment presently remain in Nevada, where they have diminished in value during the years they were there.   Further, the Trustees have not attempted to remedy the past breaches by, e.g., demanding that Waggoner and Tolbert reimburse the OETT for the lost use of the equipment or for the high costs of transporting the equipment to Nevada in the first place.    The management-side OETT Trustees are also liable because, by failing to perform

their own duties as Trustees under § 404(a)(1) (to ensure that Plan assets are used only for the benefit of Plan participants and beneficiaries and for the purpose of defraying reasonable Plan administration expenses), and instead simply allowing the officer defendants and Tolbert to engage in whatever wrongful conduct, prohibited transactions and self-dealing that they wished to engage in, they enabled the breaches of the officer defendants and Tolbert to occur.

### 3. ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.2.c Above (Losses due to Additional Embezzlement and Wrongdoing by Tolbert)

368.   By engaging in the acts and practices of embezzlement and misuse of OETT assets set forth in Section IV.C.2.c above, the allegations of which are incorporated herein by reference, OETT fiduciary Defendant Tolbert breached his fiduciary duties to act solely in the interests of beneficiaries and participants as well as his duties of loyalty and prudence under Section 404(a)(1).

369.   Tolbert took his entire salary, for example, from the OETT even though he was also working for the Southern Nevada Training Trust, to the detriment of the OETT.   Doing so may have benefited the Southern Nevada Training Trust, but it was not consistent with Tolbert's duties to the participants and beneficiaries of the OETT and, or with his duty to seek to defray the OETT's expenses of administration.

370.   Waggoner, who considered himself in charge of matters of compensation, unquestionably knew that Tolbert was drawing his entire salary from the OETT, and, far from taking any reasonable steps to remedy the breach, directly enabled the breach to occur.

371.   To the extent some of the other OETT Defendant Trustees might claim they were unaware that the OETT Administrator was drawing his entire salary from the Plan whose assets they were duty-bound to protect, when some portion of that salary plainly should have been paid by the Nevada entity, they abdicated their

duties under Section 404(a)(1) to act prudently and loyally and to defray fund expenses in allowing the OETT Administrator to be paid in this fashion.   Likewise, any OETT Trustees who simply deferred to Trustee Waggoner on Administrator compensation issues breached their duties under ERISA § 405(b) to jointly manage and control plan assets and to take reasonable steps to ensure that co-trustees such as Waggoner do not breach their fiduciary duties.   Moreover, as discussed in paragraphs 157-159, *supra*, all of the other OETT Trustees (putting aside Don Bourguignon, who ceased being a Trustee before this case was filed) have unquestionably known since Plaintiffs raised this issue in prior pleadings that Tolbert was being paid only by OETT with no allocation of his salary to the Nevada entity, yet, on information and belief, they allowed this practice to continue rather than taking halting it, until he recently retired, further damaging the Plan. As such, they also are liable as co-fiduciaries under Section 405(a).

372.   Tolbert also breached his § 404(a)(1) fiduciary duties by stealing plan assets in the recycling scheme discussed in incorporated paragraphs 160-163 above. His conduct in that scheme also constitutes prohibited self-dealing in violation of § 406(b).   Tolbert also intentionally caused the OETT to engage in prohibited transactions with a party in interest (himself), in violation of § 406(a)(1)(D), every time he had employees engage in the recycling yard transactions previously alleged, whereby plan assets were transferred to Tolbert for his use and benefit. Defendant William Waggoner was fully aware that this conduct was occurring and did nothing, despite plainly having the ability to fire Tolbert, sue Tolbert, etc., and thus is liable as a co-fiduciary under Section 405(a).   In addition, by virtue of his unquestioned ability to replace OETT administrators and union Trustees, Waggoner had a duty to monitor Tolbert's actions and to terminate him if he repeatedly breached his duties.   Waggoner breached his own duties by failing to terminate Tolbert for years while Tolbert continued to embezzle OETT assets.   On information and belief, Defendants Adams, Sikorki, Hawn and Davison were also

fully aware of this conduct, yet did nothing, and thus are also liable.   For their part, the management OETT Trustees have known of this conduct at least since it was raised by Plaintiffs in earlier pleadings, yet, to Plaintiffs' knowledge, they too have taken no reasonable steps to remedy it, including, e.g., suing Tolbert, reporting him to authorities, or at least demanding that he reimburse the OETT for the embezzled assets.   As such, they too are liable as co-fiduciaries under ERISA § 405(a)(3).

373.   Tolbert also breached his § 404(a)(1) fiduciary duties by habitually charging hundreds of dollars for lunches, as discussed in paragraphs 164-166, and charging those lunches to the OETT.   Doing so constitutes prohibited self-dealing in violation of § 406(b).   Waggoner was aware that Tolbert was doing this, and did nothing to halt or otherwise remedy the misconduct.   He is therefore liable as a co-fiduciary.   In addition, by virtue of his ability to hire and fire OETT administrators and union Trustees, Waggoner had a duty to monitor Tolbert's actions and to terminate him if he repeatedly breached his duties.   Waggoner breached his own duties by failing to terminate him for years, while Tolbert embezzled OETT assets.

374.   In addition, Tolbert breached his § 404(a)(1) fiduciary duties by placing and maintaining his granddaughter on the OETT payroll, as discussed in paragraphs 167-168, even though she was not qualified and/or capable of performing her job duties and did not do so, in order for her to obtain health insurance and an expensive transplant procedure at the cost of the Health & Welfare Fund.   Waggoner was aware that Tolbert had done this, but he did nothing to halt or otherwise remedy the misconduct.   He is therefore liable as a co-fiduciary.

375.   By hiring Ms. McMullen, Tolbert also caused the OETT to engage in a prohibited "party in interest" transaction in violation of § 406(a), since his granddaughter is a party-in-interest under ERISA as his lineal offspring (29 U.S.C. § 1002(14)(F)), and in no way could her compensation be deemed reasonable when she was not capable of performing her duties and did not do so.

376.   In addition, as alleged in paragraph 169 *supra*, Tolbert breached his fiduciary duties under § 404(a)(1) by paying Southern Nevada Training Trust bills with OETT monies, which is in no way consistent with his duties to act in the best interests of OETT participants and to defray plan administration expenses, let alone to act with loyalty and prudence to plan participants.   Allowing two training trusts to operate out of a single office, as occurred here, with no policy or practice to properly allocate expenses between each trust (to the detriment of OETT) was a breach of fiduciary duty under § 404(a)(1) by each and every one of the OETT Defendant Trustees, as well as of Tolbert.   The Trustees failed to discharge their duty of loyalty and prudence, and their duty to defray plan administration expenses, when they failed to institute and enforce policies and procedures to ensure that the OETT was not simply paying operational costs of the Nevada entity.   In addition to breaching their own fiduciary duties, each OETT fiduciary is liable for Tolbert's breaches under § 405(a)(2) because they enabled this gross misuse of OETT assets by failing to meet their obligations under § 404(a)(1), by, for example, ensuring that there were policies and procedures in place of the sort discussed above.   In addition, putting aside Don Bourguignon, the OETT Trustees have each known of these breaches at least since Plaintiffs raised them in earlier pleadings, but, to Plaintiffs' knowledge, they have done nothing (such as demanding and obtaining full reimbursement from the Nevada entity) to remedy this misconduct.

377.   As discussed in paragraph 170-172 *supra*, Tolbert instructed and allowed OETT employees to keep unused Plan expense monies, in violation of his fiduciary duties under § 404(a)(1)(A) and (B).   Every time he allowed staff to keep such unused expense monies, which should have been returned to the Plan and used for the benefit of participants, Tolbert also engaged in prohibited transactions under § 406(a)(1)(D), by allowing the transfer to or use of money by parties-in-interest, namely, Plan employees.

378.   William Waggoner was aware that Tolbert was doing this, and did nothing to halt or otherwise remedy the misconduct.   He is therefore liable as a co-fiduciary.   In addition, by virtue of his ability to hire and fire OETT administrators and union Trustees, Waggoner had a duty to monitor Tolbert's actions and to terminate him if he repeatedly breached his duties.   Waggoner breached his own duties by failing to do so.   All the other OETT Defendant Trustees also breached their fiduciary duties by failing to institute or enforce policies and practices to ensure the return of unused expense monies and by failing to jointly manage and control plan assets (including monies given to employees for expenses).   They are also liable as co-fiduciaries for this reason, given their abdication of their duties under § 404(a)(1), which enabled this practice to occur.   See § 405(a)(2).   The officer OETT Trustees are also liable under § 405(a)(3), as they knew of the practice and allowed it to proceed, as discussed in paragraph 172.

**4.      ERISA Liability Based on Acts and Omission Discussed in Section IV.C.1 Above (Losses due to Write-offs and Failures to Collect Debts/Contributions Owed to the Plan By Employers)**

379.   Plan fiduciaries have a duty to seek to collect all monies owing to the Plan, so that they may be used for the benefit of participants and beneficiaries. Here, as discussed in paragraphs 106-122 *supra*, incorporated by reference, the OETT Defendant Trustees failed to act prudently and loyally, in violation of § 404(a), when they allowed Waggoner to write off, or decline to collect debts owed by certain employers, including Defendant Poss's company, Leo Majich's company, and other employers whose identities are not yet known to Plaintiffs but are or should be known to Defendants.   Such conduct, on information and belief, is continuing, and has occurred on a regular, continuing basis over the last ten years, although Defendants omitted to disclose its occurrence to Plaintiffs, who only learned of it within the last year.   To the extent certain of the management OETT

Trustee defendants claim to have been ignorant of the fact or extent to which Waggoner was writing off, excusing, or declining to collect employer debts because they simply deferred such decisions to Waggoner or his "write-off committee" of two, they breached their fiduciary duty to jointly manage and control plan assets and to prudently pursue monies that could be used for plan purposes.

380.   Every instance of such conduct also constitutes a prohibited transaction under § 406(a)(1)(B) (lending of money or other extension of credit between the plan and a party in interest).

381.   All of the OETT Defendant Trustees are liable under § 405(a), regardless whether they themselves knowingly participated in the decisions to write off debts.   Even if they did not themselves approve the write-offs, Trustees are, as previously alleged, required to pursue and collect monies owed to the Plan, not to simply forego doing so; here, in allowing Waggoner and the officer defendants to write off debts of favored son employers, including co-trustee Poss's company and in taking no steps thereafter to remedy the breaches, the OETT Defendant Trustees rendered themselves liable for the breaches.   Moreover, by failing to make good on their own duties to act with a single eye toward the interests of Plan participants – rather than Waggoner or favored employers – the Trustees enabled the breaches of Waggoner and the officer defendants.   Certainly, it would have been easy to keep tabs on contributions owed to the Plan, and to require full votes of a majority of Trustees before any debts could be written off (assuming there was some reasonable basis to write off debts in some particular instances), but here, the Trustees did no such thing, instead deferring to Waggoner to make such decisions as a general rule.   They are all liable for this reason.

5.     **ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.8 Above (Losses due to Misconduct by Theresa Goodell at OEFI)**

382.   As discussed in paragraphs 218-226 *supra*, incorporated herein by reference, OEFI Funds Manager (and fiduciary) Leo Majich's daughter, Theresa Goodell, embezzled OEFI monies for personal travel and other personal business, took pay for phony overtime, and, with Leo Majich, took extra payroll checks. Majich also engaged in prohibited self-dealing (§ 406(b)) and, because he was a party in interest, prohibited transactions (§ 406(a)) each time he took extra payroll checks.

383.   Defendants OEFI, its Chairman Kenneth Bourguignon, Leo Majich and William Waggoner knew this was occurring and took no steps to remedy the misconduct by, e.g, reporting Goodell (or Majich, to the extent he took extra payroll checks) to governmental authorities, demanding and obtaining reimbursement, or instituting litigation against Goodell and Majich.   They breached their duties of loyalty by allowing this conduct to occur (and Waggoner then protected Ms. Goodell, rather than firing her, as he could easily have done given his control over hiring and firing; Kenneth Bourguignon also failed to take steps to have her fired).

384.   The other OETT Defendants Trustees also are liable as co-fiduciaries, because they have had actual knowledge (via audit results) of the misconduct of their co-fiduciaries for several years but took no steps to remedy the misconduct either (by demanding reimbursement, filing – or even reasonably considering the possibility of - litigation, reporting the wrongdoers to the DOL, etc.).   As such, they are liable under § 405(a)(3).

6. **ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.9 Above (Losses due to Credit Card Fraud by OEFI Employees)**

385.   As discussed in paragraphs 227-229 *supra*, incorporated herein by reference, OEFI's auditor, Bernard Kotkin & Co., performed annual audits which demonstrated massive misuse and embezzlement of OEFI monies (derived from the three Trusts at issue, including OETT) for the personal use of employees of OEFI. Dozens of employees had credit cards unnecessary to their positions, including, e.g, Sears cards, Costco cards, gas cards, Mastercard and Visa cards, and, in some instances, multiple gas cards.  (Leo Majich, for example, though not a field employee, had an OEFI-issued Chevron gas card, an OEFI-issued Shell gas card, an OEFI-issued Phillips 76 gas card, as well as a company Mastercard.  Likewise, Goodell – not a field employee – had a Phillips 76 card, a Shell card, and a Mastercard.)

386.   Leo Majich, by allowing more than three dozen employees to use OEFI credit cards with few if any restrictions and without any safeguards to ensure they were being used solely on fund business, breached his fiduciary duty to act with loyalty to participants (by ensuring that plan monies were spent on their behalf and not for personal use of his employees and by defraying plan administration expenses), as well as his duty to act as a prudent man would under similar circumstances in performing his job as Funds Manager.

387.   By engaging in this conduct (i.e., extending credit to employees for personal use and paying personal expenses incurred on OEFI credit cards), Majich and OEFI also knowingly caused prohibited transactions with parties in interest (namely, employees of OEFI, *see* 29 U.S.C. §1002(14(H)); in violation of ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D), with actual or constructive knowledge that doing so constituted an extension of credit and/or a

1   transfer to, or use by or for the benefit, of the employees of plan monies, since all

2   of OEFI's monies come from Local 12's Trusts, including OETT.

3       388.   Majich and Waggoner were provided with the annual audits on an

4   annual basis, and, on information and belief, so were the rest of the Trustees

5   (assuming they were fulfilling their duties under § 404(a) and § 405(b)(1)).  Yet,

6   despite actual knowledge of the rampant credit card abuse and loss of fund monies,

7   they did nothing to remedy the misconduct, even though Majich, OEFI, Waggoner

8   and Chairman Bourguignon were certainly capable of, e.g., demanding

9   reimbursement, taking away credit cards and/or firing the employees who were

10  misusing and embezzling fund assets for personal use.   When Michael Graydon

11  took over Majich's position, he ultimately canceled unnecessary credit cards and

12  was able to recover some of the lost monies; however, other monies – paid by the

13  Plan to OEFI and lost due to such credit card abuse - were not recovered, to the

14  detriment of the Plan.

15      389.   The OETT Defendant Trustees took no steps of their own to remedy

16  the rampant credit card abuse for personal purposes, about which they knew as a

17  result of the audits, and instead actively concealed it from Plaintiffs and plan

18  participants.  They are liable both for breaching their fiduciary duties to act

19  prudently managing and controlling the plan's assets and as co-fiduciaries for the

20  above described ERISA violations of Majich, OEFI, Waggoner and Bourguignon.

21  By failing to institute and enforce policies that would have prevented such

22  widespread access to and rampant misuse of OEFI (and, thus, Plan) monies,

23  consistent with their duties under § 404(a)(1), they enabled the breaches above to

24  occur, and are liable under § 405(a)(2).

25      390.   In addition, they actively concealed the misconduct, including the

26  annual audit reports, from plan participants, who undoubtedly would have

27  complained to the DOL and demanded that heads roll had they been apprised of

28  audit reports showing that Plan assets were being embezzled and mis-spent in such

a fashion.  As such, the OETT Defendant Trustees, regardless whether they themselves directly participated in the breaches, are liable as co-fiduciaries under § 405(a)(1).

392.   Finally, by virtue of the audit reports showing rampant misuse of OEFI monies during their tenures as Trustees, all of the OETT Defendant Trustees were fully aware of the breaches of Majich, OEFI, Waggoner and OEFI Chairman Bourguignon, yet they took no steps in subsequent years to remedy the breaches of those defendants.   As such, they are liable as co-fiduciaries with Majich, OEFI, Waggoner and Kenneth Bourguignon under § 405(a)(3).

> **7.   ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.11 Above (Failure to Address Improper Double-Breasting and Resulting Lack of Contributions)**

392.   Plan fiduciaries such as the OETT Defendant Trustees have a fiduciary duty, in keeping with their duty to serve the interests of plan participants and to act prudently, to seek to collect monies and contributions owed to the Plan and its participants and beneficiaries.   As discussed in Section IV.C.11, paragraphs 236-241, *supra*, incorporated herein by reference, by failing to pursue employers for contributions that those employers were evading by engaging in improper double-breasting in order to circumvent their contribution obligations, Majich (now deceased) and the OETT Defendant Trustees breached their fiduciary duties under § 404(a).  Likewise, by failing to collect millions of dollars of delinquent contributions from employers, irrespective of issues regarding improper double-breasting, the OETT Defendant Trustees breached their fiduciary duties.  As of mid-2012, for example, there were millions of dollars in delinquent contributions; no justifiable basis existed, consistent with the Trustees' duties under § 404(a), not to seek collection of at least the vast bulk of those contributions, by, e.g., instituting litigation (counsel Chris Laquer has been paid millions of dollars during the last

five years in large part for collection services), by calling for work-stoppages to induce compliance, or by other means available to them.

393.   Moreover, the OETT Defendant Trustees have been apprised of the existence of these breaches for some time and yet, to Plaintiffs' knowledge, still have taken no steps to remedy them.   They are thus liable as co-fiduciaries under § 405(a)(3).

8.     **ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.12 Above (Payment of Employee FICA Taxes From Fund Monies)**

394.   As discussed in Section IV.C.12, paragraphs 242-250 *supra*, incorporated herein by reference, personal FICA tax shares of employees of OEFI, OETT, the Pension Fund, the Health & Welfare Fund and the Vacation Fund, were, until Michael Graydon discovered the practice and stopped it in 2010, paid from OEFI's General Fund.   That practice, on information and belief, was engineered or at least approved of many years ago by Waggoner and Leo Majich.   OEFI and its Chairman Kenneth Bourguignon, as well as at least the Local 12 officer Trustees, were also fully aware of this practice, yet did nothing to stop it or to remedy the breaches, such as by demanding and obtaining reimbursement of the monies. Paying FICA taxes from fund monies (as previously alleged, all OEFI monies are derived from the Trusts) plainly was not consistent with the Trustees' duties to act with the exclusive purpose of paying benefits to plan participants and beneficiaries and to defray expenses of plan administration, nor the way any prudent man would act under similar circumstances.  Indeed, when Michael Graydon and/or his staff approached a third party vendor regarding handling payroll for OEFI and the Trusts, which OEFI had been handling for years, the vendor stated that it had never heard of such a thing occurring.   As such, these fiduciaries breached their fiduciary duties under § 404(a).

395.   Defendants OEFI, Waggoner, Majich, Tolbert and Kenneth Bourguignon did not publicize or disclose to Plaintiffs or members generally that they were using FICA payments as a mechanism for giving employees of OEFI and the Trusts hidden raises improperly paid for with assets of the Trusts.

396.   OEFI, Kenneth Bourguignon, and Waggoner also engaged in prohibited transactions by knowingly paying fund monies (the FICA tax shares) to OEFI and other Trust employees for their use and benefit.  Such employees are parties in interest under 29 U.S.C. § 1002(14)(H), as are fiduciaries like Majich and Tolbert, who had their own FICA tax shares paid by OEFI.

397.   Every Trustee who has served since Graydon discovered and discontinued the practice in 2010 has been aware that it was a breach of fiduciary duty to pay FICA taxes of OEFI and other employees using fund monies.   None of them have taken steps to remedy the breaches, either by seeking reimbursement from the parties in interest who received the FICA share payments, or by obtaining reimbursement from their co-fiduciaries who breached their duties by diverting plan assets from the Plan and its participants to employees of OEFI and the Trusts, and by causing prohibited transactions.  All of them are therefore liable as co-fiduciaries for the breaches of Waggoner and the others who were primarily responsible for this Plan-subsidized, disguised raise practice.

**9.**     **ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.14 Above (Maintenance of Incompetent Employer Trustees on Trusts)**

398.   As discussed in Section IV.C.14, paragraphs 255-260 *supra*, which are incorporated herein by reference, Trustee C.W. Poss, who has been incompetent to consistently perform his duties as a Trustee within at least the last two years, has nevertheless been allowed to remain as an OETT Trustee, likely due to his record of support for and non-opposition to the positions of William Waggoner. Defendant Poss's co-trustees failed to act prudently and with a single eye toward

1  the best interests of plan participants and beneficiaries by failing to take steps to
2  remedy this misconduct and instead simply sitting by while such an incompetent
3  Trustee, whose "discretion" and exercise thereof Waggoner generally controlled,
4  was allowed to remain in such an important position as their fellow Trustee.

5          10.    **ERISA Liability Based on Acts and Omissions Discussed in**
6          **Section IV.B.2 Above (Relating to BA's Fund)**

7      399.   As discussed in Section IV.B.2, paragraphs, 65-79 *supra*, the
8  allegations of which are incorporated by reference, certain OETT employees,
9  including coordinators, have been paid $550 monthly for "expenses" from OETT
10  assets without any policy or practice of confirming that all (or any) such monies
11  were in fact actually expended for the benefit of the OETT.   Waggoner and his
12  officer co-defendant Trustees of OETT, as well as OEFI and its Chairman at
13  relevant times, Kenneth Bourguignon, have authorized, enabled and/or knowingly
14  permitted this conduct to occur for years, with knowledge or at least constructive
15  knowledge that it was not a proper use of Plan assets despite their duties to ensure
16  that Plan assets are used for the benefit of participants and to defray administration
17  expenses.   Simply paying lump sum "expenses" of $550 without confirming that
18  such expenses were in fact reasonably or actually incurred, in large part so that $50
19  of that amount could be kicked back to the BA's Fund on a monthly basis, is
20  unquestionably a breach of both the duty of loyalty and the duty of prudence under
21  § 404(a).

22      400.   Waggoner, who has generally fancied himself as in charge of the
23  Trusts and has placed himself in charge of deciding matters of employee
24  compensation, also caused prohibited transactions by improperly transferring fund
25  assets ($550 of unchanging, monthly purported "expense" monies) to parties in
26  interest including employees and Plan fiduciaries (including Tolbert and, by virtue
27  of the kickback of $50, himself), for their personal use and benefit.

28

401.   Waggoner also engaged in prohibited self-dealing in violation of § 406(b) by conceiving of and implementing a program whereby he would skim $50 of the $550 in monthly "expenses" paid from Plan assets for his own personal benefit.   For their part, knowingly permitting a portion of the inflated $550 in expenses paid monthly to OETT coordinators (from Taft-Hartley funds) to be kicked back on a monthly, continuing basis to Waggoner for the BA's Fund was unquestionably a breach of all of the OETT Defendant Trustees' duty of loyalty and duty of prudence.   No reasonable Trustee could believe that allowing a program with the purpose and effect of diverting thousands of dollars of monies from OETT (and, indirectly, its participants) to the use and benefit of Waggoner was in any way consistent with his duties to the Plan.

402.   OEFI, Kenneth Bourguignon and the other officer OETT Trustees, at least, have known for years that Waggoner was engaging in this conduct, but did nothing to stop it or remedy it (putting aside that the extra "expense" monies are now, since the filing of this action, being paid directly through payroll, rather than separate checks, in an apparent effort to actively conceal the continuing misconduct).

403.   The management-side OETT Trustees have known since at least the filing of this action that such conduct was occurring and has been occurring for years, yet they too have taken no steps to remedy the past misconduct.

404.   Defendant Tolbert, by taking lump sum expenses unrelated to expenses actually and properly occurred, also violated § 408(c)(2), which precludes fiduciaries who are who are already receiving full time pay "from an employer … whose employees are participants in the plan" from receiving any compensation from the plan "except for reimbursement of expenses properly and actually incurred."

405.   In sum, the acts and omissions of Defendants set forth above and in the allegations incorporated by reference in this Claim were in no way consistent with

their duties under § 404 to make all decisions with an eye single to the interests of the plan participants and beneficiaries, to act prudently and with single-minded devotion to plan participants and beneficiaries, or to act for the exclusive purposes of providing benefits to plan participants and beneficiaries and defraying administrative expenses of the Plan.

406.   As a proximate result of Defendants' conduct as alleged above, the OETT has been harmed and sustained losses.   Defendants should be required to make good to the OETT for any losses it has suffered as a result of their breaches. Defendants Waggoner, Tolbert and Adams, and any other fiduciaries who have earned profits or ill-gotten gains should also be required to restore any profits they have made by using the assets of the plan.   In addition, the OETT Defendant Trustees should all be removed as Trustees by the Court, as they have plainly demonstrated their unfitness to serve as fiduciaries by the acts and omissions set forth above.  *See* ERISA § 409.

## SECOND CLAIM FOR RELIEF

**EQUITABLE RELIEF, WITH RESPECT TO OETT, PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).**

**[By Plaintiffs, On Behalf of the OETT as a Whole and the Local 12 Fund Beneficiary Class, Seeking Equitable Relief, Against the OETT Defendant Trustees, Bert Tolbert, OEFI, Kenneth Bourguignon, Patty Waggoner and Kenneth Waggoner]**

407.   Plaintiffs re-allege and incorporate by reference Section VI (ERISA Provisions) and paragraphs 106-174, 218-250, 259-260 *supra*, as well as the allegations in the preceding Claim for Relief except those allegations relating to the relief sought thereunder, as though every such allegation were physically contained within the text of this Claim for Relief.

### A.   Statutory Basis for this Claim

408.   ERISA § 502(a)(3) authorizes suits "(A) to enjoin any act or practice which violates any provision of [Title I] or the terms of the plan, or (B) to obtain appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [Title I] or the terms of the Plan." 29 U.S.C. § 1132(a)(3).

ERISA § 502(a)(3) "admits of no limit … on the possible universe of defendants." *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc*., 530 U.S. 238, 246 (2000). The "focus" is "on redressing the 'act or practice' which violates" ERISA. *Id*.  A defendant may be sued under § 502(a)(3) even if it is not "expressly subject to a duty under one of ERISA's substantive provisions." *Id*.

### B.   Parties to this Claim

409.   This Claim for Relief is brought against the OETT Defendant Trustees, OEFI and Bert Tolbert.  All of these defendants, as alleged previously, are fiduciaries with respect to OETT.

410.   This claim is also brought against Patty Waggoner and Kenneth D. Waggoner, who, regardless of fiduciary status, may be sued hereunder as non-fiduciaries who participated in ERISA violations, such as prohibited party-in-interest transactions under ERISA § 406(a).

411.   Plaintiffs are participants in the OETT.  The goal of Title I of ERISA is to protect the interests of participants and their beneficiaries in employee benefit plans.

412.   This Claim is brought by Plaintiffs, individually and on behalf of the Local 12 Fund Beneficiary Class, seeking to recover equitable relief to protect the OETT (sometimes referred to in this Claim as the "Plan").

413.   This Claim for Relief seeks only equitable relief.

### C.   Acts or Practices Violating Title I of ERISA

414.   In the interests of brevity, Plaintiffs incorporate the allegations regarding ERISA violations and fiduciary breaches in the preceding Claim For

Relief as though fully set forth herein, with the exception of the allegations regarding the remedies sought in that Claim.

**D. Equitable Relief Sought on Behalf of the Plan for Acts and Practices Violating Title I of ERISA**

415. Plaintiffs request a permanent injunction forbidding OETT's Trustees from engaging in prohibited transactions with parties in interest in violation of § 406(a), including but not limited to the acts and practices at issue herein.

416. Plaintiffs request a permanent injunction forbidding OETT's Trustees from engaging in self-dealing in violation of § 406(b).

417. Plaintiffs request a permanent injunction forbidding OEFI from paying the FICA tax share of its employees or any Trust employee, to the extent that practice has resumed after its discontinuation by Michael Graydon.

418. Plaintiffs request an injunction specifically forbidding the Officer Trustee Defendants, Patty Waggoner, and Kenneth D. Waggoner from making personal use of OETT assets or for any reasons other than the purposes of providing benefits to Plan participants and defraying reasonable plan expenses of administration.

419. Plaintiffs request an order requiring Tolbert, Waggoner, Patty Waggoner, Kenneth Waggoner, Mickey Adams and Ron Sikorski to disgorge all profits and all plan assets (and/or the reasonable value thereof, to the extent labor and services were obtained from Plan employees), they have obtained as a result of their violations of Title I as alleged herein.

420. Plaintiffs request an order forbidding Tolbert, who retired in recent months, from ever serving again as a fiduciary in connection with OETT or any Local 12-affiliated employee benefit plan.

421. Assuming the Court removes them as Trustees pursuant to the First Claim for Relief, Plaintiffs request an order forbidding the OETT Officer Trustee

**FOURTH AMENDED CLASS ACTION COMPLAINT**

Defendants from ever serving again as a fiduciary in connection with OETT or any Local 12-affiliated employee benefit plan.

422.   Assuming the Court removes them as Trustees pursuant to the First Claim for Relief, Plaintiffs request an order forbidding the management-side Officer Trustee Defendants from ever serving again as a fiduciary in connection with OETT or any Local 12-affiliated employee benefit plan.

423.   Plaintiffs request an order forbidding William Waggoner and any other Local 12 Officer Trustee Defendants, to the extent they in the future replace him in his position as Business Manager due to his retirement, imprisonment, or any other reason, from appointing or having any role in the appointment of any new union Trustees to OETT or any Local 12-affiliated employee benefit plan.

424.   Plaintiffs request an order requiring OETT to inform its employees, every six months, that performing personal services for Local 12 officers or others while on OETT time is prohibited by law and may subject any person engaging in such conduct to civil or criminal liability.

425.   Plaintiffs request an order requiring that any and all OETT equipment transferred to Nevada be expeditiously returned to OETT, with costs and expenses of such transfers being borne not by OETT but rather by Defendants Tolbert and the Defendant OETT Trustees.

426.   Plaintiffs request a permanent injunction requiring the Trustees of OETT to take reasonable steps to collect all contributions owed by employers to OETT that may still be recovered (*see, e.g.* 29 U.S.C. § 1145), as well as all contributions that come due in the future.

427.   Plaintiffs request an injunction forbidding William Waggoner from diverting OETT assets to himself by means of his BA's Fund practice, and requiring him to disgorge all such funds he has taken in the past.

428.   Plaintiffs request an injunction requiring OEFI to institute written policies and procedures forbidding the use of OEFI credit cards for personal use.

429.   Plaintiffs request an injunction requiring a vote of all OETT Trustees, to be recorded in the minutes of the meetings of any such Trustees, on any proposal to write off the debts of any employers.

430.   Plaintiffs request an order requiring any defendants who participated in prohibited transactions, as alleged herein, either as party in interest or as plan fiduciary, to disgorge any monies or assets obtained in connection with such transactions.

431.   Plaintiffs request an order requiring any defendants who engaged in self-dealing, as alleged herein, to disgorge any monies or assets obtained thereby.

432.   Plaintiffs request an order prohibiting OETT and OEFI from destroying Plan-related documents unless permitted to do so by law.

## THIRD CLAIM FOR RELIEF

## ERISA VIOLATIONS WITH RESPECT TO THE PENSION FUND PURSUANT TO ERISA § 409, 29 U.S.C. § 1109, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2)

**[By All Plaintiffs, on Behalf of the Pension Fund As a Whole and the Local 12 Fund Beneficiary Class, Against Kenneth Bourguignon, the Pension Fund Defendant Trustees and OEFI]**

433.   Plaintiffs re-allege and incorporate by reference Section VI (ERISA Provisions) and paragraphs 106-122, 175-199, 214-260 set forth *supra*, as though every such allegation were physically contained within the text of this Claim for Relief.

A.   **Statutory Basis For This Claim**

434.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant or beneficiary to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C § 1109.

435.   § 409(a) provides that  "[a]ny person who is a fiduciary with respect to a plan who breaches *any* of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter *shall be personally liable to make good to such plan any losses to the plan* resulting from each such breach, *and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan* by the fiduciary, and shall be subject to such *other equitable or remedial relief* as the court may deem appropriate, *including removal of such fiduciary*." (Emphasis added.)

### B.   <u>Parties to this Claim</u>

436.   This Claim for Relief is brought against the Pension Fund Defendant Trustees and OEFI.   These Defendants have assumed fiduciary obligations to plan participants, including Plaintiffs, and are "fiduciaries" under ERISA.    ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), provides in relevant part that a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

437.   Each of the Pension Fund Defendant Trustees herein was given and accepted discretion to manage the Plan in his role as Trustee and, in fact, each such defendant exercised at least some authority and control (regardless whether he did so in a manner consistent with his duties under ERISA) over the management and disposition of Plan assets.

438.   Trustees and plan administrators are, by definition, fiduciaries.  20 C.F.R. § 2509.75-8 ("a plan administrator or a trustee of a plan must, by the very nature of his position, have "discretionary authority or discretionary responsibility

1   in the administration" of the plan within the meaning of § 3(21)(A)(iii) of the Act.

2   Persons who hold such positions will therefore be fiduciaries.")

3        439.   Plaintiffs have at all relevant times been participants in the Pension

4   Fund.  The goal of Title I of ERISA is to protect the interests of participants and

5   their beneficiaries in employee benefit plans.

6        440.   This Claim is brought by Plaintiffs, not on their own behalf as

7   individuals, but rather in a representative capacity on behalf of the Pension Fund

8   (sometimes referred to in this claim as the "Plan") as a whole, seeking to recover

9   class relief for the Plan as authorized in § 409(a), pursuant to Fed. R. Civ. P.

10   23(b)(1).

11        441.   This Claim is brought by Plaintiffs, not on their own behalf as

12   individuals but rather in a representative capacity on behalf of the Pension Fund

13   (sometimes referred to in this Claim as the "Plan") as a whole, seeking to recover

14   relief for the Plan as authorized in § 409(a).

15        **C.    Bases for ERISA Liability**

16             **1.    ERISA Liability Based on Acts and Omission Discussed in**

17                  **Section IV.C.1 Above (Losses due to Write-offs and Failures**

18                  **to Collect Debts/Contributions Owed to the Plan By**

19                  **Employers)**

20        442.   Plan fiduciaries have a duty to seek to collect all monies owing to the

21   Plan, so that they may be used for the benefit of participants and beneficiaries.

22   Here, as discussed in paragraphs 106-122 *supra*, incorporated by reference, the

23   Pension Fund Trustees failed to act prudently and loyally, in violation of § 404(a),

24   when they allowed Waggoner to write off, or decline to collect debts owed by

25   certain employers, including Defendant Poss's company, Leo Majich's company,

26   and other employers whose identities are not yet known to Plaintiffs but are or

27   should be known to Defendants.   Such conduct, on information and belief, is

28   continuing, and has occurred on a regular, continuing basis over the last ten years,

although Defendants omitted to disclose its occurrence to Plaintiffs, who only learned of it within the last year.  To the extent certain of the management Trustee defendants claim to have been ignorant of the fact or extent to which Waggoner was writing off, excusing, or declining to collect employer debts because they simply deferred such decisions to Waggoner or his "write-off committee" of two, they breached their fiduciary duty to jointly manage and control plan assets and to prudently pursue monies that could be used for plan purposes.

443.   Every instance of such conduct also constitutes a prohibited transaction under § 406(a)(1)(B) (lending of money or other extension of credit between the plan and a party in interest).

444.   As shown by the allegations incorporated by reference regarding losses due to write-offs and failures to collect, in paragraphs 106-122 *supra*, the Pension Fund Defendant Trustees also violated § 405(b)(1) by failing to use reasonable care to prevent co-trustees from committing breaches and to jointly manage and control Pension Fund assets.  No reasonable or effective policies or practices were put in place, let alone enforced, by the Pension Fund Defendant Trustees, while jointly managing and controlling the assets of the plan, to ensure that favoritism or other preferences in collection decisions did not occur, despite the prevalence of such practices.

445.   The management-side Pension Fund Trustees -  Dan Billy, Walt Elliot, C.W. Poss, Michael Crawford, Mike Prlich and Kenneth Bourguignon - are liable for their co-fiduciaries' breaches under § 405(a)(2), as well as for their own violations of § 405(b) (requiring them to jointly manage and control plan assets and to exercise reasonable care to prevent co-trustee breaches).   The management-side Pension Fund Trustees are also liable under § 405(a)(3) because they have had knowledge of these breaches of fiduciary duty at least since Plaintiffs raised these allegations many months ago, and yet have failed to make reasonable efforts under the circumstances to remedy the breaches by, e.g., demanding that non-biased

1  collection efforts commence immediately or filing suit for breaches of fiduciary

2  duty against Waggoner and the other Local 12 Officer-Trustees.   They are also

3  liable under § 405(a)(2) because, by failing to perform their own duties as Trustees

4  under § 404(a)(1), they enabled the breaches of the officer defendant-Trustees to

5  occur.   Trustees are required to hold the assets of the Plan in trust and to ensure

6  that Plan assets are used only for the benefit of Plan participants and beneficiaries

7  and for the purpose of defraying reasonable Plan administration expenses, but

8  instead of doing so, the management-side Trustees allowed the officer defendant-

9  Trustees to engage in whatever wrongful conduct, prohibited transactions and self-

10  dealing that they wished to engage in.   They are liable as co-fiduciaries for the

11  breaches of Waggoner and the other Local 12 Officer-Trustees.

12        **2.     ERISA Liability Based on Acts and Omissions Discussed in**

13              **Section IV.C.8 Above (Losses due to Misconduct by Theresa**

14              **Goodell at OEFI)**

15        446.   As discussed in paragraphs 218-226 *supra*, incorporated herein by

16  reference, OEFI Funds Manager (and fiduciary) Leo Majich's daughter, Theresa

17  Goodell, embezzled OEFI monies for personal travel and other personal business,

18  took pay for phony overtime, and, with Leo Majich, took extra payroll checks.

19  Majich also engaged in prohibited self-dealing (§ 406(b)) and, because he was a

20  party in interest, prohibited transactions (§ 406(a)(1)(D)) each time he took extra

21  payroll checks.

22        447.   Defendants OEFI, its Chairman at relevant times (and Pension Fund

23  Trustee) Kenneth Bourguignon, Leo Majich and William Waggoner knew this was

24  occurring and took no steps to remedy the misconduct by, e.g, reporting Goodell

25  (or Majich, to the extent he took extra payroll checks) to authorities, demanding

26  and obtaining reimbursement, or instituting litigation against Goodell and Majich.

27  They plainly breached their duties of loyalty by allowing this conduct to occur (and

28

1  Waggoner then protected her, rather than firing her, as he could easily have done

2  given his control over hiring and firing; Bourguignon also failed to fire her).

3    448.   The other Pension Fund Trustees also are liable as co-fiduciaries,

4  because they have had actual knowledge (via audit results) of the misconduct of

5  their co-fiduciaries for several years but took no steps to remedy the misconduct

6  either (by demanding reimbursement, filing – or even reasonably considering the

7  possibility of - litigation, reporting the wrongdoers to the DOL, etc.).   As such,

8  they are liable under § 405(a)(3).

9    **3.    ERISA Liability Based on Acts and Omissions Discussed in**

10   **Section IV.C.9 Above (Losses due to Credit Card Fraud by**

11   **OEFI Employees)**

12    449.   As discussed in paragraphs 227-229 *supra*, incorporated herein by

13  reference, OEFI's auditor, Bernard Kotkin & Co., performed annual audits which

14  demonstrated massive misuse and embezzlement of OEFI monies (derived from the

15  Trusts, including the Pension Fund) for the personal use of employees of OEFI.

16  Dozens of employees had credit cards unnecessary to their positions, including, e.g,

17  Sears cards, Costco cards, gas cards, Mastercard and Visa cards, and, in some

18  instances, multiple gas cards.  (Majich, for example, though not a field employee,

19  had an OEFI-issued Chevron gas card, an OEFI-issued Shell gas card, an OEFI-

20  issued Phillips 76 gas card, as well as a company Mastercard.  Likewise, Goodell –

21  not a field employee – had a Phillips 76 card, a Shell card, and a Mastercard.)

22    450.   Leo Majich, by allowing more than three dozen employees to use

23  OEFI credit cards with few if any restrictions and without any safeguards to ensure

24  they were being used solely on fund business, breached his fiduciary duty to act

25  with loyalty to participants (by ensuring that plan monies were spent on their behalf

26  and not for personal use of his employees and by defraying plan administration

27  expenses), as well as his duty to act as a prudent man would under similar

28  circumstances in performing his job as Funds Manager.

451.   By engaging in this conduct (i.e., extending credit to employees for personal use and paying personal expenses incurred on OEFI credit cards), Majich and OEFI also knowingly caused prohibited transactions with parties in interest (namely, employees of OEFI, *see* 29 U.S.C. §1002(14)(H)); in violation of ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D), with actual or constructive knowledge that doing so constituted an extension of credit and/or a transfer to, or use by or for the benefit, of the employees of plan monies, since all of OEFI's monies come from Local 12's Trusts, including the Pension Fund.

452.   Majich and Waggoner were provided with the annual audits on an annual basis, and, on information and belief, so were the rest of the Trustees (assuming they were fulfilling their duties under § 404(a) and § 405(b)(1)).  Yet, despite actual knowledge of the rampant credit card abuse and loss of fund monies, they did nothing to remedy the misconduct, even though Majich, OEFI, Waggoner and Chairman Bourguignon were certainly capable of, e.g., demanding reimbursement, taking away credit cards and/or firing the employees who were misusing and embezzling fund assets for personal use.   When Michael Graydon took over Majich's position, he ultimately canceled unnecessary credit cards and was able to recover some of the lost monies; however, other monies – paid by the Plan to OEFI and lost due to such credit card abuse - were not recovered, to the detriment of the Plan.

453.   The Pension Fund Defendant Trustees took no steps of their own to remedy the rampant credit card abuse for personal purposes, about which they knew as a result of the audits, and instead actively concealed it from Plaintiffs and plan participants.  They are liable both for breaching their fiduciary duties to act prudently managing and controlling the plan's assets and as co-fiduciaries for the above described ERISA violations of Majich, OEFI, Waggoner and Bourguignon. By failing to institute and enforce policies that would have prevented such widespread access to and rampant misuse of OEFI (and, thus, Plan) monies,

consistent with their duties under § 404(a)(1), they enabled the breaches above to occur, and are liable under § 405(a)(2).

454.   In addition, they actively concealed the misconduct, including the annual audit reports, from plan participants, who undoubtedly would have complained to the DOL and demanded that heads roll had they been alerted to reports showing that their plan assets were being embezzled and mis-spent in such a fashion.  As such, the Pension Fund Defendant Trustees, regardless whether they themselves directly participated in the breaches, are liable as co-fiduciaries under § 405(a)(1).

455.   Finally, by virtue of the audit reports showing rampant misuse of OEFI monies during their tenures as Trustees, all of the Pension Fund Defendant Trustees were fully aware of the breaches of Majich, OEFI, Waggoner and OEFI Chairman Bourguignon, yet they took no steps to remedy the misconduct.   As such, they are liable as co-fiduciaries with Majich, OEFI, Waggoner and Kenneth Bourguignon under § 405(a)(3).

**4.      ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.11 Above (Failure to Address Improper Double-Breasting and Resulting Lack of Contributions)**

456.   Plan fiduciaries such as the Pension Fund Trustees have a fiduciary duty, in keeping with their duty to serve the interests of plan participants and to act prudently, to seek to collect monies and contributions owed to the Plan and its participants and beneficiaries.   As discussed in Section IV.C.11, paragraphs 236-241, *supra*, incorporated herein by reference, by failing to pursue employers for contributions that those employers were evading by engaging in improper double-breasting in order to circumvent their contribution obligations, Majich (now deceased) and the Pension Fund Trustees breached their fiduciary duties under § 404(a).  Likewise, by simply failing to collect millions of dollars of delinquent contributions from employers, regardless of double-breasting, the Pension Fund

1   Trustees breached their fiduciary duties.  As of mid-2012, for example, there were

2   millions of dollars in delinquent contributions, and, on information and belief, no

3   justifiable basis, consistent with the Trustees' duties under § 404(a), not to seek

4   collection of at least the vast bulk of those contributions, by, e.g., instituting

5   litigation (counsel Chris Laquer has been paid millions of dollars during the last

6   five years in large part for collection services), by calling for work-stoppages to

7   induce compliance, or by other means available to them.  It is no defense to a Plan

8   trustee to assert blissful ignorance as to whether contributions are improperly being

9   avoided and/or not collected, given the Trustees' duties of prudence and loyalty and

10  their obligations to jointly manage and control plan assets.

11        457.   Moreover, any Trustees (if there were any) who learned about the

12  breaches after the fact and yet still took no steps to remedy them are liable as co-

13  fiduciaries under § 405(a)(3).

14              **5.      ERISA Liability Based on Acts and Omissions Discussed in**

15                       **Section IV.C.12 Above (Payment of Employee FICA Taxes**

16                       **From Fund Monies)**

17        458.   As discussed in Section IV.C.12, paragraphs 242-250, *supra*,

18  incorporated herein by reference, personal FICA tax shares of employees of OEFI,

19  the Pension Fund, the Health & Welfare Fund and the Vacation Fund, were, until

20  Michael Graydon discovered the practice and stopped it in 2010, paid from OEFI's

21  General Fund, that, on information and belief was either engineered or at least

22  approved of many years ago by Waggoner and Leo Majich.   OEFI and its

23  Chairman, Pension Fund Trustee Kenneth Bourguignon, as well as at least the

24  Local 12 officer Plan Trustees, were also fully aware of this practice, yet did

25  nothing to stop it or to remedy the breaches, such as by demanding and obtaining

26  reimbursement of the monies.   Paying FICA taxes from fund monies (since all

27  OEFI monies are derived from the Trusts, including OEFI) plainly was not

28  consistent with the Trustees' duties to act with the exclusive purpose of paying

1  benefits to plan participants and beneficiaries and to defray expenses of plan

2  administration, nor the way any prudent man would act under similar

3  circumstances.  Indeed, when Michael Graydon and/or his staff approached a third

4  party vendor regarding handling payroll for OEFI and the Trusts, which OEFI had

5  been handling for years, the vendor stated that it had never heard of such a thing

6  occurring.   As such, these fiduciaries breached their fiduciary duties under §

7  404(a).

8       459.   Defendants OEFI, Waggoner, Majich, Tolbert and Kenneth

9  Bourguignon did not publicize that they were using FICA payments as a

10  mechanism for giving employees of OEFI and the Trusts hidden raises paid for

11  with the assets of the Trusts.

12       460.   OEFI, Kenneth Bourguignon, and Waggoner also engaged in

13  prohibited transactions by knowingly paying fund monies (the FICA tax shares) to

14  OEFI and other Trust employees for their use and benefit.  Such employees are

15  parties in interest under 29 U.S.C. § 1002(14(H), as are fiduciaries like Majich and

16  Tolbert, who had their own FICA tax shares paid by OEFI.

17       461.   Every Trustee who has served since Graydon discovered and

18  discontinued the practice in 2010 has been aware that it was a breach of fiduciary

19  duty to pay FICA taxes of OEFI and other employees using fund monies.   None of

20  them have taken steps to remedy the breaches, either by seeking reimbursement

21  from the parties in interest who received the FICA share payments, or by obtaining

22  reimbursement from their co-fiduciaries who breached their duties by diverting

23  plan assets from the Plan and its participants to employees of OEFI and the Trusts,

24  and by causing prohibited transactions.

25

26

27

28

6. **ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.14 Above (Maintenance of Incompetent Employer Trustees on Trusts)**

462.   As discussed in Section IV.C.14, paragraphs 255-260 *supra*, which are incorporated herein by reference, two management-side Trustees (Poss and Kenneth Bourguignon) who have been incompetent within at least the last two years to satisfactorily perform their duties as Pension Fund Trustees were allowed within at least the last two years to remain as Trustees for the Pension Fund, which has two billion dollars in assets and should have compete trustees.   Their co-trustees failed to act prudently and with a single eye toward the best interests of plan participants and beneficiaries by failing to take steps to remedy this misconduct and instead simply sitting by while incompetent Trustees whose "discretion" and exercise thereof Waggoner generally controlled were allowed to serve as Trustees.

7. **ERISA Liability Based on Acts and Omissions Discussed in § IV.B.2 Above (Relating to BA's Fund)**

463.   As discussed in Section IV.B.2, paragraphs, 65-79, *supra*, the allegations of which are incorporated by reference, OETT instructors have been paid $550 monthly for "expenses" from OETT assets without any policy or practice of confirming that all (or any) such monies were in fact actually expended for the benefit of the OETT.   As previously alleged, the same "expense" practice, resulting in payments to the BA's Fund, occurred with OEFI auditors, whose compensation, given the nature of OEFI's funding, derives from monies from all three Trusts, including the Health & Welfare Fund.  Waggoner and his officer co-defendant Trustees of the Pension Fund, as well as OEFI and its sometimes Chairman and long-time management-side Pension Fund Trustee, Kenneth Bourguignon, have authorized, enabled and/or knowingly permitted this conduct to occur for years, with knowledge or at least constructive knowledge that it was not a

1   proper use of fund assets despite their duties to ensure that plan assets are used for

2   the benefit of participants and to defray administration expenses.   Simply paying

3   lump sum expenses of $550 without any reasonable or actual expenses incurred, in

4   large part so that $50 a month could be kicked back to the BA's Fund, is

5   unquestionably a breach of both the duty of loyalty and the duty of prudence under

6   § 404(a).

7       464.   Waggoner, who has generally fancied himself as in charge of the

8   Trusts and placed himself in charge of deciding matters of compensation, including

9   this sort of expense arrangement (which personally benefits him), also caused

10   prohibited transactions by transferring Pension Fund assets (as part of the $550 of

11   unchanging, monthly purported "expense" monies paid to OEFI employees partly

12   derived from Pension Fund monies, given the nature of OEFI's business as

13   described above) to parties in interest including employees and fiduciaries

14   (including himself, by virtue of the kickback of $50, himself).   Waggoner also

15   engaged in prohibited self-dealing in violation of § 406(b) by conceiving of and

16   implementing a program whereby he would skim $50 of the $550 in monthly

17   "expenses" paid from Plan assets for his own personal benefit.   Knowingly

18   permitting a portion of the inflated $550 in expenses paid monthly to OEFI auditors

19   (from Taft-Hartley funds) to be kicked back on a monthly, continuing basis to

20   Waggoner for the BA's Fund was unquestionably a breach of both the Trustees'

21   duty of loyalty and duty of prudence.  No reasonable Plan Trustee could believe

22   that allowing a program with the purpose and effect of diverting thousands of

23   dollars of monies annually from the Pension Fund (and, indirectly, its participants)

24   to the use and benefit of Waggoner was in any way consistent with his duties to the

25   Plan.

26       465.   OEFI, Kenneth Bourguignon and the other Local 12 Officer Pension

27   Fund Trustees, at least, have known for years that Waggoner was engaging in this

28   conduct, but did nothing to stop it or remedy it (putting aside that the extra

"expense" monies are now, since the filing of this action, being paid directly through payroll, rather than separate checks, in an apparent effort to actively conceal the continuing misconduct).

466.   The management Plan Trustees have known since at least the filing of this action that such conduct was occurring and has been occurring for years, yet they too have taken no steps to remedy the past misconduct in took no steps to remedy the past misconduct, including the loss of fund monies that now may not be recoverable by them due to the passage of the statute of limitations.

**8.     ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.4 Above (Regarding Pension Fund Real Estate Holdings)**

467.   As alleged in Section IV.C.4, *supra*, the allegations of which are incorporated herein by reference, the Pension Fund Trustees breached their fiduciary duties in numerous ways in connection with real estate assets which they, as Trustees, hold in trust for the benefit of Plan participants and beneficiaries. These breaches occurred in connection with the room conversion and lease transactions at the Plan's Washington Court Hotel (see ¶¶ 175-181), in connection with the Plan's Dallas parking facilities (see ¶¶ 188), in connection with the Sheraton Grand Hotel (see ¶¶ 189-191), in connection with other Pension Fund properties owned in California which have not been put to their best use to earn monies for participants and beneficiaries and with respect to which extensive monies have been paid to contractors for construction that was not properly completed (see ¶¶ 192).   The Pension Fund Trustees have, by these acts and omissions, breached their fiduciary duties under ERISA § 404(a)(1)(A) (duty of loyalty), § 404 (a)(1)(B) (duty of prudence).  In addition, the Trustees, as discussed in paragraphs 193-199, have invested far too greatly in real estate and thereby failed to properly diversify the assets of the Plan, rendering them liable under § 404 (a)(1)(B).

468.   The Trustees, and each of them, are also liable for failing to use reasonable care to prevent Waggoner from committing breaches and in failing to jointly – in any real sense – manage and control the Plan assets, to the extent Waggoner was allowed, with respect to the Properties in question, to enter into whatever lease agreements or side-deals he wished to enter into without proper oversight by other Trustees.   § 404 (b)(1)(A).

469.   The Trustees other than Waggoner are also liable as co-Trustees Waggoner's breaches under § 405(a).   By effectively allowing Waggoner to run the Plan's real estate business as he liked, the Trustees enabled Waggoner to engage in the conduct discussed in Section IV.C.4 *supra*, and they are thus liable under § 405(a)(2).    The Trustees other than Waggoner were also aware – or should have been – that he was entering into below-market lease transactions, that he was not putting real estate to good use, that he was over-investing in real estate, and that, e.g., he was allowing the conversion of room space in the Washington Court hotel (at conversion costs to the Plan) to an apartment to provide free living space to Joel Manion's son.    They are thus also liable under § 405(a)(3).

> **9.**     **ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.10 Above (Hiring of Patty Waggoner Company to Improve Pension Fund Properties)**

470.   As alleged above, during the time when she was a high-ranking officer of Spacemaker Tenant Improvements ("Spacemaker") with a right to share in that entity's profits, including within the six years prior to the filing of this action, the Pension Fund has hired Spacemaker to perform contracting services on properties owned by the Pension Fund, including its Vintage Park and Lake Avenue properties.

471.   The contracting services provided by Spacemaker were not provided on the basis of arms-length bidding processes.  Rather, Spacemaker received those construction jobs simply by virtue of Patty Waggoner's marriage to William

Waggoner.  Moreover, even had they used a bidding process, Spacemaker, due to the spousal relationship between the Waggoners, could not appropriately have performed that work.   Pension Fund monies were paid to Spacemaker (and, therefore, to Patty Waggoner).  Moreover, as alleged above, substandard work was performed and not remedied appropriately.   And, Spacemaker failed to make required Pension Fund contributions for the member employees working for it on these properties, and Waggoner and the other Pension Fund Trustees took no efforts to recover those contributions, in further breach of their fiduciary duties. Waggoner and all Pension Fund Trustees who sat as Trustees at the time of these events violated Rule 406(a) by hiring Patty Waggoner's company and thereby causing the Fund to engage in prohibited transactions with Patty Waggoner, a party in interest given her relationship with Trustee William Waggoner.

472.   In addition, to the extent certain Trustees did not participate in the retention of Spacemaker/Patty Waggoner, they are liable in any event, by failing to exercise reasonable care to ensure Waggoner was not breaching his duties, by taking no steps to remedy Waggoner's breaches, including, by, e.g., suing him or Spacemaker for the losses due to the Plan following the retention of his wife's company as contractor.  To the extent some Trustees assert that the acts described above are Waggoners and that they were unaware that he was hiring his wife's company in prohibited transactions, they are nonetheless liable for enabling his breaches by failing to act prudently in handling Pension Fund assets as Trustees. If certain Trustees did not approve of Waggoner's real estate-related practices in connection with the Pension Fund, they could not simply disassociate themselves from the handling of the real estate aspects of the Plan asset portfolio consistent with their duties to Plan participants and beneficiaries.

### 10.   ERISA Liability Based on Other Party in Interest Transactions

473.   In addition, the Pension Fund Trustees knowingly caused the Plan to engage in investment-related transactions with pension investment advisor John Elliot, the son of Defendant Trustee Walt Elliot and thus a person in interest under ERISA.   *See* 29 U.S.C. § 1002(14)(F) and (15).   The Pension Fund Trustees plainly knew that these transactions constituted a direct furnishing of services by persons in interest, since they knew of the familial relationship between Walt and John Elliot.  They thus knew – or should have known – that these were prohibited transactions under ERISA.   See ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C) (prohibiting transactions involving the furnishing of services between the plan and a party in interest).  To the extent any losses were incurred by the Plan in connection with any investments made utilizing the services of John Elliot (during the last several years while Walt Elliot served as a Trustee), or the services of Kenny Waggoner, also a party in interest, while at McMorgan, the Trustees should be required to make good to the Plan for those losses.

474.   In sum, the acts and omissions of Defendants set forth above and in the allegations incorporated by reference in this Claim were in no way consistent with their duties under § 404 to make all decisions with an eye single to the interests of the plan participants and beneficiaries, to act prudently and with single-minded devotion to plan participants and beneficiaries, or to act for the exclusive purposes of providing benefits to plan participants and beneficiaries and defraying administrative expenses of the Plan.

475.   As a proximate result of Defendants' conduct as alleged above, the Plan has been harmed and sustained losses.   Defendants should be required to make good to the Plan for any losses it has suffered as a result of their breaches. Defendants Waggoner and any other fiduciaries who have earned profits or ill-gotten gains should also be required to restore any profits they have made by using

the assets of the plan.   In addition, the Plan Trustees should all be removed as Trustees by the Court, as they have plainly demonstrated their unfitness to serve as fiduciaries by the acts and omissions set forth above.  *See* ERISA § 409.

## FOURTH CLAIM FOR RELIEF

### EQUIITABLE RELIEF, WITH RESPECT TO THE PENSION FUND, PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)

**[By All Plaintiffs, On Behalf of the Pension Fund as a Whole and the Local 12 Fund Beneficiary Class, Seeking Equitable Relief, Against the Pension Fund Defendant Trustees, OEFI, Kenneth Bourguignon, Patty Waggoner and Kenneth Waggoner**

476.   Plaintiffs re-allege and incorporate by reference Section VI (ERISA Provisions) and paragraphs 106-122, 175-199, 214-260 above, as well as the allegations in the preceding Claim for Relief except those allegations relating to the relief sought thereunder, as though every such allegation were physically contained within the text of this Claim for Relief.

A.   **Statutory Basis for this Claim**

477.   ERISA § 502(a)(3) authorizes suits "(A) to enjoin any act or practice which violates any provision of [Title I] or the terms of the plan, or (B) to obtain appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [Title I] or the terms of the Plan." 29 U.S.C. § 1132(a)(3).

478.   ERISA § 502(a)(3) "admits of no limit … on the possible universe of defendants." *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246 (2000). The "focus" is "on redressing the 'act or practice' which violates" ERISA. *Id*.  A defendant may be sued under § 502(a)(3) even if it is not "expressly subject to a duty under one of ERISA's substantive provisions." *Id*.

**B.    Parties to this Claim**

479.   This Claim for Relief is brought against the Pension Fund Defendant Trustees, OEFI, and Kenneth Bourguignon.  All of these defendants, as alleged previously, are fiduciaries with respect to the Pension Fund.  This claim is also brought against Kenneth Waggoner and Patty Waggoner, who, regardless of fiduciary status, may be sued hereunder as non-fiduciaries who participated in ERISA violations, such as prohibited party-in-interest transactions under ERISA § 406(a).

480.   Plaintiffs are participants in the Pension Fund.  The goal of Title I of ERISA is to protect the interests of participants and their beneficiaries in employee benefit plans.

481.   This Claim is brought by Plaintiffs, individually and on behalf of the Local 12 Fund Beneficiary Class, seeking equitable relief to protect the Pension Fund (sometimes referred to in this Claim as the "Plan").

482.   This Claim for Relief seeks only equitable relief.

**C.    Acts or Practices Violating Title I of ERISA**

483.   In the interests of brevity, Plaintiffs incorporate the allegations regarding ERISA violations and fiduciary breaches in the preceding Claim For Relief as though fully set forth herein, with the exception of the allegations regarding the remedies sought in that Claim.

**D.    Equitable Relief Sought on Behalf of the Plan for Acts and Practices Violating Title I of ERISA**

484.   Plaintiffs request a permanent injunction forbidding the Pension Fund Trustees from engaging in prohibited transactions with parties in interest (such as Kenneth Waggoner and John Elliot) in violation of § 406(a), including but not limited to the acts and practices at issue herein.

485.   Plaintiffs request a permanent injunction forbidding the Pension Fund Trustees from engaging in self-dealing in violation of § 406(b).

486.   Plaintiffs request a permanent injunction forbidding OEFI from paying the FICA tax share of its employees or any Trust employee, to the extent that practice has resumed after its discontinuation by Michael Graydon.

487.   Plaintiffs request an injunction specifically forbidding the Officer Trustee Defendants from making personal use of Pension Fund assets (including but not limited to real estate owned by the Plan) or using such assets for any reasons other than the purposes of providing benefits to Plan participants and defraying reasonable plan expenses of administration.

488.   Plaintiffs request an order requiring Waggoner, Patty Waggoner, Kenny Waggoner and any other Defendants herein and to disgorge all profits and all plan assets (and/or the reasonable value thereof, to the extent labor and services were obtained from Plan employees), they have obtained as a result of their violations of Title I as alleged herein, including their participation in prohibited transactions as parties in interest or otherwise.

489.   Assuming the Court removes them as Trustees pursuant to the First Claim for Relief, Plaintiffs request an order forbidding the Pension Fund Officer Trustee Defendants from ever serving again as a fiduciary in connection with the Pension Fund or any Local 12-affiliated employee benefit plan.

490.   Assuming the Court removes them as Trustees pursuant to the First Claim for Relief, Plaintiffs request an order forbidding the management-side Officer Trustee Defendants from ever serving again as a fiduciary in connection with the Pension Fund or any Local 12-affiliated employee benefit plan.

491.   Plaintiffs request an order forbidding William Waggoner and any other Local 12 Officer Trustee Defendants, to the extent they in the future replace him in his position as Business Manager due to his retirement, imprisonment, or any other reason, from appointing or having any role in the appointment of any new union Trustees to the Pension Fund or any Local 12-affiliated employee benefit plan.

492.   Plaintiffs request an order requiring appropriate diversification of Pension Fund assets, including but not limited to real estate owned by the Plan.

493.   Plaintiffs request a permanent injunction requiring the Trustees of the Plan to take reasonable steps to collect all contributions owed by employers to the Plan that may still be recovered *(see, e.g.* 29 U.S.C. § 1145), as well as all contributions that come due in the future.

494.   Plaintiffs request an injunction forbidding William Waggoner from diverting Plan assets to himself by means of his BA's Fund practice, and requiring him to disgorge all such funds he has taken in the past.

495.   Plaintiffs request an injunction requiring OEFI to institute written policies and procedures forbidding the use of OEFI credit cards for personal use.

496.   Plaintiffs request an injunction requiring a vote of all Trustees, to be recorded in the minutes of the meetings of any such Trustees, on any proposal to write off the debts of any employers.

497.   Plaintiffs request an order requiring any defendants who participated in prohibited transactions, as alleged herein, either as party in interest or as plan fiduciary, to disgorge any monies or assets obtained in connection with such transactions.

498.   Plaintiffs request an order requiring any defendants who engaged in self-dealing, as alleged herein, to disgorge any monies or assets obtained thereby.

499.   Plaintiffs request an order prohibiting Defendants from destroying Plan-related documents unless permitted to do so by law.

FOURTH AMENDED CLASS ACTION COMPLAINT

# FIFTH CLAIM FOR RELIEF

## ERISA VIOLATIONS WITH RESPECT TO THE PENSION FUND PURSUANT TO ERISA § 409, 29 U.S.C. § 1109, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2)

### [By Plaintiff Salas, on Behalf of the Plan As a Whole and the Local 12 Fund Beneficiary Class, Against the Pension Fund Defendant Trustees]

### (Based on Extra Retiree Pension Payments)

500.   Plaintiffs re-allege and incorporate by reference Section VI (ERISA Provisions) and paragraphs 106-122, 175-199, 214-260 set forth *supra*, as though every such allegation were physically contained within the text of this Claim for Relief.

### A.    Statutory Basis For This Claim

501.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant or beneficiary to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C § 1109.

502.   ERISA § 409(a) provides that  "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."  (Emphasis added.)

503.   This Claim is brought by Plaintiff Salas, not on his own behalf as an individual, but rather in a representative capacity on behalf of the Pension Fund (sometimes referred to in this claim as the "Plan") as a whole, seeking to recover class relief for the Plan as authorized in § 409(a), pursuant to Fed. R. Civ. P. 23(b)(1).

B. **Parties to this Claim**

504.   This Claim for Relief is brought against the Pension Fund Defendant Trustees.   These Defendants have assumed fiduciary obligations to plan participants, including Plaintiffs, and are "fiduciaries" under ERISA.   ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), provides in relevant part that a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

505.   Each of the Trustee defendants herein was given and accepted discretion to manage the Plan in his role as Trustee and, in fact, each such defendant exercised at least some authority and control (regardless whether he did so in a manner consistent with his duties under ERISA) over the management and disposition of Plan assets.

506.   Trustees and plan administrators are, by definition, fiduciaries.  20 C.F.R. § 2509.75-8 ("a plan administrator or a trustee of a plan must, by the very nature of his position, have "discretionary authority or discretionary responsibility in the administration" of the plan within the meaning of § 3(21)(A)(iii) of the Act. Persons who hold such positions will therefore be fiduciaries.")

507.   Plaintiff Salas is and at all relevant times has been a participant in the Pension Fund.  The goal of Title I of ERISA is to protect the interests of participants and their beneficiaries in employee benefit plans.

508.   The Pension Fund Defendant Trustees for many years approved, or at least knowingly acquiesced in, Waggoner's longstanding practice of issuing a thirteenth (i.e., additional) annual pension payment to retirees at the end of each

FOURTH AMENDED CLASS ACTION COMPLAINT

year, which was done for the purpose of securing votes for Waggoner and his slate
from retirees, a group that is typically has the highest participation rate in union
elections.

509.   This *additional* payment to retirees, which occurred through the end of
2011, was not planned for in retirees' original contributions.  It places additional
stress on the Pension Fund and certainly not is consistent with any purpose to
ensure the continuing soundness of the Plan.   To their (very belated) credit, the
Trustees finally discontinued the practice in 2012 because of the restoration status
of the Plan, which, as previously alleged, is in critical condition.   Giving extra
pension payments to retirees while actually demanding restoration payments from
members was too much even for the Pension Fund Defendant Trustees.

510.   However, by allowing this practice in prior years, including through
the end of 2011, they violated their duty of loyalty owed to all Plan participants and
beneficiaries, as well as their duty of prudence, since no prudent man would act in
such a fashion under similar circumstances.   Assisting Waggoner in ensuring his
re-election as Business Manager and his ability to continue his illegal practices
does not qualify as prudence under ERISA.   Further, the duty of loyalty is owed to
the Plan and its participants and beneficiaries, not to William Waggoner.   As such,
the Plan Trustees breached their fiduciary duties under § 404(a) by approving and
enabling this practice and knowingly allowing it to continue through 2011.

511.   To the extent any of the Defendant management Trustees claim they
were blissfully unaware of the fact that additional pension payments were being
made to thousands of retirees annually, such conduct would itself be a breach of
fiduciary duty under § 404(a) and a breach of their duties under § 405(b) to take
reasonable care to ensure that co-trustees do not breach their duties and to jointly
manage and control the Plan's assets.   Moreover, the Trustees certainly knew of
the practice when they terminated it at the end of 2011, but they took no steps to
remedy the breaches from previous years.   Doing so would have made their own

misconduct more clear.  In addition, demanding repayments from the retiree voting bloc would have been unpopular and a problematic political strategy for the union defendants, to say the least.   Moreover, since all of the Trustees were responsible for the practice, they would have had to demand that they themselves remedy the breaches, which was not going to happen.  No Local 12-affiliated Trust fiduciary, to Plaintiffs' knowledge, has ever dared demand that Waggoner himself make good for losses caused to the Trusts based on his own misconduct, let alone sued him to force him to do so.

512.   By paying millions of dollars of extra Pension Fund benefits to retirees not contemplated by their contributions and by incurring the extra associated administration costs of doing so, in order to serve Waggoner's political purposes, the Plan Trustees breached their fiduciaries duties under § 404(a)(1)(A) (duty of loyalty) to act solely in the interests of Plan participants and beneficiaries and for the purpose of defraying reasonable administration expenses  and § 404(a)(1)(B) (duty of prudence), since paying out additional pension fund benefits, to the detriment of the Plan as a whole, for such political reasons is not consistent with ensuring the solvency and continuation of the Plan.

513.   All of the Pension Fund Trustees also are liable under § 405(a)(1) for knowingly participating in this improper thirteenth pension payment practice, for enabling it by failing to satisfy their own duties of loyalty and prudence under § 404(a), and by failing to take steps to remedy it, for years, as it occurred with their knowledge on an annual basis, through the end of 2011.

514.   In sum, the acts and omissions of Defendants set forth above and in the allegations incorporated by reference in this Claim were in no way consistent with their duties under § 404 to make all decisions with an eye single to the interests of the plan participants and beneficiaries, to act prudently and with single-minded devotion to plan participants and beneficiaries, or to act for the exclusive purposes

FOURTH AMENDED CLASS ACTION COMPLAINT

1  of providing benefits to plan participants and beneficiaries and defraying

2  administrative expenses of the Plan.

3      515.   As a proximate result of Defendants' conduct as alleged above, the

4  Plan has been harmed and sustained losses.   Defendants should be required to

5  make good to the Plan for any losses it has suffered as a result of their breaches.

6  In addition, the Plan Trustees should all be removed as Trustees by the Court, as

7  they have plainly demonstrated their unfitness to serve as fiduciaries by the acts

8  and omissions set forth above.  *See* ERISA § 409.   Equitable relief should also be

9  granted, forbidding the challenged practice in the future.

10

11          **SIXTH CLAIM FOR RELIEF**

12  **ERISA VIOLATIONS WITH RESPECT TO THE HEALTH & WELFARE**

13  **FUND PURSUANT TO ERISA § 409, 29 U.S.C. § 1109, ERISA § 502(a)(2), 29**

14          **U.S.C. § 1132(a)(2)**

15  **[By All Plaintiffs, on Behalf of the Plan as a Whole and the Local 12 Fund**

16  **Beneficiary Class, Against the Health & Welfare Fund Defendant Trustees,**

17          **OEFI, Kenneth Bourguignon and Kenneth Waggoner]**

18      516.   Plaintiffs re-allege and incorporate by reference Section VI (ERISA

19  Provisions) and each and every allegation set forth above, as though every such

20  allegation were physically contained within the text of this Claim for Relief,

21  including, in particular, paragraphs 106-122, 200-213, 218-250, and 259-260.

22      A.    **Statutory Basis For This Claim**

23      517.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan

24  participant or beneficiary to bring a civil action for appropriate relief under ERISA

25  § 409, 29 U.S.C § 1109.

26      518.   § 409(a) provides that "[a]ny person who is a fiduciary with respect to

27  a plan who breaches **any** of the responsibilities, obligations, or duties imposed

28  upon fiduciaries by this subchapter shall be personally liable to make good to such

plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." (Emphasis added.)

### B. <u>Parties to this Claim</u>

519.   This Claim for Relief is brought against the Health & Welfare Fund Defendant Trustees, OEFI and its former Chairman Kenneth Bourguignon, and Kenneth Waggoner, given his role as an investment advisor to the Plan.  These Defendants have assumed fiduciary obligations to plan participants, including Plaintiffs, and are "fiduciaries" under ERISA.    ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), provides in relevant part that a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.  Trustees and plan administrators are, by definition, fiduciaries.  20 C.F.R. § 2509.75-8.

520.   This Claim is brought by Plaintiffs, not on their own behalf as individuals, but rather in a representative capacity on behalf of the Health & Welfare Fund (sometimes referred to in this claim as the "Plan") as a whole, seeking to recover class relief for the Plan as authorized in § 409(a), pursuant to Fed. R. Civ. P. 23(b)(1).

521.   The goal of Title I of ERISA is to protect the interests of participants and their beneficiaries in employee benefit plans.

**FOURTH AMENDED CLASS ACTION COMPLAINT**

C.     **Bases for ERISA Liability**

      1.     **ERISA Liability Based on Acts and Omission Discussed in Section IV.C.1 Above (Losses due to Write-offs and Failures to Collect Debts/Contributions Owed to the Plan By Employers)**

522.   Plan fiduciaries have a duty to seek to collect all monies owing to the Plan, so that they may be used for the benefit of participants and beneficiaries. Here, as discussed in paragraphs 106-122 *supra*, incorporated by reference, the Health & Welfare Fund Defendant Trustees failed to act prudently and loyally, in violation of § 404(a), when they allowed Waggoner to write off, or decline to collect debts owed by certain employers, including Defendant Poss's company, Leo Majich's company, and other employers whose identities are not yet known to Plaintiffs but are or should be known to Defendants.   Such conduct, on information and belief, is continuing, and has occurred on a regular, continuing basis over the last ten years, although Defendants omitted to disclose its occurrence to Plaintiffs, who only learned of it within the last year.  To the extent certain of the management Health & Welfare Fund Trustee defendants claim to have been ignorant of the fact or extent to which Waggoner was writing off, excusing, or declining to collect employer debts because they simply deferred such decisions to Waggoner or his "write-off committee" of two, they breached their fiduciary duty to jointly manage and control plan assets and to prudently pursue monies that could be used for plan purposes.

523.   Every instance of such conduct also constitutes a prohibited transaction under § 406(a)(1)(B) (lending of money or other extension of credit between the plan and a party in interest).

524.   All of the Health & Welfare Fund Defendant Trustees are liable under § 405(a), regardless whether they themselves knowingly participated in the decisions to write off debts.   Even if they did not themselves approve the write-

offs, Trustees are, as previously alleged, required to pursue and collect monies owed to the Plan, not to simply forego doing so; here, in allowing Waggoner and the officer defendants to write off debts of favored son employers, including co-trustee Poss's company and in taking no steps thereafter to remedy the breaches, the Health & Welfare Fund Defendant Trustees rendered themselves liable for the breaches. Moreover, by failing to make good on their own duties to act with a single eye toward the interests of Plan participants – rather than Waggoner or favored employers – the Trustees enabled the breaches of Waggoner and the officer defendants. Certainly, it would have been easy to keep tabs on contributions owed to the Plan, and to require full votes of a majority of Trustees before any debts could be written off (assuming there was some reasonable basis to write off debts in some particular instances), but here, the Trustees did no such thing, instead deferring to Waggoner to make such decisions as a general rule. They are all liable for this reason.

> **2. ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.8 Above (Losses due to Misconduct by Theresa Goodell at OEFI)**

525. As discussed in paragraphs 218-226 *supra*, incorporated herein by reference, OEFI Funds Manager (and fiduciary) Leo Majich's daughter, Theresa Goodell, embezzled OEFI monies for personal travel and other personal business, took pay for phony overtime, and, with Leo Majich, took extra payroll checks. Majich also engaged in prohibited self-dealing (§ 406(b)) and, because he was a party in interest, prohibited transactions (§ 406(a)) each time he took extra payroll checks.

526. Defendants OEFI, its Chairman Kenneth Bourguignon, Leo Majich and William Waggoner knew this was occurring and took no steps to remedy the misconduct by, e.g, reporting Goodell (or Majich, to the extent he took extra

payroll checks) to governmental authorities, demanding and obtaining reimbursement, or instituting litigation against Goodell and Majich.   They breached their duties of loyalty by allowing this conduct to occur (and Waggoner then protected Ms. Goodell, rather than firing her, as he could easily have done given his control over hiring and firing; Kenneth Bourguignon also failed to take steps to have her fired).

527.   The other Health & Welfare Fund Defendant Trustees also are liable as co-fiduciaries, because they have had actual knowledge (via audit results) of the misconduct of their co-fiduciaries for several years but took no steps to remedy the misconduct either (by demanding reimbursement, filing – or even reasonably considering the possibility of - litigation, reporting the wrongdoers to the DOL, etc.).   As such, they are liable under § 405(a)(3).

**3.** **ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.9 Above (Losses due to Credit Card Fraud by OEFI Employees)**

528.   As discussed in paragraphs 227-229 *supra*, incorporated herein by reference, OEFI's auditor, Bernard Kotkin & Co., performed annual audits which demonstrated massive misuse and embezzlement of OEFI monies (derived from the three Trusts at issue, including the Health & Welfare Fund) for the personal use of employees of OEFI.  Dozens of employees had credit cards unnecessary to their positions, including, e.g, Sears cards, Costco cards, gas cards, Mastercard and Visa cards, and, in some instances, multiple gas cards.  (Leo Majich, for example, though not a field employee, had an OEFI-issued Chevron gas card, an OEFI-issued Shell gas card, an OEFI-issued Phillips 76 gas card, as well as a company Mastercard.  Likewise, Goodell – not a field employee – had a Phillips 76 card, a Shell card, and a Mastercard.)

529.   Leo Majich, by allowing more than three dozen employees to use OEFI credit cards with few if any restrictions and without any safeguards to ensure

they were being used solely on fund business, breached his fiduciary duty to act with loyalty to participants (by ensuring that plan monies were spent on their behalf and not for personal use of his employees and by defraying plan administration expenses), as well as his duty to act as a prudent man would under similar circumstances in performing his job as Funds Manager.

530.   By engaging in this conduct (i.e., extending credit to employees for personal use and paying personal expenses incurred on OEFI credit cards), Majich and OEFI also knowingly caused prohibited transactions with parties in interest (namely, employees of OEFI, see 29 U.S.C. §1002(14(H)); in violation of ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D), with actual or constructive knowledge that doing so constituted an extension of credit and/or a transfer to, or use by or for the benefit, of the employees of plan monies, since all of OEFI's monies come from Local 12's Trusts, including the Health & Welfare Fund.

531.   Majich and Waggoner were provided with the annual audits on an annual basis, and, on information and belief, so were the rest of the Trustees (assuming they were fulfilling their duties under § 404(a) and § 405(b)(1)).  Yet, despite actual knowledge of the rampant credit card abuse and loss of fund monies, they did nothing to remedy the misconduct, even though Majich, OEFI, Waggoner and Chairman Bourguignon were certainly capable of, e.g., demanding reimbursement, taking away credit cards and/or firing the employees who were misusing and embezzling fund assets for personal use.   When Michael Graydon took over Majich's position, he ultimately canceled unnecessary credit cards and was able to recover some of the lost monies; however, other monies – paid by the Plan to OEFI and lost due to such credit card abuse - were not recovered, to the detriment of the Plan.

532.   The Health & Welfare Fund Defendant Trustees took no steps of their own to remedy the rampant credit card abuse for personal purposes, about which

FOURTH AMENDED CLASS ACTION COMPLAINT

they knew as a result of the audits, and instead actively concealed it from Plaintiffs and plan participants.  They are liable both for breaching their fiduciary duties to act prudently managing and controlling the plan's assets and as co-fiduciaries for the above described ERISA violations of Majich, OEFI, Waggoner and Bourguignon.  By failing to institute and enforce policies that would have prevented such widespread access to and rampant misuse of OEFI (and, thus, Plan) monies, consistent with their duties under § 404(a)(1), they enabled the breaches above to occur, and are liable under § 405(a)(2).

533.   In addition, they actively concealed the misconduct, including the annual audit reports, from plan participants, who undoubtedly would have complained to the DOL and demanded that heads roll had they been apprised of audit reports showing that Plan assets were being embezzled and mis-spent in such a fashion.  As such, the Health & Welfare Fund Defendant Trustees, regardless whether they themselves directly participated in the breaches, are liable as co-fiduciaries under § 405(a)(1).

534.   Finally, by virtue of the audit reports showing rampant misuse of OEFI monies during their tenures as Trustees, all of the Health & Welfare Fund Defendant Trustees were fully aware of the breaches of Majich, OEFI, Waggoner and OEFI Chairman Bourguignon, yet they took no steps in subsequent years to remedy the breaches of those defendants.   As such, they are liable as co-fiduciaries with Majich, OEFI, Waggoner and Kenneth Bourguignon under § 405(a)(3).

**4.      ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.11 Above (Failure to Address Improper Double-Breasting and Resulting Lack of Contributions)**

14.   Plan fiduciaries such as the Health & Welfare Fund Defendant Trustees have a fiduciary duty, in keeping with their duty to serve the interests of plan participants and to act prudently, to seek to collect monies and contributions owed to the Plan and its participants and beneficiaries.   As discussed in Section

IV.C.11, paragraphs 236-241 *supra*, incorporated herein by reference, by failing to pursue employers for contributions that those employers were evading by engaging in improper double-breasting in order to circumvent their contribution obligations, Majich (now deceased) and the Health & Welfare Fund Defendant Trustees breached their fiduciary duties under § 404(a).  Likewise, by failing to collect millions of dollars of delinquent contributions from employers, irrespective of issues regarding improper double-breasting, the Health & Welfare Fund Defendant Trustees breached their fiduciary duties.  As of mid-2012, for example, there were millions of dollars in delinquent contributions; no justifiable basis existed, consistent with the Trustees' duties under § 404(a), not to seek collection of at least the vast bulk of those contributions, by, e.g., instituting litigation (counsel Chris Laquer has been paid millions of dollars during the last five years in large part for collection services), by calling for work-stoppages to induce compliance, or by other means available to them.

15.    Moreover, the Health & Welfare Fund Defendant Trustees have been apprised of the existence of these breaches for some time and yet, to Plaintiffs' knowledge, still have taken no steps to remedy them.   They are thus liable as co-fiduciaries under § 405(a)(3).

> **5.    ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.12 Above (Payment of Employee FICA Taxes From Fund Monies)**

16.    As discussed in Section IV.C.12, paragraphs 242-250 *supra*, incorporated herein by reference, personal FICA tax shares of employees of OEFI, OETT, the Pension Fund, the Health & Welfare Fund and the Vacation Fund, were, until Michael Graydon discovered the practice and stopped it in 2010, paid from OEFI's General Fund.   That practice, on information and belief, was engineered or at least approved of many years ago by Waggoner and Leo Majich.   OEFI and its Chairman Kenneth Bourguignon, as well as at least the Local 12 officer Trustees,

were also fully aware of this practice, yet did nothing to stop it or to remedy the breaches, such as by demanding and obtaining reimbursement of the monies. Paying FICA taxes from fund monies (as previously alleged, all OEFI monies are derived from the Trusts) plainly was not consistent with the Trustees' duties to act with the exclusive purpose of paying benefits to plan participants and beneficiaries and to defray expenses of plan administration, nor the way any prudent man would act under similar circumstances.  Indeed, when Michael Graydon and/or his staff approached a third party vendor regarding handling payroll for OEFI and the Trusts, which OEFI had been handling for years, the vendor stated that it had never heard of such a thing occurring.   As such, these fiduciaries breached their fiduciary duties under § 404(a).

17.    Defendants OEFI, Waggoner, Majich, Tolbert and Kenneth Bourguignon did not publicize or disclose to Plaintiffs or members generally that they were using FICA payments as a mechanism for giving employees of OEFI and the Trusts hidden raises improperly paid for with assets of the Trusts.

18.    OEFI, Kenneth Bourguignon, and Waggoner also engaged in prohibited transactions by knowingly paying fund monies (the FICA tax shares) to OEFI and other Trust employees for their use and benefit.  Such employees are parties in interest under 29 U.S.C. § 1002(14)(H), as are fiduciaries like Majich and Tolbert, who had their own FICA tax shares paid by OEFI.

19.    Every Trustee who has served since Graydon discovered and discontinued the practice in 2010 has been aware that it was a breach of fiduciary duty to pay FICA taxes of OEFI and other employees using fund monies.   None of them have taken steps to remedy the breaches, either by seeking reimbursement from the parties in interest who received the FICA share payments, or by obtaining reimbursement from their co-fiduciaries who breached their duties by diverting plan assets from the Plan and its participants to employees of OEFI and the Trusts, and by causing prohibited transactions.  All of them are therefore liable as co-

1   fiduciaries for the breaches of Waggoner and the others who were primarily
2   responsible for this Plan-subsidized, disguised raise practice.

3   **6.      ERISA Liability Based on Acts and Omissions Discussed in**
4   **Section IV.C.14 Above (Maintenance of Incompetent**
5   **Employer Trustees on Trusts)**

6       535.   As discussed in Section IV.C.14, paragraphs 255-260 *supra*, which are
7   incorporated herein by reference, management-side Trustee C.W. Poss has been
8   incompetent within at least the last two years to satisfactorily perform his duties as
9   a Trustee, yet he was allowed to remain as a Trustee for the Health & Welfare Fund
10  until his resignation in 2013 after being sued in this action.   Hi co-Trustees failed
11  to act prudently and with a single eye toward the best interests of plan participants
12  and beneficiaries by simply sitting by while Poss, whose "discretion" and exercise
13  thereof Waggoner controlled, was allowed to serve as a Trustee.

14  **7.      ERISA Liability Based on Acts and Omissions Discussed in §**
15  **IV.B.1 Above (Relating to BA's Fund)**

16      536.   As discussed in Section IV.B.1, paragraphs, 65-79 *supra*, the
17  allegations of which are incorporated by reference, OETT instructors have been
18  paid $550 monthly for "expenses" from OETT assets without any policy or practice
19  of confirming that all (or any) such monies were in fact actually expended for the
20  benefit of the OETT.   The same "expense" practice, resulting in payments to the
21  BA's Fund, occurred with OEFI auditors, whose compensation, given the nature of
22  OEFI's funding, derives from monies from all three Trusts, including the Health &
23  Welfare Fund.  Waggoner and his officer co-defendant Trustees of the Health &
24  Welfare Fund, as well as OEFI and its Chairman, Kenneth Bourguignon, have
25  authorized, enabled and/or knowingly permitted this conduct to occur for years,
26  with knowledge or at least constructive knowledge that it was not a proper use of
27  fund assets despite their duties to ensure that plan assets are used for the benefit of
28  participants and to defray administration expenses.   Simply paying lump sum

expenses of $550 without any reasonable or actual expenses incurred, in large part so that $50 a month could be kicked back to the BA's Fund, is unquestionably a breach of both the duty of loyalty and the duty of prudence under § 404(a).

537.   Waggoner, who has generally considered himself as in charge of the Trusts and placed himself in charge of deciding matters of compensation, including this sort of expense arrangement (which personally benefits him), also caused prohibited transactions by transferring Health & Welfare Fund assets to parties in interest including employees and fiduciaries (including himself, by virtue of the kickback of $50).  As previously alleged, OEFI is funded entirely by the Trusts, including the Health & Welfare Fund.

538.   Waggoner also engaged in prohibited self-dealing in violation of § 406(b) by conceiving of and implementing a program whereby he would skim $50 of the $550 in monthly "expenses" paid from Plan assets for his own personal benefit.   Knowingly permitting a portion of the inflated $550 in expenses paid monthly to OEFI auditors (from Taft-Hartley funds) to be kicked back on a monthly, continuing basis to Waggoner for the BA's Fund was unquestionably a breach of both the Trustees' duty of loyalty and duty of prudence.  No reasonable Plan Trustee could believe that allowing an "expense" program designed to divert thousands of dollars of fund monies annually to the use and benefit of Waggoner was in any way consistent with a Trustee's duties to the Plan.

539.   OEFI, Kenneth Bourguignon and the other Local 12 Officer Trustees, at least, have known for years that Waggoner was engaging in this conduct, but did nothing to stop it or remedy it (putting aside that the extra "expense" monies are now, since the filing of this action, being paid directly through payroll, rather than separate checks, in an apparent effort to actively conceal the continuing misconduct).

540.   The management-side Plan Trustees have known since at least the filing of this action that such conduct was occurring and has been occurring for

years, yet they too have taken no steps to remedy the past misconduct in took no steps to remedy the past misconduct, including the loss of fund monies that now may not be recoverable by them due to the passage of the statute of limitations.

**8.   ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.6 Above (Steering of H&W Investments to Kenny Waggoner)**

541.   As alleged in Section IV.C.6 *supra*, the allegations of which are incorporated by reference, the Health & Welfare Fund Trustees have in recent years allowed the Fund to engage in investment transactions with Kenny Waggoner, the son (and thus a party in interest) of William Waggoner.  Kurt Glass questioned this practice and was told by Defendant Chris Laquer to drop the matter.  Such transactions were prohibited transactions under 29 U.S.C. § 1106(a)(1)(C).   The Trustees are liable for all losses resulting from such prohibited transactions.

**9.   ERISA Liability Based on Acts and Omissions Discussed in Section IV.C.5 Above (Prohibited Loan Transaction Between Local 12 and Health & Welfare Fund)**

542.   As alleged in Section IV.C.5 *supra*, the allegations of which are incorporated by reference, the Health & Welfare Fund Defendant Trustees caused the Fund to enter into a $10 million loan with Local 12, a party in interest, and a corresponding $10 million extension of credit with Pro-Biz Bank.  That transaction was illegal.   The Trustees breached their duties under ERISA by agreeing to allow such a *per se* illegal transaction to proceed.   Chris Laquer, counsel for the Health & Welfare Fund, participated directly in and facilitated that illegal transaction and was himself paid many thousands of dollars in Plan monies as a result.

543.   In addition, one of the results of the Local 12 loan transaction was that Pro-Biz Bank required that its loan agreement stipulate that it would be the commercial (as opposed to custodian) bank for the Health & Welfare Fund. This imposed new administration costs for the Plan because it involved splitting the Plan

out of the existing Wells Fargo commercial banking agreement which was a package deal for all of the Trusts for commercial banking services.

544.   As a proximate result of Defendants' conduct as alleged above, the Plan has been harmed and sustained losses.   Defendants should be required to make good to the Plan for any losses it has suffered as a result of their breaches and illegal conduct.   Defendants Waggoner and any other fiduciaries who have earned profits or ill-gotten gains should also be required to restore any profits they have made by using the assets of the plan.   In addition, the Plan Trustees should all be removed as Trustees by the Court, as they have plainly demonstrated their unfitness to serve as fiduciaries by the acts and omissions set forth above. *See* ERISA § 409.

## SEVENTH CLAIM FOR RELIEF

**EQUITABLE RELIEF, WITH RESPECT TO THE HEALTH & WELFARE FUND, PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**

**[By All Plaintiffs, On Behalf of the Plan as a Whole and the Local 12 Fund Beneficiary Class, Seeking Equitable Relief, Against the Health & Welfare Defendant Trustees, OEFI, Kenneth Bourguignon, Chris Laquer and Kenneth Waggoner]**

545.   Plaintiffs re-allege and incorporate by reference Section VI (ERISA Provisions) and paragraphs 106-122, 200-213, 218-250, and 259-260 above, as well as the allegations in the preceding Claim for Relief except those allegations relating to the relief sought thereunder, as though every such allegation were physically contained within the text of this Claim for Relief.

### A.   **Statutory Basis for this Claim**

546.   ERISA § 502(a)(3) authorizes suits "(A) to enjoin any act or practice which violates any provision of [Title I] or the terms of the plan, or (B) to obtain appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [Title I] or the terms of the Plan." 29 U.S.C. § 1132(a)(3).

547.   ERISA § 502(a)(3) "admits of no limit … on the possible universe of defendants." *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246 (2000). The "focus" is "on redressing the 'act or practice' which violates" ERISA. *Id.*  A defendant may be sued under § 502(a)(3) even if it is not "expressly subject to a duty under one of ERISA's substantive provisions." *Id.*

**B.   <u>Parties to this Claim</u>**

548.   This Claim for Relief is brought against the Health & Welfare Fund Defendant Trustees, OEFI, and Kenneth Bourguignon.   All of these defendants, as alleged previously, are fiduciaries with respect to the Health & Welfare Fund.  This claim is also brought against Kenneth Waggoner, who, regardless of fiduciary status, may be sued hereunder as a non-fiduciary who participated in ERISA violations, such as prohibited party-in-interest transactions under ERISA § 406(a), by virtue of his investment transactions with the Plan.  In addition, this claim is brought against party in interest Chris Laquer, seeking disgorgement of the Plan monies he wrongfully obtained as a result as his direct participation in and facilitation of the illegal loan transaction between Local 12 and the Plan.

549.   Plaintiffs are participants in the Health & Welfare Fund.  The goal of Title I of ERISA is to protect the interests of participants and their beneficiaries in employee benefit plans.

550.   This Claim is brought by Plaintiffs, individually and on behalf of the Local 12 Fund Beneficiary Class, seeking to recover equitable relief to protect the Health & Welfare Fund (sometimes referred to in this Claim as the "Plan").

551.   This Claim for Relief seeks only equitable relief.

**C.   <u>Acts or Practices Violating Title I of ERISA</u>**

552.   In the interests of brevity, Plaintiffs incorporate the allegations regarding ERISA violations and fiduciary breaches in the preceding Claim or Relief as though fully set forth herein, with the exception of the allegations regarding the remedies sought in that Claim.

D.    **Equitable Relief Sought on Behalf of the Plan for Acts and Practices Violating Title I of ERISA**

553.   Plaintiffs request a permanent injunction forbidding the Health & Welfare Fund Trustees from engaging in prohibited transactions with parties in interest (such as Kenneth Waggoner) in violation of § 406(a), including but not limited to the acts and practices at issue herein.

554.   Plaintiffs request a permanent injunction forbidding the Health & Welfare Fund Trustees from engaging in self-dealing in violation of § 406(b).

555.   Plaintiffs request a permanent injunction forbidding OEFI from paying the FICA tax share of its employees or any Trust employee, to the extent that practice has resumed after its discontinuation by Michael Graydon.

556.   Plaintiffs request an injunction specifically forbidding the Officer Trustee Defendants from making personal use of Health & Welfare Fund assets or using such assets for any reasons other than the purposes of providing benefits to Plan participants and defraying reasonable plan expenses of administration.

557.   Plaintiffs request an order requiring William Waggoner and Kenneth Waggoner to disgorge all profits and all plan assets they have obtained as a result of their violations of Title I as alleged herein.

558.   Assuming the Court removes them as Trustees pursuant to the First Claim for Relief, Plaintiffs request an order forbidding the Health & Welfare Fund Officer Trustee Defendants from ever serving again as a fiduciary in connection with the Health & Welfare Fund or any Local 12-affiliated employee benefit plan.

559.   Assuming the Court removes them as Trustees pursuant to the First Claim for Relief, Plaintiffs request an order forbidding the management-side Officer Trustee Defendants from ever serving again as a fiduciary in connection with the Health & Welfare Fund or any Local 12-affiliated employee benefit plan.

560.   Plaintiffs request an order forbidding William Waggoner and any other Local 12 Officer Trustee Defendants, to the extent they in the future replace him in

his position as Business Manager due to his retirement, imprisonment, or any other reason, from appointing or having any role in the appointment of any new union Trustees to the Health & Welfare Fund or any Local 12-affiliated employee benefit plan.

561.   Plaintiffs request a permanent injunction requiring the Trustees of the Plan to take reasonable steps to collect all contributions owed by employers to the Plan that may still be recovered (*see, e.g.* 29 U.S.C. § 1145), as well as all contributions that come due in the future.

562.   Plaintiffs request an injunction forbidding William Waggoner from diverting Plan assets to himself by means of his BA's Fund practice, and requiring him to disgorge all such funds he has taken in the past.

563.   Plaintiffs request an injunction requiring OEFI to institute written policies and procedures forbidding the use of OEFI credit cards for personal use.

564.   Plaintiffs request an injunction requiring a vote of all Trustees, to be recorded in the minutes of the meetings of any such Trustees, on any proposal to write off the debts of any employers.

565.   Plaintiffs request an order requiring any defendants who participated in prohibited transactions, as alleged herein, either as party in interest or as plan fiduciary, to disgorge any monies or assets obtained in connection with such transactions.  Plaintiffs specifically request that defendant Chris Laquer be required to disgorge the fund monies he was paid for his purported "legal" services in directly participating in, facilitating and advocating the prohibited transaction whereby Local 12 illegally loaned $10 million dollars to the Plan without obtaining a required Prohibited Transaction Exemption under 29 U.S.C. § 1108(a).

566.   Plaintiffs request an order prohibiting Defendants from destroying Plan-related documents unless permitted to do so by law.

## EIGHTH CLAIM FOR RELIEF

### ERISA VIOLATIONS PURSUANT TO ERISA § 409, 29 U.S.C. § 1109, ERISA §502(a)(2), 29 U.S.C. § 1132(a)(2)

### [By All Plaintiffs, on Behalf of the OETT As a Whole and the Local 12 Fund Beneficiary Class, Against OEFI, Kenneth Bourguignon, and the Local 12 Officer Defendant Trustees]

### (Based on Diversion of OETT Assets to IUOE Via EPEC Payroll Practice)

567.   Plaintiffs re-allege and incorporate by reference Section VI (ERISA Provisions) and paragraphs 106-174, 218-250, 259-260 set forth *supra*, as though every such allegation were physically contained within the text of this Claim for Relief.

568.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant or beneficiary to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C § 1109.

569.   ERISA § 409(a) provides that  "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."  (Emphasis added.)

570.   This Claim is brought by Plaintiffs, not on their own behalf as individuals, but rather in a representative capacity on behalf of the OETT (sometimes referred to in this claim as the "Plan") as a whole, seeking to recover class relief for the Plan as authorized in § 409(a), pursuant to Fed. R. Civ. P. 23(b)(1).

571.   This Claim for Relief is brought against OEFI, Kenneth Bourguignon, and the Local 12 Officer Defendant Trustees.

572.   As alleged previously, OEFI is an appointed administrator (handling administrative matters, including payroll, for the Trusts, including OETT) and thus a fiduciary of the OETT.

573.   Kenneth Bourguignon is, or at least has been during relevant times, the Chairman of OEFI, and is thus a functional fiduciary who exercises authority and control over disposition of plan assets.

574.   William Waggoner and the officer defendants herein are Trustees of the OETT and fiduciaries by definition (20 C.F.R. § 2509.75-8).   Indeed, Waggoner openly declared to Michael Graydon in 2008 that he is in charge of the Trusts, and, as alleged previously, he dominates the business of OETT, including compensation-related matters.

575.   The IUOE is a party in interest under 29 U.S.C. § 1002(14)(d) as an employee organization any of whose members are covered by the Plan.

576.   Plaintiffs are participants in the OETT and members of both Local 12 and the IUOE.  As alleged previously, OETT trust fund monies have been diverted from the Fund to the IUOE and its President's Club via payroll transactions handled by OEFI, pursuant to the direction of William Waggoner, enforcing the IUOE's mandatory contributions policy.   In effect, Defendants used certain of Plaintiffs, as alleged previously and other OETT employees as unwitting intermediaries in a scheme to acquire Plan monies that were required to be used for the exclusive purpose of providing benefits to Plan participants and defraying Plan administration expenses, laundering the monies by purporting to "pay" them as "expenses" to Plaintiffs and other OETT employees and class members while simultaneously "deducting" them and sending them to the IUOE via the payroll transactions in question.

FOURTH AMENDED CLASS ACTION COMPLAINT

577.   ERISA § 406(a) provides that a plan fiduciary shall not cause the plan (here, OETT) to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."   Plainly, Defendants herein knew that the payroll transactions in question constituted the transfer of OETT monies (from inflated "expense" payments) to the IUOE, a party in interest.   As previously alleged, all monies used for payroll transactions by OEFI come from funds advanced by the Trusts, including OETT, and Defendants are fully aware of that fact.   On information and belief, Waggoner caused OEFI, with the knowledge and necessary complicity of its Chairman, Kenneth Bourguignon, to engage in the payroll transactions at issue, in which Plan monies due to OETT employees, such as Plaintiffs Paxin and Chamberlain, were electronically diverted to the IUOE.   By requiring, approving, and/or engaging in payroll transactions which directly result in the diversion of Plan monies to the IUOE, Defendants Waggoner, OEFI and Bourguignon have caused the OETT to engage in transactions that constitute a direct, or at least an indirect, transfer to or use for the benefit of the IUOE, a party in interest.   Such conduct violates ERISA § 406(a)(1)(D).

578.   Such conduct also violates the fiduciary duties of all the fiduciary defendants sued herein under ERISA § 404(a)(1), as it violates their obligation to discharge their duties with respect to OETT "solely in the interests of the participants and beneficiaries" of OETT and for the "exclusive purpose" of providing benefits to Plan participants and beneficiaries, rather than to IUOE. Defendants Waggoner, OEFI and Kenneth Bourguignon are also liable as co-fiduciaries of each other, under ERISA § 405, for knowingly participating in the EPEC diversion payroll transactions, knowing such acts were breaches of fiduciary duty by each of them, and for failing to make reasonable efforts under the circumstances to remedy each other's breaches.

579.   Defendants Adams, Sikorski, Hawn and Davison have been fully aware of this EPEC scheme at Local 12 for as long as it occurred.   Despite their knowledge and their duties as OETT Trustees, they allowed it to occur and took no steps to stop it or to otherwise remedy it, including by demanding that it cease or pursuing relief, such as damages under § 409(a), against Waggoner, OEFI and Kenneth Bourguignon, or equitable relief such as an injunction, restitution or disgorgement of profits under § 502(a)(3), against those defendants or IUOE.   As such, they too are liable as co-fiduciaries under ERISA § 405.

580.   As a result of the aforementioned violations, each of the Defendants herein are personally liable to make good to OETT the amounts paid to IUOE. They should also be removed as fiduciaries based on their complicity in this Plan asset diversion scheme, which demonstrates their unfitness to serve as Plan fiduciaries.  *See* ERISA § 409, 29 U.S.C. § 1109.

## NINTH CLAIM FOR RELIEF

**EQUITABLE RELIEF PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**

**[By All Plaintiffs, On Behalf of the OETT as a Whole and the Local 12 Fund Beneficiary Class, Seeking Equitable Relief, Against the IUOE and Defendants William Waggoner, OEFI and Kenneth Bourguignon]**

**(Based on Diversion of OETT Assets to IUOE Via EPEC Payroll Practice)**

581.   Plaintiffs re-allege and incorporate by reference Section VI (ERISA Provisions) and paragraphs 106-174, 218-250, 259-260 *supra*, as though every such allegation were physically contained within the text of this Claim for Relief.

582.   ERISA § 502(a)(3) authorizes suits "(A) to enjoin any act or practice which violates any provision of [Title I] or the terms of the plan, or (B) to obtain

appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [Title I] or the terms of the Plan." 29 U.S.C. § 1132(a)(3).

583.   ERISA § 502(a)(3) "admits of no limit … on the possible universe of defendants." *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246 (2000). The "focus" is "on redressing the 'act or practice' which violates" ERISA. *Id*.   A defendant may be sued under § 502(a)(3) even if it is not "expressly subject to a duty under one of ERISA's substantive provisions." *Id*.

584.   This Claim for Relief seeks only equitable relief.

585.   This Claim for Relief is brought against the IUOE and against William Waggoner, OEFI and Kenneth Bourguignon.

586.   As alleged previously, OEFI is an appointed administrator (handling administrative matters, including payroll, for the Trusts, including OETT) and thus a fiduciary of the OETT.

587.   Kenneth Bourguignon is, or at least has been during relevant periods, the Chairman of OEFI, and thus a functional fiduciary who exercises authority and control over disposition of plan assets.

588.   William Waggoner is a Trustee of the OETT and a fiduciary by definition (20 C.F.R. § 2509.75-8).

589.   The IUOE is a party in interest under 29 U.S.C. § 1002(14)(d) as an employee organization any of whose members are covered by the Plan.

590.   Plaintiffs are participants in the OETT and are members of both Local 12 and the IUOE.  This claim is brought because OETT trust fund monies have been diverted to the IUOE and its President's Club via payroll transactions handled by OEFI, pursuant to the direction of William Waggoner, enforcing the IUOE's mandatory contributions policy.

591.   ERISA § 406(a) provides that plan fiduciaries shall not cause the plan (here, OETT) to engage in a transaction, if he knows or should know that such

transaction constitutes *a direct or indirect* "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

592.   As previously alleged, all monies used for payroll transactions by OEFI come from funds advanced by the Trusts, including OETT.

593.   On information and belief, Waggoner caused OEFI, with the knowledge and necessary complicity of its Chairman, Kenneth Bourguignon, to engage in the payroll transactions at issue, in which Fund monies due to OETT employees, such as Plaintiffs Paxin and Chamberlain, were electronically diverted to the IUOE.

594.   By requiring, approving, and/or engaging in payroll transactions which directly result in the diversion of fund monies to IUOE, Defendants Waggoner, OEFI and Kenneth Bourguignon have violated ERISA § 406(a)(1)(D), which prohibits transactions that constitute a direct, or at least an indirect, transfer of Plan assets to or use for the benefit of the IUOE, a party in interest.

595.   The IUOE, though not presently alleged to be a fiduciary of the OETT, is subject to being sued for equitable relief under § 502(a)(3) for its role in the prohibited transactions.

596.   Wherefore, Plaintiffs, on behalf of the Plan as a whole, request that Defendants sued herein be enjoined from continuing with the acts and practices set forth herein.   Plaintiffs also request that the IUOE be required to restore, to the Plan, all Plan monies transferred to it or used by or for its benefit, as a result of the EPEC-related acts and practices set forth above.

**TENTH CLAIM FOR RELIEF**

**COMMON LAW BREACH OF FIDUCIARY DUTY**

**[By Plaintiffs, Individually and on Behalf of the Local 12 Member Class, against Defendants James T. Callahan, Vince Giblin, William Waggoner and Does 1-10]**

**(Based on Forced EPEC Contributions Practice)**

597.   Plaintiffs re-allege, and incorporate by reference, the allegations set forth in paragraphs 83-102.

598.   This claim is based upon Defendants' mandatory EPEC contribution practice, which has unfairly and illegally required Plaintiffs and Class members to pay monies from their wages as a condition of employment.  No collective bargaining agreement exists for the employees of Local 12 or its affiliated trusts to protect them as employees.  Plaintiffs and all class members who were required to make such contributions were damaged as a result of the practice.

599.   This Claim is stated against Defendants James T. Callahan and Vince Giblin, the current and most recent former General Presidents of the IUOE, respectively.    It is also stated against Defendant William Waggoner, who enforced the IUOE General Presidents' wrongful practice and assisted in the collection of such mandatory contributions and the diversion of those assets to the IUOE's PAC, in violation of Waggoner's own fiduciary duties to Local 12 members.

600.   The relations between Defendants herein, on the one hand, and Plaintiffs and Class members, on the other hand, imposed a duty on Defendants to act with the utmost good faith for the benefit of Plaintiffs and Class members, who were entitled to believe in the integrity of Defendants, but instead were left the victims of Defendants who chose to serve interests other than the best interests of Plaintiffs and Class members.    Unquestionably, union members are entitled to repose confidence in their union's General Presidents and their local union's

**FOURTH AMENDED CLASS ACTION COMPLAINT**

Business Manager, rather than having their portions of their wages extorted or, at least, unfairly diverted, from them by their union officers.

601.   Defendants Callahan, Giblin and Waggoner violated their common law fiduciary duties by requiring forced contributions to EPEC from Plaintiffs and Class members.   Such conduct was entirely inconsistent with the fiduciary duties they owed to Plaintiffs and Class members under California law.

602.   As a proximate result of Defendant Callahan and Giblin's breach of fiduciary duties relating to the mandatory EPEC contribution practice, Plaintiffs and class members have suffered damages, namely, the loss of wages they have surrendered to EPEC.

603.   By extorting, converting, embezzling or otherwise unlawfully securing Plaintiffs' and class members' monies, Plaintiffs and the class were damaged. Plaintiffs should be made whole, and all profits or monies obtained by Defendants in breach of their common law fiduciary duties should be disgorged.  *People ex rel. Harris v. Rizzo*, 214 Cal.App.4th 921, 951, n. 30 (2013).

604.   Defendants' conduct as alleged hereinabove was criminal, oppressive, malicious, willful and intended to harm and did harm Plaintiffs and the Class, warranting imposition of exemplary damages.

605.   Waggoner, as discussed above, directly participated in the EPEC contributions practice.   To the extent his conduct does not itself breach his own fiduciary duties, his conduct renders him equally liable under California law as a willing aiding and abettor for the breaches of fiduciary duty of the IUOE Defendants.   Waggoner, as IUOE First Vice President, was fully aware of the practice in question and affirmatively and substantially assisted it by the conduct set forth in paragraphs 86, 89-91, 96 *supra*, previously incorporated hereinabove by reference.

FOURTH AMENDED CLASS ACTION COMPLAINT

## ELEVENTH CLAIM FOR RELIEF

## COMMON LAW BREACH OF FIDUCIARY DUTY

### [By Plaintiffs, Individually and on Behalf of the BA's Fund Class, Against the Local 12 Officer Defendants and Does 1-10]

#### (Based on Mandatory BA's Fund Contributions Practice)

606.   Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein, including, in particular, the allegations in paragraphs 65-79, *supra*.

607.   This Claim is based on Defendants' unlawful, unfair practice of requiring that employees contribute monies to the "BA's Fund," including Waggoner's Re-Election Fund and the remaining resulting slush fund.  This Claim is stated against the Local 12 Officer Defendants, who have assumed common law fiduciary obligations to Plaintiffs and Class Members.   No collective bargaining agreement exists for the employees of Local 12 or its affiliated trusts to protect them as employees.   This claim is also stated against IUOE General Presidents Vince Giblin and James T. Callahan, who, despite their own fiduciary duties to IUOE members and their ability to order Waggoner to cease his illegal conduct, knowingly allowed Waggoner to continue this wrongful practice, both before and during this litigation.

608.   The relations between Defendants herein, on the one hand, and Plaintiffs and Class members, on the other hand, impose a duty on Defendants to act with the utmost good faith for the benefit of Plaintiffs and Class members, who were entitled to believe in the integrity of Defendants, but instead were left the victims of Defendants who chose not to serve their best interests.  Unquestionably, union members are entitled to repose confidence in their Business Manager and their local union officers, including, here, the Local 12 Officer Defendants, as well as their General Presidents, rather than having their portions of their wages extorted or, at least, diverted, from them.

609.   The Local 12 Officer Defendants violated their common law fiduciary duties by requiring forced contributions to the BA's Fund from Plaintiffs and Class members, and/or, to the extent they did not themselves create the requirement (which, on information and belief, Waggoner created), by endorsing and enforcing that requirement by means of their positions as officers.   Such conduct was entirely inconsistent with the fiduciary duties they owed to Plaintiffs and Class members under California law.

610.   As a proximate result of the Local 12 Officer Defendants' breach of fiduciary duties relating to the mandatory BA's Fund practice, Plaintiffs and class members have suffered damages, namely, the loss of wages they have surrendered to the BA's Fund.

611.   By extorting, converting, embezzling or otherwise unlawfully securing Plaintiffs' and class members' monies, Plaintiffs and the class were damaged.

612.   Plaintiffs should be made whole, and all profits or monies obtained by Defendants in breach of their common law fiduciary duties should be disgorged. *People ex rel. Harris v. Rizzo*, 214 Cal.App.4th 921, 951, n. 30 (2013).

613.   In addition, General Presidents Giblin and Callahan, despite their fiduciary duties and resulting duties of disclosure to Plaintiffs and Class members, with knowledge that IUOE First Vice President William Waggoner was illegally demanding BA's Fund contributions, failed to disclose to Plaintiffs and Class members that Waggoner's demands were improper and that they did not have to accede to them in order to keep their jobs.   Likewise, the General Presidents, despite having the power to do so, failed to take steps to halt Waggoner's conduct, with Callahan failing to act even after this action was filed when he unquestionably knew or should have known that Waggoner's conduct was improper and should be stopped.

614.   Defendants' conduct as alleged hereinabove was criminal, oppressive, malicious, willful and intended to harm and did harm Plaintiffs and the Class, warranting imposition of exemplary damages.

615.   Defendants Adams, Hawn, Davison and Sikorski fully supported and substantially assisted Waggoner in his BA's Fund practice with knowledge of its impropriety, including by taking steps to enforce it and to ensure that others below them were enforcing it.  They are therefore liable as aiders and abetters.

## TWELFTH CLAIM FOR RELIEF
### COMMON LAW BREACH OF FIDUCIARY DUTY
**[By Plaintiffs, Individually and on Behalf of the Local 12 Member Class against the Local 12 Officer Defendants, Bert Tolbert, and Vince Giblin]**
**(Based on Acts of Embezzlement and other Misconduct)**

616.   Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein.

617.   This claim is stated against the Local 12 Officer Defendants, Vince Giblin, and Bert Tolbert.

618.   The relations between Defendants herein, on the one hand, and Plaintiffs and Class members, on the other hand, impose a duty on Defendants to act with the utmost good faith for the benefit of Plaintiffs and Class members, who were entitled to believe in the integrity of Defendants, but instead were left the victims of Defendants who chose not to serve their best interests.

619.   Defendants have violated their common law fiduciary duties and are liable under California law for those breaches of fiduciary duty that are unrelated to ERISA-governed employee benefit plans.

620.   Defendants breached their fiduciary duties by the acts set forth above (incorporated herein, including those set forth at paragraphs 261-319) that are not

related to employee benefit plans, and Plaintiffs suffered damages as a proximate result thereof.  Examples of Defendants' breaches of fiduciary duty include:

- Defendants' improper and unreimbursed personal use of the Local's jet, and the Local 12 Officer Defendants' allowing of family members, Vince Giblin, Hilda Solis and others to use the jet for non-union business without compensation to the Local, as alleged in paragraphs 265-282, 287-293 *supra*;

- Defendants' absurdly wasteful use of the Local's jet, at exorbitant costs, for short trips, between, e.g., Ontario and Van Nuys and Ontario and San Diego, in lieu of much more economical automobile transportation, as alleged in paragraphs 283-286 *supra*.

- the Local 12 Officer Defendants' improper and unreimbursed use of the Local's printing press, as alleged in paragraphs 294-298 *supra*;

- the Local 12 Officer Defendants' willing diversion of the use of the Local's Ford Flex to Defendant Patty Waggoner, William Waggoner's wife, for her personal use, as alleged in paragraphs 299-301 *supra*;

- the embezzlement by the Local 12 Officer Defendants and Tolbert of the labor and services of union employees for work at their homes, as alleged in paragraphs 137 *supra*;

- Vince Giblin's use of the Local's jet without compensation from Giblin to the Local, including in 2009 to attend the Western Regional Conference;

621.   None of the acts alleged above was consistent with Defendants' high fiduciary duties to members under California law.

622.   By embezzling or otherwise unlawfully securing or diverting union assets, labor and/or services for their personal use, Plaintiffs and the Class were damaged.   Plaintiffs and Class members are regularly required to pay supplemental dues due to shortfalls in the Local's general fund related at least in part to Defendants' embezzlements from the general fund; but for the aforementioned

embezzlements, at least some portion of those supplemental dues would not be necessary.  In addition, because the jet, the printing press, and other Local 12 assets were paid for with union members' dues, the members were damaged in that their dues, intended to be used for their benefits, were in effect diverted from their proper use by Defendants for the personal use and enjoyment of Defendants.

623.   Plaintiffs should be made whole, and all profits or monies obtained by Defendants in breach of their common law fiduciary duties should be disgorged. *People ex rel. Harris v. Rizzo*, 214 Cal.App.4th 921, 951, n. 30 (2013).

624.   Defendants' conduct as alleged hereinabove was in at least some respects criminal, and was oppressive, malicious, willful and intended to harm and did harm Plaintiffs and the Class, warranting imposition of exemplary damages.

625.   To the extent the Local 12 Officer Defendants other than Waggoner did not directly participate in Waggoner's breaches of fiduciary duty as identified above and in the allegations incorporated herein, they knew of those breaches of fiduciary duty and substantially assisted Waggoner in accomplishing them, by supporting Waggoner, voting in support of Waggoner's proposals when necessary, enforcing Waggoner's wrongful policies, submitting false DOL filings, and, despite their own fiduciary duties to members, assisting Waggoner in concealing his misconduct from members who, but for the concealment, could have taken steps to attempt to stop Waggoner's misconduct.

## THIRTEENTH CLAIM FOR RELIEF

## VIOLATION OF 18 U.S.C. § 1962(C) OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT [18 U.S.C. §§ 1961-68]

## [By Plaintiffs, Individually and on Behalf of the BA's Fund Class against the Local 12 Officer Defendants]

### (Based on the Extortionate BA's Fund Practice)

626.   Plaintiffs re-allege, and incorporate by reference, each and every

paragraph herein, including, in particular, the allegations in paragraphs 65-79, *supra*.

627.   This claim for relief is alleged against Defendants William Waggoner, Ron Sikorski, Mickey Adams, Dan Hawn, Larry Davison and Does 1-10 (referred to in this claim as "the Local 12 RICO Defendants").

628.   The Local 12 RICO Defendants are each a "person" as that term is defined by 18 U.S.C. § 1961(3).

629.   Local 12 constitutes an enterprise as that term is defined by 18 U.S.C. § 1961(4).  Each separate trust fund operated by OEFI also constitutes an enterprise as that term is defined by 18 U.S.C. § 1961(4).

630.   Local 12 and its associated funds, collectively, constitute an enterprise as that term is defined by 18 U.S.C. § 1961(4).

631.   The enterprises alleged hereinabove are collectively referred to as the "LOCAL 12 RICO Enterprises".

632.   The LOCAL 12 RICO ENTERPRISES are engaged in, and their activities affect, interstate and foreign commerce.

633.   The Local 12 RICO Defendants are, and at all relevant times were, associated with the LOCAL 12 ENTERPRISES.

634.   As described herein, the Local 12 RICO Defendants knowingly and willfully set into motion an over-arching scheme to use the LOCAL 12 RICO Enterprises to illegally obtain and extort monies from Plaintiffs and the BA's Fund Class members.  The primary goal in all instances was to unlawful obtain money through the use of the LOCAL 12 RICO Enterprises.  To accomplish this goal of wrongful and unlawful enrichment, the Local 12 RICO Defendants engaged in and/or authorized unlawful activities, including the use of threats of economic harm and violence, to effectuate the scheme.

635.   For more than two years prior to the filing of this action, the Local 12 RICO Defendants, in furtherance of and for the purpose of executing the schemes

**FOURTH AMENDED CLASS ACTION COMPLAINT**

and artifices to extort monies from Plaintiffs and the BA's Fund Class members described herein, on numerous occasions engaged in the extortion of property of Plaintiffs Salas, Chamberlain, and Watson, and other members of the BA's Fund Class by ensuring that it was widely known that the failure to give money to the LOCAL 12 RICO Enterprises for use by Defendant Waggoner would be punished with termination.  The threats originated with Defendant William Waggoner, and were then disseminated throughout Local 12 by Waggoner, the other Local 12 RICO Defendants, and others that they designated.  The scheme was implemented with the assistance of all of the Local 12 RICO Defendants:

> (a)   William Waggoner devised the BA's Fund scheme, disseminated the instruction to implement it, and ordered the termination of employees who disobeyed him;
>
> (b)   Mickey Adams deposited the collected BA's fund monies into a special account used for that purpose;
>
> (c)   Ron Sikorski was a signatory on that same BA's fund account when Mickey Adams was unavailable, and Ron Sikorski oversaw collection of BA's fund monies in District 5;
>
> (d)   Dan Hawn collected the extorted BA's fund contributions in District 1 before Joe Wilson;
>
> (e)   Larry Davison collected the extorted BA's fund contributions in the Ventura County area.

636.   Each such extortionate act in connection with the schemes and artifices to take monies from Plaintiffs and the BA's Fund Class members described herein constitutes a distinct violation of the Hobbs Act, 18 U.S.C. § 1951, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b). Hobbs Act violations are distinct from many other types of criminal acts in that they are among the rare types of criminal acts that are viewed as a single violation that is continuing in nature.  Thus, when a victim of the Local 12 RICO Defendants

made a series of payments under threat of economic injury, the series of payment by that victim comprised a single, continuing violation of the Hobbs Act that was not complete until the threat of economic injury no longer existed.

637.   Wages and expense reimbursements paid to members of the BA's Fund Class represent their own personal, tangible assets subject to conversion, in violation of the Hobbs Act, 18 U.S.C. § 1951, and subsequent deposit into bank accounts.

638.   For more than two years prior to the filing of this action, and continuing to the present, the Local 12 RICO Defendants named in this Claim for Relief, in furtherance of and for the purpose of executing the schemes and artifices described herein, on numerous occasions knowingly engaged in and caused to occur monetary transactions in criminally derived property, pooled for deposit every three months.  The transactions were accomplished by depositing, withdrawing or transferring funds by, through, or to a financial institution, as such an institution is defined by 18 U.S.C. § 1956.

639.   Having communicated that employment would terminate for refusal to comply with the demand to provide money to the Local 12 RICO Enterprises, Waggoner knew that the property involved in the financial transactions represented the proceeds of unlawful activity.  Despite that knowledge, Waggoner caused to occur financial transaction which in fact involved the proceeds of specified unlawful activity with the intent to promote the carrying on of that unlawful activity.

640.   Having conceived of the plan to force contributions to the Local 12 RICO Enterprises with threats of termination, and having communicated the mandate that employees should be terminated for refusal to comply with the demand to provide money to the Local 12 RICO Enterprises, the Local 12 RICO Defendants knew that the property extorted from BA's Fund Class members and involved in the financial transactions represented the proceeds of unlawful activity.

FOURTH AMENDED CLASS ACTION COMPLAINT

Despite that knowledge, Local 12 RICO Defendants caused to occur financial transaction which in fact involved the proceeds of specified unlawful activity with the intent to promote the carrying on of that unlawful activity.  Mickey Adams and Ron Sikorski in particular had authority to deposit into the main account, and Ron Sikorski had authority to deposit into and withdraw from the District 5 account where money was pooled before being deposited into the main BA's Fund account.

641.   Funds used in such transactions were derived from offenses listed in 18 U.S.C. § 1961(1), including, but not limited to, funds derived from violations of the Hobbs Act, 18 U.S.C. § 1951.  Each such monetary transaction in connection with the described schemes and artifices constitutes a separate and distinct violation of 18 U.S.C. § 1957, relating to unlawful monetary transactions and money laundering, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1).  The Local 12 RICO Defendants knowingly engaged or attempted to engage in a monetary transactions in criminally derived property (monies collected from Plaintiffs and BA's Fund Class members subjected to Hobbs Act violations) of a value, on information and belief, greater than $10,000.

642.   For the Plaintiffs employed by or paid out of Local 12's assets, including Salas, and those BA's Fund Class members employed by or paid out of Local 12's assets, the scheme of the Local 12 RICO Defendants also constitutes a plan to unlawfully convert the assets of a labor organization through use of the LOCAL 12 RICO Enterprises.  Because the Local 12 RICO Defendants conspired to threaten and then did threaten BA's Fund Class members to obtain the mandatory payments, they were aware that the monies were never intended to remain in the possession of those BA's Fund Class members.  Each such misuse of funds constitutes a separate and distinct violation of 29 U.S.C. § 501(c), and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1).

643.   For the Plaintiffs employed by or paid out of Local 12's associated Trust Fund assets, including Chamberlain and Watson, and those BA's Fund Class

FOURTH AMENDED CLASS ACTION COMPLAINT

members employed by or paid out of Local 12's associated Trust Fund assets, the scheme of the Local 12 RICO Defendants also constitutes a plan to unlawfully convert the assets of an employee benefit plan through use of the LOCAL 12 RICO Enterprises. Because the Local 12 RICO Defendants conspired to threaten and then did threaten BA's Fund Class members to obtain the mandatory payments, they were aware that the monies were never intended to remain in the possession of those BA's Fund Class members. Each such misuse of funds constitutes a separate and distinct violation of 18 U.S.C. § 664, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1).

644. The Local 12 RICO Defendants' repeated violations of 18 U.S.C. §§ 664, 1951, 1956, 1957, and 29 U.S.C. § 501(c), among others, extended over a period of years and involved distinct and independent criminal acts. Those criminal acts were neither isolated nor sporadic events, but involved the regular and repeated violation as a way of doing business and to accomplish the Local 12 RICO Defendants' desired ends in the course of the continuing business of the LOCAL 12 RICO Enterprises. These predicate acts were related to each other by virtue of (a) common participants, (b) similarly situated victims, (c) common methods of commission through the habitual use of threats directed at employment, and (d) the common purpose and common result of directly harming the members of the BA's Fund Class, all while accomplishing the unlawful aims of the Local 12 RICO Defendants. As such, this conduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

645. The unlawful and improper activities of the Local 12 RICO Defendants threaten to continue. Based upon the past pattern of activity, the Local 12 RICO Defendants will likely continue to extort from BA's Fund Class members.

646. The Local 12 RICO Defendants all violated 18 U.S.C. § 1962(c) by directly or indirectly conducting or participating in the conduct of the affairs of the LOCAL 12 RICO Enterprises through a pattern of racketeering activity.

FOURTH AMENDED CLASS ACTION COMPLAINT

647.   The Local 12 RICO Defendants' violation of 18 U.S.C. § 1962(c) caused Plaintiffs and the EPEC Class to suffer direct injury in amounts as may be shown according to proof at time of trial.

648.   The Local 12 RICO Defendants' conduct as alleged hereinabove was criminal, oppressive, malicious, willful and intended to harm and did harm Plaintiffs and the BA's Fund Class, warranting imposition of exemplary damages.

## FOURTEENTH CLAIM FOR RELIEF

### VIOLATION OF 18 U.S.C. § 1962(C) OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT [18 U.S.C. §§ 1961-68]

**[By Plaintiffs, Individually and on Behalf of the EPEC Class, against Defendants IUOE, Vince Giblin, James T. Callahan, and William Waggoner]**

**(Based on EPEC-Related Practices)**

649.   Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein, including, in particular, the allegations in paragraphs 83-102, *supra*.

650.   This claim for relief is alleged against Defendants IUOE, Vince Giblin, James T. Callahan and William Waggoner (referred to in this claim as the IUOE RICO Defendants).

651.   The IUOE RICO Defendants are each a "person" as that term is defined by 18 U.S.C. § 1961(3).

652.   IUOE's EPEC fund constitutes an enterprise as that term is defined by 18 U.S.C. § 1961(4).

653.   IUOE and its associated EPEC fund, collectively, constitute an association that is an enterprise as that term is defined by 18 U.S.C. § 1961(4).

654.   The enterprises alleged hereinabove are collectively referred to as the "IUOE RICO EPEC Enterprises".

655.   The IUOE RICO ENTERPRISES are engaged in, and their activities affect, interstate and foreign commerce.

656.   The IUOE RICO Defendants are, and at all relevant times were, associated with the IUOE RICO EPEC ENTERPRISES.

657.   As described herein, the IUOE RICO Defendants knowingly and willfully set into motion an over-arching scheme to use the IUOE RICO EPEC Enterprises to illegally obtain and extort monies from Plaintiffs and the EPEC Class members.  The primary goal in all instances was to unlawful obtain money through the use of the IUOE RICO EPEC Enterprises.  To accomplish this goal of wrongful and unlawful enrichment, the IUOE RICO Defendants engaged in and/or authorized unlawful activities, including the use of threats of economic harm and violence, to effectuate the scheme.

658.   For more than two years, the IUOE RICO Defendants, in furtherance of and for the purpose of executing the schemes and artifices to extort monies from Plaintiffs and the EPEC Class members described herein, on numerous occasions engaged in the extortion of property of Plaintiffs Salas, Chamberlain, and Paxin, and other members of the EPEC Class by ensuring that it was widely known that the failure to give money to the IUOE RICO EPEC Enterprises for delivery to the EPEC fund would be punished with termination.  The threats originated with IUOE and its General Presidents, Giblin and Callahan, and were then disseminated throughout Local 12 by Waggoner.  The scheme was implemented with the assistance of all of the IUOE RICO Defendants:

          (a)    Vince Giblin, when General President, mandated compliance with the EPEC fund extortion scheme, disseminated the instruction to implement it through the GEB members and IUOE staff, and ordered and/or threatened the termination or other economically injurious retaliatory unfair treatment of employees of local unions, like Local 12, who disobeyed the mandate;

(b)  Vince Giblin also mandated that CBAs include mandatory EPEC contribution provisions from the hourly wages of union members and instructed GEB members, like Waggoner, to force union members to consent to hourly contribution provisions;

(c)  James T. Callahan, as General President, continues to mandate compliance with the EPEC fund extortion scheme, disseminates the instruction to implement it through the GEB members and IUOE staff, and orders and/or threatens the termination or other economically injurious retaliatory unfair treatment of employees of local unions, like Local 12, who disobeyed the mandate;

(d)  IUOE continues to mandate compliance with the EPEC fund extortion scheme, disseminates the instruction to implement it through the GEB members and IUOE staff, and helps cause the termination or other economically injurious retaliatory unfair treatment of employees of local unions, like Local 12, who disobey the mandate;

(e)  William Waggoner, in his roles as First Vice President of IUOE and Business Manager of Local 12, brought to Local 12, without objection, the mandate to comply with the EPEC fund extortion scheme, disseminates the instruction to comply through Local 12, and helps cause the termination or other economically injurious retaliatory unfair treatment of employees Local 12 who disobey the mandate;

659.  Each such extortionate activity in connection with the schemes and artifices to take monies from Plaintiffs and the EPEC Class members described herein constitutes a distinct violation of the Hobbs Act, 18 U.S.C. § 1951, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).  Hobbs Act violations are distinct from many other types of criminal

acts in that they are among the rare types of criminal acts that are viewed as a

single violation that is continuing in nature.  Thus, when a victim of the Local 12

RICO Defendants made a series of payments under threat of economic injury, the

series of payment by that victim comprised a single, continuing violation of the

Hobbs Act that was not complete until the threat of economic injury no longer

existed.

660.   Wages paid to members of the EPEC Class represent their own

personal, tangible assets subject to conversion, in violation of the Hobbs Act, 18

U.S.C. § 1951, and subsequent deposit into accounts.

661.   For more than two years, and continuing to the present, the IUOE

RICO Defendants named in this Claim for Relief, in furtherance of and for the

purpose of executing the schemes and artifices described herein, on numerous

occasions knowingly engaged in and caused to occur monetary transactions in

criminally derived property with value in excess of $10,000.  The transactions were

accomplished by depositing, withdrawing or transferring funds by, through, or to a

financial institution, as such an institution is defined by 18 U.S.C. § 1956.

662.   Having communicated that employment would terminate for refusal to

comply with the demand to provide money to the IUOE RICO EPEC Enterprises,

Waggoner knew that the property involved in the financial transactions represented

the proceeds of unlawful activity.  Despite that knowledge, Waggoner caused to

occur financial transactions which in fact involved the proceeds of specified

unlawful activity with the intent to promote the carrying on of that unlawful

activity.

663.   Having conceived of the plan to force contributions to the IUOE RICO

EPEC Enterprises with threats of termination, and having communicated the

mandate to GEB Members like Waggoner that employees should be terminated or

otherwise unfairly retaliated against in economically injurious fashion for refusal to

comply with the demand to provide money to the IUOE RICO EPEC Enterprises,

**FOURTH AMENDED CLASS ACTION COMPLAINT**

Giblin, Callahan and IUOE knew that the property extorted from EPEC Class members and involved in the financial transactions represented the proceeds of unlawful activity.  Despite that knowledge, Giblin, Callahan and IUOE caused to occur financial transaction which in fact involved the proceeds of specified unlawful activity with the intent to promote the carrying on of that unlawful activity.

664.   Funds used in such transactions were derived from offenses listed in 18 U.S.C. § 1961(1), including, but not limited to, funds derived from violations of the Hobbs Act, 18 U.S.C. § 1951.  Each such monetary transaction in connection with the described schemes and artifices constitutes a separate and distinct violation of 18 U.S.C. § 1957, relating to unlawful monetary transactions and money laundering, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1).  The IUOE RICO Defendants knowingly engaged or attempted to engage in monetary transactions in criminally derived property (monies collected from Plaintiffs and EPEC Class members subjected to Hobbs Act violations) of a value greater than $10,000.

665.   For the Plaintiffs employed by or paid out of Local 12's assets, including Salas and the other EPEC Class members employed by or paid out of Local 12's assets, the scheme of the IUOE RICO Defendants also constitutes a plan to unlawfully convert the assets of a labor organization through use of the IUOE RICO EPEC Enterprises.  Because the IUOE RICO Defendants conspired to threaten and then did threaten EPEC Class members to obtain the mandatory payments, they were aware that the monies were never intended to remain in the possession of those EPEC Class members.  Each such misuse of funds constitutes a separate and distinct violation of 29 U.S.C. § 501(c), and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1).

666.   For the Plaintiffs employed by or paid out of Local 12's associated Trust Fund assets, including Chamberlain and Paxin and the other EPEC Class

members employed by or paid out of Local 12's associated Trust Fund assets, the scheme of the IUOE RICO Defendants also constitutes a plan to unlawfully convert the assets of an employee benefit plan through use of the IUOE RICO EPEC Enterprises.  Because the IUOE RICO Defendants conspired to threaten and then did threaten EPEC Class members to obtain the mandatory payments, they were aware that the monies were never intended to remain in the possession of those EPEC Class members.  Each such misuse of funds constitutes a separate and distinct violation of 18 U.S.C. § 664, and further constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1).

667.   The IUOE RICO Defendants' repeated violations of 18 U.S.C. §§ 664, 1951, 1956, 1957, and 29 U.S.C. § 501(c), among others, extended over a period of years and involved distinct and independent criminal acts.  Those criminal acts were neither isolated nor sporadic events, but involved the regular and repeated violation as a way of doing business and to accomplish the IUOE RICO Defendants' desired ends in the course of the continuing business of the IUOE RICO EPEC Enterprises.  These predicate acts were related to each other by virtue of (a) common participants, (b) similarly situated victims, (c) common methods of commission through the habitual use of threats directed at employment, and (d) the common purpose and common result of directly harming the members of the EPEC Class, all while accomplishing the unlawful aims of the IUOE RICO Defendants.  As such, this conduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

668.   The unlawful and improper activities of the IUOE RICO Defendants threaten to continue.  Based upon the past pattern of activity, the IUOE RICO Defendants will likely continue to extort from EPEC Class members.

669.   The IUOE RICO Defendants all violated 18 U.S.C. § 1962(c) by directly or indirectly conducting or participating in the conduct of the affairs of the IUOE RICO EPEC Enterprises through a pattern of racketeering activity.

670. The IUOE RICO Defendants' violation of 18 U.S.C. § 1962(c) caused Plaintiffs and the EPEC Class to suffer direct injury in amounts as may be shown according to proof at time of trial.

671. The IUOE RICO Defendants' conduct as alleged hereinabove was criminal, oppressive, malicious, willful and intended to harm and did harm Plaintiffs and the EPEC Class, warranting imposition of exemplary damages.

## FIFTEENTH CLAIM FOR RELIEF

## CONVERSION

## [By Plaintiffs, Individually and on Behalf of the BA's Fund Class, against the Local 12 Officer Defendants]

672. Plaintiffs re-allege, and incorporate by reference, each and every paragraph herein, including, in particular, the allegations in paragraphs 65-79, *supra*.

673. As described herein, including at Paragraphs 65-79 (incorporated herein by reference), Plaintiffs Salas, Chamberlain, Watson, and other members of the BA's Fund Class received monthly purported "expense reimbursement" payments in the unchanging amount of $550 from Local 12 or Local 12 affiliated entities, such as OETT. As described herein, including at Paragraphs 69-75, Defendants, as a matter of standard operating policy at Local 12, issued direct or indirect threats of economic injury to obtain $50 of the $550 from Plaintiffs Salas, Chamberlain, Watson, and others, for use by Waggoner. This $50 cash payment went to what is referred to at Local 12 as the BA's Fund (which, in effect, is part Bill Waggoner Re-Election Fund and part slush fund).

674. When Defendants diverted Plaintiffs' and BA's Fund Class members' monies to their own benefit (and/or the benefit of Waggoner), Plaintiffs and BA's Fund Class members were deprived of dominion over their tangible personal assets, causing actual interference with Plaintiffs' and BA's Fund Class members' use and

enjoyment of their tangible and specific personal assets (namely, their money). The actual interference with Plaintiffs' and BA's Fund Class members' dominion over their tangible and specific personal assets constitutes a conversion of such assets, damaging Plaintiffs and BA's Fund Class members in the process.

675.   As a direct and proximate result of the conversion by Defendants of such tangible personal and specifically ascertainable and identifiable monies, Plaintiffs and BA's Fund Class members have been damaged as may be shown according to proof at time of trial.

676.   Defendants knew at all times that the improperly converted monies of Plaintiffs and BA's Fund Class members belonged exclusively to Plaintiffs and other BA's Fund Class members, rather than to Defendants.  Defendants knew at all times that they possessed no rightful claim to such assets of Plaintiffs and BA's Fund Class members.  Defendants nevertheless seized and converted Plaintiffs' and BA's Fund Class members' tangible personal assets, and, as of the date of filing of this amended Complaint have made no offer to return such tangible personal assets, to pay fair value for the converted monies, or to otherwise mitigate the damages caused to Plaintiffs and BA's Fund Class members by Defendants' conversion.

677.   In doing the acts herein alleged, these Defendants acted with malice and oppression.  Such despicable conduct, in willful and conscious disregard of Plaintiffs' rights and safety, justifies an award of exemplary damages against these Defendants in amounts as may be shown according to proof at time of trial.

FOURTH AMENDED CLASS ACTION COMPLAINT

## SIXTEENTH CLAIM FOR RELIEF

## VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, *ET SEQ.*

**[By Plaintiffs, Individually and on Behalf of the Local 12 Member Class and the EPEC Class Against Defendants IUOE, Vince Giblin, James T. Callahan and William Waggoner]**

**(Based on Forced EPEC Contributions)**

678.   Plaintiffs re-allege, and incorporate by reference as though fully set forth herein, the allegations in paragraphs 83-102 above, related to the mandatory EPEC contributions practice, as well as the allegations of the Fourteenth Claim for Relief.

679.   This claim is stated by Plaintiffs Paxin, Salas and Chamberlain, individually and on behalf of the Class and the EPEC Class, against the IUOE, Vince Giblin, James T. Callahan, and William Waggoner, based on these Defendants' unlawful and unfair practice of requiring mandatory "EPEC" contributions taken directly from the wages of Local 12 members, as alleged in paragraphs 83-102 *supra*.   Waggoner, as discussed above, the IUOE's First Vice President and Local 12's Business Manager, participated directly in this practice, collecting the monies in question before passing them off.

680.   The wrongful conduct of Defendants alleged herein violates California's "Unfair Competition Law (the "UCL"), set forth in Cal. Bus. & Prof. Code §§ 17200, *et seq.*, in that it constitutes unfair and/or unlawful business acts and practices.   This claim is brought by Plaintiffs individually, as representatives on behalf of the Class Members, and in their capacities as private attorneys general, against all Defendants for their unlawful and/or unfair business acts and/or practices pursuant to the UCL.   Plaintiffs seek to enforce important rights affecting the public interest within the meaning of Code of Civil Procedure § 1021.5.

681.   As a result of the unfair and/or unlawful conduct alleged herein,

Plaintiffs have suffered injury and lost money and/or property, including wages that they were forced to contribute to EPEC in violation of the law.

682.   As a result of Defendants' wrongful conduct, Defendants acquired monies from Plaintiffs and class members.  Such monies should be awarded to Plaintiffs and class members as restitution.   In addition, Defendants' unlawful and/or unfair practices should be enjoined.

683.   Defendants, and each of them, are "persons" as defined in the UCL.

## "Unlawful" Conduct Under the UCL

684.   Defendants' acts and practices alleged above constitute unlawful business acts and/or practices within the meaning of the UCL.

685.   A violation of the UCL's "unlawful" prong may be predicated on the violation of virtually any state or federal law, rule or regulation.  Defendants' unlawful EPEC contribution practices violate numerous laws and/or regulations - federal and/or state, statutory and/or common law - and said predicate acts are therefore *per se* violations of the UCL.  Here, Defendants' EPEC practice is unlawful because, *as demonstrated by the factual allegations referenced above and incorporated herein*, it constitutes one or more of the following:

(a)   Violations of RICO, as alleged above;

(b)   The illegal practice of taking mandatory 5 cent per hour EPEC contributions from IUOE members nationwide without their consent, which is an unlawful practice as stated by the United States Supreme Court.

(c)   Embezzlement under the California Penal Code (*see* Cal. Penal Code §§504, 506 and 508; *see also* § 490a, stating that embezzlement now constitutes the crime of theft);

(d)   Receipt of stolen or extorted property, knowing that said property was stolen or extorted (Cal. Penal Code § 496);

(e)   Extortion (Penal Code §§ 518, 519 *et seq.*);

(f)     Violations of the federal Hobbs Act and the other federal acts
which, as alleged above, serve as predicate acts in connection
with Plaintiffs' claims against Defendants for racketeering;

### "Unfair" Conduct Under the UCL

686.   The conduct of the IUOE Defendants in mandating that Plaintiffs and
class members make payments to EPEC as described in paragraphs 83-102 *supra*,
is "unfair" under the UCL.

687.   Such conduct violates established law and/or public policies which
seek to ensure the protection of union members and consumers from theft and
embezzlement schemes of the sort employed here.  The conduct engaged in by
Defendants was and is directly contrary to established legislative goals and public
policies of the State of California and the United States, including but not limited to
California's laws prohibiting theft, embezzlement and extortion, as well as RICO
and section 501 of the LMRDA, and was and is unfair under the UCL.  In addition,
the harm to Plaintiffs and Class members (the forced surrender under fear of
termination of a portion of their hard-earned wages) outweighs the utility, if any, of
Defendants' wrongful acts and/or practices as alleged herein.   Further, the conduct
at issue (alleged above and incorporated herein by reference) is and was immoral,
unethical, oppressive, unscrupulous or substantially injurious to Plaintiffs and Class
members and thus unfair under the UCL.  No one can dispute that forcing
employees to kickback a portion of their pay, at peril of job loss or at least adverse
consequences, is immoral, unethical, unscrupulous and substantially injurious.  At
all times relevant, the conduct at issue alleged herein caused:  1) substantial injury
to Plaintiffs and Class members (i.e., the forced surrender of portions of their
wages to the IUOE and its PAC), 2) had no countervailing benefit to Class
members, consumers or competition that could possibly outweigh this substantial
injury; and 3) caused injury that could not have reasonably been avoided by
Plaintiffs and others similarly situated.

1

### Relief Requested Under This Claim

2      688.   Plaintiffs, individually, and on behalf of Class members, are entitled

3   to, and do, seek such relief as may be necessary to disgorge money and/or property

4   that the Defendants have wrongfully acquired, or money and property in which

5   Plaintiffs and the class members have a vested ownership interest but which has

6   been withheld from Plaintiffs and the class members.

7      689.   Plaintiffs, individually, and on behalf of Class members, are further

8   entitled to and do seek a declaration that the above described business practices are

9   unfair and/or unlawful, and injunctive relief restraining the Defendants, and each of

10  them, from engaging in any of the above-described unfair and/or unlawful business

11  practices in the future.

12     690.   Plaintiffs, individually, and on behalf of Class members, have no plain,

13  speedy, and/or adequate remedy at law to redress the injuries which they have

14  suffered as a consequence of the Defendants' unfair and/or unlawful business

15  practices.  As a result of the unfair and/or unlawful business practices described

16  above, Plaintiffs, individually, and on behalf of members of the putative Class,

17  have suffered and will continue to suffer irreparable harm unless the Defendants,

18  and each of them, are restrained from continuing to engage in the previously

19  alleged violations of the UCL.

20     691.   Wherefore, Plaintiffs and Class members are entitled to equitable

21  relief, including restitution of all monies and property wrongfully taken from them,

22  and of all monies and property withheld or owed to them in which they have a

23  vested interest, and restitutionary disgorgement of all profits accruing to

24  Defendants due to their practices, to the extent such relief would be restitutionary

25  in nature; injunctive relief including but not limited to a permanent injunction

26  requiring Defendants to cease their illegal unfair practices and to comply with the

27  law; declaratory relief of an equitable nature, an award of attorneys' fees pursuant

28  to California Code of Civil Procedure § 1021.5 and other applicable laws; and an

### FOURTH AMENDED CLASS ACTION COMPLAINT

1  award of costs.

2  <u>**Aiding and Abetting Liability**</u>

3  692.   Defendant William Waggoner aided and abetted the IUOE Defendants

4  in connection with their unlawful and/or unfair EPEC contributions practice, as

5  alleged in paragraphs 83-102 *supra*.   Waggoner knew that the IUOE Defendants

6  were mandating illegal contributions (just as he was with his BA's Fund), and

7  substantially assisted in the accomplishment of that practice by affirmatively

8  helping to enforce it and collecting the monies in question, as alleged in paragraphs

9  83-102 *supra*.

10  693.   Because of his aiding and abetting, which contributed to the losses

11  suffered by Plaintiffs and the Class, Defendant Waggoner is jointly liable for all of

12  the primary violations alleged herein to have resulted in losses of money to

13  Plaintiffs and Class members.

14

15  <u>**SEVENTEENTH CLAIM FOR RELIEF**</u>

16  **VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §**

17  **17200, *ET SEQ.***

18  <u>**[By Plaintiffs Salas, Watson and Chamberlain, Individually and on Behalf of**</u>

19  <u>**the BA's Fund Class, Against the Local 12 Officer Defendants]**</u>

20  **(Based on Forced Contributions to BA's Fund)**

21  694.   Plaintiffs re-allege, and incorporate by reference, the allegations set

22  forth in paragraphs 65-79 above, as well as the allegations of the Thirteenth Claim

23  for Relief.

24  695.   This claim is stated by Plaintiffs Salas, Watson, Chamberlain, and the

25  Local 12 Employee Class against the Local 12 Officer Defendants.

26  696.   The wrongful conduct of Defendants alleged herein violates

27  California's "Unfair Competition Law (the "UCL"), set forth in Cal. Bus. & Prof.

28  Code §§ 17200, *et seq.*, in that it constitutes unfair and/or unlawful business acts

and practices. This claim is brought by Plaintiffs individually, as representatives on behalf of the Class Members, and in their capacities as private attorneys general, against all Defendants for their unlawful and/or unfair business acts and/or practices pursuant to the UCL. Plaintiffs seek to enforce important rights affecting the public interest within the meaning of Code of Civil Procedure § 1021.5.

697. As a result of the unfair and/or unlawful conduct alleged herein, Plaintiffs have suffered injury and lost money and/or property, including employment compensation that they were forced to contribute to the BA's Fund in violation of the law.

698. As a result of Defendants' wrongful conduct, Defendants acquired monies from Plaintiffs and class members. Such monies should be awarded to Plaintiffs and class members as restitution. In addition, Defendants' unlawful and/or unfair practices should be enjoined.

699. Defendants, and each of them, are "persons" as defined in the UCL.

### "Unlawful" Conduct Under the UCL

700. Defendants' acts and practices alleged above constitute unlawful business acts and/or practices within the meaning of the UCL.

701. A violation of the UCL's "unlawful" prong may be predicated on the violation of virtually any state or federal law, rule or regulation. Defendants' unlawful, extortive BA's Fund contribution practices violate numerous laws and/or regulations - federal and/or state, statutory and/or common law - and said predicate acts are therefore *per se* violations of the UCL. Here, the Local 12 Officer Defendants' BA's Fund practice, *as demonstrated by the factual allegations relating to it incorporated herein*, is unlawful because it constitutes one or more of the following:

        (a)    Violations of RICO, as alleged above;

        (b)    Receipt of extorted property, knowing that said property was extorted (Cal. Penal Code § 496);

**FOURTH AMENDED CLASS ACTION COMPLAINT**

1    (c)  Extortion (Penal Code §§ 518, 519 *et seq.*);

2    (d)  Violations of the federal Hobbs Act, as alleged above.

3          **"Unfair" Conduct Under the UCL**

4    702. The conduct of the Local 12 Officer Defendants in extorting

5  contributions to the BA's Fund from Plaintiffs and BA's Fund Class members

6  make payments to EPEC as described in paragraphs 65-79 *supra* also is "unfair"

7  under the UCL.

8    703. Such conduct violates established law and/or public policies which

9  seek to ensure the protection of union members and consumers from theft and

10  embezzlement schemes of the sort employed here.  The conduct engaged in by

11  Defendants was and is directly contrary to established legislative goals and public

12  policies of the State of California and the United States, including but not limited to

13  California's laws prohibiting theft, embezzlement and extortion, as well as RICO

14  and section 501 of the LMRDA, and was and is unfair under the UCL.  In addition,

15  the harm to Plaintiffs and BA's Fund Class members (surrendering their

16  employment compensation to William Waggoner and his BA's Fund) outweighs

17  the utility, if any, of Defendants' wrongful acts and/or practices as alleged herein.

18  Further, the conduct at issue is and was immoral, unethical, oppressive,

19  unscrupulous or substantially injurious to Plaintiffs and class members and thus

20  unfair under the UCL.   No one can dispute that forcing employees to kickback a

21  portion of their pay, at peril of job loss or at least adverse consequences, is

22  immoral, unethical, unscrupulous and substantially injurious.  At all times relevant,

23  the conduct at issue alleged herein caused:  1) substantial injury to Plaintiffs and

24  BA's Fund Class members (i.e., the forced surrender of portions of their wages to

25  Defendants), 2) had no countervailing benefit to BA's Fund Class members,

26  consumers or competition that could possibly outweigh this substantial injury; and

27  3) caused injury that could not have reasonably been avoided by Plaintiffs and

28  others similarly situated.

**Relief Requested Under this Claim**

704.   Plaintiffs, individually, and on behalf of BA's Fund Class members, are entitled to, and do, seek such relief as may be necessary to disgorge money and/or property that the Defendants have wrongfully acquired, or money and property in which Plaintiffs and the class members have a vested ownership interest but which has been withheld from Plaintiffs and the class members.

705.   Plaintiffs, individually, and on behalf of BA's Fund Class members, are further entitled to and do seek a declaration that the above described business practices are unfair and/or unlawful, and injunctive relief restraining the Defendants, and each of them, from engaging in any of the above-described unfair and/or unlawful business practices in the future.

706.   Plaintiffs, individually, and on behalf of BA's Fund Class members, have no plain, speedy, and/or adequate remedy at law to redress the injuries which they have suffered as a consequence of the Defendants' unfair and/or unlawful business practices.  As a result of the unfair and/or unlawful business practices described above, Plaintiffs, individually, and on behalf of members of the BA's Fund Class, have suffered and will continue to suffer irreparable harm unless the Defendants, and each of them, are restrained from continuing to engage in the previously alleged violations of the UCL.

707.   Wherefore, Plaintiffs and BA's Fund Class members are entitled to equitable relief, including restitution of all monies and property wrongfully taken from them, and of all monies and property withheld or owed to them in which they have a vested interest, and restitutionary disgorgement of all profits accruing to Defendants due to their practices, to the extent such relief would be restitutionary in nature; injunctive relief including but not limited to a permanent injunction requiring Defendants to cease their illegal unfair practices and to comply with the law; declaratory relief of an equitable nature, an award of attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 and other applicable laws; and an

1  award of costs.

2  <u>**Aiding and Abetting Liability**</u>

3  Defendants aided and abetted each other in connection with their BA's

4  Fund practice.   Each of the Local 12 Officer Defendants knew that the other Local

5  12 Officer Defendants, including Waggoner, were mandating illegal contributions,

6  and each one substantially assisted in the accomplishment of that practice by

7  affirmatively collecting the extorted funds and conveying the message that the

8  funds had to be paid.

9  Because of their aiding and abetting of each other's wrongs and illegal

10 conduct, which contributed to the losses suffered by Plaintiffs and the Local 12

11 Class, Defendants are jointly liable for all of the primary violations alleged herein

12 that they knowingly and substantially assisted in accomplishing.

13

14 <u>**EIGHTEENTH CLAIM FOR RELIEF**</u>

15 **VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §**

16 **17200, *ET SEQ.***

17 **<u>[By Plaintiffs, Individually and on behalf of the Local 12 Member Class</u>**

18 **<u>Against the Local 12 Officer Defendants]</u>**

19 **(Based on Officer Embezzlement and Misuse of Union Assets Unrelated to the**

20 **BA's Fund Practice)**

21 708.   Plaintiffs re-allege, and incorporate by reference, the allegations in

22 Section III (Parties), *supra*, Section V.D, paragraphs 261-319 *supra*, as well as the

23 allegations in the Twelfth Claim for Relief, as though fully set forth herein.

24 709.   This claim addresses wrongful acts and practices unrelated to the

25 wrongs described above regarding employee trust funds; i.e., this claim addresses

26 only those acts and practices that affected Plaintiffs and class members without

27 regard to their status of beneficiaries and participants in Taft-Hartley regulated

28

employee benefit funds, but rather as individuals and members of Local 12.   *See* Section IV.D, above.

710.   The wrongful conduct of the Local 12 Officer Defendants alleged in detail above and incorporated herein by reference violates the UCL in that it constitutes unfair and unlawful business acts and practices.  This claim is brought by Plaintiffs individually, as representatives on behalf of the Class Members, and in their capacities as private attorneys general, against the Local 12 Officer Defendants for their unlawful and/or unfair business acts and/or practices pursuant to the UCL.  Plaintiffs seek to enforce important rights affecting the public interest within the meaning of Code of Civil Procedure § 1021.5.

711.   As a result of the wrongful practices alleged above and incorporated herein, Plaintiffs have suffered injury and lost money and/or property, including supplemental dues that they were required to pay as a result of shortfalls in Local 12's General Fund due in no small part to the embezzlements and misuse of union assets described in the allegations set forth above, which are incorporated herein by reference.  Plaintiffs do not seek to recover those supplemental dues as restitution but simply note that they represent money Plaintiffs have had to part with as a result of Defendants' unlawful and unfair business practices.

712.   Defendants engaged in false, unfair, and misleading business practices, and received ill-gotten gains therefrom, by engaging in the acts and omissions described above and incorporated herein.  Defendants have obtained valuable money and services from Plaintiffs and others similarly situated, and/or have failed to pay or turn over money and property in which Plaintiffs, class members have a vested interest, to the detriment of Plaintiffs and class members.  Such monies and property should be awarded to Plaintiffs and class members as restitution.   In addition, the unlawful and/or unfair practices described above should be enjoined.

713.   Defendants, and each of them, are "persons" as defined in the UCL.

## "Unlawful" Conduct Under the UCL

714.   Defendants' acts and practices alleged above constitute unlawful business acts and/or practices within the meaning of the UCL.

715.   A violation of the UCL's "unlawful" prong may be predicated on the violation of virtually any state or federal law, rule or regulation.  Defendants' unlawful business acts and/or practices, as alleged in detail above in Section IV.D and incorporated herein by reference, have violated numerous laws and/or regulations, and are therefore *per se* violations of the UCL.  Defendants'  predicate unlawful business acts and/or practices include, but are not limited to, the following:

      (a)   Embezzlement under the California Penal Code (*see* Cal. Penal Code §§504, 506 and 508; *see also* § 490a, stating that embezzlement now constitutes the crime of theft);

      (b)   Grand theft under the California Penal Code (Penal Code § 487), in connection with the theft and appropriation of monies, property and/or labor, worth in excess of $950, such as the theft of recycled metals, and the appropriation of labor for repairs or restoration of personal property such as boats or automobiles;

      (c)   Petty theft under the California Penal Code (Penal Code § 487), in connection with the theft of monies and property worth $950 or less;

      (d)   Receipt of stolen or extorted property, knowing that said property was stolen or extorted (Cal. Penal Code § 496);

      (e)   Violations of the fiduciary duty provisions set forth in the LMRDA, section 501;

## "Unfair" Conduct Under the UCL

716.   The embezzlement and misuse of union assets by the Local 12 Officer Defendants, as hereinbefore alleged, also is "unfair" under the UCL.

717.   Such conduct violates established law and/or public policies which seek to ensure the protection of union members and consumers from theft and embezzlement schemes of the sort employed here.  The conduct engaged in by Defendants was and is directly contrary to established legislative goals and public policies of the State of California and the United States (including those set forth in the statutes identified above as a basis for unlawful practice liability, such as the LMRDA and California Penal Code sections identified there), and was and is unfair under the UCL.  In addition, the harm to Plaintiffs, members of the general public and Class Members, as described in detail above (including the misuse and theft of union assets purchased at least in part with member dues and the requirement that members pay supplemental dues to shore up the General Fund harmed by Defendants' extensive misconduct), outweighs the utility – which is non-existent - of Defendants' wrongful acts and/or practices as alleged herein.   Further, the conduct at issue, alleged in detail above in the specific allegations incorporated by reference herein, is and was immoral, unethical, oppressive, unscrupulous or substantially injurious to Plaintiffs and class members and thus unfair under the UCL.   At all times relevant, the conduct at issue alleged herein caused:  1) substantial injury to Plaintiffs and Class members (i.e., the diminution in the financial condition of their union and the theft, embezzlement and diversion of union assets paid for with their dues), 2) had no countervailing benefit to Class members, consumers or competition that could possibly outweigh this substantial injury; and 3) caused injury that could not have reasonably been avoided by Plaintiffs and others similarly situated.

## Relief Requested Under this Claim

Plaintiffs, individually, and on behalf of Class members, are entitled to, and do, seek such relief as may be necessary to disgorge money and/or property that the Defendants have, or may have, wrongfully acquired by means of the unfair and/or unlawful practices set forth above, and/or money and property in which Plaintiffs

and the Class members have a vested ownership interest but which has been withheld from Plaintiffs and the Class members as a result of said practices.

718.   Plaintiffs, individually, and on behalf of Class members, are further entitled to and do seek a declaration that the above-described business practices are unfair and/or unlawful, and injunctive relief restraining the Defendants, and each of them, from engaging in any of the above-described unfair and/or unlawful business practices in the future.

719.   Plaintiffs have no plain, speedy, and/or adequate remedy at law to redress the injuries which they have suffered as a consequence of the Defendants' unfair and/or unlawful business practices.  As a result of the unfair and/or unlawful business practices described above, Plaintiffs, individually, and on behalf of members of the putative Class, have suffered and will continue to suffer irreparable harm unless the Defendants, and each of them, are restrained from continuing to engage in the previously alleged violations of the UCL.

720.   Wherefore, Plaintiffs and Class members are entitled to equitable relief, including restitution of all monies and property wrongfully taken from them and/or withheld or owed to them in which they have a vested interest, and restitutionary disgorgement of all profits accruing to Defendants due to their practices, to the extent such relief would be restitutionary in nature; injunctive relief including but not limited to a permanent injunction requiring Defendants to cease their illegal and unfair practices; declaratory relief of an equitable nature, an award of attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 and other applicable laws; and an award of costs.

## Aiding and Abetting Liability

721.   To the extent that certain of the Local 12 Officer Defendants were not the primary violators of the UCL with respect to particular acts and practices alleged as a basis for liability herein, they aided and abetted their co-defendants who were the primary violators.  All Local 12 Officer Defendants actually knew

1   that other Defendants, such as Waggoner, were engaging in breaches of duty and

2   illegal or otherwise wrongful acts, at least in some respects.  Each Defendant also

3   enabled and substantially assisted in the accomplishment of one or more of the

4   breaches of duty and wrongs committed by the primary violators constituting the

5   actionable wrong in each claim, and thereby substantially assisted in the wrongs,

6   crimes, torts, statutory violations and unfair practices alleged herein.

7       722.   The Defendant members of the local union's executive board, like

8   Mickey Adams and Ron Sikorski, on numerous occasions and dates that are known

9   to them but that not presently known to Plaintiffs, voted in favor of  William

10  Waggoner's acts and practices of wrongful conduct, where votes were required to

11  permit that conduct, and thus substantially assisted in its accomplishment.   Despite

12  their fiduciary duties to the union membership and to the local union intended to

13  benefit the members, such executive board Defendants knowingly and substantially

14  assisted Waggoner in his wrongs, rather than voting against him or taking other

15  steps to stop him or even abstaining from voting in favor of his wrongful conduct.

16  Such conduct also constituted ratification of Waggoner's acts.

17      723.   William Waggoner, for his part, also knew of and substantially assisted

18  in the breaches of duty unrelated to trust fund assets by others, including his wife

19  Patty Waggoner and his son Kenneth Waggoner, as alleged above.

20      724.   In addition, William Waggoner and other Local 12 Officer Defendants,

21  such as Local 12 President Adams, flew together for personal reasons on the local's

22  jet, thereby knowingly and substantially assisting one another in embezzling from

23  Local 12 (and from members like Plaintiffs, who the Local's assets are intended to

24  benefit).  Each of the officer Defendants who took such flights knew that flying on

25  the union jet for personal reasons, without compensation to the union, was

26  improper, illegal, and in breach of their fiduciary duties, yet they went ahead

27  anyway.   After all, flying on a private jet where poker games can be played with

28  one's cronies is far more economical and enjoyable than paying for one's travel on

a public airline.   Waggoner and his cronies treated the union jet and union resources like their personal slush fund.

725.   Defendant Patty Waggoner would, as alleged, sometimes take the union jet to go shopping in Las Vegas for personal reasons; she or William Waggoner would ask a union officer, such as defendant Mickey Adams, to accompany her under the pretext that the officer was going to Las Vegas to handle Southern Nevada Local 12 business there.   Officers who accepted such invitations to "ride along" with Ms. Waggoner knowingly aided and abetted her embezzlement of union resources and unlawful, unfair business practices.  Any of these officers, who had fiduciary duties to the Local and its members and who, as officers, undoubtedly were vested with the authority to prevent the illegal use of the union jet, could have – and should have – stopped Patty Waggoner and the wives and family members of other officers from taking the jet on their personal jaunts, but instead they assisted them in doing so by riding along in an artificial effort to make the wrongful conduct appear less improper.

726.   Because of their aiding and abetting of each other's wrongs and illegal conduct, which contributed to the losses suffered by Plaintiffs and the Class, Defendants are jointly liable for all of the primary violations alleged herein that they knowingly and substantially assisted in accomplishing.

## **PRAYER FOR RELIEF**

Plaintiffs, individually, and on behalf of all others similarly situated, pray for relief and judgment against Defendants, jointly and severally, as follows:

## **Class Certification**

1.    That the defined Classes be certified;

2.    That Plaintiffs be appointed as the representatives of the defined Classes; and

FOURTH AMENDED CLASS ACTION COMPLAINT

1         3.      That counsel for Plaintiffs be appointed as Class Counsel.

2

3       **As to the First, Third, Fifth, Sixth and Eighth (ERISA Violations)**

4                       **Claims for Relief**

5         4.      For a declaration that the Defendants sued in the Claim have breached

6 their ERISA fiduciary duties to the Plan and its participants and otherwise violated

7 ERISA as alleged;

8         5.      For a judgment finding the Defendants sued in the Claim liable for

9 breaching their fiduciary duties and otherwise violating ERISA as alleged and

10 requiring said Defendants to "make good" to the Plan for any losses to the Plan

11 resulting from their violations and to restore to the Plan any profits earned by

12 Defendants made through their use of Plan assets;

13         6.      For removal of the fiduciary Defendants found to have breached their

14 duties under ERISA, pursuant to ERISA § 409.

15         7.      For permanent injunctive relief;

16         8.      For attorney's fees and costs pursuant to ERISA;

17         9.      For such other and further "equitable or remedial relief" as this Court

18 may deem proper.

19

20      **As to the Second, Fourth, Seventh and Ninth (ERISA Equitable Relief)**

21                       **Claims for Relief**

22       10.     For a judgment finding the Defendants sued in the Claim liable for

23 violating ERISA as alleged;

24       11.     For permanent injunctive relief as requested in the Claim for Relief;

25       12.     For equitable restitution and disgorgement as requested in the Claim

26 for Relief;

27       13.     For attorney's fees and costs pursuant to ERISA;

28

**FOURTH AMENDED CLASS ACTION COMPLAINT**

14.    For such other and further equitable relief as this Court may deem proper.

## As to the Tenth through Twelfth (Common Law Breach of Fiduciary Duty) Claims for Relief

15.    For compensatory and general damages, as shown according to proof;

16.    For disgorgement of profits and monies wrongfully obtained;

17.    For temporary and permanent injunctive relief;

18.    For exemplary damages

19.    For declaratory relief;

20.    For imposition of a constructive trust;

21.    For prejudgment interest according to law;

22.    For costs of suit; and,

23.    For such other and further relief as this Court may deem proper.

## As to the Thirteenth and Fourteenth (RICO) Claims for Relief

24.    For compensatory and general damages, as shown according to proof;

25.    For a judgment finding the Defendants sued in this Claim liable as alleged.

26.    For treble damages;

27.    For exemplary damages;

28.    For an accounting;

29.    For temporary and permanent injunctive relief;

30.    For disgorgement of monies improperly obtained;

31.    For prejudgment interest according to law;

32.    For attorney's fees;

33.    For costs of suit; and,

34.    For such other and further relief as this Court may deem proper.

**FOURTH AMENDED CLASS ACTION COMPLAINT**

**As to the Fifteenth (Conversion) Claim for Relief**

35.   For compensatory and general damages, as shown according to proof;

36.   For a judgment finding the Defendants sued in this Claim liable as alleged.

37.   For exemplary damages;

38.   For an accounting;

39.   For temporary and permanent injunctive relief;

40.   For disgorgement of monies improperly obtained;

41.   For prejudgment interest according to law;

42.   For costs of suit; and,

43.   For such other and further relief as this Court may deem proper.


**As to the Sixteenth, Seventeenth and Eighteenth (UCL) Claims for Relief**

44.   That the Court declare, adjudge and decree that the Defendants sued in the Claim violated California Business and Professions Code §§ 17200, *et seq.* by the conduct alleged in the Claim;

45.   For restitution to Plaintiffs and all class members and prejudgment interest from the day such amounts were due and payable;

46.   For the appointment of a receiver to receive, manage and distribute any and all funds disgorged from Defendants and determined to have been wrongfully acquired by Defendants as a result of violations of California Business & Professions Code §§ 17200 *et seq.;*

47.   For reasonable attorneys' fees and costs of suit incurred herein pursuant to California Code of Civil Procedure § 1021.5;

48.   For injunctive relief to ensure compliance with the UCL, pursuant to California Business & Professions Code § 17200, *et seq.*; and,

1      49.    For such other and further relief as the Court may deem equitable and

2  appropriate.

3

4                                          Respectfully submitted

5  Dated: January 6, 2014                  MOORE & LEVIANT LLP

6

7                                By: /s/ H. Scott Leviant

8                                     J. Mark Moore
                                      H. Scott Leviant

9                                     BERNS WEISS LLP

10                                    Jeffrey K. Berns
                                      Lee A. Weiss

11                                    Albert G. Lum

12                                    Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **DEMAND FOR JURY TRIAL**

2         Plaintiffs demand a trial by jury on all claims so triable.

3

4                                    Respectfully submitted

5    Dated: January 6, 2014              MOORE & LEVIANT LLP

6

7                            By: /s/ H. Scott Leviant

8                                 J. Mark Moore
                                  H. Scott Leviant

9                                 BERNS WEISS LLP
                                  Jeffrey K. Berns
10                                Lee A. Weiss
                                  Albert G. Lum
11
                                  Attorneys for Plaintiffs
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

U.S. Department of Labor

Employee Benefits Security Administration
Los Angeles Regional Office
1055 East Colorado Boulevard, Suite 200
Pasadena, California 91106-2357
Telephone: (626) 229-1000
FAX Telephone: (626) 229-1098



MAR   1 2007

Reply to the Attention of: Case No. 72-030222
Sandra S. Corral, Investigator
Direct Dial: (626) 229-1006

Christopher M. Laquer, Esq.
Laquer, Urban, Clifford & Hodge, LLP
225 South Lake Avenue, Suite 200
Pasadena, California 91101-3030

Re:   Operating Engineers' Health and Welfare Fund
      EIN/PN: 95-6034886/003

Dear Mr. Laquer:

This letter is in response to yours of March 9, 2006. In consideration of our discussions and the additional materials provided to us following our initial letter of August 15, 2005 seeking voluntary compliance, we have revised our findings for each of the Trustee meetings and IFEBP seminars in question as follows:

1.   <u>Trustee Meeting -- September 22 to 23, 2000 (Dallas, Texas)</u>

Mickey J. Adams' expense report and hotel billing indicates that he charged the Fund twice for a bar tab of $64 and a dinner expense of $108.12 on September 22, 2000. No itemized receipts were submitted for these charges. It is our view that the $64 bar tab and the $172.12 double charge were imprudent and not reasonably incurred for the purposes of Plan administration or solely in the interest of the participants and beneficiaries as required by ERISA section 404(a)(1). Nor do we believe that these charges, totaling **$236.12**, were properly and actually incurred in the Trustee's performance of his duties as required by 408(c)(2). Therefore, it is our view that these charges constituted an improper transfer of Plan assets to this fiduciary and party in interest, in violation of ERISA sections 406(a)(1)(D) and 406(b)(1).

Robert Burns sought reimbursement for $332.19 in dinner charges on September 23, 2000. Fifteen receipts show only bar charges of $276.11. John Spaulding submitted expenses solely for bar charges in the amount of $54.44. Burns also charged five movies at $10.81 each, or $54.05. We believe that the bar charges of $330.55 and movie charges of $54.05, or **$384.60** were prohibited under the Trustees Expense Reimbursement Policy in effect at the time, which restricted expenses to those that were "actually and reasonably incurred in connection with attendance at the meetings," and Article V, Section 17(h) of the Trust Document which requires that all expenses be necessary, affordable, beneficial and legal. We further believe that these charges were imprudent and not reasonably incurred for the purposes of Plan administration or solely in the interest of the participants and beneficiaries as required by ERISA section 404(a)(1). Nor do we believe that these charges properly incurred in the Trustees' performance of their duties as required by Section 408(c)(2). Therefore, it is our view that these charges constituted an improper transfer of Plan assets to the fiduciaries and parties in interest, in violation of ERISA sections 406(a)(1)(D) and 406(b)(1).

Christopher M. Laquer, Esq.
Re: Operating Engineers' Health and Welfare Fund
Page 2

Doug Duplisea submitted expenses of $2,395.15 without any receipts. Expenses over $25 totaled $2,271.15. Gene Sapper did not present any receipts for $2,277.10 submitted in expenses. Expenses over $25 totaled $1,809.00. Alex Rados submitted one receipt for airfare in the sum of $266 in support of $837.33 in expenses. Expenses over $25 totaled $496.33. The travel policy in effect at the time required that the Trustees account for their expenses. The new travel policy which was forwarded to us on February 22, 2005, requires that all expenses in excess of $25 be documented with receipts. We believe that reimbursement by the Fund for **$4,576.48** in unsupported expenses over $25 was prohibited by the Plan documents, was imprudent and not in the interest of the participants and beneficiaries as required by ERISA section 404(a)(1). Therefore, it is our view that reimbursement of these expenses constituted an improper transfer of Plan assets to the fiduciaries and parties in interest, in violation of ERISA sections 406(a)(1)(D) and 406(b)(1).

2.    IFEBP Conference – November 2000 (Honolulu, Hawaii)

Alexander Rados' upgraded room rate was $208.89 more a day than the standard room rate, resulting in extra charges of **$1,044.45** for five days. We note that the travel policy in effect at the time had no provision for upgraded rooms, although, the new travel policy provides that room costs are to be adjusted to reflect a single rate for reimbursement purposes. It is our view that the extra charges for an upgraded room were prohibited under the original travel policy, which restricted expenses to those "reasonably" incurred, and Article V, Section 17(h) of the Trust Document which requires that all expenses be necessary, affordable, beneficial and legal. We further believe that these charges were imprudent and not reasonably incurred for the purposes of Plan administration or solely in the interest of the participants and beneficiaries as required by ERISA section 404(a)(1). Nor do we believe that these charges properly incurred in the Trustee's performance of his duties as required by Section 408(c)(2). Therefore, it is our view that these charges constituted an improper transfer of Plan assets to this fiduciary and party in interest, in violation of ERISA sections 406(a)(1)(D) and 406(b)(1).

Mickey Adams' expense report lists a $30 lobby bar charge on November 11, 2000. Robert Burns was reimbursed for liquor charges of $294.25 on November 15, 2000, and $62.46 in movie charges. Dale Vawter was reimbursed for $89.26 in liquor charges on November 13, 2000. As stated above, it is our view that such charges were not reasonably incurred in connection with the conference, and were not necessary, beneficial, prudent or proper. Further, under the new travel policy, entertainment expenses are personal to the individual and not reimbursable by the Fund. Therefore, we believe that these charges, totaling **$475.97**, constituted improper transfers of Plan assets to the fiduciaries and parties in interest, in violation of ERISA sections 406(a)(1)(D) and 406(b)(1).

Robert Burns' expense report lists an auto rental expense of $52 on November 13, 2000, and a cab charge that same day for $30. Dale Vawter's expense report lists auto rental expenses of $316.84 for November 12, 2000 and November 16, 2000, and cab charges for those days totaling $110. We believe that incurring cab charges totaling **$140** when the Plan paid for rental cars is prohibited under the original travel policy, which restricted expenses to those "reasonably" incurred, and Article V, Section 17(h) of the Trust Document which requires that all expenses be necessary, affordable, beneficial and legal. We further believe that these charges were

Christopher M Laquer, Esq.
Re: Operating Engineers' Health and Welfare Fund
Page 3

imprudent and not reasonably incurred for the purposes of Plan administration or solely in the
interest of the participants and beneficiaries as required by ERISA section 404(a)(1). Nor do we
believe that these charges were properly incurred in the Trustees' performance of their duties as
required by Section 408(c)(2). Therefore, it is our view that these charges constituted an
improper transfer of Plan assets to these fiduciaries and parties in interest, in violation of ERISA
sections 406(a)(1)(D) and 406(b)(1).

Gene Sapper did not submit any receipts for $4,804.95 in expenses, **$4,530.10** of which were
over $25. We believe that reimbursement by the Fund for unsupported expenses is prohibited by
the Plan documents, is imprudent and not in the interest of the participants and beneficiaries as
required by ERISA section 404(a)(1). Therefore, it is our view that reimbursement of these
expenses constituted an improper transfer of Plan assets to the fiduciary and party in interest, in
violation of ERISA section 406(b)(1), and was a prohibited transfer of Plan assets to or for the
benefit of a party in interest in violation of ERISA section 406(a)(1)(D), and should be returned
to the Trust.

3.     IFEBP Conference and Trustee Meeting – May 2001 (Wash., DC)

Fred Young submitted an expense report for $3,242.20 in non-itemized expenses without
receipts. Leslie Farrow submitted expenses of $358 without receipts. Expenses over $25 totaled
$300. Bill Schmidt submitted non-itemized expenses of $3,435.40 without receipts (including an
auto rental expense of $320 plus cab charges of $190). Alexander Rados submitted $860.14 in
expenses over $25 without receipts. As stated above, it is our view that reimbursement by the
Fund for **$7,837.74** in unsupported expenses over $25 was prohibited by the Plan documents,
was imprudent and not in the interest of the participants and beneficiaries as required by ERISA
section 404(a)(1). Therefore, it is our view that reimbursement of these expenses constituted an
improper transfer of Plan assets to the fiduciaries and parties in interest, in violation of ERISA
sections 406(a)(1)(D) and 406(b)(1).

William Schmidt submitted charges of **$32.37** for three American Beauties arrangements. It is
our view that this expense was imprudent and excessive, was unrelated to the reasonable and
necessary expenses of administration, and was not incurred solely in the interest of the
participants and beneficiaries, in violation of ERISA section 404(a)(1). It is further our view that
this expense was a prohibited transfer of Plan assets to or on behalf of the fiduciary in violation
of ERISA section 406(b)(1), or a prohibited transfer of Plan assets to parties in interest in
violation of ERISA section 406(a)(1)(D).

4.     IFEBP Conference - October 5-10, 2001 (San Francisco, CA)

Gene Sapper submitted $3,356.62 in expenses without receipts, $2,968.62 of which were for
expenses over $25. As stated above, it is our view that reimbursement by the Fund for **$2,968.62**
in unsupported expenses was prohibited by the Plan documents, was imprudent and not in the
interest of the participants and beneficiaries as required by ERISA section 404(a)(1). Therefore,
it is our view that reimbursement of these expenses constituted an improper transfer of Plan
assets to this fiduciary and party in interest, in violation of ERISA sections 406(a)(1)(D) and
406(b)(1).

Christopher M. Laquer, Esq
Re: Operating Engineers' Health and Welfare Fund
Page 4

It is our opinion that Fred Young's bar charges of $187.54 on October 6, 2001, Mickey Adams' bar charges of $53.65 on October 5, 2001, and John Spaulding's bar charges of $25.75 on October 9, 2001, should be returned to the Fund. It is also our opinion that Robert Burns' movie rental reimbursement charges of $29.85 and Leslie Farrow's movie rental reimbursement of $19.90 should be returned to the Fund. We believe that these expenses were not reasonably incurred in connection with the conference, and are not necessary, beneficial, prudent or proper. Therefore, we believe that these charges, totaling **$316.69**, constituted improper transfers of Plan assets to the fiduciaries and parties in interest, in violation of ERISA sections 406(a)(1)(D) and 406(b)(1).

Leslie Farrow submitted $84.85 in hotel expenses from October 11 through October 12, 2001, and a $75 meal expense without receipts. Since these charges followed the IFEBP meeting by more than one day, we believe these charges, totaling **$159.85**, were personal in nature and therefore prohibited under the travel policy in effect at the time, which restricted expenses to those that were "actually and reasonably incurred in connection with attendance at the meetings," and Article V, Section 17(h) of the Trust Document which requires that all expenses be necessary, affordable, beneficial and legal. We further believe that these charges were imprudent and not reasonably incurred for the purposes of Plan administration or solely in the interest of the participants and beneficiaries as required by ERISA section 404(a)(1). Nor do we believe that these charges properly incurred in the Trustee's performance of his duties as required by Section 408(c)(2). Therefore, it is our view that these charges constituted an improper transfer of Plan assets to this fiduciary and party in interest, in violation of ERISA sections 406(a)(1)(D) and 406(b)(1).

5.   Trustees Meeting - March 18-23, 2002 (Las Vegas, Nevada)

William Schmidt claimed $300 in non-itemized expenses without receipts (excluding mileage). Alexander Rados claimed $735.73 without receipts (excluding mileage), $569.47 of which were over $25. C. W. Poss claimed $290.50 without receipts (excluding mileage), $79 of which were over $25. Doug Duplisea claimed $370 in expenses without receipts (excluding mileage), $181 of which were over $25. Leslie Farrow claimed $201 in expenses without receipts (excluding mileage), $75 of which were over $25. As stated above, it is our view that reimbursement by the Fund for **$1,204.47** in unsupported expenses was prohibited by the Plan documents, was imprudent and not in the interest of the participants and beneficiaries as required by ERISA section 404(a)(1). Therefore, it is our view that reimbursement of these expenses constituted an improper transfer of Plan assets to the fiduciaries and parties in interest, in violation of ERISA sections 406(a)(1)(D) and 406(b)(1).

Robert Burns was reimbursed $19.90 for two movies on March 20, 2002. Mickey Adams was reimbursed for $61.50 in bar charges on March 19, 2002. We believe that these charges were prohibited by the travel policy in effect at the time which restricted expenses to those that were "actually and reasonably incurred in connection with attendance at the meetings," and Article V, Section 17(h) of the Trust Document which requires that all expenses be necessary, affordable, beneficial and legal. We further believe that these charges were imprudent and not reasonably incurred for the purposes of Plan administration or solely in the interest of the participants and beneficiaries as required by ERISA section 404(a)(1). Nor do we believe that these charges properly incurred in the Trustees' performance of their duties as required by Section 408(c)(2)

Christopher M. Laquer, Esq
Re: Operating Engineers' Health and Welfare Fund
Page 5

Therefore, it is our belief that these expenses, totaling **$81.40,** should be returned to the Fund.

6.    IFEBP Conference – May 20-22, 2002 and Trustees Meeting - May 23, 2002
        (Washington, DC)

Dale Vawter was accompanied by Donna, Ashley, and Phillis Vawter. Hotel expenses show lunch charges of $49.31 on May 19, 2002, breakfast and lunch charges of $71.73 on May 20, 2002, lunch charges of $42.21 on May 21, 2002, and breakfast charges of $17.25 on May 23, 2002, all totaling **$180.50.** It is our opinion that the expenses of Vawter's family were not reasonably incurred in connection with the IFEBP conference or Trustee meeting, and were not necessary, beneficial, prudent or proper. Further, under the new travel policy, entertainment expenses are personal to the individual and not reimbursable by the Fund. Therefore, it is our view that reimbursement of expenses attributable to Vawter's family constituted an improper transfer of Plan assets to this fiduciary and party in interest, in violation of ERISA sections and 406(b)(1) and 406(a)(1)(D).

Dale Vawter's hotel billing also shows bar charges of $99.60 on May 20, 2002. Steve Billy's hotel billing shows bar charges of $63.35 on May 23, 2002. Mickey Adams' hotel billing shows bar charges of $117.18 on May 21, 2002. We believe that these expenses were not reasonably incurred in connection with the conference, and are not necessary, beneficial, prudent or proper. Therefore, we believe that these charges, totaling **$280.13,** constituted improper transfers of Plan assets to the fiduciaries and parties in interest, in violation of ERISA sections 406(a)(1)(D) and 406(b)(1), and should be returned to the Fund.

Alexander Rados' expense report lists an auto rental expense of $76.68 on May 20, 2002, and a cab charge that same day for **$43.** As stated above, we do not believe that cab charges when the Plan is paying for a rental car to be prudent or reasonably incurred for the purposes of Plan administration or solely in the interest of the participants and beneficiaries. Therefore, it is our view that this charge constitutes an improper transfer of Plan assets to this fiduciary and party in interest, in violation of ERISA sections 406(a)(1)(D) and 406(b)(1).

Steve Billy did not submit receipts for $285 in expenses, $150 of which were over $25. Alexander Rados did not submit receipts for $1,326.42 in expenses, $1,153.67 of which were over $25. For the reasons stated above, we believe that reimbursement by the Fund for these unsupported expenses, totaling **$1,303.67,** should be returned to the Fund.

7.    IFEBP Meeting - September 20-25, 2002 (Toronto, Canada)

Gene Sapper did not submit receipts for expenses totaling $5,565.53, of which $5,225.63 were over $25. Mickey Adams and William Schmidt submitted bar tabs totaling $666.24. For the reasons stated above, we believe that these charges, totaling **$5,891.87,** should be returned to the Fund.

8.    Trustees Meeting - October 11-14, 2002 (Dallas, Texas)

Robert Burns submitted $92.10 in bar charges. John Spaulding's bar tab was $134.51. For the reasons stated above, these charges, totaling **$226.61,** should be returned to the Fund.

Christopher M. Laquer, Esq.
Re: Operating Engineers' Health and Welfare Fund
Page 6

9.  IFEBP Conference- November 7-12, 2003 (San Diego, California)

Mickey Adams billed $45.09 in bar charges on November 7, 2003, Steve Vawter billed $47.43 in
bar charges on November 10, 2003, Robert Burns submitted $31.35 in bar charges on
November 9, 2003, and John Spaulding billed $134.22 in bar charges. In addition, Spaulding
billed $11.04 in movie charges on November 12, 2003. We believe these charges, totaling
**$269.13**, should be returned to the Fund.

Alexander Rados submitted receipts for only $948.89 of $1,970.60 in expenses (including
mileage expenses for each day from November 8, 2003 through November 13, 2003, plus cab
charges for those same days totaling $123), of which $749.41 were over $25.  Leslie Farrow
submitted receipts for only $1,367.86 of $2,245.56 in expenses, for which $618.70 were over $25.
We believe that **$1,368.11** in expenses submitted without receipts should be returned to the Fund.
Again, we believe that the reimbursement of cab charges when the Plan has paid mileage for a
personal vehicle is not prudent or reasonably incurred for the purposes of Plan administration or
solely in the interest of the participants and beneficiaries.

Disclosure

With regard to the revisions to the summary plan description, please provide us with a copy of
the corrected portion of the SPD and a copy of the summary of material modification for our file.

Conclusion

In our view, the Trustees are in violation of ERISA and will remain so until the Trust is
reimbursed for all imprudent, excessive and prohibited charges totaling **$33,551.88**, plus lost
opportunity costs, for the nine-off site meetings and seminars, and for all similarly prohibited
transactions since November 12, 2003 and up to the present date.  We note that Trustee Schmidt
repaid the Trust $189 in improper reimbursements and accrued interest of $85 on November 3,
2004.  We note that Trustee Bourguignon repaid improper reimbursements plus interest in the
sum of $2,040 to the Fund on April 4, 2005.  Finally, we note that Leo Majich repaid improper
reimbursements plus interest in the sum of $4,399.67 to the Fund on August 26, 2005.

We have provided the foregoing statement of our views to help you evaluate your obligations
under ERISA.  Your failure to correct the violations may result in referral of this matter to the
Office of the Solicitor of Labor for possible legal action. In addition to any possible legal action
by the Department, you should also be aware that the Secretary, pursuant to section 504(a) of
ERISA, is authorized to furnish information to "any person . . . actually affected by any matter
which is the subject" of ERISA investigation.  Further, even if the Secretary decided not to take
any legal action in this matter, you would nonetheless remain subject to suit by other parties
including plan participants or their beneficiaries.

If you take proper corrective action, the Department will not bring a lawsuit with regard to these
issues.  However, ERISA section 502(l) requires the Secretary of Labor to assess a civil penalty
against a fiduciary that breaches a fiduciary responsibility under, or commits any other violation
of, Part 4 of Title I of ERISA or any other person who knowingly participates in such breach or

Christopher M. Laquer, Esq.
Re: Operating Engineers' Health and Welfare Fund
Page 7

violation. The penalty under section 502(l) is equal to 20 percent of the "applicable recovery amount," a term which means any amount recovered from a fiduciary or other person with respect to a breach or violation either pursuant to a settlement agreement with the Secretary or ordered by a court to be paid in a judicial proceeding instituted by the Secretary.[1]

Please advise us within ten (10) days of your receipt of this letter what action you propose to take with respect to the specific matters discussed. If you would prefer to conference with us directly, please contact Investigator Sandra Corral at (626) 229-1006 with your availability.

Sincerely,

Billy Beaver

**Billy Beaver**
**Regional Director**

cc:     Leo A. Majich, Fund Manager
        Operating Engineers Trust Funds
        100 East Corson Street
        Pasadena, California 91103

---

1      The Department may, in its sole discretion, waive or reduce the penalty if it determines in writing that the fiduciary or knowing participant in the breach acted reasonably and in good faith, or it is reasonable to expect that the fiduciary or knowing participant will be able to restore all losses to the plan without severe financial hardship unless such waiver or reduction is granted. The Department may, in its sole discretion, agree to such a waiver or reduction in conjunction with entering into a settlement agreement. The procedure for applying for a waiver or reduction of the civil penalty is set forth in an interim regulation promulgated by the Department at 29 C.F.R. 2570.80 to 2570.88. A petition for a waiver of reduction of the civil penalty should be directed to the Los Angeles Regional Office. The Department has also issued a proposed regulation regarding implementation of the civil penalty at 29 C.F.R. 2560.502l-1.

# EXHIBIT "2"

# OPERATING ENGINEERS TRUST FUNDS

## I.U.O.E. LOCAL 12

## HEALTH AND WELFARE FUND

# *Benefit Information*

## SOUTHERN CALIFORNIA
## SOUTHERN NEVADA

**January 2009**

113

# OPERATING ENGINEERS HEALTH & WELFARE FUND
# ACTIVE & RETIRED PLANS

**IMPORTANT** - This Benefit Booklet is provided to explain the benefits available through the Health & Welfare Fund. The Plan Rules and Regulations of the Fund are available upon request from the Fund Office.

If there is a conflict between what is written in this Benefit Booklet and the Plan Rules and Regulations, the Rules and Regulations will control.

The Rules and Regulations providing Health Care Benefits for Active or Retired Employees of the Operating Engineers Health and Welfare Fund are subject to change at any time by the Board of Trustees. No benefit presently provided either to Active Employees or Retired Employees is guaranteed to remain in the Plan of benefits in the future. No Active Employee or Retired Employee has a right to continue receiving the same eligibility and benefits as exist now or have existed in the past. The benefits do not become "vested" at any particular time of employment or upon retirement. The Fund attempts to maintain financial reserves which are adequate to pay claims already incurred and claims likely to be incurred under eligibility earned by Active Employees but does not maintain reserves for future eligibility of Active Employees or Retired Employees. The Fund pays current claims for benefits from current contributions by employers. After a claim for benefits has been incurred, the Fund will pay that claim so long as sufficient funds are available. However, all future claims for benefits not incurred are subject to changes in the Rules and Regulations governing benefits and the Board of Trustees may make such rule changes effective on whatever date serves the interest of the Fund and its participants.

The Fund Office will respond to questions asked by an Employee or Beneficiary either orally or in writing to assist understanding of any plan of benefits. However, no oral or written communication to an Employee or Beneficiary from any person (including a Trustee or a Fund Office representative) may change any Plan rule or confer any benefit. The written Rules and Regulations as interpreted by the full Board of Trustees will determine eligibility and benefits in all cases. Any mistaken, incorrect or inaccurate statement of Plan benefits or accrual of rights to an Employee or Beneficiary will not be binding upon the Plan and will be corrected when the error is found. The correction will be made regardless of whether the erroneous statement has been signed on behalf of the Board of Trustees which administers the Plan of benefits.

Any oral or written statement made by an individual Employer Trustee or Union Trustee referring to, describing or interpreting any plan of benefits is to be treated solely as a statement of an Employer or of the Union, respectively, and is not authorized to be a statement made by a Trustee on behalf of the Plan or Fund. Only a written statement signed by or on behalf of the full Board of Trustees is to be interpreted as a communication made by the Trustees in their capacities as fiduciaries of the Plan or Fund.

> # Information about the Health and Welfare Fund
> # and its Plans can also be found at www.oefunds.org.

# Table of Contents

Page

## A
Accidental Death and Dismemberment
  Benefits .............................112
Acupuncture ..........................51
Alternative Therapy .....................51
Ambulance Service .....................52
Aquatic Therapy .......................51
Audit of Hospital Charges ................70

## B
Blood – Donation and Storage .............52

## C
Calendar Year Medical Maximum ...........41
Care in a Foreign Country ................43
Case Management Program ...............43
Change of Address ......................1
Chemotherapy .........................52
Chiropractor ..........................52
Claim Review Procedures ................15
COBRA Continuation of Coverage Plan ......31
Coordination of Benefits .................105
CVS Caremark ........................83

## D
Deductible – Medical ...................40
DeltaCare PMI Dental Plan ..............100
Dental Benefits .......................99
Dental Consultant .....................101
Dependent Eligibility – Active .............22
Dependent Eligibility – Retiree ............25
Diabetic Supplies ......................87
Disability Extensions ...................23
Durable Medical Equipment ..............53

## E
Eligibility – Active .....................19
Eligibility Card .......................20
Eligibility – Retiree ....................24
Exclusions – Dental Benefits .............102
Exclusions – Hospital Expenses ...........71
Exclusions – Medical and Hospital Benefits ...74
Exclusions – Prescription Drug Benefits ......89

## F
Facts About Your Health and Welfare Plan .....4
Family Medical Leave Act (FMLA) ..........35
Fee-For-Service Dental Plan ..............99
Fee-For-Service Medical Benefit Summary ....46
Fee-For-Service Prescription Drug Plan .......86

Page

Filing a Claim for Benefits ...............12
Flu Shots ............................54
Frequently Asked Questions – Eligibility ......37
Frequently Asked Questions – General ......115
Frequently Asked Questions – PPO ..........72

## G
Generic Drug Policy .....................86
Glossary of Terms ....................119

## H
Health Insurance Portability Act (HIPAA) ......36
Health Net ...........................77
Health Plan of Nevada ..................78
Hearing Aid Benefit .....................54
Home Health Care/Registered Nurse .........55
Hospital Benefits ......................68
How to Identify Yourself ..................1

## I
Immunizations ........................55
Infertility/Fertility Treatment ..............56
Information You Will Receive from the
  Fund Office .........................3
Inpatient Hospital Benefits ................68

## K
Kaiser Permanente Health Plan ............77
Kidney Dialysis .......................56

## L
Laboratory/Radiology ...................56
Laser Eye Surgery .....................97
Life Events Checklist ....................4
Life Insurance .......................111
Lifetime Medical Maximum ...............41
Limitations – Dental Benefits ............101

## M
Maternity Benefits .....................57
Medical Child Support Orders .............22
Medical Necessity .....................41
Medicare Prescription Drug Program – Part D ...90
Military Leave ........................21

## N
Newborns' and Mothers' Health Protection Act
  (NMHPA) ..........................11

# Table of Contents (continued)

Page

Page

## O

Operating Engineers Dental Panel . . . . . . . . . . . .99
Open Enrollment for Retiree Health & Welfare  . .26
Open Enrollment for Surviving Spouses and
    Dependents . . . . . . . . . . . . . . . . . . . . . . . . . .37
Optional Retiree Coverage . . . . . . . . . . . . . . . . .29
Organ Transplants . . . . . . . . . . . . . . . . . . . . . . .58
Orthodontia . . . . . . . . . . . . . . . . . . . . . . . . . . . .100
Orthotics - Foot . . . . . . . . . . . . . . . . . . . . . . . . . .59
Outpatient Emergency Care . . . . . . . . . . . . . . . .70
Outpatient Surgery Facility . . . . . . . . . . . . . . . . .70
Overpayments . . . . . . . . . . . . . . . . . . . . . . . . . . .43
Over-the-Counter Drugs . . . . . . . . . . . . . . . . . . .88
Oxygen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59

## P

Pain Management Programs . . . . . . . . . . . .44 & 60
Personal Injury Liability . . . . . . . . . . . . . . . . . . . .42
Physical Therapy . . . . . . . . . . . . . . . . . . . . . . . . .52
Physician Care . . . . . . . . . . . . . . . . . . . . . . . . . .60
Physician's Assistant . . . . . . . . . . . . . . . . . . . . .61
Plan M . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27
Pre-Admission Testing . . . . . . . . . . . . . . . . . . . .69
Prescription Drug Benefits . . . . . . . . . . . . . . . . .83
Prescription Vitamins . . . . . . . . . . . . . . . . . . . . .88
Privacy Statement . . . . . . . . . . . . . . . . . . . . . . .124
Prosthetic Appliances . . . . . . . . . . . . . . . . . . . . .61

## R

Radial Keratotomy . . . . . . . . . . . . . . . . . . . . . . .97
Reserve Hours Account . . . . . . . . . . . . . . . . . . . .20
Routine Physical Exam . . . . . . . . . . . . . . . . . . . .62

## S

Self-Payment Plan for Widows/Widowers and
    Other Dependents . . . . . . . . . . . . . . . . . . . . .36
Separation from Employment . . . . . . . . . . . . . . .24

## S

Skilled Nursing Facility . . . . . . . . . . . . . . . . . . . . .71
Speech Therapy . . . . . . . . . . . . . . . . . . . . . . . . .62
Statement of ERISA Rights . . . . . . . . . . . . . . . .10
Substance Abuse/Chemical Dependency
    Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . .63
Supplies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .63
Surgery Benefits . . . . . . . . . . . . . . . . . . . . . . . . .64

## T

Termination of Active Eligibility . . . . . . . . . . . . . .21
Termination of Retiree Eligibility . . . . . . . . . . . . .25
TMJ Treatment . . . . . . . . . . . . . . . . . . . . . . . . .101
Types of Medical Coverage Available . . . . . . . . .39

## U

United Concordia Dental Plan . . . . . . . . . . . . . .100
United Healthcare Vision (UHC) . . . . . . . . . . . . .95
Useful Telephone Numbers . . . . . . . . . . . . . . . . .2

## V

Vision Care Benefits . . . . . . . . . . . . . . . . . . . . . .93
Vision Service Plan (VSP) . . . . . . . . . . . . . . . . .93

## W

Weekly Disability Benefit (Nevada Only) . . . . . .113
Weight Control Programs . . . . . . . . . . . . . . . . . .66
Well-Child Care . . . . . . . . . . . . . . . . . . . . . . . . . .66
Wigs and Hairpieces . . . . . . . . . . . . . . . . . . . . . .67
Women's Health and Cancer Rights Act
    (WHCRA) . . . . . . . . . . . . . . . . . . . . . . . . . . .12
Workers Compensation Policy . . . . . . . . . . . . . .42

# CHAPTER 1.  GENERAL INFORMATION

**In this Chapter –**
- How to Identify Yourself
- Plan Rules and Regulations
- Change of Address
- Useful Telephone Numbers
- Information You Will Receive from the Fund Office
- Life Events Checklist
- Facts About Your Plan
- Statement of ERISA Rights
- Newborns' and Mothers' Health Protection Act (NMHPA)
- Women's Health and Cancer Rights Act (WHCRA)
- Filing a Claim for Benefits
- Claim Renew Procedures

## HOW TO IDENTIFY YOURSELF

The Fund uses the Social Security number of the Employee or a Health Care Identification number (HCID) as an identification number for all transactions. The HCID number starts with "OE" and may be found on your ID card.  The Union Register number is also used as a cross reference.  Always include the Employee's Social Security number or HCID number on any claim or correspondence that you submit to the Fund Office.  **A missing Social Security or HCID number can significantly delay payment of your claims.**

## PLAN RULES AND REGULATIONS

A booklet that includes the Rules and Regulations of each of the Funds in which you may be a participant is provided upon request. The Plan Rules and Regulations govern every aspect of Plan operations in each case. That is the "legal document" which is the basis for all eligibility and benefit provisions in each Plan. Periodically those Rules and Regulations are amended and updated and revised pages are available from the Fund Office. It is important that you keep that document in a safe place so that you can refer to it whenever necessary. If you do not have a current booklet or if you have misplaced or lost it, you can obtain a copy by merely requesting one from the Fund Office in writing.

## CHANGE OF ADDRESS

**It is important that you keep the Fund Office advised at all times of any change of address.**

Changes in address will not be accepted by the Fund Office unless the change is in writing and the written notice has been signed by the eligible Employee.  Any other change of address will not be accepted.

- **All address changes must be in writing – telephone changes cannot be accepted.**

- **All mailings from the Fund Office will be made to the *last known address*.**

## USEFUL TELEPHONE NUMBERS

If you need assistance or information regarding the Plan benefits, you may call the appropriate department listed below:

| Claims Information Center & Eligibility | (888) 512-5279 (626) 356-1004 | Death Benefits | (626) 356-1062 |
|---|---|---|---|
| Pension: | | Vacation-Holiday | (626) 356-1050 |
| Last names A-G | (626) 356-1060 | Switchboard | (626) 356-1000 |
| Last names H-O | (626) 356-1061 | Administration | (626) 356-1098 |
| Last names P-Z | (626) 356-1063 | Las Vegas Fund Office | (702) 949-1212 |

If you would like to FAX information to the Fund Office, you may use the Department numbers listed below:

| Employer Compliance | (626) 796-4742 | Administration Department | (626) 356-1065 |
|---|---|---|---|
| Pension Department | (626) 796-4742 | Las Vegas Fund Office | (702) 949-1221 |
| Vacation-Holiday Department | (626) 796-4742 | | |

To avoid the expense of a long distance call, use the FAX system. You may call the appropriate local District Office of I.U.O.E., Local 12 listed below and ask them to FAX your inquiry to the Fund Office.

| District No. 1 - Pasadena District No. 1 - Lancaster | (626) 792-2519 (661) 942-1175 | District No. 5 - Redlands District No. 5 - Palm Desert | (909) 307-8700 (760) 779-0299 |
|---|---|---|---|
| District No. 2 - Ventura District No. 2 - Arroyo Grande | (805) 643-8740 (805) 489-1533 | District No. 6 - Las Vegas | (702) 598-1212 |
| District No. 3 - Bakersfield | (661) 325-9491 | District No. 7 - Anaheim | (714) 827-4591 |
| District No. 4 - San Diego | (619) 295-3186 | | |

**Your best method of getting information is to get it from the Fund Office. You should not ask a Union Business Agent for an interpretation of the Rules and Regulations of the Plans because Union Business Agents are not Plan representatives and are not expected to be familiar with Fund Office operations.**

IMPORTANT:  Questions about Union dues, withdrawal, the burial fund and the apprentice training program must be directed to the offices of I.U.O.E., Local 12.  The Trust Fund does not handle these matters and cannot answer your questions about them.

## INFORMATION YOU WILL RECEIVE FROM THE FUND OFFICE

1. **Eligibility Card** - Every eligible Employee, Active and Retired, except those enrolled in an HMO, receives an eligibility card.

   **A.** **Active Employees** - The card is issued quarterly at the beginning of the eligibility quarter. The card will indicate the expiration date of eligibility including any hours used from your Reserve Hours Account.

   If you do not receive an eligibility card and you have been employed by a signatory employer, you must advise the Fund Office immediately.

   **B.** **Retired Employees** - The card is issued when coverage under the Retiree program begins and at the beginning of each calendar year. There is no expiration date on the card because eligibility is determined on a monthly basis.

2. **Quarterly Bulletin** - "*For Your Benefit*" is published four times each year and includes information about the benefits provided by the Health and Welfare Fund and the Pension Trust. It also notifies Employees of changes in benefit provisions. Also included is general information of interest to the Employees. This bulletin is sent to Active Employees only.

3. **Summary Annual Report** - Every year you will receive a statement of the financial condition of the Health & Welfare Fund, Pension Trust and Vacation-Holiday Savings Trust. This statement is designed to give you the basic financial information of each of the Trusts for the Plan Year covered by the report. Any questions you have about the report can be answered by the Administrative personnel in the Fund Office.

## LIFE EVENTS CHECKLIST

The Plan requires certain documentation on various different occasions known as "Life Events".  These various Life Events and the corresponding documentation required are outlined below:

| Life Event | Documentation Required by the Plan |
|---|---|
| **Marriage** | A certified copy of the recorded marriage certificate. |
| **Divorce** | A copy of the recorded final divorce decree. *Note*: The Plan will require a Qualified Medical Child Support Order (QMCSO) that designates one parent to pay for a child's health coverage and meets all of the federal requirements for this type of order, if applicable. |
| **Birth** | A certified copy of the recorded birth certificate. *Note*: If your dependent child does not reside with you, the Plan will require a Qualified Medical Child Support Order (QMCSO) that designates one parent to pay for a child's health coverage and meets all of the federal requirements for this type of order. |
| **Adoption** | A copy of the adoption papers issued by the court. |
| **Guardianship** | A copy of the guardianship papers issued by the court. |
| **Students (age 19 to 26)** | Verification of full-time student status from an accredited school for each term. |
| **Physically and/or Mentally Disabled Dependents** | A completed Total Disability application (available from the Fund Office) and a copy of the attending physician's history and physical report. |
| **Death** | A certified copy of the death certificate. |

## FACTS ABOUT YOUR HEALTH AND WELFARE PLAN

1.  **Name of Plan**.  This Plan is known as the Operating Engineers Health and Welfare Fund.

2.  **Plan Administrator and Sponsor.**  The Board of Trustees is the Plan Administrator. This means that the Board of Trustees is responsible for seeing that information regarding the Plan is reported to government agencies and disclosed to Plan participants and beneficiaries in accordance with the requirements of the Employee Retirement Income Security Act of 1974.

    The Fund Office will provide you, upon written request, information as to whether a particular employer is contributing to this Plan on behalf of participants in the Plan, if the employer is a contributor, and the address of the employer.

3.  **Board of Trustees.**  The Board of Trustees consists of an equal number of employer and union representatives, selected by the employers and union from the list in item #4 on the following page, in accordance with the Trust Agreement which relates to this Plan.

If you wish to contact the Board of Trustees, you may use the address and phone number below:

Operating Engineers Health and Welfare Fund
100 E. Corson Street
Pasadena, California 91103
(626) 356-1000

The Trustees have designated the Administrative Organization named below to perform the routine functions of the Plan:

Operating Engineers Funds, Inc.
100 E. Corson Street
Pasadena, California 91103
(626) 356-1000

4.   **Names, Titles and Addresses of Any Trustee or Trustees.**  As of the printing of this booklet, the Trustees of this Plan are:

# EMPLOYER TRUSTEES

Bruce Cooksey
J.F. Shea Construction, Inc.
667 Brea Canyon Rd.
Walnut, CA 91788-7849

Les Farrow
LES FARROW EXCAVATING AND GRADING
P.O. Box 8765
Fountain Valley, CA 92728

Tim MacDonald
C.A. RASMUSSEN, INC.
28548 Livingston Avenue
Valencia, CA 91355-4171

John Nelson
FCI CONSTRUCTORS, INC.
2585 Business Park Drive
Vista, CA  92081

C. W. Poss
1604 Island Drive
Fullerton, CA 92833

Mike Roddy
WASHINGTON DIVISION OF
URS CORPORATION
5176 E. Vernon Street
Long Beach, CA 90815

Jack Schaefer
2881 S. Valley View  Blvd., #1
Las Vegas, NV 89102-0145

Mitch White
MANSON CONSTR.
1617 Pier "D" Street
Long Beach, CA  90802

## UNION TRUSTEES

William C. Waggoner
I.U.O.E., Local #12
150 E. Corson Street
Pasadena, CA 91103

Steve Montrie
I.U.O.E., Local #12
150 E. Corson Street
Pasadena, CA 91103

Mickey J. Adams
I.U.O.E., Local #12
150 E. Corson Street
Pasadena, CA 91103

Ron Sikorski
I.U.O.E., Local #12
150 E. Corson Street
Pasadena, CA 91103

Steve Billy
I.U.O.E., Local #12
150 E. Corson Street
Pasadena, CA 91103

Fred C. Young
I.U.O.E., Local #12
150 E. Corson Street
Pasadena, CA 91103

Kurt Glass
I.U.O.E., Local #12
150 E. Corson Street
Pasadena, CA 91103

5.  **Identification Numbers**.  The number assigned to the Plan by the Internal Revenue Service is 95-6034886. This Plan Number is 003.

6.  **Agent for Service of Legal Process**.  The name and address of the agent designated for the service of legal process is:

Michael P. Graydon
Operating Engineers Funds, Inc.
100 E. Corson Street
Pasadena, California 91103

Legal process may also be served on a Plan Trustee.

7.  **Collective Bargaining Agreement**.  Contributions to this Plan are made on behalf of each Employee in accordance with collective bargaining agreements between I.U.O.E., Local #12 and participating employers.

The Fund Office will provide you, upon written request, a copy of the collective bargaining agreement. The collective bargaining agreement is also available for examination at the Fund Office.

8.  **Source of Contributions**.  The benefits described in this section are provided through employer contributions to this Plan. The amount of employer contributions to this Plan is determined by the provisions of the collective bargaining agreements with employer representatives. The collective bargaining agreements require contributions to this Plan at a fixed rate per hour worked. The Fund Office will provide you, upon written request, information as to whether a particular employer is contributing to this Plan on behalf of participants working under the collective bargaining agreement.

9.  **Type of Plan**.  This Plan is maintained for the purpose of providing life insurance, accidental death and dismemberment, hospital, medical, prescription drug, dental, vision care, and hearing aid benefits in the event of sickness or accident for Active & Retired Employees and their covered Dependents. The Plan

6

also provides weekly disability income benefits for participants in Southern Nevada only.  The Plan is:

- A collectively-bargained, labor-management trust administered by a Board of Trustees comprised of labor and management representatives pursuant to §302(c)(5) of the Taft-Hartley Act,

- A "voluntary employees' beneficiary association" qualified under the Internal Revenue Code §501(c)(9),

- An "employee welfare benefit plan" under ERISA §3(1), and

- A "group health plan" as defined in ERISA §607.

10. **Trust Fund**.  The Fund's assets and reserves are held in trust by the Board of Trustees (see item number 4 above) of the Operating Engineers Health and Welfare Fund.

11. **Plan Amendment and Termination.**  The benefits provided under the Plan are not permanent.  The Board of Trustees reserves the right, in its sole discretion at any time and from time to time to:

- Terminate or amend the amount or condition of any benefits even though such termination or amendment affects claims which you may already have incurred.

- Change or postpone the method of payment of any benefit.

- Amend or cancel any other provisions of the Plan.

The Trustees do not promise to continue the benefits and coverages in full or in part in the future and rights to future benefits and coverages are not vested.  This means they can be taken away.  In particular, retirement or the completion of the requirements to receive a pension benefit under the Pension Plan does not give any participant or former participant any vested right to continued benefits or coverages under the Rules and Regulations of the Health and Welfare Fund.

The Board of Trustees is authorized and has the power to:

- Decide the meaning of any doubtful or ambiguous provision of the Rules and Regulations of the Plan.

- Decide on a participant's entitlement to or application for benefits under the Rules and Regulations of the Plan.

- Sign agreements, write and carry out reasonable Rules and Regulations, and do all things necessary in the establishment, maintenance and administration of the Plan.

If the Plan terminates, any and all money and assets remaining in the Fund, after payment of expenses, will be used to continue the benefits provided by the Plan, until such money and assets have been used up.

12. **Funding.**  Benefits of the Plan are provided under service agreements or insurance contracts or directly from the Fund's assets, which are accumulated under the provisions of the collective bargaining agreements and the trust agreement and are held for the purpose of providing benefits to covered participants and defraying reasonable operating costs. Fee-for-Service hospital, medical, prescription drug, hearing aid, dental, vision, life and accidental death and dismemberment and weekly disability income benefits are paid directly from Fund assets.

Prepaid medical and prescription drug benefits are provided through Kaiser, Health Net and Health Plan of Nevada.

Prepaid dental benefits are provided through United Concordia, Delta Dental and Safeguard.

**13.  Organizations Through Which Benefits are Provided.**

The carriers listed below provide fully insured benefits under the Plan.

Delta Dental
12898 Towne Center Dr.
Cerritos, CA  90703
(*Prepaid dental benefits*)

Health Net
21281 Burbank Blvd.
Woodland Hills, CA 91367
(*Prepaid medical and prescription drug benefits*)

Health Plan of Nevada
PO Box 15645
Las Vegas, NV  89114
(*Prepaid medical and prescription drug benefits*)

Kaiser Permanente
393 E. Walnut St.
Pasadena, CA  91188
(*Prepaid medical and prescription drug benefits*)

Safeguard Dental
505 N. Euclid St., Suite 200
Anaheim, CA  92803
(*Prepaid dental benefits*)

United Concordia Dental Plan of California
P.O. Box 10194
Van Nuys, CA 91410
(*Prepaid dental benefits*)

The Plan is fully self-insured for the benefits obtained through the companies listed below.  These companies administer at least a portion of the benefits for the Plan, but do not insure or otherwise guarantee any of the benefits of the Plan.

Affiliated Health Funds (AHF)
100 E. Corson St.
Pasadena, CA  91103
(*Provides access to its network of hospital and medical providers, performs healthcare cost management services, provider credentialing and claims screening.*)

Anthem Blue Cross
P.O. Box 60007
Los Angeles, CA 90060-0007
(*Provides access to its network of hospital and medical providers, performs healthcare cost management services, provider credentialing and claims screening.*)

CVS Caremark
2211 Sanders Road
Northbrook, IL 60062
(*Administers the prescription drug benefit*)

Health Care Insights
11075 S. State St., Bldgs 3 & 4
Sandy, UT 84070
(*Provides review and analysis of medical, hospital, dental and prescription drug claims and provides information concerning payments.*)

Interplan Corporation
2575 Grand Canal Blvd.
Suite 200
Stockton, CA 95207
(*Provides access to its network of hospital and medical providers, performs healthcare cost management services, provider credentialing and claims screening*)

ppoNext
1501 Hughes Way
Suite 400
Long Beach, CA 90810
(*Provides access to its network of hospital and medical providers, performs healthcare cost management services, provider credentialing and claims screening*)

United Concordia
P.O. Box 69422
Harrisburg, PA 17106
(*Administers the dental benefit and provides access to its network of dental providers*)

United Healthcare Vision
Liberty 6 Suite 200
6220 Old Dobbin Lane
Columbia, MD 21045
(*Administers the vision benefit and provides access to its network of vision providers*)

USA Senior Care Network, Inc.
916 South Capital of Texas Highway
Austin, TX 78746
(*Provides access to its network of hospital and medical providers, performs healthcare cost management services, provider credentialing and claims screening*)

Vision Service Plan of America
100 Howe Ave.
Sacramento, CA 95825
(*Administers the vision benefit and provides access to its network of vision providers*)

Individual conversion policies are provided by Kaiser Permanente, Health Net and Health Plan of Nevada (hospital, medical and prescription drug coverage).

All benefit types provided by the Plan are set forth in the Table of Contents on Pages i-iii. The complete terms of the Vision Care Benefits are set forth in the Agreements with Vision Service Plan and United Healthcare Vision. The complete terms of the Prepaid benefits are set forth in the Kaiser Permanente Group Hospital and Medical Service Agreement, Health Net Group Hospital and Professional Service Agreement, the Health Plan of Nevada Service Agreement, the Delta Dental Plans Service Agreement, the Safeguard Dental Services Agreement and the United Concordia Service Agreement. The complete terms of the self-funded benefits are set forth in the Rules and Regulations and available to any participant at any time.

14. **Fiscal Plan Year**. The fiscal records of the Plan are kept separately for each fiscal Plan Year. The Fiscal Plan Year begins on July 1 and ends on June 30.

15. **The Plan's Requirements with Respect to Eligibility for Participation and Benefits**. The eligibility requirements are specified on pages 19-38.

16. **Circumstances Resulting in Disqualification, Ineligibility or Denial or Loss of Benefits**. Loss of eligibility is described on pages 21 and 25.

17. **Procedures to Follow for Filing a Claim**. The procedure to be followed in filing a claim for benefits is outlined on pages 12-15.

    Claims submitted must be accompanied by any information or proof requested and reasonably required to process such claims by the Fund Office or the Board of Trustees.

18. **Review Procedure**. If your claim is denied in whole or in part, you will receive a written explanation giving detailed reasons for the denial, specific reference to the plan provisions on which the denial is based, a description of any additional material or information necessary for you to perfect the claim and an explanation of why such information or material is necessary, as well as an explanation of our claim appeals procedure. A description of the appeals procedure appears on pages 15-18.

## STATEMENT OF ERISA RIGHTS

As a participant in the Operating Engineers Health and Welfare Fund, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan participants shall be entitled to:

### Receive Information about Your Plan and Benefits

Examine, without charge, at the Plan Administrator's office and at other specified locations, such as work sites and union halls, all Plan documents, including insurance contracts, Collective Bargaining Agreements and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefits Administration.

Obtain copies of documents governing the operation of the Plan, including insurance contracts, Collective Bargaining Agreements and a copy of the latest annual report (Form 5500 Series) and upon written request to the Plan Administrator. The Administrator may make a reasonable charge for the copies.

Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

### Continue Group Health Plan Coverage

Continue health care coverage for yourself, spouse or dependents if there is a loss of coverage under the Plan as a result of a qualifying event. You or your dependents may have to pay for such coverage. Review this Summary Plan Description and the documents governing the Plan on the rules governing your COBRA continuation coverage rights.

Reduction or elimination of exclusionary periods of coverage for preexisting conditions under your group health plan, if you have creditable coverage from another plan. You should be provided a certificate of creditable coverage, free of charge, from your group health plan or health insurance issuer when you lose coverage under the Plan, when you become entitled to elect COBRA continuation coverage, when your COBRA continuation coverage ceases, if you request it before losing coverage, or if you request it up to 24 months after losing coverage. Without evidence of

creditable coverage, you may be subject to preexisting condition exclusions for the first 12 months (18 months for late enrollees) of your COBRA coverage.

## Prudent Actions by Plan Fiduciaries

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

## Enforce Your Rights

If your claim for a welfare benefit is denied in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of the Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. In addition, if you disagree with the plan's decision or lack thereof concerning the qualified status of a medical child support order, you may file suit in federal court.

If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a state or federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

## Assistance with Your Questions

If you have any questions about your plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance with obtaining documents from the Plan, you should contact the nearest office of the Employee Benefits Security Administration (formerly known as the Pension and Welfare Benefit Administration), U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## NEWBORNS' AND MOTHERS' HEALTH PROTECTION ACT (NMHPA)

This Plan complies with a federal law that prohibits restricting benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a normal vaginal delivery, or less than 96 hours following a cesarean section. However, federal law generally does not prohibit the mother's or newborn's attending provider, after consulting with the mother, from discharging the mother or her newborn earlier than 48 hours (or 96 hours as applicable). In any case, this Plan does not require that a health care practitioner obtain authorization from the Plan (or its utilization review company) for prescribing a length of stay up to 48 hours (or 96 hours following a cesarean section).

## WOMEN'S HEALTH AND CANCER RIGHTS ACT (WHCRA)

Under the Women's Health and Cancer Rights Act of 1998, all plans like this one that cover mastectomies are also required to cover related reconstructive surgery. Available reconstructive surgery must include both reconstruction of the breast on which surgery was performed and surgery and reconstruction of the other breast to produce a symmetrical appearance. Coverage must also be available for breast prostheses and for the physical complications of mastectomy, including lymphedemas. These services are elective and are chosen by the patient in consultation with the attending physician. These services are subject to the Plan's usual provisions regarding deductibles, benefit maximums, coinsurance and copayments.

## FILING A CLAIM FOR BENEFITS

### Hospital and Medical Benefits

Generally, claim forms are not required. Providers submit their own itemized claims in an acceptable format. If needed, claim forms for medical benefits may be obtained from any Union Office or the Fund Office. All completed claims should be sent to the Fund Office for processing. All benefit checks including your Explanation of Benefits (EOB) will be issued by the Fund Office.

When you use contracting providers, the providers will file the claim for you.

The Fund will accept hospital expense claims and medical expense claims for up to 12 months after the date of service. Hospital and medical claims older than this will not be paid.

If you receive treatment outside of the United States, submit a detailed, translated bill, which includes the number of days hospitalized, lab work done, drugs administered, diagnosis or type of treatment given, to the Fund Office.

Before submitting a claim form, be sure it is filled out properly. To avoid delays in the processing of your claims, follow these steps:

1. Complete your portion of the form. If you want the Fund to pay your doctor directly, sign the authorization to pay the benefits to the physician and check the appropriate box for assignment. Sign the authorization to release information.

2. Have the person providing services complete the rest of the form.

3. Check the claim form to be certain that all applicable portions of the form are completed. Be sure your bills are itemized. The following information should be indicated on the bills or claim form submitted:

   - Your name and Social Security number or HCID number.
   - The patient's name and address, date of birth and relationship to you.
   - The date of service.
   - If you have coverage under any other group hospital or medical plan, the name of the insurance company providing your other group coverage and the policy number of this coverage.
   - The CPT codes (these are the codes for physician services and other health care services found in the "Current Procedural Terminology, Current Edition", as maintained and distributed by the American Medical Association) and/or HCPCS (Health Care Financing Administration's Common Procedure Coding System).
   - The ICD-9 codes (these are the diagnosis codes found in the "International Classification of Diseases, Current Edition", as maintained and distributed by the U.S. Department of Health and Human Services).

- The billed charge(s).
- National Drug Code (NDC) number, if applicable.
- The number of units (for anesthesia and certain other claims).
- The Federal taxpayer identification number (TIN) of the provider.
- The billing name and address.
- If services were rendered because of an accident, include the date and place of injury, as well as details (i.e. auto accident, fall, work related accident, etc.).
- Mail your claim or have your doctor mail your itemized bills to the Fund Office.

If you have any questions about your claim, call the Fund Office at (626) 356-1004.

## Prescription Drug Benefit

If you use a non-participating retail pharmacy for your prescription drugs, you need to file a Prescription Drug Claim Form as provided by the Fund Office.  You must pay full price for the prescribed item and submit the claim form to the Fund Office for reimbursement. Reimbursement is limited to a maximum of 60 days  for any one individual drug.

The steps for filing a prescription drug claim form are as follows:

1.  Request an itemized bill from the pharmacy showing the following information for each prescription:

    - Prescription number;
    - Date of sale;
    - Name of the physician who issued the prescription;
    - Patient's name;
    - Cost of the prescription; and
    - National Drug Code (NDC) number for the drug.

2.  Complete the claim form.  Make sure you include the Employee's name and Social Security or HCID number, the patient's name, address, date of birth, and relationship to you, your billing address and the policy number and insurance company name for any other group coverage the patient has.

3.  Attach the itemized bill to the claim form and submit it to the Fund Office.

## Dental Benefits

Claim forms for dental benefits may be obtained from any Union Office or the Fund Office.  All completed claims should be sent to the Fund Office for processing.  All benefit checks including your Explanation of Benefits (EOB) will be issued by the Fund Office.

When you use Operating Engineers Panel Dentists, each panel dentist has a supply of claim forms and will file the claim for you.

To file a claim for non-Panel dentist services, follow these steps:

1.  Complete and sign Part 1 before you visit the dentist.  Make sure you include the Employee's name and Social Security or HCID number, the patient's name, address, date of birth, and relationship to you, your billing address and the policy number and insurance company name for any other group coverage the patient has.

2.  Have the dentist complete Part 2 of the claim form and return it to the Fund Office.

13

## Vision Benefits

If you use a VSP or United Healthcare Vision (UHC) provider, you will not need to file a claim form. You will pay the amount due from you at the end of the visit and your provider will take care of billing VSP or UHC for the remainder.

If you use a non-VSP or non-UHC provider, you will need to request an itemized bill and send it to:

Vision Service Plan
Attention: Non-Member Doctor Claims
P.O. Box 997100
Sacramento, CA 95899-7100

Or

United Healthcare Vision Claims Department
P.O. Box 30978
Salt Lake City, UT 84130

Be sure to include the Employee's name, mailing address and Social Security number and the patient's name, relationship to the Employee and date of birth.

## Hearing Aid Benefit

**NOTE:   A prescription for a hearing aid is required.**

To file a claim for hearing aid benefits, follow these steps:

1.  Get a claim form from any Union Office or the Fund Office.

2.  Complete your portion of the claim form. Make sure you include the Employee's name and Social Security or HCID number, the patient's name, address, date of birth, and relationship to you, your billing address and the policy number and insurance company name for any other group coverage the patient has.

3.  Have the provider complete the provider's portion of the claim form.

4.  Send the claim form and prescription with an itemized bill showing the cost of the hearing aid device to the Fund Office. The ear in which the hearing aid was placed must also be specified.

## Life Insurance and Accidental Death and Dismemberment Benefits

Life Insurance and Accidental Death and Dismemberment claim forms are available from the Fund Office. Provide a copy of the death certificate, and, if appropriate, written evidence of the accidental nature of the death, to the Fund Office. In the event of dismemberment, notify the Fund Office promptly. A claim form will be sent to you.

For further details, contact the Death Benefits Department at (626) 356-1062.

## Weekly Disability Benefit (So. Nevada Only)

Disability forms are available from the Fund Office or the Las Vegas District Office of the I.U.O.E., Local 12. You and your physician must complete the form and return it to the Fund Office for processing.

NOTE: · For services rendered by providers contracting with the Fund such as United Concordia Dental Plan or the various HMO's, the requirements are different and you should get in touch with the contracting provider if you require information on submitting a claim for reimbursement.

IMPORTANT:   If you or your Dependent disagrees with the payment made in regard to any claim, it can be appealed as explained in the section "Claim Review Procedures" of this booklet.   Please alert your Dependents to the existence of that information in this booklet.

## CLAIM REVIEW PROCEDURES

The information below does not apply to Health Net, Health Plan of Nevada or Kaiser Permanente. If you are enrolled in one of those medical plans, see their materials for information on their claims review procedures.

### Types of Claims

- **Urgent Claim** means a claim for medical care or treatment, that requires review sooner than other claims to avoid the possibility of:

  o   serious jeopardy to your life or health or your ability to regain maximum function; or

  o   severe pain that could not be adequately managed without the care or treatment that is the subject of the claim if this is the opinion of a physician who knows your medical condition.

  **Note**:   Claims that do not require prior approval before incurring services or treatment are not Urgent Claims.   Also, the Urgent Claim procedures do not apply to Emergency Care.   If you experience a medical emergency you should go directly to the nearest hospital emergency room. The term "Emergency" means the sudden onset of a condition requiring immediate treatment, including but not limited to heart attack, poisoning, loss of consciousness or convulsions.   The charges for these services will be submitted as Post-Service Claims and will be subject to the Plan's limits and exclusions.

- **Pre-Service Claim** means any claim for benefits for which the plan requires you to obtain approval before obtaining medical care.

  **Note**:   Except as required under the Dental Plan or under the Contract Prescription Drug Plan, the Plan does not require prior approval of benefits.

- **Post-Service Claim** means any claim for payment of treatment, services or supplies that have already been provided to you.   You may obtain a claim form by calling the Fund Office.   Be sure to specify what type of claim you are filing as there are separate forms for medical, dental, life insurance and weekly disability benefits.

- **Concurrent Claim** means any claim that is reconsidered after an initial approval was made and which results in a reduced or a terminated benefit.

  **Note**:   Currently, the Plan does not require reconsideration of treatment that was pre-authorized. Therefore, the Plan will not treat any claim as a concurrent claim.

- **Disability Claim** means any claim that requires a finding of disability as a condition of eligibility. For example, claims for Weekly Disability Benefits for Active Employees in Southern Nevada will be treated as Disability Claims.

**Authorized Representatives**

An authorized representative, such as your spouse, may complete the claim form for you if you are unable to complete the form yourself. Another Dependent or a friend may also complete the claim form for you if you are unable to complete the form yourself and have previously designated the individual to act on your behalf. A form can be obtained from the Fund Office to designate an authorized representative. The Fund Office may request additional information to verify that this person is authorized to act on your behalf. Even if you have designated an authorized representative to act on your behalf, you must personally sign a claim form and file it with the Fund Office at least annually.

A health care professional with knowledge of your medical condition may act as an authorized representative in connection with an Urgent Claim without you having to complete the special authorization form.

**Initial Claim Determination**

The guidelines outlined below are time frames within which a claim must be **decided** for approval or denial. These are **NOT** the periods within which claim payments that have been granted must actually be paid or services that have been approved must actually be rendered. The payment of a claim or the provision of a service following plan approval is done so in a timeframe appropriate with applicable law.

The Fund Office will make an <u>initial determination</u> whether claims will be approved or denied as follows:

- **Urgent Claim**: You will be notified of a determination within 72 hours from the receipt of the claim by the Fund Office.

  If the Fund Office determines that additional information is needed in order to make an initial determination of an urgent claim the Fund Office will notify you if you have failed to provide necessary information. The notification will specify the information required within 24 hours of the receipt of the urgent claim. You and/or your doctor must provide the specified information within 48 hours. The time limit within which the urgent claim must be resolved will be suspended for 48 hours or until the Fund Office receives the requested information, whichever occurs first. Notice of the decision will be provided no later than 48 hours after receipt of the specified information, but only if the information is received within the required time frame.

- **Pre-Service Claim**: You will be notified of a determination within 15 days from the receipt of the claim by the Fund Office, unless additional time is needed. If the Fund Office determines that an extension of time is required to make an initial determination on a pre-service claim due to matters beyond the control of the Fund Office, the time limit within which the initial determination must be made by the Fund Office may be extended for 15 days if the Fund Office notifies you of the extension within the time limit initially set for processing the pre-service claim.

  If an extension is needed because the Fund Office needs additional information in order to make an initial determination of a pre-service claim, the Fund Office will notify you of the information required to complete the claim. In that case, you and/or your doctor will have 45 days to supply the additional information. The time limit within which the pre-service claim must be resolved will be suspended for 45 days or until the Fund Office receives the requested information, whichever occurs first. The Plan then has 15 days to make a decision and notify you of the determination.

  If your provider improperly files a **Pre-Service Claim**, you and/or your provider will be notified as soon as possible but not later than 5 days after receipt of the claim, of the proper procedures to be followed in filing a claim. Notice of an improperly filed Pre-Service claim will only be sent if the claim includes (i) your name, (ii) your specific medical condition or symptom, and (iii) a specific treatment, service or product for which approval is requested. Unless the claim is re-filed properly, it will not constitute a claim.

- **Post-Service Claim**:  You will be notified of a determination on your post-service claim within 30 days from the receipt of the claim by the Fund Office. If the Fund Office determines that an extension of time is required to make an initial determination on a post-service claim due to matters beyond the control of the Fund Office, the time limit within which the initial determination must be made by the Fund Office may be extended for 15 days if the Fund Office notifies you of the extension within the time limit initially set for processing the post-service claim.

  If an extension is needed because the Fund Office needs additional information in order to make an initial determination of a post-service claim, the Fund Office will notify you of the information required to complete the claim. In that case, you and/or your doctor will have 45 days to supply the additional information.  The time limit within which the post-service claim must be resolved will be suspended for 45 days or until the Fund Office receives the requested information, whichever occurs first. The Plan then has 15 days to make a decision and notify you of the determination.

- **Disability Claim**:  You will be notified of a determination on your disability claim within 45 days from the receipt of the claim by the Fund Office. If the Fund Office determines that an extension of time is required to make an initial determination on a disability claim due to matters beyond the control of the Fund Office, the time limit within the initial determination must be made by the Fund Office may be extended for two (2) periods of 30 days each if the Fund Office notifies you of the extension within the time limit initially set for processing the disability claim.

  If an extension is needed because the Fund Office needs additional information in order to make an initial determination of a disability claim, the Fund Office will notify you of the information required to complete the claim. In that case, you and/or your doctor will have 45 days to supply the additional information.  The time limit within which the disability claim must be resolved will be suspended for 45 days or until the Fund Office receives the requested information, whichever occurs first.  Once you respond to the Plan's request for the information, you will be notified of the Plan's decision on the claim within 30 days.

## Denied Claims

If your claim has been denied in whole or in part by the Fund Office, you will be notified in writing within the time limits indicated above.  However, for urgent claims, the notice may be provided orally and confirmed in writing within three (3) calendar days after the oral notice.

The notice of the denial of the initial benefit determination will state the following:

- The specific reason or reasons for the denial.
- A reference to the provision in the plan Rules and Regulations upon which the denial was based.
- A statement of any additional information or material required for the processing of the claim and the reason such additional information is needed.
- A statement of information sufficient to inform you of the Fund's procedures for the appeal of denied claims. The notice will include copies of any internal rules, guidelines, protocols or other criteria relied upon by the Fund Office in denying the claim unless you are notified in writing that such material is available and will be provided to you at no cost upon your request.

## Appeals Process

If your claim is denied, you may ask the Board of Trustees to review the denial (an appeal).  Your request for review must be made in writing to the Fund Office.  Your request must state in clear and concise terms the reason or reasons why you disagree with the denial.  You must send the Board any document not already provided that supports your claim, and you must file it with the Fund Office within 180 days after you receive notice of the denial of your claim.  You or your authorized representative will be permitted to review pertinent documents and to submit issues and comments in writing.

A request to review the denial of an Urgent Claim may be made orally instead of writing if you prefer.

If you have a good reason, the Board of Trustees will permit the petition to be amended or supplemented and may, in its sole discretion, grant a hearing on the petition before a hearing panel consisting of at least one Employer Trustee and one Union Trustee to receive and hear any evidence or argument which cannot be presented satisfactorily by correspondence. If you fail to file a petition for review within the 180 day period or fail to appear and participate in any hearing you will lose your right to review by the Trustees. However, the Board may allow you to file your request for review late if application to do so is made within one year after the date shown on the notice of denial.

You have the right to submit comments, documents, records and other information in support of your claim for benefits. Upon request and free of charge, the Plan will provide you with reasonable access to and copies of all documents, records or other information relevant to your claim.

Upon request, you will be provided with the identification of medical or vocational experts, if any, that gave advice to the Plan on your claim, without regard to whether their advice was relied upon in deciding your claim.

A different person will review your claim and such person will not be a subordinate of the person who originally denied your claim. The reviewer will not give deference to the initial adverse benefit determination. The decision will be made on the basis of the record, including such additional documents and comments that may be submitted by you relating to the claim.

If your claim was denied on the basis of a medical judgment (such as a determination that the treatment or service was not medically necessary or was investigational or experimental), a health care professional who has appropriate training and experience in a relevant field of medicine will be consulted. Such professional will not be an individual who was consulted in connection with the initial determination that is the subject of the appeal or any subordinate of such individual.

A decision by the Board of Trustees will be made promptly, but in no event will it exceed the following time limits:

- **Urgent Claims**: within 72 hours from the receipt of the appeal by the Fund Office.

- **Pre-Service Claims**: within 30 days from the receipt of the appeal by the Fund Office.

- **Post-Service Claims:** within 60 days from the receipt of the appeal by the Fund Office.

- **Disability Claims:** within 45 days from the receipt of the appeal by the Fund Office. The Fund Office may extend this period by an additional period of 45 days if the Fund Office provides notice to you of the circumstances requiring the extension within the first 45-day period.

The Board of Trustees, as permitted by federal law and regulation, may defer the decisions on adverse benefit determination appeals until the next regularly scheduled meeting of the Fund's benefit appeals committee.

**If Your Appeal is Denied**

You will be notified of the decision of the Board of Trustees in writing. The decision will include all of the same information which is required to be provided by the Fund Office for an initial benefit determination as outlined above.

The decision of the Board of Trustees on the petition for review will be final and binding upon all parties involved with the claim, including the applicant, claimant or petitioner, subject only to judicial review as provided in the plan Rules and Regulations.

# EXHIBIT "3"



**International Union of Operating Engineers**    AFL-CIO

Southern California & Southern Nevada

**WM. C. WAGGONER**
*Business Manager*
*and*
*General Vice-President*

August 19, 2011

TO:    All Officers and Local 12 Employees

FROM:  Wm. C. Waggoner, Business Manager
       I.U.O.E., Local Union No. 12

===================================================================

At the Executive Board Meeting held on August 6, 2011, the Executive Board took certain actions that will affect practically all of the employees of Local 12.

First, a motion was passed unanimously that Executive Board Meetings will be held every other month instead of the usual schedule of meetings every month.  Therefore, there will not be a Board Meeting in September.

Secondly, I recommended that we ask the employees to take two days off per month without pay.  We will work out a schedule to determine which day of the week each employee will be off work.

This will allow us to reduce the number of employees in each department by 50 percent for those days off.

In other words, half of the staff will be working five days per week and the other half will receive pay for four days.

Between December 31, 2009 and December 31, 2010, the General Fund's loss was $5,727,742.  According to the number generated in the first six months of this year, we estimate that we will lose approximately $4 million this year.

As we all know, you cannot continue to operate creating a deficit in the amounts reflected in the above paragraph.

In the event the economy improves, the membership goes back to work and we stop the bleeding, we will discontinue this program and return to a five day week operation.

Thank you for your assistance and cooperation in adopting this program until we see better days ahead.

150 EAST CORSON STREET  •  P.O. BOX 7109  •  PASADENA, CALIFORNIA  91109-7209  •  TELEPHONE: (626) 792-8900

# EXHIBIT "4"

**LOCAL 12**

*International Union of Operating Engineers*    AFL-CIO

Southern California & Southern Nevada

**WM. C. WAGGONER**
*Business Manager
and
General Vice-President*

## MEMORANDUM

TO:      ALL LOCAL 12 OFFICERS, DISTRICT REPRESENTATIVES, BUSINESS AGENTS AND OTHER DRIVERS

FROM:    WILLIAM C. WAGGONER, BUSINESS MANAGER

DATE:    9/13/04

---

Please be advised, I am sending this memo that is of utmost importance. This is not just a memo from the main office and like similar memos you toss in a file. Local 12 is having a serious problem of obtaining automobile insurance coverage at a reasonable rate. In fact, Hartford Insurance our present carrier was the only insurance company that would agree to underwrite our auto insurance coverage.

The reason is very simple. Some of the agents driving records are horrible. It is not fair that the agents who drive very carefully and sensibly are "burdened" by those who take to many risks in their driving habits. Like everything else we have to mix their good driving records with those who think they are "Jeff Gordon". In other words, clean up your act, because we don't intend to buy "tanks" for you to perform your every day activities.

Please review the attached Driver Safety Policy and acknowledge by signing the white copy and sending it to me no later than September 30, 2004.

WCW:sdh

# DRIVER SAFETY POLICY

Local 12 considers the prevention of vehicle accidents essential to the well being of our employees, union equipment and the general public.  All drivers are expected to practice defensive driving by following traffic regulations and our established procedures.

## *DEFINITION OF DEFENSIVE DRIVER*

"Defensive Drivers are persons who commit no driving errors themselves and make allowances for the lack of skill or improper driving practice of the other driver.  Defensive Drivers adjust their own driving to compensate for unusual weather, road and traffic conditions and are not tricked into an accident by the unsafe actions of pedestrians and other drivers.  Being alert to accident producing situations, they recognize the need for preventive action in advance and take the necessary precaution to prevent the accident.  As Defensive Drivers, they know when it is necessary to slow down, stop or yield the right-of-way to avoid involvement."

- A Department of Motor Vehicle report will be run routinely on all of our drivers each year to insure safety and compliance to this policy.

## *PREDOMINATE VEHICLE ACCIDENT CAUSES:*

Disregard For Signs & Lights

Not Driving Defensively

Speeding/Attitude

Unsafe Stopping or Parking

Alcohol, Drugs, Tired

Unsafe Entry Onto Highway

Following to Close

Inattention/Poor Judgment

Unsafe Backing

Too Fast For Conditions

Momentarily Distracted

Failure to Stop or Signal

## *PROCEDURES WHEN ACCIDENT OCCURS*

1. Report an accident promptly to the executive offices.
2. Give a detailed report of how the accident occurred with a diagram.
3. Get information from the other driver such as:
   a. Name
   b. Address

Page 2

   c.  Name of Insurance Company
       i.  Policy number
      ii.  Agent
     iii.  Phone number

(A copy of an Accident Report Brochure, which has been given to you recently is attached for your reference)

By: _____      Date: _9 – 10– 04____
   William C. Waggoner
   Business Manager

Acknowledged and Understood:

_____      Date: _____

# EXHIBIT "5"

## SCANLON: Hilda Solis' legacy of pandering

*She enabled union corruption*

COMMENTS (4)    SIZE: + / -    PRINT

| By Terrence Scanlon | Thursday, January 17, 2013 |
| --- | --- |

Hilda Solis is leaving her position as secretary of labor 🔗(#) -- or, as she saw the job, secretary for the Support of Unions.

The official mission of he Labor Department is "To foster, promote, and develop he welfare of the wage earners, job seekers, and retirees of the United States; improve working conditions; advance opportunities for profitable employment; and assure work-related benefits and rights." There's nothing in that description about unions, which today represent fewer than 1 in 16 workers in he private sector. From her first day in office to the last, however, Ms. Solis was the unions' faithful servant.

Ms. Solis was born into the labor union movement. Her father was a Teamster and her mother a member of what is now the United Steelworkers. During her time in Congress (2001-09), she received more than $900,000 in contributions from unions, and she was a member of the so-called Progressive Caucus, the far left among members of Congress.

When President Obama picked her as his labor secretary, John Sweeney, then the president of the AFL-CIO, said he was "thrilled." At a United Food and Commercial Workers Union convention, she told conventioneers, "President Obama has your back, and so do I."

At a conven ion of the plumbers and pipe fitters union, she called her audience "brothers and sisters" and called he labor union movement "our movement."

In the Bush administration, the Labor Department had conducted a program of "compliance assistance," a good-cop approach that sought to avoid crippling fines for businesses 🔗(#) even as it resulted in record-low workplace death and injury rates and record-high back pay collected for workers. When she became labor secretary, Ms. Solis abandoned that approach and hired hundreds of investigators (710 of them by early 2010) to go after businesses that, she said, were shortchanging workers, denying them rightful benefits and endangering their safety. She would be, in her words, a "new sheriff in town."

She sought scores of new rules and regulations on business 🔗(#) , 90 in 2010 alone, but she got rid of rules that unions didn't like.

One of her biggest changes in direction was her reversal of Bush administration efforts to fight union corruption. Ms. Solis' predecessor, Elaine Chao, had issued several rule changes to make it easier for union members and watchdogs to detect wrongdoing, especially conflicts of interest among union officials and the people with whom they do business.

Regarding a conflict-of-interest form that union officials file, the Bush administration offered amnesty to first-time filers in 2005, and the number of filers went from 96 to 13,326. The form, which had not been updated for 40 years, was made more detailed, and coverage was extended to include more officials such as, in some cases, shop stewards.

The new disclosure rules helped union members by exposing corruption. For example, they forced Tyrone Freeman, head of California's largest union local, out of office after the revelation of the union's contract with his wife's video production firm and of he expenditure of nearly $10,000 of union money at a cigar bar.

In Denver, a local president of the United Food and Commercial Workers was voted out of office and
replaced with a Safeway bakery clerk after disclosures that  he president spent union money on alcohol
and Broncos tickets and that, while making $162,000 a year, he put his wife and son on the payroll for
a combined $268,000.

The Chao rules helped the Labor Department's Office of Labor-Management Standards obtain 929
convictions, mostly for embezzlement, and recover some $93 million. Other rules would have made it
easier to track the operation of union trusts such as those set up for health benefits, pensions (#) ,
training programs and strike funds.

Ms. Solis rolled back the Chao reforms.

Her excuse? The changes "had a detrimental impact on workers" and "made the union financial (#)
reporting requirements not only overly burdensome but ineffective." In response, Ms. Chao accused
the Obama administration of "not enforcing laws on union transparency and democracy" and "telling
unions that they don't have to comply."

Today, private-sector unions are failing enterprises. They seem unable to adapt to a changing
environment -- to global trade, to the advance of information technology (#) and robotics, and to the
rise, in states like Indiana and Michigan, of poli ical leaders who do not fear them. In the private sector,
38 percent of workers belonged to unions 60 years ago; today the figure is 6 2 percent.

Ironically, given unions' critical role in electing and re-elec ing Mr. Obama, the jobs-destroying taxes
and hyper-regulation of the Obama era may make it even worse for unions. Unionized businesses,
lacking the flexibility of non-union businesses, will be less likely to grow and more likely to fail, which
will further diminish the influence and membership of unions.

Hilda Solis ran the Labor Department as an extension of the union movement, but her heavy-handed
approach -- seeing business as an enemy rather than as a partner in creating jobs -- may have simply
been another nail in the movement's coffin.

*Terrence Scanlon is president of the Capital Research Center.*

# EXHIBIT "6"

# BILL WAGGONER
## BUSINESS MANAGER

# State of the Union

At the start of 2011, it seemed as if the struggling economy and the high unemployment numbers were going to take forever to improve. The recession isn't over yet, and not everybody's back to work, but it's looking a whole lot better than it was this time last year.

Our stated goal at the beginning 2011 was to get the economy moving again. That would make the out-of-work list shorter.

The loss of reported hours hit every union organization even harder in early 2011, and we were no exception. The Officers and I had to learn how to become familiar with the ins and outs of the Pension Rehabilitation Agreement and compliance with federal regulations.

If you will recall, I reported at the General Membership Meeting in December 2010 that our Health and Welfare Fund was in serious financial condition. Estimates were that we had to come up with an increase amounting to $4.60 per hour, which included $1.00 an hour in the hourly wage rate, a $1.90 reduction in benefits and a $1.50 per hour increase from the employer.

Also in the early part of 2011, you read in the News-Record how the Pension Fund fell below acceptable levels. The Southern California Operating Engineers Training Trust, and to a lesser degree the Las Vegas Training Trust, were running at a loss every month, and were scrambling to reduce their expenditures. The Survey Training Trust was also experiencing financial problems.

Even though many unions were in worse shape than we were, this was a very difficult time for all of us.

You, the membership, are the reason why things started to turn around mid-2011. Your vote to allocate the negotiated increase at the June Semi-Annual Membership Meeting created an infusion of funds into the Health and Welfare Fund, Pension Fund, Joint Apprentice Training/Journeyman Retraining Fund and The Engineers Contract Compliance Committee Fund.

Without your support, without that membership vote, there is no way we Officers could accomplish what we needed to do.

The Health and Welfare Trust Fund was the hardest hit, and the one that needed the most attention. We had almost daily meetings with trustees and auditors in the summer and fall of 2011 to try to address the critical losses we were experiencing, despite record cutbacks in spending.

Then things finally started looking up. The $10 million loan by Local 12 to rescue the Health and Welfare Fund and the subsequent $10 million line of credit has finally stopped the bleeding.

At the latest Trust Fund Meeting, a report revealed

a number of positive trends. The hours reported were improving, the backlog of claims was shrinking, they are in the process of catching up and the newer claims were also being processed.

And I received a report recently from the International which stated that there are almost 17,000 more Operating Engineers working now than there were three months ago. Overall employment percent fell from 15.8 to 9.8. It may not be that low here in California and Nevada, but judging from the out-of-work list, it is definitely lower.

Another item in the good news department - our new Dispatch Hall in San Diego is open for business.

### Labor-Friendly Politicians

There were a few other things that were going our way in 2011. With Jerry Brown in Sacramento, we had the ear of the Governor's office, including his Labor-friendly departmental appointments. These departments, such as the Employment Development Department, which handles unemployment insurance issues dealing with wage and hour situations, are important when we encounter a major problem with respect to the membership of Local 12.

One of Brown's key choices was Christine Baker, now head of the Department of Industrial Relations (DIR). She's agreed to merge the formerly independent divisions of the DIR, so it is going to be easier to get help with our problems regarding the enforcement of



*Business Manager William C. Waggoner addresses the January meeting in District 4.*

the State Prevailing Laws and the registration of our Prevailing Rates.

Another good choice was Labor Commissioner Julie Su, who has a record of prosecuting employers who take advantage of workers.

Jerry Brown is a classic example of why we need to elect Labor-friendly people in government. The major priority in the presidential election this year must be to keep Barack Obama and Labor Secretary Hilda Solis in office. The working men and women of our country must protect their rights to earn a decent wage and work in safe conditions, and they can do that by choosing candidates who value those rights.

### Labor-UNfriendly politicians

Some of the Labor-UNfriendly politicians, especially in Nevada, worked hard last year, as they always do, to try to undo legislation that we have fought hard to get enacted to benefit the working men and women of our country.

Somebody in Nevada came up with Bill 312, which would delete the overtime provision in our negotiated contracts. Prevailing rates would be the prevailing rates *Continued on page 10*

**ABOUT THE COVER**

*For more information on the Porter Ranch Project turn to our centerspread.*

*Cover photo courtesy of Business Representative Ed Guthrie.*

# EXHIBIT "7"

# SPIRO MOORE LLP

Attorneys at Law

11377 W. Olympic Boulevard ▪ Fifth Floor ▪ Los Angeles, California 90064-1683
Telephone (310) 235-2468 ▪ Fax (310) 235-2456

H. Scott Leviant
scott@spiromoore.com

July 29, 2013

VIA FIRST CLASS U.S. MAIL AND E-MAIL

Howard Z. Rosen
Posner & Rosen LLP
3600 Wilshire Blvd., Suite 1800
Los Angeles, CA  90010
hzrosen@posner-rosen.com

Re: *Salas, et al. v. International Union of Operating Engineers, et al.*
U.S. District Court Case No. 2:12-cv-10506-DDP-VBK

Dear Mr. Rosen:

This correspondence concerns the preservation of certain specific materials relevant to the litigation of this matter.  I refer you to my March 6, 2013 correspondence regarding Plaintiffs' general demand that document spoliation (which resulted in the subsequent sequestration and concealment of records previously selected for destruction).  A copy of that March 6, 2013 correspondence is attached for convenience to the email forwarding this letter.

First, Plaintiffs demand the preservation of recordings, in all formats, of the telephone communications into and out of Local 12's offices.  Defendant-officers of Local 12, including William Waggoner ("Waggoner"), Business Manager of Local 12 and First Vice President of the International Union of Operating Engineers, are obligated to ensure the preservation of those recordings, irrespective of the legality of the recording.

Second, Plaintiffs demand preservation of the records located on the six-foot long shelf in Angelina's office at OEFI.  Those records, which we understand relate to audits that were terminated in process and to collection matters that were abandoned, terminated or never genuinely commenced at the direction of Waggoner and others, involve predominantly Croatian-owned employers that were excused from contribution obligations by virtue of their relationships with Waggoner and Leo Majich.  The uncollected amounts at issue involve many millions of dollars of owed Fund contributions, causing additional harm to the Class.  Plaintiffs intend to pursue the damages resulting from these "favored sons" transactions, about which we were recently advised.    These files are exceedingly relevant to Plaintiffs' claims, including, but not limited to, their claims based on officers' and Trustees' violations of various duties and obligations.  Relatedly, Plaintiffs will also be seeking the compliance department records relating to the identification of these companies for purposes of the discontinuation of audits.  Those records must also be safeguarded from spoliation or concealment.

# SPIRO MOORE LLP

Howard Z. Rosen, Esq.
July 29, 2013
Page 2 of 2

In the event that you have been replaced as counsel for Mr. Waggoner, or in the event Mr. Waggoner has retained additional counsel who might be unaware of their preservation duties, please advise us of the identity of any new or additional counsel and forward this communication to their attention for prompt action. We are profoundly concerned about the potential for spoliation with regard to these records, particularly in view of the past attempts at spoliation that Plaintiffs have alleged have already been undertaken since Plaintiffs filed their case.

Thank you.

Sincerely,

SPIRO MOORE LLP

H. Scott Leviant

HSL:sp
cc:     J. Mark Moore (via e-mail only)
        Steven D. Atkinson (via e-mail only)
        Thomas H. Cadden (via e-mail only)
        E. Sean McLoughlin (via e-mail only)

# SPIRO MOORE LLP

*Attorneys at Law*

11377 W. Olympic Boulevard ▪ Fifth Floor ▪ Los Angeles, California 90064-1683
Telephone (310) 235-2468 ▪ Fax (310) 235-2456

H. Scott Leviant
scott@spiromoore.com

March 6, 2013

VIA FIRST CLASS U.S. MAIL AND E-MAIL

Howard Z. Rosen
Posner & Rosen LLP
3600 Wilshire Blvd., Suite 1800
Los Angeles, CA  90010
hzrosen@posner-rosen.com

> Re:   *Salas, et al. v. International Union of Operating Engineers, et al.*
>        U.S. District Court Case No. 2:12-cv-10506-DDP-VBK

Mr. Rosen:

This correspondence concerns reports of recent, substantial document destruction occurring at Local 12.  This correspondence constitutes our demand that your client, William Waggoner, who is in a position to control all such activities Local 12, immediately cease and desist all such activity to the extent materials remain that have not been destroyed since the filing of this action.

All defendants, including William Waggoner ("Waggoner"), Business Manager of Local 12 and First Vice President of the International Union of Operating Engineers, are obligated to preserve all hard copy documents and electronically stored information ("ESI") as if it was the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure.   This obligation includes suspending Local 12's records information management/destruction policy with respect to all information, including ESI from all databases, network systems, and hard drives, including email, calendar, webpage, voicemail, instant message, intranet, and social network data.  In addition to its obligations concerning information that came into existence before the suit was filed, Waggoner and Local 12, which Waggoner controls by virtue of his many years as the Business Manager of Local 12, should also maintain in active directories all information in native format created after the above-mentioned lawsuit was filed, including all information concerning the many transactions, transaction types, investments and expenditures.

In addition to notifying you of spoliation concerns, I also write to begin the process of meeting and conferring regarding the identity and source of potentially responsive information, including ESI.  Guided by Federal Rule of Civil Procedure 26(f), the Civil Discovery Standards for the American Bar Association Section on Litigation, The Manual for Complex Litigation (Fourth), and The Sedona Conference principles, plaintiffs seek the following information from Waggoner (including information in his possession, custody and control, which extends

# SPIRO MOORE LLP

Howard Z. Rosen, Esq.
March 6, 2013
Page 2 of 5

throughout Local 12).  The requested information would minimize any potential discovery burden on your client and provide plaintiffs with a fair opportunity to receive information relevant to these lawsuits.  Importantly, by virtue of Mr. Waggoner's positions with Local 12 and the associated funds, a majority of the responsive information is well within his possession, custody or control.

## I.      NETWORK STRUCTURE

Plaintiffs request network structure information relating to Waggoner's personal and Local 12 information technology system(s).  This information is necessary to determine the locations to search for responsive information.  See Civil Discovery Standards, 2004 A.B.A. Sec. Lit. 31, 2004 Comment (parties should discuss "[t]he universe of potentially responsive data that exist, including the platforms on which, and place where, such data may be found (including databases, networks, systems, servers, archives, backup or disaster recovery systems, tapes, discs, drives, cartridges and other storage media, laptops, PCs, Internet data, and PDAs")); "The Case for Cooperation," 10 Sedona Conf. J. 339, 344-45 (2009) ("Cooperation…requires…that counsel adequately prepare prior to conferring with opposing counsel to identify custodians and likely sources of relevant ESI."); *Nissan North Am., Inc. v. Johnson Electric North Am., Inc.*, No. 09-11783, 2011 U.S. Dist. LEXIS 16022, at *9-10 (E.D. Mich. Feb. 17, 2011) (ordering production of a "data map to show what data is stored on each [] systems, who uses the systems, the retention of the data stored and where and how the data is backed up or archived").

## II.     DOCUMENT RETENTION POLICIES

Plaintiffs request that Waggoner describe any retention or deletion policies not described in response to Section I above, which were in place prior to this litigation.  Waggoner should also describe the steps taken to preserve potentially relevant information, both personally and by virtue of his fiduciary positions at Local 12, in anticipation of this litigation.  Notably, Waggoner had reason to anticipate this litigation after learning of the previously-filed suit against Local 501. This information includes:

1.      When document retention instructions were sent;
2.      The medium(s) of sharing the retention instructions (e.g., conference call, letter, email, in-person meetings, etc.);
3.      To whom document retention instructions were addressed;
4.      The kinds and categories of information covered by retention instructions;
5.      The format types of documents and information retention letter recipients were instructed to preserve (e.g., emails, calendar items, voicemails, instant messages, etc.);
6.      Whether retention letter recipients were instructed to maintain potentially relevant information on their own workstations and/or network folders, and if not, where (e.g., a designated network folder) and/or to whom retention letter recipients were instructed to deliver potentially relevant information;

# SPIRO MOORE LLP

Howard Z. Rosen, Esq.
March 6, 2013
Page 3 of 5

       7.      Whether retention instruction recipients were instructed to maintain all relevant information; and

       8.      What steps, if any, Waggoner, personally and as Business Manager of Local 12, has taken to ensure compliance with retention instructions.

Case law instructs that the above requested information is relevant and not covered by the work-product doctrine. *In re Ebay Seller Antitrust Litig.*, No. 07-01882, 2007 U.S. Dist. LEXIS 75498, at *8-*9 (N.D. Cal. Oct. 2, 2007) ("[P]laintiffs are entitled to know what kinds and categories of ESI eBay employees were instructed to preserve and collect, and what specific actions they were instructed to undertake to that end."  Additionally, "eBay shall provide a list of names and job titles of the approximately 600 employees who received [document retention notices]."); *Algonquin Heights v. United States*, No. 97-582, 2008 U.S. Claims LEXIS 500, at *21 (Fed. Cl. Feb. 29, 2008) ("[P]laintiffs may inquire into document preservation and production matters with [defendant's 30(b)(6)] designees without intruding into areas potentially protected by the work product doctrine.").


## III.    WITNESSES AND ESI DOCUMENT CUSTODIANS

      The parties should also begin the discussion of relevant witnesses. *See also In re Celexa & Lexapro Prods. Liab. Litig.*, MDL No. 1736, 2006 U.S. Dist LEXIS 91590, at *10 (Nov. 13, 2006) (organizational charts should be produced to assist the requesting party in identifying appropriate custodians); *Capital Records, Inc. v. MP3tunes, LLC*, 261 F.R.D. 44, 54 (S.D.N.Y. 2009) (same).  Thus, in addition to organizational charts for employees whose functions related to all aspects of the operation of Local 12, Waggoner, personally and as Business Manager of Local 12, should provide the following information for each potentially relevant witness:

       1.      Name;

       2.      Job title(s);

       3.      Description of job role(s) correlating to the title(s) identified in 2 above;

       4.      Time period during which the person held the job title(s) in 2 above;

       5.      Current employer; and

       6.      If not currently employed by Local 12, the person's current contact information if known.


## IV.    ESI SEARCH TERMS AND CONCEPT SEARCHING

      Subject to proof of burden regarding specific ESI sources and the susceptibility of the sources to be filtered with search terms, plaintiffs are open to Waggoner, personally and as Business Manager of Local 12, using properly formulated, and mutually selected search terms and phrases for culling specific, relevant ESI.   However, the search terms must be run against the ESI as it exists in native format.  Thus, the parties should begin the process of formulating appropriate search terms and phrases.  Because search terms largely determine the scope of

# SPIRO MOORE LLP

Howard Z. Rosen, Esq.
March 6, 2013
Page 4 of 5

documents produced in litigation, it is critical that plaintiffs understand and have meaningful input into the search terms used. *See Zubalake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) (the parties must negotiate ESI search terms); *William A. Gross Constr. Assocs., Inc. v. American Mfrs. Mut. Ins. Co*., 256 F.R.D. 134, 134 (S.D.N.Y. 2009) (There is a "need for careful thought, quality control, testing, and cooperation with opposing counsel in designing search terms or 'keywords' to be used to produce emails or other [ESI]."); Manual for Complex Litigation (Fourth) §40.25(2) (2004) (the "parties should attempt to reach agreement on all issues regarding preservation of documents, data, and tangible things [including] … key words to be used in identifying responsive materials."). Admonishing a party for not openly engaging in search filtering techniques, the court in *In re Seroquel Prods. Liab. Litig*., 244 F.R.D. 650, 662 (M.D. Fla. 2007) stated:

> [W]hile key word searching is a recognized method to winnow relevant documents from large repositories, use of this technique must be a cooperative and informed process. Rather than working with Plaintiffs from the outset to reach agreement on appropriate and comprehensive search terms and methods, AZ undertook the task in secret. Common sense dictates that sampling and other quality assurance techniques must be employed to meet requirements of completeness.

Of course, "[search term] agreements should take account of the iterative nature of the discovery process and allow for refinement as the parties' understanding of the relevant issues develops." The Sedona Principles (Second Edition), June 2007, at p.57, available at http://www.thesedonaconference.org (last visited April 27, 2010). Before agreeing to search terms or phrases, plaintiffs requires certain information, including: (1) any code words and shorthand references relating to funds, transactions, or investments alleged in the operative complaint; (2) nicknames and shorthand references for relevant witnesses; (3) names of companies and vendors utilized by Local 12 for all aspects of its operation; and (4) any document vendor's ability to implement Boolean searches, fuzzy search technology, and particular term limiters for searching (e.g., "AND," "OR" and "NOT" limiters, whether a vendor can process "w/5" but not "w/s," wildcards of (!) or (*), etc.). In addition, use of statistical sampling methods in non-reviewed populations of ESI should be done to provide an added measure of assurance regarding the relevance of particular search terms. *See Victor Stanley, Inc. v. Creative Pipe, Inc*., 250 F.R.D. 251, 257 (D. Md. 2008) ("[t]he only prudent way to test the reliability of the keyword search is to perform some appropriate sampling of the documents").

To properly formulate search terms and phrases for all custodians and other electronic sources, non-privileged documents from unfiltered custodian files for a select few Local 12 custodians should be first produced. *In re Seroquel Prods. Liab. Litig*., 244 F.R.D. 650, 662 (M.D. Fla. 2007). Plaintiffs are open to proposals by Waggoner, personally and as Business Manager of Local 12, regarding sufficient numbers of representative custodians from whom unfiltered data will be produced.

Because search terms and phrases suffer inherent flaws, e.g., exclusion of common or inadvertently misspelled instances of a term, or code words, "concept searching" in addition to

# SPIRO MOORE LLP

Howard Z. Rosen, Esq.
March 6, 2013
Page 5 of 5

keyword searching should be conducted. *See Disability Rights Council of Greater Washington v. Washington Metropolitan Transit Authority*, 242 F.R.D. 139, 148 (D.D.C. June 1, 2007) (recognizing literature that argues concept searching, as opposed to keyword searching, is more efficient and more comprehensive); "The Sedona Conference Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery," The Sedona Conference Journal (August 2007) at pp. 202-03. Concept search methods "attempt to locate information that relates to a desired concept, without the presence of a particular word or phrase." *Id.* For example, properly structured concept searches would recognize that documents not specifically mentioning any specific fund but discussing a property held in Local 12's asset portfolio are nevertheless potentially related to property over-valuation to defraud various funds.

## V.    ONSITE DOCUMENT REVIEW

It has not been discussed whether Waggoner, personally and as Business Manager of Local 12, will request that plaintiffs conduct an onsite review for particular categories of relevant information.  However, if onsite review is foreseeable, plaintiffs request that, to the extent possible, the parameters for such review be negotiated at this stage.  The issues to be discussed include:

1.    The location(s) of the review;
2.    The date(s) for the review;
3.    The categories of information that will be provided during onsite review;
4.    The approximate volume of documents;
5.    The method(s) by which desired information is flagged for vendors to image or copy;
6.    The medium(s) of information provided for inspection during the onsite review; and
7.    Whether the flagged documents will be provided on a quick-peek basis.

Please contact me if you are unclear by any of the matters discussed above.  As coordinating counsel on this litigation, please share this correspondence with counsel for all other represented defendants to help guide their document preservation and identification endeavors.

Sincerely,

SPIRO MOORE LLP

H. Scott Leviant

HSL:sp
cc:    Ira Spiro