HOWARD Z. ROSEN, State Bar No. 54442
hzrosen@posner-rosen.com
JASON C. MARSILI, State Bar No. 233980
jmarsili@posner-rosen.com
BRIANNA M. PRIMOZIC, State Bar No. 274397
bprimozic@posner-rosen.com

POSNER & ROSEN LLP
3600 Wilshire Blvd., Suite 1800
Los Angeles, CA 90010-2679
Telephone No. (213) 389-6050
Facsimile No. (213) 389-0663

Attorneys for DEFENDANTS
*William C. Waggoner, Mickey J. Adams,*
*Ron Sikorski, Dan Billy, Dan Hawn,*
*Larry Davison, Patricia M. Waggoner,*
*Kenneth D. Waggoner, Bert Tolbert,*
*and Operating Engineers Funds, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIO SALAS, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>INTERNATIONAL UNION OF<br>OPERATING ENGINEERS, *et al.*,<br><br>    Defendants. | CASE NO.  CV 12-10506 DDP (VBKx)<br>*CLASS ACTION*<br><br>**NOTICE OF SUBMISSION OF<br>NEWLY ISSUED NINTH CIRCUIT<br>DECISION** |

1        Defendants William C. Waggoner, Patricia M. Wagoner, Bert Tolbert,

2  Mickey J. Adams, Ron Sikorski, Dan Billy, Dan Hawn, Larry Davison, and

3  Kenneth D. Waggoner, and Operating Engineers Funds, Inc. submit for this Court's

4  consideration the October 28, 2014 decision of the Ninth Circuit in *United*

5  *Brotherhood of Carpenters and Joiners of America v. Building and Construction*

6  *Trades Dep't*, No. 12-36049, a copy of which is attached hereto and incorporated

7  herein as Exhibit "A." This decision is relevant to Defendants' Motion to Dismiss

8  Fourth Amended Complaint (Document 182), which the Court took under

9  submission on July 7, 2014 (Document 223).

10       The *United Brotherhood of Carpenters* decision is relevant to the showing

11  by Defendants that the RICO claims should be dismissed. The Ninth Circuit

12  affirmed an order granting a motion to dismiss RICO claims because the complaint

13  failed to plausibly allege predicate acts of racketeering activity under the Hobbs

14  Act or state extortion law. The question before the Ninth Circuit was "whether the

15  Carpenters adequately alleged that the Building Trades, its agents, or its

16  coconspirators used violence or force against the Carpenters or its members."

17  *United Brotherhood of Carpenters*, slip op., at 15. Here, the issues involve the

18  adequacy of RICO allegations that former OETT administrator Bert Tolbert, in

19  approximately 1999, made an unlawful threat against Plaintiff Watson concerning

20  his previous failure to contribute to the BA's Fund. The Ninth Circuit decision

21  ///

22  ///

1    provides guidance as to what constitutes sufficient allegations of unlawful threats

2    for purposes of RICO predicate acts. *Id.*, at 15-17.

3

4    **DATED:** October 29, 2014           **POSNER & ROSEN LLP**

5

6                      By:___*Howard Z. Rosen*_____

7                        HOWARD Z. ROSEN

8                        JASON C. MARSILI
                         BRIANNA M. PRIMOZIC

9                        Attorneys for Defendants
                       William C. Waggoner, Mickey J. Adams,

10                       Ron Sikorski, Dan Billy, Dan Hawn, Larry
                       Davison, Patricia M. Waggoner, Kenneth

11                       D. Waggoner, Bert Tolbert, and OEFI.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF SUBMISSION OF NEWLY ISSUED NINTH CIRCUIT DECISION

# EXHIBIT A

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA; SOUTHWEST REGIONAL COUNCIL OF CARPENTERS; SOUTHWEST CARPENTERS JATC; PACIFIC NORTHWEST REGIONAL COUNCIL OF CARPENTERS; WASHINGTON STATE UBC JATC; NORTHEAST CARPENTERS REGIONAL COUNCIL OF CARPENTERS; CARPENTERS AND CARPENTERS DISTRICT COUNCIL OF GREATER ST. LOUIS AND VICINITY; LARRY GOULD; WILLIAM CLAYTON; JORDAN TRUMAN; BUTCH PARKER; SCOTT FLANNERY; RICHARD BURWELL; EMANUEL LEE; PAUL LEDYARD; JOSEPH EDNEY; WILLIE MARSHALL; JOHN LAKE; ROGER JOHNSON; BRIAN THOMPSON; CHARLES MCWILLIAMS; BILLY COOLEY; SHERYL HOLLIS; BOOKER STANDERFER; BOB SCOTT; JOE BACA, | No. 12-36049<br><br>D.C. No. 2:12-cv-00109-TOR<br><br><br>OPINION |

_Plaintiffs-Appellants_,

v.

2                    CARPENTERS V. BUILDING TRADES

> BUILDING AND CONSTRUCTION
> TRADES DEP'T, AFL-CIO; JAMES
> WILLIAMS; RON AULT; DAVID
> MOLNAA,
>                              *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Washington
Thomas O. Rice, District Judge, Presiding

Argued and Submitted
May 12, 2014—Seattle, Washington

Filed October 28, 2014

Before: Diarmuid F. O'Scannlain, Andrew J. Kleinfeld,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge O'Scannlain

## SUMMARY[*]

### RICO / Labor Law

The panel affirmed the dismissal of an action brought under RICO and the Labor Management Reporting and Disclosure Act by the United Brotherhood of Carpenters and Joiners of America, a labor union, against the Building and Construction Trades Department, AFL-CIO, an umbrella labor organization representing unions and individuals in the construction industry.

The Carpenters, together with subordinate labor organizations and individual members, alleged that the Building Trades conducted a campaign of intense economic pressure, as well as acts of vandalism and threats of force, to persuade the Carpenters to reaffiliate with the Building Trades and pay dues to it.

The panel held that the Carpenters failed to state a civil RICO claim because it did not plausibly allege any predicate acts, or racketeering activity, under either the Hobbs Act or state extortion law. The panel held that the Hobbs Act is not violated, and a "claim of right" defense is not defeated, based on unwanted or subjectively valueless services in the context of an economic pressure campaign. The panel also held that the Carpenters did not adequately allege that the Building Trades, its agents, or its coconspirators used violence or force against the union or its members.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

4          CARPENTERS V. BUILDING TRADES

The panel held that the Carpenters failed to state a claim that officers of the Building Trades violated the LMRDA by orchestrating the termination of an affiliation agreement between the Carpenters and the Metal Trades Department, AFL-CIO, another labor organization, because Carpenters members were not expelled from the Metal Trades as a disciplinary action.

The panel held that the district court did not abuse its discretion by denying leave to amend the complaint.

## COUNSEL

Craig D. Singer, Williams & Connolly LLP, Washington, DC, argued the cause and filed the briefs for the plaintiffs-appellants. With him on the briefs were Charles Davant IV, Williams & Connolly LLP, Washington, DC, Daniel M. Shanley, DeCarlo & Shanley, Los Angeles, CA, and G. Robert Blakey (Of Counsel), William J. and K. O'Neill Professor of Law, Notre Dame Law School, Notre Dame, IN.

Leon Dayan, Bredhoff & Kaiser, PLLC, Washington, DC, argued the cause  and filed the brief for the defendants-appellees. With him on the brief were Abigail V. Carter, Joshua B. Shiffrin, Matthew Stark Rubin, and Laurence Gold, Bredhoff & Kaiser, PLLC, Washington, DC.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether a labor union's use of economic pressure is extortion under the Racketeer Influenced and Corrupt Organizations Act.

### I

The Building and Construction Trades Department, AFL-CIO, ("Building Trades") is an umbrella labor organization representing unions and individuals in the construction industry. Subordinate labor unions pay the Building Trades per capita monthly fees and must comply with the Building Trades' rules. The United Brotherhood of Carpenters and Joiners of America ("Carpenters") is no longer affiliated with the Building Trades because it believes that the Building Trades' services are "unrequested, unwanted and unnecessary" and that its rules are "stale, outdated and anticompetitive."[1]

This case concerns the "Push-Back-Carpenters Campaign," a campaign of (at least) intense economic pressure orchestrated by the Building Trades to force the Carpenters into paying what it calls "monthly bloated per capita payments in perpetuity," that is, into reaffiliating with the Building Trades and paying dues. Allegations of "economic pressure" include: promoting a 2008 AFL-CIO

---

[1] As we are reviewing a dismissal under Federal Rule of Civil Procedure 12(b)(6), we accept as true the complaint's well-pleaded factual allegations. *E.g.*, *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1061 (9th Cir. 2012).

resolution authorizing the AFL-CIO to charter a union to compete with the Carpenters; the organization of a "Unity Rally" in St. Louis; repeated public criticism of the Carpenters on websites and in other publications; filing frivolous regulatory claims against the Carpenters; stealing confidential information; forcing the Carpenters' Seattle legal counsel to terminate its relationship with the Carpenters; and orchestrating the June 2011 termination of an affiliation agreement (the "Solidarity Agreement") between the Carpenters and the Metal Trades Department, AFL-CIO.

The Carpenters' complaint also alleges acts of vandalism and threats of force, such as: vandalism of Carpenters' job sites and property; death threats against Carpenters' officials and representatives; threats of violence at Pier 66 in Seattle; and the public dissemination of video footage of a violent attack on Carpenters' members.

Although the Carpenters have not acceded to the Building Trades' demands, they allegedly have suffered significant harm, including: "lost members and dues, lost or reduced promotion, contractual and/or membership recruitment opportunities, lost job opportunities, positions and work assignments, loss of confidential information, increased costs due to the termination of contractual relations with its attorneys, and substantial and irreparable loss of goodwill."

The Carpenters, together with six subordinate labor organizations and nineteen individual members, sued the Building Trades and three of its officers and agents: James Williams, Ron Ault, and David Molnaa.[2]  The Carpenters

---

[2] Two other individuals named as defendants, Mark Ayers and Ed Hill, were voluntarily dismissed.

alleged nine claims, four under the Racketeer Influenced and Corrupt Organizations Act's private cause of action ("civil RICO"), 18 U.S.C. § 1964(c), one under the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(5), and four under state law.

Concluding that the Carpenters failed to allege proximate causation or any predicate acts and also failed to join a necessary defendant to obtain injunctive relief under the LMRDA, the district court dismissed all of the Carpenters' federal claims. *See* Fed. R. Civ. P. 12(b)(6). The court also declined to exercise supplemental jurisdiction over the state claims. Finally, although the Carpenters had not previously amended their complaint, the court declined to grant leave to amend on the ground of futility. The Carpenters timely appealed.

## II

RICO provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Subsections 1962(a) through (c) prohibit certain "pattern[s] of racketeering activity" in relation to an "enterprise." Subsection 1964(d) makes it illegal to conspire to violate subsections (a), (b), and (c) of section 1962.

"The elements of a civil RICO claim are as follows: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (internal quotation marks and citation omitted). "[R]acketeering activity" includes, *inter alia*, "any act which

is indictable" under the Hobbs Act, 18 U.S.C. § 1951, or "any act or threat involving . . . extortion, . . . which is chargeable under State law." 18 U.S.C. § 1961(1)(A), (B).

The primary issue in this appeal is whether the Carpenters plausibly alleged any predicate acts, under either the Hobbs Act or state extortion law.

A

"Extortion" under the Hobbs Act, "means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The Carpenters' complaint alleges that the Building Trades applied intense economic pressure in an effort to force them to surrender their money and submit to Building Trades control.

Fear, in the context of the Hobbs Act, can include fear of economic loss. *See, e.g., Levitt v. Yelp! Inc.*, No. 11-17676, 2014 WL 4290615, at *8 (9th Cir. Sept. 2, 2014); *United States v. Greger*, 716 F.2d 1275, 1278–79 (9th Cir. 1983); *Rennell v. Rowe*, 635 F.3d 1008, 1012 (7th Cir. 2011); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 522 (3d Cir. 1998) ("The term 'fear' includes the fear of economic loss."). But "there is nothing inherently wrongful about the use of economic fear to obtain property." *United States v. Sturm*, 870 F.2d 769, 773 (1st Cir. 1989). "[T]he fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions." *Brokerage Concepts, Inc.*, 140 F.3d at 523. Courts must therefore differentiate between legitimate use of economic fear—hard bargaining—and wrongful use of such

fear—extortion. *See, e.g., George Lussier Enters., Inc. v. Subaru of New England, Inc.*, 393 F.3d 36, 50 (1st Cir. 2004). "Distinguishing between hard bargaining and extortion can be difficult." *Rennell*, 635 F.3d at 1011.

For guidance, courts have turned to *United States v. Enmons*, 410 U.S. 396 (1973). *See, e.g., Rennell*, 635 F.3d at 1011; *Brokerage Concepts, Inc.*, 140 F.3d at 522. In *Enmons*, the Court held that a defendant violates the Hobbs Act only "where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property. 410 U.S. at 400. Defending against an accusation of extortion "based on a lawful claim to the property obtained has been dubbed the 'claim of right' defense to extortion." *Brokerage Concepts, Inc.*, 140 F.3d at 522.

Where violence or violent threats are concerned, the claim of right defense is strictly limited to employer-union labor disputes. *United States v. Daane*, 475 F.3d 1114, 1119–20 (9th Cir. 2007); *see also Brokerage Concepts, Inc.*, 140 F.3d at 523 & n.21 (collecting cases). But courts have recognized a claim of right defense where property is obtained through the use of fear of economic loss, which is not "'inherently' wrongful." *Id.* at 523; *see also, e.g., United States v. Vigil*, 523 F.3d 1258, 1262–63 (10th Cir. 2008). "Fear of economic loss is not an inherently wrongful means; however, when employed to achieve a wrongful purpose, its 'use' is wrongful." *United States v. Clemente*, 640 F.2d 1069, 1077 (2d Cir. 1981).

Thus, following *Enmons*, using fear of economic loss to obtain personal payoffs or payments for "imposed, unwanted, superfluous and fictitious services," 410 U.S. at 400, may

well be extortionate. *See, e.g., Vigil*, 523 F.3d at 1265 (finding extortion where government official used economic pressure to obtain personal payoff by imposing unwanted employee who was unwilling to work). In either case, the transaction used to obtain the property of another may be illegitimate and the use of economic pressure may be wrongful.

1

Even where the Push-Back-Carpenters Campaign involved legitimate means, such as chartering competing unions, it was still extortionate, according to the Carpenters, because it was directed toward a wrongful end—coercing the Carpenters into accepting "stale, outdated and anticompetitive" services that "are unrequested, unwanted and unnecessary."

The Carpenters' complaint does not plausibly allege that the Building Trades demanded any sort of personal payoffs. *See, e.g., Gregor*, 716 F.2d at 1278–79; *Clemente*, 640 F.2d at 1073. Instead, it contends that the Building Trades' services are unwanted and would provide nothing of value to the Carpenters. But none of the cases cited by the Carpenters allows a Hobbs Act conviction based on unwanted or subjectively valueless services in the context of an economic pressure campaign.

A claim of right defense will not protect someone who obtains the property of another in return for "imposed, unwanted, superfluous *and* fictitious" services. *Enmons*, 410 U.S. at 400 (emphasis added) (citing *United States v. Kemble*, 198 F.2d 889 (3d Cir. 1952)). Fear cannot be used to force an "employer to pay wages for an additional worker

to do exactly what another worker [is] already being paid to do." *Viacom Int'l, Inc. v. Icahn*, 747 F. Supp. 205, 212 (S.D.N.Y. 1990) (citing *Kemble*, 198 F.2d 889).

So in *Vigil*, the case the Carpenters rely upon most heavily, the Tenth Circuit affirmed a Hobbs Act extortion conviction where the victim was required to "hire a specific and unwanted individual at the price she sets." 523 F.3d at 1265. Vigil, the New Mexico State Treasurer, insisted that the victim hire an unnecessary employee because he, Vigil, owed the potential employee's husband money. *Id.* at 1261. Even though the prospective employee "did not want to work for the compensation," Vigil tried to coerce the victim into paying her 40% of the gross income from a government contract. *See id.* at 1262. Not only were her services "unwanted" but "the compensation was intended as personal payoff to [Vigil's] former associate . . . rather than to achieve a legitimate objective." *Id.* at 1265. That was extortion, according to the court.[3] But, unlike *Vigil*, there is no plausible allegation here that any Building Trades official sought a "personal payoff," or misappropriated a governmental position.

More fundamentally, a claim of right defense cannot be defeated by a contention that a particular transaction has no "subjective" or "idiosyncratic" value. *See, e.g., Viacom Int'l*, 747 F. Supp. at 212 n.7 (noting that a forced transaction was extortionate where "[n]othing of *objective* value transferred to the plaintiff" (emphasis added)). Otherwise any plaintiff could bring a civil RICO claim based on a bare allegation that whatever service or good he received in return for his property was of no subjective value. However little value the

---

[3] We need not and do not decide whether *Vigil* was correctly decided.

12          CARPENTERS V. BUILDING TRADES

Carpenters thinks the Building Trades might provide, its services are not the equivalent of Christopher Moltisanti's "no show" construction job. *See The Sopranos*: *Episode 402, No Show (HBO)*.

2

The Push-Back-Carpenters Campaign was also extortionate, according to the Carpenters, because it used wrongful means, such as filing frivolous regulatory claims, or misusing confidential membership information. The Carpenters' argument relies on a frequently cited passage in *Viacom International*, where the district court distinguished hard bargaining from extortion by noting that, in the latter, the victim "has a pre-existing entitlement to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant." 747 F. Supp. at 213. Because the Carpenters had a legal right to be free from frivolous regulatory claims or misused confidential information, it maintains, the Building Trades' conduct was extortionate. Under that approach, any economic pressure campaign that includes tortious conduct, for example, would be a predicate offense to civil RICO, regardless of whether the alleged tortfeasor demanded payment to refrain from harming the victim.

As the Building Trades contends, use of economic pressure is wrongful if the victim "had a pre-existing right to the purported consideration being offered by the defendant as an inducement to enter into the transaction." If so, "there is no legitimacy to the proposed transaction." For example, in *Rennell*, the defendant terminated a joint venture and gave his former partner a take-it-or-nothing offer of 8% of what he owed. 635 F.3d at 1009, 1013. Still, the defendant had a

CARPENTERS V. BUILDING TRADES        13

claim of right to his former partner's interest in the joint
venture: he had a right to terminate the venture agreement.
*Id.* at 1012–13.   And even if the defendant breached the
parties' contracts or "acted in violation of the general duty of
good faith and fair dealing," he did not forfeit his claim of
right defense.  *Id.* at 1014.  Such claims "should be pursued
through state-law theories of contract and, perhaps, tort—not
civil RICO."  *Id.*

Clearer still is *Brokerage Concepts, Inc.*, where an HMO
required a pharmacy to use its subsidiary as a third-party
provider if the pharmacy wanted access to the HMO's
provider network.  140 F.3d at 525.  If the HMO had been
legally compelled to grant access to its network, the
pharmacy "would have had a legal entitlement to be a
member of the provider network and thus to be free of the
fear that it would be excluded from that network."  *Id.* at 526.
But as the HMO was not legally compelled to grant access, its
use of economic pressure was not wrongful.

In both of those cases, the decisive question was whether
the victim had a pre-existing statutory or contractual right to
the *consideration* offered by the defendant in return for the
victim's property.  If so, the resulting transaction would have
been an illegitimate sham, and potentially a "wrongful" goal
to pursue.

But none of the cases cited by the Carpenters involves an
economic pressure campaign declared "wrongful" because it
happened to include, incidentally, tortious conduct or simple
breach of contract.   For those cases to be on point, the

Carpenters would need to have a statutory or contractual right to the services the Building Trades offers, which it does not.[4]

We recently held that a lawyer's threat to a engage potential witness to "do 'whatever it is we need her to do,' including impeding the investigation, lying to [an] investigating Assistant U.S. Attorney . . . , and repeating those lies to the grand jury" was "unlawful, and therefore clearly wrongful under the circumstances." *United States v. Villalobos*, 748 F.3d 953, 955, 957 (9th Cir. 2014). *Villalobos* did not, however, hold that conduct must be characterized as wrongful if it involves a breach of duty derived from contract or tort law in the course of pursuing a legitimate transaction. The proper remedy for such a breach is a claim under state law. And the Carpenters' complaint does not allege a violation of the Hobbs Act through the use of economic fear merely because the Building Trades might have committed some tort or breached some contract as part of the Push-Back-Carpenters Campaign.

---

[4] In addition to being unsupported by precedent, the Carpenters' argument invites us to declare extortionate under the Hobbs Act any economic pressure campaign involving, no matter how incidentally, any violation of state law. Such a declaration would transform innumerable state crimes and torts into federal crimes. But the Supreme Court has reminded us just recently that we should refrain from interpreting federal statutes to "'alter sensitive federal-state relationships'" by "convert[ing] an astonishing amount of 'traditionally local criminal conduct' into 'a matter for federal enforcement.'" *Bond v. United States*, 134 S. Ct. 2077, 2091 (2014) (quoting *United States v. Bass*, 404 U.S. 336, at 349–50 (1971)).

B

By contrast, use of "actual or threatened force or violence
to obtain property" is "inherently wrongful" and not subject
to a claim of right defense. *Daane*, 475 F.3d at 1119–20
(quoting *United States v. Sturm*, 870 F.2d 769, 772–73 (1st
Cir. 1989)).   The question, therefore, is whether the
Carpenters adequately alleged that the Building Trades, its
agents, or its coconspirators used violence or force against the
Carpenters or its members.

1

The Carpenters' brief points to three factual allegations
that the Building Trades or a named defendant personally
threatened violence.

First, it asserts that "the Building Trades and Williams
publicly disseminated video footage of a violent attack o[n]
Carpenters' members, accompanied by a written warning that
similar violence would ensue." But the Building Trades did
not "publicly disseminate" the video. Instead, the Building
Trades disseminated a news release that mentioned a video
had "surfaced" on YouTube, but did not embed the video or
include a link. And the news release did not describe a
violent attack on the Carpenters, but a brawl that started when
one of the Carpenters "grab[bed] an Iron Worker." The
release does not contain a warning of similar violence, just
the phrases "[c]raft unions are not taking this struggle lying
down," and "the building trades unions turned out in force."

Second, the Carpenters' brief mentions materials on a
website that "direct and encourage violence." Again, this
overstates the complaint, which describes one potentially

troubling statement in an interview posted on the website: "Defendant Ayers called the Carpenters 'a cancer that is spreading' that needed to be confronted by 'the kind of powerful response you would expect when a burglar is caught stealing something of value.'"

Finally, the brief describes "speeches containing anti-Carpenters threats and incitements . . . to take violent actions." Hill said the Building Trades would do "whatever it takes to protect our members"; Ayers called for a "united" stand, warned that Building Trades members were "being threatened all around the nation," and declared that "[t]his problem didn't start in St. Louis, but by God it needs to end in St. Louis"; and Williams noted a "line in the sand" and explained "[a]fter today, there's no going back." Perhaps recognizing that none of these statements sounds like a call for violence, the complaint reiterates that each, "[i]n the context of the past violence, . . . mean[t] to threaten and use physical violence and force."

In some contexts, such statements could constitute threats of violence actionable under civil RICO[5]—the Carpenters' brief cites no remotely comparable case, *see Daane*, 475 F.3d at 1116–19—but not plausibly in this context. Prior to the statements, the complaint alleges precisely one act of vandalism by unnamed "Defendants' agents," and two emailed "veiled death threats" against a Carpenters' officer,

---

[5] The Building Trades notes that holding such comments actionable under civil RICO would raise significant First Amendment concerns. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 900 n.28, 928 (1982) (holding that Charles Evers's statement at a rally, "that any 'uncle toms' who broke the boycott would 'have their necks broken' by their own people," was protected speech).

without specifying how the individuals named as Defendants'
"agents" were connected to the Building Trades.  The
complaint's interpretation of the emails relies, in turn, on
"prior and contemporaneous violent vandalism," but includes
only the one example—anonymous vandalism not connected
to the Building Trades.

The Carpenters' complaint does not plausibly allege that
any defendant used threats of violence to obtain the
Carpenters' property.

2

The Carpenters' complaint also ties the Building Trades
to threats and violence by non-parties, whom it labels
coconspirators with and agents of the Building Trades.

Even in a complaint, formulaic recitations and
"conclusory statement[s]" will not suffice to allege
conspiracy plausibly. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d
1042, 1048 (9th Cir. 2008).  A complaint must "answer the
basic questions: who, did what, to whom (or with whom),
where, and when?" *Id.*  Bare assertions of "agreement," *id.*
at 1047 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S.
544, 557 (2007)), or identifications of particular persons as
"coconspirators," *id.* at 1050, will not suffice.

The Carpenters' complaint recites several "actions"
"undertaken . . . as part of, and in furtherance of, the unlawful
conspiracy," but identifies the actors, if at all, merely as
"Defendants' agents."  As to the actors who are actually
named, the complaint simply refers to them as "co-
conspirators," who had "agreed to act, and w[ere] acting, on
behalf of the Defendants."  No detailed facts are alleged.

18          CARPENTERS V. BUILDING TRADES

Such rote recitations do not render plausible that the non-
parties conspired with the Building Trades or agreed with the
Building Trades to commit or threaten violence.[6]

Despite the Carpenters' thorough briefing, its allegations
of agency boil down to three facts: First, the perpetrators of
various violent actions, most of whom are unnamed, are
labeled "Defendants' agents."  But a mere label cannot
demonstrate an agency relationship.  Second, subordinate
union members followed Defendants' directions by engaging
in threats and violence.  But those "directions," described
above, simply did not amount to instructions to commit
violence.  And in any case, the violent acts either predate the
Defendants' statements, or postdate them by over a year.
Third, the Building Trades blessed and encouraged the
violence by disseminating a YouTube video.  But, as
described above, the Building Trades' news release hardly
amounts to blessing and encouraging violence.[7]

The Carpenters' formulaic and conclusory allegations of
conspiracy and agency do not suggest plausibly that the

---

[6] Terrence O'Sullivan, who made some of the most troubling statements
in the record—asking the Unity Rally audience "if anyone had any
rope?"—is identified in the complaint as a member of the Building
Trades' Governing Board of Presidents.  Even if he were a coconspirator,
holding his statements actionable would raise First Amendment concerns.
*See supra*, note 5.

[7] The Carpenters' RICO case statement alleges that Mark Keffler, during
a phone call with a Carpenters representative, threatened that "a lot of
pissed off people out there . . . will start killing [Carpenters] soon."  But
Keffler is merely labeled "Defendants' agent," with no supporting factual
assertions concerning his connection, if any, to the defendants.

Building Trades or any named defendant attempted to acquire
the Carpenters' property through violence or threats.

C

Even if the Carpenters failed to allege extortion under the
Hobbs Act, it argues that it has alleged "RICO predicate
offenses under twelve States' extortion statutes."   For
example, some states do not provide a claim of right defense
to the use of fear to obtain a victim's property, and others
prohibit threats of reputational harm.   Boiled down, the
Carpenters' brief suggests that any conduct criminalized
under any state's "extortion" statute is a proper RICO
predicate offense.

This argument repeats the error of an argument rejected
long ago in *United States v. Nardello*, 393 U.S. 286 (1969),
which concerned the meaning of "extortion" in the Travel
Act, 18 U.S.C. § 1952.   Nardello argued that the Act
encompassed only conduct labeled "extortion" by a state
statute, but not identical conduct labeled "blackmail," for
example.   *Nardello*, 393 U.S. at 293–94.   Rejecting the
argument that the meaning of extortion was tethered to the
state statute, the Court held that the Act referred to conduct
"generically classified as extortionate," that is to say,
"obtaining something of value from another with his consent
induced by the wrongful use of force, fear, or threats." *Id.* at
290.

The same generic definition of extortion applies under
§ 1961(1)(A).   *Scheidler v. Nat'l Org. for Women, Inc.*,
537 U.S. 393, 409 (2003). The Carpenters would expand that
definition to include any conduct labeled "extortion" under
any state statute.   The district court correctly rejected that

argument.  Even if a state labels particular conduct extortion, "it cannot qualify as a predicate offense for a RICO suit unless it is capable of being generically classified as extortionate." *Wilkie v. Robbins*, 551 U.S. 537, 567 (2007) (internal quotation marks and citation omitted).  Whether under the Hobbs Act or under the generic definition, use of fear must be "wrongful" to be extortionate.[8]

In addition, the Carpenters' brief contends that the "generic definition of extortion, in contrast to the Hobbs Act, does not require a showing that the defendant lacked a claim of right to the property in question."  It labels the existence of a claim of right an "affirmative defense" and cites *United States v. Velasquez-Bosque* for the proposition that "[t]he availability of an affirmative defense is not relevant to the categorical analysis."  601 F.3d 955, 963 (9th Cir. 2010) (declaring irrelevant that California's carjacking statute does not permit a claim of right defense, whereas generic robbery does).  But whether the defendant had a legitimate claim to the property obtained by use of economic fear, although called a "claim of right" defense, is not actually an "affirmative defense" in this context.  Instead, it is an interpretation of what "wrongful use of fear"—an *element* of both Hobbs Act and generic extortion—means.  *See, e.g.*, *Brokerage Concepts, Inc.*, 140 F.3d at 523.  Thus, even if a state criminalized the use of economic fear to achieve a

---

[8] Regardless of whether such reasoning defies the canon against superfluity, as the Carpenters' brief asserts, it is compelled by Supreme Court precedent.  And, moreover, the rule against redundancy does not require the Carpenters' conclusion.  If every state were to adopt the Hobbs Act wholesale as its law criminalizing extortion, Congress's choice of the disjunctive would become "superfluous" by necessity.

legitimate end,[9] the state offense would not equal *generic* extortion.

That leaves, as possible allegations of generic extortion in violation of state law, the Building Trades' alleged threats of personal reputational harm to the Carpenters. *See Nardello*, 393 U.S. at 295–96 (attempt to obtain money by threatening to "expose alleged homosexual conduct" fit within generic extortion). The Carpenters' brief does not cite any particular portion of the record where the Building Trades threatened and inflicted reputational harm, and our review of the Carpenters' complaint does not reveal any such plausible allegations. *See Levitt*, 2014 WL 4290615, at *9 (noting that a "claim of reputational harm" must be connected with "a specific allegation of wrongful conduct").

### III

Nineteen Carpenters' members allege that officers Ault, Williams, and Molnaa violated the LMRDA "by directing the unlawful suspension or expulsion of the Carpenters and the Individual Plaintiffs through the revocation of the Solidarity Agreements" without written charges or a hearing. On

---

[9] None of the cases cited by the Carpenters concern extortion by fear of economic loss. All concern fear of threatened violence, for which there is no claim of right defense, except in a specific labor context, under the Hobbs Act. *See Gomez v. Garcia*, 81 F.3d 95, 96 (9th Cir. 1996) (holding no claim of right defense for threat with a gun); *Rael v. Sullivan*, 918 F.2d 874, 875 (10th Cir. 1990) (holding no claim of right defense for threat to "kick [victim's] ass"); *State v. Logan*, 29 So. 336 (La. 1901) (holding no claim of right defense for threat to kill); *Pierce v. Commonwealth*, 138 S.E. 2d 28, 31–32 (Va. 1964) (holding no claim of right defense for threat from loaded pistol).

appeal, they argue that such automatic expulsions are unlawful.

Under the heading "Safeguards against improper disciplinary action," LMRDA § 101(a)(5) provides that:

> No member of any labor organization may be fined, suspended, expelled, or *otherwise disciplined* except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

29 U.S.C. § 411(a)(5) (emphasis added).

The Carpenters' members were not expelled from the Metal Trades as a disciplinary action. *See* Merriam-Webster's Collegiate Dictionary 356 (11th ed. 2005) (defining "to discipline" as "to punish or penalize for the sake of discipline"); Black's Law Dictionary 531 (9th ed. 2009) (defining "discipline" as "[p]unishment intended to correct or instruct; esp., a sanction or penalty imposed after an official finding of misconduct"). Both the text and immediate context of section 101(a)(5) suggest that automatic expulsion without written charges and a full hearing is only a violation where the expulsion is disciplinary. First, the phrase "otherwise disciplined" limits the reach of the first three verbs—"fined, suspended, expelled"—to disciplinary actions, a limitation that is also implied by the heading. *See, e.g., Ram v. INS*, 243 F.3d 510, 514 & n.3 (9th Cir. 2001) (noting that a section's heading may be useful in interpreting its meaning). Second, such procedural protections make little sense where

an expulsion is not a disciplinary action, but the result of a dissolved affiliation agreement between competing labor unions.

Furthermore, the cases cited by the Carpenters concern disciplinary expulsions and are, therefore, not on point. *See, e.g., Myers v. Affiliated Prop. Craftsmen Local No. 44*, 667 F.2d 817, 821 (9th Cir. 1982). If the Carpenters' members were correct under the statute, then either termination of such affiliation agreements would become practically impossible or the "full and fair hearing[s]" guaranteed by the statute would become a farce. Neither result is required by the statute or the case law.

## IV

Although the Carpenters did not request leave to amend its complaint, it contends on appeal that the district court abused its discretion by denying such leave.

Whether to grant leave to amend is committed to the sound discretion of the district court. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "[W]e first look," therefore, "to whether the trial court identified and applied the correct legal rule . . . . Second, we look to whether the trial court's resolution . . . resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

The district court identified and applied the correct legal rule. It recognized our repeated admonition that "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the

24      CARPENTERS V. BUILDING TRADES

pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).  And it properly cited the five factors to be considered "in assessing the propriety of leave to amend—bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint."  *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). Nonetheless, the court declined to grant leave to amend as futile.  Specifically, it noted the exhaustive length of the Carpenters' complaint and explained that it could not "conceive of any new facts that could possibly cure the pleading."

We are unable to say that the district court's finding is illogical, implausible, or without support in the record.  In fact, it is quite reasonable to suppose that the Carpenters' "sprawling 246-page" complaint contained all of the key facts supporting its claims against the Building Trades.  The Carpenters' brief suggests it could have cured the pleading's failure to allege an agency relationship between the Building Trades and those individuals who committed violent and threatening acts.  But neither the brief nor counsel's oral argument has suggested specific facts that might have cured such deficiency.

## V

We conclude that the Carpenters' complaint fails to state a claim under civil RICO or the LMRDA against the Building

Trades, and that the district court did not abuse its discretion in denying leave to amend.

**AFFIRMED.**