O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIO SALAS, individually and on behalf of all others similarly situated; et al.,<br><br>           Plaintiff,<br><br>   v.<br><br>INTERNATIONAL UNION OF OPERATING ENGINEERS, a trade union; et al.,<br><br>           Defendants.<br>_____ | Case No. CV 12-10506 DDP (VBKx)<br><br>**ORDER RE: RICO CLAIMS**<br><br>[Dkt. NO.s 175, 182, 183] |

Presently before the court are several motions to dismiss Plaintiffs' 224-page Fourth Amended Complaint ("FAC"), brought by several different groups of Defendants. This Order addresses whether Plaintiffs' 13th and 14th claims for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act must be dismissed. Having considered the submissions of the parties and heard oral argument, the court grants the motions with respect to the RICO issues (Dkt. 175, 182) and adopts the following order.

///

**I.   Background**

Defendants generally fall into two categories. The first group, the "International Defendants," is comprised of Defendants the International Union of Operation Engineers ("the International"), its former president Vince Giblin, his successor, James Callahan, and First Vice President William Waggoner ("Waggoner"). The second group, the "Local 12 Defendants," is comprised of Waggoner, who served as the local's elected Business Manager, and Defendants Sikorski, Adams, Hawn, and Davison.

Plaintiffs' 13th claim alleges that the Local 12 defendants extorted payments from local employees to a slush fund known as the "BA's fund." Plaintiffs' 14th claim alleges that the International Defendants extorted payments from employees to a political action fund, the "EPEC fund" or "President's Club."
Both claims allege that Defendants' practices violate RICO.

Various Defendants now move to dismiss Plaintiffs' RICO claims.

**II.   Legal Standard**

A complaint will survive a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000). Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me

2

accusation." Iqbal, 556 U.S. at 678. Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." Id. at 679. In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted. Id. at 678 (citations and internal quotation marks omitted).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." Id. at 679. Plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." Twombly, 550 U.S. at 555. "Determining whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

**III. Discussion**

   A.   Civil RICO

The Racketeer Influenced and Corrupt Organizations ("RICO") Act, passed in 1970 as Title IX of the Organized Crime Control Act, provides for both criminal and civil liability for acts of criminal organizations. See Odom v. Microsoft Corp., 486 F.3d 541, 545 (9th Cir. 2007); 18 U.S.C. § 1961, et seq. The Supreme Court has stated RICO should "be liberally construed to effectuate its remedial purposes." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 498 (1985).

To state a RICO claim under § 1962, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, 473 U.S. at 496. An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "Racketeering activity" includes "any act indictable under" any of a list of dozens of criminal statutes. 18 U.S.C. § 1961(1). A "pattern" "requires the commission of at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5). Although two predicate acts are needed for a pattern, "[t]he Supreme Court has concluded that Congress had a 'fairly flexible concept of a pattern in mind.'" United States v. Freeman, 6 F.3d 586, 596 (9th Cir. 1993) (quoting H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989)). A plaintiff, however, "must show that the racketeering predicates are related, *and* that they amount to or pose an [implicit or explicit] threat of continued criminal activity." H.J., 492 U.S. at 239 (emphasis in original).

Additionally, "[c]ausation lies at the heart of a civil RICO claim." Poulos v. Caesars World, Inc., 379 F.3d 654, 664 (9th Cir. 2004). "[A] plaintiff must show not only that the defendant's violation was a 'but for' cause of his injury, but that it was the proximate cause as well." Forsyth, 114 F.3d at 1481. "This requires a showing of a direct relationship between the injurious conduct alleged and the injury asserted" and "a concrete financial loss." Id.

///

4

B. Predicate Acts

In their Fourth Amended Complaint, Plaintiffs base their RICO claims on the following racketeering activities: (1) extortion in violation of the Hobbs Act, (2) monetary transactions and money laundering in violation of 18 U.S.C. § 1957, and (3) embezzlement or conversion of assets of a labor organization–in violation of 29 U.S.C. § 501(c)--or of a related employee benefit plan--in violation of 18 U.S.C. § 664. The third activity, embezzlement or conversion, is no longer at issue.[1]

Though Plaintiffs identify two types of RICO predicate acts, extortion and money laundering, the critical inquiry concerns the former, upon which the latter depends.  This is because to show money laundering in violation of § 1957, Plaintiffs must establish that Defendants "(1) knowingly engaged in a financial transaction; (2) knew that the transaction involved criminal property; (3) the property's value exceeded $10,000; and (4) the property was derived from a specified unlawful activity." United States v. Messer, 197 F.3d 330, 341 (9th Cir. 1999); 18 U.S.C. § 1957(a).  Here, Plaintiffs contend that Defendants' "specified unlawful activity" was extortion in violation of the Hobbs Act. Thus, to sufficiently plead the elements of their § 1957 claim, Plaintiffs must plausibly allege that Defendants derived Plaintiffs' property through extortion.

---

[1] Plaintiffs state they "have elected not to pursue RICO liability based upon predicate acts for violations of 29 U.S.C. § 501(c) and 18 U.S.C. § 664" (Opposition to Defendants William C. Waggoner, et al.'s Motion to Dismiss the Fourth Amended Complaint, at 15 n.8; Opposition to Motion to Dismiss Fourth Amended Complaint by Defendants International Union of Operating Engineers, Etc., at 21 n.6).

Under 18 U.S.C. § 1961(1), extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, may constitute a predicate act. 18 U.S.C. § 1961. "[T]he Hobbs Act defines its crime of 'extortion' as 'the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.'" Sekhar v. United States, 133 S. Ct. 2720, 2725 (2013); 18 U.S.C. § 1951(b)(2). "Obtaining of property" requires "not only the deprivation but also the acquisition of property." Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, 404 (2003). Thus, "[t]o violate the Hobbs Act, an alleged extortionist must actually appropriate (or attempt to appropriate) the victim's property such that it can be exercised, transferred or sold." United States v. McFall, 558 F.3d 951, 957 (9th Cir. 2009) (citing Scheidler, 537 U.S. at 405).

"Other than fraud, RICO predicate acts need not be pled with particularity but must be sufficiently pled to give [d]efendants notice of the factual basis of the claim." Slade v. Gates, No. 01-8244-RMT, 2002 WL 31357043, *6 (C.D. Cal. Oct. 2, 2002). Thus, "extortion claims should be evaluated against the more lenient pleading standards of Rule 8(a)." Id.; See also McLaughlin v. Anderson, 962 F.2d 187, 194 (2nd Cir. 1992) (holding that the district court "should have evaluated the [extortion] claim against the more lenient pleading standards of [Rule] 8(a)"); Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists, 945 F. Supp. 1355, 1379–80 (D. Or. 1996) ("where the alleged RICO predicate acts do not involve fraud, the more lenient pleading standard in Rule 8(a) applies").

///

1.  Sufficiency of Extortion Allegations

    (a)  Thirteenth Claim - The BA Fund

Local 12 established three trusts for the benefit of its members: the Health and Welfare Trust, the Operating Engineers Training Trust ("Training Trust") and the Pension Trust. Plaintiffs allege that employees of the Training Trust, including Plaintiff Watson, were given $550 monthly stipends for expenses. Plaintiffs further allege that Training Trust employees were forced to make monthly contributions of $50 cash from their expense stipends to a slush fund called the "BA's fund." (4AC ¶¶ 65-66.) The Fund purportedly "existed to directly benefit Defendant Waggoner" and to fund his reelection as Local 12's Business Manager. (Id. ¶¶ 66, 68.)

To sufficiently plead Hobbs Act extortion, Plaintiffs must show that Defendants obtained Plaintiffs' property, namely the $50 payments from Plaintiffs' expense stipends, "by wrongful use of actual or threatened force, violence or fear." 18 U.S.C. § 1951(b)(2). "To prove the substantive act of attempted extortion there must be proof of an attempt to instill fear." United States v. Zemek, 634 F.2d 1159, 1174 (9th Cir. 1980). Although fear of economic loss can suffice, such fear must be reasonable. See, e.g., Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Ill., 424 F.3d 659, 672 (7th Cir. 2005)("Roger's bald assertion that he . . . had been intimidated does not carry the day . . . . Any fear that Roger or the others may have felt must be reasonable . . . . Roger's failure to present some objective evidence of extortion – for example, historical data tying the award or denial of towing to contributions made or not made-—becomes a serious problem for

Roger's case."); United States v. Capo, 817 F.2d 947, 951 (2d Cir. 1987) ("The fear of economic loss must be a reasonable one. The mere voluntary payment of money or delivery of property, unaccompanied by any fear of economic loss, would not constitute extortion.").

Plaintiffs allege that the Local 12 Defendants extorted Plaintiffs Salas, Chamberlain, Watson, and others "by ensuring that it was widely known that the failure to give money to the Local 12 Rico Enterprises for use by Defendant Waggoner would be punished with termination." (FAC ¶ 635.) According to Plaintiffs, the threats of extortion "originated with . . . Waggoner, and were then disseminated throughout Local 12 by Waggoner, the other Local 12 RICO Defendants, and others that they designated." (Id.) The court addresses the RICO Defendants in turn.

i. Defendant Waggoner

Plaintiffs make no allegation that Waggoner used violence or actual or threatened force to instill fear in Plaintiffs and obtain the BA's Fund payments. Rather, Plaintiffs assert that Waggoner engaged in extortionate practices when he "devised the BA's Fund scheme, disseminated the instruction to implement it, and ordered the termination of employees who disobeyed him." (Id.) Plaintiffs make no factual allegations, however, to support these conclusory assertions. Instead, Plaintiffs point to alleged instances of extortionate threats made by unnamed actors and other individuals who are not named as Defendants in the RICO claims.

The FAC alleges, for example, that Training Trust Administrator Bert Tolbert, who is not one of the Defendants against whom the Thirteenth Claim for Relief is brought, called

8


Plaintiff Watson into his office and reprimanded Watson for failing to contribute a portion of his $550 monthly expense check to the BA's Fund. (Id. ¶¶ 65-66.) Tolbert purportedly told Watson that anyone who received such a check was expected to contribute $50 in cash to the BA's fund, "made it clear to Watson that the contribution was not voluntary," and "told Watson to begin contributions immediately." (Id. ¶ 67.)

These allegations, even if true, fail to establish that Waggoner directly threatened Plaintiffs or instructed Tolbert to make such threats. The only connection Plaintiffs draw between Waggoner and Tolbert is that a portion of the funds Tolbert collected through the alleged threats were eventually deposited, on a quarterly basis, into a "pot" of the BA's fund called the Bill Waggoner Re-Election Fund. (Id. ¶ 71.) The FAC further alleges that Waggoner "was free to, and did, use [the remainder of the BA's fund] however he desired." (Id.) This tenuous connection and unsupported assertion are insufficient to give rise to a plausible claim of Hobbs Act extortion.

Plaintiffs further allege that Plaintiffs Salas, Chamberlain, and "scores upon scores of other employees of Local 12, OETT, and OEFI" were "forced to contribute to the BA's Fund under threat of termination." (Id. ¶ 70.) Plaintiffs, however, do not identify any threats of termination made to any Plaintiff, nor do Plaintiffs allege that Waggoner was the motivating force behinds efforts targeting Plaintiff Salas or Chamberlain. (See id.)

Plaintiffs argue that they need not identify any threats or coercion, so long as the payments they made were obtained through fear. The FAC, however, cites only one instance of fear, alleging

9

that Watson contributed to the BA's Fund because "he was concerned that if he did not, his employment would be terminated or at least adversely affected." (4AC ¶ 67.) The FAC does not explain why Watson felt such concern, nor allege that any employee ever faced termination or an adverse employment action as a result of failure to pay into the BA's fund. As in Roger Whitmore's Auto. Servs., Watson's mere assertion that he "was concerned," absent any objective or historical evidence of extortion, does not constitute reasonable fear sufficient to state a claim for extortion. Plaintiffs, thus, have failed to adequately plead that Waggoner engaged in extortion with respect to the BA's Fund.

ii. Defendants Sikorski, Adams, Hawn, and Davison

Plaintiffs allege that Defendant Adams, a signatory to the bank account for the Bill Waggoner Re-Election Fund, and Defendant Sikorski, an alternate signatory, "directly participated in Waggoner's extortion scheme." (Id. ¶ 75.) Plaintiffs further allege that Defendants Hawn and Davison "directly participated in Waggoner's extortion scheme by helping to collect the extorted payments." (Id.) Because Plaintiffs have not plausibly alleged that Waggoner engaged in an "extortion scheme," Plaintiffs' claim against the other Local 12 Defendants necessarily fails.[2] Claim Thirteen is, therefore, dismissed with respect to all moving defendants.

---

[2] Even if Plaintiffs had adequately stated a claim against Waggoner, the sparse, conclusory allegations regarding the other Local 12 Defendants would be insufficient to state a claim against them.

10

(b)  Fourteenth Claim

Plaintiffs' Fourteenth Claim involves contributions Plaintiffs were allegedly forced to make to the International's Political Action Fund, also known as "EPEC" or the "President's Fund". According to the FAC, local union officers, directors, coordinators, district representatives, business agents and organizers (as well as officers and/or senior employees of affiliated trusts) "were told and/or made otherwise aware that if they wanted to serve in their positions, they had no choice but to contribute to EPEC in amounts up to $800 per year, calculated as one percent of $80,000, the salary cap for this contribution." (FAC ¶ 83.)

Plaintiffs allege that Defendants IUOE, Giblin, Callahan, and Waggoner[3] (the IUOE Defendants), on "numerous occasions," "engaged in the extortion of property of Plaintiffs Salas, Chamberlain, and Paxin, and other members of the EPEC class by ensuring that it was widely know that the failure to give money to the IUOE EPEC Enterprises for delivery to the EPEC fund would be punished with termination." (Id. ¶ 658.) As explained above with respect to Plaintiffs' Thirteenth Claim, Plaintiffs must establish that Defendants obtained Plaintiffs' property "by wrongful use of actual or threatened force, violence or fear" to sufficiently plead Hobbs Act extortion. See 18 U.S.C. § 1951(b)(2).

///

---

[3] As Vice President of the International and Business Manager of Local 12, Waggoner is the only Defendant who falls into both groups of Defendants.

11

                    i. Defendants Giblin, Callahan, and IUOE

According to Plaintiffs, "[t]he threats [of exortion] originated with IUOE and its General Presidents, Giblin and Callahan, and were then disseminated throughout Local 12 by Waggoner." (FAC ¶ 658.) Plaintiffs assert that "Giblin stated at a General Executive Board ("GEB") meeting to members of the GEB, including Waggoner, that all of them and all employees of their local unions would be required to contribute to the President's Club." (FAC ¶ 84.) Further, "Giblin left no room for doubt that the contribution mandate had to be communicated to all local unions and that local union employees had to comply or face harsh consequences." (Id.)

As to Defendant Callahan, Plaintiffs assert that when he became the IUOE's General President, "he continued to require enforcement of the contribution mandate by threat of retaliation against non-compliant local union employees, and Waggoner, the First Vice President of IUOE, and all of the GEB members were aware that they were to continue to use extortive pressure to compel contributions from local union employees." (Id. ¶ 86.)

Even if Giblin's alleged statements to GEB members that all employees "would be required to contribute" could be read as a mandate to members to use threats against Plaintiffs and other union employees, such statements would not be sufficient to state a claim for extortion. Plaintiffs must establish that Defendants' threats or use of fear resulted in Defendants' obtaining Plaintiffs' EPEC Fund payments. The alleged connection between Giblin's statement and any resulting EPEC contributions, let alone any appropriation of those contributions, is tenuous at best.

Although Giblin's alleged command, filtered down through GEB members to union employees, might conceivably have been the motivating force behind certain EPEC contributions, Giblin's fund-raising goal could also have a resulted from a desire to increase members' participation in political activities.  Plaintiffs cannot adequately plead a RICO claim simply by alleging facts that would be equally consistent with either Plaintiff's theory or some innocent explanation.  <u>In re Century Aluminum Co. Securities Litigation</u>, 729 F.3d 1104, 1108 (9th Cir. 2013).  "Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible within the meaning of <u>Iqbal</u> and <u>Twombly</u>."  (<u>Id.</u>)(internal citation omitted).

    To the extent the FAC includes other instances of threats or coercion, those vague allegations, often phrased in the passive voice, either bear no apparent connection to any named Defendant or, as with Plaintiffs' Thirteen Claim, relate to persons not named as in the Fourteenth Claim who share no obvious relationship with any named Defendant.

    For example, Plaintiffs assert that when employees failed to complete the authorization form for compulsory payroll deduction payments to the EPEC fund, "hardball tactics [were] applied, and the resisting individual [was] told that they must contribute if they want[ed] to keep their job." (<u>Id.</u> ¶ 88.) Plaintiffs, however, fail to state who applied these "hardball tactics," or to whom the alleged threats were directed.

    Similarly, Plaintiffs assert that at a meeting of Business Agents, an EPEC contribution authorization form was handed out by a

13

District Representative, "believed to be Steven Montrie." (Id. ¶ 89.)  "When Montrie was asked why [the Business Agents] had to pay," he purportedly replied, "'If you like working here you've got to pay it,' or substantially similar words to that effect." (Id.) Again, however, Plaintiffs's vague assertion fails to establish that Montrie, who is not named as a Defendant anywhere in the FAC, was motivated by Giblin's statement to the General Executive Board or by any other act of the named Defendants, or that any Plaintiffs were even present at the meeting.

Plaintiffs, therefore, have failed to adequately plead that Defendants Giblin, Callahan, and IUOE engaged in Hobbs Act extortion.

### iii.  Defendant Waggoner

Plaintiffs claim "Waggoner affirmatively assisted Defendant Giblin's forced donation campaign by demanding contributions from his own Local's employees, consistent with Giblin's demand at the aforementioned GEB meeting." (Id. ¶ 91.) According to Plaintiffs, Waggoner "sent out a memo to staff members informing them that they had to sign an authorization for payroll deductions for the mandatory President's Club contributions." (Id.) Consequently, Plaintiffs Salas, Chamberlain, and Paxin paid the mandatory contributions to the President's Club "because they knew that they had no choice but to do so in order to avoid adverse consequences to their employment." (Id.)  The FAC provides no basis for Plaintiffs' alleged knowledge that refusal to contribute to the President's club would result in adverse employment consequences. Plaintiffs' allegation that they "had to sign," without more, cannot support a reasonable fear.  See Roger Whitmore's, 424 F.3d

at 672.  The Fourteenth Claim is dismissed as to all moving defendants.

### 2.   Aiding and Abetting Liability

Aiders and abettors of criminal offenses are punishable as principals.  18 U.S.C. § 2.  In <u>Central Bank of Denver v. First Interstate Bank of Denver</u>, 511 U.S. 164 (1994), the Supreme Court addressed the question whether Section 10(b) of the Securities Exchange Act created a private cause of action for aiding and abetting where the language of the statute included no such language.  The court held in the negative, observing that Congress knows how to explicitly provide for civil aiding and abetting liability when it intends to create it, and that nothing in the text of the statute suggested such an unstated intent.  <u>Central Bank of Denver</u>, 511 U.S. at 182-185.  Like the statute at issue in <u>Central Bank of Denver</u>, the civil RICO statute, 18 U.S.C. 1964, does not include civil aiding and abetting.  Courts often apply Central Bank of Denver to bar aiding and abetting RICO claims.  <u>See</u>, <u>e.g.</u>, <u>Rolo v. City Investing Co. Liquidating Trust</u>, 155 F.3d 644, 657 (3d Cir. 1998).

In light of <u>Central Bank of Denver</u>, the parties here all agree that there is no civil liability for aiding and abetting a RICO violation, and Plaintiffs do not allege any such claim.  Instead, Plaintiffs allege that certain named Defendants are liable as <u>principal</u> RICO violators because they aided and abetted underlying RICO predicate offenses.

Plaintiffs' argument begins with general principles of criminal liability.  As stated above, aiders and abettors are criminally liable as principals.  18 U.S.C. § 2.  Racketeering

15

activities, as defined by 18 U.S.C. § 1961(1), include "any act which is indictable under" a host of criminal statutes. Section 2 is not one of those statutes. Nevertheless, Plaintiffs contend, because aiders and abettors are liable as principals under Section 2, an abettor of extortion could be indicted under 18 U.S.C. § 1961. Thus, the argument goes, even though there is no aiding and abetting liability for RICO violations, aiding and abetting a predicate act, as an "indictable offense," itself constitutes a predicate act.

Only one court appears to have adopted Plaintiffs' position after Central Bank of Denver. See In re Trilegiant Corp., Inc., 11 F.Supp.3d 132, 141 (D. Conn. 2014). As an initial matter, while the Trilegiant court did accept the argument that aiding and abetting a predicate act could constitute racketeering activity, the court did so in the course of dismissing the RICO claim at issue. Id. In any event, this court respectfully disagrees with the Trilegiant court's brief discussion of the matter. An exception allowing civil RICO claims to be premised upon the aiding and abetting of underlying predicate acts would swallow Central Bank of Denver's rule foreclosing implicit civil aiding and abetting liability. Lastly, the court notes that it cannot discern from the FAC which Defendants are alleged to have violated RICO by dint of Plaintiffs' Section 2 aiding and abetting theory and which are alleged to have directly committed predicate offenses.

    C.    California Business and Professions Code § 17200

The Seventeenth Claim for violations of California Business & Professions Code § 17200 is based upon the Thirteenth Claim, and is therefore also dismissed. The Eighteenth Claim, however, is not

based upon RICO claims. Although it appears to the court that the allegation that Plaintiffs were forced to make payments to cover shortfalls in the General Fund may be sufficient to establish injury, this claim was discussed only briefly in the parties' papers and at oral argument. The court retains some doubts as to whether the relationship between the parties, as well as the nature of the "required" payments, gives rise to a § 17200 claim. In light of these questions, the motions to dismiss Claim Eighteen are denied, albeit without prejudice.

**IV. Conclusion**

For the reasons stated above, Plaintiffs' Thirteenth, Fourteenth, and Seventeenth claims are DISMISSED. Plaintiffs having already amended their complaint four times, these claims are dismissed with prejudice.

IT IS SO ORDERED.

Dated: February 18, 2015

DEAN D. PREGERSON
United States District Judge