Jeffrey K. Berns (SBN 131351)
    jberns@law111.com
H. Scott Leviant (SBN 200834)
    hsleviant@law111.com
Albert G. Lum (SBN 259053)
    alum@law111.com
**BERNS WEISS LLP**
6800 Owensmouth Avenue, Suite 310
Canoga Park, CA 91303
Telephone:  (818) 961-2000
Facsimile:   (818) 936-0232

Lee A. Weiss (SBN 297834)          J. Mark Moore (SBN 180473)
    lweiss@law111.com                  jmm@mllawyers.net
**BERNS WEISS LLP**                **LAW OFFICES OF J. MARK MOORE**
585 Stewart Avenue, Suite L-20     6800 Owensmouth Avenue, Suite 310
Garden City, NY 11530              Canoga Park, CA 91303
Telephone:  (516) 222-2900         Telephone:  (877) 360-7020
Facsimile:   (818) 936-0232        Facsimile:   (310) 870-7020

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIO SALAS, individually, and on behalf of all others similarly situated; MELVIN CHAMBERLAIN, individually, and on behalf of all others similarly situated; ALBIN WATSON, individually, and on behalf of all others similarly situated; JOHN PAXIN, individually, and on behalf of all others similarly situated;<br><br>Plaintiffs,<br><br>vs.<br><br>WILLIAM C. WAGGONER, an individual; BERT TOLBERT, an individual; MICKEY J. ADAMS, an individual; RON SIKORSKI, an individual; C. W. POSS, an individual; OPERATING ENGINEERS FUNDS INC. a non-profit corporation; and, DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.: 12-cv-10506 DDP (VBKx)<br><br>**FIFTH AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................... i

I.   INTRODUCTION ...................................................................1

II.  JURISDICTION AND VENUE.................................................1

III. THE PARTIES .........................................................................2

   A.   Plaintiffs ......................................................................2

   B.   Defendants....................................................................3

      1.   William Waggoner ............................................3

      2.   Officers and Other Fiduciaries of Local 12 .......3

      3.   Non-Union Trustees for the Local 12-Affiliated Employee Benefit Plans.....................................4

      4.   Other Defendants ..............................................9

   C.   Significant Non-Parties ..............................................10

IV. STATEMENT OF FACTS ......................................................10

   A.   The IUOE ...................................................................10

   B.   The Defendant Trustees and Trust Fund Fiduciaries Breached Their Fiduciary Duties and Violated ERISA in Many Respects .............11

      1.   Defendant-Trustee William Waggoner Wrote Off or Declined to Collect Millions of Dollars of Employer Debts Without Obtaining Approval of a Majority of the Trustees When the Debts Were Owed by Employers Management-Side Trustees or Employers Favored by Waggoner or His Long-time Close Associate, OEFI Funds Manager Leo Majich ..................................12

      2.   Misconduct and Embezzlement as to the Training Trust.................15

      3.   Conduct During This Lawsuit Demonstrating Defendants' Awareness of the Impropriety of Their Actions...............................22

4.  The Pension Fund Defendant Trustees Violated ERISA by Making Extra Pension Payments to Retirees Who Have Been Waggoner's Most Loyal Voting Bloc ...............................23

C.  Defendant Waggoner and His Fellow Officer Defendants Embezzled, Diverted and Misused Union Assets, Harming Local 12 and Its Members ...................................................24

1.  The Weak State of Local 12's General Fund ...................24

2.  Misconduct Regarding the Union Jet ...............................25

V.  THE ERISA PROVISIONS VIOLATED IN THIS CASE ...........................32

A.  Breaches of Fiduciary Duties Under ERISA § 404(a)(1) ........................32

B.  Violations of § 406(b)'s Prohibition on Self-Dealing Transactions ........33

C.  Violations of § 406(a)' Prohibition on Transactions With Parties in Interest ..........................................................34

D.  Co-Fiduciary Liability Under § 405 ........................................35

E.  § 408(c)(2)'s Provision that Fiduciaries Who are Already Receiving Full-Time Pay May Receive No Compensation From a Plan Other Than For Reimbursement of Expenses Properly and Actually Incurred .............................................36

VI.  CLAIMS FOR RELIEF ...............................................37

FIRST CLAIM FOR RELIEF ...............................................37

ERISA VIOLATIONS WITH RESPECT TO THE OETT PURSUANT TO ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), ERISA § 409, 29 U.S.C. § 1109 ...............................................37

A.  Statutory Basis For This Claim ...............................................37

B.  Parties to this Claim ...............................................37

C.  Bases for ERISA Liability ...............................................39

1    1. ERISA Liability Based on Acts and Omissions Described
2      Section IV.B.2.a Above (Embezzlement and Personal Use of
3      OETT Assets, Including Equipment, Vehicles, Parts, Labor and
4      Services) ..................................................................39
5    2. ERISA Liability Based On Acts and Omissions Discussed In
6      Section IV.B.2.b Above (Asset Diversion from OETT to
7      Southern Nevada Training Trust)....................................40
8    3. ERISA Liability Based on Acts and Omission Discussed in
9      Section IV.B.1 Above (Losses due to Write-offs and Failures to
10     Collect Debts/Contributions Owed to the Plan By Employers).......41
11 SECOND CLAIM FOR RELIEF ...........................................................43
12 EQUITABLE RELIEF, WITH RESPECT TO OETT, PURSUANT TO ERISA §
13  502(a)(3), 29 U.S.C. § 1132(a)(3). ..............................................43
14  A. Statutory Basis for this Claim ................................................43
15  B. Parties to this Claim ...........................................................43
16  C. Acts or Practices Violating Title I of ERISA...........................44
17  D. Equitable Relief Sought on Behalf of the Plan for Acts and
18    Practices Violating Title I of ERISA ...................................44
19 THIRD CLAIM FOR RELIEF ...............................................................46
20 ERISA VIOLATIONS WITH RESPECT TO THE PENSION FUND
21  PURSUANT TO ERISA § 409, 29 U.S.C. § 1109, ERISA § 502(a)(2), 29
22  U.S.C. § 1132(a)(2) .............................................................46
23  A. Statutory Basis For This Claim ..............................................46
24  B. Parties to this Claim ...........................................................46
25  C. Bases for ERISA Liability.....................................................47
26    1. ERISA Liability Based on Acts and Omission Discussed in
27      Section IV.B.1 Above (Losses due to Write-offs and Failures to
28      Collect Debts/Contributions Owed to the Plan By Employers).......47

FIFTH AMENDED COMPLAINT

FOURTH CLAIM FOR RELIEF ..................................................................49

EQUIITABLE RELIEF, WITH RESPECT TO THE PENSION FUND,

    PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) ....................49

    A.    Statutory Basis for this Claim ...............................................49

    B.    Parties to this Claim ................................................................49

    C.    Acts or Practices Violating Title I of ERISA.........................50

    D.    Equitable Relief Sought on Behalf of the Plan for Acts and

          Practices Violating Title I of ERISA .....................................50

FIFTH CLAIM FOR RELIEF ......................................................................51

ERISA VIOLATIONS WITH RESPECT TO THE PENSION FUND

    PURSUANT TO ERISA § 409, 29 U.S.C. § 1109, ERISA § 502(a)(2), 29

    U.S.C. § 1132(a)(2) ................................................................51

    A.    Statutory Basis For This Claim ..............................................52

    B.    Parties to this Claim ................................................................52

SIXTH CLAIM FOR RELIEF ......................................................................56

ERISA VIOLATIONS WITH RESPECT TO THE HEALTH & WELFARE

    FUND PURSUANT TO ERISA § 409, 29 U.S.C. § 1109, ERISA §

    502(a)(2), 29 U.S.C. § 1132(a)(2) .........................................56

    A.    Statutory Basis For This Claim ..............................................56

    B.    Parties to this Claim ................................................................56

    C.    Bases for ERISA Liability.......................................................57

          1.    ERISA Liability Based on Acts and Omission Discussed in

              Section IV.B.1 Above (Losses due to Write-offs and Failures to

              Collect Debts/Contributions Owed to the Plan By Employers).......57

SEVENTH CLAIM FOR RELIEF .................................................................59

EQUITABLE RELIEF, WITH RESPECT TO THE HEALTH & WELFARE

    FUND, PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) ........59

**FIFTH AMENDED COMPLAINT**

A.   Statutory Basis for this Claim ................................................... 59

B.   Parties to this Claim .................................................................. 59

C.   Acts or Practices Violating Title I of ERISA ........................... 60

D.   Equitable Relief Sought on Behalf of the Plan for Acts and
     Practices Violating Title I of ERISA ....................................... 60

EIGHTH CLAIM FOR RELIEF .......................................................... 61

COMMON LAW BREACH OF FIDUCIARY DUTY ......................... 61

NINTH CLAIM FOR RELIEF .............................................................. 63

VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §
     17200, *ET SEQ.* .......................................................................... 63

PRAYER FOR RELIEF ....................................................................... 68

I.    **INTRODUCTION**

1.    This action arises from years of illegal activity and embezzlement by Defendant William C. Waggoner, the First Vice President of the International Union of Operating Engineers ("IUOE"), and his fellow officers and subordinates at Local 12, a Southern California local union headquartered in Pasadena encompassed within the IUOE.  Local 12's members, including Plaintiffs, were victimized by this extensive illegal activity, which harmed both Local 12 itself and its members.  In addition, Local 12 established and currently maintains certain employee benefit plans for its members and their beneficiaries.  Three of these employee benefit plans are at issue in this action – the Operating Engineers Pension Trust ("The Pension Fund"), the Operating Engineers So. California and Journeyman-Apprentice Training Trust ("OETT" or the "Training Trust") and the Operating Engineers Health & Welfare Fund (the "Health & Welfare Fund").  These three employee benefit plans are sometimes collectively referred to herein as "the Trusts."  Plaintiffs seek redress for massive breaches of fiduciary duty and asset mismanagement by the Trustees and fiduciaries of the Trusts, including Mr. Waggoner and the other ERISA fiduciary defendants named herein, which resulted in millions of dollars of losses to the Trusts.

2.    Plaintiffs, on behalf of the victimized Trusts as a whole, now seek monetary and equitable relief to remedy all of the wrongdoing addressed herein.

II.    **JURISDICTION AND VENUE**

3.    The action is brought, among other bases, under the Interstate Commerce Clause of the United States Constitution.

4.    Jurisdiction is specifically conferred on this Court by various federal statutes including, but not limited to, the following:  ERISA, including but not limited to 29 U.S.C. § 1132(e)(1).

5.    Original jurisdiction lies with this Court as to the Federal questions

1   raised herein, pursuant to 28 U.S.C. § 1331.

2       6.     Jurisdiction over any California state claims for relief contained in this

3   Complaint arises under the doctrine of supplemental jurisdiction, 28 U.S.C. §

4   1367(a).

5       7.     Venue as to each defendant is proper in this District pursuant to 18

6   U.S.C. § 1965, because each of the Defendants resides, is found, has an agent,

7   controls and/or transacts or transacted affairs in this District.  In addition,

8   Defendants are engaged in interstate and foreign commerce, and a substantial part

9   of the events giving rise to the claims for violations of Federal law occurred in this

10  District, all in the course of interstate and foreign commerce.  Venue is also proper

11  in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

12

13  **III.**   **THE PARTIES**

14       **A.**    **Plaintiffs**

15      8.     Plaintiff Mario Salas is, and at all relevant times was, a member of

16  Local 12.  Plaintiff Salas is a former Business Agent for (and employee of) Local

17  12.  He was terminated in 2012.  Since his termination as a Local 12 employee,

18  Plaintiff Salas has returned to work in the field.  Mr. Salas is a participant in the

19  Pension Fund, the Health & Welfare Fund, and the OETT, having satisfied any and

20  all conditions required to so participate.

21      9.     Plaintiff Melvin Chamberlain is, and at all relevant times was, a

22  member of Local 12.  Plaintiff Chamberlain is a former Instructor for OETT at the

23  San Diego training center (and, as such, a former employee of OETT).  He is now

24  retired.  Mr. Chamberlain is a participant in the Pension Fund, the Health &

25  Welfare Fund, and the OETT, having satisfied any and all conditions required to so

26  participate.

27      10.    Plaintiff Albin Watson is, and at all relevant times was, a member of

28  Local 12.  Plaintiff Watson is a former Coordinator for the OETT at the Whittier

training center (and, as such, a former employee of OETT).  He is now retired.  Mr.
Watson is a participant in the Pension Fund and the OETT, having satisfied any and
all conditions required to so participate.

11.     Plaintiff John Paxin is, and at all relevant times was, a member of
Local 12.  Plaintiff Paxin is a former Local 12 Executive Board member (and thus a
former employee of Local 12) and Instructor for the OETT at the Whittier and
Devore training centers (and thus a former employee of OETT).  Mr. Paxin is
retired from his positions with the union, though he sometimes still works as a
crane instructor and is required to maintain crane certifications for that purpose.
Mr. Paxin is a participant in the Pension Fund and the OETT, having satisfied any
and all conditions required to participate.

### B.     **Defendants**

#### 1.     **William Waggoner**

12.     Defendant William C. Waggoner (sometimes, "Mr. Waggoner" or
"Waggoner") was the First Vice President of the IUOE.  Mr. Waggoner was first
elected as an IUOE Vice President in 1980.  Mr. Waggoner was also the Western
States Director and the Business Manager (the top elected official) of Local 12.
Mr. Waggoner viewed Local 12 as "his" union, and he was the dominating,
controlling force in the union and the affiliated employee benefit plans providing
benefits to members of the union.

#### 2.     **Officers and Other Fiduciaries of Local 12**

13.     Defendant Bert Tolbert was until recently the administrator of the
OETT and the Southern Nevada Training Trust (sometimes he was referred to as
the Director of Training; herein he is simply referred to as the "Administrator" of
those two training trusts).

14.     Defendant Mickey J. Adams, the President of Local 12, is and/or has
been, during relevant times, a Trustee of the Health & Welfare Fund, the Pension

Fund, and the Training Trust.

15.     Defendant Ron Sikorski, formerly the Vice President of Local 12, is and/or has been, during relevant times, a Trustee of the Health & Welfare Fund, the Pension Fund, and the Training Trust.

16.     Defendants William Waggoner, Ron Sikorski, and Mickey Adams are sometimes collectively referred to herein as the "Local 12 Officer Defendants."

### 3.     Non-Union Trustees for the Local 12-Affiliated Employee Benefit Plans

#### a)     *The Employee Benefit Plans*

17.     Local 12 established and currently maintains certain employee benefit plans for its members.  Three of them are at issue in this action -- the Operating Engineers Pension Trust ("The Pension Fund"), the Operating Engineers So. California and Journeyman-Apprentice Training Trust ("OETT" or the "Training Trust") and the Operating Engineers Health & Welfare Fund (the "Health & Welfare Fund").  These three employee benefit plans are sometimes collectively referred to herein as "the Trusts."  The assets of each of the Trusts are held in trust by its respective Board of Trustees.

18.     Each of the Trusts is an employee benefit plan under the Employee Retirement Income Security Act ("ERISA").

19.     Each of the Trusts is governed by a Board of Trustees.  One-half of the Trustees are representatives of employers who have signed collective bargaining agreements ("CBAs") with Local 12 or representatives of employer organizations with member-employers that are signatories to CBAs with Local 12. The remaining Trustees are Local 12 officers selected by Defendant William Waggoner (regardless whether they have any knowledge of employee benefit plans or their duties under ERISA at the time of their appointment).

20.     Each Board of Trustees has a Chairman and a Secretary-Treasurer. The Chairman and Secretary-Treasurer positions typically rotate among Trustees

on a periodic basis.  Defendant Waggoner, who sat on the Board of each of the Trusts, was frequently either the Chairman or the Secretary-Treasurer of each Board.

21.    Defendant Operating Engineers Funds Inc. ("OEFI") is a non-profit corporation that administers the employee benefit programs for the Trusts.  Each of the Trusts is supposed to pay only its *pro rata* share of the expenses incurred by OEFI.  OEFI's Chairman at certain relevant times has been Kenneth Bourguignon.  Defendant William Waggoner also filled that position at times.  At least some of the employees of OEFI are Local 12 members, entitled to participate in the Pension Fund, Health & Welfare Fund, and Training Trust under the terms of those Plans.  Some OEFI employees belong to a different union, the OPEIU.

**The Pension Fund**

22.    The Pension Fund is a pension benefit plan established by the IUOE, Local 12 and participating employers through collective bargaining.  It is subject to the provisions of ERISA.  OEFI administers the Pension Fund (though Invesco Advisers had management power over some Pension Fund assets, including real estate, by virtue of delegation of that role by OEFI and/or the Pension Fund Trustees to Invesco and by its designation as the managing member of LLC's that serve effectively as holding companies for various Pension Fund real estate assets).

23.    The Pension Fund is in critical condition and at a vastly increased risk of default, at least in part due to the fiduciary breaches alleged herein.  At the time of the filing of this lawsuit, on information and belief, the Pension Fund was more than 30% under-funded.  In addition, in order to improve the financial health of the Pension Fund, Local 12 members working in the field, including Plaintiff Mario Salas, have been required to begin paying extra monies into the Pension Fund, over and above the amounts previously deducted from their pay for their own pension contributions.  For example, in or about July 2013, Local 12's new form CBA (Local 12 endeavors to use CBAs with standardized terms for the majority of

employers) provided members with a $2.00 per hour raise, but of that amount, $1.10 per hour (or $44 per 40-hour work week) is being deducted to prop up the condition of the Pension Fund.  That money is not being credited to Plaintiff Salas or other workers for purposes of their own pensions, but rather is being used solely to attempt to shore up the condition of the fund.[1]

### The Training Trust

24.   The Training Trust is an employee benefit plan established by Local 12 and participating employers through collective bargaining. It is subject to the provisions of ERISA.  OEFI administers the Training Trust.  The Training Trust employs Local 12 members directly for the purpose of administration and training. Salaries, expenses, equipment, training, and other activities are paid out of Training Trust assets.  The Training Trust was established in 1964 to provide initial training and re-training to apprentice and journeymen members of Local 12 in various disciplines of construction covered under local 12's collective bargaining agreements.  The Training Trust main office is located in Whittier, California and has six other training sites located throughout Southern California and Southern Nevada.  The Training Trust site in Whittier hosts a variety of training courses such as welding, inspection, hazardous materials, heavy equipment repair, crane training, many certification courses, and other training related to the work that operating engineers perform.  Regardless whether they are currently employed, all members in good standing, including Plaintiffs, are entitled to make use of the Training Trust and are participants therein.

25.   The Training Trust is presently governed by a Board of Trustees.  Six of the Trustees are union-side Trustees.  The other Trustees  are purportedly independent; they represent contractors from the management side (either directly,

---

[1] Of the newly negotiated $2.00 per hour raise, members receive only 80 cents per hour, before taxes, as in addition to the $1.10 that goes to the Pension Fund, an additional 10 cents purportedly goes to "supplemental dues."

as representatives of specific employers, or indirectly, appointed by employer organizations with seats on the Trust's Board), but Defendant Waggoner exercised influence over their selection (in part, through employers' knowledge that Waggoner would call financially devastating strikes on specific employers if challenged) to ensure that he always got his way on the Board.  Once on the Board, Waggoner maintained his influence over management-side Trustees; Waggoner was well known for selectively calling for financially punishing strikes on specific employers, rather than general strikes.

26.     Through coercion and careful selection, Defendant Waggoner ensured that at least one management-side Trustee always voted in the manner that he desired and/or directed, to the extent votes are even held.  One way that Defendant Waggoner accomplished this control was through the inclusion of Trustees no longer capable of understanding the materials presented to Trustees as a result of physical infirmity.  Another way that Defendant Waggoner accomplished this control was by providing gifts from the Trusts to management-side Trustees, such as expensive vacation travel, where luxury resorts and airfare was covered by the Trust and concealed as travel for "educational" reasons.  Waggoner was, in practice, effectively in control of OETT and had in practice exercised control and authority over OETT and its administrators, managers and employees for years, including in matters of hiring and termination and in directing the use of OETT labor and assets.

**The Health & Welfare Fund**

27.     The Health & Welfare Fund is a benefit plan established by Local 12 and participating employers through collective bargaining.  It provides health and welfare benefits to participants and beneficiaries, and is subject to the provisions of ERISA.  OEFI manages mostly routine aspects of the Health & Welfare Fund.  The Board of Trustees is the Health & Welfare Fund Plan Administrator.

28.     The Health & Welfare Fund's Board of Trustees is "authorized and has

the power to do all things necessary in the establishment, maintenance and administration of the Plan." January 2009 Health & Welfare Fund Benefit Information document, p. 7, a relevant excerpt of which is attached hereto as Exhibit 1.[2] "The people who operate your plan, called 'fiduciaries of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries." *Id.*, p. 11. "If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a state or federal court." *Id.*

29.    The Health & Welfare Fund is funded by employer contributions, pursuant to CBAs, which, according to Plan documents provided to members (*id.*, p. 6), require contributions at a fixed rate per hour worked by the employers' union member employees.[3]

30.    The Health & Welfare Fund, like the Pension Fund, is in very poor financial condition and has been for years during the period of time that Defendants have breached their fiduciary duties with respect to the Fund as alleged herein.

**b)**    *Management-Side Trustee Defendant*

31.    Defendant C. W. Poss has at relevant times including within the applicable ERISA statute of limitations period, been a management-side Trustee of the Health & Welfare Fund, the Pension Fund, and thus a fiduciary thereof. Recently, after being sued in this action, he resigned, on information and belief, from his positions with the Health & Welfare Fund and the Pension Fund. On information and belief, Mr. Poss is now mentally incompetent, though in years past, including within the applicable ERISA statute of limitations period, Mr. Poss was sufficiently competent to understand his obligations as a Trustee. During his time

---

[2] The same is true of the Pension Fund and the Training Trust.

as a Trustee, Mr. Poss has regularly supported the positions of Defendant Waggoner, in exchange for which he and his family receive expensive paid vacations, funded by Local 12 Trusts, each year.  Previously, Mr. Poss's company had substantial contributions to the Health & Welfare and Pension Funds written off and/or excused by Defendant Waggoner, as alleged below, while he sat as a Trustee on the Boards of those funds.

32.    Defendant OEFI is a non-profit corporation that administers the employee benefit programs for over 35,000 participants in Local 12's various benefit funds, including the Trusts at issue herein.

33.    Defendants William Waggoner, Mickey Adams, and Ron Sikorski are sometimes referred to collectively herein as the "OETT Defendant Trustees."

34.    Defendants William Waggoner, Mickey Adams, Ron Sikorski, and C.W. Poss are sometimes referred to collectively herein as the "Pension Fund Defendant Trustees."

35.    Defendants William Waggoner, Mickey Adams, Ron Sikorski, and C.W. Poss, are sometimes referred to collectively herein as the "Health & Welfare Fund Defendant Trustees."

### 4.    Other Defendants

36.    Plaintiffs do not know the true names or capacities of the persons or entities sued herein as DOES 1-10, inclusive, and therefore sue said Defendants by such fictitious names.  Each of the DOE Defendants was in some manner legally responsible for the violations alleged herein.  Plaintiffs will amend this complaint to set forth the true names and capacities of these Defendants when they have been ascertained, together with appropriate charging allegations, as may be necessary.

37.    At all times mentioned herein, the Defendants named as DOES 1-10,

---

[3] The Pension Fund and the Training Trust also are funded by contributions

1   inclusive, and each of them, were residents of, doing business in, availed

2   themselves of the jurisdiction of, and/or injured Plaintiffs and aggrieved employees

3   in the State of California, among other locations.

4

5       C.      **Significant Non-Parties**

6       38.     Defendant Local 12 is a local union in the IUOE headquartered in

7   Pasadena, California.  Local 12, a local IUOE union, is a "hoisting and portable"

8   local (sometimes also known as a Heavy Equipment Operators local).  Local 12's

9   geographic reach is substantial, covering territory in Southern California and

10  Southern Nevada.  Local 12 reports having more than 20,000 members as of 2013.

11

12  **IV.    STATEMENT OF FACTS**

13      A.      **The IUOE**

14      39.     The IUOE is a trade union that primarily represents operating

15  engineers, who work as heavy equipment operators, mechanics, and surveyors in

16  the construction industry, as well as stationary engineers, who work in operations

17  and maintenance in building and industrial complexes, and in the service industries.

18  IUOE also represents, *inter alia*, nurses and other health industry workers, a

19  significant number of public employees engaged in a wide variety of occupations,

20  as well as a number of job classifications in the petrochemical industry.

21      40.     Founded in 1896, IUOE has approximately 400,000 members in 123

22  local unions throughout the United States and Canada. IUOE is the 10th largest

23  union in the AFL-CIO.

24

25

26

27

28  at a fixed rate per hour worked.

**FIFTH AMENDED COMPLAINT**

**B.**     **The Defendant Trustees and Trust Fund Fiduciaries Breached**
**Their Fiduciary Duties and Violated ERISA in Many Respects**

41.     Numerous violations of ERISA's fiduciary duties and other prohibitions on self-dealing and party-in-interest transactions are set forth below. The misconduct is wide-ranging and extensive, and Plaintiffs have attempted to segregate it by subject matter and by the involved trust fund, to the extent possible, although some ERISA violations concern more than one trust fund.

42.     Much, although by no means all, of the misconduct alleged herein was done at the instigation of Defendant Waggoner and the Local 12 officer Defendants and/or for their benefit.  However, as shown below, management-side Trustees acquiesced and allowed them to occur, and/or failed to take appropriate steps to remedy breaches by co-trustees after learning of those breaches.  Given their ERISA duties, *inter alia*, to act prudently and with a single eye to protecting the interests of trust beneficiaries and participants (ERISA § 404(a), 29 U.S.C. § 1104(a)), to exercise due care to prevent the breaches of co-trustees while jointly managing trust assets (ERISA § 405(b)) and to take reasonable steps to remedy breaches after the fact (ERISA § 405(a)) – which they plainly violated, repeatedly - management-side Trustees are responsible regardless of whether the schemes and wrongs alleged were primarily their own or those of Defendant Waggoner and the other Local 12 officer Defendants.

43.     Subjective motives for ERISA violations are generally irrelevant, but it appears that management-side Trustees breached their duties and/or at least failed to remedy the fiduciary breaches of Defendant Waggoner and the other Local 12 officer Defendants in part because they desired to stay in Defendant Waggoner's good graces.  ERISA liability cannot be avoided simply because a fiduciary may be more concerned about disruption to his own business than protecting the interests of the participants and beneficiaries whose interests he is obligated to serve.  To the contrary, ERISA expressly imposes duties to put the interests of participants and

beneficiaries first.

      **1.**     **Defendant-Trustee William Waggoner Wrote Off or Declined to Collect Millions of Dollars of Employer Debts Without Obtaining Approval of a Majority of the Trustees When the Debts Were Owed by Employers Management-Side Trustees or Employers Favored by Waggoner or His Long-time Close Associate, OEFI Funds Manager Leo Majich**

44.    29 U.S.C. § 1145 provides: "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." Attorneys' fees to prevailing trustees are *mandatory* under 29 U.S.C. § 1132(g) when collection suits for unpaid contributions under § 1145 are successful. *Kemmis v. McGoldrick*, 706 F.2d. 993, 997 (9th Cir. 1983) (in case involving IUOE Local 12, the Ninth Circuit stating: "However, 29 U.S.C. § 1132(g)(2) (Supp. V 1981) now makes the award of attorney's fees mandatory when the trustees prevail in actions to enforce and collect benefit fund contributions.")

45.    In gross dereliction of his fiduciary duties as a union officer and a Trustee, Defendant Waggoner has written off and/or declined to collect large debts for benefit contributions owed by employers to all three of the involved Trusts (OETT, Pension Fund and Health & Welfare Fund). In at least some instances, he has done so unilaterally and without obtaining proper votes of a majority of the Trustees approving such decisions. In allowing him to do so and failing to take any steps to remedy his misconduct, the other Trustee Defendants violated their fiduciary duties under ERISA § 404 and also are liable as co-fiduciaries under ERISA §§405(a) and 405(b).

a)   *Leo Majich and Majich Bros.*

46.   Defendant Waggoner excused roughly $500,000 in contributions owed to the Local 12 Pension and Health & Welfare Funds by Majich Bros., Inc. (Leo Majich's company) at the same time that Leo Majich – an ERISA fiduciary – was the OEFI Funds Manager for Local 12's Trusts.

47.   Other Trustees on the Boards of those two Trusts knew of Waggoner's misconduct, or certainly should have known of it, if they were faithfully fulfilling their responsibilities under ERISA to preserve trust assets, to exercise reasonable care to prevent breaches by their co-trustees, and to jointly manage and control plan assets.  However, they did nothing to stop Waggoner's misconduct or to remedy it after the fact, in breach of their fiduciary duties.  The Trustees certainly know how to sue for unpaid contributions, as demonstrated by recent litigation in this very Court.  *See*, *Trustees of Operating Engineers Pension Trust v. Smith-Emery Co.*, CV 09-1476 CAS VBKx.

48.   To the extent some of the other Trustees were not initially involved in or aware of Waggoner's decision to forego collecting Majich Bros., Inc.'s owed contributions, they have had notice of Waggoner's misconduct for some time (including at least during the pendency of this litigation), and yet still, to Plaintiffs' knowledge, have done nothing to remedy Waggoner's breach of duty, thereby breaching their own fiduciary duties under ERISA § 404 and also rendering themselves liable as co-fiduciaries under ERISA § 405(a).

49.   Waggoner, Leo Majich and the other Trustees have to date failed to disclose and instead actively concealed from Local 12 members (no doubt due to the obvious fiduciary breaches involved) the failure to collect these contributions to the detriment of the involved Trust Funds.  Due to the concealment of this conduct from Local 12 members, Plaintiffs did not discover it until the latter half of 2013, when they learned via the former OEFI Administrator Michael Graydon that a secret write-off file existed that included Majich's company, C.W. Poss, Inc.

(discussed in the following subsection), and a host of others.  All of the Trustees should be removed for failure to pursue Majich Bros., Inc. for delinquent contributions.

**b)**   *Defendant C.W. Poss and C.W. Poss, Inc.*

50.    In another instance, over $500,000 in contribution debts owed by management-side Trustee C.W. Poss's company, C.W. Poss, Inc., to the Pension Fund and the Health & Welfare Fund were excused by Waggoner while Mr. Poss was sitting as a Trustee of those two employee benefit plans and of the Training Trust.  Waggoner's conduct breached his fiduciary duties under ERISA § 404 to act in the interests of the fund participants and beneficiaries and to preserve the assets of the Trusts.

51.    Likewise, Mr. Poss's failure to ensure that his own company made required contributions to the Trusts, while siting as a Trustee on the Boards of those Trusts, was plainly a breach of his own duties to act in the best interests of fund participants and beneficiaries. Poss was fully aware that his company owed substantial contributions to the Trusts and yet, despite his fiduciary duties to serve the interests of fund participants – which he was legally required to place above his own interests and those of his company – he did not ensure that those contributions were made.  Because this conduct occurred before his mental competence was in question, as it now is, Poss knew full well what Waggoner was doing – i.e., excusing his company from making required contributions to the Pension and Health & Welfare Funds.  Yet, far from objecting and insisting that his company's contributions be made, he willingly acquiesced to Waggoner's breach of fiduciary duty and concealed it from union members.

52.    Waggoner, in addition to being liable for his own conduct, is liable as a co-trustee under ERISA § 405(a) for Poss's breach, as he directly participated in and enabled it.  All other Defendant Trustees are liable for failing to exercise reasonable care to prevent Waggoner's breach of duty and for failing to take

1   reasonable or timely steps to remedy his misconduct.

2        53.     For their part, the other management-side Trustees, at least some of

3   whom on information and belief were circumvented by Waggoner in the sense that

4   their approval was not sought or obtained for his conduct, they did not resign or act

5   in any way at any time thereafter to correct or remedy the misconduct of their co-

6   trustees, Waggoner and Poss, including even after this lawsuit was filed more than

7   a year ago.  They have not, for example, demanded or otherwise forced Waggoner

8   and Poss to remedy their breaches, by litigation or otherwise.  As noted above, the

9   Trustees certainly know how to sue for unpaid contributions when Waggoner wants

10  them to.

11       54.     Waggoner, Poss and the other Trustees failed to disclose and instead

12  actively concealed from Local 12 members (no doubt due to the obvious fiduciary

13  breaches involved) that these contributions of C.W. Poss, Inc. had simply been

14  excused, to the detriment of the involved Trusts.  Due to the concealment of this

15  conduct, Plaintiffs did not discover it until, as noted above, the latter half of 2013,

16  when they learned of the existence of the secret write-off file.

17       55.     Defendant Poss, on information and belief, resigned from his positions

18  after this action was filed raising these allegations.  Given his past misconduct, he

19  should be enjoined from serving as a Trustee in the future, as should all of the other

20  Trustees who failed to pursue Poss and his company.

21

22              **2.      Misconduct and Embezzlement as to the Training Trust**

23              **a)**    *Waggoner and Other Local 12 Defendants Embezzled*

24                     *OETT Property and Labor*

25       56.     Vehicles owned by the OETT training center that were scheduled to be

26  sold at auction after their useful life were often pulled from sale and purchased by

27  Administrators (like Bert Tolbert), Board Members, officers and upper

28  management of Local 12, including line officers, at a sub-market rate price from

the auction house.  When ERISA fiduciaries (such as the Local 12 Officer Trustees or Tolbert) purchased these OETT vehicles, these transactions were prohibited "party-in-interest" transactions under ERISA § 406(a), and constituted prohibited self-dealing under § 406(b). The vehicles were then restored by staff members at the OETT Whittier training center ("OETT Whittier"), during working hours by employees on the OETT payroll.  To conceal these transactions, all replacement parts for such vehicles were charged to the identification numbers for other equipment owned by OETT.

57.    The time required for OETT Whittier employees to restore the vehicles was not reimbursed to the OETT.  The restored vehicle's ownership would then be transferred to the union officer who purchased the vehicle at the sub-market rate. Administrators (like Bert Tolbert), Board Members, officers and upper management of Local 12, including line officers, have taken advantage of this scheme.  This conduct constituted the embezzlement of OETT resources (including the labor of employees) that should have been dedicated to serve the interests of participants and beneficiaries, and harmed the OETT and its participants and beneficiaries, including Plaintiffs.

58.    Many of those same individuals receive free service on their personal vehicles at OETT Whittier, constituting further embezzlement of union resources. For example, Bert Tolbert's brother-in-law received a full restoration on a Dodge Stakebed pick up, by on-duty employees.  This conduct constituted the embezzlement of OETT resources (including the labor of employees) that should have been dedicated to serve the interests of participants and beneficiaries, and harmed the OETT and its participants and beneficiaries, including Plaintiffs. Tolbert breached his fiduciary duties by enabling such conduct as OETT Administrator for the benefit of his brother.

59.    Bert Tolbert also had personal riding lawnmowers repaired by staff at OETT Whittier, during working hours, while staff was on duty.  This conduct

constituted the embezzlement of OETT resources (including the labor of employees) that should have been dedicated to serve the interests of participants and beneficiaries, and harmed the OETT and its participants and beneficiaries, including Plaintiffs.  Tolbert also had OETT staff restore for him a motorized, antique wheelbarrow on tracks.  Again, Tolbert breached his fiduciary duties under § 404(a) of ERISA by engaging in such conduct, and engaged in prohibited self-dealing in violation of § 406(b).

60.     Bert Tolbert would also dispatch OETT Whittier vehicles (during work hours) to pick up and then repair equipment, recreational vehicles and boats or vehicles owned by Administrators, officers, Board Members, or upper management employees.  The use of OETT Whittier vehicles and staff in connection with such activities constituted embezzlement of Trust assets and harmed the OETT and its participants and beneficiaries, including Plaintiffs.  All such transactions were in breach of Tolbert's fiduciary duties under § 404(a) of ERISA and constituted prohibited transactions with parties in interest under § 406(a).

61.     Union leaders, including Waggoner, Bert Tolbert, and Fred Young, also store or stored personal vehicles at the OETT Whittier training center without paying fair rental compensation for use of the space, thus providing value to such union officers that they are not entitled to receive.  For example, Waggoner has for a long period of time stored a vintage Cadillac at the OETT Whittier training center.  Were he to store it in another secure facility, he would have to pay, but instead he took advantage of OETT facilities to store his vintage Cadillac for free.  Waggoner also stored a Jeep at OETT facilities and had it periodically serviced there, with parts paid for by OETT.  Bert Tolbert stored a boat at OETT facilities.  Such conduct violates the fiduciary duties of Waggoner and constitutes prohibited self-dealing under ERISA § 406(b).

62.     Over the years, Defendants William Waggoner, Bert Tolbert, Mickey Adams and others have repaired and/or restored personal vehicles, including

**Fifth Amended Complaint**

collectible antique cars and boats, using OETT funds and staff.  Fred Young, along with Ray Horn's relative, also had boats rebuilt at the training facility.

63.    A 1951 Chevrolet Bowtie owned by Bert Tolbert was also rebuilt using Trust assets and staff, without reimbursement to the Trust.

64.    William Waggoner's Model A Ford was rebuilt using Trust assets and staff, without reimbursement to the Trust.  The Model A Ford was stored at the Local 12 union hall parking garage.  The gate is now customarily locked, likely to prevent members from gaining access and confirming Waggoner's use of union property to store his Model A Ford.

65.    Bert Tolbert purchased a truck that was fully rebuilt using Trust assets and staff, without reimbursement to the Trust.

66.    These embezzled vehicle restorations were concealed through the use of dummy VIN numbers.  When Defendants embezzled these assets, they would direct office staff to record repairs under different VIN numbers, demonstrating their awareness of their wrongful conduct.

67.    The conduct described above constituted embezzlement of fund assets. To the extent such conduct was engaged in or authorized by OETT fiduciaries such as William Waggoner, Mickey Adams, Ron Sikorski, and Bert Tolbert, it was a violation of their fiduciary duties under ERISA § 404.  Using fund assets (including labor, services and equipment) to repair personal vehicles or boats is in gross violation of these Trustees' duties under ERISA to preserve fund assets and to act only in the interests of beneficiaries and participants.  Such conduct also plainly constitutes prohibited self-dealing under ERISA § 406(a).

68.    Employees of OETT also have been dispatched to repair or service Mickey Adams' boat, which was docked at a river, while on payroll.  Mickey Adams embezzled the staff time, OETT vehicle usage, fuel costs, and parts for the repair of his boat.  In at least one instance, Pete Majich was dispatched to provide repairs to Adams' boat, during working hours while he was on OETT's payroll.  On

another occasion, Adams had work done on his boat trailer by OETT staff.  Such repairs plainly do not fall within the scope of permissible functions of the Taft-Hartley-regulated OETT.  The parts for Adams' boat repair were purchased by OETT and falsely reported as OETT operating costs on the 5500 forms filed for OETT and transmitted by wire to the DOL.  Defendant Adams, an OETT Trustee, embezzled monies from the OETT in connection with his boat repairs, in violation of his fiduciary duties under ERISA § 404 and in violation of § 406's prohibitions on self-dealing and party-in-interest transactions.

69.    Tolbert and the OETT Defendant Trustees breached their fiduciary duties by allowing such conduct to occur, knowing that the Local 12 officers regularly engaged in such conduct at OETT and doing nothing, rather than, consistent with their duties under ERISA § 404 and 405(b) (imposing a duty to exercise reasonable care to prevent co-trustee breaches) putting in place procedures to ensure that fund assets were not embezzled in this fashion as they were on a regular basis.

70.    In short, those individuals receiving these embezzled benefits, including at least Defendants Waggoner, Sikorski, Tolbert and Adams, breached their fiduciary duties under ERISA by embezzling fund assets in a manner that was neither reasonable nor necessary to OETT operation and administration, or consistent with their fiduciary duties under ERISA § 404.  The other OETT Defendant Trustees, with knowledge of these breaches, have done nothing to remedy them, rendering themselves liable regardless whether they participated in the breaches themselves.

71.    The Defendant OETT Trustees, as well as Bert Tolbert, actively concealed the misuse of OETT assets from members, including even Plaintiffs, who were not reasonably able to discover the embezzlement and related criminal activity until 2012.  Plaintiffs were not provided with access to the financial records of OETT as part of their duties and had no way of discovering that the OETT assets

1   used by Waggoner, Sikorski, Tolbert, Adams and others were not paid for by the

2   officers and other fiduciaries who were in fact embezzling those assets.  Plaintiffs

3   were not included in discussions between Tolbert and officers of Local 12.

4        72.   Any Defendant OETT Trustees who did not personally participate in

5   the embezzlement and asset diversion described in the foregoing paragraphs failed

6   to exercise reasonable care to prevent their co-trustees' wrongdoing and breached

7   their fiduciary duties to the OETT Trust Fund on which they sit and/or sat as

8   Trustees by allowing the embezzlements to occur over many years without

9   instituting effective practices or procedures to preserve fund assets in the face of

10  such abuses.  Such omissions are in no way consistent with their fiduciary duties

11  under ERISA.

12       73.   Indeed, even after this litigation was filed and the Defendant OETT

13  Trustees who may not have personally participated in embezzling OETT assets

14  were unquestionably on notice of the embezzlements described above, Defendants

15  have, on information and belief, done nothing to remedy the misconduct, such as

16  instituting audits, demanding reimbursement, instituting legal actions, or reporting

17  the embezzlement to appropriate authorities with the DOL or other law

18  enforcement.

19       74.   The OETT (and, indirectly, Plaintiffs and other participants in it) was

20  harmed by Defendants' breaches of fiduciary duties and by the embezzlement of

21  assets, including tools, parts and labor, from OETT.

22            **b)**   *The OETT Fiduciaries Diverted and/or Allowed the*

23                 *Diversion of Trust Assets from the Southern California*

24                 *Training Trust*

25       75.   The OETT, a Taft-Hartley fund established to provide member training

26  services to the Local 12 members in California, has purchased equipment initially

27

28

identified as purchased for OETT.[4]  However, the equipment would then be deleted from the OETT inventory, and transferred to the Southern Nevada Training Trust, without compensation from the Southern Nevada Training Trust to the OETT.

76.    OETT training personnel and equipment were used to transfer equipment from the OETT to the Southern Nevada Training Trust.  OETT personnel, including Pete Majich, an employee of the OETT, applied for and received DOT permits to transfer "wide load" equipment.  Pete Majich operated the lead vehicle during the transport of large construction equipment to the Southern Nevada Training Trust.  When equipment is deleted from the OETT inventory, it is not returned to the OETT.  However, some equipment also has been "loaned" from the OETT to the Southern Nevada Training Trust for periods of time including one month to many years.  In these cases, fair market rental value has not been paid by the Southern Nevada Training Trust to the OETT.  The OETT (and, indirectly, Plaintiffs and other participants whose contributions fund OETT) was injured when OETT assets were embezzled and when fair rental rates were not paid for the extended use of those equipment pieces.  At least until this lawsuit was filed, all costs associated with the transfer of equipment to Nevada, including employee costs, e.g. salaries, benefits, and expense monies, were paid by the OETT without reimbursement thereto from the Southern Nevada Training Trust. The Defendant OETT Trustees breached their fiduciary duties to that Taft-Hartley fund by this scheme, harming the OETT (and, indirectly, its participants, including Plaintiffs) in an amount to be proven at trial.

---

[4] Local 12 creates some confusion with nomenclature in that it often refers to both the Southern California Training Trust and the Southern Nevada Training Trust as "OETT."  (Plaintiffs, in using the term "OETT," are referencing only the Southern California Training Trust.) The main location in Southern California is often called OETT Whittier.  However, these two Taft-Hartley trust funds are (in theory) distinct legal entities, though the management employees co-mingled assets of the two trusts and treated them, at times, as though they were a single entity.  This reckless disregard for fund separateness places the status of both funds at risk under IRS regulations.

77.   Employees of the OETT create the curriculum, testing, interview applicants and actually instruct and/or teach apprentices in Southern Nevada. However, the Southern Nevada Training Trust does not repay the OETT for the use of its employees who remain at all times on the latter's payroll.  The Southern Nevada Training Trust also fails to share in the cost of benefits provided to instructors on the payroll of the OETT.  Jim Leslie, Plaintiff Skip Watson, and Dave Barton were sent to Southern Nevada to provide trainings at that Trust, but the Southern Nevada Training Trust did not pay for their time or training materials. During testing, proctors would be sent from Southern California to Southern Nevada, but, again, the Southern Nevada Training Trust did not pay for the OETT staff time.  Lee Landers and Ron Havlick of the OETT also were sent to provide services to the Southern Nevada Training Trust, but the value of their services was not reimbursed.  Handbooks were printed and shipped to the Southern Nevada Training Trust from Southern California, at Southern California's expense.

78.   Allowing the diversion of fund resources from the OETT, without reimbursement, to the Southern Nevada entity (the Southern Nevada Operating Engineers Journeyman and Apprentice Training Trust) was a breach of fiduciary duty by the defendants who sit as Trustees or are otherwise fiduciaries of OETT, and harmed the trust in an amount to be proven at trial.

79.   After this lawsuit was filed, a comprehensive effort was undertaken to eliminate the connections between the OETT and the Southern Nevada Training Trust.

### 3.   Conduct During This Lawsuit Demonstrating Defendants' Awareness of the Impropriety of Their Actions

80.   At least since the First Amended Complaint in this case was filed, some of the vehicles and equipment formerly owned by the OETT but used by the Southern Nevada Training Trust have been returned to Southern California,

demonstrating Defendants' recognition of their wrongful conduct.  The equipment was moved back to Southern California by drivers Jim Capen and John Bader, two Teamsters employed by OETT and permanently assigned to its Whittier, California facility.

81.    In addition, in an unprecedented step after the filing of the Second Amended Complaint, the Southern Nevada Training Center has paid the Southern California Training Center for the transfer of equipment from the Southern Nevada Training Trust back to the OETT.  On information and belief, the total amount of compensation paid was roughly $62,000. However, that payment and transfer back to OETT does not eliminate all of the injury caused to OETT by the longstanding practice of disregarding the integrity of Trust assets and falsifying records to hide those illegal practices.

### 4.    The Pension Fund Defendant Trustees Violated ERISA by Making Extra Pension Payments to Retirees Who Have Been Waggoner's Most Loyal Voting Bloc

82.    The Pension Fund Defendant Trustees for many years approved, or at least knowingly acquiesced in, Waggoner's longstanding practice of issuing a thirteenth (i.e., additional) annual pension payment to retirees at the end of each year, which was done for the purpose of securing votes for Waggoner and his slate from retirees, a group that is typically has the highest participation rate in union elections.

83.    This *additional* payment to retirees, which occurred through the end of 2011, was not planned for in retirees' original contributions.  It places additional stress on the Pension Fund and certainly not is consistent with any purpose to ensure the continuing soundness of the Plan.  To their (very belated) credit, the Trustees finally discontinued the practice in 2012 because of the restoration status of the Plan, which, as previously alleged, is in critical condition.  Giving extra

pension payments to retirees while actually demanding restoration payments from members was too much even for the Pension Fund Defendant Trustees.

84.     However, by allowing this practice in prior years, including through the end of 2011, they violated their duty of loyalty owed to all Plan participants and beneficiaries, as well as their duty of prudence, since no prudent man would act in such a fashion under similar circumstances.  Assisting Waggoner in ensuring his re-election as Business Manager and his ability to continue his illegal practices does not qualify as prudence under ERISA.  Further, the duty of loyalty is owed to the Plan and its participants and beneficiaries, not to William Waggoner.  As such, the Plan Trustees breached their fiduciary duties under § 404(a) by approving and enabling this practice and knowingly allowing it to continue through 2011.

85.     By paying millions of dollars of extra Pension Fund benefits to retirees not contemplated by their contributions and by incurring the extra associated administration costs of doing so, in order to serve Waggoner's political purposes, the Plan Trustees breached their fiduciaries duties under § 404(a)(1)(A) (duty of loyalty) to act solely in the interests of Plan participants and beneficiaries and for the purpose of defraying reasonable administration expenses  and § 404(a)(1)(B) (duty of prudence), since paying out additional pension fund benefits, to the detriment of the Plan as a whole, for such political reasons is not consistent with ensuring the solvency and continuation of the Plan.

C.     **Defendant Waggoner and His Fellow Officer Defendants Embezzled, Diverted and Misused Union Assets, Harming Local 12 and Its Members**

1.     **The Weak State of Local 12's General Fund**

86.     One of the more tragic aspects of the Local 12 Officer Defendants' rampant misuse of Local 12 assets, as detailed below, is the dire financial impact on Local 12's General Fund.  Despite Local 12's poor financial condition,

Defendants continue to misuse and embezzle its assets, thereby further worsening its financial condition.

87. In 2010, the union's General Fund lost $5,727,742, according to William Waggoner.

88. The General Fund also lost millions of dollars in 2011 and 2012 and, it is believed, in 2013.

89. To address this deficit, Waggoner and the Local 12 Executive Board recommended asking Local 12 employees to take two days off without pay. A true and correct copy of William Waggoner's letter is attached hereto as Exhibit 2. Employees, including Plaintiff Salas, were ultimately required to give up days of work to address the General Fund deficit. Meanwhile, as shown below, Waggoner continues to misuse the union's jet without compensation to the union to the detriment of its General Fund.

### 2. Misconduct Regarding the Union Jet

  a) *Defendants William Waggoner, Mickey Adams, Ron Sikorski, and Others Used Local 12's Aircraft for Their Personal Use*

90. In 2002, Local 12 purchased a 2001 Cessna Citation XL jet ("the Local 12 jet"), with registration number N705SG. The reported value of the Local 12 jet in 2002 was $8,644,396.00. The value reported was false, because the Local 12 jet, though claimed by Waggoner to be new, was actually previously owned, which diminished its actual value. The nine-passenger cabin was appointed with, among other things, leather seats, a couch, a lavatory, walnut trim, 110-volt electrical outlets, 4 writing tables, and a wine caddy. The plane is pictured below:

**FIFTH AMENDED COMPLAINT**



Waggoner convinced the Executive Board to approve the purchase as an investment because, as promised by Waggoner, the "new" Local 12 jet would be leased when it was not in use (at least 51% of the time, as projected by Waggoner), generating income.  In fact, Local 12 has never reported lease income for the Local 12 jet.

91.    In both 2009 and 2010, the Local 12 jet was advertised for lease.  Yet to Plaintiffs' knowledge, no lease proceeds were ever reported in any LM-2 filing by Local 12.  Assuming there *were* lease proceeds, Local 12 either failed to report them or they were received by an entity or person(s) other than Local 12, despite being the property of Local 12.  Since the filing of this action, the website listing for the Local 12 jet is no longer available.  The agent handling lease arrangements for the Local 12 jet was Guardian Air, owned by James Previti. A parent company of Guardian Air, KMR Aviation, served as the custodian of records for the Local 12 jet.

92.    In the 2010 LM-2 filing, the value of the Local 12 jet is not reported or not accurately reported.  The total value of reported "other fixed assets" is

$11,342.00, far below the value of the Local 12 jet.  Likewise, in the 2011 LM-2 filing, the value of the Local 12 jet is not reported or not accurately reported.  The total value of reported "other fixed assets" is $22,560.00, far below the value of the Local 12 jet.

93.    William Waggoner required the union officers, who frequently travelled in the Local 12 aircraft, to occasionally take commercial flights "just to make it look good."  There was no need for Local 12 to purchase the Local 12 jet, as the locations where this aircraft flew and does fly are adequately serviced by commercial airlines.

94.    There are numerous instances in which William Waggoner and/or Patricia Waggoner have used the Local 12 jet for personal travel.  For example, William Waggoner flew to Bakersfield to attend the August 25, 2011 Ray Price concert.  Local 12 paid for that excursion.  William Waggoner also used the Local 12 jet to attend rodeo and NASCAR events in Las Vegas.  The rodeo events were annual trips for Waggoner.  There were no scheduled district meetings at the time of this roundtrip flight to Las Vegas.  The entire Waggoner family flew to Las Vegas to attend the wedding of Margaret Hammond, the former babysitter for Kenneth Waggoner.  None of the costs of these trips were reimbursed to Local 12, which had to pay the costs associated with the use of the Local 12 jet.

95.    On or about August 30, 2007, Waggoner used the Local 12 jet to fly to Bakersfield to attend the funeral of Dolly Adams, Mickey Adams' mother.  On this occasion, Waggoner and Local 12 chartered a second plane from Guardian Air (Air Charter operated by KMR Aviation Inc., certificate #DCUA716B), a King Air 200 (tail number N505SP or N550SP) to transport additional line officers and additional Local 12 headquarters staff to Ms. Adams's funeral. KMR notes that its King Air 200 aircraft are available to charter for hourly rates of $1,840 to $1,995. On information and belief, at least $8,000 was spent by Local 12 for the charter of the KMR King Air 200 flight to Bakersfield, California.  In addition to attending the

**FIFTH AMENDED COMPLAINT**

funeral, Waggoner insisted that all of the Local 12 staff join him for lunch at his favorite Basque restaurant, the Wool Growers Restaurant in Bakersfield, which he paid for using Local 12 funds.  The members of Local 12 were not advised of this misuse of union assets and had no way to discover the misuse until learning of it within approximately the last year, after a former union employee provided information about the systemic misuse of Local 12 assets in the form of unnecessary jet flights.

96.     The mother-in-law of Mickey Adams died north of Las Vegas, Nevada. The Local 12 jet flew a few officers and the Adams family to the funeral, including the family pet, a guide dog who traveled to the funeral in Bakersfield sitting in Waggoner's usual seat on the jet.  Local 12's general fund (and thus, its members) bore the expenses of this personal travel and, on information and belief, Local 12 and its general fund received no compensation or reimbursement from the passengers or anyone else for this personal use of Local 12's jet.

97.     Patty Waggoner also used the Local 12 jet for her own personal travel. For example, Mrs. Waggoner would use the Local 12 jet to fly to Las Vegas for shopping and golfing trips.  She sometimes travelled with a representative of ProBiz Bank, Valerie Prince, who brokered a $10 million loan to Local 12's Health & Welfare Fund, and/or other personal friends.  Patricia Waggoner also used the Local 12 jet to go on shopping trips with Maritza Adams, Mickey Adams' wife, and golfing trips with her son, Kenneth Waggoner.  On information and belief, the Local 12 General Fund received no reimbursement or compensation for this personal use of Local 12's jet.

98.     On flights to the east coast or the Midwest in the Local 12 jet, William Waggoner would stop over in Lawrence, Kansas to visit his brother and refuel the Local 12 jet, despite higher fuel costs for refueling there. On one such occasion, on or about September 16, 2009, on a return flight to Van Nuys, California from the AFL-CIO National Convention held in Pittsburgh, PA, the entire Local 12

contingent of officers had lunch with Geno in Lawrence, Kansas.[5]

99.    Through parts of 2009 and 2010, Maritza Adams, defendant Mickey Adams' wife, was frequently a guest on the Local 12 jet for the personal purpose of visiting her mother in Henderson, Nevada.  Later, while her mother was in an assisted living facility north of Las Vegas, Maritza Adams also frequently took the Local 12 jet to visit her mother at that facility.  On information and belief, the Local 12 General Fund received no reimbursement or compensation for this personal use of the Local 12 jet.

100.   Kenneth D. Waggoner, William Waggoner's son, was shuttled back and forth to college in Santa Clara on the Local 12 jet.  Local 12 was not reimbursed for this personal use of Local 12's property.  Kenneth Waggoner also used the jet with his mother, Patricia Waggoner, to shop and play golf in Las Vegas, Nevada and at Rancho Murieta, California.  On information and belief, the Local 12 General Fund received no reimbursement for this personal use of Local 12's jet.

101.   On or about April 9, 2012, Susan Holmes, an administrative employee at Local 12, along with her husband, Jim, flew on Local 12's jet to Washington D.C. The flight included Ron Sikorski, Mickey Adams, William and Patty Waggoner, and Dennis Lundy. The primary purpose of the trip was for William Waggoner to attend the IUOE General Executive Board Meeting.  There is no legitimate reason that that Susan and Jim Holmes or Patty Waggoner should have

---

[5] That trip can be documented in multiple ways, due to the coincidental involvement of local police.  Upon landing in Lawrence, Kansas, co-pilot Robert Squillace retrieved calls from the Pittsburgh Police Department asking for information on William C. Waggoner.  The reason for the calls was that William Waggoner had left Pittsburgh without paying a taxi fare in full, shorting the driver out of $120.00.  The driver contacted the police after advising Waggoner he was going to do so, to which Waggoner responded that the police could catch the jet as it was running down the runway.  Upon speaking to the Pittsburgh police while in Lawrence, Robert Squillace denied to the officer he was speaking with that he had any knowledge of who was on the Local 12 jet, and, more specifically, denied that he knew William Waggoner.

been included in that flight, and no apparent reason for the other officers or Dennis
Lundy, an IUOE employee in the Western United States, to be on that flight.  Only
Waggoner could attend the GEB meeting.  The group returned on or about April
12, 2012.  On information and belief, consistent with customary practice, the
passengers on that flight stayed at the Washington Court Hotel without
compensating Local 12 or its Pension Fund, which owns the hotel.

102.   Whenever Waggoner traveled any significant distance on the Local 12
jet, he required a poker cabal to accompany him (consisting, at various times, of the
other defendant officers of Local 12 and anyone else that Waggoner directed to
accompany him on the Local 12 jet), irrespective of whether his poker companions
had any legitimate business purpose for accompanying Waggoner on the Local 12
jet.  For example, when Waggoner would travel to the East Coast to attend IUOE
GEB meetings, he would take officers of Local 12 and others with him, just to play
poker, even though his poker companions had no reason to accompany Waggoner
to an IUOE GEB meeting.  As they were not members of the GEB, the poker
companions were not permitted to attend GEB meetings.

103.   In virtually every instance where William Waggoner used the Local 12
jet, he would require the pilots to fly the Local 12 jet from Ontario, California,
where it was stored, to Van Nuys, California, because it was slightly closer to his
home than the Ontario airport and the traffic was better.  Each of these short hops,
requiring an extra landing and takeoff, cost Local 12 roughly $2,000 in additional
fuel charges.  These additional charges, which caused damage to Local 12's
General Fund and to its members, are an abuse by fiduciaries to the union and
amount to embezzlement of union funds for personal benefit.

104.   Operation of aircraft by Local 12 imposed a substantial cost over many
years on the members of Local 12.  The expensive operation of such aircraft is
responsible, in part, for the supplemental dues payments imposed on members,
including Plaintiffs.  By way of example only, as reported in Local 12's 2007 LM-2

report, pilot salaries of $156,370.00 and total disbursements to pilots of $186,811.00 were reported.  Transactions involving aircraft were reported in General Overhead, in amounts of $40,835, $136,464, $59,829, $36,138, $149,331, $ 5337, $49,119, $18,700, $204,034, totalling $699,787.00.

105.   Even after the filing of this action and in the midst of investigation regarding jet use by federal authorities, the willful misuse of union money in the form of frivolous jet flights has continued.  For example, on December 5, 2013, Defendant Mickey Adams, Defendant Ron Sikorski and John Adams (a Business Representative for Local 12 in Bakersfield and Adams's nephew) flew from Ontario, California to San Diego for a meeting with Granite Construction, at an effective operational cost that likely exceeds $10,000, when they could have made the two-hour drive in a union vehicle for the price of gas.  Particularly when union members are perpetually being forced to replenish the General Fund of Local 12, this extravagant misuse of Local 12's money is a breach of the fiduciary duties owed to Local 12 and its members.

106.   In sum, William Waggoner, Mickey Adams, Ron Sikorski and others used the Local 12 jet for their personal use, failed to account anywhere for revenues that may have been generated by that jet which was advertised as available for charter rental, and falsified many years of LM-2 filings to conceal activities, and costs, and asset values from discovery by Local 12 members.

          **b)**    *Defendants Waggoner and the Local 12 Officers Hid the Misuse and Cost of the Jet By Falsely Claiming Its Fuel Costs Represented Automobile Lease Charges*

107.   Local 12 has consistently purchased its vehicle fleet from Ford and services its own vehicles, but its LM-2 filings since at least 2006 show inexplicably variable expenditures classified as "auto leasing and maintenance."  On past LM-2 filings, Defendant Waggoner has reported payments to Wright Express Fleet Services, Inc. and Fleet Services, Inc.  In 2011, these expenditures totaled

$281,153.00.  However, the monthly payments vary by as much as fifty percent. These charges are neither automobile lease payments nor automobile fuel charges, but rather charges for jet fuel, which Waggoner was hiding to conceal the cost to Local 12 of owning and operating the Local 12 jet.

108.   On the LM-2 for 2012, dated March 12, 2013, Waggoner finally reported the true nature of the fuel expenses that he had previously camouflaged as vehicle lease expenses.  In the 2012 LM-2, payments to Wright Express *Financial Services, Inc.* are classified as "Transportation Equipment Fuel."  The company is classified as a "Gas and Oil Company."  In addition, nearly $100,000 in costs are listed as "Transportation Equipment Fuel" provided by Guardian Jet Center.  There is also a $36,588 payment to Guardian Air Services LLC for additional expenses associated with the jet.  Since Guardian Air Services also appeared on the 2011 LM-2 form, receiving a nearly identical payment, it appears that the payment to Guardian Air Services represents storage charges, not fuel charges.

109.   Waggoner's prior false filings violate Title II of the LMRDA, 29 U.S.C. §§ 431 and 432.  The destruction of records by Local 12 subsequent to the filing of this lawsuit infringes upon the rights of every member of Local 12 to freely access all of the information underlying the reports filed by Waggoner.  The allegations contained herein provide the just cause for the right to examine any books, records, and accounts necessary to verify such reports by Waggoner, which should be retained for a minimum of five years.  29 U.S.C. § 436.

110.   On information and belief, since the filing of this action, federal criminal authorities have begun actively investigating Defendants' misuse of the Local 12 jet.

## V.    THE ERISA PROVISIONS VIOLATED IN THIS CASE

### A.    Breaches of Fiduciary Duties Under ERISA § 404(a)(1)

111.   ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides in relevant part

that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries* and--

    **(A)** for the exclusive purpose of:

        **(i)** *providing benefits to participants and their beneficiaries*; and

        **(ii)** *defraying reasonable expenses of administering the plan*;

    **(B)** *with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims*;

    **(C)** by *diversifying the investments of the plan* so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

    **(D)** *in accordance with the documents and instruments governing the plan* insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

112.   Thus, as judicially construed, an ERISA fiduciary owes multiple duties.  First is a duty of loyalty pursuant to which all decisions regarding an ERISA plan must be made with an eye single to the interests of the plan participants and beneficiaries.  Second, ERISA imposes an unwavering duty to act both as a prudent person would act in a similar situation and with single-minded devotion to the plan participants and beneficiaries.  Third, ERISA fiduciaries must act for the exclusive purpose of providing benefits to plan participants and beneficiaries.

    **B.**    **Violations of § 406(b)'s Prohibition on Self-Dealing Transactions**

113.   ERISA § 406(b), 29 U.S.C. § 1106(b) ("Transactions between plan and fiduciary") was also violated by some of Defendants.  That ERISA provision provides, in pertinent part, that plan fiduciaries shall not deal with plan assets in

their own interest or for their own account and shall not receive any consideration for their own personal account from any party dealing with such plan in connection with a transaction involving plan assets.

**C.    Violations of § 406(a)' Prohibition on Transactions With Parties in Interest**

114.    ERISA § 406(a), 29 U.S.C. § 1106(a) ("Transactions between plan and party in interest") provides in pertinent part that (1) a plan fiduciary shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a *direct or indirect* (A) *sale or exchange, or leasing, of any property* between the plan and a party in interest; (B) *lending of money* or other extension of credit between the plan and a party in interest; (C) *furnishing of goods, services, or facilities between the plan and a party in interest*; (D) *transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…*" (Emphasis added.)

115.    Pursuant to 29 U.S.C. § 1002, "parties in interest" include, *inter alia*,

    (a)    "any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such benefit plan" (§1002(14)(A));

    (b)    persons providing services to the plan (§1002(14)(B));

    (c)    employers who have any employees covered by the plan (§1002(14)(C);

    (d)    any employee organization any of whose members are covered by the plan (i.e., including Local 12)) (§1002(14)(D));

    (e)    any owner of an employer any of whose employees are covered by the plan (§1002(14)(E);

    (f)    any relative of (i) any fiduciary or of (ii) any person providing services to the plan or of (iii) any employer of any employees covered by the plan or of (iv) any owner of any employer any of whose

employees are covered by the plan (§1002(14)(F)), with relative defined as "a spouse, ancestor, lineal descendant, or spouse of a lineal descendant." (§1002(15));

 (g) any employee, officer or director of (i) the plan or (ii) a person providing services to the plan or (iii) an employer any of whose employees are covered by the plan or (iv) an employee organization (such as Local 12) any of whose members are covered by such plan or (v) an owner of an employer whose employees are covered by the plan (§1002(14)(H)).

### D. Co-Fiduciary Liability Under § 405

116. ERISA § 405, 29 U.S.C. § 1105 ("Liability for breach of co-fiduciary") provides that in subsection (a): "In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104 (a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

117. Section 405(b)(1) ("Assets held by two or more trustees") provides that, in with exceptions that Plaintiffs do not know to be at issue here, where there are multiple trustees, "(A) *each shall use reasonable care to prevent a co-trustee from committing a breach*; and (B) *they shall jointly manage and control the assets of the plan*, except that nothing in this subparagraph (B) shall preclude any

agreement, authorized by the trust instrument, allocating specific responsibilities, obligations, or duties among trustees, in which event a trustee to whom certain responsibilities, obligations, or duties have not been allocated shall not be liable by reason of this subparagraph (B) either individually or as a trustee for any loss resulting to the plan arising from the acts or omissions on the part of another trustee to whom such responsibilities, obligations, or duties have been allocated." (Emphasis added.)

118.   Section 405(b)(2) states that "Nothing in this subsection shall limit any liability that a fiduciary may have under subsection (a) of this section or any other provision of this part."  Thus, § 405(b)(2) provides additional grounds for co-trustee liability, beyond those set forth in § 405(b)(1), where trustees either (1) do not use reasonable care to prevent a co-trustee (such as Waggoner) from committing a breach or (2) do not jointly manage and control the assets of the plan, in the absence of a specific authorized agreement regarding specialized allocation of duties or responsibilities.

**E.      § 408(c)(2)'s Provision that Fiduciaries Who are Already Receiving Full-Time Pay May Receive No Compensation From a Plan Other Than For Reimbursement of Expenses Properly and Actually Incurred**

119.   ERISA § 408(c)(2), 29 U.S.C. § 1108(c)(2), provides in relevant part that no fiduciary who is already receiving full time pay "from an employer or an association of employers, whose employees are participants in the plan, or from an employee organization whose members are participants in such plan" shall receive any compensation from such plan "except for reimbursement of expenses properly and actually incurred."  (Emphasis added.)

120.   Certain of Defendants violated § 1108(c)(2).  Tolbert, for example, received uniform-in-amount monthly "expense" payments from OETT, a portion of which he then kicked back to Waggoner.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**ERISA VIOLATIONS WITH RESPECT TO THE OETT PURSUANT TO ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), ERISA § 409, 29 U.S.C. § 1109 [By All Plaintiffs, on Behalf of the Plan As a Whole, Against the OETT Defendant Trustees, Bert Tolbert]**

121.   Plaintiffs re-allege and incorporate by reference Section V (ERISA Provisions) and paragraphs 46-57, 58-76, 77-81 set forth above, as though every such allegation were physically contained within the text of this Claim for Relief.

### A.   Statutory Basis For This Claim

122.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant or beneficiary to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C § 1109.  ERISA § 409(a) provides that  "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."  (Emphasis added.)

### B.   Parties to this Claim

123.   This Claim for Relief is brought against the Defendants who are fiduciaries of the OETT, namely, Bert Tolbert and the OETT Defendant Trustees. These Defendants have assumed fiduciary obligations to plan participants, including Plaintiffs, and are "fiduciaries" under ERISA.  ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), provides in relevant part that a person is a fiduciary with

respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

124.   Tolbert and each of the OETT Defendant Trustees was given and accepted discretion to manage the Plan in his role as Trustee and, in fact, each such Defendant exercised at least some authority and control (regardless whether he did so in a manner consistent with his duties under ERISA) over the management and disposition of Plan assets.

125.   Trustees and plan administrators are, by definition, fiduciaries.  20 C.F.R. § 2509.75-8 ("a plan administrator or a trustee of a plan must, by the very nature of his position, have "discretionary authority or discretionary responsibility in the administration" of the plan within the meaning of § 3(21)(A)(iii) of the Act. Persons who hold such positions will therefore be fiduciaries.")

126.   Plaintiffs, as previously alleged, are participants in the OETT.  The goal of Title I of ERISA is to protect the interests of participants and their beneficiaries in employee benefit plans.

127.   This Claim is brought by Plaintiffs, not on their own behalf as individuals, but rather in a representative capacity on behalf of the OETT (sometimes referred to in this claim as the "Plan") as a whole, seeking to recover class relief for the Plan as authorized in § 409(a).

C.   **Bases for ERISA Liability**

1.   **ERISA Liability Based on Acts and Omissions Described Section IV.B.2.a Above (Embezzlement and Personal Use of OETT Assets, Including Equipment, Vehicles, Parts, Labor and Services)**

128.   By engaging in the conduct set forth in Section IV.B.2.a above regarding embezzlement of OETT assets, vehicles, parts, equipment, parts, labor and services, the allegations of which are incorporated herein by reference, OETT fiduciary Defendants Tolbert, Waggoner, Sikorski and Adams violated their fiduciary duties to act solely in the interests of beneficiaries and participants as well as their duties of loyalty and prudence under § 404(a)(1).  They also engaged in prohibited self-dealing in violation of § 406(b) and intentionally caused the OETT to engage in prohibited transactions under § 406(a)(1)(A) (sale or exchange of property between plan and party in interest), (C) (furnishing of goods, services and/or facilities between plan and party in interest) and (D) (transfer to, or use by or for the benefit of party and interest of plan assets), where they themselves, or other officers or employees, were the parties in interest.

129.   By permitting widespread misuse and embezzlement of OETT assets, as discussed in Section IV.B.2, knowing that such conduct was regularly occurring, the officer Trustees violated their fiduciary duties to act solely in the interests of beneficiaries and participants as well as their duties of loyalty and prudence under § 404(a)(1).

130.   As shown by the allegations incorporated by reference regarding embezzlements from OETT, in paragraphs 47-82 *supra*, the OETT Defendant Trustees also violated § 405(b)(1) by failing to use reasonable care to prevent co-trustees from committing breaches and to jointly manage and control OETT assets. No reasonable or effective policies or practices were put in place, let alone enforced, by the OETT Defendant Trustees, while jointly managing and controlling

the assets of the plan, to ensure that Local 12 officers did not use OETT staff and assets for personal gain or for matters unrelated to serving the interests of participants and beneficiaries, despite the prevalence of such practices.  Nor were OETT employees clearly informed that it was prohibited and in violation of ERISA for them to perform work on the vehicles, boats, homes, etc. of officers and officers' family members while on OETT time, or informed that doing so would subject them to termination or other discipline, let alone actually disciplined.

> ## 2.   ERISA Liability Based On Acts and Omissions Discussed In Section IV.B.2.b Above (Asset Diversion from OETT to Southern Nevada Training Trust)

131.   As discussed in Section IV.B.2.b above, the OETT Defendant Trustees and Tolbert directed or at least permitted the diversion of expensive OETT trust assets (construction equipment) from the OETT to the Nevada Training Trust.  This occurred on numerous occasions during the last six years, at times when each of the OETT Defendant Trustees was serving as a Trustee.  Without reciting every incorporated allegation, the OETT Trustees and Tolbert transferred and/or approved the transfer of valuable assets away from OETT for the benefit of non-OETT participants, with significant associated transportation and other costs, particularly given that cranes and wide-load equipment were being transported on interstate freeways, sometimes with the need to obtain DOT permits.  In addition, as alleged above, numerous OETT employees were sent to work in Nevada but were not compensated by the Southern Nevada Training Trust, but rather by OETT.

132.   The OETT Defendant Trustees, by permitting such conduct, violated their fiduciary duties to act solely in the interests of OETT participants as well as their duties of loyalty and prudence under § 404(a)(1).  Shipping off employees and equipment without compensation was neither consistent with their duties of loyalty or prudence nor remotely consistent with the requirements that Defendants discharge their duties as fiduciaries with the "exclusive purpose" of providing

1   benefits to OETT participants and defraying reasonable costs administration

2   expenses.

3        133.   To the extent certain OETT Defendant Trustees were blissfully

4   unaware that co-fiduciaries were causing the transfer of millions of dollars of

5   OETT equipment from California to Nevada for the benefit of non-OETT

6   participants, their failures to exercise reasonable care to prevent breaches by

7   Waggoner, Tolbert and the officer Trustees and to jointly manage and control the

8   disposition of OETT assets (including expensive cranes and other construction

9   equipment) that were instead simply moved out of state, are violations of  ERISA §

10   405(b), rendering them liable on that basis.

11        134.   All of the OETT Defendant Trustees are also liable as co-fiduciaries

12   under ERISA § 405(a).  Tolbert and the officer Trustees, for example,

13   unquestionably have known that OETT equipment was being moved to Nevada,

14   and they both participated in such conduct and undertook to conceal it from

15   Plaintiffs and other members and participants, knowing that their conduct was

16   improper, as evidenced in part by the fact that, as previously alleged, they have

17   spent substantial monies (at OETT expense) since this litigation was filed to bring

18   some (but not all) of the equipment back from Nevada.  They are thus liable under

19   § 405(a)(1).

20           **3.**     **ERISA Liability Based on Acts and Omission Discussed in**

21                  **Section IV.B.1 Above (Losses due to Write-offs and Failures**

22                  **to Collect Debts/Contributions Owed to the Plan)**

23        135.   Plan fiduciaries have a duty to seek to collect all monies owing to the

24   Plan, so that they may be used for the benefit of participants and beneficiaries.

25   Here, as discussed in paragraphs 47-58 *supra*, incorporated by reference, the OETT

26   Defendant Trustees failed to act prudently and loyally, in violation of § 404(a),

27   when they allowed Waggoner to write off, or decline to collect debts owed by

28   Defendant Poss's company and Leo Majich's company.  Such conduct, on

information and belief, is continuing, and has occurred on a regular, continuing basis over the last ten years, although Defendants omitted to disclose its occurrence to Plaintiffs.  To the extent certain of the management OETT Trustee defendants claim to have been ignorant of the fact or extent to which Waggoner was writing off, excusing, or declining to collect employer debts because they simply deferred such decisions to Waggoner or his "write-off committee" of two, they breached their fiduciary duty to jointly manage and control plan assets and to prudently pursue monies that could be used for plan purposes.

136.   Every instance of such conduct also constitutes a prohibited transaction under § 406(a)(1)(B) (lending of money or other extension of credit between the plan and a party in interest).

137.   All of the OETT Defendant Trustees are liable under § 405(a), regardless whether they themselves knowingly participated in the decisions to write off debts.  Even if they did not themselves approve the write-offs, Trustees are, as previously alleged, required to pursue and collect monies owed to the Plan, not to simply forego doing so; here, in allowing Waggoner and the officer defendants to write off debts of favored son employers, including co-trustee Poss's company and in taking no steps thereafter to remedy the breaches, the OETT Defendant Trustees rendered themselves liable for the breaches.  Moreover, by failing to make good on their own duties to act with a single eye toward the interests of Plan participants – rather than Waggoner or favored employers – the Trustees enabled the breaches of Waggoner and the officer defendants.  Certainly, it would have been easy to keep tabs on contributions owed to the Plan, and to require full votes of a majority of Trustees before any debts could be written off (assuming there was some reasonable basis to write off debts in some particular instances), but here, the Trustees did no such thing, instead deferring to Waggoner to make such decisions as a general rule.  They are all liable for this reason.

**SECOND CLAIM FOR RELIEF**

**EQUITABLE RELIEF, WITH RESPECT TO OETT, PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).**

**[By Plaintiffs, On Behalf of the OETT as a Whole, Seeking Equitable Relief, Against the OETT Defendant Trustees, Bert Tolbert, OEFI]**

138.    Plaintiffs re-allege and incorporate by reference Section V (ERISA Provisions) and paragraphs 46-57, 58-76, and 77-81 *supra*, as well as the allegations in the preceding Claim for Relief except those allegations relating to the relief sought thereunder, as though every such allegation were physically contained within the text of this Claim for Relief.

A.    **Statutory Basis for this Claim**

139.    ERISA § 502(a)(3) authorizes suits "(A) to enjoin any act or practice which violates any provision of [Title I] or the terms of the plan, or (B) to obtain appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [Title I] or the terms of the Plan." 29 U.S.C. § 1132(a)(3).

ERISA § 502(a)(3) "admits of no limit … on the possible universe of defendants." *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246 (2000). The "focus" is "on redressing the 'act or practice' which violates" ERISA. *Id*.  A defendant may be sued under § 502(a)(3) even if it is not "expressly subject to a duty under one of ERISA's substantive provisions." *Id*.

B.    **Parties to this Claim**

140.    This Claim for Relief is brought against the OETT Defendant Trustees, OEFI and Bert Tolbert.  All of these defendants, as alleged previously, are fiduciaries with respect to OETT.

141.    Plaintiffs are participants in the OETT.  The goal of Title I of ERISA is to protect the interests of participants and their beneficiaries in employee benefit plans.

142.    This Claim is brought by Plaintiffs seeking to recover equitable relief

1  to protect the OETT (sometimes referred to in this Claim as the "Plan").

2      143.   This Claim for Relief seeks only equitable relief.

3      **C.**    **Acts or Practices Violating Title I of ERISA**

4      144.   In the interests of brevity, Plaintiffs incorporate the allegations

5  regarding ERISA violations and fiduciary breaches in the preceding Claim For

6  Relief as though fully set forth herein, with the exception of the allegations

7  regarding the remedies sought in that Claim.

8      **D.**    **Equitable Relief Sought on Behalf of the Plan for Acts and**

9            **Practices Violating Title I of ERISA**

10      145.   Plaintiffs request a permanent injunction forbidding OETT's Trustees

11  from engaging in prohibited transactions with parties in interest in violation of §

12  406(a), including but not limited to the acts and practices at issue herein.

13      146.   Plaintiffs request a permanent injunction forbidding OETT's Trustees

14  from engaging in self-dealing in violation of § 406(b).

15      147.   Plaintiffs request an injunction specifically forbidding the Officer

16  Trustee Defendants from making personal use of OETT assets or for any reasons

17  other than the purposes of providing benefits to Plan participants and defraying

18  reasonable plan expenses of administration.

19      148.   Plaintiffs request an order forbidding Tolbert from ever serving again

20  as a fiduciary in connection with OETT or any Local 12-affiliated employee benefit

21  plan.

22      149.   Assuming the Court removes them as Trustees pursuant to the First

23  Claim for Relief, Plaintiffs request an order forbidding the OETT Officer Trustee

24  Defendants from ever serving again as a fiduciary in connection with OETT or any

25  Local 12-affiliated employee benefit plan.

26      150.   Plaintiffs request an order forbidding William Waggoner and any other

27  Local 12 Officer Trustee Defendants from appointing or having any role in the

28  appointment of any new union Trustees to OETT or any Local 12-affiliated

employee benefit plan.

151.   Plaintiffs request an order requiring OETT to inform its employees, every six months, that performing personal services for Local 12 officers or others while on OETT time is prohibited by law and may subject any person engaging in such conduct to civil or criminal liability.

152.   Plaintiffs request an order requiring that any and all OETT equipment transferred to Nevada be expeditiously returned to OETT, with costs and expenses of such transfers being borne not by OETT but rather by Defendants Tolbert and the Defendant OETT Trustees.

153.   Plaintiffs request a permanent injunction requiring the Trustees of OETT to take reasonable steps to collect all contributions owed by employers to OETT that may still be recovered (*see, e.g.* 29 U.S.C. § 1145), as well as all contributions that come due in the future.

154.   Plaintiffs request an injunction requiring a vote of all OETT Trustees, to be recorded in the minutes of the meetings of any such Trustees, on any proposal to write off the debts of any employers.

155.   Plaintiffs request an order requiring any defendants who participated in prohibited transactions, as alleged herein, either as party in interest or as plan fiduciary, to disgorge any monies or assets obtained in connection with such transactions.

156.   Plaintiffs request an order requiring any defendants who engaged in self-dealing, as alleged herein, to disgorge any monies or assets obtained thereby.

157.   Plaintiffs request an order prohibiting OETT and OEFI from destroying Plan-related documents unless permitted to do so by law.

**THIRD CLAIM FOR RELIEF**

**ERISA VIOLATIONS WITH RESPECT TO THE PENSION FUND PURSUANT TO ERISA § 409, 29 U.S.C. § 1109, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2)**

**[By All Plaintiffs, on Behalf of the Pension Fund As a Whole, Against the Pension Fund Defendant Trustees and OEFI]**

158.   Plaintiffs re-allege and incorporate by reference Section V (ERISA Provisions) and paragraphs 46-57 set forth *supra*, as though every such allegation were physically contained within the text of this Claim for Relief.

**A.     Statutory Basis For This Claim**

159.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant or beneficiary to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C § 1109.

160.   § 409(a) provides that  "[a]ny person who is a fiduciary with respect to a plan who breaches ***any*** of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter ***shall be personally liable to make good to such plan any losses to the plan*** resulting from each such breach, ***and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan*** by the fiduciary, and shall be subject to such ***other equitable or remedial relief*** as the court may deem appropriate, ***including removal of such fiduciary***." (Emphasis added.)

**B.     Parties to this Claim**

161.   This Claim for Relief is brought against the Pension Fund Defendant Trustees and OEFI.  These Defendants have assumed fiduciary obligations to plan participants, including Plaintiffs, and are "fiduciaries" under ERISA.  ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), provides in relevant part that a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises

any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

162.   Each of the Pension Fund Defendant Trustees herein was given and accepted discretion to manage the Plan in his role as Trustee and, in fact, each such defendant exercised at least some authority and control (regardless whether he did so in a manner consistent with his duties under ERISA) over the management and disposition of Plan assets.

163.   Trustees and plan administrators are, by definition, fiduciaries.  20 C.F.R. § 2509.75-8 ("a plan administrator or a trustee of a plan must, by the very nature of his position, have "discretionary authority or discretionary responsibility in the administration" of the plan within the meaning of § 3(21)(A)(iii) of the Act. Persons who hold such positions will therefore be fiduciaries.")

164.   Plaintiffs have at all relevant times been participants in the Pension Fund.  The goal of Title I of ERISA is to protect the interests of participants and their beneficiaries in employee benefit plans.

165.   This Claim is brought by Plaintiffs, not on their own behalf as individuals but rather in a representative capacity on behalf of the Pension Fund (sometimes referred to in this Claim as the "Plan") as a whole, seeking to recover relief for the Plan as authorized in § 409(a).

C.   **Bases for ERISA Liability**

1.   **ERISA Liability Based on Acts and Omission Discussed in Section IV.B.1 Above (Losses due to Write-offs and Failures to Collect Debts/Contributions Owed to the Plan)**

166.   Plan fiduciaries have a duty to seek to collect all monies owing to the Plan, so that they may be used for the benefit of participants and beneficiaries.

Here, as discussed in paragraphs 47-58 *supra*, incorporated by reference, the Pension Fund Trustees failed to act prudently and loyally, in violation of § 404(a), when they allowed Waggoner to write off, or decline to collect debts owed by two employers, Defendant Poss's company and Leo Majich's company.  Such conduct, on information and belief, is continuing, and has occurred on a regular, continuing basis over the last ten years, although Defendants omitted to disclose its occurrence to Plaintiffs.  To the extent certain of the management Trustee defendants claim to have been ignorant of the fact or extent to which Waggoner was writing off, excusing, or declining to collect these two employer debts because they simply deferred such decisions to Waggoner or his "write-off committee" of two, they breached their fiduciary duty to jointly manage and control plan assets and to prudently pursue monies that could be used for plan purposes.

167.   Every instance of such conduct also constitutes a prohibited transaction under § 406(a)(1)(B) (lending of money or other extension of credit between the plan and a party in interest).

168.   As shown by the allegations incorporated by reference regarding losses due to write-offs and failures to collect, in paragraphs 47-58 *supra*, the Pension Fund Defendant Trustees also violated § 405(b)(1) by failing to use reasonable care to prevent co-trustees from committing breaches and to jointly manage and control Pension Fund assets.  No reasonable or effective policies or practices were put in place, let alone enforced, by the Pension Fund Defendant Trustees, while jointly managing and controlling the assets of the plan, to ensure that favoritism or other preferences in collection decisions did not occur, despite the prevalence of such practices.

169.   The management-side Pension Fund Trustee - C.W. Poss - is liable for his co-fiduciaries' breaches under § 405(a)(2), as well as for his own violations of § 405(b) (requiring him to jointly manage and control plan assets and to exercise reasonable care to prevent co-trustee breaches).  He is also liable under § 405(a)(2)

because, by failing to perform his own duties as Trustee under § 404(a)(1), he enabled the breaches of the officer defendant-Trustees to occur.  Trustees are required to hold the assets of the Plan in trust and to ensure that Plan assets are used only for the benefit of Plan participants and beneficiaries and for the purpose of defraying reasonable Plan administration expenses.

### FOURTH CLAIM FOR RELIEF

**EQUIITABLE RELIEF, WITH RESPECT TO THE PENSION FUND, PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**

**[By All Plaintiffs, On Behalf of the Pension Fund as a Whole, Seeking Equitable Relief, Against the Pension Fund Defendant Trustees, OEFI]**

170.   Plaintiffs re-allege and incorporate by reference Section V (ERISA Provisions) and paragraphs 46-57 above, as well as the allegations in the preceding Claim for Relief except those allegations relating to the relief sought thereunder, as though every such allegation were physically contained within the text of this Claim for Relief.

**A.   Statutory Basis for this Claim**

171.   ERISA § 502(a)(3) authorizes suits "(A) to enjoin any act or practice which violates any provision of [Title I] or the terms of the plan, or (B) to obtain appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [Title I] or the terms of the Plan." 29 U.S.C. § 1132(a)(3).

172.   ERISA § 502(a)(3) "admits of no limit … on the possible universe of defendants." *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246 (2000). The "focus" is "on redressing the 'act or practice' which violates" ERISA. *Id*.  A defendant may be sued under § 502(a)(3) even if it is not "expressly subject to a duty under one of ERISA's substantive provisions." *Id*.

**B.   Parties to this Claim**

173.   This Claim for Relief is brought against the Pension Fund Defendant

Trustees and OEFI.  All of these defendants, as alleged previously, are fiduciaries with respect to the Pension Fund.

174.   Plaintiffs are participants in the Pension Fund.  The goal of Title I of ERISA is to protect the interests of participants and their beneficiaries in employee benefit plans.

175.   This Claim is brought by Plaintiffs, seeking equitable relief to protect the Pension Fund (sometimes referred to in this Claim as the "Plan").

176.   This Claim for Relief seeks only equitable relief.

C.   **Acts or Practices Violating Title I of ERISA**

177.   In the interests of brevity, Plaintiffs incorporate the allegations regarding ERISA violations and fiduciary breaches in the preceding Claim For Relief as though fully set forth herein, with the exception of the allegations regarding the remedies sought in that Claim.

D.   **Equitable Relief Sought on Behalf of the Plan for Acts and Practices Violating Title I of ERISA**

178.   Plaintiffs request a permanent injunction forbidding the Pension Fund Trustees from engaging in prohibited transactions with parties in interest in violation of § 406(a), including but not limited to the acts and practices at issue herein.

179.   Plaintiffs request a permanent injunction forbidding the Pension Fund Trustees from engaging in self-dealing in violation of § 406(b).

180.   Plaintiffs request an injunction specifically forbidding the Officer Trustee Defendants from making personal use of Pension Fund assets (including but not limited to real estate owned by the Plan) or using such assets for any reasons other than the purposes of providing benefits to Plan participants and defraying reasonable plan expenses of administration.

181.   Assuming the Court removes them as Trustees pursuant to the First Claim for Relief, Plaintiffs request an order forbidding the Pension Fund Officer

Trustee Defendants from ever serving again as a fiduciary in connection with the Pension Fund or any Local 12-affiliated employee benefit plan.

182.   Assuming the Court removes them as Trustees pursuant to the First Claim for Relief, Plaintiffs request an order forbidding the Officer Trustee Defendants from ever serving again as a fiduciary in connection with the Pension Fund or any Local 12-affiliated employee benefit plan.

183.   Plaintiffs request an order forbidding William Waggoner and any other Local 12 Officer Trustee Defendants from appointing or having any role in the appointment of any new union Trustees to the Pension Fund or any Local 12-affiliated employee benefit plan.

184.   Plaintiffs request a permanent injunction requiring the Trustees of the Plan to take reasonable steps to collect all contributions owed by employers to the Plan that may still be recovered (*see, e.g.* 29 U.S.C. § 1145), as well as all contributions that come due in the future.

185.   Plaintiffs request an injunction requiring a vote of all Trustees, to be recorded in the minutes of the meetings of any such Trustees, on any proposal to write off the debts of any employers.

186.   Plaintiffs request an order prohibiting Defendants from destroying Plan-related documents unless permitted to do so by law.

## FIFTH CLAIM FOR RELIEF
### ERISA VIOLATIONS WITH RESPECT TO THE PENSION FUND PURSUANT TO ERISA § 409, 29 U.S.C. § 1109, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2)
### [By Plaintiff Salas, on Behalf of the Plan As a Whole, Against the Pension Fund Defendant Trustees]
### (Based on Extra Retiree Pension Payments)

187.   Plaintiffs re-allege and incorporate by reference Section V (ERISA

Provisions) and paragraphs 84-87 set forth *supra*, as though every such allegation were physically contained within the text of this Claim for Relief.

### A.    **Statutory Basis For This Claim**

188.  ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant or beneficiary to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C § 1109.

189.  ERISA § 409(a) provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." (Emphasis added.)

190.  This Claim is brought by Plaintiff Salas, not on his own behalf as an individual, but rather in a representative capacity on behalf of the Pension Fund (sometimes referred to in this claim as the "Plan") as a whole, seeking to recover relief for the Plan as authorized in § 409(a).

### B.    **Parties to this Claim**

191.  This Claim for Relief is brought against the Pension Fund Defendant Trustees.  These Defendants have assumed fiduciary obligations to plan participants, including Plaintiffs, and are "fiduciaries" under ERISA.  ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), provides in relevant part that a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or

1    responsibility to do so, or (iii) he has any discretionary authority or discretionary

2    responsibility in the administration of such plan.

3        192.   Each of the Trustee defendants herein was given and accepted

4    discretion to manage the Plan in his role as Trustee and, in fact, each such

5    defendant exercised at least some authority and control (regardless whether he did

6    so in a manner consistent with his duties under ERISA) over the management and

7    disposition of Plan assets.

8        193.   Trustees and plan administrators are, by definition, fiduciaries.  20

9    C.F.R. § 2509.75-8 ("a plan administrator or a trustee of a plan must, by the very

10   nature of his position, have "discretionary authority or discretionary responsibility

11   in the administration" of the plan within the meaning of § 3(21)(A)(iii) of the Act.

12   Persons who hold such positions will therefore be fiduciaries.")

13       194.   Plaintiff Salas is and at all relevant times has been a participant in the

14   Pension Fund.  The goal of Title I of ERISA is to protect the interests of

15   participants and their beneficiaries in employee benefit plans.

16       195.   The Pension Fund Defendant Trustees for many years approved, or at

17   least knowingly acquiesced in, Waggoner's longstanding practice of issuing a

18   thirteenth (i.e., additional) annual pension payment to retirees at the end of each

19   year, which was done for the purpose of securing votes for Waggoner and his slate

20   from retirees, a group that is typically has the highest participation rate in union

21   elections.

22       196.   This *additional* payment to retirees, which occurred through the end of

23   2011, was not planned for in retirees' original contributions.  It places additional

24   stress on the Pension Fund and certainly not is consistent with any purpose to

25   ensure the continuing soundness of the Plan.  To their (very belated) credit, the

26   Trustees finally discontinued the practice in 2012 because of the restoration status

27   of the Plan, which, as previously alleged, is in critical condition.  Giving extra

28   pension payments to retirees while actually demanding restoration payments from

members was too much even for the Pension Fund Defendant Trustees.

197.   However, by allowing this practice in prior years, including through the end of 2011, they violated their duty of loyalty owed to all Plan participants and beneficiaries, as well as their duty of prudence, since no prudent man would act in such a fashion under similar circumstances.  Assisting Waggoner in ensuring his re-election as Business Manager and his ability to continue his illegal practices does not qualify as prudence under ERISA.  Further, the duty of loyalty is owed to the Plan and its participants and beneficiaries, not to William Waggoner.  As such, the Plan Trustees breached their fiduciary duties under § 404(a) by approving and enabling this practice and knowingly allowing it to continue through 2011.

198.   To the extent any of the Defendant Trustees claim they were blissfully unaware of the fact that additional pension payments were being made to thousands of retirees annually, such conduct would itself be a breach of fiduciary duty under § 404(a) and a breach of their duties under § 405(b) to take reasonable care to ensure that co-trustees do not breach their duties and to jointly manage and control the Plan's assets.  Moreover, the Trustees certainly knew of the practice when they terminated it at the end of 2011, but they took no steps to remedy the breaches from previous years.  Doing so would have made their own misconduct more clear.  In addition, demanding repayments from the retiree voting bloc would have been unpopular and a problematic political strategy for the union defendants, to say the least.  Moreover, since all of the Trustees were responsible for the practice, they would have had to demand that they themselves remedy the breaches, which was not going to happen.  No Local 12-affiliated Trust fiduciary, to Plaintiffs' knowledge, has ever dared demand that Waggoner himself make good for losses caused to the Trusts based on his own misconduct, let alone sued him to force him to do so.

199.   By paying millions of dollars of extra Pension Fund benefits to retirees not contemplated by their contributions and by incurring the extra associated

administration costs of doing so, in order to serve Waggoner's political purposes, the Plan Trustees breached their fiduciaries duties under § 404(a)(1)(A) (duty of loyalty) to act solely in the interests of Plan participants and beneficiaries and for the purpose of defraying reasonable administration expenses  and § 404(a)(1)(B) (duty of prudence), since paying out additional pension fund benefits, to the detriment of the Plan as a whole, for such political reasons is not consistent with ensuring the solvency and continuation of the Plan.

200.   All of the Pension Fund Trustees also are liable under § 405(a)(1) for knowingly participating in this improper thirteenth pension payment practice, for enabling it by failing to satisfy their own duties of loyalty and prudence under § 404(a), and by failing to take steps to remedy it, for years, as it occurred with their knowledge on an annual basis, through the end of 2011.

201.   In sum, the acts and omissions of Defendants set forth above and in the allegations incorporated by reference in this Claim were in no way consistent with their duties under § 404 to make all decisions with an eye single to the interests of the plan participants and beneficiaries, to act prudently and with single-minded devotion to plan participants and beneficiaries, or to act for the exclusive purposes of providing benefits to plan participants and beneficiaries and defraying administrative expenses of the Plan.

202.   As a proximate result of Defendants' conduct as alleged above, the Plan has been harmed and sustained losses.  Defendants should be required to make good to the Plan for any losses it has suffered as a result of their breaches.   In addition, the Plan Trustees should all be removed as Trustees by the Court, as they have plainly demonstrated their unfitness to serve as fiduciaries by the acts and omissions set forth above. *See* ERISA § 409.  Equitable relief should also be granted, forbidding the challenged practice in the future.

## SIXTH CLAIM FOR RELIEF

### ERISA VIOLATIONS WITH RESPECT TO THE HEALTH & WELFARE FUND PURSUANT TO ERISA § 409, 29 U.S.C. § 1109, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2)

### [By All Plaintiffs, on Behalf of the Plan as a Whole, Against the Health & Welfare Fund Defendant Trustees, OEFI]

203.   Plaintiffs re-allege and incorporate by reference Section V (ERISA Provisions) and each and every allegation set forth above, as though every such allegation were physically contained within the text of this Claim for Relief, including, in particular, paragraphs 46-57.

**A.**   **Statutory Basis For This Claim**

204.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant or beneficiary to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C § 1109.

205.   § 409(a) provides that "[a]ny person who is a fiduciary with respect to a plan who breaches **any** of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." (Emphasis added.)

**B.**   **Parties to this Claim**

206.   This Claim for Relief is brought against the Health & Welfare Fund Defendant Trustees and OEFI.  These Defendants have assumed fiduciary obligations to plan participants, including Plaintiffs, and are "fiduciaries" under ERISA.  ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), provides in relevant part that a person is a fiduciary with respect to a plan to the extent (i) he exercises any

discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.  Trustees and plan administrators are, by definition, fiduciaries.  20 C.F.R. § 2509.75-8.

207.   This Claim is brought by Plaintiffs, not on their own behalf as individuals, but rather in a representative capacity on behalf of the Health & Welfare Fund (sometimes referred to in this claim as the "Plan") as a whole, seeking to recover relief for the Plan as authorized in § 409(a).

208.   The goal of Title I of ERISA is to protect the interests of participants and their beneficiaries in employee benefit plans.

C.     **Bases for ERISA Liability**

1.     **ERISA Liability Based on Acts and Omission Discussed in Section IV.B.1 Above (Losses due to Write-offs and Failures to Collect Debts/Contributions Owed to the Plan)**

209.   Plan fiduciaries have a duty to seek to collect all monies owing to the Plan, so that they may be used for the benefit of participants and beneficiaries. Here, as discussed in paragraphs 47-58 *supra*, incorporated by reference, the Health & Welfare Fund Defendant Trustees failed to act prudently and loyally, in violation of § 404(a), when they allowed Waggoner to write off, or decline to collect debts owed by Defendant Poss's company and Leo Majich's company.  Such conduct, on information and belief, is continuing, and has occurred on a regular, continuing basis over the last ten years, although Defendants omitted to disclose its occurrence to Plaintiffs.  To the extent certain of the management Health & Welfare Fund Trustee defendants claim to have been ignorant of the fact or extent to which Waggoner was writing off, excusing, or declining to collect these two employer

debts because they simply deferred such decisions to Waggoner or his "write-off committee" of two, they breached their fiduciary duty to jointly manage and control plan assets and to prudently pursue monies that could be used for plan purposes.

210.   Every instance of such conduct also constitutes a prohibited transaction under § 406(a)(1)(B) (lending of money or other extension of credit between the plan and a party in interest).

211.   All of the Health & Welfare Fund Defendant Trustees are liable under § 405(a), regardless whether they themselves knowingly participated in the decisions to write off debts.  Even if they did not themselves approve the write-offs, Trustees are, as previously alleged, required to pursue and collect monies owed to the Plan, not to simply forego doing so; here, in allowing Waggoner and the officer defendants to write off debts of favored son employers, including co-trustee Poss's company and in taking no steps thereafter to remedy the breaches, the Health & Welfare Fund Defendant Trustees rendered themselves liable for the breaches.  Moreover, by failing to make good on their own duties to act with a single eye toward the interests of Plan participants – rather than Waggoner or favored employers – the Trustees enabled the breaches of Waggoner and the officer defendants.  Certainly, it would have been easy to keep tabs on contributions owed to the Plan, and to require full votes of a majority of Trustees before any debts could be written off (assuming there was some reasonable basis to write off debts in some particular instances), but here, the Trustees did no such thing, instead deferring to Waggoner to make such decisions as a general rule.  They are all liable for this reason.

## SEVENTH CLAIM FOR RELIEF

### EQUITABLE RELIEF, WITH RESPECT TO THE HEALTH & WELFARE FUND, PURSUANT TO ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)

### [By All Plaintiffs, On Behalf of the Plan as a Whole, Seeking Equitable Relief, Against the Health & Welfare Defendant Trustees, OEFI]

212.   Plaintiffs re-allege and incorporate by reference Section V (ERISA Provisions) and paragraphs 46-57 above, as well as the allegations in the preceding Claim for Relief except those allegations relating to the relief sought thereunder, as though every such allegation were physically contained within the text of this Claim for Relief.

**A.   Statutory Basis for this Claim**

213.   ERISA § 502(a)(3) authorizes suits "(A) to enjoin any act or practice which violates any provision of [Title I] or the terms of the plan, or (B) to obtain appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [Title I] or the terms of the Plan." 29 U.S.C. § 1132(a)(3).

214.   ERISA § 502(a)(3) "admits of no limit … on the possible universe of defendants." *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246 (2000). The "focus" is "on redressing the 'act or practice' which violates" ERISA. *Id*.   A defendant may be sued under § 502(a)(3) even if it is not "expressly subject to a duty under one of ERISA's substantive provisions." *Id*.

**B.   Parties to this Claim**

215.   This Claim for Relief is brought against the Health & Welfare Fund Defendant Trustees and OEFI.  All of these defendants, as alleged previously, are fiduciaries with respect to the Health & Welfare Fund.

216.   Plaintiffs Salas and Chamberlain are participants in the Health & Welfare Fund.  The goal of Title I of ERISA is to protect the interests of participants and their beneficiaries in employee benefit plans.

217.   This Claim is brought by Plaintiffs, seeking to recover equitable relief

to protect the Health & Welfare Fund (sometimes referred to in this Claim as the "Plan").

218.   This Claim for Relief seeks only equitable relief.

C.   **Acts or Practices Violating Title I of ERISA**

219.   In the interests of brevity, Plaintiffs incorporate the allegations regarding ERISA violations and fiduciary breaches in the preceding Claim or Relief as though fully set forth herein, with the exception of the allegations regarding the remedies sought in that Claim.

D.   **Equitable Relief Sought on Behalf of the Plan for Acts and Practices Violating Title I of ERISA**

220.   Assuming the Court removes them as Trustees pursuant to the First Claim for Relief, Plaintiffs request an order forbidding the Health & Welfare Fund Officer Trustee Defendants from ever serving again as a fiduciary in connection with the Health & Welfare Fund or any Local 12-affiliated employee benefit plan.

221.   Assuming the Court removes them as Trustees pursuant to the First Claim for Relief, Plaintiffs request an order forbidding the management-side Trustee Defendants from ever serving again as a fiduciary in connection with the Health & Welfare Fund or any Local 12-affiliated employee benefit plan.

222.   Plaintiffs request an order forbidding William Waggoner and any other Local 12 Officer Trustee Defendants from appointing or having any role in the appointment of any new union Trustees to the Health & Welfare Fund or any Local 12-affiliated employee benefit plan.

223.   Plaintiffs request a permanent injunction requiring the Trustees of the Plan to take reasonable steps to collect all contributions owed by employers to the Plan that may still be recovered (*see, e.g.* 29 U.S.C. § 1145), as well as all contributions that come due in the future.

224.   Plaintiffs request an injunction requiring a vote of all Trustees, to be recorded in the minutes of the meetings of any such Trustees, on any proposal to

1  write off the debts of any employers.

2      225.  Plaintiffs request an order prohibiting Defendants from destroying

3  Plan-related documents unless permitted to do so by law.

4

5  ## EIGHTH CLAIM FOR RELIEF

6  **COMMON LAW BREACH OF FIDUCIARY DUTY**

7  **[By Plaintiffs, Individually and on Behalf of the Local 12 Member Class**

8  **against the Local 12 Officer Defendants]**

9  **(Based on Acts of Embezzlement and other Misconduct)**

10     226.  Plaintiffs re-allege, and incorporate by reference, each and every

11  paragraph herein.

12     227.  This claim is stated against the Local 12 Officer Defendants.

13     228.  The relations between Defendants herein, on the one hand, and

14  Plaintiffs, on the other hand, impose a duty on Defendants to act with the utmost

15  good faith for the benefit of Plaintiffs, who were entitled to believe in the integrity

16  of Defendants, but instead were left the victims of Defendants who chose not to

17  serve their best interests.

18     229.  Defendants have violated their common law fiduciary duties and are

19  liable under California law for those breaches of fiduciary duty that are unrelated to

20  ERISA-governed employee benefit plans.

21     230.  Defendants breached their fiduciary duties by the acts set forth above

22  (incorporated herein, including those set forth at paragraphs 92-116) that are not

23  related to employee benefit plans, and Plaintiffs suffered damages as a proximate

24  result thereof.  Examples of Defendants' breaches of fiduciary duty include:

25  • Defendants' improper and unreimbursed personal use of the Local's jet,

26      and the Local 12 Officer Defendants' allowing of family members and

27      others to use the jet for non-union business without compensation to the

28      Local, as alleged in paragraphs 92-108 *supra*;

- Defendants' absurdly wasteful use of the Local's jet, at exorbitant costs, for short trips, between, e.g., Ontario and Van Nuys and Ontario and San Diego, in lieu of much more economical automobile transportation, as alleged in paragraphs 109-112 *supra*.

231.   None of the acts alleged above was consistent with Defendants' high fiduciary duties to members under California law.

232.   By embezzling or otherwise unlawfully securing or diverting union assets, labor and/or services for their personal use, Plaintiffs were damaged. Plaintiffs are regularly required to pay supplemental dues due to shortfalls in the Local's general fund related at least in part to Defendants' embezzlements from the general fund; but for the aforementioned embezzlements, at least some portion of those supplemental dues would not be necessary.  In addition, because the jet and other Local 12 assets were paid for with union members' dues, the members were damaged in that their dues, intended to be used for their benefits, were in effect diverted from their proper use by Defendants for the personal use and enjoyment of Defendants.

233.   Plaintiffs should be made whole, and all profits or monies obtained by Defendants in breach of their common law fiduciary duties should be disgorged. *People ex rel. Harris v. Rizzo*, 214 Cal.App.4th 921, 951, n. 30 (2013).

234.   Defendants' conduct as alleged hereinabove was in at least some respects criminal, and was oppressive, malicious, willful and intended to harm and did harm Plaintiffs, warranting imposition of exemplary damages.

235.   To the extent the Local 12 Officer Defendants other than Waggoner did not directly participate in Waggoner's breaches of fiduciary duty as identified above and in the allegations incorporated herein, they knew of those breaches of fiduciary duty and substantially assisted Waggoner in accomplishing them, by supporting Waggoner, voting in support of Waggoner's proposals when necessary, enforcing Waggoner's wrongful policies, submitting false DOL filings, and, despite

their own fiduciary duties to members, assisting Waggoner in concealing his misconduct from members who, but for the concealment, could have taken steps to attempt to stop Waggoner's misconduct.

## NINTH CLAIM FOR RELIEF

### VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, *ET SEQ.*

### [By Plaintiffs Against the Local 12 Officer Defendants]

### (Based on Officer Embezzlement and Misuse of Union Assets)

236.   Plaintiffs re-allege, and incorporate by reference, the allegations in Section III (Parties), *supra*, Section IV.C, paragraphs 88-112 *supra*, as well as the allegations in the Eighth Claim for Relief, as though fully set forth herein.

237.   This claim addresses wrongful acts and practices unrelated to the wrongs described above regarding employee trust funds; i.e., this claim addresses only those acts and practices that affected Plaintiffs without regard to their status of beneficiaries and participants in Taft-Hartley regulated employee benefit funds, but rather as individuals and members of Local 12.  *See* Section IV.C, above.

238.   The wrongful conduct of the Local 12 Officer Defendants alleged in detail above and incorporated herein by reference violates the UCL in that it constitutes unfair and unlawful business acts and practices.  This claim is brought by Plaintiffs individually, and in their capacities as private attorneys general, against the Local 12 Officer Defendants for their unlawful and/or unfair business acts and/or practices pursuant to the UCL.  Plaintiffs seek to enforce important rights affecting the public interest within the meaning of Code of Civil Procedure § 1021.5.

239.   As a result of the wrongful practices alleged above and incorporated herein, Plaintiffs have suffered injury and lost money and/or property, including supplemental dues that they were required to pay as a result of shortfalls in Local

12's General Fund due in no small part to the embezzlements and misuse of union assets described in the allegations set forth above, which are incorporated herein by reference.  Plaintiffs do not seek to recover those supplemental dues as restitution but simply note that they represent money Plaintiffs have had to part with as a result of Defendants' unlawful and unfair business practices.

240.   Defendants engaged in false, unfair, and misleading business practices, and received ill-gotten gains therefrom, by engaging in the acts and omissions described above and incorporated herein.  Defendants have obtained valuable money and services from Plaintiffs and others similarly situated to the detriment of Plaintiffs.  In addition, the unlawful and/or unfair practices described above should be enjoined.

241.   Defendants, and each of them, are "persons" as defined in the UCL.

## **"Unlawful" Conduct Under the UCL**

242.   Defendants' acts and practices alleged above constitute unlawful business acts and/or practices within the meaning of the UCL.

243.   A violation of the UCL's "unlawful" prong may be predicated on the violation of virtually any state or federal law, rule or regulation.  Defendants' unlawful business acts and/or practices, as alleged in detail above in Section IV.C and incorporated herein by reference, have violated numerous laws and/or regulations, and are therefore *per se* violations of the UCL.  Defendants' predicate unlawful business acts and/or practices include, but are not limited to, the following:

        (a)    Embezzlement under the California Penal Code (*see* Cal. Penal Code §§504, 506 and 508; *see also* § 490a, stating that embezzlement now constitutes the crime of theft);

        (b)    Violations of the fiduciary duty provisions set forth in the LMRDA, section 501;

1

## "Unfair" Conduct Under the UCL

2    244.   The embezzlement and misuse of union assets by the Local 12 Officer

3    Defendants, as hereinbefore alleged, also is "unfair" under the UCL.

4    245.   Such conduct violates established law and/or public policies which

5    seek to ensure the protection of union members and consumers from theft and

6    embezzlement schemes of the sort employed here.  The conduct engaged in by

7    Defendants was and is directly contrary to established legislative goals and public

8    policies of the State of California and the United States (including those set forth in

9    the statutes identified above as a basis for unlawful practice liability, such as the

10   LMRDA and California Penal Code sections identified there), and was and is unfair

11   under the UCL.  In addition, the harm to Plaintiffs and members of the general

12   public, as described in detail above (including the misuse and theft of union assets

13   purchased at least in part with member dues and the requirement that members pay

14   supplemental dues to shore up the General Fund harmed by Defendants' extensive

15   misconduct), outweighs the utility – which is non-existent - of Defendants'

16   wrongful acts and/or practices as alleged herein.  Further, the conduct at issue,

17   alleged in detail above in the specific allegations incorporated by reference herein,

18   is and was immoral, unethical, oppressive, unscrupulous or substantially injurious

19   to Plaintiffs and thus unfair under the UCL.  At all times relevant, the conduct at

20   issue alleged herein caused:  1) substantial injury to Plaintiffs and members (i.e.,

21   the diminution in the financial condition of their union and the theft, embezzlement

22   and diversion of union assets paid for with their dues), 2) had no countervailing

23   benefit to members, consumers or competition that could possibly outweigh this

24   substantial injury; and 3) caused injury that could not have reasonably been

25   avoided by Plaintiffs and others similarly situated.

26   ## Relief Requested Under this Claim

27   246.   Plaintiffs are further entitled to and do seek a declaration that the

28   above-described business practices are unfair and/or unlawful, and injunctive relief

restraining the Defendants, and each of them, from engaging in any of the above-described unfair and/or unlawful business practices in the future.

247.   Plaintiffs have no plain, speedy, and/or adequate remedy at law to redress the injuries which they have suffered as a consequence of the Defendants' unfair and/or unlawful business practices.  As a result of the unfair and/or unlawful business practices described above, Plaintiffs have suffered and will continue to suffer irreparable harm unless the Defendants, and each of them, are restrained from continuing to engage in the previously alleged violations of the UCL.

248.   Wherefore, Plaintiffs are entitled to equitable relief, including injunctive relief including but not limited to a permanent injunction requiring Defendants to cease their illegal and unfair practices; declaratory relief of an equitable nature, an award of attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 and other applicable laws; and an award of costs.

## **Aiding and Abetting Liability**

249.   To the extent that certain of the Local 12 Officer Defendants were not the primary violators of the UCL with respect to particular acts and practices alleged as a basis for liability herein, they aided and abetted their co-defendants who were the primary violators.  All Local 12 Officer Defendants actually knew that other Defendants, such as Waggoner, were engaging in breaches of duty and illegal or otherwise wrongful acts, at least in some respects.  Each Defendant also enabled and substantially assisted in the accomplishment of one or more of the breaches of duty and wrongs committed by the primary violators constituting the actionable wrong in each claim, and thereby substantially assisted in the wrongs, crimes, torts, statutory violations and unfair practices alleged herein.

250.   The Defendant members of the local union's executive board, like Mickey Adams and Ron Sikorski, on numerous occasions and dates that are known to them but that not presently known to Plaintiffs, voted in favor of William Waggoner's acts and practices of wrongful conduct, where votes were required to

permit that conduct, and thus substantially assisted in its accomplishment.  Despite their fiduciary duties to the union membership and to the local union intended to benefit the members, such executive board Defendants knowingly and substantially assisted Waggoner in his wrongs, rather than voting against him or taking other steps to stop him or even abstaining from voting in favor of his wrongful conduct. Such conduct also constituted ratification of Waggoner's acts.

251.   William Waggoner, for his part, also knew of and substantially assisted in the breaches of duty unrelated to trust fund assets by others.

252.   In addition, William Waggoner and other Local 12 Officer Defendants, such as Local 12 President Adams, flew together for personal reasons on the local's jet, thereby knowingly and substantially assisting one another in embezzling from Local 12 (and from members like Plaintiffs, who the Local's assets are intended to benefit).  Each of the officer Defendants who took such flights knew that flying on the union jet for personal reasons, without compensation to the union, was improper, illegal, and in breach of their fiduciary duties, yet they went ahead anyway.  After all, flying on a private jet where poker games can be played with one's cronies is far more economical and enjoyable than paying for one's travel on a public airline.  Waggoner and his cronies treated the union jet and union resources like their personal slush fund.

253.   Patty Waggoner would, as alleged, sometimes take the union jet to go shopping in Las Vegas for personal reasons; she or William Waggoner would ask a union officer, such as defendant Mickey Adams, to accompany her under the pretext that the officer was going to Las Vegas to handle Southern Nevada Local 12 business there.  Officers who accepted such invitations to "ride along" with Ms. Waggoner knowingly aided and abetted her embezzlement of union resources and unlawful, unfair business practices.  Any of these officers, who had fiduciary duties to the Local and its members and who, as officers, undoubtedly were vested with the authority to prevent the illegal use of the union jet, could have – and should

have – stopped Patty Waggoner and the wives and family members of other officers from taking the jet on their personal jaunts, but instead they assisted them in doing so by riding along in an artificial effort to make the wrongful conduct appear less improper.

254.   Because of their aiding and abetting of each other's wrongs and illegal conduct, which contributed to the losses suffered by Plaintiffs, Defendants are jointly liable for all of the primary violations alleged herein that they knowingly and substantially assisted in accomplishing.

### **PRAYER FOR RELIEF**

Plaintiffs, individually, and on behalf of all others similarly situated, pray for relief and judgment against Defendants, jointly and severally, as follows:

### **As to the First, Third, Fifth and Sixth (ERISA Violations) Claims for Relief**

1.   For a declaration that the Defendants sued in the Claim have breached their ERISA fiduciary duties to the Plan and its participants and otherwise violated ERISA as alleged;

2.   For a judgment finding the Defendants sued in the Claim liable for breaching their fiduciary duties and otherwise violating ERISA as alleged and requiring said Defendants to "make good" to the Plan for any losses to the Plan resulting from their violations and to restore to the Plan any profits earned by Defendants made through their use of Plan assets;

3.   For removal of the fiduciary Defendants found to have breached their duties under ERISA, pursuant to ERISA § 409.

4.   For permanent injunctive relief;

5.   For attorney's fees and costs pursuant to ERISA;

6.   For such other and further "equitable or remedial relief" as this Court

may deem proper.

### As to the Second, Fourth and Seventh (ERISA Equitable Relief) Claims for Relief

7.     For a judgment finding the Defendants sued in the Claim liable for violating ERISA as alleged;

8.     For permanent injunctive relief as requested in the Claim for Relief;

9.     For attorney's fees and costs pursuant to ERISA;

10.    For such other and further equitable relief as this Court may deem proper.

### As to the Eighth (Common Law Breach of Fiduciary Duty) Claim for Relief

11.    For compensatory and general damages, as shown according to proof;

12.    For disgorgement of profits and monies wrongfully obtained;

13.    For temporary and permanent injunctive relief;

14.    For exemplary damages

15.    For declaratory relief;

16.    For imposition of a constructive trust;

17.    For prejudgment interest according to law;

18.    For costs of suit; and,

19.    For such other and further relief as this Court may deem proper.

### As to the Ninth (UCL) Claims for Relief

20.    That the Court declare, adjudge and decree that the Defendants sued in the Claim violated California Business and Professions Code §§ 17200, *et seq.* by the conduct alleged in the Claim;

21.    For restitution and prejudgment interest from the day such amounts

1  were due and payable;

2      22.    For the appointment of a receiver to receive, manage and distribute any

3  and all funds disgorged from Defendants and determined to have been wrongfully

4  acquired by Defendants as a result of violations of California Business &

5  Professions Code §§ 17200 *et seq.;*

6      23.    For reasonable attorneys' fees and costs of suit incurred herein

7  pursuant to California Code of Civil Procedure § 1021.5;

8      24.    For injunctive relief to ensure compliance with the UCL, pursuant to

9  California Business & Professions Code § 17200, *et seq.*; and,

10     25.    For such other and further relief as the Court may deem equitable and

11  appropriate.

12

13                              Respectfully submitted

14  Dated: April 8, 2016         BERNS WEISS LLP

15

16                    By:_____

17                       Jeffrey K. Berns
                         Lee A. Weiss
18                       H. Scott Leviant
                         Albert G. Lum

19                       LAW OFFICES OF J. MARK MOORE
20                       J. Mark Moore

21                       Attorneys for Plaintiffs

22

23

24

25

26

27

28

**FIFTH AMENDED COMPLAINT**

1

## DEMAND FOR JURY TRIAL

2       Plaintiffs demand a trial by jury on all claims so triable.

3

4                              Respectfully submitted

5       Dated: April 8, 2016        BERNS WEISS LLP

6

7                           By:_____

8                              Jeffrey K. Berns
                               Lee A. Weiss
9                              H. Scott Leviant
                               Albert G. Lum

10                             LAW OFFICES OF J. MARK MOORE
                               J. Mark Moore
11

12                             Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIFTH AMENDED COMPLAINT**

Exhibit "1"

# OPERATING ENGINEERS TRUST FUNDS

## I.U.O.E. LOCAL 12

## HEALTH AND WELFARE FUND

# *Benefit Information*

## SOUTHERN CALIFORNIA
## SOUTHERN NEVADA

**January 2009**

# OPERATING ENGINEERS HEALTH & WELFARE FUND
# ACTIVE & RETIRED PLANS

**IMPORTANT** - This Benefit Booklet is provided to explain the benefits available through the Health & Welfare Fund. The Plan Rules and Regulations of the Fund are available upon request from the Fund Office.

If there is a conflict between what is written in this Benefit Booklet and the Plan Rules and Regulations, the Rules and Regulations will control.

The Rules and Regulations providing Health Care Benefits for Active or Retired Employees of the Operating Engineers Health and Welfare Fund are subject to change at any time by the Board of Trustees. No benefit presently provided either to Active Employees or Retired Employees is guaranteed to remain in the Plan of benefits in the future. No Active Employee or Retired Employee has a right to continue receiving the same eligibility and benefits as exist now or have existed in the past. The benefits do not become "vested" at any particular time of employment or upon retirement. The Fund attempts to maintain financial reserves which are adequate to pay claims already incurred and claims likely to be incurred under eligibility earned by Active Employees but does not maintain reserves for future eligibility of Active Employees or Retired Employees. The Fund pays current claims for benefits from current contributions by employers. After a claim for benefits has been incurred, the Fund will pay that claim so long as sufficient funds are available. However, all future claims for benefits not incurred are subject to changes in the Rules and Regulations governing benefits and the Board of Trustees may make such rule changes effective on whatever date serves the interest of the Fund and its participants.

The Fund Office will respond to questions asked by an Employee or Beneficiary either orally or in writing to assist understanding of any plan of benefits. However, no oral or written communication to an Employee or Beneficiary from any person (including a Trustee or a Fund Office representative) may change any Plan rule or confer any benefit. The written Rules and Regulations as interpreted by the full Board of Trustees will determine eligibility and benefits in all cases. Any mistaken, incorrect or inaccurate statement of Plan benefits or accrual of rights to an Employee or Beneficiary will not be binding upon the Plan and will be corrected when the error is found. The correction will be made regardless of whether the erroneous statement has been signed on behalf of the Board of Trustees which administers the Plan of benefits.

Any oral or written statement made by an individual Employer Trustee or Union Trustee referring to, describing or interpreting any plan of benefits is to be treated solely as a statement of an Employer or of the Union, respectively, and is not authorized to be a statement made by a Trustee on behalf of the Plan or Fund. Only a written statement signed by or on behalf of the full Board of Trustees is to be interpreted as a communication made by the Trustees in their capacities as fiduciaries of the Plan or Fund.

---

## Information about the Health and Welfare Fund and its Plans can also be found at www.oefunds.org.

---

i

# Table of Contents

Page

## A

Accidental Death and Dismemberment
  Benefits ............................112
Acupuncture ...........................51
Alternative Therapy .....................51
Ambulance Service .....................52
Aquatic Therapy .......................51
Audit of Hospital Charges ..............70

## B

Blood – Donation and Storage ...........52

## C

Calendar Year Medical Maximum .........41
Care in a Foreign Country ..............43
Case Management Program .............43
Change of Address .......................1
Chemotherapy .........................52
Chiropractor ..........................52
Claim Review Procedures ...............15
COBRA Continuation of Coverage Plan ....31
Coordination of Benefits ...............105
CVS Caremark .........................83

## D

Deductible – Medical ...................40
DeltaCare PMI Dental Plan .............100
Dental Benefits .......................99
Dental Consultant .....................101
Dependent Eligibility – Active ..........22
Dependent Eligibility – Retiree .........25
Diabetic Supplies .....................87
Disability Extensions ..................23
Durable Medical Equipment .............53

## E

Eligibility – Active ....................19
Eligibility Card .......................20
Eligibility – Retiree ...................24
Exclusions – Dental Benefits ..........102
Exclusions – Hospital Expenses .........71
Exclusions – Medical and Hospital Benefits ....74
Exclusions – Prescription Drug Benefits ....89

## F

Facts About Your Health and Welfare Plan ......4
Family Medical Leave Act (FMLA) ..........35
Fee-For-Service Dental Plan .............99
Fee-For-Service Medical Benefit Summary ....46
Fee-For-Service Prescription Drug Plan ....86

Page

Filing a Claim for Benefits ..............12
Flu Shots ..............................54
Frequently Asked Questions – Eligibility ....37
Frequently Asked Questions – General ....115
Frequently Asked Questions – PPO ........72

## G

Generic Drug Policy ....................86
Glossary of Terms .....................119

## H

Health Insurance Portability Act (HIPAA) .....36
Health Net ............................77
Health Plan of Nevada .................78
Hearing Aid Benefit ....................54
Home Health Care/Registered Nurse .....55
Hospital Benefits ......................68
How to Identify Yourself ................1

## I

Immunizations .........................55
Infertility/Fertility Treatment ...........56
Information You Will Receive from the
  Fund Office ...........................3
Inpatient Hospital Benefits .............68

## K

Kaiser Permanente Health Plan ...........77
Kidney Dialysis ........................56

## L

Laboratory/Radiology ..................56
Laser Eye Surgery .....................97
Life Events Checklist ....................4
Life Insurance .......................111
Lifetime Medical Maximum ..............41
Limitations – Dental Benefits ..........101

## M

Maternity Benefits .....................57
Medical Child Support Orders ...........22
Medical Necessity .....................41
Medicare Prescription Drug Program – Part D ...90
Military Leave .........................21

## N

Newborns' and Mothers' Health Protection Act
  (NMHPA) ............................11

# Table of Contents (continued)

Page

## O

Operating Engineers Dental Panel . . . . . . . . . . . .99
Open Enrollment for Retiree Health & Welfare  . .26
Open Enrollment for Surviving Spouses and
   Dependents . . . . . . . . . . . . . . . . . . . . . . . . . . .37
Optional Retiree Coverage . . . . . . . . . . . . . . . . .29
Organ Transplants . . . . . . . . . . . . . . . . . . . . . . .58
Orthodontia . . . . . . . . . . . . . . . . . . . . . . . . . . . .100
Orthotics - Foot . . . . . . . . . . . . . . . . . . . . . . . . . .59
Outpatient Emergency Care . . . . . . . . . . . . . . . .70
Outpatient Surgery Facility . . . . . . . . . . . . . . . . .70
Overpayments . . . . . . . . . . . . . . . . . . . . . . . . . . .43
Over-the-Counter Drugs . . . . . . . . . . . . . . . . . . .88
Oxygen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59

## P

Pain Management Programs . . . . . . . . . . .44 & 60
Personal Injury Liability . . . . . . . . . . . . . . . . . . . .42
Physical Therapy . . . . . . . . . . . . . . . . . . . . . . . .52
Physician Care . . . . . . . . . . . . . . . . . . . . . . . . . .60
Physician's Assistant . . . . . . . . . . . . . . . . . . . . .61
Plan M . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27
Pre-Admission Testing . . . . . . . . . . . . . . . . . . . .69
Prescription Drug Benefits . . . . . . . . . . . . . . . . .83
Prescription Vitamins . . . . . . . . . . . . . . . . . . . . .88
Privacy Statement . . . . . . . . . . . . . . . . . . . . . . .124
Prosthetic Appliances . . . . . . . . . . . . . . . . . . . . .61

## R

Radial Keratotomy . . . . . . . . . . . . . . . . . . . . . . .97
Reserve Hours Account . . . . . . . . . . . . . . . . . . .20
Routine Physical Exam . . . . . . . . . . . . . . . . . . . .62

## S

Self-Payment Plan for Widows/Widowers and
   Other Dependents . . . . . . . . . . . . . . . . . . . . . .36
Separation from Employment . . . . . . . . . . . . . . .24

Page

Skilled Nursing Facility . . . . . . . . . . . . . . . . . . . .71
Speech Therapy . . . . . . . . . . . . . . . . . . . . . . . . .62
Statement of ERISA Rights . . . . . . . . . . . . . . . .10
Substance Abuse/Chemical Dependency
   Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . .63
Supplies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .63
Surgery Benefits . . . . . . . . . . . . . . . . . . . . . . . . .64

## T

Termination of Active Eligibility . . . . . . . . . . . . . .21
Termination of Retiree Eligibility . . . . . . . . . . . . .25
TMJ Treatment . . . . . . . . . . . . . . . . . . . . . . . . . .101
Types of Medical Coverage Available . . . . . . . . .39

## U

United Concordia Dental Plan . . . . . . . . . . . . . .100
United Healthcare Vision (UHC) . . . . . . . . . . . . .95
Useful Telephone Numbers . . . . . . . . . . . . . . . . .2

## V

Vision Care Benefits . . . . . . . . . . . . . . . . . . . . . .93
Vision Service Plan (VSP) . . . . . . . . . . . . . . . . .93

## W

Weekly Disability Benefit (Nevada Only) . . . . . .113
Weight Control Programs . . . . . . . . . . . . . . . . . .66
Well-Child Care . . . . . . . . . . . . . . . . . . . . . . . . . .66
Wigs and Hairpieces . . . . . . . . . . . . . . . . . . . . . .67
Women's Health and Cancer Rights Act
   (WHCRA) . . . . . . . . . . . . . . . . . . . . . . . . . . . .12
Workers Compensation Policy . . . . . . . . . . . . . .42

# CHAPTER 1.  GENERAL INFORMATION

**In this Chapter –**

- How to Identify Yourself
- Plan Rules and Regulations
- Change of Address
- Useful Telephone Numbers
- Information You Will Receive from the Fund Office
- Life Events Checklist
- Facts About Your Plan
- Statement of ERISA Rights
- Newborns' and Mothers' Health Protection Act (NMHPA)
- Women's Health and Cancer Rights Act (WHCRA)
- Filing a Claim for Benefits
- Claim Renew Procedures

## HOW TO IDENTIFY YOURSELF

The Fund uses the Social Security number of the Employee or a Health Care Identification number (HCID) as an identification number for all transactions. The HCID number starts with "OE" and may be found on your ID card.  The Union Register number is also used as a cross reference.  Always include the Employee's Social Security number or HCID number on any claim or correspondence that you submit to the Fund Office.  **A missing Social Security or HCID number can significantly delay payment of your claims.**

## PLAN RULES AND REGULATIONS

A booklet that includes the Rules and Regulations of each of the Funds in which you may be a participant is provided upon request. The Plan Rules and Regulations govern every aspect of Plan operations in each case. That is the "legal document" which is the basis for all eligibility and benefit provisions in each Plan. Periodically those Rules and Regulations are amended and updated and revised pages are available from the Fund Office. It is important that you keep that document in a safe place so that you can refer to it whenever necessary. If you do not have a current booklet or if you have misplaced or lost it, you can obtain a copy by merely requesting one from the Fund Office in writing.

## CHANGE OF ADDRESS

**It is important that you keep the Fund Office advised at all times of any change of address.**

Changes in address will not be accepted by the Fund Office unless the change is in writing and the written notice has been signed by the eligible Employee.  Any other change of address will not be accepted.

- **All address changes must be in writing – telephone changes cannot be accepted.**

- **All mailings from the Fund Office will be made to the *last known address*.**

## USEFUL TELEPHONE NUMBERS

If you need assistance or information regarding the Plan benefits, you may call the appropriate department listed below:

| Claims Information Center & Eligibility | (888) 512-5279 (626) 356-1004 | Death Benefits | (626) 356-1062 |
|---|---|---|---|
| Pension: | | Vacation-Holiday | (626) 356-1050 |
| Last names A-G | (626) 356-1060 | Switchboard | (626) 356-1000 |
| Last names H-O | (626) 356-1061 | Administration | (626) 356-1098 |
| Last names P-Z | (626) 356-1063 | Las Vegas Fund Office | (702) 949-1212 |

If you would like to FAX information to the Fund Office, you may use the Department numbers listed below:

| Employer Compliance | (626) 796-4742 | Administration Department | (626) 356-1065 |
|---|---|---|---|
| Pension Department | (626) 796-4742 | Las Vegas Fund Office | (702) 949-1221 |
| Vacation-Holiday Department | (626) 796-4742 | | |

To avoid the expense of a long distance call, use the FAX system. You may call the appropriate local District Office of I.U.O.E., Local 12 listed below and ask them to FAX your inquiry to the Fund Office.

| District No. 1 - Pasadena District No. 1 - Lancaster | (626) 792-2519 (661) 942-1175 | District No. 5 - Redlands District No. 5 - Palm Desert | (909) 307-8700 (760) 779-0299 |
|---|---|---|---|
| District No. 2 - Ventura District No. 2 - Arroyo Grande | (805) 643-8740 (805) 489-1533 | District No. 6 - Las Vegas | (702) 598-1212 |
| District No. 3 - Bakersfield | (661) 325-9491 | District No. 7 - Anaheim | (714) 827-4591 |
| District No. 4 - San Diego | (619) 295-3186 | | |

**Your best method of getting information is to get it from the Fund Office. You should not ask a Union Business Agent for an interpretation of the Rules and Regulations of the Plans because Union Business Agents are not Plan representatives and are not expected to be familiar with Fund Office operations.**

IMPORTANT:  Questions about Union dues, withdrawal, the burial fund and the apprentice training program must be directed to the offices of I.U.O.E., Local 12.  The Trust Fund does not handle these matters and cannot answer your questions about them.

## INFORMATION YOU WILL RECEIVE FROM THE FUND OFFICE

1. **Eligibility Card** - Every eligible Employee, Active and Retired, except those enrolled in an HMO, receives an eligibility card.

   A. **Active Employees** - The card is issued quarterly at the beginning of the eligibility quarter. The card will indicate the expiration date of eligibility including any hours used from your Reserve Hours Account.

   If you do not receive an eligibility card and you have been employed by a signatory employer, you must advise the Fund Office immediately.

   B. **Retired Employees** - The card is issued when coverage under the Retiree program begins and at the beginning of each calendar year. There is no expiration date on the card because eligibility is determined on a monthly basis.

2. **Quarterly Bulletin** - "*For Your Benefit*" is published four times each year and includes information about the benefits provided by the Health and Welfare Fund and the Pension Trust. It also notifies Employees of changes in benefit provisions. Also included is general information of interest to the Employees. This bulletin is sent to Active Employees only.

3. **Summary Annual Report** - Every year you will receive a statement of the financial condition of the Health & Welfare Fund, Pension Trust and Vacation-Holiday Savings Trust. This statement is designed to give you the basic financial information of each of the Trusts for the Plan Year covered by the report. Any questions you have about the report can be answered by the Administrative personnel in the Fund Office.

3

## LIFE EVENTS CHECKLIST

The Plan requires certain documentation on various different occasions known as "Life Events". These various Life Events and the corresponding documentation required are outlined below:

| Life Event | Documentation Required by the Plan |
|---|---|
| **Marriage** | A certified copy of the recorded marriage certificate. |
| **Divorce** | A copy of the recorded final divorce decree. *Note*: The Plan will require a Qualified Medical Child Support Order (QMCSO) that designates one parent to pay for a child's health coverage and meets all of the federal requirements for this type of order, if applicable. |
| **Birth** | A certified copy of the recorded birth certificate. *Note*: If your dependent child does not reside with you, the Plan will require a Qualified Medical Child Support Order (QMCSO) that designates one parent to pay for a child's health coverage and meets all of the federal requirements for this type of order. |
| **Adoption** | A copy of the adoption papers issued by the court. |
| **Guardianship** | A copy of the guardianship papers issued by the court. |
| **Students (age 19 to 26)** | Verification of full-time student status from an accredited school for each term. |
| **Physically and/or Mentally Disabled Dependents** | A completed Total Disability application (available from the Fund Office) and a copy of the attending physician's history and physical report. |
| **Death** | A certified copy of the death certificate. |

## FACTS ABOUT YOUR HEALTH AND WELFARE PLAN

1. **Name of Plan.** This Plan is known as the Operating Engineers Health and Welfare Fund.

2. **Plan Administrator and Sponsor.** The Board of Trustees is the Plan Administrator. This means that the Board of Trustees is responsible for seeing that information regarding the Plan is reported to government agencies and disclosed to Plan participants and beneficiaries in accordance with the requirements of the Employee Retirement Income Security Act of 1974.

   The Fund Office will provide you, upon written request, information as to whether a particular employer is contributing to this Plan on behalf of participants in the Plan, if the employer is a contributor, and the address of the employer.

3. **Board of Trustees.** The Board of Trustees consists of an equal number of employer and union representatives, selected by the employers and union from the list in item #4 on the following page, in accordance with the Trust Agreement which relates to this Plan.

If you wish to contact the Board of Trustees, you may use the address and phone number below:

Operating Engineers Health and Welfare Fund
100 E. Corson Street
Pasadena, California 91103
(626) 356-1000

The Trustees have designated the Administrative Organization named below to perform the routine functions of the Plan:

Operating Engineers Funds, Inc.
100 E. Corson Street
Pasadena, California 91103
(626) 356-1000

4.  **Names, Titles and Addresses of Any Trustee or Trustees.**  As of the printing of this booklet, the Trustees of this Plan are:

# EMPLOYER TRUSTEES

Bruce Cooksey
J.F. Shea Construction, Inc.
667 Brea Canyon Rd.
Walnut, CA 91788-7849

Les Farrow
LES FARROW EXCAVATING AND GRADING
P.O. Box 8765
Fountain Valley, CA 92728

Tim MacDonald
C.A. RASMUSSEN, INC.
28548 Livingston Avenue
Valencia, CA 91355-4171

John Nelson
FCI CONSTRUCTORS, INC.
2585 Business Park Drive
Vista, CA 92081

C. W. Poss
1604 Island Drive
Fullerton, CA 92833

Mike Roddy
WASHINGTON DIVISION OF
URS CORPORATION
5176 E. Vernon Street
Long Beach, CA 90815

Jack Schaefer
2881 S. Valley View  Blvd., #1
Las Vegas, NV 89102-0145

Mitch White
MANSON CONSTR.
1617 Pier "D" Street
Long Beach, CA  90802

## UNION TRUSTEES

William C. Waggoner
I.U.O.E., Local #12
150 E. Corson Street
Pasadena, CA 91103

Steve Montrie
I.U.O.E., Local #12
150 E. Corson Street
Pasadena, CA 91103

Mickey J. Adams
I.U.O.E., Local #12
150 E. Corson Street
Pasadena, CA 91103

Ron Sikorski
I.U.O.E., Local #12
150 E. Corson Street
Pasadena, CA 91103

Steve Billy
I.U.O.E., Local #12
150 E. Corson Street
Pasadena, CA 91103

Fred C. Young
I.U.O.E., Local #12
150 E. Corson Street
Pasadena, CA 91103

Kurt Glass
I.U.O.E., Local #12
150 E. Corson Street
Pasadena, CA 91103

5. **Identification Numbers**. The number assigned to the Plan by the Internal Revenue Service is 95-6034886. This Plan Number is 003.

6. **Agent for Service of Legal Process**. The name and address of the agent designated for the service of legal process is:

Michael P. Graydon
Operating Engineers Funds, Inc.
100 E. Corson Street
Pasadena, California 91103

Legal process may also be served on a Plan Trustee.

7. **Collective Bargaining Agreement**. Contributions to this Plan are made on behalf of each Employee in accordance with collective bargaining agreements between I.U.O.E., Local #12 and participating employers.

The Fund Office will provide you, upon written request, a copy of the collective bargaining agreement. The collective bargaining agreement is also available for examination at the Fund Office.

8. **Source of Contributions**. The benefits described in this section are provided through employer contributions to this Plan. The amount of employer contributions to this Plan is determined by the provisions of the collective bargaining agreements with employer representatives. The collective bargaining agreements require contributions to this Plan at a fixed rate per hour worked. The Fund Office will provide you, upon written request, information as to whether a particular employer is contributing to this Plan on behalf of participants working under the collective bargaining agreement.

9. **Type of Plan**. This Plan is maintained for the purpose of providing life insurance, accidental death and dismemberment, hospital, medical, prescription drug, dental, vision care, and hearing aid benefits in the event of sickness or accident for Active & Retired Employees and their covered Dependents. The Plan

, also provides weekly disability income benefits for participants in Southern Nevada only. The Plan is:

- A collectively-bargained, labor-management trust administered by a Board of Trustees comprised of labor and management representatives pursuant to §302(c)(5) of the Taft-Hartley Act,

- A "voluntary employees' beneficiary association" qualified under the Internal Revenue Code §501(c)(9),

- An "employee welfare benefit plan" under ERISA §3(1), and

- A "group health plan" as defined in ERISA §607.

10. **Trust Fund.** The Fund's assets and reserves are held in trust by the Board of Trustees (see item number 4 above) of the Operating Engineers Health and Welfare Fund.

11. **Plan Amendment and Termination.** The benefits provided under the Plan are not permanent. The Board of Trustees reserves the right, in its sole discretion at any time and from time to time to:

- Terminate or amend the amount or condition of any benefits even though such termination or amendment affects claims which you may already have incurred.

- Change or postpone the method of payment of any benefit.

- Amend or cancel any other provisions of the Plan.

The Trustees do not promise to continue the benefits and coverages in full or in part in the future and rights to future benefits and coverages are not vested. This means they can be taken away. In particular, retirement or the completion of the requirements to receive a pension benefit under the Pension Plan does not give any participant or former participant any vested right to continued benefits or coverages under the Rules and Regulations of the Health and Welfare Fund.

The Board of Trustees is authorized and has the power to:

- Decide the meaning of any doubtful or ambiguous provision of the Rules and Regulations of the Plan.

- Decide on a participant's entitlement to or application for benefits under the Rules and Regulations of the Plan.

- Sign agreements, write and carry out reasonable Rules and Regulations, and do all things necessary in the establishment, maintenance and administration of the Plan.

If the Plan terminates, any and all money and assets remaining in the Fund, after payment of expenses, will be used to continue the benefits provided by the Plan, until such money and assets have been used up.

12. **Funding.** Benefits of the Plan are provided under service agreements or insurance contracts or directly from the Fund's assets, which are accumulated under the provisions of the collective bargaining agreements and the trust agreement and are held for the purpose of providing benefits to covered participants and defraying reasonable operating costs. Fee-for-Service hospital, medical, prescription drug, hearing aid, dental, vision, life and accidental death and dismemberment and weekly disability income benefits are paid directly from Fund assets.

Prepaid medical and prescription drug benefits are provided through Kaiser, Health Net and Health Plan of Nevada.

Prepaid dental benefits are provided through United Concordia, Delta Dental and Safeguard.

7

13. **Organizations Through Which Benefits are Provided.**

The carriers listed below provide fully insured benefits under the Plan.

Delta Dental
12898 Towne Center Dr.
Cerritos, CA  90703
(*Prepaid dental benefits*)

Health Net
21281 Burbank Blvd.
Woodland Hills, CA 91367
(*Prepaid medical and prescription drug benefits*)

Health Plan of Nevada
PO Box 15645
Las Vegas, NV  89114
(*Prepaid medical and prescription drug benefits*)

Kaiser Permanente
393 E. Walnut St.
Pasadena, CA  91188
(*Prepaid medical and prescription drug benefits*)

Safeguard Dental
505 N. Euclid St., Suite 200
Anaheim, CA  92803
(*Prepaid dental benefits*)

United Concordia Dental Plan of California
P.O. Box 10194
Van Nuys, CA 91410
(*Prepaid dental benefits*)

The Plan is fully self-insured for the benefits obtained through the companies listed below.  These companies administer at least a portion of the benefits for the Plan, but do not insure or otherwise guarantee any of the benefits of the Plan.

Affiliated Health Funds (AHF)
100 E. Corson St.
Pasadena, CA  91103
(*Provides access to its network of hospital and medical providers, performs healthcare cost management services, provider credentialing and claims screening.*)

Anthem Blue Cross
P.O. Box 60007
Los Angeles, CA 90060-0007
(*Provides access to its network of hospital and medical providers, performs healthcare cost management services, provider credentialing and claims screening.*)

CVS Caremark
2211 Sanders Road
Northbrook, IL 60062
(*Administers the prescription drug benefit*)

Health Care Insights
11075 S. State St., Bldgs 3 & 4
Sandy, UT  84070
(*Provides review and analysis of medical, hospital, dental and prescription drug claims and provides information concerning payments.*)

Interplan Corporation
2575 Grand Canal Blvd.
Suite 200
Stockton, CA 95207
(*Provides access to its network of hospital and medical providers, performs healthcare cost management services, provider credentialing and claims screening*)

ppoNext
1501 Hughes Way
Suite 400
Long Beach, CA 90810
(*Provides access to its network of hospital and medical providers, performs healthcare cost management services, provider credentialing and claims screening*)

United Concordia
P.O. Box 69422
Harrisburg, PA 17106
(*Administers the dental benefit and provides access to its network of dental providers*)

United Healthcare Vision
Liberty 6 Suite 200
6220 Old Dobbin Lane
Columbia, MD 21045
(*Administers the vision benefit and provides access to its network of vision providers*)

USA Senior Care Network, Inc.
916 South Capital of Texas Highway
Austin, TX 78746
(*Provides access to its network of hospital and medical providers, performs healthcare cost management services, provider credentialing and claims screening*)

Vision Service Plan of America
100 Howe Ave.
Sacramento, CA  95825
(*Administers the vision benefit and provides access to its network of vision providers*)

Individual conversion policies are provided by Kaiser Permanente, Health Net and Health Plan of Nevada (hospital, medical and prescription drug coverage).

All benefit types provided by the Plan are set forth in the Table of Contents on Pages i-iii. The complete terms of the Vision Care Benefits are set forth in the Agreements with Vision Service Plan and United Healthcare Vision. The complete terms of the Prepaid benefits are set forth in the Kaiser Permanente Group Hospital and Medical Service Agreement, Health Net Group Hospital and Professional Service Agreement, the Health Plan of Nevada Service Agreement, the Delta Dental Plans Service Agreement, the Safeguard Dental Services Agreement and the United Concordia Service Agreement. The complete terms of the self-funded benefits are set forth in the Rules and Regulations and available to any participant at any time.

14. **Fiscal Plan Year**. The fiscal records of the Plan are kept separately for each fiscal Plan Year. The Fiscal Plan Year begins on July 1 and ends on June 30.

15. **The Plan's Requirements with Respect to Eligibility for Participation and Benefits**. The eligibility requirements are specified on pages 19-38.

16. **Circumstances Resulting in Disqualification, Ineligibility or Denial or Loss of Benefits**. Loss of eligibility is described on pages 21 and 25.

17. **Procedures to Follow for Filing a Claim**. The procedure to be followed in filing a claim for benefits is outlined on pages 12-15.

Claims submitted must be accompanied by any information or proof requested and reasonably required to process such claims by the Fund Office or the Board of Trustees.

18. **Review Procedure**. If your claim is denied in whole or in part, you will receive a written explanation giving detailed reasons for the denial, specific reference to the plan provisions on which the denial is based, a description of any additional material or information necessary for you to perfect the claim and an explanation of why such information or material is necessary, as well as an explanation of our claim appeals procedure. A description of the appeals procedure appears on pages 15-18.

## STATEMENT OF ERISA RIGHTS

As a participant in the Operating Engineers Health and Welfare Fund, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan participants shall be entitled to:

### Receive Information about Your Plan and Benefits

Examine, without charge, at the Plan Administrator's office and at other specified locations, such as work sites and union halls, all Plan documents, including insurance contracts, Collective Bargaining Agreements and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefits Administration.

Obtain copies of documents governing the operation of the Plan, including insurance contracts, Collective Bargaining Agreements and a copy of the latest annual report (Form 5500 Series) and upon written request to the Plan Administrator. The Administrator may make a reasonable charge for the copies.

Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

### Continue Group Health Plan Coverage

Continue health care coverage for yourself, spouse or dependents if there is a loss of coverage under the Plan as a result of a qualifying event. You or your dependents may have to pay for such coverage. Review this Summary Plan Description and the documents governing the Plan on the rules governing your COBRA continuation coverage rights.

Reduction or elimination of exclusionary periods of coverage for preexisting conditions under your group health plan, if you have creditable coverage from another plan. You should be provided a certificate of creditable coverage, free of charge, from your group health plan or health insurance issuer when you lose coverage under the Plan, when you become entitled to elect COBRA continuation coverage, when your COBRA continuation coverage ceases, if you request it before losing coverage, or if you request it up to 24 months after losing coverage. Without evidence of

creditable coverage, you may be subject to preexisting condition exclusions for the first 12 months (18 months for late enrollees) of your COBRA coverage.

## Prudent Actions by Plan Fiduciaries

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

## Enforce Your Rights

If your claim for a welfare benefit is denied in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of the Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. In addition, if you disagree with the plan's decision or lack thereof concerning the qualified status of a medical child support order, you may file suit in federal court.

If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a state or federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

## Assistance with Your Questions

If you have any questions about your plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance with obtaining documents from the Plan, you should contact the nearest office of the Employee Benefits Security Administration (formerly known as the Pension and Welfare Benefit Administration), U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## NEWBORNS' AND MOTHERS' HEALTH PROTECTION ACT (NMHPA)

This Plan complies with a federal law that prohibits restricting benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a normal vaginal delivery, or less than 96 hours following a cesarean section. However, federal law generally does not prohibit the mother's or newborn's attending provider, after consulting with the mother, from discharging the mother or her newborn earlier than 48 hours (or 96 hours as applicable). In any case, this Plan does not require that a health care practitioner obtain authorization from the Plan (or its utilization review company) for prescribing a length of stay up to 48 hours (or 96 hours following a cesarean section).

## WOMEN'S HEALTH AND CANCER RIGHTS ACT (WHCRA)

Under the Women's Health and Cancer Rights Act of 1998, all plans like this one that cover mastectomies are also required to cover related reconstructive surgery. Available reconstructive surgery must include both reconstruction of the breast on which surgery was performed and surgery and reconstruction of the other breast to produce a symmetrical appearance. Coverage must also be available for breast prostheses and for the physical complications of mastectomy, including lymphedemas. These services are elective and are chosen by the patient in consultation with the attending physician. These services are subject to the Plan's usual provisions regarding deductibles, benefit maximums, coinsurance and copayments.

## FILING A CLAIM FOR BENEFITS

### Hospital and Medical Benefits

Generally, claim forms are not required. Providers submit their own itemized claims in an acceptable format. If needed, claim forms for medical benefits may be obtained from any Union Office or the Fund Office. All completed claims should be sent to the Fund Office for processing. All benefit checks including your Explanation of Benefits (EOB) will be issued by the Fund Office.

When you use contracting providers, the providers will file the claim for you.

The Fund will accept hospital expense claims and medical expense claims for up to 12 months after the date of service. Hospital and medical claims older than this will not be paid.

If you receive treatment outside of the United States, submit a detailed, translated bill, which includes the number of days hospitalized, lab work done, drugs administered, diagnosis or type of treatment given, to the Fund Office.

Before submitting a claim form, be sure it is filled out properly. To avoid delays in the processing of your claims, follow these steps:

1. Complete your portion of the form. If you want the Fund to pay your doctor directly, sign the authorization to pay the benefits to the physician and check the appropriate box for assignment. Sign the authorization to release information.

2. Have the person providing services complete the rest of the form.

3. Check the claim form to be certain that all applicable portions of the form are completed. Be sure your bills are itemized. The following information should be indicated on the bills or claim form submitted:

   - Your name and Social Security number or HCID number.
   - The patient's name and address, date of birth and relationship to you.
   - The date of service.
   - If you have coverage under any other group hospital or medical plan, the name of the insurance company providing your other group coverage and the policy number of this coverage.
   - The CPT codes (these are the codes for physician services and other health care services found in the "Current Procedural Terminology, Current Edition", as maintained and distributed by the American Medical Association) and/or HCPCS (Health Care Financing Administration's Common Procedure Coding System).
   - The ICD-9 codes (these are the diagnosis codes found in the "International Classification of Diseases, Current Edition", as maintained and distributed by the U.S. Department of Health and Human Services).

12

- The billed charge(s).
- National Drug Code (NDC) number, if applicable.
- The number of units (for anesthesia and certain other claims).
- The Federal taxpayer identification number (TIN) of the provider.
- The billing name and address.
- If services were rendered because of an accident, include the date and place of injury, as well as details (i.e. auto accident, fall, work related accident, etc.).
- Mail your claim or have your doctor mail your itemized bills to the Fund Office.

If you have any questions about your claim, call the Fund Office at (626) 356-1004.

## Prescription Drug Benefit

If you use a non-participating retail pharmacy for your prescription drugs, you need to file a Prescription Drug Claim Form as provided by the Fund Office. You must pay full price for the prescribed item and submit the claim form to the Fund Office for reimbursement. Reimbursement is limited to a maximum of 60 days for any one individual drug.

The steps for filing a prescription drug claim form are as follows:

1. Request an itemized bill from the pharmacy showing the following information for each prescription:

   - Prescription number;
   - Date of sale;
   - Name of the physician who issued the prescription;
   - Patient's name;
   - Cost of the prescription; and
   - National Drug Code (NDC) number for the drug.

2. Complete the claim form. Make sure you include the Employee's name and Social Security or HCID number, the patient's name, address, date of birth, and relationship to you, your billing address and the policy number and insurance company name for any other group coverage the patient has.

3. Attach the itemized bill to the claim form and submit it to the Fund Office.

## Dental Benefits

Claim forms for dental benefits may be obtained from any Union Office or the Fund Office. All completed claims should be sent to the Fund Office for processing. All benefit checks including your Explanation of Benefits (EOB) will be issued by the Fund Office.

When you use Operating Engineers Panel Dentists, each panel dentist has a supply of claim forms and will file the claim for you.

To file a claim for non-Panel dentist services, follow these steps:

1. Complete and sign Part 1 before you visit the dentist. Make sure you include the Employee's name and Social Security or HCID number, the patient's name, address, date of birth, and relationship to you, your billing address and the policy number and insurance company name for any other group coverage the patient has.

2. Have the dentist complete Part 2 of the claim form and return it to the Fund Office.

13

## Vision Benefits

If you use a VSP or United Healthcare Vision (UHC) provider, you will not need to file a claim form. You will pay the amount due from you at the end of the visit and your provider will take care of billing VSP or UHC for the remainder.

If you use a non-VSP or non-UHC provider, you will need to request an itemized bill and send it to:

Vision Service Plan
Attention: Non-Member Doctor Claims
P.O. Box 997100
Sacramento, CA 95899-7100

Or

United Healthcare Vision Claims Department
P.O. Box 30978
Salt Lake City, UT 84130

Be sure to include the Employee's name, mailing address and Social Security number and the patient's name, relationship to the Employee and date of birth.

## Hearing Aid Benefit

**NOTE:    A prescription for a hearing aid is required.**

To file a claim for hearing aid benefits, follow these steps:

1.  Get a claim form from any Union Office or the Fund Office.

2.  Complete your portion of the claim form. Make sure you include the Employee's name and Social Security or HCID number, the patient's name, address, date of birth, and relationship to you, your billing address and the policy number and insurance company name for any other group coverage the patient has.

3.  Have the provider complete the provider's portion of the claim form.

4.  Send the claim form and prescription with an itemized bill showing the cost of the hearing aid device to the Fund Office. The ear in which the hearing aid was placed must also be specified.

## Life Insurance and Accidental Death and Dismemberment Benefits

Life Insurance and Accidental Death and Dismemberment claim forms are available from the Fund Office. Provide a copy of the death certificate, and, if appropriate, written evidence of the accidental nature of the death, to the Fund Office. In the event of dismemberment, notify the Fund Office promptly. A claim form will be sent to you.

For further details, contact the Death Benefits Department at (626) 356-1062.

## Weekly Disability Benefit (So. Nevada Only)

Disability forms are available from the Fund Office or the Las Vegas District Office of the I.U.O.E., Local 12. You and your physician must complete the form and return it to the Fund Office for processing.

NOTE:  ·  For services rendered by providers contracting with the Fund such as United Concordia Dental Plan or the various HMO's, the requirements are different and you should get in touch with the contracting provider if you require information on submitting a claim for reimbursement.

IMPORTANT:    If you or your Dependent disagrees with the payment made in regard to any claim, it can be appealed as explained in the section "Claim Review Procedures" of this booklet.   Please alert your Dependents to the existence of that information in this booklet.


## CLAIM REVIEW PROCEDURES

The information below does not apply to Health Net, Health Plan of Nevada or Kaiser Permanente.  If you are enrolled in one of those medical plans, see their materials for information on their claims review procedures.

### Types of Claims

- **Urgent Claim** means a claim for medical care or treatment, that requires review sooner than other claims to avoid the possibility of:

  o   serious jeopardy to your life or health or your ability to regain maximum function; or

  o   severe pain that could not be adequately managed without the care or treatment that is the subject of the claim if this is the opinion of a physician who knows your medical condition.

  **Note**:  Claims that do not require prior approval before incurring services or treatment are not Urgent Claims.  Also, the Urgent Claim procedures do not apply to Emergency Care.  If you experience a medical emergency you should go directly to the nearest hospital emergency room. The term "Emergency" means the sudden onset of a condition requiring immediate treatment, including but not limited to heart attack, poisoning, loss of consciousness or convulsions.  The charges for these services will be submitted as Post-Service Claims and will be subject to the Plan's limits and exclusions.

- **Pre-Service Claim** means any claim for benefits for which the plan requires you to obtain approval before obtaining medical care.

  **Note**:  Except as required under the Dental Plan or under the Contract Prescription Drug Plan, the Plan does not require prior approval of benefits.

- **Post-Service Claim** means any claim for payment of treatment, services or supplies that have already been provided to you.  You may obtain a claim form by calling the Fund Office.  Be sure to specify what type of claim you are filing as there are separate forms for medical, dental, life insurance and weekly disability benefits.

- **Concurrent Claim** means any claim that is reconsidered after an initial approval was made and which results in a reduced or a terminated benefit.

  **Note**:  Currently, the Plan does not require reconsideration of treatment that was pre-authorized. Therefore, the Plan will not treat any claim as a concurrent claim.

- **Disability Claim** means any claim that requires a finding of disability as a condition of eligibility. For example, claims for Weekly Disability Benefits for Active Employees in Southern Nevada will be treated as Disability Claims.

**Authorized Representatives**

An authorized representative, such as your spouse, may complete the claim form for you if you are unable to complete the form yourself. Another Dependent or a friend may also complete the claim form for you if you are unable to complete the form yourself and have previously designated the individual to act on your behalf. A form can be obtained from the Fund Office to designate an authorized representative. The Fund Office may request additional information to verify that this person is authorized to act on your behalf. Even if you have designated an authorized representative to act on your behalf, you must personally sign a claim form and file it with the Fund Office at least annually.

A health care professional with knowledge of your medical condition may act as an authorized representative in connection with an Urgent Claim without you having to complete the special authorization form.

**Initial Claim Determination**

The guidelines outlined below are time frames within which a claim must be **decided** for approval or denial. These are **NOT** the periods within which claim payments that have been granted must actually be paid or services that have been approved must actually be rendered. The payment of a claim or the provision of a service following plan approval is done so in a timeframe appropriate with applicable law.

The Fund Office will make an <u>initial determination</u> whether claims will be approved or denied as follows:

- **Urgent Claim**: You will be notified of a determination within 72 hours from the receipt of the claim by the Fund Office.

  If the Fund Office determines that additional information is needed in order to make an initial determination of an urgent claim the Fund Office will notify you if you have failed to provide necessary information. The notification will specify the information required within 24 hours of the receipt of the urgent claim. You and/or your doctor must provide the specified information within 48 hours. The time limit within which the urgent claim must be resolved will be suspended for 48 hours or until the Fund Office receives the requested information, whichever occurs first. Notice of the decision will be provided no later than 48 hours after receipt of the specified information, but only if the information is received within the required time frame.

- **Pre-Service Claim**: You will be notified of a determination within 15 days from the receipt of the claim by the Fund Office, unless additional time is needed. If the Fund Office determines that an extension of time is required to make an initial determination on a pre-service claim due to matters beyond the control of the Fund Office, the time limit within which the initial determination must be made by the Fund Office may be extended for 15 days if the Fund Office notifies you of the extension within the time limit initially set for processing the pre-service claim.

  If an extension is needed because the Fund Office needs additional information in order to make an initial determination of a pre-service claim, the Fund Office will notify you of the information required to complete the claim. In that case, you and/or your doctor will have 45 days to supply the additional information. The time limit within which the pre-service claim must be resolved will be suspended for 45 days or until the Fund Office receives the requested information, whichever occurs first. The Plan then has 15 days to make a decision and notify you of the determination.

  If your provider improperly files a **Pre-Service Claim**, you and/or your provider will be notified as soon as possible but not later than 5 days after receipt of the claim, of the proper procedures to be followed in filing a claim. Notice of an improperly filed Pre-Service claim will only be sent if the claim includes (i) your name, (ii) your specific medical condition or symptom, and (iii) a specific treatment, service or product for which approval is requested. Unless the claim is re-filed properly, it will not constitute a claim.

16

- **Post-Service Claim**: You will be notified of a determination on your post-service claim within 30 days from the receipt of the claim by the Fund Office. If the Fund Office determines that an extension of time is required to make an initial determination on a post-service claim due to matters beyond the control of the Fund Office, the time limit within which the initial determination must be made by the Fund Office may be extended for 15 days if the Fund Office notifies you of the extension within the time limit initially set for processing the post-service claim.

  If an extension is needed because the Fund Office needs additional information in order to make an initial determination of a post-service claim, the Fund Office will notify you of the information required to complete the claim. In that case, you and/or your doctor will have 45 days to supply the additional information. The time limit within which the post-service claim must be resolved will be suspended for 45 days or until the Fund Office receives the requested information, whichever occurs first. The Plan then has 15 days to make a decision and notify you of the determination.

- **Disability Claim**: You will be notified of a determination on your disability claim within 45 days from the receipt of the claim by the Fund Office. If the Fund Office determines that an extension of time is required to make an initial determination on a disability claim due to matters beyond the control of the Fund Office, the time limit within the initial determination must be made by the Fund Office may be extended for two (2) periods of 30 days each if the Fund Office notifies you of the extension within the time limit initially set for processing the disability claim.

  If an extension is needed because the Fund Office needs additional information in order to make an initial determination of a disability claim, the Fund Office will notify you of the information required to complete the claim. In that case, you and/or your doctor will have 45 days to supply the additional information. The time limit within which the disability claim must be resolved will be suspended for 45 days or until the Fund Office receives the requested information, whichever occurs first. Once you respond to the Plan's request for the information, you will be notified of the Plan's decision on the claim within 30 days.

## Denied Claims

If your claim has been denied in whole or in part by the Fund Office, you will be notified in writing within the time limits indicated above. However, for urgent claims, the notice may be provided orally and confirmed in writing within three (3) calendar days after the oral notice.

The notice of the denial of the initial benefit determination will state the following:

- The specific reason or reasons for the denial.
- A reference to the provision in the plan Rules and Regulations upon which the denial was based.
- A statement of any additional information or material required for the processing of the claim and the reason such additional information is needed.
- A statement of information sufficient to inform you of the Fund's procedures for the appeal of denied claims. The notice will include copies of any internal rules, guidelines, protocols or other criteria relied upon by the Fund Office in denying the claim unless you are notified in writing that such material is available and will be provided to you at no cost upon your request.

## Appeals Process

If your claim is denied, you may ask the Board of Trustees to review the denial (an appeal). Your request for review must be made in writing to the Fund Office. Your request must state in clear and concise terms the reason or reasons why you disagree with the denial. You must send the Board any document not already provided that supports your claim, and you must file it with the Fund Office within 180 days after you receive notice of the denial of your claim. You or your authorized representative will be permitted to review pertinent documents and to submit issues and comments in writing.

A request to review the denial of an Urgent Claim may be made orally instead of writing if you prefer.

If you have a good reason, the Board of Trustees will permit the petition to be amended or supplemented and may, in its sole discretion, grant a hearing on the petition before a hearing panel consisting of at least one Employer Trustee and one Union Trustee to receive and hear any evidence or argument which cannot be presented satisfactorily by correspondence.  If you fail to file a petition for review within the 180 day period or fail to appear and participate in any hearing you will lose your right to review by the Trustees. However, the Board may allow you to file your request for review late if application to do so is made within one year after the date shown on the notice of denial.

You have the right to submit comments, documents, records and other information in support of your claim for benefits.  Upon request and free of charge, the Plan will provide you with reasonable access to and copies of all documents, records or other information relevant to your claim.

Upon request, you will be provided with the identification of medical or vocational experts, if any, that gave advice to the Plan on your claim, without regard to whether their advice was relied upon in deciding your claim.

A different person will review your claim and such person will not be a subordinate of the person who originally denied your claim.  The reviewer will not give deference to the initial adverse benefit determination.  The decision will be made on the basis of the record, including such additional documents and comments that may be submitted by you relating to the claim.

If your claim was denied on the basis of a medical judgment (such as a determination that the treatment or service was not medically necessary or was investigational or experimental), a health care professional who has appropriate training and experience in a relevant field of medicine will be consulted.  Such professional will not be an individual who was consulted in connection with the initial determination that is the subject of the appeal or any subordinate of such individual.

A decision by the Board of Trustees will be made promptly, but in no event will it exceed the following time limits:

- **Urgent Claims**: within 72 hours from the receipt of the appeal by the Fund Office.

- **Pre-Service Claims**: within 30 days from the receipt of the appeal by the Fund Office.

- **Post-Service Claims:** within 60 days from the receipt of the appeal by the Fund Office.

- **Disability Claims:** within 45 days from the receipt of the appeal by the Fund Office.  The Fund Office may extend this period by an additional period of 45 days if the Fund Office provides notice to you of the circumstances requiring the extension within the first 45-day period.

The Board of Trustees, as permitted by federal law and regulation, may defer the decisions on adverse benefit determination appeals until the next regularly scheduled meeting of the Fund's benefit appeals committee.

**If Your Appeal is Denied**

You will be notified of the decision of the Board of Trustees in writing.  The decision will include all of the same information which is required to be provided by the Fund Office for an initial benefit determination as outlined above.

The decision of the Board of Trustees on the petition for review will be final and binding upon all parties involved with the claim, including the applicant, claimant or petitioner, subject only to judicial review as provided in the plan Rules and Regulations.

Exhibit "2"





AFL-CIO

Southern California & Southern Nevada

**WM. C. WAGGONER**
*Business Manager*
*and*
*General Vice-President*

August 19, 2011

TO:   All Officers and Local 12 Employees

FROM:   Wm. C. Waggoner, Business Manager
        I.U.O.E., Local Union No. 12

==================================================================

At the Executive Board Meeting held on August 6, 2011, the Executive Board took certain actions that will affect practically all of the employees of Local 12.

First, a motion was passed unanimously that Executive Board Meetings will be held every other month instead of the usual schedule of meetings every month.  Therefore, there will not be a Board Meeting in September.

Secondly, I recommended that we ask the employees to take two days off per month without pay.  We will work out a schedule to determine which day of the week each employee will be off work.

This will allow us to reduce the number of employees in each department by 50 percent for those days off.

In other words, half of the staff will be working five days per week and the other half will receive pay for four days.

Between December 31, 2009 and December 31, 2010, the General Fund's loss was $5,727,742.  According to the number generated in the first six months of this year, we estimate that we will lose approximately $4 million this year.

As we all know, you cannot continue to operate creating a deficit in the amounts reflected in the above paragraph.

In the event the economy improves, the membership goes back to work and we stop the bleeding, we will discontinue this program and return to a five day week operation.

Thank you for your assistance and cooperation in adopting this program until we see better days ahead.

150 EAST CORSON STREET   •   P.O. BOX 7109   •   PASADENA, CALIFORNIA  91109-7209   •   TELEPHONE: (626) 792-8900